**No. 26-5306**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

TOHONO O'ODHAM NATION,

*Plaintiff/Appellant*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants/Appellees*.

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 4:26-cv-2127-RJL (Hon. Richard J. Leon)

---

**UNOPPOSED MOTION OF THE TOHONO O'ODHAM NATION TO EXPEDITE APPEAL**

---


Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634

Riyaz A. Kanji,
D.C. Circuit Bar No. 48737
David A. Giampetroni,
D.C. Circuit Bar No. 53350
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant Tohono O'odham Nation*

Pursuant to Federal Rule of Appellate Procedure 27, 28 U.S.C. § 1657(a), and D.C. Circuit Rules 27(e) and 47.2(a), Appellant Tohono O'odham Nation (the "Nation"), a federally recognized Indian tribe, moves this Court to expedite review of the district court's denial of the Nation's motion for a preliminary injunction to stop the construction of a border wall on the Nation's Reservation. The Nation has conferred with counsel for the Defendants, who have consented to expedition and the following schedule:

Plaintiff/Appellant's Opening Brief: September 16, 2026

Defendants-Appellees' Response Brief: October 14, 2026

Plaintiff/Appellant's Reply Brief: October 21, 2026

Oral Argument: As early as practicable in the Court's November 2026 sitting.

In support of this motion, the Nation states as follows:

1. As the district court recognized at the preliminary injunction hearing, "[t]his is a novel case with novel issues of great significance" to both the United States and the Nation. Add. 23:19–21. It involves a dispute over the plans of the Secretary of the Department of Homeland Security (the "Secretary") to construct, over the Nation's objections, at least a single and quite possibly a double border wall and related infrastructure along the 62-mile length of the southern boundary of the Nation's Reservation in Arizona, which is contiguous with the U.S.-Mexico international border. The Reservation was set apart for the Nation from its

aboriginal lands by Executive Order in 1917 and subsequently ratified by Congress.

2. In the spring of 2026, the Secretary informed the Nation of the government's plans to construct one and possibly two border walls and associated infrastructure, including a parallel roadway, along the southern boundary of the Nation's Reservation. Add. 4. The Secretary asserts authority under various statutes authorizing the establishment of border security infrastructure along the U.S.-Mexico international border. *See, e.g.,* Pub. L. No. 104-208, § 102, 110 Stat. 3009, 554–55 (1996) (codified as amended at 8 U.S.C. § 1103 note).

3. The Secretary's construction of the wall and related infrastructure along the Nation's southern boundary will entail the excavation and blasting of rugged and pristine mountains that are sacred to the Nation and its people, the bulldozing and blading of fragile desert ecosystems, and the severance of a landscape that has formed the homeland of the O'odham for millennia. The ensuing destruction will be severe and enduring, and the wall and related infrastructure, when built, will forever destroy the Nation's ability to exercise its federally protected proprietary and sovereign rights over the lands so occupied. The result will be both a permanent trespass and—because the wall and related infrastructure will wholly eliminate every legal incident of reservation status

pertaining to the lands—a permanent diminishment of the boundaries of the Reservation.

4. On June 16, 2026, the Nation brought suit against the Secretary, asserting that construction of the wall and related infrastructure would (1) constitute a trespass under federal common law; and (2) unlawfully diminish the Reservation boundaries absent explicit authorization of Congress and therefore constitute an ultra vires act.

5. On June 26, 2026, the Department of Homeland Security (the "Department") awarded a contract for construction of a single or double border wall and related infrastructure along the southern boundary of the Nation's Reservation. Add. 4. The Secretary has informed the district court and the Nation that construction will begin as early as October 12, 2026. *Id*. at 4–5.

6. On August 14, 2026, the district court denied the Nation's motion for a preliminary injunction. Add. 1–19. Within hours of that decision, James Percival, the General Counsel for the Department of Homeland Security, publicly announced that "[t]his wall is getting built. Our authority is beyond dispute. RESISTANCE IS FUTILE."[1] Consistent with this proclamation, on August 25, the Secretary deployed a convoy of federal officials and contractors onto the

[1] @DHSGenCounsel, X (Aug. 14, 2026, 1:14 PM), https://x.com/DHSGenCounsel/status/2088313210797441387.

Reservation. Those contractors are presently conducting 7–10 days' worth of geotechnical borings in preparation of construction.

7. On August 27, 2026, the Nation moved the district court for an injunction pending this appeal, which motion remains pending as of this filing.

8. To obtain expedited review, "[t]he movant must demonstrate that the delay will cause irreparable injury and that the decision under review is subject to substantial challenge." D.C. Circuit Handbook of Practice and Internal Procedures VIII.B (Dec. 4, 2025). These criteria are amply satisfied here, and good cause accordingly exists to grant this motion.

9. Relief is needed in less time than would ordinarily be required for the Court to decide this appeal. The median time for an appeal in this Circuit from the filing of the notice of appeal to a final decision is 11.5 months. U.S. Courts of Appeals– Median Time Intervals in Months for Civil and Criminal Appeals Terminated on the Merits, by Circuit, During the 12-Month Period Ending Sept. 30, 2025, at 2.[2] As recounted above, actual construction on the Nation's Reservation will begin as early as October 12, and federal contractors have already been deployed, over the Nation's strenuous objections, to commence preparatory work on the Reservation. Secretary Mullin testified to Congress that a primary border wall will be completed along the entire length of border by June 2027, less

[2] https://www.uscourts.gov/sites/default/files/document/jb_b4a_0930.2025.pdf.

than a year from now. Press Release, U.S. Dep't of Homeland Sec. (July 2, 2026) (quoting Secretary Mullin testifying to Congress in June 2026 that "[o]n the border wall…we are on track to have the primary wall done, completed from the Pacific to Gulf of America at this time next year").[3] Absent expedition, then, the wall, or very significant portions of it, would already be built before this Court could adjudicate its legality under an ordinary timeline.

10. And the harm sustained by then would be irreparable. The Secretary did not dispute below that the construction of the wall along the border would reconfigure a vast swath of sensitive mountain and desert terrain which is sacred to the Nation and is the foundation of its cultural and religious identity. Nor did he dispute that the Nation has assiduously stewarded those lands since time immemorial, or that a finished wall and related infrastructure will forever foreclose the Nation from all other beneficial use and occupancy of—and the exercise of sovereignty over—the lands so occupied. These are quintessential forms of irreparable harm.

11. The district court did not suggest otherwise. Rather, it denied preliminary injunctive relief on other bases, each of which is subject to substantial challenge.

---

[3] https://homeland.house.gov/2026/07/02/one-year-later-how-the-one-big-beautiful-bill-helped-secure-america/.

First, the Secretary contended that the government is free to make unconsented use of the Nation's lands pursuant to a 1907 Presidential Proclamation reserving to the federal government a 60-foot strip of public lands along the U.S.-Mexico border. Proclamation of May 27, 1907, 35 Stat. 2136 ("Roosevelt Reservation"). The district court found that "the Roosevelt Reservation likely exists" at the Nation's southern boundary. Add. 11. But the Roosevelt Reservation expressly attached only to "public lands." 35 Stat. 2136. Lands subject to tribal aboriginal title (pursuant to which the Nation undisputedly held its lands prior to 1917) are not public lands. *See, e.g.*, *United States v. Santa Fe*, 314 U.S. 339, 345–51 (finding lands subject to unextinguished tribal aboriginal rights not within scope of a grant of public lands to a railroad); *Bardon v. N. Pac. R.R. Co.*, 145 U.S. 535, 538 (1892) ("[B]y 'public land,' as it has been long settled, is meant such land as is open to sale or other disposition under general laws. All land, to which any claims or rights of others have attached, does not fall within the designation of 'public land.'").

Second, the district court ignored uncontroverted evidence that even if the Roosevelt Reservation exists along the Nation's border, it will be impossible for the Secretary's contractors to construct a wall, much of it across mountainous terrain, while confining themselves to a 60-foot-wide corridor. Among other things, the contractors will need to blast and level mountains; establish staging

areas and concrete batching plants; and build access and switchback roads for heavy machinery. The Nation's expert witness, a former military engineer who served as an engineer of record for a border wall project in close proximity to the Reservation, appropriately deemed the notion that all this can be done within 60 feet of the border fanciful. And events since the district court decision have borne out his view. Even in the course of conducting preliminary geotechnical investigations, the Secretary's contractors have needed to trespass on Nation roads with respect to which the federal government possesses no relevant right-of-way.

Third, the district court concluded that the Nation is unlikely to succeed on the merits of its federal common law trespass claim based on the government's sovereign immunity. Add. 14–16. This reasoning is likewise subject to substantial challenge. As the Supreme Court recently reaffirmed, a "plaintiff[] may sue in equity without a congressionally-provided cause of action to prevent an injurious act by a [federal] public officer," *Trump v. Cook*, 609 U.S. ___, 2026 WL 1855613, at *11 n.2 (June 29, 2026) (quotation marks omitted); *see also, e.g.*, *Leopold v. Manger*, 102 F.4th 491, 495–96 (D.C. Cir. 2024) ("[S]overeign immunity does not prevent an injunction against a state officer who abridges a common law duty," and "the mere fact that [a claimant] alleges a violation of federal common law does not foreclose application of the *Larson-Dugan* [rule allowing suits against federal officers.]"); *Chamber of Com. of U.S. v. Reich*, 74

F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not.").

Fourth, the district court concluded that "the availability of a federal common law trespass claim by an Indian tribe against the federal government is at best uncertain." Add. 15. This reasoning is likewise subject to substantial challenge. The Supreme Court has affirmed that tribes possess a "common-law right of action … against trespassers on their land," *Oneida Cnty., N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 235–36 & n.6 (1985), and has cited as an illustrative case *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C. 1973), where the court squarely held that tribes possess "a cause of action for trespass … against federal officers," *id*. at 1378–79. *See also, e.g., Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113 (1919) (stating that "we entertain no doubt" of Indians' "capacity to maintain … a suit" for an injunction against the appropriation of Indian lands by federal officials).

Fifth, the district court concluded that the Nation had failed to establish irreparable harm. Add. 17. It notably did not base this conclusion on an assessment of the destruction the Secretary's threatened actions will cause. Rather, it reasoned that "Plaintiff's alleged harms … are not likely to materialize because … the Roosevelt Reservation likely exists along the Nation's border[.]" *Id*. Thus, the district court substituted its assessment of the merits for the separate and

independent irreparable harm analysis. This was legal error. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) ("Within the irreparable harm analysis itself—which assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law—we examine only whether that violation, if true, inflicts irremediable injury."). With its improper dismissal of the Nation's alleged harms, the Court unsurprisingly found the equities to favor the government "at this juncture." Add. 17.

12. The Nation takes border security extremely seriously. It is no less important to the Nation than it is to the Secretary—as reflected in what the district court accurately described as the Nation's "long-standing cooperative relationship with the U.S. Government when it comes to border security and enforcement." Add. 4 (quotation marks omitted). But an assertion by the Executive Branch that it can blast and bulldoze and permanently dispossess a sovereign tribe of reservation lands absent Congress's assent is unprecedented in the modern era. The courts' ultimate resolution of this case will have sweeping implications for tribes across the United States. The federal government will, of course, have its say on these issues before this Court, both as to the legal merits and the government's interests. But in the meantime, absent expedition, the Secretary will commence, and quite possibly complete, what no one disputes will be the irremediable destruction of the lands at issue before this Court resolves the Secretary's legal right to do so or

whether the equities in fact favor the Nation. Expedition is warranted under these circumstances.

| | |
|---|---|
| Dated: August 27, 2026 | Respectfully submitted, |


*<u>/s/ Riyaz A. Kanji</u>*
Riyaz A. Kanji,
D.C. Circuit Bar No. 48737
David A. Giampetroni,
D.C. Circuit Bar No. 53350
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Appellant Tohono O'odham Nation*

## CERTIFICATE OF COMPLIANCE

The foregoing motion is in 14-point Times New Roman proportional font and contains 2,077 words and thus complies with Federal Rules of Appellate Procedure 27(d)(1)–(2) and 32(a)(5).

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

As required by Circuit Rules 27(a)(4) and 28(a)(1), undersigned counsel for Plaintiff/Appellant the Tohono O'odham Nation hereby provides the following information:

### I. Parties Appearing Below

The parties who appeared before the U.S. District Court were:

1. The Tohono O'odham Nation, a federally recognized Indian tribe.
2. Markwayne Mullin, Secretary of the United States Department of Homeland Security (named in his official capacity).
3. Rodney Scott, Commissioner of United States Customs and Border Protection (named in his official capacity).
4. Rosario Vasquez, Chief of the United States Border Patrol (named in his official capacity).

### II. Amici Appearing Below

The amici curiae appearing before the U.S. District Court were:

1. Warren Petersen, in his capacity as President of the Arizona Senate.
2. Steve Montenegro, in his capacity as Speaker of the Arizona House of Representatives.

### III. Parties Appearing in this Court

1. The Tohono O'odham Nation, a federally recognized Indian tribe.
2. Markwayne Mullin, Secretary of the United States Department of Homeland Security (named in his official capacity).

3. Rodney Scott, Commissioner of United States Customs and Border Protection (named in his official capacity).

4. Rosario Vasquez, Chief of the United States Border Patrol (named in his official capacity).

## IV. Ruling Under Review

The ruling under review is the August 14, 2026, Order of United States District Court Judge Richard J. Leon, Dkt. No. 46, denying the Tohono O'odham Nation's Motion for a Preliminary Injunction in Case No. 26-cv-2127-RJL.

## V. Related Cases

This case has not previously been before this Court or any other court other than the district court. Counsel is not aware of any other related cases. *See* Circuit Rule 28(a)(1)(C).

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2026, I electronically filed the foregoing Unopposed Motion of the Tohono O'odham Nation to Expedite Appeal with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

**ADDENDUM**

Memorandum Opinion, Dkt. 45
Filed August 14, 2026 .......... 1

Order [denying Plaintiff's Motion for Preliminary Injunction], Dkt. 46
Filed August 14, 2026 .......... 19

Excerpt of Transcript of Motion Hearing Held Before the Honorable Judge
Richard J. Leon, United States District Judge
Held July 22, 2026 .......... 20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TOHONO O'ODHAM NATION,<br><br>Plaintiff,<br><br>v.<br><br>MARKWAYNE MULLIN, *et al.*,<br><br>Defendants. | ) | Civil Case No. 26-2127 (RJL) |

**MEMORANDUM OPINION**

August 13th, 2026 [Dkt. #3]

For decades, plaintiff the Tohono O'odham Nation and the United States Government have worked together to secure a sixty-two mile stretch of the international border with Mexico. In 2004, the Tohono O'odham Nation agreed to construction of a vehicle barrier over most of the international border that stops vehicles—but not people—from crossing. The Government now plans to replace the vehicle barrier with a congressionally-authorized and funded border wall next to the Tohono O'odham Reservation. Plaintiff seeks a preliminary injunction to stop construction on grounds that the border wall will change the Reservation boundaries and will result in trespasses over the Reservation. Because plaintiff is unlikely to succeed on the merits of these claims, and because the remaining preliminary injunction factors favor the Government, I will **DENY** plaintiff's Motion for a Preliminary Injunction.

## BACKGROUND

### I. The United States-Mexico International Border

The international border between the United States and Mexico stretches for nearly 2,000 miles and spans four states—California, Arizona, New Mexico, and Texas.[1] Securing and maintaining control of such a lengthy and geographically varied border is a challenge, especially given the high volume of illegal entries and drug smuggling. For example, at the Arizona border from 2021 to 2026, the Government apprehended 1.3 million illegal aliens and seized thousands of pounds of illicit drugs, including over 3,475 pounds of fentanyl, 17,200 pounds of marijuana, and 11,750 pounds of methamphetamine. Decl. of Paul Enriquez ("Enriquez Decl.") [Dkt. #18-2] ¶ 10.

Congress has directed the Secretary of Homeland Security (the "Secretary") to "achieve and maintain operational control over" the United States-Mexico border, including through "physical infrastructure enhancements." Secure Fence Act of 2006, Pub. L. No. 109-367, § 2(a), 120 Stat. 2638, 2638 (codified at 8 U.S.C. § 1701 note). Congress has repeatedly passed legislation authorizing the Secretary to construct physical barriers at the border. *See, e.g.*, Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 102, 110 Stat. 3009, 3009-554 (1996) (codified at 8 U.S.C. § 1103 note and hereinafter referred to as the Illegal Immigration Reform and Immigrant Responsibility Act, or "IIRIRA"). Most recently, Congress appropriated $46 billion to U.S. Customs and Border Protection for, among other things, the "[c]onstruction, installation, or improvement

[1] Smart Wall Map, U.S. Customs & Border Protection, https://perma.cc/9LWK-6HEP (last accessed Aug. 10, 2026).

of new or replacement primary, waterborne, and secondary barriers." One Big Beautiful Bill Act, Pub. L. No. 119-21, tit. IX, sec. 90001, 139 Stat. 72, 358 (2025).

To fast-track border construction, Congress authorized the Secretary to "waive all legal requirements . . . necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1). Congress further limited federal courts' jurisdiction over "any action undertaken, or any decision made, by the Secretary" pursuant to IIRIRA's waiver authority. IIRIRA § 102(c)(2)(A). The statute permits only constitutional challenges to such "action[s]" or "decision[s]," and any legal challenges must be brought within sixty days. IIRIRA § 102(c)(2)(B), (C). On April 3, 2008, the Secretary issued a broad waiver of numerous environmental and procedural laws, including the Administrative Procedure Act, for projects "in the States of California, Arizona, New Mexico, and Texas." 73 Fed. Reg. 18293; *see also* 91 Fed. Reg. 45823, 45823 (July 21, 2026) (waiving numerous laws specifically for the Tucson 5 Project).

## II. The Tohono O'odham Nation

Plaintiff, the Tohono O'odham Nation ("plaintiff" or "the Nation"), is a "federally recognized Indian tribe with a government-to-government relationship with the United States." Compl. [Dkt. #1] ¶ 8. The Nation occupies a 2.8 million-acre reservation in Arizona. *Id.* ¶ 13. For approximately sixty-two miles, the Nation's reservation runs alongside the international border with Mexico. *Id.*

Plaintiff's "broader aboriginal territory" "extends throughout much of present-day Arizona and into Mexico." *Id.* ¶ 24. There are currently "[s]eventeen O'odham communities with approximately 2,000 members" in Mexico, and members of the Nation

"continue to cross the border for sacred pilgrimages and ceremonies at important religious and cultural sites." *Id.* ¶ 27.

The Nation has a "long-standing cooperative relationship" with the U.S. Government when it comes to border security and enforcement. *Id.* ¶ 34. In addition to collaborating with federal law enforcement agencies, the Nation has led a High Intensity Drug Trafficking Task Force (the NATIVE Task Force) targeting drug trafficking within the Nation's borders. Decl. of James Cook ("Cook Decl.") [Dkt. #3-5] ¶ 11. The Nation has authorized construction of "two Customs and Border Protection Forward Operating Bases on the Reservation," ten "Integrated Fixed Towers" for border surveillance, and "vehicle barriers and a patrol road along the vast majority of the border, with the exception of those areas where vehicle access is impossible due to mountainous terrain." Compl. ¶¶ 36, 38. Today, the four-foot vehicle barrier along most of the international border prevents vehicles from crossing the border but offers little resistance to pedestrians who wish to go over or under these barriers. *See* Cook Decl. ¶ 15.

## III. The Tucson 5 Project

In the spring of 2026, the U.S. Department of Homeland Security informed plaintiff of its "plans to construct a border wall and associated infrastructure along the international border within the Nation's Reservation." Compl. ¶ 49. Plaintiff has not consented to any construction. *Id.* ¶ 51. On June 26, 2026, U.S. Customs and Border Protection awarded a contract for construction of a "primary physical barrier" and "barrier system attributes" in what the Government is calling the "Tucson 5 Project." Enriquez Decl. ¶ 11. Design work

is underway. *See id.* ¶ 14. U.S. Customs and Border Protection "does not anticipate construction activities starting prior to October 12, 2026." *Id.*

## IV. Procedural History

On June 16, 2026, the Nation sued defendants Markwayne Mullin, Rodney Scott, and Rosario Vasquez ("defendants") all in their official capacities as Secretary of the U.S. Department of Homeland Security, Commissioner of U.S. Customs and Border Protection, and Chief of U.S. Border Patrol, respectively. *See* Compl. The next day, the Nation moved for a preliminary injunction halting construction of the border wall adjacent to the Nation's reservation. *See* Pl.'s Mot. for Prelim. Inj. ("Mot.") [Dkt. #3]. The Government opposes. *See* Defs.' Mem. of Points & Authorities in Opp'n to Pl.'s Mot. for Prelim. Inj. [Corrected] ("Opp'n") [Dkt. #19-1]. Plaintiff filed its reply on July 14, 2026. *See* Pl.'s Reply Mem. ("Reply") [Dkt. #25].

On July 22, 2026, the Court held a hearing on plaintiff's motion for a preliminary injunction. *See* Hr'g Tr. [Dkt. #43]. At the close of the hearing, the Court provided the parties with the opportunity to "submit a supplemental pleading based on the arguments that took place here today." Hr'r Tr. at 37:6–7. The parties submitted their supplemental briefs on July 30, 2026. *See* Suppl. Mem. of the Tohono O'odham Nation in Supp. of its Mot. for Prelim. Inj. ("Pl.'s Suppl. Br.") [Dkt. #37]; Defs.' Suppl. Br. in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Defs.' Suppl. Br.") [Dkt. #39-1]. The motion is now ripe for decision.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555

U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

## Analysis

### I. Likelihood of Success on the Merits

#### A. Ultra Vires *Claim*

Plaintiff argues that defendants' planned construction of the border wall is *ultra vires* because the wall will diminish the boundaries of the Reservation without express congressional authorization and will violate 25 U.S.C. § 398d.[2] While *ultra vires* review is available, I conclude that plaintiff is unlikely to succeed on the merits because the federal Roosevelt Reservation exists along the international border and, in any event, plaintiff has not established that construction of a border wall will indeed alter Reservation boundaries.

##### 1. Availability of *Ultra Vires* Review

Before getting to the merits of a nonstatutory *ultra vires* claim, the plaintiff must show that "(i) there is no express statutory preclusion of all judicial review" and "(ii) there is no alternative procedure for review of the statutory claim." *Fed. Express Corp. v. U.S. Dep't of Com.* ("*FedEx*"), 39 F.4th 756, 763 (D.C. Cir. 2022) (internal quotation marks

[2] 25 U.S.C. § 398d provides that "[c]hanges in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress."

omitted). Defendants argue that IIRIRA Section 102(c)(2) expressly precludes review of plaintiff's *ultra vires* claim. On this point, I disagree.

"Judicial review for *ultra vires* agency action 'rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief.'" *FedEx*, 39 F.4th at 763 (quoting *National Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022)). The "presum[ption] that agency action is judicially reviewable," however, "may be overcome by specific language that is a reliable indicator of congressional intent." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505 (D.C. Cir. 2019) (quoting *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017)). The relevant question, then, is whether Congress has "clearly and directly" prohibited judicial review of plaintiff's *ultra vires* claim. *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991).

Defendants argue that IIRIRA's waiver provision—Section 102(c)(1)—and the accompanying jurisdiction-stripping provision—Section 102(c)(2)—preclude plaintiff's *ultra vires* claim. Section 102(c)(1) provides:

> Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary . . . determines necessary to ensure expeditious construction of the barriers and roads under this section.

8 U.S.C. § 1103 note.

Section 102(c)(2)(A) provides:

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims *arising from any action undertaken, or any decision*

> *made, by the Secretary of Homeland Security pursuant to paragraph (1).* A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

*Id.* (emphasis added). The connection between plaintiff's *ultra vires* claim and the jurisdiction-stripping provision is not obvious. Plaintiff argues that defendants' planned construction of the border wall is *ultra vires* because the wall will diminish reservation boundaries without congressional authorization. Unlike many recent border wall cases, plaintiff does not challenge the legality of a secretarial waiver pursuant to IIRIRA Section 102(c)(1). *See, e.g.*, *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 235 (D.D.C. 2019). Defendants nevertheless argue that Section 102(c)(2)'s jurisdiction-stripping provision applies here because *ultra vires* review is available only when "there is no alternative procedure for review of the statutory claim," *FedEx*, 39 F.4th at 763, and plaintiff relies on the Secretary's waiver of the Administrative Procedure Act to satisfy this requirement. In other words, because plaintiff's *ultra vires* claim is "premised on an IIRIRA waiver," Section 102(c)(2) precludes plaintiff's claim. Defs.' Suppl. Br. at 4.

Our Circuit's reasoning in *North American Butterfly Association v. Wolf* strongly suggests—if not requires me to find—that plaintiff's *ultra vires* claim about diminishment of reservation boundaries does not "arise from" the Secretary's 2008 waiver of the Administrative Procedure Act. In *North American Butterfly*, our Circuit Court explained that Section 102(c)(2) "[b]y its terms . . . does not extend to construction or related activities that do not necessarily flow from exercise of the waiver authority as such, but that IIRIRA section 102(a)-(b) authorizes independently." 977 F.3d 1244, 1260 (D.C. Cir. 2020).

"Because 'arise' out of means 'to originate from a specified source, the phrase 'arising out of' generally requires 'a causal connection,' not merely a 'logical' one." *Id.* (internal citations omitted).

The 2008 waiver *enables* plaintiff to bring an *ultra vires* claim because there are no other avenues for judicial review. But it can hardly be said that the Secretary's waiver *caused* plaintiff's *ultra vires* claim. *Cf. Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (explaining, in the context of personal jurisdiction, that "arise out of" requires a "causal showing"). Interpreting Section 102(c)(2)'s "arising from" language to "require[] a causal connection," *North American Butterfly*, 977 F.3d at 1260 (internal quotation marks omitted), also gives effect to IIRIRA's specific reference to Section 102(c)(1). Congress could have stripped jurisdiction over any actions or decisions pursuant to the Secretary's authority under Sections 102(a) and 102(b), but it instead focused the jurisdiction-stripping provision on the Secretary's waiver authority under Section 102(c). Consistent with this reasoning, at least one court has exercised jurisdiction over *ultra vires* claims "challeng[ing] the scope of the Secretary's authority to build roads and walls under section 102(a) and 102(b), not the scope of waiver authority under section 102(c)." *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019). Section 102(c)(2) therefore does not supply "clear and convincing evidence that Congress intended to deny the District Court jurisdiction" over plaintiff's *ultra vires* claim. *MCorp*

*Fin., Inc.*, 502 U.S. at 44.[3]

### 2. Merits

That hurdle aside, to succeed on the merits of its *ultra vires* claim, plaintiff must establish that defendants have "plainly act[ed] in excess of [their] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *FedEx*, 39 F.4th at 763 (internal quotation marks omitted). As I have said before, "*ultra vires* review is a high bar"—it is the ultimate "Hail Mary pass." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 104 (D.D.C. 2026) (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)). Plaintiff is unlikely to clear this high bar.

To succeed on an *ultra vires* claim, the plaintiff must show that "the agency has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.'" *FedEx*, 39 F.4th at 764 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). "Only error that is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* (cleaned up). The legal error must be "so extreme that one may view it as jurisdictional or nearly so." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *Griffith*, 842 F.2d at 493).

[3] Defendants do not separately argue that there is a "statutory review scheme provid[ing] aggrieved persons with a meaningful and adequate opportunity for judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal quotation marks omitted).

Plaintiff argues that the proposed border wall will unlawfully diminish the Nation's reservation boundaries without the authority of Congress and in violation of 25 U.S.C. § 398d. Plaintiff's *ultra vires* claim suffers, unfortunately, from multiple deficiencies.

*First*, the Roosevelt Reservation likely exists along the international border. In 1907—ten years before the creation of the Nation's modern-day Reservation by executive order—President Theodore Roosevelt "set apart as a public reservation[] all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico." Proclamation of May 27, 1907, 35 Stat. 2136, 2136 [Dkt. #18-3]. Plaintiff argues that it had aboriginal title to the land *before* the creation of the Roosevelt Reservation, so the Nation's lands were not "public lands," and therefore the Roosevelt Reservation has never existed on the reservation. Mot. at 22–31. But historical evidence casts doubt on plaintiff's theory.

In a 1934 dispute before the Solicitor of the Interior, the Nation argued that they held rights to land "in fee by virtue of a title vested in them before the area in question came under the sovereignty of the United States," so "the land never became part of the public domain," or "public lands." Solicitor's Memorandum Opinion M-27656 (Mar. 1, 1934) at 360, *supplemented by* M-27656 (Supp.) (May 7, 1934) [Dkt. #18-7]. The Solicitor of the Interior issued an opinion concluding that "the interest of the [Nation] in the land they claim [is] subordinate to a superior proprietorship in the United States." *Id.* at 363. The Nation did not "have a perfected title in fee which precludes the United States from exercising any proprietorship over the land." *Id.* While the opinion recognized that the Nation retained the "Indian right of surface occupancy," *id.* at 438, this right was not

equivalent to an "independent title which can . . . embarrass any future action that to Congress may seem appropriate in the premises." *Id.* at 438, 370–71. The opinion therefore calls into question plaintiff's claim that the Reservation land was not "public land" before the President established the Reservation in 1917.

Subsequent practice reflects multiple instances in which the Government and the Nation acknowledged the existence of the Roosevelt Reservation. In 1937, Congress passed a law modifying the boundaries of the Nation's Reservation but expressly noting that "[t]his extension shall not affect . . . the reservation of a strip of land sixty feet wide along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907." Act of July 28, 1937, Pub. L. No. 75-217, 50 Stat. 536 [Dkt. #18-4]. And as recently as 2004, the Nation—in approving construction of a vehicle barrier along the international border—acknowledged that U.S. Border Patrol "plans to construct the border vehicle barrier and road entirely within the sixty-foot strip of land reserved by the Presidential Proclamation of President Theodore Roosevelt dated May 27, 1907." Resolution No. 04-095 (Mar. 8, 2004) [Dkt. #18-6].

Plaintiff points to other historical evidence to argue that the Roosevelt Reservation has never existed on the Nation's Reservation because the Reservation was never "public land," but plaintiff's evidence is flawed. The 1968 Indian Claims Commission decision that recognized the Nation's aboriginal title also stated specifically that the "Gadsden Purchase of 1854 brought the subject lands under United States sovereignty and *they became public land* by the Act of July 22, 1854." 19 Ind. Cl. Comm. 394, 432 [Dkt. #3-15] (emphasis added). The decision goes on to say that the "[1854] Act provided for the

application to the new public lands of the pre-emption laws of the Territory of New Mexico *other than on lands covered by claims based on Spanish or Mexican law*." *Id.* (emphasis added). Plaintiff suggests that this phrase included claims based on aboriginal title. *See* Reply at 7–8. But the case plaintiff relies on does not say this outright. *See United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339, 351 (1941) ("[T]hese Acts were concerned not with the problem of ascertaining the boundaries of Indian country but with the problem of quieting titles originating under Spanish or Mexican grants.") Such conflicting historical evidence is not the stuff of successful *ultra vires* claims.[4]

*Second*, even if the Roosevelt Reservation does not exist on the Nation's Reservation, plaintiff has not shown how construction of a wall on the existing international border will change the boundaries of the Nation's reservation. The core of plaintiff's *ultra vires* theory is that only Congress can "adjust the Nation's boundaries." Pl.'s Suppl. Br. at 2. As a legal matter, it is well-established that Congress has exclusive authority to diminish reservation boundaries, and that Congress must make its intent to do so clear and unambiguous. *See McGirt v. Oklahoma*, 591 U.S. 894, 903–04 (2020). But I am not aware of any case holding that construction of a border wall adjacent to a Reservation—with the possibility of activities that may interfere with the Nation's use and occupancy rights—necessarily diminishes the Reservation's boundaries.

[4] Plaintiffs' reliance on references to the Nation's grazing of cattle up to the border is not persuasive because, as defendants argue, "[t]here is no conflict between the federal government's reservation of the land for national security purposes and transient uses like grazing." Defs.' Suppl. Br. at 8.

To the contrary, the establishment of non-Indian towns, or the sale of property to non-Indians, does *not* change the reservation status of the lands. *See, e.g.*, *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 358–59 (1962) (rejecting argument that "lands owned by towns" were "exclud[ed] from a reservation"). As defendants persuasively argue, "constructing a border barrier is not the type of action that could change the status or boundaries of a reservation." Defs.' Suppl. Br. at 5.

Plaintiff's novel *ultra vires* theory therefore fails to meet the "high bar," *Nat'l Tr. for Historic Pres.*, 827 F. Supp. 3d at 104, for extraordinary equitable relief.

**B. *Trespass Claim***

As a fallback, plaintiff argues that defendants' planned border wall may be enjoined for the independent reason that it constitutes a trespass on the Reservation. Plaintiff's trespass claim is unlikely to succeed on the merits because the federal government's sovereign immunity bars its claim.

As our Circuit has explained, "claims against the federal government and its actors are jurisdictionally barred by sovereign immunity." *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024). Congress may waive sovereign immunity through "clear statutory text" in statutes such as the Administrative Procedure Act or the Federal Tort Claims Act. *Id.* Courts interpret such statutes "strictly," and any exceptions to the Government's sovereign immunity "are not to be lightly implied." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). Plaintiff does not argue that any statute waives sovereign immunity here. It couldn't!

Instead, plaintiff relies on the *Larson-Dugan* exception to sovereign immunity for both its *ultra vires* and trespass claims. Under the *Larson-Dugan* exception, "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949)). In other words, sovereign immunity does not bar successful *ultra vires* claims. As explained *supra* Section I.A., plaintiff's *ultra vires* claim fails on the merits so the *Larson-Dugan* exception cannot operate to waive defendants' sovereign immunity for plaintiff's trespass claim.

Plaintiff argues that the *Larson-Dugan* exception also extends to suits seeking "an injunction against a state officer who abridges a common law duty without statutory authorization." Mot. at 19–20 (quoting *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024)). But the cases cited by plaintiff all involve mandamus petitions seeking access to documents under the common law right of public access. *See Leopold*, 102 F.4th at 493; *Schilling*, 102 F.4th at 505; *Leopold v. Sullivan*, 823 F. Supp. 3d 59, 64 (D.D.C. 2026). As far as I can tell, no court has extended the *Larson-Dugan* exception to common law tort claims, let alone trespass claims, seeking injunctive relief against the Government.

However, even if plaintiff established a waiver of the Government's sovereign immunity, the availability of a federal common law trespass claim by an Indian tribe against the federal government is at best uncertain. Plaintiff relies on dicta to suggest the availability of such a cause of action. *See Edwardsen v. Morton*, 369 F. Supp. 1359, 1371 (D.D.C. 1973) (explaining that "officers are themselves liable in trespass if their actions

cause[] third parties to enter the land" but concluding that "resort to that principle of tort law actually is unn[e]cessary in view of the fiduciary duty of the federal government and its agents to protect the interests of Native Americans"). But plaintiff has not identified any case (outside the context of a Federal Tort Claims Act claim for damages) involving a common law trespass suit against the Government.

Indeed, significant uncertainties remain about the actual scope of construction activities and the extent to which they may interfere with the Nation's land outside the Roosevelt Reservation. *See* Enriquez Decl. ¶ 13 ("[T]he contractor has been instructed to confine the project footprint . . . to the 60-foot federal Roosevelt Reservation."). At this early stage, plaintiff has not established a "'clear showing' of entitlement" to the extraordinary remedy of preliminary injunctive relief. *Haynes v. Navy Fed. Credit Union*, 841 F. Supp. 2d 221, 223 (D.D.C. 2012) (quoting *Winter*, 555 U.S. at 21).

## II. Remaining *Winter* Factors

Because plaintiff is unlikely to succeed on the merits, I could deny relief on that basis alone. *Cf. Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025). But for the sake of completeness, I will briefly address the remaining *Winter* factors, all of which favor defendants.

To prevail, plaintiff must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The threat of harm must be "both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks omitted). Plaintiff

must also show that "the balance of equities tips in [its] favor," and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. When "the Government is the opposing party," these final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiff argues that the planned border wall will inflict irreparable harm to its sovereignty and proprietary control over its lands, as well as cause environmental and First Amendment harms. *See* Mot. at 41–43. Plaintiff's alleged harms based on its claim to the land leading up to the international border are not likely to materialize because, as explained *supra* Section I.A.2., the Roosevelt Reservation likely exists along the Nation's border, and defendants have not yet articulated plans to construct outside the Roosevelt Reservation. Regarding the environmental and First Amendment harms, plaintiff has pointed to numerous harms to the landscape, including "four sets of mountain peaks" that are "sacred peaks to the Tohono people." Hr'g Tr. at 12:11–12, 15. Defendants note, however, that plans have not yet been finalized for the border wall, and that many—if not all—of plaintiff's alleged environmental and First Amendment injuries could be mitigated through consultation with the Nation and accommodations, such as crossing gates to enable members of the Nation to access the international border. *See* Enriquez Decl. ¶¶ 16–17, 24–29, 33. Given the possibility of mitigating plaintiff's injuries, I find that plaintiff has not yet established irreparable harm that is "certain" and "great." *Mexichem Specialty Resins, Inc.*, 787 F.3d at 555 (internal quotation marks omitted).

And in any event, I find that the Government's interests in securing the border, enforcing immigration laws, and ensuring public safety outweigh any surviving irreparable harms at this juncture. "The Supreme Court has recognized that the public interest in

enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981). Congress, through enacting IIRIRA and appropriating funds for border wall construction, has identified physical border walls as a key component of border security. Given the national security and foreign policy considerations related to the border wall, deference to the Government is warranted, particularly for plaintiff's *ultra vires* claim. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 723 (D.C. Cir. 2022).

## CONCLUSION

The international border is an area of great significance to both the United States and to the Nation. While I have concluded that a preliminary injunction is unwarranted, I fully expect the Government in the months ahead to follow through on its guarantees of consultation and cooperation with the Nation to address the Nation's concerns regarding border wall construction!

For the foregoing reasons, it is hereby **ORDERED** that plaintiff's Motion for a Preliminary Injunction [Dkt. #3] is **DENIED**. An accompanying order will issue contemporaneously with this opinion.

RJLeon

RICHARD J. LEON
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br><br>Plaintiff,<br><br>v.<br><br>MARKWAYNE MULLIN, *et al.*,<br><br>Defendants. | Civil Case No. 26-2127 (RJL) |

**ORDER**

August 13th, 2026 [Dkt. #3]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiff's Motion for Preliminary Injunction [Dkt. #3] is **DENIED**.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TOHONO O'ODHAM NATION, | ) | Civil Action |
| | ) | No. 26-cv-2127 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Washington, DC |
| MARKWAYNE MULLIN, et al., | ) | July 22, 2026 |
| | ) | Time: 4:11 p.m. |
| Defendants. | ) | |

TRANSCRIPT OF MOTION HEARING
HELD BEFORE
THE HONORABLE JUDGE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For Plaintiff:
Riyaz A. Kanji
David A. Giampetroni
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106

Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
12 North Cheyenne Avenue, Suite 220
Tulsa, OK 74103

Howard M. Shanker
Logan Takao Cooper
TOHONO O’ODHAM NATION
Office of Attorney General
P.O. Box 830
Sells, AZ 85634

For Defendants:
Adam Gustafson
Bradley Thomas Craigmyle
Andrew Block
DOJ Environment and Natural Resources Division
950 Pennsylvania Ave NW
Washington, DC 20530

---

Court Reporter: Rebecca Monroe, RPR
Official Court Reporter
United States Courthouse, Room 6706
333 Constitution Avenue, NW
Washington, DC 20001

So it's a different kind of situation.

MR. KANJI: Well -- and of course we very much appreciate that, Your Honor, and we appreciate the fact that we could come back into the Court and might ultimately achieve a favorable resolution, but let me say two things about that. One is the counter is also true, which is that if the Government came -- if the Court hypothetically, again, were to issue an injunction and the Government came back with some design plan that miraculously kept it within 60 feet and the Court agreed that the 60 feet is operative in any event, the Government could seek a modification of the injunction.

It's a question of where -- where the risks are. And what we know on that score is the Government has said, and it's in its papers, that in order to even do the design planning, it needs to come on the Reservation and do geo-technical borings, biological and cultural surveys, other -- other activities that are central to the actual planning. Those are --

THE COURT: Outside of the 60-foot area?

MR. KANJI: I don't know. The Government has not been clear about that. They talk about geo-technical borings for the wall. I assume -- but I'm just assuming here that those would have to take place wherever there is going to be support -- embankment support for the wall. The Government doesn't say that can all be confined to 60 feet, I don't think it can. I'm not the engineer though, but they are -- they are

being very clear in saying they have to do those activities.

Those would all be acts of trespass and the Government has said that they want to commence those immediately. They want to start the design process already. So that's part of what we're talking about, Your Honor, which is absent action from the Court now, we're going to be in a situation that's incredibly important to the Nation where you're going to have Government agents, officials, contractors taking place -- you know, conducting activities on the Reservation -- it could be tomorrow, it could be next week that go right to the core of the issues here about whether the Government has the authority to do so in the first place.

And if the Court holds its hand, stays its hand, the Government will just -- has made clear that it will assume that it has that authority and will act on it. And we don't know exactly what they will do.

THE COURT: Well, the practical reality, as you probably know, is that the Court is not going to issue an opinion in the next week. This is a novel case with novel issues of great significance to the country and to the Nation -- the Nation of your client, tribal Nation. And I'm not going to turn out an opinion in the next seven days, that's not possible.

And, of course, you're also well aware that whatever opinion this Court issues is appealable. So if I rule in your

favor, they can appeal. If I rule in their favor, you can appeal. And we all know how long it takes for the Court of Appeals to issue its decision.

MR. KANJI: I -- I --

THE COURT: I'm still waiting on the Kelly case, the WilmerHale case, and the ballroom case.

MR. KANJI: I understand all of those realities, Your Honor. And what I will say is this, that if I would hope and trust that the Government before this Court decides, and we understand the weight of the decision and the fact that it takes time to issue proper decisions in a case with these issues, I would hope and trust that the Government would not engage in significant activity before this Court decides that it won't prejudge anything.

But if this Court then denies the injunction motion, I would not expect the Government to exercise restraint because this Court would have denied our motion. And at that point, I would expect -- I think it's just reality that the Government could take all manner of action while we are appealing or while we're waiting for further proceedings in this court.

THE COURT: They would do that knowing full well that you could come back to this Court for relief. They know that. That's what happened in the ballroom case. On numerous occasions, I denied a PI, a TRO. And I still had the jurisdiction over the case and ultimately I ruled, as I did