**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-5306**

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

TOHONO O'ODHAM NATION,

*Plaintiff-Appellant*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Columbia
Case No. 4:26-cv-2127-RJL (Hon. Richard J. Leon)

# OPENING BRIEF OF APPELLANT


Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634

Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant Tohono O'odham Nation*


(additional counsel listed on next page)

Philip H. Tinker
KANJI & KATZEN, P.L.LC.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

As required by Circuit Rules 27(a)(4) and 28(a)(1), undersigned counsel for Plaintiff-Appellant the Tohono O'odham Nation hereby provides the following information:

## I. Parties Appearing Below

The parties who appeared before the U.S. District Court were:

1. The Tohono O'odham Nation, a federally recognized Indian tribe.
2. Markwayne Mullin, Secretary of the United States Department of Homeland Security (named in his official capacity).
3. Rodney Scott, Commissioner of United States Customs and Border Protection (named in his official capacity).
4. Rosario Vasquez, Chief of the United States Border Patrol (named in his official capacity).

## II. Amici Appearing Below

The amici curiae appearing before the U.S. District Court were:

1. Warren Petersen, in his capacity as President of the Arizona Senate.
2. Steve Montenegro, in his capacity as Speaker of the Arizona House of Representatives.

## III. Parties Appearing in this Court

The parties appearing in this Court are:

1. The Tohono O'odham Nation, a federally recognized Indian tribe.
2. Markwayne Mullin, Secretary of the United States Department of Homeland Security (named in his official capacity).

3. Rodney Scott, Commissioner of United States Customs and Border Protection (named in his official capacity).

4. Rosario Vasquez, Chief of the United States Border Patrol (named in his official capacity).

## IV. Ruling Under Review

The ruling under review is the August 14, 2026 Memorandum Opinion, Dkt. 45, JA0944-0961, and Order of United States District Court Judge Richard J. Leon, Dkt. 46, JA0962, denying the Tohono O'odham Nation's Motion for Preliminary Injunction in Case No. 26-cv-2127-RJL.

## V. Related Cases

This case has not previously been before this Court or any other court other than the district court. Counsel is not aware of any other related cases. *See* Circuit Rule 28(a)(1)(C).

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

# TABLE OF CONTENTS


CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES....................i

TABLE OF AUTHORITIES ....................vi

GLOSSARY....................xiv

INTRODUCTION ....................1

JURISDICTIONAL STATEMENT ....................3

STATEMENT OF ISSUES ....................3

STATEMENT OF THE CASE....................4

I. Factual Background....................4

A. The Nation and Its Cross-Border History ....................4

B. The Nation's Reservation....................5

C. The Nation's Robust Border Security Efforts and Collaboration with the United States....................7

D. The Nation's Opposition to a Reservation Border Wall....................10

E. The Secretary's Plan to Build a Wall on the Reservation....................13

II. Procedural History....................13

SUMMARY OF THE ARGUMENT ....................15

ARGUMENT....................17

I. The Nation Is Likely to Succeed on Its Trespass Claim. ....................17

A. The Nation May Sue to Prevent Unauthorized Intrusions on Its Reservation. ....................17

1. The Nation Has a Cause of Action Under Federal Common Law ....................18

2. The Secretary Is Not Entitled to Sovereign Immunity. ............23

B. The Secretary's Construction Activities Would Necessarily Trespass on Tribal Lands. ....................25

1. The Secretary Cannot Confine Border Wall Construction Activities to Within Sixty Feet of the Border. ....................26

2. The Roosevelt Reservation Never Attached to the Nation's Reservation Lands. ....................30

a. The Roosevelt Reservation Only Attached to "Public Lands." ....................30

b. Lands Subject to Indian Aboriginal Rights Were Not "Public Lands" When the Roosevelt Reservation was Established. ....................31

c. The Nation Possessed Unextinguished Aboriginal Rights to Its Lands When the Roosevelt Reservation Was Established. ....................34

d. Congress Promptly Confirmed that the Roosevelt Reservation Did Not Attach to Lands Within the Nation's Reservation. ....................35

e. The District Court Erred in Concluding that the Roosevelt Reservation Likely Exists Within the Nation's Reservation. ....................37

C. Congress Has Not Authorized the Secretary to Trespass on the Nation's Reservation. ....................41

II. The Nation Is Likely to Succeed on Its Ultra Vires Claim. ..........................43

A. Judicial Review Is Not Expressly Precluded by Statute and There Is No Alternative Procedure for Review of the Nation's Statutory Claim. ..........................................................................................45

B. The Secretary's Actions Are Plainly in Excess of His Delegated Powers and Contrary to a Specific Statutory Prohibition that Is Clear and Mandatory.........................................................................................45

1. The Secretary's Wall Project Would Alter the Nation's Reservation Boundaries. ........................................................46

2. The Secretary's Actions are Contrary to a Specific Statutory Prohibition that Is Clear and Mandatory...................48

3. The Secretary's Proposed Border Wall Plainly Exceeds His Delegated Powers..................................................................49

III. The Equitable Factors Favor a Preliminary Injunction. ...............................51

A. The Nation Will Suffer Irreparable Injury Absent an Injunction. ......51

B. The Equities Weigh Heavily in Favor of an Injunction......................54

CONCLUSION ..........................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

**Alabama Association of Realtors v. Department of Health and Human Services*,
594 U.S. 758 (2021) ........................................................................ 54

**Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) ........................................................................ 32, 34, 52

*Apis v. United States*,
88 F. 931 (S.D. Cal. 1898) ........................................................................ 38

*Arizona v. Navajo Nation*,
599 U.S. 555 (2023) ........................................................................ 20

**Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co.*,
184 F.4th 874 (7th Cir. 2026) ........................................................................ 19, 25

**Bardon v. Northern Pacific Railroad Co.*,
145 U.S. 535 (1892) ........................................................................ 31

**Barker v. Harvey*,
181 U.S. 481 (1901) ........................................................................ 31, 33, 34

*Carpentier v. Montgomery*,
80 U.S. 480 (1871) ........................................................................ 38

**Chamber of Commerce of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........................................................................ 23, 44, 45

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ........................................................................ 45

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 53

**Cramer v. United States*,
261 U.S. 219 (1923) ........................................................................ 33

*Donnelly v. United States*,
228 U.S. 243 (1913) ........ 6

**Dugan v. Rank*,
372 U.S. 609 (1963) ........ 23

**Edwardsen v. Morton*,
369 F.Supp. 1359 (D.D.C. 1973) ........ 20, 21, 22

*Environmental Commission of Florida Electric Power Coordinating Group, Inc. v. EPA*,
94 F.4th 77 (D.C. Cir. 2024) ........ 40

*Erhardt v. Boaro*,
113 U.S. 537 (1885) ........ 18

*F.D.I.C. v. Meyer*,
510 U.S. 471 (1994) ........ 24

*Federal Express Corp. v. U.S. Department of Commerce*,
39 F.4th 756 (D.C. Cir. 2022) ........ 51

**Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 44, 54

**Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) ........ 54

**Lane v. Pueblo of Santa Rosa*,
249 U.S. 110 (1919) ........ 20, 22

**Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) ........ 23

**League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........ 54

**Leopold v. Manger*,
102 F.4th 491 (D.C. Cir. 2024) ........ 24

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ........ 52

**Marsh v. Brooks*,
49 U.S. (8 How.) 223 (1850) ........ 19

*Mashpee Wampanoag Tribe v. Bernhardt*,
Civil Action No. 18-2242, 2020 WL 3034854 (D.D.C. June 5, 2020)........ 52

*Mattz v. Arnett*,
412 U.S. 481 (1973) ........ 42

**McGirt v. Oklahoma*,
591 U.S. 894 (2020) ........ 50

**Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) ........ 20, 46

*Minidoka & Southwestern Railroad Co. v. United States*,
235 U.S. 211 (1914) ........ 31

*More v. Steinbach*,
127 U.S. 70 (1888) ........ 32

*Morton v. Ruiz*,
415 U.S. 199 (1974) ........ 34

*Mountain States Legal Foundation v. Bush*,
306 F.3d 1132 (D.C. Cir. 2002) ........ 45

**National Association of Postal Supervisors v. U.S. Postal Service*,
26 F.4th 960 (D.C. Cir. 2022) ........ 44, 45

**National Trust for Historic Preservation v. National Park Service*,
___ F.4th ___, 2026 WL 2276494 (D.C. Cir. 2026)........ 29

**Nebraska v. Parker*,
577 U.S. 481 (2016) ........ 46, 47, 48, 50

*Newhall* v. *Sanger*,
92 U.S. 761 (1875) .......... 31

*Northern Lumber Co. v. O'Brien*,
204 U.S. 190 (1907) .......... 31

**Oneida County v. Oneida Indian Nation of New York State*,
470 U.S. 226 (1985) .......... 19, 20, 21, 32, 43

**Quechan Indian Tribe v. United States*,
535 F.Supp.2d 1072 (S.D. Cal. 2008) .......... 21, 22

*Quechan Indian Tribe v. United States*,
Civil No. 02cv1096, 2014 WL 13126627 (S.D. Cal. Sept. 30, 2014) .......... 21

*Rosebud Sioux Tribe v. Kneip*,
430 U.S. 584 (1977) .......... 47

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006) .......... 40

**Schilling v. U.S. House of Representatives*,
102 F.4th 503 (D.C. Cir. 2024) .......... 23, 24, 25

**Seymour v. Superintendent of Washington State Penitentiary*,
368 U.S. 351 (1962) .......... 47, 48

*Shawnee Tribe v. Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021) .......... 54

**Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States*,
299 U.S. 476 (1937) .......... 22, 46

*Sioux Tribe of Indians v. United States*,
316 U.S. 317 (1942) .......... 48

**Solem v. Bartlett*,
465 U.S. 463 (1984) .......... 47, 50

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
985 F.3d 1032 (D.C. Cir. 2021) .......... 20

**Swinomish Indian Tribal Community v. BNSF Railway Co.*,
951 F.3d 1142 (9th Cir. 2020) .......... 19

**Texas v. U.S. Department of Homeland Security*,
123 F.4th 186 (5th Cir. 2024) .......... 19, 24, 52

**Trump v. Cook*,
146 S.Ct. 2234 (2026) .......... 23

**Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) .......... 54

*U.S. Information Agency v. Krc*,
989 F.2d 1211 (D.C. Cir. 1993) .......... 24

*United Church of the Medical Center v. Medical Center Commission*,
689 F.2d 693 (7th Cir. 1982) .......... 52

*United States v. Auguisola*,
68 U.S. 352 (1863) .......... 32

*United States v. Dann*,
873 F.2d 1189 (9th Cir. 1989) .......... 21

**United States v. Dion*,
476 U.S. 734 (1986) .......... 42, 43, 50

**United States v. Lee*,
106 U.S. 196 (1882) .......... 18

*United States v. Milner*,
583 F.3d 1174 (9th Cir. 2009) .......... 25

*United States v. O'Donnell*,
303 U.S. 501 (1938) .......... 31

*United States v. Santa Fe Pacific Railroad Co.*,
314 U.S. 339 (1941) ........ 33, 39, 40, 42, 43

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
790 F.3d 1000 (10th Cir. 2015) ........ 52

**Statutes**

8 U.S.C. § 1103(a)(5) ........ 41, 49

25 U.S.C. § 398d ........ 3, 45, 48

28 U.S.C. § 1292(a)(1) ........ 3

28 U.S.C. § 1331 ........ 3

28 U.S.C. § 1362 ........ 3

28 U.S.C. § 2679(b)(1) ........ 24

Act of July 22, 1854, 10 Stat. 308 ........ 32

Act of May 25, 1918, ch. 86, 40 Stat. 561 ........ 6, 36, 51

Act of June 28, 1926, ch. 701, 44 Stat. 775 ........ 7

Act of May 21, 1928, ch. 645, 45 Stat. 617 ........ 6, 36

Act of Feb. 21, 1931, ch. 267, 46 Stat. 1202 ........ 7

Act of July 28, 1937, ch. 527, 50 Stat. 536 ........ 7

Act of June 13, 1939, ch. 203, 53 Stat. 819 ........ 7

Act of Sept. 10, 1978, Pub. L. No. 95-361, 92 Stat. 595 ........ 7

Pub. L. No. 110-161, 121 Stat. 1844 ........ 42

S. Doc. No. 70-53 (1929) ........ 5, 6, 7, 37

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border) .................... 41, 42, 44, 45, 50

**Other Legislative Materials**

Indian Appropriation Bill, 1919, U.S. Senate Comm. on Indian Affairs (Jan. 31, 1918) .......... 36

**Treaties**

Gadsen Purchase Treaty, December 30, 1853, 10 Stat. 1031 .......... 5, 32

Treaty of Guadalupe Hidalgo, July 4, 1848, 9 Stat. 922 .......... 31, 32

**Rules**

Fed. R. App. P. 4(a)(1)(B) .......... 3

**Regulations**

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 73 Fed. Reg. 18293-01 (Apr. 3, 2008) .......... 44

Indian Entities Recognized by and Eligible to Receive Service from the United States Bureau of Indian Affairs, 91 Fed. Reg. 4102-01 (Jan. 30, 2026) .......... 4

Notice of Correction, 91 Fed. Reg. 13861-01 (Mar. 23, 2026) .......... 30

**Other Authorities**

3 William Blackstone, Commentaries on the Laws of England (1765) .......... 18

*Authority of the Secretary of the Interior to Enter into Agreement Fixing Boundaries of Tribal, Allotted, and Ceded Indian Lands*, 57 Interior Dec. 219, 1940 WL 4175 (D.O.I. 1940) .......... 49

Press Release, U.S. Department of Homeland Security (Apr. 9, 2026) ................. 55

Press Release, U.S. Department of Homeland Security (July 16, 2026)................ 55

Proclamation of May 27, 1907, 35 Stat. 2136 ........................................... 30, 35, 36

Restatement (Second) of Torts § 158 (A.L.I. 1965) ............................................. 25

Restatement (Second) of Torts § 938 (A.L.I. 1979) ............................................. 52

Revocation of Prior Monument Designations,
2025 WL 1719535 (O.L.C. 2025)........................................................................ 49

U.S. Customs and Border Protection, Southwest Land Border Encounters (By
Component)..........................................................................................................10

U.S. Customs and Border Protection, Nationwide Encounters .........................10, 55

## GLOSSARY

| **Abbreviation** | **Term** |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551-559 |
| CBP | United States Customs and Border Protection |
| Department | United States Department of Homeland Security |
| ICC | The Indian Claims Commission |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009 (1996) |
| Nation | Tohono O'odham Nation |
| Secretary | The Secretary of the United States Department of Homeland Security; the Commissioner of United States Customs and Border Protection; and the Chief of United States Border Patrol |
| Section 102 | Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1966, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border) |

## INTRODUCTION

This case involves a critical and irreversible threat to the Tohono O'odham Nation's land and culture. The southern boundary of the Nation's Reservation lies in the Sonoran Desert of Arizona and is coterminous with the border between the United States and Mexico. Given its location, the Nation has long had a critical interest in border security, and has long cooperated extensively with the federal government to protect their shared interests. But the Nation vigorously opposes the construction of sixty-two miles of border wall across its Reservation. Building that wall would require the excavation and blasting of rugged mountains that are sacred to the Nation and its people, the bulldozing and blading of fragile desert ecosystems, and the severance of a landscape that has formed the homeland of the O'odham for millennia.

The Nation accordingly brought this suit to prevent that incursion on its sovereign territory. And the Nation is entitled to preliminary relief freezing the status quo while this litigation proceeds. On the merits, the Nation is likely to succeed on its two claims against the Secretary. First, the Secretary's actions would trespass on the Reservation—both because the border wall would permanently occupy Reservation lands and because building it would entail permanent destruction of adjacent Reservation lands. Second, the Secretary's actions would eliminate every legal incident of reservation status (including the

right of use and occupancy) on the subject lands and would thus effectuate a permanent diminishment of Reservation boundaries.

The equities strongly favor protecting the Nation from these harms. The destruction of the Nation's natural and cultural resources is a quintessential irreparable harm. And particularly given the Nation's existing cooperation with the Secretary—including allowing for two Department border security bases on the Reservation and the deployment of sophisticated surveillance technology and vehicle barriers—the Secretary will face no countervailing harm from a pause in construction. More fundamentally, the Supreme Court and this Court have consistently reaffirmed that equity and the public interest lie in ensuring that federal agencies respect the limits on their lawful authority.

An assertion by federal officials that they can blast, bulldoze, and permanently dispossess a federally recognized tribe of reservation lands absent Congress's assent is unprecedented in the modern era. As a result of the district court's ruling, the Secretary is presently free to begin destroying the Reservation landscape in furtherance of his wall project—and indeed, has threatened to do so as early as October 12. Because neither the law nor the equities support the Secretary's efforts to override the Nation's sovereign rights in its lands, this Court should direct the entry of preliminary relief.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1362 because this case arises under federal law and was brought by an Indian tribe. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court issued its Memorandum Opinion, JA0944-0961, and Order, JA0962, denying the Nation's Motion for Preliminary Injunction on August 14, 2026, and the Nation timely filed its Notice of Appeal, JA0963-0965, on August 26, 2026. *See* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES

1. Whether the Nation has established a likelihood of success on the merits of its claim that the Secretary's proposed border wall construction project will necessarily result in trespasses on the Nation's Reservation.

2. Whether the Nation has established a likelihood of success on the merits of its claim that the Secretary's border wall construction project will diminish the Nation's Reservation boundaries, in plain violation of 25 U.S.C. § 398d and federal common law principles establishing that only Congress may modify or diminish reservation boundaries.

3. Whether the equities likewise support the Nation's request for a preliminary injunction, such that the district court erred in declining to preliminarily enjoin the Secretary's proposed border wall construction project.

# STATEMENT OF THE CASE

## I. Factual Background

### A. The Nation and Its Cross-Border History

The Nation is a federally recognized Indian tribe, 91 Fed. Reg. 4102-01, 4,105 (Jan. 30, 2026), that exercises sovereignty over an approximately 2.8-million-acre reservation in the Sonoran Desert in Arizona. The southern boundary of the Reservation is coextensive with approximately sixty-two miles of the international border with Mexico.




Figure 1: Map of Tohono O'odham Current Reservation and Ancestral Territory (JA0072)

The Nation's "traditional homeland stretche[d] from the Gila River in the North to Hermosillo, Sonora, in the South, and from the Sea of Cortez in the West to the San Pedro River in the East." JA0192. The O'odham "moved with the seasons," making use of "the animals, the plants, and the water across the Sonoran Desert." *Id.*

In the 1853 Gadsden Purchase Treaty, 10 Stat. 1031 (ratified June 30, 1854), Mexico ceded lands in what is now southern Arizona and New Mexico to the United States. The ceded area included a substantial portion of the Nation's aboriginal lands, including the lands that would become its Reservation. With the treaty's ratification, the international border bisected the Nation's traditional territory. But that did not sever the Nation's cross-border ties. Today, seventeen O'odham communities and several thousand Nation members are found in Mexico. JA0034-0035. "O'odham on both sides of the border share the same language, culture, religion and history." JA0071. Nation members regularly cross into Mexico for important religious and family purposes, including for sacred ceremonies and to bury and visit their dead in ancestral cemeteries. JA0035-0036; JA0192-0209; JA0231-0234; JA0262; JA0271; JA0291-0293; JA0325-0331; JA0333-0334; JA0374-0376.

**B. The Nation's Reservation**

President Wilson initially created the Nation's Reservation by Executive Order on January 14, 1916, setting apart approximately 2.8 million acres of the Nation's aboriginal lands for the exclusive use and occupancy of the Nation (then referred to by the United States as the "Papago Indians"). *See* S. Doc. No. 70-53, at 1008-11 (1929) ("1916 Executive Order"). The following year, the President

reduced the Reservation to roughly 2.3 million acres by excluding certain lands from its northern portion. *See id.* at 1005-08 ("1917 Executive Order").

The southern boundary of the Reservation remained unchanged between the 1916 and 1917 Executive Orders, which provided that "all surveyed land and all unsurveyed land … within the townships and ranges listed below be, and the same hereby are, withdrawn and set apart as a reservation for the benefit of the Papago Indians in Arizona[.]" S. Doc. No. 70-53, at 1005. The townships and ranges specified as forming the southern portion of the Reservation are contiguous with the international border. *See* JA0289-0290.

Congress promptly ratified the Reservation, and its southern boundary in particular, when it appropriated funds in 1918 "[f]or the construction of a fence along the international boundary line between Mexico and the Papago Indian Reservation," Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561, 569.[1] In 1928, Congress again affirmed that the Nation's Reservation boundaries extend to the international border when it appropriated funds for "the construction of a fence on or near the east boundary of the Papago Indian Reservation, Arizona, beginning at the International boundary line and extending in a northerly direction for approximately sixty miles[.]" Act of May 21, 1928, ch. 645, 45 Stat. 617, 617.

[1] *Donnelly v. United States*, 228 U.S. 243, 258 (1913) (deeming Indian reservations established by executive order to be statutory reservations where Congress "ratifie[s]" the executive orders by referencing them in later statutes).

Congress had already recognized and added land to the Reservation in 1926 legislation, and it did so again on four separate occasions between 1931 (when it restored the lands removed by the 1917 Executive Order) and 1978.[2] Today, virtually the entirety of the Nation's Reservation land base is held in trust by the United States for the benefit of the Nation. *See* JA0034.

### C. The Nation's Robust Border Security Efforts and Collaboration with the United States

Given its location, the Nation has a critical interest in eliminating illegal activity at the border. As the Nation's Chairman explained in his declaration below, the Nation "work[s] with CBP and Border Patrol every single day to help accomplish these goals." JA0039.

In particular, the Nation devotes substantial manpower to preventing illegal crossings, drug trafficking, and other forms of smuggling at the border. JA0072; JA0213-0219. It also maintains "long-standing and highly cooperative relationships with multiple federal law enforcement agencies, including the Federal Bureau of Investigation, the Department of Homeland Security …, the Drug Enforcement Agency, the Bureau of Indian Affairs, and the National Counterterrorism Center." JA0214. Since 2013, the Nation has led a multi-agency

---

[2] *See* Act of June 28, 1926, ch. 701, 44 Stat. 775, 775; Act of Feb. 21, 1931, ch. 267, § 2, 46 Stat. 1202, 1202; Act of July 28, 1937, ch. 527, § 1, 50 Stat. 536, 536; Act of June 13, 1939, ch. 203, § 2, 53 Stat. 819, 819; Act of Sept. 10, 1978, Pub. L. No. 95-361, 92 Stat. 595, 595.

drug trafficking task force that "has successfully completed numerous high-value efforts, including the dismantling of major drug trafficking operations and the seizure of millions of dollars' worth of illicit drugs and other contraband." JA0215. The Nation also played a lead role in forming the Shadow Wolves, the Department's "only all-Native American tactical security force, which combines … traditional knowledge with modern cutting-edge techniques to identify, trace, and intercept smuggling operations within the Reservation." *Id.* In addition to its significant on-Reservation successes, "[t]his elite unit has also been deployed abroad to train border guards and customs agents in multiple allied nations and has participated in anti-terrorism operations and trainings in Afghanistan and Pakistan." *Id.*

Over the course of many years, the Nation has forged an extensive relationship with the Department. With the Nation's authorization, the Department has built two CBP Forward Operating Bases on the Reservation. These sizable bases feature working facilities and living quarters for CBP personnel, with CBP conducting surveillance and patrol operations from the bases. JA0216. In 2019, the Nation approved the lease of ten additional sites along the Reservation's southern border, on which CBP has constructed 160-foot-tall Integrated Fixed Towers. JA0216-0217. "Each tower is equipped with night vision, thermal sensors, and ground sweeping radar, which feed real-time data to Border Patrol agents at Border

Patrol's facilities within the Reservation. The towers also have long-range and wide-angle surveillance cameras. Border Patrol uses the combination of cameras, sensors and radar to monitor every person and vehicle along the entire span of the international border[]." *Id.* Additionally, CBP operates "vehicle surveillance units, which consist of sophisticated camera and surveillance systems mounted on the beds of all-terrain pickup trucks[.]" JA0217. And CBP maintains (again with the Nation's consent) a vehicle checkpoint within the Reservation on the highway leading to Phoenix. *Id.*

In 2006, the Nation agreed to the construction of vehicle barriers and a patrol road along the vast majority of the Nation's southern border. JA0215-0216; *see also* JA0056-0060. That agreement grew out of numerous collaborative discussions between the Nation and the Department, after which the Nation "allow[ed] the government to put in vehicle barriers that did not disrupt the environment or disturb our ancestors' resting places." JA0040. The barriers "have virtually eliminated unauthorized vehicle transit" onto the Reservation from Mexico. JA0216.

Under the combined efforts of the federal government and the Nation, the border is more secure than it has been in decades. CBP reports a sixty-two percent decrease in border encounters in the Tucson Sector (which includes the

Reservation) between FY 2025 and FY 2026,[3] and a roughly ninety-five percent decline in border apprehensions across that Sector to date this year as compared to the same period in 2024.[4] *See also* JA0219-0221 (discussing data specific to Nation's Reservation).

**D. The Nation's Opposition to a Reservation Border Wall**

While the Nation has cooperated intensively with the Department and other federal agencies to secure the border, it has long opposed the construction of a border wall through the Reservation. In 2017, the Nation's Legislative Council enacted a Resolution detailing the reasons for that opposition while reaffirming its commitment to vigorous border protection measures. JA0114-0120. The Nation remains firm in its position, as a border wall would have devastating effects on the Nation's lands and its people.

As Chris Senseney—who served as an engineer of record on the design and construction of two border wall projects proximate to the Nation's Reservation, and who is now a Professor of Civil Engineering at the University of Colorado,

---

[3] *See* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component (locate section labeled "Fiscal Year Percent Change").

[4] *See* https://www.cbp.gov/newsroom/stats/nationwide-encounters (reporting 14,606 apprehensions in 2026 to date, compared to 440,589 for same period in 2024) (locate section labeled "U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component" and select "Choose Region: Southwest Land Border" and "Area of Responsibility: Tucson Sector" fields).

JA0123-0124—explained in a declaration below, border wall construction would have "permanent and lasting impacts" on the Reservation landscape, JA0126. There are four separate mountainous areas along the Reservation's sixty-two-mile southern border, JA0131-0134, which include peaks sacred to the Nation, JA0044; JA0195; JA0324; JA0332-0333. Border wall construction in these areas would require "substantial earthwork, blasting [and] mountaintop removal … resulting in permanent and irreversible alterations to the natural landscape and topography of the Reservation." JA0140; *see also* JA0134-0135; JA0137. And typically, "construction of 30-foot-tall barriers requires extensive staging areas, material storage, equipment parking, and portable concrete batch plants that extend hundreds to thousands of feet beyond the immediate border corridor[.]" JA0140. "These activities result in substantial and long-lasting disturbances to soils, hydrology, desert pavement, and vegetation communities, and these impacts are unlikely to be fully reclaimed for centuries in the arid environment of the Reservation." *Id.*; *see also* JA0270-0271; JA0275-0276. The Secretary presented no contrary evidence below.

Professor Senseney further explained that the project will require at least nine east-west access roads to be graded across the Reservation, as well as switchback roads for heavy machinery to access the mountainous areas. JA0130–0131; *see also* JA0135-0136. The Secretary has countered only that he "does not

plan to construct any new north-south access roads," JA0629, which says nothing about the east-west and switchback road requirements Professor Senseney has identified. Such roads have been necessary for the Secretary's recent border wall projects, JA0724; JA0726-0727; JA0729, and the Secretary has nowhere explained why they will not be necessary here.

These sweeping changes would not only permanently degrade the Reservation landscape, they would have profoundly detrimental impacts on Nation members. For example, the Nation's Chairman has described one of the peaks that would need to be blasted as "sacred to our people and very significant for my family." JA0044. He has elaborated:

> It is the place where I go to pray, where I can walk up the slope and see all of our lands to the north and south, and I pray for all of the people all across those lands .... If a wall were built across this peak, it would completely destroy this sacred and special place.

*Id.* Other sacred mountains in the wall's path would also face desecration, including the Baboquivari range, where the O'odham believe the "center of the universe" and the "home of the Creator, I'itoi" are located, *see* JA0195. The same is true for trails and associated materials, including petroglyphs, left by O'odham ancestors on their religious expeditions for millennia as "perpetual prayers," JA0333. In sum, "construction of walls … would disturb the sacred natural-cultural landscape that is, in effect, the origin, destination, medium, and altar for O'odham religious belief and practice." JA0334; *see also* JA0231; JA0262; JA0293-0294.

### E. The Secretary's Plan to Build a Wall on the Reservation

On May 15, 2026, the Department informed the Nation that it would release a contract solicitation that day for a border wall project on the Reservation. JA0087. On May 27, the Department provided the Nation with statement of work documents for the project, JA0089-0094; JA0096-0101; JA0103-0112. Those documents provided that "acquiring staging areas on private lands" and "construction access road[s]" would be the "responsibility of the Contractor." JA0101. On June 1, the Department provided the Nation with maps including potential access routes for the project within the interior of the Reservation, while noting that these routes had not been "Cleared for Access or Construction." JA0104.

On June 26, 2026—ten days after the Nation filed suit—the Department awarded a contract for construction of up to two thirty-foot walls, a patrol road, and related infrastructure including shelters, light poles, and surveillance technology. JA0787. Design work is now underway, with construction to begin as early as October 12, 2026. JA0627. The contract requires that all construction activities "shall be completed by September 14, 2027." JA0791.

## II. Procedural History

On June 16, 2026, the Nation filed suit challenging the Secretary's planned border wall construction as a trespass and an ultra vires diminishment of the

Nation's Reservation boundary. JA0011-0030. It simultaneously moved for a preliminary injunction. JA0031-0033.

On August 14, 2026, the district court denied the Nation's motion. JA0944-0961. With respect to the Nation's trespass claim, it concluded that the availability of a trespass cause of action against federal officials is "at best uncertain," JA0958; the Secretary likely possesses sovereign immunity, JA0957-0958; and "uncertainties remain" regarding whether the Secretary's construction activities would have impacts outside the "Roosevelt Reservation"—a sixty-foot corridor along parts of the international border that, according to the district court, extends across the Nation's Reservation and allows the United States to utilize those lands for border security purposes, JA0959. As for the Nation's ultra vires claim, the court concluded that the Secretary's actions will not diminish the Reservation because the Roosevelt Reservation "likely" attaches to it, JA0954, and if it does not, the Nation has not shown that the Secretary's wall will necessarily change the Nation's Reservation boundaries, JA0956-0957. It further held that the remaining injunction factors favor the Secretary because it is not "certain" that his construction activities will cause harm outside the Roosevelt Reservation, JA0960 (citation omitted), and in any event such harm would be outweighed by the government's interest in border security, *id.*

With the Secretary poised to begin construction in the coming weeks, the Nation has filed a motion for injunction pending appeal, JA0966-0968, which is pending before the district court.

## SUMMARY OF THE ARGUMENT

Constructing the border wall across the Nation's Reservation would unlawfully trespass on the Nation's lands and diminish the Reservation. That irreversible action would severely injure the Tribe's sovereign, proprietary, and environmental interests in its land. The district court erred in denying preliminary relief.

**I.** The Nation is likely to succeed on the merits of its trespass claim.

**A.** To start, the district court's procedural reasons for rejecting that claim are irreconcilable with precedent. Indian tribes have long sued trespassers (including federal officials) under the common law, and the Supreme Court has expressly approved of that cause of action. And federal officials have no sovereign immunity against claims that they are abridging a common law duty without statutory authorization.

**B.** The Secretary's proposed construction of the border wall would constitute a trespass. The record is clear that border wall construction would require blasting and leveling mountains and would wield other significant impacts on Nation lands along the Reservation's southern border, whatever the status of the

Roosevelt Reservation. And although the Court need not reach the question, the Secretary is wrong to assert that the sixty-foot corridor of land abutting the international border belongs to the federal government and not to the Nation: The 1907 declaration creating the Roosevelt Reservation applied specifically to "public lands," and the Nation held title to the lands in question long before 1907. Congress has also legislated in ways that are incompatible with treating the Nation's lands as public lands. The district court went astray in ignoring that evidence and relying instead on sources that are neither from the relevant time period nor persuasive on their own terms.

**C.** Finally, no statute authorizes the Secretary's proposed trespass. Congress has authorized the Department to construct a wall at appropriate junctures across the border but has nowhere permitted Department officials to trespass on tribal lands to do so. And foundational principles of Indian law require Congress to explicitly consider and bless intrusions on tribal rights; no generic border-wall-related statute comes close to fitting the bill.

**II.** The Nation is also likely to succeed on the merits of its ultra vires claim. Both Congress and the Supreme Court have spoken clearly that the Executive Branch may not alter a reservation's boundaries absent an act of Congress. Erecting one or two border walls, a roadway, and associated infrastructure across the Nation's southern border would diminish the Nation's lands by depriving the

Nation and its members of their right to use, occupy, or govern the walled area. The Secretary again cannot point to any statute expressly sanctioning such intrusions on tribal land.

**III.** Finally, the equities overwhelmingly favor granting preliminary relief. Building the border wall would cause irreversible damage to the Nation's lands and erode the Nation's sovereignty. By contrast, there is little on the other side of the ledger: The Nation is committed to working cooperatively with the federal government to ensure that unlawful border crossings in the Reservation's vicinity remain at historic lows, and the public interest lies in ensuring that the Secretary respects limits on his authority.

## ARGUMENT

### I. The Nation Is Likely to Succeed on Its Trespass Claim.

#### A. The Nation May Sue to Prevent Unauthorized Intrusions on Its Reservation.

The district court held that—regardless of the severity of on-reservation trespasses that federal officers may seek to commit—the federal courts have no power to enjoin them because (1) tribes (unlike other plaintiffs) cannot maintain trespass actions under the federal common law against federal officers, JA0958-0959; and (2) those officers enjoy sovereign immunity from suit, JA0957-0958. Neither holding withstands scrutiny.

### 1. The Nation Has a Cause of Action Under Federal Common Law.

The district court decreed that the Nation is unlikely to prevail on its trespass claim because the availability of such a claim "by an Indian tribe against the federal government is at best uncertain." JA0958. But case law firmly supports the Nation's right to sue federal officials to enjoin a trespass.

The tort of trespass is deeply rooted in the common law, *see* 3 William Blackstone, Commentaries on the Laws of England 208-09 (1765), and it has long been understood to run against governmental officials, *see United States v. Lee*, 106 U.S. 196, 220-21 (1882) (rejecting proposition "that the courts cannot give remedy when the citizen has been deprived of his property …[,] converted to the use of the government without any lawful authority … because the president has ordered it …. If such be the law of this country, it sanctions a tyranny"). There is also a long tradition of granting injunctive relief to prevent trespasses that would prove difficult to reverse: "[I]t is now a common practice in cases where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate … to issue an injunction, though the title to the premises be in litigation." *Erhardt v. Boaro*, 113 U.S. 537, 539 (1885).

These principles retain their force today, including in actions against the federal government. Recently, for example, when United States Border Patrol agents began cutting wire fencing that the State of Texas had placed along part of

the southern border, the Fifth Circuit enjoined the Department, and the Secretary's predecessors-in-office, based on the state's common law trespass claim. *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 192 (5th Cir. 2024).

As the Supreme Court has recognized, Indian tribes have the same common law rights as other property holders. In *Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226, 236 (1985), the Court squarely held that, under "well-established principles," tribes "can maintain … action[s] for violation of their possessory rights based on federal common law." *See also id.* at 235-36 & n.6 (collecting cases). And the courts have accorded tribes injunctive relief in such cases. *See, e.g.*, *Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co.*, 184 F.4th 874, 898-902 (7th Cir. 2026) (requiring removal of pipeline operating in trespass on tribal land); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1160 (9th Cir. 2020) (holding that tribe could maintain trespass claim for injunctive relief under the "federal common law right of tribes to exclude non-Indians from Indian lands").

These rules are of longstanding vintage, *see Marsh v. Brooks*, 49 U.S. (8 How.) 223, 232 (1850) ("That an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question."), and they flow inexorably from the nature of tribal landholdings, including those of the Nation. "When the United States establishes a tribal reservation, the reservation generally

includes (among other things) the land" and the rights to associated resources, and "[e]ach of those rights is a stick in the bundle of property rights that makes up a reservation." *Arizona v. Navajo Nation*, 599 U.S. 555, 563 (2023). "Over tribal lands, the tribe has the rights of a landowner as well as the rights of … sovereignty," including "the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain[.]" *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146 n.12 (1982) (citation modified); *see also, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1044 (D.C. Cir. 2021) (tribes enjoy "sovereign authority …. to manage the use of their territory and resources" (citation modified)).

The Supreme Court has also made clear that federal officials, like other trespassers, are subject to suit under the common law when they intrude on tribal lands. As an example of the applicable federal common law, the Court cited *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C. 1973)—a case that explains that "a cause of action for trespass" lies "*against federal officers*" "[i]f [tribal] plaintiffs were in fact disturbed in their use and occupancy," *id.* at 1378-79 (emphasis added); *see Oneida Indian Nation*, 470 U.S. at 236 n.6 (describing *Edwardsen* as "upholding [a] trespass action"). This was in keeping with prior decisions of the Court, including its determination in *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110,

113-14 (1919), that a tribe could sue and obtain a preliminary injunction against federal officials for the unauthorized appropriation of its land.

Other courts have likewise recognized that tribes can maintain common law trespass actions against federal officials. In *Quechan Indian Tribe v. United States*, Civil No. 02cv1096, 2014 WL 13126627 (S.D. Cal. Sept. 30, 2014), the court held that federal employees trespassed on reservation land when they drove "heavy equipment" over the land and "damaged tribal cultural resource sites[.]" *Id.* at *2, *4; *see also Quechan Indian Tribe v. United States*, 535 F.Supp.2d 1072, 1123 (S.D. Cal. 2008) (granting summary judgment to tribe for trespass); *United States v. Dann*, 873 F.2d 1189, 1196 n.5 (9th Cir. 1989) ("If an executive official or agency attempts to extinguish" tribal possessory rights "without any congressional authorization," the tribe "must be able to protect" those rights "by asserting [them] against the official or agency.").

The district court grappled with none of this precedent. It waved away *Edwardsen*'s discussion of tribal trespass claims as "dicta," JA0958, while ignoring *Oneida Indian Nation* altogether and failing to cite a single countervailing case to justify its skepticism of tribal trespass claims against federal officials. It did not attempt to explain why tribes (of all entities) would be uniquely dispossessed of the time-honored right to sue federal officials to stop trespasses, or why tribes

would be able to obtain such injunctive relief against *other* parties but not federal officials.

The Secretary has suggested that because the United States holds title to the Nation's lands in trust for the Nation, he may override the Nation's interests and appropriate the land for federal purposes. Courts have long rejected that distorted view of trusteeship. In *Shoshone Tribe of Indians of Wind River Rsrv. in Wyo. v. United States*, 299 U.S. 476 (1937), the Supreme Court declared that although "[t]itle in the strict sense" may be "in the United States," tribes retain the "right of occupancy" to such lands and "all its beneficial incidents." *Id.* at 496. Hence, in *Edwardsen*, the court readily concluded that "a physical invasion of [the] lands would … violate Native rights to undisturbed use and occupancy," making federal officials liable for trespass "even if the United States … hold[s] the title to all realty," *id.* at 1372. The *Quechan Indian Tribe* court likewise allowed the tribe to sue federal officials for trespass on reservation land held in trust by the United States. 535 F.Supp.2d at 1123. All of this accords with basic principles of fairness and trusteeship. As the Supreme Court has underscored in addressing other arguments by the federal government that its special duties to the tribes allow it greater authority to override tribal property interests: "That would not be an exercise of guardianship, but an act of confiscation." *Pueblo of Santa Rosa*, 249 U.S. at 113.

### 2. The Secretary Is Not Entitled to Sovereign Immunity.

The district court also erred in holding that defendants were immune from suit. *See* JA0957-0958. It is well settled that "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit," *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949)). In such circumstances, "there is no sovereign immunity to waive—it never attached in the first place." *Id.* at 1329. "This exception to sovereign immunity is known as the *Larson-Dugan* exception." *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024); *see Dugan v. Rank*, 372 U.S. 609 (1963).

The district court wrongly suggested that this well-accepted body of case law does not permit "common law tort claims" against federal officials, JA-0958. But in fact, longstanding Supreme Court precedent provides that federal officers may be sued—including for common law torts—so long as their actions are "unconstitutional" or "beyond [their] statutory powers," *Larson*, 337 U.S. at 698. Just this past Term, the Court reiterated that a plaintiff "may sue in equity without a congressionally-provided cause of action to prevent an injurious act by a [federal] public officer." *Trump v. Cook*, 146 S.Ct. 2234, 2251 n.2 (2026) (citation modified).

This Court has accordingly explained that "sovereign immunity does not prevent an injunction against a state officer who abridges a common law duty without statutory authorization." *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024); *see id.* at 496-97 (holding that an "officer suit based on a common law right" can "mark[] an exception to sovereign immunity"); *see also Schilling*, 102 F.4th at 506 ("*Larson-Dugan* is triggered" where "defendants acted outside of the scope of their duty … imposed by the common law"). The district court cited no authority even suggesting that common law trespass claims are uniquely excluded from long-established doctrine regarding officer suits, and none exists.

Nor is there any support for the Secretary's argument below that these foundational principles do not apply because the Federal Tort Claims Act (FTCA) provides a damages remedy against the United States. The FTCA is the "exclusive" path to bring a "civil action or proceeding for money damages" against federal entities. 28 U.S.C. § 2679(b)(1). But this is not an action "for money damages"; the Nation seeks only equitable relief. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) (explaining that an FTCA claim must "allege[] the six elements" contained in the statute, including that the claim is "for money damages" (citation omitted)). Thus, as the Fifth Circuit has explained, the FTCA "neither says nor implies anything about prospective or nonmonetary relief," which remains available against the United States. *Texas*, 123 F.4th at 203; *see U.S. Info. Agency*

*v. Krc*, 989 F.2d 1211, 1216 (D.C. Cir. 1993) (explaining that while "the FTCA specifically bars money damages[,] … injunctive relief is available").

Accordingly, the Secretary lacks sovereign immunity in this action. The Nation asserts that he is committing a common law tort—trespass—without any statutory or constitutional basis. And while the Secretary disputes these conclusions, his arguments go to the merits and not to immunity as an independent bar to suit, *see Schilling*, 102 F.4th at 506 (there is no sovereign immunity whenever "a defendant is alleged to have violated their duty under the common law"), and they lack merit in any event. *See infra* pp. 41-43.

### B. The Secretary's Construction Activities Would Necessarily Trespass on Tribal Lands.

On the merits, the Nation's trespass claim is straightforward. "Federal common law governs an action for trespass on Indian lands." *Bad River Band*, 184 F.4th at 886 (quoting *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009)). That law "generally comports with the Restatement of Torts[.]" *Id.* (quoting *Milner*, 583 F.3d at 1182). Under the Restatement, one is subject to liability to another for trespass if, without consent, "he intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land[.]" Restatement (Second) of Torts § 158 (A.L.I. 1965).

The Secretary's proposed actions—to enter or cause his agents to enter the Reservation for purposes not authorized by the Nation, alter the border landscape,

and leave behind at least one thirty-foot-high wall and associated infrastructure—are quintessential acts of trespass under this definition. But the Secretary argues that his contractors will confine their work to a sixty-foot "Roosevelt Reservation" that, in his telling, exists along the Nation's southern boundary. This Court need not reach the Secretary's Roosevelt Reservation argument because it is clear that his contractors cannot restrict their work to the sixty-foot corridor and hence will be trespassing regardless of whether the Roosevelt Reservation exists on the Nation's lands. But if this Court does reach the question, it should hold that President Roosevelt's order never attached to the Nation's lands and hence cannot justify the Secretary's actions.

### 1. The Secretary Cannot Confine Border Wall Construction Activities to Within Sixty Feet of the Border.

The district court addressed the extent of the Secretary's likely trespass on the Nation's Reservation in a single paragraph, stating that "significant uncertainties remain about the actual scope of construction activities and the extent to which they may interfere with the Nation's land outside the Roosevelt Reservation," and crediting the Secretary's representation that "'[t]he contractor has been instructed to confine the project footprint … to the 60-foot federal Roosevelt Reservation.'" JA0959. But the uncontroverted evidence establishes that border wall construction will necessarily extend beyond the disputed sixty-foot corridor, and the district court was not justified in turning a blind eye to that

evidence based on statements in a contract that defy the laws of physics and that the Nation lacks any ability to enforce.

As Professor Senseney explained, there exist four separate mountainous areas along the Reservation's sixty-two-mile southern border. JA0131-0134. Building the wall along the border would require blasting through and leveling those mountains, activity that cannot be contained within sixty feet. JA0131-0136; *see* JA0774-0775 (illustrative photographs). Paul Enriquez, CBP's Director of Infrastructure, acknowledged that wall construction will require blasting through "four particular mountainous locations," JA0631, and nowhere claimed that such activity can be restricted to a sixty-foot corridor.

At the preliminary injunction hearing, counsel for the Secretary accordingly conceded that "if you … restrict us to the 60-foot zone, then you've got difficult engineering challenges ahead of you[.]" JA0752. He argued that the Secretary could seek the Nation's consent for the wall to "meander[]" inland, JA0753, but the Nation will not provide such consent because that would divide the Reservation, with the Nation's citizenry on one side of the wall and its sacred peaks and substantial borderlands on the other. No contractual language can change the fact that either of the two options—mountain blasting or Reservation partition—will constitute a trespass.

Professor Senseney further detailed that border wall construction necessarily "requires extensive staging areas, material storage, equipment parking, and portable concrete batch plants that extend hundreds to thousands of feet beyond the immediate border corridor[.]" JA0140. Director Enriquez again acknowledged that such staging areas could extend hundreds of feet north of the border. JA0629.

Finally, the Nation's evidence shows that the project will require at least nine east-west access roads to be constructed far beyond the sixty-foot corridor, as well as switchback roads for heavy machinery to access the mountainous areas of the Reservation. JA0130-0131; *see also* JA0135-0136. Such roads have been commonplace in the Secretary's recent border wall projects, JA0724-0730, and the Reservation contract confirms that "[t]he minimum number of roads needed for proposed actions must be constructed," JA0810.

Any notion, then, that the border wall project on the Reservation can be carried out entirely within the sixty-foot corridor is fanciful. The court below was wrong to disregard the largely undisputed evidence based on a contractual provision (calling for the work to be within the corridor) to which the Nation is not a party and hence cannot enforce. And while this was clear when the district court issued its preliminary ruling, it is even more so now, as the Secretary and his contractors have demonstrated the stipulations in their contract to be meaningless, at least with respect to the Nation's rights. Reflecting the fact that the government

enjoys a right of way along the full extent of the north-south Reservation arterials only for limited purposes that do not include border wall construction, JA1048-1052, the contract provides that "[n]o [interior Reservation] roads are currently approved for accessing the project area" and that "the contractor shall not assume they will be permitted to access the project location from the North through the Tohono O'odham Reservation," JA0793. And yet on August 25, 2026, Department contractors and an escort of CBP and Border Patrol officers entered the Reservation to conduct "geotechnical surveying activities" in furtherance of the border wall project, JA1058, and over the Nation's strenuous objections, they (in the words of the contract) traveled "from the North through the … Reservation," JA0793.[5]

The Secretary and his contractors will necessarily have to trespass on the Nation's lands to build their wall, and the district court erred in relying on their intramural contractual stipulations to conclude otherwise.

[5] The attachments associated with the Matthews Declaration, JA1010-1052, and the Third Kanji Declaration, JA1053-1058, were filed in conjunction with the Nation's Motion for Injunction Pending Appeal. The Nation includes them in its Appendix and refers to them here because they relate to probative events (of which the Secretary had full knowledge and control) taking place after the preliminary injunction proceedings, such that the Nation could not have introduced them earlier. *Cf. Nat'l Tr. for Hist. Pres. in United States v. Nat'l Park Serv.*, __ F.4th __, 2026 WL 2276494, at *39 n.15 (D.C. Cir. 2026) (faulting party for introducing new facts while providing "no reason at all" for doing so).

### 2. The Roosevelt Reservation Never Attached to the Nation's Reservation Lands.

Even if it were possible for border wall construction to remain within the sixty-foot corridor, that would not defeat the Nation's trespass claim. That is because President Roosevelt's declaration of a sixty-foot reservation along the international boundary covers only those lands that were public lands in 1907. Lands subject to aboriginal title are not public lands. And no one disputes that the Nation possessed aboriginal title to the lands that became its Reservation when President Roosevelt issued his 1907 proclamation—indeed, the President and Congress confirmed that title in formally creating and then ratifying the Nation's Reservation. Accordingly, the Nation's lands are not part of the Roosevelt Reservation.

#### a. The Roosevelt Reservation Only Attached to "Public Lands."

By its plain terms, the Roosevelt Reservation reserved "public lands within sixty feet of the international boundary," 35 Stat. 2136, 2136, to the United States. It accordingly did not attach to lands that were not "public lands" in 1907. The United States agrees, having recently stated with respect to a section of border land in New Mexico, for example, that "there is no Roosevelt Reservation in this section because this section was conveyed to the state prior to the Roosevelt Proclamation." Notice of Correction, 91 Fed. Reg. 13861-01, 13862 (Mar. 23,

2026) (discussing Section 16); *see also, e.g.*, *Minidoka & Sw. R.R. Co. v. United States*, 235 U.S. 211, 216 (1914) (Where a law "applies only to 'public lands,'" it "cannot be construed … to authorize the building of roads across lands which had been segregated from the public domain[.]").

**b. Lands Subject to Indian Aboriginal Rights Were Not "Public Lands" When the Roosevelt Reservation was Established.**

Lands subject to aboriginal title are not "public lands." "The words 'public lands' are habitually used" to "describe such [lands] as are subject to sale or other disposal under general laws.'" *Barker v. Harvey*, 181 U.S. 481, 490 (1901) (quoting *Newhall* v. *Sanger*, 92 U.S. 761, 763 (1875)). Thus, it was "long settled" by 1907 that "[a]ll land, to which any claims or rights of others have attached, does not fall within the designation of 'public land.'" *Bardon v. N. Pac. R.R. Co.*, 145 U.S. 535, 538 (1892). The Supreme Court reaffirmed this principle just months before the Roosevelt Reservation was established. *See N. Lumber Co. v. O'Brien*, 204 U.S. 190, 196 (1907) (quoting same); *see also, e.g.*, *United States v. O'Donnell*, 303 U.S. 501, 510 (1938) (public lands do not include "lands which are not unqualifiedly subject to sale and disposition because they have been appropriated to some other purpose.").

This principle excluded lands legally held by Indian tribes from the category of public lands. In the 1848 Treaty of Guadalupe Hidalgo, 9 Stat. 922, and the

1853 Gadsden Purchase Treaty, 10 Stat. 1031, Mexico ceded the modern southwest to the United States (including, in the latter treaty, the lands that today comprise the Nation's Reservation). Both treaties provided that any existing rights in the ceded lands "shall be inviolably respected" by the United States, Art. VIII, 9 Stat. at 929; Art. V, 10 Stat. at 1035 (incorporating same). Thus, "the rights of the inhabitants to their property were not affected [by the cession]"; instead, "[t]hey remained as before." *More v. Steinbach*, 127 U.S. 70, 78 (1888); *see United States v. Auguisola*, 68 U.S. 352, 358-59 (1863) (same). In 1854, in furtherance of these treaty obligations, Congress provided that all lands subject to claims of right predating United States sovereignty within the Territory of New Mexico (which then encompassed the Nation's current Reservation) "*shall be reserved from sale or other disposal by the government*" until "final action of Congress on such claims," Act of July 22, 1854, 10 Stat. 308, 309 (emphasis added).

These protections extended to lands held under "aboriginal title," which "is a right of exclusive use and occupancy held by Natives in lands and waters used by them and their ancestors prior to the assertion of sovereignty over such areas by the United States," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 536 n.4 (1987) (citation modified); *see Oneida Indian Nation*, 470 U.S. at 235-36 (describing aboriginal title as "the unquestioned right of the Indians to the exclusive possession of their lands … as sacred as the fee simple of the whites" and hence allowing

them to bring suit "against trespassers on their land" (quotation marks omitted)). As a unanimous Supreme Court explained in *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339 (1941), "it has been the policy of the federal government from the beginning to respect the Indian right of occupancy," *id.* at 345 (citation omitted), and "lands within the Mexican Cession were not excepted from th[at] policy," *id.*

Accordingly, the Supreme Court has repeatedly ruled that tribal lands subject to aboriginal title are not public lands. In *Santa Fe*, the Court addressed whether lands claimed by a tribe in Arizona fell within an 1866 statutory grant to a railroad of a "right of way through the public lands," and held that if the tribe held aboriginal title in the land, then its exclusive rights to occupy it "survived the railroad grant," 314 U.S. at 345. *Cramer v. United States*, 261 U.S. 219 (1923), similarly involved a statute granting "alternate section[s] of public land" along a planned railroad route, while confirming that lands already "granted, sold, reserved … or otherwise disposed of" did not fall within the grant. *Id.* at 227. After recounting "the policy of the federal government from the beginning to respect the Indian right of occupancy," *id.*, the Court concluded that "we have no doubt" that the land at issue was "'reserved … or otherwise disposed of,'" *id*. at 230. And in *Barker*, the Court explained that where Indians hold an unextinguished "right of

occupation, … it could not well be said that [the] lands … were a part of the public domain[.]" 181 U.S. at 491.

**c. The Nation Possessed Unextinguished Aboriginal Rights to Its Lands When the Roosevelt Reservation Was Established.**

It is undisputed in this litigation that in 1907, the lands that would become the Nation's Reservation were subject to the Nation's unextinguished aboriginal rights. For good reason: The historical record is clear.

In 1915, the Commissioner of Indian Affairs selected a "Committee of Eight" to make recommendations regarding a reservation location for the Nation. JA0563; JA0576. The Committee's subsequent report recommended the lands that came to be the present-day Reservation, stating that those lands were bounded by "the Mexican boundary on the south," JA0576, and concluding that the Papago "have inhabited [them] … from time immemorial," JA0580. Their longstanding "exclusive use" of the area gave rise to "a right of occupancy" and "a title or right of possession, of which they cannot be deprived without authority from Congress." JA0606. This was the quintessential definition of aboriginal title, *Amoco Prod. Co.*, 480 U.S. at 536 n.4, and the Supreme Court has accordingly described those lands as "within the borders of the Papago aboriginal tribal land," *Morton v. Ruiz*, 415 U.S. 199, 202 n.2 (1974).

The Secretary of the Interior and the President both endorsed the recommendation. The Secretary agreed that it had been "conclusively shown that the Papago Indians had been in undisturbed possession of the lands described … for over 300 years, last past, and that every consideration of humanity and justice, therefore, pointed to the necessity of establishing a permanent reservation for their benefit." JA0490. And President Wilson accepted the recommendation in issuing his executive orders.

The lands that became the Nation's Reservation—bounded on the south by the international border—thus were not "public lands" in 1907 because they remained subject to the Nation's unextinguished aboriginal rights.

#### d. Congress Promptly Confirmed that the Roosevelt Reservation Did Not Attach to Lands Within the Nation's Reservation.

Congress, too, has made clear that it views the Nation's lands as outside the scope of the Roosevelt Reservation. In addition to its limitation to public lands, the 1907 Proclamation provided that the sixty-foot strip "may be used *for public highways but for no other purpose whatever*, so long as the reservation of same under this proclamation shall continue in force," 35 Stat. at 2137 (emphasis added). In 1918, Congress enacted a statute applicable to the Nation's southern boundary irreconcilable with such a restriction. That statute authorized "the construction of a fence along the international boundary line between Mexico and the Papago Indian

Reservation," Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561, 569—thus confirming that Congress's view that the Nation's lands directly abutted Mexico. Congress did so to facilitate cattle grazing by Nation members right up to the border. *See* Indian Appropriation Bill, 1919, U.S. Senate Comm. on Indian Affs. (Jan. 31, 1918) at 112 (included in addendum submitted with this brief); *see also* JA0386; JA0424 (discussing same).

Congress and the Executive Branch, then, condoned a use irreconcilable with the Roosevelt Reservation's prohibition that the sixty-foot strip "may be used for public highways but for no other purpose whatever, so long as … this proclamation shall continue in force," 35 Stat. at 2137. If the Roosevelt Reservation was in force at the Nation's southern boundary, Congress could have authorized the fence sixty feet north of the international border. Instead, Congress and the Executive Branch demonstrated their clear understanding that it was not.

Congress once again treated the Nation's lands inconsistently with the Roosevelt Proclamation in 1928. That year, Congress authorized "a fence on or near the east boundary of the Papago Indian Reservation, Arizona, beginning at the International boundary line and extending in a northerly direction for approximately sixty miles[.]" Act of May 21, 1928, ch. 645, 45 Stat. 617, 617. If the Roosevelt Reservation existed there, the fence would have bisected and obstructed it, quite contrary to its sole permissible use as a "public highway."

### e. The District Court Erred in Concluding that the Roosevelt Reservation Likely Exists Within the Nation's Reservation.

Despite this clear evidence, the district court concluded that "the Roosevelt Reservation likely exists" within the Nation's Reservation, JA0954. In so holding, the district court did not meaningfully engage with the law or sources described above, relying instead on sources that long postdate the establishment of either the Roosevelt or the Nation's Reservation and that do not sustain the Secretary's counter-textual position.

**The 1934 Solicitor of the Interior Opinions.** The district court concluded that two 1934 opinions by Solicitor of the Interior Margold "call[] into question" the Nation's claim that its lands were not public lands in 1907. JA0955. That is flatly incorrect. Those opinions rejected the Nation's claim that it held its Reservation under "a perfected title in fee," which would have included mineral rights. JA0666. But the Solicitor did so not on the basis that Reservation lands had ever been public, which he nowhere concludes. Rather, he rejected the Nation's claims because the 1917 Executive Order expressly excluded them, and instead confirmed only the Nation's "Indian right of surface occupancy." As he explained:

> When the United States acquired the Papago country as a part of the Gadsden Purchase, the area now included within the Papago Reservation was in the possession of the Papago Indians. The fact of immemorial Indian occupancy of this entire area is not disputed. The courts have consistently recognized such possession as vesting a legally protected possessory interest in the Indians. "The Indian's

> right of occupancy has always been held to be sacred; something not to be taken from him except by his consent." See *Minnesota v. Hitchcock*, 185 U.S. 373 (1902). No reason appears for denying such recognition with respect to Indian country acquired from Spain or Mexico.

JA0675-0676 (citation omitted). The Solicitor, in other words, confirmed that the Nation held aboriginal title to the lands that became its Reservation, meaning those lands never became public.

**The Act of July 28, 1937.** The district court further concluded that in a 1937 statute adding a tract of land to the southwest corner of the Nation's Reservation, Congress "acknowledged the existence of the Roosevelt Reservation" within the Reservation. JA0955. But that statute referenced the Roosevelt Reservation in agnostic terms, stating simply in a savings clause that the added tract "shall not affect … the reservation of a strip of land sixty feet wide along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907," JA0651.[6] Congress had been informed by the Department of the Interior that the lands covered by the Act had been erroneously omitted from the 1917 boundaries of the Nation's Reservation and "that the error [should] be corrected." JA0712. In

---

[6] *See, e.g.*, *Carpentier v. Montgomery*, 80 U.S. 480, 495 (1871) (statute providing that confirmation of land claim "shall not affect the interests of third persons …. was intended to save the rights of third persons … *who might have*" superior claims (emphasis added)); *Apis v. United States*, 88 F. 931, 939 (S.D. Cal. 1898) (interpreting statute providing that confirmation of land claim "shall not affect any valid adverse right" as "leaving open for further consideration the question of the existence of adverse rights").

the ensuing years, individuals and the State of Arizona made claims, complicating the situation faced by Congress in 1937. *See id.* JA0711. Congress accordingly had good reason to include an agnostic savings clause.

Moreover, the tract added by the 1937 Act was *outside* the Nation's boundaries as established in 1917, and the 1937 Act was limited to that tract. *See id*. By contrast, the Act of 1918 discussed above applied to the entire length of the Nation's 1917 southern boundary, made no mention of the Roosevelt Reservation, and condoned a use irreconcilable with its existence. *See supra* pp. 35-36.

**The 1968 ICC Opinion.** The district court credited the statements of the ICC that lands subject to the Gadsden Purchase "'*became public land* by the Act of July 22, 1854.'" JA0955 (quoting JA0437). But *Santa Fe* had already held in 1941 that the 1854 Act did not subject tribal aboriginal lands to the 1866 grant of a right of way through public lands. *See* 314 U.S. at 348 (rejecting that 1854 Act "effected any extinguishment of [aboriginal] title"). The Court so held in part because, as noted, the 1854 Act provided that "until the final action of Congress," which had not occurred, the lands "shall be reserved from sale or other disposal by the government," *id*. at 350 (quoting 10 Stat. at 309 § 8). The district court erred in

crediting unexamined dicta from the ICC when the Supreme Court has squarely addressed the same statute and come to a contrary conclusion.[7]

**21st-Century Statements.** Finally, the district court concluded that a reference to the Roosevelt Reservation by the Nation in a 2004 Tribal Council resolution supports its existence at the Nation's southern boundary. JA0955. But the Nation's boundaries and the legal status of its lands were ratified repeatedly by acts of Congress, *see supra* pp. 6-7 & nn. 1-2, including the Act of 1918. No statement by a party can change the force and effect of those statutes. *See, e.g.*, *Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. EPA*, 94 F.4th 77, 114 (D.C. Cir. 2024) ("[B]ecause '[o]ur task is to construe what Congress has enacted,' we need not 'accept an interpretation of a statute simply because it is agreed to by the parties.'" (second brackets in original) (quoting *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 56 (2006))).

Indeed, underscoring the futility of looking to party statements to interpret statutes, the Nation and CBP have *also* agreed to language making clear that the Roosevelt Reservation does not extend to the Nation's lands. In 2019, the Nation

[7] The district court dismissed *Santa Fe* as "conflicting historical evidence" because it states that the Act of 1854 and another statute "'were concerned not with the problem of ascertaining the boundaries of Indian country.'" JA0956 (quoting *Santa Fe*, 314 U.S. at 351). But in context, *Santa Fe* made that observation in support of its conclusion that "[t]hese acts did not extinguish any Indian title based on aboriginal occupancy," 314 U.S. at 350, rejecting the railroad's contrary argument, *see id*. at 351.

and CBP negotiated a right-of-way agreement for border security infrastructure. CBP's draft referred to the Roosevelt Reservation as existing within the Nation's boundaries, which the Nation deleted as part of the negotiations. *See* JA0692-0701; JA0704-0706 (informing CBP of the Nation's "removal of references to the Roosevelt Reservation"). In the final executed agreement, CBP agreed to those deletions and that the infrastructure would instead be authorized by the Nation's consent, *see* JA0681-0690, based on the parties' understanding that "[u]nlike … other federal lands on the international boundary …, the Nation's reservation is not public land and the Nation has a duty to ensure that tribal members' rights and the Nation's sovereignty are protected," JA0681.

### C. Congress Has Not Authorized the Secretary to Trespass on the Nation's Reservation.

The Secretary is plainly exceeding his statutory authority by ordering federal officers and contractors to trespass on the Reservation. The laws authorizing border wall construction do not authorize federal officials or their contractors to trespass, let alone on tribal land.

Congress's delegation to the Secretary of "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens," 8 U.S.C. § 1103(a)(5), makes no mention whatsoever of trespass, of the Nation or its Reservation, or of tribal lands more generally. Section 102 directs the Secretary "to install additional physical barriers and roads … in the vicinity of the

United States border," IIRIRA § 102(a), while requiring only that he "construct reinforced fencing along not less than 700 miles of the [approximately 2,000-mile] southwest border," Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090 (amending IIRIRA § 102(b)(1)(A)). It does not mandate a wall "in [any] particular location," IIRIRA § 102(b)(1)(D), much less on the Nation's Reservation.[8] Congress has simply not authorized the Secretary to trespass on the Reservation.

Basic principles of Indian law further strengthen that conclusion. While Congress indisputably can abrogate tribal property rights, it must make its intent to do so unmistakable. The Court distilled its precedents establishing that standard in *United States v. Dion*, 476 U.S. 734 (1986), which holds that "[w]hat is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty," *id*. at 739-40. While *Dion* involved tribal rights within a treaty-established reservation, the Court cited both treaty and non-treaty precedents, with the latter including *Santa Fe*, 314 U.S. 339 (involving lands subject to tribal aboriginal title), and *Mattz v. Arnett*, 412 U.S. 481 (1973)

---

[8] Section 102(b)(1)(C)(i) requires the Secretary to consult with "Indian tribes" along with other "property owners" "near the sites at which … fencing is to be constructed." But that duty is not specific to tribal interests or rights, it in no way contemplates the abrogation of those rights, and indeed it explicitly states that the consultation requirement does not "create or negate any right" of any "person or entity," *id.* § 102(b)(1)(C)(ii)(I).

(executive order reservation). *See Dion*, 476 U.S. at 739. And *Oneida Indian Nation* leaves no doubt that the standards of congressional clarity required for abrogation of treaty rights apply equally "in nontreaty matters," declaring that "[m]ost importantly, ... congressional intent to extinguish Indian title must be 'plain and unambiguous,'" 470 U.S. at 247-48 (quoting *Santa Fe*, 314 U.S. at 346). The Secretary cannot identify any statute that comes close to meeting that standard.

* * *

Under well-established law, the Nation is not powerless to prevent the unprecedented acts of trespass the Secretary seeks to engage in on the Nation's lands. The Nation may maintain a federal common law cause of action for trespass, and the Secretary enjoys no immunity from such suit when he is acting beyond his lawful authority. The Secretary's border wall project will necessarily entail substantial trespasses on lands the Nation has safeguarded for centuries, and no statutory justification exists for his actions. The district court accordingly erred in failing to enjoin the Secretary.

## II. The Nation Is Likely to Succeed on Its Ultra Vires Claim.

Alternatively, the Nation is likely to succeed on its claim that the Secretary's pursuit of a border wall and associated infrastructure on the Nation's Reservation contravenes a clear statutory prohibition and hence is ultra vires.

To start, the Nation may sue to vindicate this claim. In Section 102, Congress authorized the Secretary to fortify sections of the U.S.-Mexico border with additional barriers and roads and empowered him "to waive all legal requirements … necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1). The Secretary subsequently waived the requirements of the APA with respect to stretches of border that include the Nation's Reservation. *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 73 Fed. Reg. 18293-01 (Apr. 3, 2008). But in cases in which APA review may not be had, "judicial review is [still] available when an agency acts *ultra vires*[.]" *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (citation omitted); *see also Reich*, 74 F.3d at 1327-29 (same).

To succeed on its ultra vires claim, the Nation must demonstrate that "(1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim and (3) the challenged action is plainly in excess of [the Secretary's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (quotation marks omitted).

### A. Judicial Review Is Not Expressly Precluded by Statute and There Is No Alternative Procedure for Review of the Nation's Statutory Claim.

The first two elements of the test are readily met. The Nation is aware of no statute precluding review of the Nation's claim. And the only alternative procedure for review of the Nation's statutory claim would have been the APA, which has been waived.

### B. The Secretary's Actions Are Plainly in Excess of His Delegated Powers and Contrary to a Specific Statutory Prohibition that Is Clear and Mandatory.

The third element of the ultra vires test is "demanding," *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022), but far from insurmountable, *see, e.g.*, *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 972-74; *Reich*, 74 F.3d at 1324. It is amply met here. As this Court has explained, ultra vires review is available "where the authorizing statute *or another statute* places discernible limits" on executive action. *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (emphasis added). The Nation's ultra vires claim does not allege that the Secretary's actions violate a prohibition in Section 102 but rather that they independently violate 25 U.S.C. § 398d, which provides that "[c]hanges in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." The Secretary's erection of a border wall and related

infrastructure would alter the Nation's Reservation boundaries in violation of § 398(d)'s explicit prohibition.

**1. The Secretary's Wall Project Would Alter the Nation's Reservation Boundaries.**

As established in 1917 and thereafter supplemented by Congress, the southern boundary of the Nation's Reservation is coterminous with the international border, *supra* p. 6, and the Roosevelt Reservation did not alter that boundary, *supra* pp. 30-41. The Secretary plans to permanently occupy a corridor of land roughly sixty-two miles long and sixty feet wide with one and potentially two steel walls set in concrete foundations, at least one roadway, and other associated infrastructure. If those plans are realized, the sixty-two-mile-long corridor will lose every incident of reservation status. The Nation will be wholly excluded from exercising its rights of use and occupancy on that land. *See, e.g.*, *Shoshone Tribe of Indians*, 299 U.S. at 496 (describing the Indian "right of occupancy" as "the primary one to which the incidents [of reservation status] attach"). And it will have no ability to exercise the powers "of self-government and territorial management," *Merrion*, 455 U.S. at 139, that likewise accompany reservation status.

In *Nebraska v. Parker*, 577 U.S. 481 (2016), the Court identified as among the "hallmarks of diminishment" federal action "to extinguish the land's prior use … as an Indian reservation—and … set [it] aside for other public purposes." *Id.* at

489. That is precisely what the Secretary proposes to do. He has identified no conceivable "use … as an Indian reservation," *id*., that the Nation could make of the affected land corridor—whether in exercising its rights of use and occupancy or of self-government and territorial management—if it is buried permanently beneath the Secretary's new walls and roads. Rather, he seeks to extinguish those uses and set aside the corridor for border wall purposes. That is diminishment, plain and simple.

The district court disagreed, asserting that it was "not aware of any case holding that construction of a border wall adjacent to a Reservation—with the possibility of activities that may interfere with the Nation's use and occupancy rights—necessarily diminishes the Reservation's boundaries" and that even "the establishment of non-Indian towns, or the sale of property to non-Indians, does *not* change the reservation status of the lands." JA0956-0957 (citing *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 358-59 (1962)).

That reasoning is flawed. Regarding the first point, no such case exists because the federal government has never tried to build a border wall on an Indian reservation. As to the second, while the *Seymour* Court concluded that a statute authorizing the sale of "surplus" reservation lands to non-Indians did not diminish the reservation, it did not purport to announce a categorical rule. Rather, it is well-established that some such acts "diminished reservations and other[s] … did not,"

*Solem v. Bartlett*, 465 U.S. 463, 469 (1984) (citations omitted); *cf., e.g.*, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 588 (1977) (holding that act that "opened the land for settlement … diminished the boundaries of the Reservation"). In *Seymour*, the sale of lands to non-Indians was held not to accomplish diminishment because: (1) it was specifically intended to "open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards," 368 U.S. at 356; and (2) the lands at issue were scattered throughout the interior of the reservation, which would have resulted in "an impractical pattern of checkerboard jurisdiction" if diminishment were found, *id.* at 358. Neither of those considerations apply here. The Secretary does not seek to wall off the perimeter of the Reservation to advance Reservation purposes. Rather, he seeks to "set [it] aside for other public purposes"—which is the very "hallmark[] of diminishment," *Parker*, 577 U.S. at 489.

#### 2. The Secretary's Actions are Contrary to a Specific Statutory Prohibition that Is Clear and Mandatory.

The prohibition against reservation diminishment is clear and mandatory. Section 398d provides that "[c]hanges in the boundaries of reservations created by Executive order … *shall not be made except by Act of Congress*." 25 U.S.C. § 398d (emphasis added). As the Supreme Court has recognized, that language requires that "any future changes" to reservation boundaries be made "by Congress

alone." *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 325 n.6 (1942). The Department of the Interior has likewise stated that "[t]he words of this statute are too plain and explicit to require interpretation." 57 Interior Dec. 219, 227, 1940 WL 4175, at *8 (D.O.I. 1940). And in 2025, the Office of Legal Counsel stated that, with Congress's enactment of § 398d, "the boundaries of Indian reservations were effectively permanent …. because "Congress said so … [in] an explicit statement of legislative policy[.]" Revocation of Prior Monument Designations, 2025 WL 1719535, at *28 (O.L.C. 2025) (emphasis omitted).

The district court agreed that "[a]s a legal matter, it is well-established that Congress has exclusive authority to diminish reservation boundaries, and that Congress must make its intent to do so clear and unambiguous." JA0956. But it accepted the Secretary's reasoning that § 398d will not be violated because the construction of a border wall "'is not the type of action that *could* change the status or boundaries of a reservation.'" JA0957 (quoting Sec'y Suppl. Mem. 5) (emphasis added). That is incorrect, for the reasons stated above. *See supra* pp. 46-48.

### 3. The Secretary's Proposed Border Wall Plainly Exceeds His Delegated Powers.

No other statute authorizes the Secretary to diminish the Nation's Reservation. As discussed above, Congress has delegated to the Secretary the power "to control and guard the boundaries and borders of the United States against the illegal entry of aliens[.]" 8 U.S.C. § 1103(a)(5). It has further provided

that "[t]he Secretary … shall take such actions as may be necessary to install additional physical barriers and roads … in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). These delegations do not come close to what is required to evidence congressional authorization to diminish an Indian reservation.

As the Supreme Court has repeatedly held and recently reaffirmed, "once a block of land is set aside for an Indian reservation …, the entire block retains its reservation status until Congress *explicitly indicates* otherwise," *McGirt v. Oklahoma*, 591 U.S. 894, 914 (2020) (emphasis added) (citation modified); *see also, e.g.*, *Solem*, 465 U.S. at 470 (Congress must "clearly evince an intent to change boundaries before diminishment will be found" (quotation marks omitted)); *Parker*, 577 U.S. at 488 (same). As discussed above, Congress has required construction of 700 miles of reinforced fencing along the 2,000-mile southern border, without mandating construction at *any* specific location, let alone the Nation's Reservation. *See supra* p. 42. This hardly constitutes clear and unambiguous evidence that Congress specifically "considered the conflict" between its authorized border security measures and the Nation's Reservation rights and "chose to resolve that conflict" by delegating authority to the Secretary to diminish the Nation's Reservation boundaries. *Dion*, 476 U.S. at 739-40. The

Secretary's plans to diminish the Nation's Reservation vastly exceed his delegated authority.

* * *

Promptly upon the establishment of the Nation's Reservation in 1917, Congress ratified its southern boundary as "the international boundary line between Mexico and the Papago Indian Reservation," Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561, 569, and it has never, in the 108 years since, diminished the Reservation or delegated authority to the Executive Branch to do so. But diminishment is precisely what the Secretary seeks to accomplish here. "[*U*]*ltra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022). That requirement could not be met more plainly or literally than it is here, and the Nation has accordingly established a likelihood of success on its ultra vires claim.

## III. The Equitable Factors Favor a Preliminary Injunction.

### A. The Nation Will Suffer Irreparable Injury Absent an Injunction.

If the Secretary moves forward with his border wall plans, the Nation will suffer several quintessential forms of irreparable harm.

First, it is difficult to imagine a more complete abrogation of the Nation's sovereignty than for the Secretary to move unilaterally over the Nation's vehement

objections to reshape the Nation's own homeland. Such "loss of sovereign authority over [a] Tribe's historic lands" is irreparable as it "is not one that can be calculated in terms of money." *Mashpee Wampanoag Tribe v. Bernhardt*, Civil Action No. 18-2242, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) (citation modified); *see also, e.g.*, *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (Gorsuch, J.) ("[We have] repeatedly stated that an invasion of tribal sovereignty can constitute irreparable injury." (citation modified)).

Second, such unilateral action would likewise undermine the Nation's proprietary control over its lands. "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights," *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982), and "where a tort claim seeks to stop a 'continuing trespass to land,' … irreparable injury exists, and injunctive relief is appropriate," *Texas*, 123 F.4th at 212 (quoting Restatement (Second) of Torts § 938 cmt. c (A.L.I. 1979)); *see also, e.g.*, *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) ("It is settled beyond the need for citation, however, that a given piece of property is considered to be unique, and its loss is always an irreparable injury.").

Third, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co*, 480 U.S. at 545. That is unquestionably the case here, where the Secretary's plan would flatten mountaintops and permanently scar the Reservation landscape. Lands sacred to the O'odham cannot be returned to form once the government and its contractors obliterate them.

The district court did not dispute any of this. Rather, it concluded that the Nation's "alleged harms based on its claim to the land leading up to the international border are not likely to materialize because … the Roosevelt Reservation likely exists along the Nation's border, and defendants have not yet articulated plans to construct outside the Roosevelt Reservation." JA0960. Even on its own terms, the district court's approach is incorrect—as detailed above, *supra* pp. 25-29, the Secretary's plans will unquestionably have significant impacts on the Nation's lands outside the disputed Roosevelt Reservation. And the approach flies in the face of Circuit precedent, as this Court has clearly explained that "[w]ithin the irreparable harm analysis itself—which assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law—we examine only whether that violation, if true, inflicts irremediable injury," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006). The harms asserted by the Nation cannot be

compensated for after the fact and hence qualify as precisely the sort of injury warranting injunctive relief.

### B. The Equities Weigh Heavily in Favor of an Injunction.

"The balance of harms and the public interest factors merge when the government is the opposing party." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021). Those factors also cut in favor of injunctive relief.

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (quotation marks omitted); *see also, e.g.*, *Glob. Health Council*, 153 F.4th at 22 (same); *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (same). Thus, because the government's actions are unauthorized trespasses, the public interest supports enjoining them.

The district court nevertheless ruled that the equitable factors favored the government due to the government's interests in securing the border. *See* JA0960-0961. "But our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 594 U.S. 758, 766 (2021); *see Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (same). The Nation, as described above, shares the government's

intense interest in border security. But however laudable the government's goals, they cannot justify illegal intrusions on the Nation's land.

In addition, there is substantial reason to doubt that border wall construction across the Nation's Reservation is needed to secure the border. The district court nowhere accounted for the fact that border security is the strongest it has been in decades, with the Department announcing in April that "[b]order encounters for first six months of the fiscal year are the lowest in recorded history," and CBP Commissioner Scott stating that "'[t]his isn't temporary—it's the new normal,'" Press Release, U.S. Dep't of Homeland Sec. (Apr. 9, 2026);[9] *see also, e.g.*, Press Release, U.S. Dep't of Homeland Sec. (July 16, 2026) ("With daily apprehensions down 94% from the previous administration, the border remains more secure than at any point in history.").[10] These trends are no different on the Tucson Sector of the international border (which includes the Nation's Reservation), where CBP reports a ninety-six percent decline in border apprehensions across that Sector this year as compared to 2024.[11] *See also* JA0219-0220, JA0221 (incidents of illegal entry on the Reservation have decreased by roughly ninety percent in recent years).

---

[9] https://www.dhs.gov/news/2026/04/09/trump-administration-delivers-11-straight-months-zero-releases-border.

[10] https://www.dhs.gov/news/2026/07/16/trump-administration-delivers-14-straight-months-zero-releases-border.

[11] https://www.cbp.gov/newsroom/stats/nationwide-encounters (reporting 14,606 apprehensions in 2026 to date, compared to 440,589 for same period in 2024)

Nor did the district court account for the fact that the government has chosen to abstain from border wall construction at other locations, including at Big Bend National Park, where in the face of economic and political pressures it has instead decided to use (at most) the same vehicle barriers and surveillance technology already in place on the Reservation. Dkt. 25 at 23; *see also* Decl. of Emma Yip, Ex. 1 at PDF p. 3, *Friends of the Ruidosa Church v. Mullin*, Case No. 3:26-cv-1099 (W.D. Tex. August 17, 2026) ("CBP is building one new access road, improving existing roads, installing detection technology and placing vehicle barriers in limited, strategic locations[.]" (citation omitted)).

The circumstances here are unprecedented. JA0744:14-16. To the Nation's knowledge, never in the modern era have federal officials claimed authority—absent specific authorization from Congress—to come uninvited onto a reservation, fundamentally alter and destroy reservation resources, and leave behind massive infrastructure rendering a portion of the reservation unusable by the tribe. As detailed above, the Secretary lacks the authority to trespass on the Nation's Reservation or to diminish its boundaries. If the Secretary wishes to abrogate those boundaries or the Nation's rights to exercise sovereign and

---

(locate section labeled "U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component," and select "Choose Region: Southwest Land Border" and "Area of Responsibility: Tucson Sector" fields).

proprietary control over the lands within them, his resort is to Congress, not to his own conception of the public interest as carried out in violation of the law.

## CONCLUSION

The Court should reverse and direct the entry of preliminary relief.

Dated: September 16, 2026

Respectfully submitted,

/s/ Riyaz A. Kanji
Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
jhandelsman@kanjikatzen.com
ajoshi@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.LC.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Appellant Tohono O'odham Nation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,977 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2026, I electronically filed the foregoing Opening Brief of Appellant with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji