No. 26-5306

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

TOHONO O'ODHAM NATION,

*Plaintiff-Appellant*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Columbia
Case No. 4:26-cv-2127-RJL (Hon. Richard J. Leon)

## ADDENDUM TO OPENING BRIEF OF APPELLANT


Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634

Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant Tohono O'odham Nation*


(additional counsel listed on next page)

Philip H. Tinker
KANJI & KATZEN, P.L.LC.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100

# TABLE OF CONTENTS

**Statutes**

8 U.S.C. § 1103(a)(5)....................1

25 U.S.C. § 398d....................8

Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561....................9

Act of June 28, 1926, ch. 701, 44 Stat. 775....................41

Act of May 21, 1928, ch. 645, 45 Stat. 617....................42

Act of Feb. 21, 1931, ch. 267, § 2, 46 Stat. 1202....................43

Act of July 28, 1937, ch. 527, § 1, 50 Stat. 536....................45

Act of June 13, 1939, ch. 203, § 2, 53 Stat. 819....................46

Act of Sept. 10, 1978, Pub. L. No. 95-361, 92 Stat. 595....................47

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border)....................49

**Legislative Materials**

Indian Appropriation Bill, 1919, U.S. Senate Comm. on Indian Affairs (Jan. 31, 1918)....................51

**Other Authorities**

1916 Executive Order (S. Doc. No. 70-53, at 1008–11)....................102

1917 Executive Order (S. Doc. No. 70-53, at 1005–08)....................106

Dated: September 16, 2026

Respectfully submitted,


*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
jhandelsman@kanjikatzen.com
ajoshi@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov


*Counsel for Appellant Tohono O'odham Nation*

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2026, I electronically filed the foregoing Addendum with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO





immigrant classes enumerated in this section, the provisions of this chapter relating to ineligibility to receive visas and the removal of aliens shall not be construed to apply to nonimmigrants—

(1) within the class described in paragraph (15)(A)(i) of section 1101(a) of this title, except those provisions relating to reasonable requirements of passports and visas as a means of identification and documentation necessary to establish their qualifications under such paragraph (15)(A)(i), and, under such rules and regulations as the President may deem to be necessary, the provisions of subparagraphs (A) through (C) of section 1182(a)(3) of this title;

(2) within the class described in paragraph (15)(G)(i) of section 1101(a) of this title, except those provisions relating to reasonable requirements of passports and visas as a means of identification and documentation necessary to establish their qualifications under such paragraph (15)(G)(i), and the provisions of subparagraphs (A) through (C) of section 1182(a)(3) of this title; and

(3) within the classes described in paragraphs (15)(A)(ii), (15)(G)(ii), (15)(G)(iii), or (15)(G)(iv) of section 1101(a) of this title, except those provisions relating to reasonable requirements of passports and visas as a means of identification and documentation necessary to establish their qualifications under such paragraphs, and the provisions of subparagraphs (A) through (C) of section 1182(a)(3) of this title.

(June 27, 1952, ch. 477, title I, § 102, 66 Stat. 173; Pub. L. 100–525, § 9(b), Oct. 24, 1988, 102 Stat. 2619; Pub. L. 101–649, title VI, § 603(a)(2), Nov. 29, 1990, 104 Stat. 5082; Pub. L. 102–232, title III, § 307(i), Dec. 12, 1991, 105 Stat. 1756; Pub. L. 104–208, div. C, title III, § 308(d)(4)(B), Sept. 30, 1996, 110 Stat. 3009–617.)

REFERENCES IN TEXT

This chapter, referred to in introductory provisions, was in the original, ''this Act'', meaning act June 27, 1952, ch. 477, 66 Stat. 163, known as the Immigration and Nationality Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of this title and Tables.

AMENDMENTS

1996—Pub. L. 104–208 substituted ''removal'' for ''exclusion or deportation'' in introductory provisions.

1991—Pars. (1) to (3). Pub. L. 102–232 substituted ''subparagraphs (A) through (C) of section 1182(a)(3) of this title'' for ''paragraph (3) (other than subparagraph (E)) of section 1182(a) of this title''.

1990—Pars. (1) to (3). Pub. L. 101–649 substituted ''(3) (other than subparagraph (E))'' for ''(27)'' in pars. (1) and (2), and ''paragraph (3) (other than subparagraph (E))'' for ''paragraphs (27) and (29)'' in par. (3).

1988—Par. (2). Pub. L. 100–525 substituted ''documentation'' for ''documentaion''.

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–208 effective, with certain transitional provisions, on the first day of the first month beginning more than 180 days after Sept. 30, 1996, see section 309 of Pub. L. 104–208, set out as a note under section 1101 of this title.

EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–232 effective as if included in the enactment of the Immigration Act of 1990, Pub. L. 101–649, see section 310(1) of Pub. L. 102–232, set out as a note under section 1101 of this title.

EFFECTIVE DATE OF 1990 AMENDMENT

Amendment by Pub. L. 101–649 applicable to individuals entering United States on or after June 1, 1991, see section 601(e)(1) of Pub. L. 101–649, set out as a note under section 1101 of this title.

DENIAL OF VISAS TO CERTAIN REPRESENTATIVES TO UNITED NATIONS

Pub. L. 101–246, title IV, § 407, Feb. 16, 1990, 104 Stat. 67, provided that:

''(a) IN GENERAL.—The President shall use his authority, including the authorities contained in section 6 of the United Nations Headquarters Agreement Act (Public Law 80–357) [Aug. 4, 1947, ch. 482, set out as a note under 22 U.S.C. 287], to deny any individual's admission to the United States as a representative to the United Nations if the President determines that such individual has been found to have been engaged in espionage activities directed against the United States or its allies and may pose a threat to United States national security interests.

''(b) WAIVER.—The President may waive the provisions of subsection (a) if the President determines, and so notifies the Congress, that such a waiver is in the national security interests of the United States.''

## § 1103. Powers and duties of the Secretary, the Under Secretary, and the Attorney General

### (a) Secretary of Homeland Security

(1) The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however*, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

(2) He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

(3) He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

(4) He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

(5) He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

(6) He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(7) He may, with the concurrence of the Secretary of State, establish offices of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

(8) After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws.

(9) Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.

(10) In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(11) The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—

(A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

(B) to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

**(b) Land acquisition authority**

(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter.

(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to section 3113 of title 40.

(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).

**(c) Commissioner; appointment**

The Commissioner shall be a citizen of the United States and shall be appointed by the President, by and with the advice and consent of the Senate. He shall be charged with any and all responsibilities and authority in the administration of the Service and of this chapter which are conferred upon the Attorney General as may be delegated to him by the Attorney General or which may be prescribed by the Attorney General. The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.

**(d) Statistical information system**

(1) The Commissioner, in consultation with interested academicians, government agencies, and other parties, shall provide for a system for collection and dissemination, to Congress and the public, of information (not in individually identifiable form) useful in evaluating the social, economic, environmental, and demographic impact of immigration laws.

(2) Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have not been admitted or have been removed from the United States, on the number of applications filed and granted for cancellation of removal, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

(3) Such system shall provide for the collection and dissemination of such information not less often than annually.

**(e) Annual report**

(1) The Commissioner shall submit to Congress annually a report which contains a summary of the information collected under subsection (d) of this section and an analysis of trends in immigration and naturalization.

(2) Each annual report shall include information on the number, and rate of denial administratively, of applications for naturalization, for each district office of the Service and by national origin group.

**(f) Minimum number of agents in States**

The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this chapter.

**(g) Attorney General**

**(1) In general**

The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

**(2) Powers**

The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.

(June 27, 1952, ch. 477, title I, § 103, 66 Stat. 173; Pub. L. 100–525, § 9(c), Oct. 24, 1988, 102 Stat. 2619; Pub. L. 101–649, title I, § 142, Nov. 29, 1990, 104 Stat. 5004; Pub. L. 104–208, div. C, title I, §§ 102(d), 125, 134(a), title III, §§ 308(d)(4)(C), (e)(4), 372, 373, Sept. 30, 1996, 110 Stat. 3009–555, 3009–562, 3009–564, 3009–618, 3009–620, 3009–646, 3009–647; Pub. L. 107–296, title XI, § 1102, Nov. 25, 2002, 116 Stat. 2273; Pub. L. 108–7, div. L, § 105(a)(1), (2), Feb. 20, 2003, 117 Stat. 531; Pub. L. 108–458, title V, § 5505(a), Dec. 17, 2004, 118 Stat. 3741; Pub. L. 111–122, § 2(a), Dec. 22, 2009, 123 Stat. 3480.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original, ''this Act'', meaning act June 27, 1952, ch. 477, 66 Stat. 163, known as the Immigration and Nationality Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of this title and Tables.

The Immigration Reform, Accountability and Security Enhancement Act of 2002, referred to in subsec. (g)(1), was S. 2444 of the 107th Congress, as introduced on May 2, 2002, which was not enacted into law. Provisions relating to the Executive Office for Immigration Review are contained in section 521 of Title 6, Domestic Security.

CODIFICATION

''Section 3113 of title 40'' substituted in subsec. (b)(3) for ''the Act of August 1, 1888 (Chapter 728; 25 Stat. 357)'' on authority of Pub. L. 107–217, § 5(c), Aug. 21, 2002, 116 Stat. 1303, the first section of which enacted Title 40, Public Buildings, Property, and Works.

AMENDMENTS

2009—Subsec. (h). Pub. L. 111–122 struck out subsec. (h), which directed the Attorney General to establish within the Criminal Division of the Department of Justice an Office of Special Investigations and to consult with the Secretary of Homeland Security concerning the prosecution or extradition of certain aliens.

2004—Subsec. (h). Pub. L. 108–458 added subsec. (h).

2003—Subsec. (a). Pub. L. 108–7, § 105(a)(1), amended Pub. L. 107–296, § 1102(2). See 2002 Amendment notes below.

Pub. L. 108–7, § 105(a)(2), which directed the amendment of Pub. L. 107–296, was executed to section 1102(2) of Pub. L. 107–296, to reflect the probable intent of Congress. See 2002 Amendment notes below.

2002—Pub. L. 107–296, § 1102(1), amended section catchline generally.

Subsec. (a). Pub. L. 107–296, § 1102(2)(A), as added by Pub. L. 108–7, § 105(a)(1), which directed the substitution of ''Secretary of Homeland Security'' for ''Attorney General'' in heading, was executed by inserting ''Secretary of Homeland Security'' as heading, to reflect the probable intent of Congress.

Subsec. (a)(1). Pub. L. 107–296, § 1102(2)(B), as added by Pub. L. 108–7, § 105(a)(1), substituted ''The Secretary of Homeland Security'' for ''The Attorney General''.

Pub. L. 107–296, § 1102(2)(C), formerly § 1102(2)(A), as redesignated by Pub. L. 108–7, § 105(a)(2), inserted ''Attorney General,'' after ''President,''. See 2003 Amendment note above.

Subsec. (a)(8) to (11). Pub. L. 107–296, § 1102(2)(D), formerly § 1102(2)(B), as redesignated by Pub. L. 108–7, § 105(a)(2), redesignated par. (8), relating to Attorney General authorization of State and local law enforcement officers in event of mass influx of aliens arriving, and par. (9), relating to Attorney General authority to support administrative detention of persons in non-Federal institutions, as pars. (10) and (11), respectively. See 2003 Amendment note above.

Subsec. (g). Pub. L. 107–296, § 1102(3), added subsec. (g).

1996—Subsec. (a). Pub. L. 104–208, § 372(1), (2), inserted ''(1)'' before first sentence and designated each sentence after the first sentence, which included second through ninth sentences, as a separate par. with appropriate consecutive numbering and initial indentation.

Pub. L. 104–208, § 125, inserted at end ''After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws. Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.''

Subsec. (a)(8). Pub. L. 104–208, § 372(3), added at end par. (8) relating to Attorney General authorization of State and local law enforcement officers in event of mass influx of aliens arriving.

Subsec. (a)(9). Pub. L. 104–208, § 373(1), added at end par. (9) relating to Attorney General authority to support administrative detention of persons in non-Federal institutions.

Subsec. (b). Pub. L. 104–208, § 102(d)(1)(B), added subsec. (b). Former subsec. (b) redesignated (c).

Subsec. (c). Pub. L. 104–208, § 373(2), inserted at end ''The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.''

Pub. L. 104–208, § 102(d)(1)(A), redesignated subsec. (b) as (c). Former subsec. (c) redesignated (d).

Subsec. (d). Pub. L. 104–208, § 102(d)(1)(A), redesignated subsec. (c) as (d). Former subsec. (d) redesignated (e).

Subsec. (d)(2). Pub. L. 104–208, § 308(e)(4), which directed amendment of subsec. (c)(2) by substituting ''cancellation of removal'' for ''suspension of deportation'', was executed by making the substitution in subsec. (d)(2) to reflect the probable intent of Congress and the redesignation of subsec. (c) as (d) by Pub. L. 104–208, § 102(d)(1)(A). See above.

Pub. L. 104–208, § 308(d)(4)(C), which directed amendment of subsec. (c)(2) by substituting ''not been admitted or have been removed'' for ''been excluded or deported'', was executed by making the substitution in subsec. (d)(2) to reflect the probable intent of Congress and the redesignation of subsec. (c) as (d) by Pub. L. 104–208, § 102(d)(1)(A). See above.

Subsec. (e). Pub. L. 104–208, § 102(d)(2), substituted ''subsection (d)'' for ''subsection (c)'' in par. (1).

Pub. L. 104–208, § 102(d)(1)(A), redesignated subsec. (d) as (e).

ADDENDUM 004



Subsec. (f). Pub. L. 104–208, § 134(a), added subsec. (f).

1990—Subsecs. (c), (d). Pub. L. 101–649 added subsecs. (c) and (d).

1988—Subsec. (a). Pub. L. 100–525, § 9(c)(1), substituted ''instructions'' for ''intructions'' and amended fourth sentence generally. Prior to amendment, fourth sentence read as follows: ''He is authorized, in accordance with the civil-service laws and regulations and the Classification Act of 1949, to appoint such employees of the Service as he deems necessary, and to delegate to them or to any officer or employee of the Department of Justice in his discretion any of the duties and powers imposed upon him in this chapter; he may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.''

Subsec. (b). Pub. L. 100–525, § 9(c)(2), struck out provision that Commissioner was to receive compensation at rate of $17,500 per annum.

### Effective Date of 2002 Amendment

Amendment by Pub. L. 107–296 effective on the date of the transfer of functions from the Commissioner of Immigration and Naturalization to officials of the Department of Homeland Security (Mar. 1, 2003), see section 1104 of Pub. L. 107–296, as added by Pub. L. 108–7, set out as an Effective Date note under section 521 of Title 6, Domestic Security.

### Effective Date of 1996 Amendment

Section 134(b) of div. C of Pub. L. 104–208 provided that: ''The amendment made by subsection (a) [amending this section] shall take effect 90 days after the date of the enactment of this Act [Sept. 30, 1996].''

Amendment by section 308(d)(4)(C), (e)(4) of Pub. L. 104–208 effective, with certain transitional provisions, on the first day of the first month beginning more than 180 days after Sept. 30, 1996, see section 309 of Pub. L. 104–208, set out as a note under section 1101 of this title.

### Effective Date of 1990 Amendment

Amendment by Pub. L. 101–649 effective Oct. 1, 1991, and applicable beginning with fiscal year 1992, see section 161(a) of Pub. L. 101–649, set out as a note under section 1101 of this title.

### Abolition of Immigration and Naturalization Service and Transfer of Functions

For abolition of Immigration and Naturalization Service, transfer of functions, and treatment of related references, see note set out under section 1551 of this title.

### Fingerprint Cards

Pub. L. 105–119, title I, Nov. 26, 1997, 111 Stat. 2448, provided in part: ''That beginning seven calendar days after the enactment of this Act [Nov. 26, 1997] and for each fiscal year thereafter, none of the funds appropriated or otherwise made available to the Immigration and Naturalization Service may be used by the Immigration and Naturalization Service to accept, for the purpose of conducting criminal background checks on applications for any benefit under the Immigration and Nationality Act [8 U.S.C. 1101 et seq.], any FD–258 fingerprint card which has been prepared by or received from any individual or entity other than an office of the Immigration and Naturalization Service with the following exceptions: (1) State and local law enforcement agencies; and (2) United States consular offices at United States embassies and consulates abroad under the jurisdiction of the Department of State or United States military offices under the jurisdiction of the Department of Defense authorized to perform fingerprinting services to prepare FD–258 fingerprint cards for applicants residing abroad applying for immigration benefits''.

### Improvement of Barriers at Border

Pub. L. 104–208, div. C, title I, § 102(a)–(c), Sept. 30, 1996, 110 Stat. 3009–554, 3009–555, as amended by Pub. L. 109–13, div. B, title I, § 102, May 11, 2005, 119 Stat. 306; Pub. L. 109–367, § 3, Oct. 26, 2006, 120 Stat. 2638; Pub. L. 110–161, div. E, title V, § 564(a), Dec. 26, 2007, 121 Stat. 2090, provided that:

''(a) In General.—The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

''(b) Construction of Fencing and Road Improvements Along the Border.—

''(1) Additional fencing along southwest border.—

''(A) Reinforced fencing.—In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

''(B) Priority areas.—In carrying out this section [amending this section], the Secretary of Homeland Security shall—

''(i) identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

''(ii) not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

''(C) Consultation.—

''(i) In general.—In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

''(ii) Savings provision.—Nothing in this subparagraph may be construed to—

''(I) create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

''(II) affect the eminent domain laws of the United States or of any State.

''(D) Limitation on requirements.—Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

''(2) Prompt acquisition of necessary easements.—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act [8 U.S.C. 1103(b)] (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

''(3) Safety features.—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features

into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

''(4) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as may be necessary to carry out this subsection. Amounts appropriated under this paragraph are authorized to remain available until expended.

''(c) WAIVER.—

''(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section [amending this section]. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

''(2) FEDERAL COURT REVIEW.—

''(A) IN GENERAL.—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

''(B) TIME FOR FILING OF COMPLAINT.—Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

''(C) ABILITY TO SEEK APPELLATE REVIEW.—An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.''

### IMPROVED BORDER EQUIPMENT AND TECHNOLOGY

Section 103 of div. C of Pub. L. 104–208 provided that: ''The Attorney General is authorized to acquire and use, for the purpose of detection, interdiction, and reduction of illegal immigration into the United States, any Federal equipment (including fixed wing aircraft, helicopters, four-wheel drive vehicles, sedans, night vision goggles, night vision scopes, and sensor units) determined available for transfer by any other agency of the Federal Government upon request of the Attorney General.''

### HIRING AND TRAINING STANDARDS

Section 106(a), (b) of div. C of Pub. L. 104–208 provided that:

''(a) REVIEW OF HIRING STANDARDS.—Not later than 60 days after the date of the enactment of this Act [Sept. 30, 1996], the Attorney General shall complete a review of all prescreening and hiring standards used by the Commissioner of Immigration and Naturalization, and, where necessary, revise such standards to ensure that they are consistent with relevant standards of professionalism.

''(b) CERTIFICATION.—At the conclusion of each of fiscal years 1997, 1998, 1999, 2000, and 2001, the Attorney General shall certify in writing to the Committees on the Judiciary of the House of Representatives and of the Senate that all personnel hired by the Commissioner of Immigration and Naturalization for such fiscal year were hired pursuant to the appropriate standards, as revised under subsection (a).''

### REPORT ON BORDER STRATEGY

Section 107 of div. C of Pub. L. 104–208 provided that:

''(a) EVALUATION OF STRATEGY.—The Comptroller General of the United States shall track, monitor, and evaluate the Attorney General's strategy to deter illegal entry in the United States to determine the efficacy of such strategy.

''(b) COOPERATION.—The Attorney General, the Secretary of State, and the Secretary of Defense shall cooperate with the Comptroller General of the United States in carrying out subsection (a).

''(c) REPORT.—Not later than one year after the date of the enactment of this Act [Sept. 30, 1996], and every year thereafter for the succeeding 5 years, the Comptroller General of the United States shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the results of the activities undertaken under subsection (a) during the previous year. Each such report shall include an analysis of the degree to which the Attorney General's strategy has been effective in reducing illegal entry. Each such report shall include a collection and systematic analysis of data, including workload indicators, related to activities to deter illegal entry and recommendations to improve and increase border security at the border and ports of entry.''

### COMPENSATION FOR IMMIGRATION JUDGES

Section 371(c) of div. C of Pub. L. 104–208 provided that:

''(1) IN GENERAL.—There shall be four levels of pay for immigration judges, under the Immigration Judge Schedule (designated as IJ–1, 2, 3, and 4, respectively), and each such judge shall be paid at one of those levels, in accordance with the provisions of this subsection.

''(2) RATES OF PAY.—

''(A) The rates of basic pay for the levels established under paragraph (1) shall be as follows:

| | |
|---|---|
| IJ–1 ............ | 70% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–2 ............ | 80% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–3 ............ | 90% of the next to highest rate of basic pay for the Senior Executive Service |
| IJ–4 ............ | 92% of the next to highest rate of basic pay for the Senior Executive Service. |

''(B) Locality pay, where applicable, shall be calculated into the basic pay for immigration judges.

''(3) APPOINTMENT.—

''(A) Upon appointment, an immigration judge shall be paid at IJ–1, and shall be advanced to IJ–2 upon completion of 104 weeks of service, to IJ–3 upon completion of 104 weeks of service in the next lower rate, and to IJ–4 upon completion of 52 weeks of service in the next lower rate.

''(B) Notwithstanding subparagraph (A), the Attorney General may provide for appointment of an immigration judge at an advanced rate under such circumstances as the Attorney General may determine appropriate.

''(4) TRANSITION.—Immigration judges serving as of the effective date shall be paid at the rate that corresponds to the amount of time, as provided under paragraph (3)(A), that they have served as an immigration judge, and in no case shall be paid less after the effective date than the rate of pay prior to the effective date.''

[Section 371(d)(2) of div. C of Pub. L. 104–208 provided that: ''Subsection (c) [set out above] shall take effect 90 days after the date of the enactment of this Act [Sept. 30, 1996].'']

### MACHINE-READABLE DOCUMENT BORDER SECURITY PROGRAM

Pub. L. 100–690, title IV, § 4604, Nov. 18, 1988, 102 Stat. 4289, which required Department of State, United States Customs Service, and Immigration and Naturalization Service to develop a comprehensive machine-readable travel and identity document border security program that would improve border entry and departure control through automated data capture of machine-readable travel and identity documents, directed specified agencies and organizations to contribute law enforcement data for the system, authorized appropriations for the program, and required continuing full im-

plementation in fiscal years 1990, 1991, and 1992, by all participating agencies, was repealed by Pub. L. 102–583, § 6(e)(1), Nov. 2, 1992, 106 Stat. 4933.

IMMIGRATION AND NATURALIZATION SERVICE PERSONNEL ENHANCEMENT

Pub. L. 100–690, title VII, § 7350, Nov. 18, 1988, 102 Stat. 4473, provided that:

''(a) PILOT PROGRAM REGARDING THE IDENTIFICATION OF CERTAIN ALIENS.—

''(1) Within 6 months after the effective date of this subtitle [Nov. 18, 1988], the Attorney General shall establish, out of funds appropriated pursuant to subsection (c)(2), a pilot program in 4 cities to improve the capabilities of the Immigration and Naturalization Service (hereinafter in this section referred to as the 'Service') to respond to inquiries from Federal, State, and local law enforcement authorities concerning aliens who have been arrested for or convicted of, or who are the subject of any criminal investigation relating to, a violation of any law relating to controlled substances (other than an aggravated felony as defined in section 101(a)(43) of the Immigration and Nationality Act [8 U.S.C. 1101(a)(43)], as added by section 7342 of this subtitle).

''(2) At the end of the 12-month period after the establishment of such pilot program, the Attorney General shall provide for an evaluation of its effectiveness, including an assessment by Federal, State, and local prosecutors and law enforcement agencies. The Attorney General shall submit a report containing the conclusions of such evaluation to the Committees on the Judiciary of the House of Representatives and of the Senate within 60 days after the completion of such evaluation.

''(b) HIRING OF INVESTIGATIVE AGENTS.—

''(1) Any investigative agent hired by the Attorney General for purposes of this section shall be employed exclusively to assist Federal, State, and local law enforcement agencies in combating drug trafficking and crimes of violence by aliens.

''(2) Any investigative agent hired under this section who is older than 35 years of age shall not be eligible for Federal retirement benefits made available to individuals who perform hazardous law enforcement activities.''

PILOT PROGRAM TO ESTABLISH OR IMPROVE COMPUTER CAPABILITIES

Pub. L. 99–570, title I, § 1751(e), Oct. 27, 1986, 100 Stat. 3207–48, provided that:

''(1) From the sums appropriated to carry out this Act, the Attorney General, through the Investigative Division of the Immigration and Naturalization Service, shall provide a pilot program in 4 cities to establish or improve the computer capabilities of the local offices of the Service and of local law enforcement agencies to respond to inquiries concerning aliens who have been arrested or convicted for, or are the subject to criminal investigation relating to, a violation of any law relating to controlled substances. The Attorney General shall select cities in a manner that provides special consideration for cities located near the land borders of the United States and for large cities which have major concentrations of aliens. Some of the sums made available under the pilot program shall be used to increase the personnel level of the Investigative Division.

''(2) At the end of the first year of the pilot program, the Attorney General shall provide for an evaluation of the effectiveness of the program and shall report to Congress on such evaluation and on whether the pilot program should be extended or expanded.''

EMERGENCY PLANS FOR REGULATION OF NATIONALS OF ENEMY COUNTRIES

Attorney General to develop national security emergency plans for regulation of immigration, regulation of nationals of enemy countries, and plans to implement laws for control of persons entering or leaving the United States, see section 1101(4) of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of Title 42, The Public Health and Welfare.

EX. ORD. NO. 13404. TASK FORCE ON NEW AMERICANS

Ex. Ord. No. 13404, June 7, 2006, 71 F.R. 33593, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to strengthen the efforts of the Department of Homeland Security and Federal, State, and local agencies to help legal immigrants embrace the common core of American civic culture, learn our common language, and fully become Americans, it is hereby ordered as follows:

SECTION 1. *Establishment*. The Secretary of Homeland Security (Secretary) shall immediately establish within the Department of Homeland Security (Department) a Task Force on New Americans (Task Force).

SEC. 2. *Membership and Operation*. (a) The Task Force shall be limited to the following members or employees designated by them at no lower than the Assistant Secretary level or its equivalent:

(i) the Secretary of Homeland Security, who shall serve as Chair;

(ii) the Secretary of State;

(iii) the Secretary of the Treasury;

(iv) the Secretary of Defense;

(v) the Attorney General;

(vi) the Secretary of Agriculture;

(vii) the Secretary of Commerce;

(viii) the Secretary of Labor;

(ix) the Secretary of Health and Human Services;

(x) the Secretary of Housing and Urban Development;

(xi) the Secretary of Education;

(xii) such other officers or employees of the Department of Homeland Security as the Secretary may from time to time designate; and

(xiii) such other officers of the United States as the Secretary may designate from time to time, with the concurrence of the respective heads of departments and agencies concerned.

(b) The Secretary shall convene and preside at meetings of the Task Force, direct its work, and as appropriate, establish and direct subgroups of the Task Force that shall consist exclusively of Task Force members. The Secretary shall designate an official of the Department to serve as the Executive Secretary of the Task Force, and the Executive Secretary shall head the staff assigned to the Task Force.

SEC. 3. *Functions*. Consistent with applicable law, the Task Force shall:

(a) provide direction to executive departments and agencies (agencies) concerning the integration into American society of America's legal immigrants, particularly through instruction in English, civics, and history;

(b) promote public-private partnerships that will encourage businesses to offer English and civics education to workers;

(c) identify ways to expand English and civics instruction for legal immigrants, including through faith-based, community, and other groups, and ways to promote volunteer community service; and

(d) make recommendations to the President, through the Secretary, from time to time regarding:

(i) actions to enhance cooperation among agencies on the integration of legal immigrants into American society;

(ii) actions to enhance cooperation among Federal, State, and local authorities responsible for the integration of legal immigrants;

(iii) changes in rules, regulations, or policy to improve the effective integration of legal immigrants into American society; and

(iv) proposed legislation relating to the integration of legal immigrants into American society.

SEC. 4. *Administration*. (a) To the extent permitted by law, the Department shall provide the funding and administrative support the Task Force needs to implement this order, as determined by the Secretary.

(b) Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted by law to an agency or the head thereof; or

(ii) functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals.

(c) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(d) This order is intended to improve the internal management of the Federal Government. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity against the United States, its departments, agencies, entities, instrumentalities, officers, employees, agents, or any other person.

GEORGE W. BUSH.

### § 1104. Powers and duties of Secretary of State

#### (a) Powers and duties

The Secretary of State shall be charged with the administration and the enforcement of the provisions of this chapter and all other immigration and nationality laws relating to (1) the powers, duties, and functions of diplomatic and consular officers of the United States, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas; (2) the powers, duties, and functions of the Administrator; and (3) the determination of nationality of a person not in the United States. He shall establish such regulations; prescribe such forms of reports, entries and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out such provisions. He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the department or independent establishment under whose jurisdiction the employee is serving, any of the powers, functions, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Department of State or of the American Foreign Service.

#### (b) Designation and duties of Administrator

The Secretary of State shall designate an Administrator who shall be a citizen of the United States, qualified by experience. The Administrator shall maintain close liaison with the appropriate committees of Congress in order that they may be advised regarding the administration of this chapter by consular officers. The Administrator shall be charged with any and all responsibility and authority in the administration of this chapter which are conferred on the Secretary of State as may be delegated to the Administrator by the Secretary of State or which may be prescribed by the Secretary of State, and shall perform such other duties as the Secretary of State may prescribe.

#### (c) Passport Office, Visa Office, and other offices; directors

Within the Department of State there shall be a Passport Office, a Visa Office, and such other offices as the Secretary of State may deem to be appropriate, each office to be headed by a director. The Directors of the Passport Office and the Visa Office shall be experienced in the administration of the nationality and immigration laws.

#### (d) Transfer of duties

The functions heretofore performed by the Passport Division and the Visa Division of the Department of State shall hereafter be performed by the Passport Office and the Visa Office, respectively.

#### (e) General Counsel of Visa Office; appointment and duties

There shall be a General Counsel of the Visa Office, who shall be appointed by the Secretary of State and who shall serve under the general direction of the Legal Adviser of the Department of State. The General Counsel shall have authority to maintain liaison with the appropriate officers of the Service with a view to securing uniform interpretations of the provisions of this chapter.

(June 27, 1952, ch. 477, title I, § 104, 66 Stat. 174; Pub. L. 87-510, § 4(a)(2), June 28, 1962, 76 Stat. 123; Pub. L. 88–426, title III, § 305(43), Aug. 14, 1964, 78 Stat. 428; Pub. L. 95–105, title I, § 109(b)(1), Aug. 17, 1977, 91 Stat. 847; Pub. L. 100–525, § 9(d), Oct. 24, 1988, 102 Stat. 2620; Pub. L. 103–236, title I, § 162(h)(2), Apr. 30, 1994, 108 Stat. 407.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (a), (b), and (e), was in the original, ''this Act'', meaning act June 27, 1952, ch. 477, 66 Stat. 163, known as the Immigration and Nationality Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of this title and Tables.

AMENDMENTS

1994—Pub. L. 103–236, § 162(h)(2)(A), struck out ''; Bureau of Consular Affairs'' after ''Secretary of State'' in section catchline.

Subsec. (a)(2). Pub. L. 103–236, § 162(h)(2)(B), substituted ''the Administrator'' for ''the Bureau of Consular Affairs''.

Subsec. (b). Pub. L. 103–236, § 162(h)(2)(C), amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: ''There is established in the Department of State a Bureau of Consular Affairs, to be headed by an Assistant Secretary of State for Consular Affairs. The Assistant Secretary of State for Consular Affairs shall be a citizen of the United States, qualified by experience, and shall maintain close liaison with the appropriate committees of Congress in order that they may be advised regarding the administration of this chapter by consular officers. He shall be charged with any and all responsibility and authority in the administration of the Bureau and of this chapter which are conferred on the Secretary of State as may be delegated to him by the Secretary of State or which may be prescribed by the Secretary of State. He shall also perform such other duties as the Secretary of State may prescribe.''

Subsec. (c). Pub. L. 103–236, § 162(h)(2)(D), substituted ''Department of State'' for ''Bureau''.

Subsec. (d). Pub. L. 103–236, § 162(h)(2)(E), struck out before period at end '', of the Bureau of Consular Affairs''.

1988—Pub. L. 100–525 substituted ''Bureau of Consular Affairs'' for ''Bureau of Security and Consular Affairs'' in section catchline.

1977—Subsec. (a)(2). Pub. L. 95–105, § 109(b)(1)(A), struck out ''Security and'' after ''Bureau of''.

Subsec. (b). Pub. L. 95–105, § 109(b)(1)(B), substituted ''Consular Affairs, to be headed by an Assistant Secretary of State for Consular Affairs'' for ''Security and Consular Affairs, to be headed by an administrator (with an appropriate title to be designated by the Secretary of State), with rank equal to that of an Assist-

United States Code Annotated
Title 25. Indians (Refs & Annos)
Chapter 12. Lease, Sale, or Surrender of Allotted or Unallotted Lands

25 U.S.C.A. § 398d

# § 398d. Changes in boundaries of Executive order reservations

Currentness

Changes in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress.

CREDIT(S)

(Mar. 3, 1927, c. 299, § 4, 44 Stat. 1347; Pub.L. 94-579, Title VII, § 704(a), Oct. 21, 1976, 90 Stat. 2792.)

25 U.S.C.A. § 398d, 25 USCA § 398d
Current through P.L. 119-100. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

ADDENDUM 009



*Provided*, That at any general election of the Territory of Hawaii, held within two years after the conclusion of peace, the repeal of this Act may, upon petition of not less than twenty per centum of the qualified electors of said Territory at the last preceding general election, be submitted to a vote of the qualified electors of said territory, and if a majority of all the qualified electors thereof voting upon such question shall vote to repeal this Act, it shall thereafter not be in force and effect, otherwise it shall be in full force and effect.

*Proviso.* Repeal may be submitted to a vote, after the war.

Election.

SEC. 2. That the said petition shall be addressed to and filed with the Secretary of the Territory at least two months before the election at which the question is to be voted upon, and the person obtaining any signature to such petition shall make affidavit that he witnessed the signing of the same and believes the address of each petitioner affixed to his name is the true address of such petitioner. Such election shall be conducted under the laws of the Territory provided for general elections.

Petition required.

Approved, May 23, 1918.

---

May 25, 1918. [S. 4409.]

[Public, No. 158.]

**CHAP. 85.**—An Act To amend section fifteen of the Act approved June third, nineteen hundred and sixteen, entitled "An Act for making further and more effectual provision for the national defense, and for other purposes," as amended by the Act approved May twelfth, nineteen hundred and seventeen, entitled "An Act making appropriations for the support of the Army for the fiscal year ending June thirtieth, nineteen hundred and eighteen, and for other purposes."

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That section fifteen of the Act approved June third, nineteen hundred and sixteen, entitled "An Act for making further and more effectual provision for the national defense, and for other purposes," as amended by the Act approved May twelfth, nineteen hundred and seventeen, entitled "An Act making appropriations for the support of the Army for the fiscal year ending June thirtieth, nineteen hundred and eighteen, and for other purposes," be, and the same is hereby, amended to read as follows:

National Defense Act. Section amended. Vol. 39, p. 176, amended. *Ante*, p. 72.

"SEC. 15. CHAPLAINS.—The President is authorized to appoint, by and with the advice and consent of the Senate, chaplains in the Army at the rate of not to exceed, including chaplains now in the service, one for each one thousand two hundred officers and men in all branches of the Military Establishment, with rank, pay, and allowances as now authorized by law: *Provided*, That there shall be assigned at least one chaplain for each regiment of Cavalry, Infantry, Field Artillery, and Engineers: *Provided further*, That the persons appointed under this Act shall be duly accredited by some religious denomination or organization and of good standing therein, under such regulations as may be prescribed by the Secretary of War: *And provided further*, That no person shall be appointed chaplain in the Army who on the date of appointment is more than forty-five years of age."

Chaplains. Ratio of number authorized.

*Provisos.* Line assignments.

Qualifications.

Age limitation.

Approved, May 25, 1918.

---

May 25, 1918. [H. R. 8696.]

[Public, No. 159.]

**CHAP. 86.**—An Act Making appropriations for the current and contingent expenses of the Bureau of Indian Affairs, for fulfilling treaty stipulations with various Indian tribes, and for other purposes, for the fiscal year ending June thirtieth, nineteen hundred and nineteen.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the following sums be, and they are hereby, appropriated, out of any money in the Treasury not otherwise appropriated, for the purpose of paying

Indian Department appropriations.

the current and contingent expenses of the Bureau of Indian Affairs, for fulfilling treaty stipulations with various Indian tribes, and in full compensation for all offices and salaries which are provided for herein for the service of the fiscal year ending June thirtieth, nineteen hundred and nineteen, namely:

## SURVEYING AND ALLOTTING INDIAN RESERVATIONS (REIMBURSABLE).

Surveying, allotting in severalty, etc.
Vol. 24, p. 388.

For the survey, resurvey, classification, and allotment of lands in severalty under the provisions of the Act of February eighth, eighteen hundred and eighty-seven (Twenty-fourth Statutes at Large, page three hundred and eighty-eight), entitled "An Act to provide for the allotment of lands in severalty to Indians," and under any other Act or Acts providing for the survey or allotment of Indian lands, $50,000, to be repaid proportionally out of any Indian moneys held in trust or otherwise by the United States and available by law for such reimbursable purposes and to remain available until expended: *Provided,* That no part of said sum shall be used for the survey, resurvey, classification, or allotment of any land in severalty on the public domain to any Indian, whether of the Navajo or other tribes, within the State of New Mexico and the State of Arizona, who was not residing upon the public domain prior to June thirtieth, nineteen hundred and fourteen.

Repayment.

*Proviso.*
Use in New Mexico and Arizona restricted.

Irrigation on reservations.

## IRRIGATION ON INDIAN RESERVATIONS (REIMBURSABLE).

Construction, maintenance, etc., of projects.

For the construction, repair, and maintenance of irrigation systems, and for purchase or rental of irrigation tools and appliances, water rights, ditches, and lands necessary for irrigation purposes for Indian reservations and allotments; for operation of irrigation systems or appurtenances thereto, when no other funds are applicable or available for the purpose; for drainage and protection of irrigable lands from damage by floods or loss of water rights, upon the Indian irrigation projects named below:

Allotments to districts.

Irrigation district one: Ahtanum project, $23,000; Satus, Toppenish, and Simcoe projects, Yakima Reservation, $3,000; Stranger Marsh project, Colville Reservation, $5,200; total, $31,200:

Irrigation district two: Shivwitz Reservation, $1,200; Moapa River Reservation, $1,000; Western Shoshone, $9,500; Walker River Reservation, $6,800; total, $18,500;

Irrigation district four: Agua Caliente Reservation, $3,000; Morongo Reservation, $2,000; Pala Reservation, $20,000; Pauma Reservation, $5,000; Rincon Reservation, $4,000; Ak Chin Reservation, $800; Papago Reservation, San Xavier, $2,000; miscellaneous projects, $10,000; total, $46,800;

Irrigation district five: Southern Ute Reservation, Pine River project, $9,000; San Juan Reservation, $22,000; New Mexico Pueblos, $12,000; Zuni Reservation, $5,000; Navajo, miscellaneous projects, including Tes-nos-pos, Moencopi Wash, Captain Tom Wash, and Red Lake, $20,000; total, $68,000;

Administrative expenses.

For necessary miscellaneous expenses incident to the general administration of Indian irrigation projects, including salaries of not to exceed five supervising engineers:

In Indian irrigation district one: Oregon, Washington, northern California, and northern Idaho, $10,000;

In Indian irrigation district two: Southern Idaho, Nevada, and Utah, $10,000;

In Indian irrigation district three: Montana, Wyoming, and South Dakota, $8,000;

ADDENDUM 011



In Indian irrigation district four: Central and southern California and southern Arizona, $15,000;

In Indian irrigation district five: Northern Arizona, New Mexico, and Colorado, $12,000;

Stream gauging.

For cooperative stream gauging with the United States Geological Survey, $4,000;

Investigating new projects, etc.
Vol. 36, p. 838.

For necessary surveys and investigations to determine the feasibility and estimated cost of new projects and power and reservoir sites on Indian reservations in accordance with the provisions of section thirteen of the Act of June twenty-fifth, nineteen hundred and ten, $10,000;

Chief engineer, etc.

For pay of one chief irrigation engineer, $4,000;

One assistant chief irrigation engineer, $2,500;

One superintendent of irrigation competent to pass upon water rights, $2,500;

One field-cost accountant, $2,250;

Travel etc., expenses.

And for traveling and incidental expenses of officials and employees of the Indian irrigation service, including sleeping-car fare, and a per diem not exceeding $3.50 in lieu of subsistence when actually employed in the field and away from designated headquarters, $6,000;

Available until expended.
Vol. 38, p. 583.
*Proviso.*
Use restricted.

In all, for irrigation on Indian reservations, $250,750, reimbursable as provided in the Act of August first, nineteen hundred and fourteen, and to remain available until expended: *Provided,* That no part of this appropriation shall be expended on any irrigation system or reclamation project for which public funds are or may be otherwise available: *Provided further,* That the foregoing amounts appropriated for such purposes shall be available interchangeably in the discretion of the Secretary of the Interior for the necessary expenditures for damage by floods and other unforeseen exigencies: *Provided, however,* That the amount so interchanged shall not exceed in the aggregate ten per centum of all the amounts so appropriated.

Flood damages, etc.

Limitation.

## SUPPRESSING LIQUOR TRAFFIC.

Suppressing liquor traffic.
*Proviso.*
Having liquors in possession made an offense.
Punishment.

For the suppression of the traffic in intoxicating liquors among Indians, $150,000: *Provided,* That on and after September first, nineteen hundred and eighteen, possession by a person of intoxicating liquors in the Indian country where the introduction is or was prohibited by treaty or Federal statute shall be an offense and punished in accordance with the provisions of the Acts of July twenty-third, eighteen hundred and ninety-two (Twenty-seventh Statutes at Large, page two hundred and sixty), and January thirtieth, eighteen hundred and ninety-seven (Twenty-ninth Statutes at Large, page five hundred and six).

Vol. 27, p. 260. Vol. 29, p. 506.

## RELIEVING DISTRESS, AND SO FORTH.

Relieving distress, preventing contagious diseases, etc.

For the relief and care of destitute Indians not otherwise provided for, and for the prevention and treatment of tuberculosis, trachoma, smallpox, and other contagious and infectious diseases, including transportation of patients to and from hospitals and sanatoria, $350,000: *Provided,* That not to exceed $40,000 of said amount may be expended in the construction and equipment of new hospitals at a unit cost of not exceeding $15,000: *Provided further,* That this appropriation may be used also for general medical and surgical treatment of Indians, including the maintenance and operation of general hospitals, where no other funds are applicable or available for that purpose: *Provided further,* That out of the appropriation herein authorized, there shall be available for the maintenance of the sanatoria and hospitals hereinafter named, and for incidental and all other expenses for their proper conduct and management, includ-

*Provisos.*
Limit for new hospitals.

Use for general treatment, etc.

Allotments to specified hospitals and sanatoria.

ing pay of employees, repairs, equipment, and improvements, not to exceed the following amounts: Blackfeet hospital, Montana, $12,500; Carson hospital, Nevada, $10,000; Cheyenne and Arapahoe hospital, Oklahoma, $10,000; Choctaw and Chickasaw hospital, Oklahoma, $35,000; Fort Lapwai sanatorium, Idaho, $40,000; Laguna sanatorium, New Mexico, $17,000; Mescalero hospital, New Mexico, $10,000; Navajo sanatorium, Arizona, $10,000; Pima hospital, Arizona, $10,000; Phoenix sanatorium, Arizona, $40,000; Spokane hospital, Washington, $10,000; Sac and Fox sanatorium, Iowa, $25,000; Turtle Mountain hospital, North Dakota, $10,000; Winnebago hospital, Nebraska, $15,000; Crow Creek hospital, South Dakota, $10,000; Hoopa Valley hospital, California, $10,000; Jicarilla hospital, New Mexico, $10,000; Truxton Canyon camp hospital, Arizona, $10,000; Indian Oasis hospital, Arizona, $10,000.

Indian schools.

## SUPPORT OF INDIAN SCHOOLS.

Support of pupils, etc.

Provisos. Deaf and dumb, or blind.

In public schools.

Parentage restriction.

Not available for specified schools.

For support of Indian day and industrial schools not otherwise provided for, for other educational and industrial purposes in connection therewith, $1,650,000: *Provided*, That not to exceed $40,000 of this amount may be used for the support and education of deaf and dumb or blind Indian children: *Provided further*, That not more than $200,000 of the amount herein appropriated may be expended for the tuition of Indian children enrolled in the public schools: *Provided further*, That hereafter no appropriation, except appropriations made pursuant to treaties, shall be used to educate children of less than one-fourth Indian blood whose parents are citizens of the United States and of the State wherein they live and where there are adequate free school facilities provided: *And provided further*, That no part of this appropriation shall be used for the support of Indian day and industrial schools where specific appropriation is made.

School and agency buildings.

## INDIAN SCHOOL AND AGENCY BUILDINGS.

Construction, etc.

Provisos. Supervising construction.

Heat and light to employees.

Not included in compensation limit. Vol. 37, p. 521.

For construction, lease, purchase, repair, and improvement of school and agency buildings, including the purchase of necessary lands and the installation, repair, and improvement of heating, lighting, power, and sewerage and water systems in connection therewith, $350,000: *Provided*, That this appropriation shall be available for the payment of salaries and expenses of persons employed in the supervision of construction work on school and agency buildings in the Indian Service: *Provided further*, That the Secretary of the Interior is authorized to allow employees in the Indian Service who are furnished quarters necessary heat and light for such quarters without charge, such heat and light to be paid for out of the fund chargeable with the cost of heating and lighting other buildings at the same place: *And provided further*, That the amount so expended for agency purposes shall not be included in the maximum amounts for compensation of employees prescribed by section one, Act of August twenty-fourth, nineteen hundred and twelve.

Transportation.

## INDIAN SCHOOL TRANSPORTATION.

Collecting, etc., pupils.

Provisos. Obtaining employment for pupils.

For collection and transportation of pupils to and from Indian and public schools, and for placing school pupils, with the consent of their parents, under the care and control of white families qualified to give them moral, industrial, and educational training, $72,000: *Provided*, That not exceeding $5,000 of this sum may be used for obtaining remunerative employment for Indian youths and, when necessary, for payment of transportation and other expenses to their

ADDENDUM 013



places of employment: *Provided further*, That where practicable the transportation and expenses so paid shall be refunded and shall be returned to the appropriation from which paid. The provisions of this section shall also apply to native Indian pupils of school age under twenty-one years of age brought from Alaska.

Repayment.

Alaska pupils.

## PER CAPITA COST.

Per capita cost.

Limit on amount per pupil.

That hereafter, except for pay of superintendents and for transportation of goods and supplies and transportation of pupils, not more than $200 shall be expended from appropriations made in this Act, or any other Act, for the annual support and education of any one pupil in any Indian school, unless the attendance in any school shall be less than one hundred pupils, in which case the Secretary of the Interior may authorize a per capita expenditure of not to exceed $225: *Provided*, That the total amount appropriated for the support of such school shall not be exceeded: *Provided further*, That the number of pupils in any school entitled to the per capita allowance hereby provided for shall be determined by taking the average attendance for the entire fiscal year and not any fractional part thereof: *Provided further*, That the foregoing shall also apply to expenditures for the fiscal year ending June thirtieth, nineteen hundred and eighteen.

*Provisos.* Restriction.

Ascertainment of average.

Applicable to fiscal year 1918.

## INDUSTRIAL WORK AND CARE OF TIMBER.

Industrial work, etc.

Timber preservation, etc.

For the purposes of preserving living and growing timber on Indian reservations and allotments, and to educate Indians in the proper care of forests; for the employment of suitable persons as matrons to teach Indian women and girls housekeeping and other household duties, for necessary traveling expenses of such matrons, and for furnishing necessary equipments and supplies and renting quarters for them where necessary; for the conducting of experiments on Indian school or agency farms designed to test the possibilities of soil and climate in the cultivation of trees, grains, vegetables, cotton, and fruits, and for the employment of practical farmers and stockmen, in addition to the agency and school farmers now employed; for necessary traveling expenses of such farmers and stockmen and for furnishing necessary equipment and supplies for them; and for superintending and directing farming and stock raising among Indians, $475,000, of which sum not less than $75,000 shall be used for the employment of field matrons: *Provided*, That the foregoing shall not, as to timber, apply to the Menominee Indian Reservation in Wisconsin: *Provided further*, That hereafter no money shall be expended for the employment of any farmer or expert farmer at a salary of or in excess of $50 per month, unless he shall first have procured and filed with the Commissioner of Indian Affairs a certificate of competency showing that he is a farmer of actual experience and qualified to instruct others in the art of practical agriculture, such certificate to be certified and issued to him by the president or dean of the State agricultural college of the State in which his services are to be rendered, or by the president or dean of the State agricultural college of an adjoining State: *Provided*, That this provision shall not apply to persons employed in the Indian Service as farmer or expert farmer prior to January first, nineteen hundred and seventeen: *And provided further*, That this shall not apply to Indians employed or to be employed as assistant farmer: *And provided further*, That not to exceed $25,000 of the amount herein appropriated shall be used to conduct experiments on Indian school or agency farms to test the possibilities of soil and climate in the cultivation of trees, cotton, grain,

Matrons.

Agricultural experiments, etc.

Farmers and stockmen.

Field matrons.

*Provisos.* Menominee Reservation.

Farmers to have competency certificates.

Exceptions.

Indian employees.

Experiments limited.

ADDENDUM 014



Pay not affected by limit.
Vol. 37, p. 521.

vegetables, and fruits: *Provided, also*, That the amounts paid to matrons, foresters, farmers, physicians, and stockmen provided for in this Act shall not be included within the limitation on salaries and compensation of employees contained in the Act of August twenty-fourth, nineteen hundred and twelve.

Supplies.

PURCHASE AND TRANSPORTATION OF INDIAN SUPPLIES.

Purchase, transportation, etc.

Proviso.
Three warehouses.

For expenses necessary to the purchase of goods and supplies for the Indian Service, including inspection, pay of necessary employees, and all other expenses connected therewith, including advertising, storage, and transportation of Indian goods and supplies, $300,000: *Provided*, That no part of the sum hereby appropriated shall be used for the maintenance of to exceed three warehouses in the Indian Service.

TELEGRAPHING AND TELEPHONING.

Telegraphing and telephoning.

For telegraph and telephone toll messages on business pertaining to the Indian Service sent and received by the Bureau of Indian Affairs at Washington, $8,000.

Court costs.

COURT COSTS.

Legal expenses in allotment suits.

Proviso.
No attorneys' fees.

For witness fees and other legal expenses incurred in suits instituted in behalf of or against Indians involving the question of title to lands allotted to them, or the right of possession of personal property held by them, and in hearings set by the United States local land officers to determine the rights of Indians to public lands, $1,000: *Provided*, That no part of this appropriation shall be used in the payment of attorneys' fees.

EXPENSES OF INDIAN COMMISSIONERS.

Citizen commission.

For expenses of the Board of Indian Commissioners, $10,000.

PAY OF INDIAN POLICE.

Indian police.

For pay of Indian police, including chiefs of police at not to exceed $50 per month each and privates at not to exceed $30 per month each, to be employed in maintaining order, for purchase of equipments and supplies and for rations for policemen at nonration agencies, $200,000.

PAY OF JUDGES OF INDIAN COURTS.

Judges, Indian courts.

For pay of judges of Indian courts where tribal relations now exist, $8,000.

GENERAL EXPENSES OF INDIAN SERVICE.

Contingent expenses, special agents, etc.
*Post*, p. 797.

Provisos.
Amount at once.
Five Civilized Tribes Competency Commission.

For pay of special agents, at $2,000 per annum; for traveling and incidental expenses of such special agents, including sleeping-car fare, and a per diem of not to exceed $3.50 in lieu of subsistence, in the discretion of the Secretary of the Interior, when actually employed on duty in the field or ordered to the seat of government; for transportation and incidental expenses of officers and clerks of the Office of Indian Affairs when traveling on official duty; for pay of employees not otherwise provided for; and for other necessary expenses of the Indian Service for which no other appropriation is available, $135,000: *Provided*, That $5,000 of this amount shall be immediately available: *Provided further*, That not to exceed $15,000 of this appropriation shall be used for continuing the work of the Competency Commission to the Five Civilized Tribes in Oklahoma.

## INDIAN SERVICE INSPECTORS.

Indian Service inspectors.

For pay of six Indian Service inspectors, exclusive of one chief inspector, at salaries not to exceed $2,500 per annum and actual traveling and incidental expenses, and not to exceed $3.50 per diem in lieu of subsistence when actually employed on duty in the field, $30,000.

## DETERMINING HEIRS.

Determining heirs of allottees.

*Provisos.* Clerks in Indian Office.

Five Civilized Tribes and Osages excepted.

For the purpose of determining the heirs of deceased Indian allottees having any right, title, or interest in any trust or restricted property, under regulations prescribed by the Secretary of the Interior, $100,000, reimbursable as provided by existing law: *Provided*, That the Secretary of the Interior is hereby authorized to use not to exceed $25,000 for the employment of additional clerks in the Indian Office in connection with the work of determining the heirs of deceased Indians, and examining their wills, out of the $100,000 appropriated herein: *Provided further*, That the provisions of this paragraph shall not apply to the Osage Indians nor to the Five Civilized Tribes of Indians in Oklahoma.

## INDUSTRY AMONG INDIANS (REIMBURSABLE).

Industry among Indians.

Encouraging farming, etc., for self-support.

*Provisos.* Repayment.

Limitation.

For the purpose of encouraging industry and self-support among the Indians and to aid them in the culture of fruits, grains, and other crops, $150,000, or so much thereof as may be necessary, to be immediately available, which sum may be used for the purchase of seed, animals, machinery, tools, implements, and other equipment necessary, in the discretion of the Secretary of the Interior, to enable Indians to become self-supporting: *Provided*, That said sum shall be expended under conditions to be prescribed by the Secretary of the Interior for its repayment to the United States on or before June thirtieth, nineteen hundred and twenty-five: *Provided further*, That not to exceed $50,000 of the amount herein appropriated shall be expended on any one reservation or for the benefit of any one tribe of Indians.

## VEHICLES FOR INDIAN SERVICE.

Vehicles.

Amount for maintenance, etc.

*Provisos.* Allotment of purchases.

That not to exceed $200,000 of applicable appropriations made herein for the Bureau of Indian Affairs shall be available for the maintenance, repair, and operation of motor-propelled and horse-drawn passenger-carrying vehicles for the use of superintendents, farmers, physicians, field matrons, allotting, irrigation, and other employees in the Indian field service: *Provided*, That not to exceed $15,000 may be used in the purchase of horse-drawn passenger-carrying vehicles, and not to exceed $30,000 for the purchase of motor-propelled passenger-carrying vehicles, and that such vehicles shall be used only for official service.

## SUPPRESSING CONTAGIOUS DISEASES AMONG LIVE STOCK OF INDIANS.

Live stock of Indians.

Paying for destroying diseased animals, etc.

For reimbursing Indians for live stock which may be hereafter destroyed on account of being infected with dourine or other contagious diseases, and for expenses in connection with the work of eradicating and preventing such diseases, to be expended under such rules and regulations as the Secretary of the Interior may prescribe, $25,000.

Arizona.

## ARIZONA AND NEW MEXICO.

Support, etc., of Indians in, and New Mexico.

SEC. 2. For support and civilization of Indians in Arizona and New Mexico, including pay of employees, $330,000.

Fort Mojave school.

For support and education of one hundred and fifty Indian pupils at the Indian school at Fort Mojave, Arizona, and for pay of superintendent, $31,300; for general repairs and improvements, $3,800; in all, $35,100.

Phoenix School.

For support and education of seven hundred Indian pupils at the Indian school at Phoenix, Arizona, and for pay of superintendent, $132,000; for general repairs and improvements, $12,500; in all, $144,500.

Truxton Canyon School.

For support and education of one hundred pupils at the Indian school at Truxton Canyon, Arizona, and for pay of superintendent, $21,500; for general repairs and improvements, $3,000; in all, $24,500.

Gila River Reservation.
Continuing irrigation system.
Vol. 33, p. 1081.

For continuing the work of constructing the irrigation system for the irrigation of the lands of the Pima Indians in the vicinity of Sacaton, on the Gila River Indian Reservation, within the limit of cost fixed by the Act of March third, nineteen hundred and five, $5,000; and for maintenance and operation of the pumping plants and canal systems, $10,000; in all, $15,000, reimbursable as provided in section two of the Act of August twenty-fourth, nineteen hundred and twelve (Thirty-seventh Statutes at Large, page five hundred and twenty-two), and to remain available until expended.

Repayment.
Vol. 37, p. 522.

Colorado River Reservation.
Extending irrigation system.

For continuing the construction of the pumping plant for irrigation purposes on the Colorado River Indian Reservation, Arizona, by the installation of additional pumping machinery and for continuing the construction of the necessary canals and laterals for the utilization of water in connection therewith, as provided in the Act of April fourth, nineteen hundred and ten (Thirty-sixth Statutes at Large, page two hundred and seventy-three), and for maintaining and operating the pumping plant, canals, and structures, $20,000, reimbursable as provided in said Act; and for continuing the purpose of securing an appropriation of water for the irrigation of approximately one hundred and fifty thousand acres of land on said reservation by the conduct of surveys and the preparation of plans and estimates for a complete irrigation system to supply water to said land, $50,000, reimbursable from funds in the Treasury of the United States to the credit of the Indians of said reservation arising from the proceeds from the sale of town lots authorized by the Act of April thirteenth, nineteen hundred and eight (Thirty-fifth Statutes at Large, page seventy-seven); in all, $70,000.

Vol. 36, p. 273.

Watering additional lands.

Repayment from sale of town lots.

Vol. 35, p. 77.

Papago Indian villages.
Water supply for.

For improvement and sinking of wells, installation of pumping machinery, construction of tanks for domestic and stock water, and for the necessary structures for the development and distribution of a supply of water, and for maintenance and operation of constructed works, for Papago Indian villages in southern Arizona, $20,000.

Navajo Indians.
School facilities for.
Vol. 15, p. 669.

To enable the Secretary of the Interior to carry into effect the provisions of the sixth article of the treaty of June first, eighteen hundred and sixty-eight, between the United States and the Navajo Nation or Tribe of Indians, proclaimed August twelfth, eighteen hundred and sixty-eight, whereby the United States agrees to provide school facilities for the children of the Navajo Tribe of Indians, $100,000: *Provided*, That the said Secretary may expend said funds, in his discretion, in establishing or enlarging day or industrial schools.

*Proviso.*
Discretionary use.

Navajos and Hopis.
Water supply for, on reservations.

For continuing the development of a water supply for the Navajo and Hopi Indians on the Navajo, Moqui, Pueblo, San Juan, and Western Navajo Reservations, $25,000, to be immediately available, reimbursable out of any funds of said Indians now or hereafter available.

ADDENDUM 017



Operating Ganado project.

For repairs, betterments, and construction of the Ganado irrigation project, Arizona, $20,000; and for maintenance and operation, $3,000; in all, $23,000: *Provided*, That the limit of cost of $60,100 specified in the Act of August twenty-fourth, nineteen hundred and twelve (Thirty-seventh Statutes at Large, page five hundred and eighteen), is hereby changed to $80,100, reimbursable under such rules and regulations as the Secretary of the Interior shall prescribe.

*Proviso.* Cost increased. Vol. 37, p. 522.

Gila River Reservation. Dam, etc., to divert water for irrigating lands on.

For completing the construction by the Indian Service of a dam with a bridge superstructure and the necessary controlling works for diverting water from the Gila River for the irrigation of Indian land and Indian allotments on the Gila River Indian Reservation, Arizona, as recommended by the Board of Engineers of the United States Army in paragraph two hundred and seventeen of its report to the Secretary of War of February fourteenth, nineteen hundred and fourteen (House Document Numbered Seven hundred and ninety-one), $50,000, to be immediately available and to remain available until expended, reimbursable as provided in section two of the Act of August twenty-fourth, nineteen hundred and twelve (Thirty-seventh Statutes at Large, page five hundred and twenty-two): *Provided*, That the limit of cost of the said dam and bridge fixed by the Act of May eighteenth, nineteen hundred and sixteen (Thirty-ninth Statutes at Large, page one hundred and thirty), is hereby changed from $200,000 to $250,000.

Repayment. Vol. 37, p. 522.

*Proviso.* Cost increased. Vol. 39, p. 130.

Salt River allotments. Additional water rights for. Vol. 39, p. 130.

For additional installments of the charges for providing water rights for six thousand three hundred and ten acres of Salt River Indian allotments reimbursable as provided in the Act of May eighteenth, nineteen hundred and sixteen, and for the extension of canals and laterals and for the construction of other necessary irrigation facilities to supply the said lands with water, $15,000.

Gila River. Irrigating canals, etc. Vol. 39, p. 130.

For continuing the construction of the necessary canals and structures to carry the natural flow of the Gila River to the Indian lands of the Gila River Indian Reservation and to public and private lands in Pinal County, reimbursable as provided in the Indian appropriation Act approved May eighteenth, nineteen hundred and sixteen, $50,000, to remain available until expended.

Little Colorado River. Bridge at Winslow. Vol. 39, p. 131.

For the completion of the construction of a bridge across the Little Colorado River at or near the town of Winslow, Arizona, $2,000, in addition to the $15,000 appropriated for this purpose by the Act of May eighteenth, nineteen hundred and sixteen (Thirty-ninth Statutes at Large, page one hundred and thirty-one); such additional amount to be expended in the same manner and under the same conditions as provided in the Act aforesaid.

Bridge at Tanners Crossing.

For the repainting and reflooring of the Government suspension bridge over the Little Colorado River near Tanners Crossing, Arizona, $4,000, to be immediately available, reimbursable from any funds now or hereafter placed in the Treasury to the credit of the Navajo Indians in Arizona, to remain a charge and lien upon the lands and funds of said tribe of Indians until paid.

Boundary fence between Papago Reservation and Mexico.

For the construction of a fence along the international boundary line between Mexico and the Papago Indian Reservation, in Arizona, created by Executive order of January fourteenth, nineteen hundred and sixteen, under such rules and regulations as the Secretary of the Interior may prescribe, $10,000, to be immediately available and to remain available until expended.

San Carlos Reservation. Purchase of cattle for Indians of. Vol. 29, p. 358, amended.

That so much of article two of the agreement with the Indians of the San Carlos Indian Reservation, concluded on February twenty-fifth, eighteen hundred and ninety-six, accepted, ratified, and confirmed in the Act approved June tenth, eighteen hundred and ninety-six, reading "and that said money shall be paid to them in cash from time to time as the same shall become available, pro rata, share and

ADDENDUM 018



share alike, to each man, woman, and child of the tribes now living upon and entitled to the privileges of the said reservation," be, and the same is hereby, amended to read, "and that said money, as the same becomes available, may, in the discretion of the Secretary of the Interior, be paid to the Indians entitled thereto or expended in the purchase of cattle for their benefit.

Kaibab Reservation. Paying for labor, etc., on road through. Vol. 39, p. 132.

That the unexpended balance of $6,715 appropriated by the Indian appropriation Act approved May eighteenth, nineteen hundred and sixteen, for the proportionate share of the amount required to construct a wagon road or highway through the Kaibab Indian Reservation is hereby made available for the purchase of material and the employment of labor upon the same terms, except that any labor may be used upon the construction of such road or highway, giving preference to Indian labor.

Little Colorado and Canon Diablo Rivers. Bridges, near Leupp Agency. Vol. 39, p. 975. *Proviso.* Repayment.

For amount necessary for completing the construction of two bridges over the Little Colorado and Canon Diablo Rivers, near the Leupp Indian Agency, Arizona, in addition to the $42,500 appropriated for this purpose by the Act approved March second, nineteen hundred and seventeen (Thirty-ninth Statutes at Large, page nine hundred and seventy-five), $5,000, or so much thereof as may be required, to be immediately available: *Provided*, That said additional sum shall be reimbursable from tribal funds as required by the said Act.

No new reservations, etc., in New Mexico and Arizona without action of Congress.

That hereafter no Indian reservation shall be created, nor shall any additions be made to one heretofore created, within the limits of the States of New Mexico and Arizona, except by Act of Congress.

California.

## CALIFORNIA.

Support, etc., of Indians in.

Sec. 3. For support and civilization of Indians in California, including pay of employees, $42,000.

Lands for homeless Indians.

For the purchase of lands for the homeless Indians in California, including improvements thereon, for the use and occupancy of said Indians, $20,000, said funds to be expended under such regulations and conditions as the Secretary of the Interior may prescribe.

Sherman Institute School.

For support and education of six hundred and eighty Indian pupils at the Sherman Institute, Riverside, California, including pay of superintendent, $128,400; for general repairs and improvements, $15,000; in all, $143,400.

Yuma allotments. Irrigation charges advanced. Vol. 36, p. 1063.

For reclamation and maintenance charge on Yuma allotments, $15,000, to remain available until expended and to be reimbursed from the sale of surplus lands or from other funds that may be available, in accordance with the provisions of the Act of March third, nineteen hundred and eleven.

Fort Bidwell School.

For support and education of one hundred Indian pupils at the Fort Bidwell Indian School, California, including pay of superintendent, $21,500; for general repairs and improvements, $3,500; for installation of water supply, $9,000, to be immediately available; in all, $34,000.

Greenville School.

For support and education of one hundred Indian pupils at the Greenville Indian School, California, including pay of superintendent, $21,500; for general repairs and improvements, $3,500; in all, $25,000.

Yuma Reservation. Roads and bridges.

For the improvement and construction of roads and bridges on the Yuma Indian Reservation in California, $10,000, to be immediately available, reimbursable to the United States by the Indians having tribal rights on said reservation.

Hoopa Valley Reservation. Road construction.

For beginning the construction of a road from Hoopa to Weitchpec, on the Hoopa Valley Reservation, in Humboldt County, California, in conformity with plans approved by the Secretary of the Interior, $10,000, to be immediately available and to remain available until

expended, and to be reimbursed out of any funds of the Indians of said reservation now or hereafter placed to their credit in the Treasury of the United States: *Provided*, That the proper authorities of the county of Humboldt, California, agree to furnish, at their own expense, a competent engineer satisfactory to the Secretary of the Interior to supervise the construction of said road; to provide the use of such tools and implements as the said Secretary may deem to be justly required of them; and to maintain said road in good condition: *Provided further*, That the total cost of said road shall not exceed $30,500.

*Proviso.* Cooperation of Humboldt County.

Limit of cost.

## FLORIDA.

Florida.

SEC. 4. For relief of distress among the Seminole Indians in Florida, and for purposes of their civilization and education, $10,000, including the construction and equipment of necessary buildings on lands set aside by the State of Florida by Act of its legislature for the perpetual use of said Indians: *Provided*, That the $8,000 appropriated by the Act of March second, nineteen hundred and seventeen (Thirty-ninth Statutes at Large, page nine hundred and seventy-six), for relief, civilization, and education of the Seminole Indians in Florida, or such part thereof as may be available for the purpose, may also be used for construction and equipment of necessary buildings on the lands aforesaid.

Seminoles. Relief of, etc.

*Proviso.* Construction, etc., of buildings.

## IDAHO.

Idaho.

SEC. 5. For support and civilization of Indians on the Fort Hall Reservation in Idaho, including pay of employees, $30,000.

Fort Hall Reservation. Support, etc., of Indians on.

For improvement and maintenance and operation of the Fort Hall irrigation system, $50,000, to be immediately available: *Provided*, That expenditures hereunder for improvements shall be reimbursable to the United States in accordance with the provisions of the Act of March first, nineteen hundred and seven.

Irrigation system. *Proviso.* Repayment.

Vol. 34, p. 1025.

For fulfilling treaty stipulations with the Bannocks in Idaho: For pay of physician, teacher, carpenter, miller, engineer, farmer, and blacksmith (article ten, treaty of July third, eighteen hundred and sixty-eight), $5,000.

Bannocks. Fulfilling treaty. Vol. 15, p. 676.

For the Coeur d'Alenes, in Idaho: For pay of blacksmith, carpenter, and physician, and purchase of medicines (article eleven, agreement ratified March third, eighteen hundred and ninety-one), $3,000.

Coeur d'Alenes. Fulfilling treaty. Vol. 26, p. 1029.

## KANSAS.

Kansas.

SEC. 6. For support and education of seven hundred and fifty Indian pupils at the Indian school, Haskell Institute, Lawrence, Kansas, and for pay of superintendent, $141,350; for general repairs and improvements, $15,000; for completing the construction of a drainage system on the Haskell Indian School Reservation, Lawrence, Kansas, $10,000, to be immediately available; in all, $166,350.

Haskell Institute School.

For support and education of eighty Indian pupils at the Indian school, Kickapoo Reservation, Kansas, including pay of superintendent, $17,400; for general repairs and improvements, $4,000; in all, $21,400.

Kickapoo Reservation School.

## MICHIGAN.

Michigan.

SEC. 7. For support and education of three hundred and fifty Indian pupils at the Indian school, Mount Pleasant, Michigan, and for pay of superintendent, $72,000; for general repairs and improvements, $6,000; in all, $78,000.

Mount Pleasant School.

ADDENDUM 020



Minnesota.

## MINNESOTA.

Pipestone School.

Proviso. Laundry, etc. Vol. 39, p. 134.

Sec. 8. For support and education of two hundred Indian pupils at the Indian school, Pipestone, Minnesota, including pay of superintendent, $41,650; for general repairs and improvements, $7,000; in all, $48,650: *Provided*, That funds heretofore appropriated for mechanical and general utility shopbuilding and for addition to hospital may be expended for rebuilding laundry, purchase of laundry equipment, and for repairs to heating and power systems at Pipestone School in an amount not exceeding $16,000, the same to be immediately available.

Chippewas of the Mississippi. Schools. Vol. 16, p. 720.

For support of a school or schools for the Chippewas of the Mississippi in Minnesota (article three, treaty of March nineteenth, eighteen hundred and sixty-seven), $4,000.

Annual celebration of White Earth Band.

The Secretary of the Interior is hereby authorized to advance to the executive committee of the White Earth Band of Chippewa Indians in Minnesota the sum of $1,000, or so much thereof as may be necessary, to be expended in the annual celebration of said band to be held June fourteenth, nineteen hundred and eighteen, out of the funds belonging to said band.

White Earth Reservation. Completing enrollment of allottees. Vol. 38, p. 88.

For the completion of the enrollment of the allottees within the White Earth Reservation, in the State of Minnesota, required by the Act of June thirtieth, nineteen hundred and thirteen, as amended by this Act, $3,000, or so much thereof as may be necessary.

Red Lake Indian Forest. Logging, mill, etc., expenses from timber receipts.

That not to exceed $80,000 of the funds derived from the sale of timber from the Red Lake Indian Forest, Minnesota, under authority of the Act of May eighteenth, nineteen hundred and sixteen (Thirty-ninth Statutes at Large, page one hundred and thirty-seven), of which amount $50,000 shall be immediately available, may be expended by the Secretary of the Interior in payment of the expenses authorized by said Act, and in the logging, booming, towing, and manufacture of timber at the Red Lake Agency sawmill: *Provided*, That not to exceed $15,000 of said amount may be used to reimburse the tribal fund known as "Indian money, proceeds of labor, Red Lake Indians," heretofore actually expended in said operations.

Proviso. Repayment to tribal funds.

Cass Lake Reservation. Road directed from bridge appropriation balance. Vol. 39, p. 978.

That of the unexpended appropriation of $5,000 authorized to be withdrawn from the tribal funds of the Chippewa Indians of Minnesota for the construction of a bridge across the Mississippi River on the Cass Lake Reservation by the Indian appropriation Act approved March second, nineteen hundred and seventeen, $4,000 may be expended for improving the road between the Cass Lake Indian School and the village of Cass Lake upon the condition that the counties of Cass and Beltrami, in the State of Minnesota, shall file with the Secretary of the Interior a written agreement to reimburse the United States, for the benefit of the Chippewa Indians, within two years to the extent of one-half of the amount expended upon said road.

Chippewas of Minnesota. Expenses of general council.

That the sum of $10,000, or so much thereof as may be necessary, of the tribal funds of the Chippewa Indians of the State of Minnesota, is hereby appropriated to pay the expenses of the general council of said tribe to be held at Bemidji, Minnesota, beginning July ninth, nineteen hundred and eighteen, pursuant to the constitution of the general council of said Chippewa Indians of Minnesota, organized in May, nineteen hundred and thirteen, and to pay the expenses of said general council in looking after the affairs of said tribe, including the actual and necessary expenses of its legislative committee in visiting Washington during the second session of the Sixty-fifth Congress; said sum to be immediately available, and said actual and necessary expenses to be approved by the president and secretary of the general council and certified to the Secretary of the Interior and as so approved and certified to be paid.

Committee to Washington.

The Secretary of the Interior is hereby authorized to withdraw from the Treasury of the United States, at his discretion, the sum of $175,000, or so much thereof as may be necessary, of the principal sum on deposit to the credit of the Chippewa Indians in the State of Minnesota, arising under section seven of the Act of January fourteenth, eighteen hundred and eighty-nine, entitled "An Act for the relief and civilization of the Chippewa Indians in the State of Minnesota," and to use the same for the purpose of promoting civilization and self-support among the said Indians in manner and for purposes provided for in said Act: *Provided*, That $4,000 of said amount, or so much thereof as may be necessary, may be used in the construction of a suitable school building at the town of White Earth: *Provided further*, That the State school district, in which the town of White Earth is located, contributes a like amount to be used in the construction of a building, the total cost of which shall not exceed $8,000, the said appropriation to remain available until expended: *And provided further*, That when said building is completed it shall be turned over to the local school authorities of the said town of White Earth, and shall thereafter be operated and maintained by them, and Indian children shall at all times be admitted to said school on the same conditions as white children.

Promoting civilization, etc., from tribal funds.

Vol. 25, p. 645.

*Provisos.* School at White Earth.

Local contribution.

Operation when completed.

## MISSISSIPPI.

Mississippi.

Full-blood Choctaws. Relief, etc., of.

SEC. 9. For the relief of distress among the full-blood Choctaw Indians of Mississippi, including the pay of one special agent, who shall be a physician, one farmer, and one field matron, $5,000; for their education by establishing and maintaining day schools including the purchase of land and the construction of necessary buildings, $20,000; for the purchase of lands, including improvements thereon, not exceeding eighty acres for any one family, for the use and occupancy of said Indians, to be expended under conditions to be prescribed by the Secretary of the Interior for its repayment to the United States, under such rules and regulations as he may direct, $25,000; for the purpose of encouraging industry and self-support among said Indians and to aid them in building homes, in the culture of fruits, grains, cotton, and other crops, $25,000, which sum may be used for the purchase of seed, animals, machinery, tools, implements, and other equipment necessary, in the discretion of the Secretary of the Interior, to enable said Indians to become self-supporting, to be expended under conditions to be prescribed by the said Secretary for its repayment to the United States on or before June thirtieth, nineteen hundred and twenty-five; in all, $75,000, to be immediately available.

Schools.

Purchase of lands.

Agricultural development.

Repayment.

## MONTANA.

Montana.

Support, etc., of Indians.

Fort Belknap Agency.

SEC. 10. For support and civilization of the Indians at Fort Belknap Agency, Montana, including pay of employees, $20,000.

Flathead Agency.

For support and civilization of Indians at Flathead Agency, Montana, including pay of employees, $20,000.

Fort Peck Agency.

For support and civilization of Indians at Fort Peck Agency, Montana, including pay of employees, $30,000.

Blackfeet Agency.

For support and civilization of Indians at Blackfeet Agency, Montana, including pay of employees, $50,000, to be immediately available.

Fort Belknap Reservation. Irrigation systems.

For maintenance and operation, including repairs, of the irrigation systems on the Fort Belknap Reservation, in Montana, $30,000, reimbursable in accordance with the provisions of the Act of April fourth, nineteen hundred and ten.

Vol. 36, p. 277.

Crows. Fulfilling treaty.

Vol. 15, p. 652.

For fulfilling treaties with Crows, Montana: For pay of physician, $1,200; and for pay of carpenter, miller, engineer, farmer, and blacksmith (article ten, treaty of May seventh, eighteen hundred and

ADDENDUM 022



sixty-eight), $3,100; for pay of second blacksmith (article eight, same treaty), $1,200; in all, $5,500.

Northern Cheyennes and Arapahoes. Subsistence, etc. Vol. 19, p. 256.

For subsistence and civilization of the Northern Cheyennes and Arapahoes (agreement with the Sioux Indians, approved February twenty-eighth, eighteen hundred and seventy-seven), including Northern Cheyennes, removed from Pine Ridge Agency to Tongue River, Montana, and for pay of physician, two teachers, two carpenters, one miller, two farmers, a blacksmith, and engineer (article seven, treaty of May tenth, eighteen hundred and sixty-eight), $80,000.

Physician, etc. Vol. 15, p. 658.

"Line riders" on Northern Cheyenne Reservation.

For the employment of "line riders" along the southern and eastern boundaries of the Northern Cheyenne Indian Reservation in the State of Montana, $1,500.

Rocky Boy's Chippewas, etc. Support, etc.

For the support and civilization of the Rocky Boy Band of Chippewas, and other indigent and homeless Indians in the State of Montana, including pay of employees, $10,000.

Irrigation systems. Flathead.

For continuing construction, maintenance, and operation of the irrigation systems on the Flathead Indian Reservation, in Montana, $375,000 (reimbursable), which shall be immediately available and remain available until expended.

Fort Peck.

For continuing construction, maintenance, and operation of the irrigation systems on the Fort Peck Indian Reservation, in Montana, $50,000 (reimbursable), which shall be immediately available and remain available until expended.

Blackfeet.

For continuing construction, maintenance, and operation of the irrigation systems on the Blackfeet Indian Reservation, in Montana, $50,000 (reimbursable), which shall be immediately available, and remain available until expended: *Provided*, That not to exceed $15,000 of applicable appropriations made for the Flathead, Blackfeet, and Fort Peck irrigation projects shall be available for the maintenance, repair, and operation of motor-propelled and horse-drawn passenger-carrying vehicles for official use upon the aforesaid irrigation project: *Provided further*, That not to exceed $3,500 may be used for the purchase of horse-drawn passenger-carrying vehicles, and that not to exceed $4,000 may be used for the purchase of motor-propelled passenger-carrying vehicles.

*Provisos.* Vehicles for irrigation projects.

Purchases limited.

Bighorn, Mont. Crow Agency lands transferred to school district.

The Secretary of the Interior is hereby authorized to transfer and convey to school district numbered seventeen, Bighorn, Montana, a tract of land not to exceed two and one-half acres, of the lands ceded by the Crow Indian Tribe and reserved for agency purposes, for public-school use, upon condition that Indian children resident within said district shall be permitted to attend said school upon an entire equality with white children.

Crow Indian Reservation. Improving Big Horn Valley irrigation systems from tribal funds.

That the Secretary of the Interior be, and he is hereby, authorized to withdraw from the Treasury of the United States the sum of $200,000 of any tribal funds on deposit to the credit of the Crow Indians in the State of Montana, and to expend the same for making necessary improvements to the irrigation systems in the Big Horn Valley on the Crow Reservation in Montana, said sum, or such part thereof as may be used for the purpose indicated, to be reimbursed to the tribe under such rules and regulations as may be prescribed by the Secretary of the Interior.

Nebraska.

## NEBRASKA.

Genoa School.

Sec. 11. For support and education of three hundred and eighty Indian pupils at the Indian school at Genoa, Nebraska, including pay of superintendent, $78,000; for general repairs and improvements, $7,500; for purchase and erection of water tank (in addition to the amount of $2,400 appropriated for this purpose in the Act of March second, nineteen hundred and seventeen, Thirty-ninth Statutes at Large, page nine hundred and eighty), $3,000, to be immediately available; in all, $88,500.

## NEVADA.

Nevada.

Sec. 12. For support and civilization of Indians in Nevada, including pay of employees, $18,500.

Support, etc., of Indians, in.

For support and education of two hundred and ninety Indian pupils at the Indian school at Carson City, Nevada, including pay of superintendent, $60,000; for general repairs and improvements, $10,000; in all, $70,000.

Carson City School.

For the improvement, enlargement, and extension of the irrigation diversion and distribution system to irrigate approximately three thousand three hundred acres of Indian land on the Pyramid Lake Reservation, Nevada, $25,000 to be immediately available: *Provided*, That the cost of said entire work shall not exceed $85,000; and for maintenance and operation of the improved system, $5,000; in all, $30,000, to remain available until expended, reimbursable from any funds of said Indians now or hereafter available.

Pyramid Lake Reservation.
Extending irrigation system.
*Proviso.*
Cost, etc.

That the unexpended balance of $11,996.13 of the appropriation of $15,000 for procuring home and farm sites and providing agricultural equipment and instruction for nonreservation Indians in Nevada, and the unexpended balance of $7,611.23 of the appropriation of $15,000 for the purchase of land and water rights for the Washoe Tribe of Indians in said State and for their support and civilization, contained in the Indian appropriation Act for the fiscal year nineteen hundred and seventeen (Thirty-ninth Statutes at Large, page one hundred and forty-three), are hereby reappropriated and made immediately available for the purchase of agricultural equipment, building material, and other supplies necessary for said Indians in utilizing the land purchased for them, and also for the expense of locating the Indians upon such land, including pay of employees where necessary.

Washoe Indians.
Agricultural supplies, etc., for.
Vol. 39, p. 143.
Balances reappropriated.

## NEW MEXICO.

New Mexico.

Sec. 13. For support and education of four hundred and fifty Indian pupils at the Indian school at Albuquerque, New Mexico, and for pay of superintendent, $85,500; for general repairs and improvements, $8,000; for completing addition to mess hall, $5,000; in all, $98,500.

Albuquerque School.

For support and education of four hundred Indian pupils at the Indian school at Santa Fe, New Mexico, and for pay of superintendent, $76,250; for general repairs and improvements, $8,000; for water supply, $1,600; in all, $85,850.

Santa Fe School.

For the pay of one special attorney for the Pueblo Indians of New Mexico, to be designated by the Secretary of the Interior, and for necessary traveling expenses of said attorney, $2,000, or so much thereof as the Secretary of the Interior may deem necessary.

Pueblo Indians.
Special attorney for.

For continuing work on the Indian highway extending from the Mesa Verde National Park to Gallup, New Mexico, on the Navajo and San Juan Reservations, $25,000; said sum to be reimbursed from any funds which are now or may hereafter be placed in the Treasury to the credit of said Indians: *Provided*, That such sums shall be expended under the direction of the Secretary of the Interior in such manner and at such times and places as he may deem proper, and in the employment of Indian labor as far as possible for the construction of said highway: *Provided further*, That not to exceed $2,500 of the sum appropriated for the building of said road by the Act of March second, nineteen hundred and seventeen (Thirty-ninth Statutes at Large, pages nine hundred and sixty-nine to nine hundred and eighty-one), to be immediately available, may be used for payment of expenses incurred during the fiscal year nineteen hundred and seventeen in excess of the appropriation made for that year in the Act of May eighteenth, nineteen hundred and sixteen

Navajo and San Juan Reservations.
Highway to Gallup.
*Provisos.*
Employment of Indians, etc.
Paying incurred expenses.
Vol. 39, p. 981.
Vol. 39, p. 144.

(Thirty-ninth Statutes at Large, pages one hundred and twenty-three to one hundred and forty-four).

Jicarilla Reservation. Purchase of live stock, etc., from timber sales. Vol. 34, p. 1413.

The proviso of section one of the Act of March fourth, nineteen hundred and seven (Thirty-fourth Statutes at Large, page fourteen hundred and thirteen), relating to the expenditure of proceeds derived from the sale of timber on the Jicarilla Reservation, is hereby amended so as to authorize the Secretary of the Interior to expend said proceeds with the consent of such allottees whose property is appropriated, to be obtained in such manner as he may prescribe, in the purchase of live stock, seeds, agricultural equipment, and for other community or individual purposes beneficial to the Indians belonging to and having rights as members of said tribe of Indians.

San Juan River. Constructing bridge across, in San Juan County. Vol. 39, p. 926.

For amount necessary to complete the construction of a steel bridge across the San Juan River in San Juan County, State of New Mexico, at the best and most available location west or southwest and near to the town of Farmington, in said county, in addition to the $25,000 appropriated for the purpose by the Act approved February twentieth, nineteen hundred and seventeen (Thirty-ninth Statutes at Large, page nine hundred and twenty-six), $4,000, or so much thereof as may be required, to be immediately available:

*Proviso.* Reimbursement.

*Provided,* That said additional sum shall be reimbursed from tribal funds as required by the said Act.

Mescalero Reservation. Road from Tularosa to the Agency.

For one-half the cost of constructing a wagon road between Tularosa, Otero County, New Mexico, and the Indian Agency on the Mescalero Indian Reservation in said State, in conformity with plans approved by the Secretary of the Interior, $16,000, or so much

Reimbursement.

thereof as may be necessary, to be immediately available, reimbursable to the United States from any funds now or hereafter placed in the Treasury to the credit of the Mescalero Tribe of Indians, to remain a charge and lien upon the lands and funds of said tribe of Indians until paid.

New York.

## NEW YORK.

Senecas. Annuity. Vol. 4, p. 442.

Sec. 14. For fulfilling treaties with Senecas of New York: For permanent annuity in lieu of interest on stock (Act of February nineteenth, eighteen hundred and thirty-one), $6,000.

Six Nations. Annuity. Vol. 7, p. 46.

For fulfilling treaties with Six Nations of New York: For permanent annuity, in clothing and other useful articles (article six, treaty of November eleventh, seventeen hundred and ninety-four), $4,500.

North Carolina.

## NORTH CAROLINA.

Cherokee School.

Sec. 15. For support and education of two hundred Indian pupils at the Indian school at Cherokee, North Carolina, including pay of superintendent, $33,600; for general repairs and improvements, $6,000; in all, $39,600.

Oconalufty River. Bridging, near Indian school. *Provisos.* Cooperation by local authorities.

For the construction of a bridge across the Oconalufty River, at or near the Indian school at Cherokee, North Carolina, $8,000, to be expended under the direction of the Secretary of the Interior: *Provided,* That no part of the money herein appropriated shall be expended until the Secretary of the Interior shall have obtained from the proper authorities of the State of North Carolina, or the county of Swain, satisfactory guaranties of the payment by the said State of North Carolina, or by the county of Swain, of at least one-half of the cost of the construction of said bridge, and that the proper authorities of the said State of North Carolina, or the said county of

Maintenance, etc.

Swain, shall assume full responsibility for, and will at all times maintain and repair, said bridge and the approaches thereto: *And*

Additional expense by State, etc.

*provided further,* That any and all expenses above the amount herein named in connection with the construction of said bridge shall be borne either by the said State of North Carolina or the said county of Swain.

ADDENDUM 025



## NORTH DAKOTA.

North Dakota.

Devils Lake Sioux. Support, etc.

Sec. 16. For support and civilization of the Sioux of Devils Lake, North Dakota, including pay of employees, $5,000.

Fort Berthold Indians. Support, etc.

For support and civilization of Indians at Fort Berthold Agency, in North Dakota, including pay of employees, $15,000.

Turtle Mountain Chippewas. Support, etc.

For support and civilization of Turtle Mountain Band of Chippewas, North Dakota, including pay of employees, $13,000.

Bismarck School.

Proviso. Reappropriation. Vol. 39, p. 982.

For support and education of one hundred and twenty-five Indian pupils at the Indian school, Bismarck, North Dakota, including pay of superintendent, $26,600, for general repairs and improvements, $6,000; in all, $32,600: *Provided,* That the amounts appropriated in the Indian appropriation Act for the fiscal year nineteen hundred and eighteen (Thirty-ninth Statutes at Large, page nine hundred and eighty-two), for employees' quarters, $10,000, and for new dining room and kitchen and equipment, $15,000, are hereby reappropriated and made available and to remain available until expended.

Fort Totten School.

For support and education of four hundred Indian pupils at Fort Totten Indian School, Fort Totten, North Dakota, and for pay of superintendent, $76,000; for general repairs and improvements, $7,000; for heating plant, $15,000; in all, $98,000.

Wahpeton School.

For support and education of two hundred Indian pupils at the Indian school, Wahpeton, North Dakota, and pay of superintendent, $41,800; for general repairs and improvements, $5,000; in all, $46,800.

Standing Rock Indians. Use of per capita distribution of tribal funds. Vol. 35, p. 463; Vol. 37, p. 675.

That the Act of May twenty-ninth, nineteen hundred and eight (Thirty-fifth Statutes at Large, page four hundred and sixty), and the Act of February fourteenth, nineteen hundred and thirteen (Thirty-seventh Statutes at Large, page six hundred and seventy-five), are hereby amended so as to authorize the Secretary of the Interior, in his discretion, and in such manner and under such rules and regulations as he may prescribe, to make per capita distributions to the Standing Rock Indians from the funds, principal and interest, accruing under said Acts, or to use said moneys for the benefit of the Indians entitled thereto.

## OKLAHOMA

Oklahoma.

Wichitas, etc. Support, etc.

Sec. 17. For support and civilization of the Wichitas and affiliated bands who have been collected on the reservations set apart for their use and occupation in Oklahoma, including pay of employees, $5,000.

Kiowas, Comanches, and Apaches. Agency expenses, from tribal funds.

The Secretary of the Interior is hereby authorized to withdraw from the Treasury of the United States, at his discretion, the sum of $25,000, or so much thereof as may be necessary, of the funds on deposit to the credit of the Kiowa, Comanche, and Apache Tribes of Indians in Oklahoma, for the support of the agency and pay of employees maintained for their benefit.

Maintenance, self-support, etc., from tribal funds.

Proviso. Report of expenditures.

That the Secretary of the Interior be, and he is hereby, authorized to withdraw from the Treasury of the United States, at his discretion, the sum of $250,000, or so much thereof as may be necessary, to be immediately available, of the funds on deposit to the credit of the Kiowa, Comanche, and Apache Tribes of Indians in Oklahoma, and pay out the same for the benefit of the members of said tribes for their maintenance and support and improvement of their homesteads for the ensuing year in such manner and under such regulations as he may prescribe: *Provided,* That the Secretary of the Interior shall report to Congress on the first Monday in December, nineteen hundred and nineteen, a detailed statement as to all moneys expended as provided for herein.

Support, etc., of Indians. Cheyennes and Arapahoes.

For support and civilization of the Cheyennes and Arapahoes who have been collected on the reservations set apart for their use and occupation in Oklahoma, including pay of employees, $35,000.

ADDENDUM 026



Kansas Indians.

For support and civilization of the Kansas Indians, Oklahoma, including pay of employees, $1,500.

Kickapoos.

For support and civilization of the Kickapoo Indians in Oklahoma, including pay of employees, $2,000.

Poncas.

For support and civilization of the Ponca Indians in Oklahoma and Nebraska, including pay of employees, $8,000.

Chilocco School.

For support and education of five hundred and fifty Indian pupils at the Indian school at Chilocco, Oklahoma, including pay of superintendent, $94,600; for general repairs and improvements, $7,000; for completing of road and bridge, $10,000, to be immediately available; in all, $111,600.

Pawnees. Annuity. Vol. 27, p. 644. Schools. Vol. 11, p. 730. Farmer, blacksmiths, etc. Vol. 11, p. 730.

For fulfilling treaties with Pawnees, Oklahoma: For perpetual annuity, to be paid in cash to the Pawnees (article three, agreement of November twenty-third, eighteen hundred and ninety-two), $30,000; for support of two manual labor schools (article three, treaty of September twenty-fourth, eighteen hundred and fifty-seven), $10,000; for pay of one farmer, two blacksmiths, one miller, one engineer and apprentices, and two teachers (article four, same treaty), $5,400; for purchase of iron and steel and other necessaries for the shops (article four, same treaty), $500; for pay of physician and purchase of medicines, $1,200; in all, $47,100.

Quapaws. Education, etc. Vol. 7, p. 425. *Proviso.* Discretionary use.

For support of Quapaws, Oklahoma: For education (article three, treaty of May thirteenth, eighteen hundred and thirty-three), $1,000; for blacksmith and assistants, and tools, iron, and steel for blacksmith shop (same article and treaty), $500; in all, $1,500: *Provided*, That the President of the United States shall certify the same to be for the best interests of the Indians.

Osages. Boarding school continued. Vol. 34, p. 544. *Provisos.* Saint Louis Mission. Vocational education. Applicable to current year.

That the third paragraph of section four of the Act of June twenty-eighth, nineteen hundred and six (Thirty-fourth Statutes at Large, page five hundred and thirty-nine), is hereby amended to the extent that the moneys therein provided for support of the Osage boarding school may be used, in the discretion of the Secretary of the Interior, for the same purposes as provided in said paragraph from January first, nineteen hundred and eighteen, to June thirtieth, nineteen hundred and nineteen: *Provided*, That the expenditure of said money shall include the Saint Louis Mission Boarding School and systematic vocational instruction, except that there shall not be expended more than $300 for annual support and education of any one pupil: *Provided further*, That the foregoing shall also apply to expenditures for the fiscal year ending June thirtieth, nineteen hundred and eighteen.

Agency purposes. Vol. 34, p. 544. Vol. 37, p. 88, amended. Amount for agency from royalties, etc., subject to annual appropriations. *Proviso.* General salary limitation not applicable. Vol. 30, p. 90.

That paragraph four, section four, of the Osage Act approved June twenty-eighth, nineteen hundred and six (Thirty-fourth Statutes at Large, page five hundred and thirty-nine), and the Act of Congress approved April eighteenth, nineteen hundred and twelve (Thirty-seventh Statutes at Large, page eighty-eight), authorizing expenditures from Osage tribal funds of not exceeding $40,000 for agency and emergency purposes is hereby amended to read as follows:

"Fourth. That such sums as may be annually appropriated by Congress shall be set aside and reserved from the royalties received from oil, gas, or other tribal mineral rights or other tribal funds, however arising, for agency purposes, which money when appropriated shall be paid out from time to time upon the requisition of the Osage tribal council with the approval of the Secretary of the Interior: *Provided*, That the provision in the Act entitled, 'An Act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight, and for other purposes,' approved June seventh, eighteen hundred and ninety-seven (Thirtieth Statutes at Large, page ninety), limiting the amount of money to be expended for

ADDENDUM 027



salaries of regular employees at any one agency shall not hereafter apply to the Osage Agency."

Amount appropriated from tribal funds.

The Secretary of the Interior is hereby authorized to withdraw from the Treasury of the United States, at his discretion, not to exceed the sum of $60,000, or so much thereof as may be necessary, of the funds on deposit to the credit of the Osage Tribe of Indians in Oklahoma, for the support of the Osage Agency and pay of tribal officers and employees of said agency.

Receipts from leases to be deposited in banks in Oklahoma.

The receipts from leasing of oil, gas, and other minerals upon the lands of the Osage Reservation, until the same are paid out as provided by existing law, may be deposited in national or State banks in Oklahoma, in the discretion of the Secretary of the Interior, such depositaries to be designated by him under such rules and regulations governing the rate of interest thereon, the time of deposit and withdrawal thereof, and the security therefor as he may prescribe.

Construction of office building.

That not exceeding $25,000 of the amount heretofore appropriated from tribal funds for Osage Agency and School for any fiscal year and remaining unexpended may be used in the construction of a fireproof office building for Osage Agency.

Allottees may change homesteads.
Vol. 34, p. 541.

That the allottees of the Osage Nation may change the present designation of homesteads to an equal area of their unencumbered surplus lands, upon application to, and under such rules and regulations as the Secretary of the Interior may prescribe: *Provided*, That each tract after the change and designation shall take the status of the other as it existed prior to the change in designation as to alienation, taxation, or otherwise, and that any order of change of designation shall be recorded in the proper office of Osage County: *Provided further*, That the Secretary of the Interior be, and he is hereby, authorized where the same would be for the best interest of Osage allottees, to permit the sale of surplus and homestead allotments, wholly or in part, of Osage allottees under such rules and regulations as he may prescribe and upon such terms as he shall approve.

*Provisos.*
Status retained.

Sale of allotments permitted.

FIVE CIVILIZED TRIBES.

Five Civilized Tribes.

Administration expenses.

SEC. 18. For expenses of administration of the affairs of the Five Civilized Tribes, Oklahoma, and the compensation of employees, $185,000: *Provided*, That a report shall be made to Congress by the Superintendent for the Five Civilized Tribes through the Secretary of the Interior, showing in detail the expenditure of all moneys appropriated by this provision: *Provided further*, That hereafter no part of said appropriation shall be used in forwarding the undisputed claims to be paid from individual moneys of restricted allottees, or their heirs, or in forwarding uncontested agricultural and mineral leases, excluding oil and gas leases, made by individual restricted Indian allottees, or their heirs, to the Secretary of the Interior for approval, but all such undisputed claims or uncontested leases, except oil and gas leases, now required to be approved under existing law by the Secretary of the Interior shall be paid, approved, rejected, or disapproved by the Superintendent for the Five Civilized Tribes of Oklahoma: *Provided, however*, That any party aggrieved by any decision or order of the Superintendent for the Five Civilized Tribes of Oklahoma may appeal from the same to the Secretary of the Interior within thirty days from the date of said decision or order.

*Provisos.*
Detailed report required.

Undisputed claims to be adjusted by Superintendent.

Oil and gas leases excepted.

Appeals to Secretary of the Interior.

Choctaws and Chickasaws.
Per capita payment from tribal funds.

That the Secretary of the Interior be, and he is hereby, authorized to pay to the enrolled members of the Choctaw and Chickasaw Tribes of Indians of Oklahoma entitled under existing law to share in the funds of said tribes, or to their lawful heirs, out of any moneys belonging to said tribes in the United States Treasury, or deposited in any bank or held by any official under the jurisdiction of the Secretary of the Interior, not to exceed $200 per capita, said payment

Regulations, etc.

*Provisos.* Restricted Indians.

Exempt from prior debts.

Claims of attorneys to be investigated, etc.

Not to delay other payments.

Distribution expenses.

to be made under such rules and regulations as the Secretary of the Interior may prescribe: *Provided*, That in cases where such enrolled members, or their heirs, are Indians who by reason of their degree of Indian blood belong to the restricted class, the Secretary of the Interior may, in his discretion, withhold such payments and use the same for the benefit of such restricted Indians: *Provided further*, That the money paid to the enrolled members or their heirs, as provided herein, shall be exempt from any lien for attorneys' fees or other debt contracted prior to the passage of this Act, except that the Secretary of the Interior is hereby authorized and directed, within thirty days after the passage of this Act, to investigate claims not to exceed $1,050 growing out of contracts alleged to be in existence between John Calvin Gray, William T. Lancaster, Arthur Jennings and Clyde Jennings, as enrolled members of the Choctaw and Chickasaw Nations, and Henry W. Blair, Kappler and Merillat, James K. Jones, Charles M. Fechheimer and Eugene Hamilton, as attorneys, and in case such claims are found to be valid and the contracts approved in accordance with existing law, the said Secretary of the Interior may, in his discretion, apply any amounts, not exceeding $1,050, that may be found due under this paragraph to the aforesaid enrolled members of the Choctaw and Chickasaw Nations to the payment of such fee, but the amounts due hereunder to other enrolled members of the Choctaw and Chickasaw Nations shall not be held in abeyance to this claim, but shall be paid promptly without reference to same: *Provided further*, That the Secretary of the Interior is hereby authorized to use not to exceed $8,000 out of the Choctaw and Chickasaw tribal funds for the expenses and the compensation of all necessary employees for the distribution of the said per capita payments.

Seminoles. Per capita payment from tribal funds.

*Provisos.* Regulations, etc.

Restricted Indians.

Exempt from prior debts.

Distribution expenses.

That the Secretary of the Interior be, and he is hereby, authorized to pay to the enrolled members of the Seminole Tribe of Indians of Oklahoma entitled under existing law to share in the funds of said tribe, or to their lawful heirs, out of the Seminole school fund, or any moneys belonging to said tribe in the United States Treasury or deposited in any bank or held by an official under the jurisdiction of the Secretary of the Interior, not to exceed $100 per capita: *Provided*, That said payment shall be made under such rules and regulations as the Secretary of the Interior may prescribe: *Provided further*, That in cases where such enrolled members, or their heirs, are Indians who belong to the restricted class, the Secretary of the Interior may, in his discretion, withhold such payments and use the same for the benefit of such restricted Indians: *Provided further*, That the money paid to the enrolled members or their heirs, as provided herein, shall be exempt from any lien for attorneys' fees or other debt contracted prior to the passage of this Act: *Provided further*, That the Secretary of the Interior is hereby authorized to use not to exceed $2,000 out of said Seminole school fund, or other money of said Seminole Tribe, for the payment of salaries of all necessary employees and other expenses for the distribution of said per capita payments.

Creeks. Per capita payment from tribal funds.

Equalization of shares.

That the Secretary of the Interior be, and he is hereby, authorized to pay to the enrolled members of the Creek Tribe of Indians of Oklahoma entitled under existing law to share in the funds of said tribe, or to their lawful heirs, all moneys except $150,000 belonging to said tribe in the hands of the United States Treasurer, or deposited in any bank, or held by an official under the jurisdiction of the Secretary of the Interior on June thirtieth, nineteen hundred and eighteen, the payment to be made in such a way as to equalize the pro rata share received by each member of said tribe, either in land or money of the tribe, taking into consideration the value of the land hereto-

fore allotted and the money received by each member: *Provided*, That said payment shall be made under such rules and regulations as the Secretary of the Interior may prescribe: *Provided further*, That in cases where such enrolled members or their heirs are Indians belonging to the restricted class, the Secretary of the Interior may, in his discretion, withhold such payments and use the same for the benefit of such restricted Indians: *Provided further*, That the money paid to the enrolled members or their heirs, as provided herein, shall be exempt from any lien for attorney's fees or other debt contracted prior to the passage of this Act: *Provided further*, That the Secretary of the Interior is hereby authorized to use not to exceed $15,000 out of said moneys for the payment of salaries of all necessary employees and other expenses for the disbursement of said moneys, as herein provided.

*Provisos.* Regulations, etc.

Restricted Indians.

Exempt from prior debts.

Distribution expenses.

For salaries and expenses of such attorneys and other employees as the Secretary of the Interior may, in his discretion, deem necessary in probate matters affecting restricted allottees or their heirs in the Five Civilized Tribes and in the several tribes of the Quapaw Agency, and for the costs and other necessary expenses incident to suits instituted or conducted by such attorneys, $85,000.

Probate expenses.

For the support, continuance, and maintenance of the Cherokee Orphan Training School, near Tahlequah, Oklahoma, for the orphan Indian children of the State of Oklahoma belonging to the restricted class, to be conducted as an industrial school under the direction of the Secretary of the Interior, $31,500, for repairs and improvements, $4,500; in all, $36,000: *Provided*, That the unexpended balance of the $40,000 appropriated by the Act of May eighteenth, nineteen hundred and sixteen, is hereby reappropriated and made immediately available for repairs and improvements to the school.

Cherokee Orphan Training School.

*Proviso.* Reappropriation. *Vol. 39, p. 147.*

The sum of $250,000, to be expended in the discretion of the Secretary of the Interior, under rules and regulations to be prescribed by him, in aid of the common schools in the Cherokee, Creek, Choctaw, Chickasaw, and Seminole Nations and the Quapaw Agency in Oklahoma, during the fiscal year ending June thirtieth, nineteen hundred and nineteen: *Provided*, That this appropriation shall not be subject to the limitation in section one of this Act limiting the expenditure of money to educate children of less than one-fourth Indian blood.

Tribal schools, including Quapaws.

*Proviso.* Parentage limitation not applicable. *Ante*, p. 564.

That the Secretary of the Interior be, and he is hereby, authorized to use not exceeding $30,000 of the proceeds of sales of unallotted lands and other tribal property belonging to any of the Five Civilized Tribes for payment of salaries of employees and other expenses of advertising and sale in connection with the further sales of such tribal lands and property, including the advertising and sale of the land within the segregated coal and asphalt area of the Choctaw and Chickasaw Nations or of the surface thereof as provided for in the Act of Congress approved February nineteenth, nineteen hundred and twelve (Thirty-seventh United States Statutes at Large, page sixty-seven), and of the improvements thereon, which is hereby expressly authorized, and for other work necessary to a final settlement of the affairs of the Five Civilized Tribes: *Provided*, That not to exceed $2,500 of such amount may be used in connection with the collection of rents of unallotted lands and tribal buildings: *Provided further*, That during the fiscal year ending June thirtieth, nineteen hundred and nineteen, no moneys shall be expended from tribal funds belonging to the Five Civilized Tribes, without specific appropriation by Congress, except as follows: Equalization of allotments, per capita and other payments authorized by law to individual members of the respective tribes, tribal and other Indian schools for the current fiscal year under existing law, salaries and contingent expenses of governors, chiefs, assistant chiefs, secretaries, interpreters, and mining

Sales of tribal property.

Payment of expenses from proceeds.

Coal and asphalt lands.

Vol. 37, p. 67.

*Provisos.* Collection of rents.

Specific authority required for expenditures.

Exceptions.

ADDENDUM 030



trustees of the tribes for the current fiscal year at salaries at the rate heretofore paid, and attorneys for the Choctaw, Chickasaw, and Creek Tribes employed under contract approved by the President, under existing law, for the current fiscal year: *Provided further,* That the Secretary of the Interior is hereby authorized to continue during the ensuing fiscal year the tribal and other schools among the Choctaw, Chickasaw, Creek, and Seminole Tribes from the tribal funds of those nations, within his discretion and under such rules and regulations as he may prescribe: *And provided further,* That the Secretary of the Interior is hereby empowered, during the fiscal year ending June thirtieth, nineteen hundred and nineteen, to expend funds of the Chickasaw, Choctaw, Creek, and Seminole Nations available for school purposes under existing law for such repairs, improvements, or new buildings as he may deem essential for the proper conduct of the several schools of said tribes.

Tribal attorneys.

Continuance of schools.

Repairs, etc., to school buildings.

For fulfilling treaties with Choctaws, Oklahoma: For permanent annuity (article two, treaty of November sixteenth, eighteen hundred and five, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $3,000; for permanent annuity for support of light-horsemen (article thirteen, treaty of October eighteenth, eighteen hundred and twenty, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $600; for permanent annuity for support of blacksmith (article six, treaty of October eighteenth, eighteen hundred and twenty, and article nine, treaty of January twentieth, eighteen hundred and twenty-five, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $600; for permanent annuity for education (article two, treaty of January twentieth, eighteen hundred and twenty-five, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $6,000; for permanent annuity for iron and steel (article nine, treaty of January twentieth, eighteen hundred and twenty-five, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $320; in all, $10,520.

Choctaws. Fulfilling treaties. Annuity. Vol. 7, p. 99; Vol. 11, p. 614.

Light-horsemen. Vol. 7, p. 213; Vol. 11, p. 614.

Blacksmith, etc. Vol. 7, p. 235; Vol. 11, p. 614.

Education. Vol. 7, p. 235; Vol. 11, p. 614.

Iron and steel. Vol. 7, p. 236; Vol. 11, p. 614.

For the salaries and expenses of not to exceed four oil and gas inspectors and necessary clerks and field assistants, under the direction of the Secretary of the Interior, to supervise oil and gas mining operations on allotted and tribal lands in the State of Oklahoma from which restrictions have not been removed, and to conduct investigations with a view to the prevention of waste, $17,500.

Oil and gas inspectors on restricted lands.

That the Secretary of the Interior be, and he is hereby, authorized and directed to sell at a price to be fixed by him which shall not be less than the appraised value, to the State of Oklahoma for a game preserve lands of the Choctaw and Chickasaw Tribes of Indians in Oklahoma described as sections one, two, eleven, twelve, thirteen, fourteen, twenty-three, twenty-four, twenty-five, and twenty-six, township three south, range twenty-five east, and sections five, six, seven, eight, seventeen, eighteen, nineteen, twenty, twenty-nine, and thirty, township three south, range twenty-six east, containing in all twelve thousand eight hundred acres, more or less: *Provided,* That any lands heretofore allotted and conveyed to allottees of the Choctaw and Chickasaw Tribes of Indians, or sold at sales heretofore held to purchasers of tracts of land within said area thus described shall be excepted from such sale.

Game preserve. Sale of Choctaw and Chickasaw lands to Oklahoma for.

Description.

*Proviso.* Allotments, etc., excepted.

That all claims against the Cherokee Nation, including claims to unpaid per capita and equalization money, which may now be paid under existing law out of the funds of the Cherokee Nation in the Treasury of the United States or otherwise in the hands of the Government, shall be filed, not later than one year from the date of the approval of this Act, with the superintendent for the Five Civilized Tribes or such other person as the Secretary of the Interior may designate, and under such rules and regulations as said Secre-

Cherokees. All claims against, to be filed within one year.

tary of the Interior may prescribe to govern the filing, determining and settlement of said claims, and the claims so submitted and filed shall be considered and adjudicated under said rules and regulations not later than six months after the expiration of the time above limited for the filing of the claims, and shall, if approved by the Secretary of the Interior, be paid out of the tribal funds of the Cherokee Nation. Upon the expiration of the time limited in this Act claims against the Cherokee Nation shall be forever barred, and all of said tribal funds then remaining to the credit of the Cherokee Nation shall be expended under the direction of the Secretary of the Interior for building and furnishing an additional dormitory for the Cherokee Orphan Training School, near Tahlequah, Oklahoma.

Adjudication, etc.

Payment.

Funds remaining to be used for Orphan Training School.

That the Secretary of the Treasury be, and he is hereby, authorized and directed to allow credit in the settlement of the accounts of William M. Baker, as cashier and special disbursing agent for the Five Civilized Tribes, for the sum of $5,356.13, paid by said disbursing agent to sundry Indian policemen in reimbursement of their expenses for board and lodging while on duty at their headquarters subsequent to July first, nineteen hundred and fourteen, said payments having been disallowed by the Comptroller of the Treasury as being prohibited by the Act of April sixth, nineteen hundred and fourteen (Thirty-eighth Statutes at Large, page three hundred and eighteen).

William M. Baker. Credit in accounts.

Vol. 38, p. 318.

That the Court of Claims is hereby authorized and directed to hear, consider, and adjudicate the following matters of J. F. McMurray, as assignee of the firm of Mansfield, McMurray and Cornish, against the Choctaw and Chickasaw Nations of Indians, or either of them, for professional services rendered, for said nations in the case of "The Choctaw and Chickasaw Nations versus The United States and the Chickasaw Freedmen," under Act of Congress approved July first, nineteen hundred and two, entitled "An Act to ratify and confirm an agreement with the Choctaw and Chickasaw Tribes of Indians, and for other purposes," and for expenses incurred under sections thirty-one, thirty-two, and thirty-three of the same Act of Congress and for payment of two unpaid Chickasaw warrants issued by tribal authorities under act of legislature of the Chickasaw Nation approved by the governor of the Chickasaw Nation on September twentieth, eighteen hundred and ninety-nine, and afterwards by the President of the United States; and to render judgment therefor in such amount or amounts as may be found to be due thereon, together with interest from the date of such services or payments at the legal rate of interest prevailing at the time and place of such transactions; which judgment, if any, against said nations or either of them shall be paid by the Treasurer of the United States out of the funds of said nations as their interests may appear: *Provided*, That as to any such claims so sued upon the Choctaw and Chickasaw Nations, or either of them, shall be permitted to interpose all proper defenses by way of counterclaim or set-off against either the assignors or the assignee of said claim, all statutes of limitations against said set-offs or counterclaims being hereby waived, and all amounts found due to said Choctaw and Chickasaw Nations, under the above provision, shall bear interest at the legal rate: *Provided further*, That any amount found to be owing, calculated upon a fair and equitable basis, by the said J. F. McMurray to the said Choctaw and Chickasaw Nations upon coal-mining leases held by him may be offset against any judgment that may be rendered in his favor upon such claims: *Provided further*, That if any of such leases are found not to be underlaid with merchantable coal and all of said leases upon which royalties are not paid within thirty days after the final settlement of these matters, the same shall be canceled; and notice of filing of such

J. F. McMurray. Claims for services to Choctaws and Chickasaws referred to Court of Claims.

Vol. 32, pp. 641, 646-648.

Judgment to be paid from tribal funds.

*Provisos.* Defenses by counterclaims or set-offs admitted.

Offsets of coal mining leases.

Cancellation of non-coal lands.

Service of process.

suits by the said J. F. McMurray shall be served upon the principal chief of the Choctaw Nation and the governor of the Chickasaw Nation, and said nations shall be represented therein by attorneys for said nations, respectively, and by the Attorney General of the United States: *Provided*, That the Secretary of the Interior is hereby authorized to adjust, by mutual agreement with the interested parties herein, under the terms hereof and within sixty days after its approval by the President of the United States, any or all of the matters covered by the above provisions, and should such agreement be made by the Secretary of the Interior he is hereby authorized and directed to make requisition upon the Treasurer of the United States for the payment of the same out of any funds of the Choctaw and Chickasaw Indians as their interests may appear, and the Treasurer shall pay the same: *And provided further*, That the Court of Claims shall require the said J. F. McMurray, upon filing suit in pursuance hereof, to give a sufficient bond, with two or more good and sufficient sureties, to abide the judgment of such court in said suit, and in case the Secretary of the Interior should arbitrate such claims and counterclaims he shall require the said McMurray to give sufficient security to abide the award of such arbitration.

Adjustment by mutual agreement authorized.

Surety bond required.

Murray State School of Agriculture. Additional amount from Chickasaw funds. Vol. 39, p. 983.

That the Secretary of the Interior is hereby authorized to withdraw from the Treasury of the United States, from funds on deposit to the credit of the Chickasaw Tribe of Indians in Oklahoma, the sum of $15,000 to be used for construction and equipment of dormitories at the Murray State School of Agriculture, Tishomingo, Oklahoma, and to be immediately available, in addition to the sum of $50,000 provided for the same use by section eighteen of the Indian appropriation Act of March second, nineteen hundred and seventeen.

Oregon.

## OREGON.

Support, etc., of Indians. Klamath Agency.

Sec. 19. For support and civilization of Indians of the Klamath Agency, Oregon, including pay of employees, $6,000.

Warm Springs Agency.

For support and civilization of the confederated tribes and bands under Warm Springs Agency, Oregon, including pay of employees, $4,000.

Umatilla Agency.

For support and civilization of the Indians of the Umatilla Agency, Oregon, including pay of employees, $3,000.

Salem School.

For support and education of six hundred Indian pupils, including native Indian pupils brought from Alaska, at the Indian school, Salem, Oregon, including pay of superintendent, $113,000; for general repairs and improvements, including drainage of school farm, $20,000; in all, $133,000.

Grande Ronde and Siletz Agencies' Indians.

For support and civilization of Indians at Grande Ronde and Siletz Agencies, Oregon, including pay of employees, $4,000.

Klamath Reservation. Modoc Point irrigation system. Vol. 36, p. 1071.

For maintenance and operation of the Modoc Point irrigation system within the Klamath Indian Reservation, in the State of Oregon, $4,000, reimbursable in accordance with the provisions of the Act of March third, nineteen hundred and eleven, and for completing construction of the Modoc Point irrigation system within the Klamath Indian Reservation, in the State of Oregon, $3,000, to be immediately available and to remain available until expended, reimbursable in accordance with the provisions of the Act of March third, nineteen hundred and eleven: *Provided*, That the limit of cost of said project fixed by the Act of May eighteenth, nineteen hundred and sixteen, is hereby changed from $170,000 to $172,000; in all, $7,000.

*Proviso.* Limit of cost increased. Vol. 39, p. 150.

Klamath Indians. Self-support, etc.

For the purpose of encouraging industry and self-support among the Klamath Tribe of Indians in Oregon, and to aid them in building homes, the culture of fruits, grain, and other crops, $400,000, or so much thereof as may be necessary, which sum may be used for the purchase of such animals, machinery, tools, implements, and other

ADDENDUM 033



equipment necessary in the discretion of the Secretary of the Interior to enable the Klamath Indians to become self-supporting, to be reimbursed, within five years from the date of this Act, from the funds accruing to the credit of said tribes in the Treasury of the United States from the sale of timber and unallotted lands on the Klamath Reservation, under such rules and regulations as the Secretary of the Interior may prescribe.

Repayment from timber sales, etc.

## PENNSYLVANIA.

Pennsylvania.

Carlisle School.

SEC. 20. For support and education of seven hundred Indian pupils at the Indian school at Carlisle, Pennsylvania, including pay of superintendent, $132,000; for general repairs and improvements, $15,000; in all, $147,000.

## SOUTH DAKOTA.

South Dakota.

Flandreau School.

SEC. 21. For support and education of three hundred and fifty Indian pupils at the Indian school at Flandreau, South Dakota, and for pay of superintendent, $72,000; for general repairs and improvements, $8,000; for repairing damages caused by fire in industrial building, $4,500; for replacing and repairing equipment contained in industrial building, $2,000, the last two sums to be immediately available; in all, $86,500.

Pierre School.

For support and education of two hundred and fifty Indian pupils at the Indian school at Pierre, South Dakota, including pay of superintendent, $52,000; for general repairs and improvements, $6,000; for installation of new boilers and construction of boiler stack, $5,000; in all, $63,000.

Rapid City School.

For support and education of two hundred and seventy-five Indian pupils at the Indian school, Rapid City, South Dakota, including pay of superintendent, $57,000; for general repairs and improvements, $5,000; for irrigation, drainage, and improving school farm, to remain available until expended, $3,000; additional appropriation for new school building, $15,000; in all, $80,000.

Sioux of different tribes.
Teachers, etc.
Vol. 15, p. 640.

For support of Sioux of different tribes, including Santee Sioux of Nebraska, North Dakota, and South Dakota: For pay of five teachers, one physician, one carpenter, one miller, one engineer, two farmers, and one blacksmith (article thirteen, treaty of April twenty-ninth, eighteen hundred and sixty-eight), $10,400; for pay of second blacksmith, and furnishing iron, steel, and other material (article eight of same treaty), $1,600; for pay of additional employees of the several agencies for the Sioux in Nebraska, North Dakota, and South Dakota, $95,000; for subsistence of the Sioux and for purposes of their civilization (Act of February twenty-eighth, eighteen hundred and seventy-seven), $200,000: *Provided*, That this sum shall include transportation of supplies from the termination of railroad or steamboat transportation, and in this service Indians shall be employed whenever practicable; in all, $307,000.

Additional employees.

Subsistence.
Vol. 19, p. 256.
*Proviso.*
Transportation.

Schools.
Vol. 19, p. 254.

For support and maintenance of day and industrial schools among the Sioux Indians, including the erection and repairs of school buildings, $200,000, in accordance with the provisions of article five of the agreement made and entered into September twenty-sixth, eighteen hundred and seventy-six, and ratified February twenty-eighth, eighteen hundred and seventy-seven (Nineteenth Statutes, page two hundred and fifty-four): *Provided*, That the unexpended balance of the sum of $300,000 appropriated by section twenty-one of the Act of March second, nineteen hundred and seventeen (Thirty-ninth Statutes at Large, page nine hundred and eighty-eight), for acquiring, constructing, or enlargement and equipment of school buildings on the Crow Creek, Pine Ridge, Rosebud, Standing Rock,

*Proviso.*
Reservation school buildings.
Reappropriation.
Vol. 39, p. 988.

ADDENDUM 034



Yankton, Sisseton, Lower Brule, and Cheyenne River Reservations is hereby reappropriated.

Yankton Sioux. Subsistence.

For subsistence and civilization of the Yankton Sioux, South Dakota, including pay of employees, $14,000.

Canton. Expenses of insane asylum.

For the equipment and maintenance of the asylum for insane Indians at Canton, South Dakota, for incidental and all other expenses necessary for its proper conduct and management, including pay of employees, repairs, improvements, and for necessary expense of transporting insane Indians to and from said asylum, $40,000.

Rosebud Agency Indians. Support, etc., from tribal funds. Vol. 36, p. 448.

That the Secretary of the Interior be, and he is hereby, authorized, in his discretion, to withdraw from the Treasury of the United States the sum of $185,000, or so much thereof as may be necessary, of the tribal funds on deposit to the credit of the Sioux Indians of Rosebud Agency, South Dakota, accruing under the Act of May thirtieth, nineteen hundred and ten (Thirty-sixth Statutes at Large, page four hundred and forty-eight), and to expend the same for the support, civilization, and education of said Indians.

Standing Rock Reservation. Reappropriation for highway through. Vol. 39, p. 151.

That the sum of $2,801.50, being the unexpended balance of the sum of $5,000 appropriated by the Indian appropriation Act approved May eighteenth, nineteen hundred and sixteen, as a proportionate share of the cost of constructing a wagon road or highway through the Standing Rock Indian Reservation in Corson County, South Dakota, be, and the same is hereby, made available upon the same terms and for the same purposes as provided in said Act.

Texas.

## TEXAS.

Alabama and Coushatta Indians. Education.

SEC. 22. For the education of the Alabama and Coushatta Indians located in Polk County, Texas, by the construction of a school building, including equipment, upon land belonging to said Indians, $5,000; and by aiding the public schools established by the State or local authorities to the extent of 10 cents per day for each Indian child who attends such schools, $2,000, to be expended under the direction of the Secretary of the Interior; and the Secretary of the Interior is hereby authorized and directed to cause an investigation to be made as to the necessity and advisability of purchasing lands for said Indians and to make report thereon to Congress on or before the first Monday in December, nineteen hundred and eighteen, and the sum of $1,000, or so much thereof as may be necessary, is hereby appropriated to pay the expenses of such investigation; in all, $8,000, to be immediately available.

Investigation for purchase of land, etc.

Utah.

## UTAH.

Utes, Confederated Bands. Carpenters, etc. Vol. 15, p. 622.

SEC. 23. For support and civilization of Confederated Bands of Utes: For pay of two carpenters, two millers, two farmers, and two blacksmiths (article fifteen, treaty of March second, eighteen hundred and sixty-eight), $6,720; for pay of two teachers (same article and treaty), $1,800; for purchase of iron and steel and the necessary tools for blacksmith shop (article nine, same treaty), $220; for annual amount for the purchase of beef, mutton, wheat, flour, beans, and potatoes, or other necessary articles of food and clothing, and farming equipment (article twelve, same treaty), $30,000; for pay of employees at the several Ute agencies, $15,000; in all, $53,740.

Food, etc.

Support, etc., of detached Indians.

For the support and civilization of Indians in Utah, not otherwise provided for, including pay of employees, $10,000.

Utes, Confederated Bands. Distribution from principal funds.

The Secretary of the Interior is hereby authorized to withdraw from the Treasury of the United States, within his discretion, the sum of $350,000 of the principal funds to the credit of the Confederated Bands of Ute Indians and to expend the sum of $50,000 of said amount for the benefit of the Ute Mountain (formerly Navajo Springs) Band of said Indians in Colorado, and the sum of $200,000

ADDENDUM 035



of said amount for the Uintah, White River, and Uncompahgre Bands of Ute Indians in Utah, and the sum of $100,000 of said amount for the Southern Ute Indians in Colorado, which sums shall be charged to said bands, and the Secretary of the Interior is also authorized to withdraw from the Treasury the accrued interest to and including June thirtieth, nineteen hundred and eighteen, on the funds of the said Confederated Bands of Ute Indians appropriated under the Act of March fourth, nineteen hundred and thirteen (Thirty-seventh Statutes at Large, page nine hundred and thirty-four), and to expend or distribute the same for the purpose of promoting civilization and self-support among the said Indians, under such regulations as the Secretary of the Interior may prescribe: *Provided*, That the Secretary of the Interior shall report to Congress, on the first Monday in December, nineteen hundred and nineteen, a detailed statement as to all moneys expended as provided for herein.

For self-support from accrued interest.

Vol. 37, p. 934.

*Proviso.* Report of expenditures.

The Secretary of the Interior is hereby authorized to withdraw from the Treasury of the United States, within his discretion, the sum of $150,000 of the principal funds to the credit of the Confederated Bands of Ute Indians and to expend same for continuing the construction of lateral distributing systems to irrigate the allotted lands of the Uncompahgre, Uintah, and White River Utes, in Utah, and to maintain existing irrigation systems authorized under the Act of June twenty-first, nineteen hundred and six, to be immediately available and to remain available until expended.

Uncompahgre, etc., Utes. Irrigating allotments of.

Vol. 34, p. 375.

The sum of $12,000, to be expended in the discretion of the Secretary of the Interior, under rules and regulations to be prescribed by him, in aid of the public schools in the Uintah and Duchesne County school districts, Utah.

Uintah and Duchesne Counties. Aid to public schools.

For the construction of a wagon road through the Shivwits Indian Reservation, Utah, $5,000; for the construction of a steel bridge and approaches across the Santa Clara River on the Shivwits Indian Reservation, $10,000; in all, $15,000, reimbursable to the United States from any funds now or hereafter placed in the Treasury to the credit of the Shivwits Tribe of Indians, to remain a charge and lien upon the lands and funds of said tribe of Indians until paid.

Shivwits Reservation. Road and bridge in.

Repayment.

## WASHINGTON.

Washington.

Sec. 24. For support and civilization of the D'Wamish and other allied tribes in Washington, including pay of employees, $7,000.

Support, etc., of Indians. D'Wamish, etc.

For support and civilization of the Makahs, including pay of employees, $2,000.

Makahs.

For support and civilization of Qui-nai-elts and Quil-leh-utes, including pay of employees, $1,000.

Qui-nai-elts and Quil-leh-utes.

For support and civilization of Indians at Yakima Agency, including pay of employees, $3,000.

Yakima Agency Indians.

For support and civilization of Indians at Colville, Taholah, Puyallup, and Spokane Agencies, including pay of employees and for purchase of agricultural implements, and support and civilization of Joseph's Band of Nez Perce Indians in Washington, $13,000.

Colville, etc., Agencies Indians.

For support of Spokanes in Washington (article six of agreement with said Indians, dated March eighteenth, eighteen hundred and eighty-seven, ratified by Act of July thirteenth, eighteen hundred and ninety-two), $1,000.

Spokanes.

Vol. 27, p. 139.

For operation and maintenance of the irrigation system on lands allotted to Yakima Indians in Washington, $15,000, reimbursable in accordance with the provisions of the Act of March first, nineteen hundred and seven: *Provided*, That money received under agreements for temporary water supply may be expended under the direction of the Secretary of the Interior for maintenance and improvement of the irrigation system on said lands.

Yakimas. Irrigating allotments. Vol. 33, p. 597; Vol. 34, p. 1050.

*Proviso.* Application of receipts.

Yakima Reservation. Payment for additional water supply to allottees.
Vol. 38, p. 604.

For the fifth installment in payment of $635,000 for water supply or irrigation of forty acres of each Indian allotment on the Yakima Indian Reservation irrigation system in the State of Washington, provided by the Act of August first, nineteen hundred and fourteen (Thirty-eighth Statutes at Large, page six hundred and four), $100,000 to be covered into the reclamation fund: *Provided*, That the land for which the aforesaid water supply was purchased shall be understood to be included within the Wapato irrigation project.

Proviso. Land specified.

Cushman School.

For support and education of three hundred and twenty-five Indian pupils at the Cushman Indian School, Tacoma, Washington, including repairs and improvements, and for pay of superintendent, $65,000, said appropriation being made to supplement the Puyallup school funds used for said school.

Wapato irrigation project. Continuing construction, etc.
Vol. 38, p. 604.

For continuing construction and enlargement of the Wapato irrigation and drainage system, to make possible the utilization of the water supply provided by the Act of August first, nineteen hundred and fourteen (Thirty-eighth Statutes at Large, page six hundred and four), for forty acres of each Indian allotment under the Wapato irrigation project on the Yakima Indian Reservation, Washington, and such other water supply as may be available or obtainable for the irrigation of a total of one hundred and twenty thousand acres of allotted Indian lands on said reservation, $500,000 to be immediately available, and to remain available until expended: *Provided*, That the entire cost of said irrigation and drainage system shall be reimbursed to the United States under the conditions and terms of the Act of May eighteenth, nineteen hundred and sixteen: *Provided further*, That out of the sum herein appropriated the Secretary of the Interior is hereby authorized to pay to Violetta Stone and W. D. Stone, husband and wife, the sum of $629.48 for lands purchased of them for use in connection with the construction of the diversion dam across the Yakima River, as provided for in the Act of May eighteenth, nineteen hundred and sixteen (Thirty-ninth Statutes at Large, page one hundred and fifty-four), and the sum herein appropriated shall be available for the purchase of such other lands as may be required in connection with the construction of the aforesaid irrigation project.

Provisos. Repayment.
Vol. 39, p. 154.

Violetta and W. D. Stone. Payment to, for lands taken.

Spokanes. Purchase of lands for fairgrounds, etc., from tribal funds.
Vol. 35, p. 458.

The Secretary of the Interior is hereby authorized to withdraw from the Treasury of the United States the sum of $2,000, or so much thereof as may be necessary, of the funds on deposit to the credit of the Indians under the Spokane jurisdiction, accruing under the Act of May twenty-ninth, nineteen hundred and eight (Thirty-fifth Statutes at Large, page four hundred and fifty-eight), and to expend the same in the purchase of land for fairgrounds purposes and the construction of a building thereon for the benefit of said Indians.

Quiniault Reservation. Construction of road on.

For the construction of a road on the Quiniault Indian Reservation, Washington, $22,500, to be immediately available and to be reimbursed from any funds now or hereafter placed in the Treasury to the credit of the Quiniault Indians, to remain a charge and lien upon the lands and funds of said tribe of Indians until paid.

Yakimas. Payment to attorneys, from tribal funds.

That there is hereby appropriated, out of the tribal funds of the Yakima Indians in the State of Washington not otherwise appropriated, to be charged to the tribal account, the sum of $2,000 to be used by and under the direction of the Yakima Tribal Council for actual and necessary expenses in presenting Indian matters to the Government officials in Washington City, or in the employment of attorneys from the State of Washington to assist them in securing information relative to their tribal rights and property.

Wisconsin.

## WISCONSIN.

Hayward School.

Sec. 25. For the support and education of two hundred and thirty Indian pupils at the Indian school at Hayward, Wisconsin, including

ADDENDUM 037



pay of superintendent, $47,450; for general repairs and improvements, $8,000; in all, $55,450.

Tomah School.

For support and education of two hundred and seventy-five Indian pupils at the Indian school, Tomah, Wisconsin, including pay of superintendent, $57,000; for general repairs and improvements, $8,000; in all, $65,000.

Chippewas of Lake Superior. Support, etc.

For support and civilization of the Chippewas of Lake Superior, Wisconsin, including pay of employees, $7,000.

Pottawatomies. Support, etc.

For support, education, and civilization of the Pottawatomie Indians who reside in the State of Wisconsin, including pay of employees, $7,000.

Wisconsin Band of Pottawatomies, Wis. and Mich. Support, etc. Vol. 38, p. 102.

For the support and civilization of those portions of the Wisconsin Band of Pottawatomie Indians residing in the States of Wisconsin and Michigan, and to aid said Indians in establishing homes on the lands purchased for them under the provisions of the Act of Congress approved June thirtieth, nineteen hundred and thirteen, $75,000, or so much thereof as may be necessary, said sum to be reimbursed to the United States out of the appropriation, when made, of the principal due as the proportionate share of said Indians in annuities and moneys of the Pottawatomie Tribe in which they have not shared as set forth in House Document Numbered Eight hundred and thirty (Sixtieth Congress, first session), and the Secretary of the Interior is hereby authorized to expend the said sum of $75,000 in the clearing of land and the purchase of houses, building material, seed, animals, machinery, tools, implements, and other equipment and supplies necessary to enable said Indians to become self-supporting: *Provided*, That from the sum herein appropriated for said Pottawatomie Indians the Secretary of the Interior is hereby authorized to pay to the legal representatives of R. V. Belt (Mrs. Joana Belt and William O. Belt) such sum, not exceeding $25,000, as he, after a proper hearing, may fix as compensation justly and equitably due the said Belt and associates on a quantum meruit for their services in recovering for the said Pottawatomie Indians the annuities withheld from them, under contract with representatives of said Indians approved by the Commissioner of Indian Affairs November first, nineteen hundred and two.

Repayment.

Use specified.

*Proviso.* R. V. Belt. Payment to legal representatives of, for services.

Menominees. Self-support, etc., from tribal funds.

Vol. 26, p. 146; Vol. 35, p. 51; Vol. 36, p. 1076.

The Secretary of the Interior is hereby authorized to withdraw from the Treasury of the United States, in his discretion, the sum of $300.000 of the tribal funds of the Menominee Indians in Wisconsin, arising under the provisions of the Acts of June twelfth, eighteen hundred and ninety (Twenty-sixth Statutes at Large, page one hundred and forty-six), and March twenty-eighth, nineteen hundred and eight (Thirty-fifth Statutes at Large, page fifty-one), section twenty-six of the Act of March third, nineteen hundred and eleven (Thirty-sixth Statutes at Large, page one thousand and seventy-six), and any Acts amendatory thereof, and under such regulations as he may prescribe to expend the same to aid said Indians to fit themselves for, or to engage in, farming or such other pursuits or avocations as will enable said Indians to become self-supporting, or in the case of the old, decrepit, or incapacitated members of the tribe, for support: *Provided*, That in the case of those who engage in farming upon the Menominee Reservation, that prior to authorization to make expenditures for farming purposes upon lands not heretofore entirely cleared of all merchantable timber, the Forest Service of the Indian Bureau shall make a survey of same and shall certify that such lands have been cut over and cleared of all merchantable timber, or that if there be merchantable timber on such lands that it is to the interest of the Menominee Indians, and not detrimental to the Menominee Forest, that such timber be removed, and that such Forest Service of the Indian Bureau shall also certify that the lands proposed to be

*Provisos.* Removing merchantable timber from farm lands.

Not detrimental to Menominee Forest.

cleared are not necessary to the preservation of the Menominee Forest and would be more valuable to the Menominee Indians if used for agricultural or grazing purposes; that any merchantable timber cut hereunder shall be disposed of in the manner provided by law for the disposition of timber cut upon the Menominee Reservation. and the authorization herein contained, in so far as it applies to the merchantable timber on said lands, shall not be construed so as to increase the total amount of said timber authorized to be cut in any one year: *Provided further*, That the funds herein authorized may, in the discretion of the Secretary of the Interior, be apportioned on a per capita basis among all enrolled members of the Menominee Tribe, a per capita payment of $50 to be made immediately after the passage of this Act to each member of said tribe, and the remainder of the share of each Indian to be deposited to his or her credit: *Provided*. That the per capita share of each minor under eighteen years of age in said sum so apportioned shall be deposited to the credit of the parent, guardian, or other person having the custody and care of said minor, the per capita share of such minors or the unexpended balance of same, when any such minors shall arrive at the age of eighteen years, shall be withdrawn from the amount of the parent, guardian, or other person and deposited to the account of such minors. All deposits made to the credit of individual members of the Menominee Tribe, to parents, guardians, or other persons under the terms of this Act, shall be subject to expenditure under the regulations governing the handling of individual Indian money.

Per capita to enrolled tribal members. Cash payment.

Shares of minors, etc.

Individual credit on reaching 18 years.

Regulation of deposits.

Wittenberg School. Sale of property.

The Secretary of the Interior is hereby authorized to sell the lands and buildings comprising the former Wittenberg Indian School, Wittenberg, Wisconsin, at not less than their appraised value. The money received from said sale to be deposited in the Treasury as miscellaneous receipts.

Wyoming.

## WYOMING.

Shoshones. Support, etc.

Sec. 26. For support and civilization of Shoshone Indians in Wyoming, including pay of employees, $15,000.

Reservation school.

For support and education of one hundred and fifty Indian pupils at the Indian school, Shoshone Reservation, Wyoming, including pay of superintendent, $32,500; for general repairs and improvements, $5,000; in all, $37,500.

Fulfilling treaty. Vol. 15, p. 576.

For support of Shoshones in Wyoming: For pay of physician, teacher, carpenter, miller, engineer, farmer, and blacksmith (article ten, treaty of July third, eighteen hundred and sixty-eight), $5,000; for pay of second blacksmith, and such iron and steel and other materials as may be required, as per article eight, same treaty, $1,000; in all, $6,000.

Irrigation system within Reservation. Construction.

Vol. 33, p. 1016.

For continuing the work of constructing an irrigation system within the diminished Shoshone or Wind River Reservation, in Wyoming, including the Big Wind River and Dry Creek Canals, and including the maintenance and operation of completed canals, $50,000, reimbursable in accordance with the provisions of the Act of March third, nineteen hundred and five, and to remain available until expended.

Irrigating additional ceded lands.

Repayment. Vol. 33, p. 1016.

*Proviso.* Payment of construction, etc., charges.

For continuation of investigations, beginning of construction and incidental operations on a project for the irrigation of a portion of the conditionally ceded lands of the Wind River Reservation, Wyoming, $100,000, reimbursable in accordance with the provisions of the Act of March third, nineteen hundred and five, and to remain available until expended: *Provided*, That the construction charge for the actual cost of said project shall be fixed by the Secretary of the Interior and divided equitably between the Indian land and public and private land irrigated by such project, and that the charge as

ADDENDUM 039



fixed for said Indian lands shall be reimbursable in accordance with the provisions of the Act of March third, nineteen hundred and five, and that the charges as fixed for private and public land irrigated under such project shall be paid by the owner or entryman in accordance with the terms of payment of construction and maintenance charges as provided by the reclamation law and amendments thereto.

Roads and bridges.

For continuing the work of constructing roads and bridges within the diminished Shoshone or Wind River Reservation, in Wyoming, $25,000, said sum to be reimbursed from any funds which are now or may hereafter be placed in the Treasury to the credit of said Indians, to remain a charge and lien upon the lands and funds of said Indians until paid.

Increased expenditures for Indians from tribal funds during fiscal year.

Sec. 27. That the Secretary of the Interior be, and he is hereby, authorized in his discretion to expend for the benefit of Indians, from their tribal funds held in trust or otherwise, not exceeding $2,500,000 during the fiscal year ending June thirtieth, nineteen hundred and nineteen, as provided by section twenty-seven of the Act of May eighteenth, nineteen hundred and sixteen (Thirty-ninth Statutes at Large, page one hundred and fifty-eight), in addition to such sums as may be required for equalization of allotments, education of Indian children, per capita and other payments to Indians and expenditures for the Five Civilized Tribes in accordance with existing law: *Provided*, That expenditures shall not be made from any one fund for purposes other than those above specified in excess of the estimates submitted by the Secretary of the Interior and appearing in House of Representatives Document Numbered Four hundred and ninety-nine, Sixty-fifth Congress, second session: *And provided further*, That no expenditures shall be made from tribal or treaty funds which are not authorized by existing laws governing their disposition and use.

Vol. 39, p. 158.

*Proviso.* Not to exceed estimates.

Funds excluded.

Indian trust funds. Withdrawal from the Treasury and segregated to individual Indians.

Sec. 28. That the Secretary of the Interior be, and he is hereby, authorized, under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and segregate the common, or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States, and which are susceptible of segregation, so as to credit an equal share to each and every recognized member of the tribe except those whose pro rata shares have already been withdrawn under existing law, and to deposit the funds so segregated in banks to be selected by him, in the State or States in which the tribe is located, subject to withdrawal for payment to the individual owners or expenditure for their benefit under the regulations governing the use of other individual Indian moneys. The said Secretary is also authorized, under such rules and regulations as he may prescribe, to withdraw from the Treasury and deposit in banks in the State or States in which the tribe is located to the credit of the respective tribes, such common, or community, trust funds as are not susceptible of segregation as aforesaid, and on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks: *Provided*, That no tribal or individual Indian money shall be deposited in any bank until the bank shall have agreed to pay interest thereon at a reasonable rate and shall have furnished an acceptable bond or collateral security therefor, and United States bonds may be furnished as collateral security for either tribal or individual funds so deposited, in lieu of surety bonds: *Provided further*, That the Secretary of the Interior, if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in United States Government bonds: *And provided further*, That any part of tribal funds required for support of schools or pay of tribal officers shall be excepted from segregation or deposit as herein authorized, and the same shall be expended for the purposes afore-

Deposit of, in banks to personal credit.

Trust funds to be deposited to tribal credit.

*Provisos.* Interest, etc.

Investment in Government bonds allowed.

Funds for schools, etc., excepted.

ADDENDUM 040



Rolls to be complete.

Funds of Five Civilized Tribes and Osage.

said: *Provided, however*, That the funds of any tribe shall not be segregated until the final rolls of said tribe are complete: *And provided further*, That the foregoing shall not apply to the funds of the Five Civilized Tribes, or the Osage Tribe of Indians, in the State of Oklahoma, but the funds of such tribes and individual members thereof shall be deposited in the banks of Oklahoma or in the United States Treasury and may be secured by the deposit of United States bonds.

Approved, May 25, 1918.

---

May 29, 1918.
[H. R. 9715.]
[Public, No. 160.]

**CHAP. 87.**—An Act Extending the time for the construction of a bridge across the Bayou Bartholomew, in Ashley County, Wilmot Township, State of Arkansas.

Bayou Bartholomew.
Time extended for bridging, by Ashley County, Ark.
Vol. 39, p. 353, amended.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the times for commencing and completing the construction of a bridge, authorized by Act of Congress approved July eighth, nineteen hundred and sixteen, to be built across the Bayou Bartholomew at a point suitable to the interests of navigation at or near Wilmot, Arkansas, on section line between sections one and twelve, township nineteen, range five west, where it crosses said bayou in Ashley County, Arkansas, are hereby extended one and three years, respectively, from the date hereof.

Amendment.

SEC. 2. That the right to alter, amend, or repeal this Act is hereby expressly reserved.

Approved, May 29, 1918.

---

May 31, 1918.
[H. R. 4910.]
[Public, No. 161.]

**CHAP. 88.**—An Act To authorize the establishment of a town site on the Fort Hall Indian Reservation, Idaho.

Fort Hall Indian Reservation, Idaho.
Town site to be established on.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Secretary of the Interior be, and he is hereby, authorized to set aside and reserve for town-site purposes a tract of land within the Fort Hall Indian Reservation, Idaho, as in his opinion may be required for the future public interests, and he may cause the same to be surveyed into suitable lots and blocks and to dedicate the streets and alleys thereof to public uses; and he is hereby authorized to set apart and reserve for school, park, and other public purposes not more than ten acres in such town site; and patents shall issue for the lands so set apart and reserved for school, park, and other public purposes to the municipality legally charged with the care and custody of lands donated for such purposes on condition that Indian children shall be permitted to attend the public schools of such town under the same conditions as white children.

Reservations for public purposes.

Appraisal and sale of lots.

SEC. 2. That the Secretary of the Interior is further authorized to cause the lots within such town site as may be established hereunder to be appraised and disposed of under such rules and regulations as he may prescribe and any and all expenses in connection with the survey, appraisement, and sale of such town site shall be reimbursed from the sales of town lots, and the net proceeds derived therefrom shall be placed in the Treasury of the United States to the credit of the Indians of the Fort Hall Reservation and shall be subject to appropriation by Congress for their benefit: *Provided, however*, That any lands disposed of hereunder shall be subject to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country until otherwise provided by Congress.

Deposit of proceeds.

*Proviso.*
Liquor prohibition.

Approved, May 31, 1918.

disease known as pleuropneumonia; nor shall any person, company, or corporation deliver for such transportation to any railroad company, or master or owner of any boat or vessel, any livestock, knowing them to be affected with any contagious, infectious, or communicable disease; nor shall any person, company, or corporation drive on foot, or transport in private conveyance from one State or Territory to another, or from any State into the District of Columbia, or from the District into any State, any livestock, knowing them to be affected with any contagious, infectious, or communicable disease, and especially the disease known as pleuropneumonia": *Provided*, That until May 1, 1928, cattle infested with or exposed to cattle fever ticks may be shipped in interstate commerce for immediate slaughter after one dipping in accordance with such regulations as the Secretary of Agriculture may prescribe.

Driving on foot, etc.

*Proviso.* Permission until May 1, 1928, of tick-infested cattle for immediate slaughter.

Sec. 2. That section 6, chapter 839, "An Act providing for the inspection of meats for exportation, prohibiting the importation of adulterated articles of food and drink, and authorizing the President to make proclamation in certain cases, and for other purposes," approved August 30, 1890, be amended to hereafter read as follows:

Pure food Act. Vol. 26, p. 416, amended.

"That the importation of meat, cattle, sheep, and other ruminants, and swine, which are diseased or infected with any disease, or which shall have been exposed to such infection within sixty days next before their importation, is hereby prohibited: *Provided*, That the Secretary of Agriculture within his discretion and under such regulations as he may prescribe, is authorized to permit the admission from Mexico into the State of Texas of cattle which have been infested with or exposed to ticks upon being freed therefrom. Any person who shall knowingly violate the foregoing provision shall be deemed guilty of a misdemeanor and shall, on conviction, be punished by a fine not exceeding $5,000, or by imprisonment not exceeding three years, and any vessel or vehicle used in such unlawful importation within the knowledge of the master or owner of such vessel or vehicle that such importation is diseased or has been exposed to infection as herein described, shall be forfeited to the United States."

Importing diseased meat, cattle, etc., prohibited.

*Proviso.* Admission from Mexico into Texas, of tick-infested cattle, freed therefrom.

Punishment for violation.

Forfeiture of vessel, etc.

Sec. 3. That all laws or parts of laws in conflict with this Act be and they are hereby expressly repealed.

Conflicting laws repealed.

Approved, June 28, 1926.

---

June 28, 1926. [S. 3361.] [Public, No. 437.]

**CHAP. 701.**—An Act To purchase lands for addition to the Papago Indian Reservation, Arizona.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the sum of $9,500 is hereby authorized to be appropriated, out of any moneys in the United States Treasury not otherwise appropriated, to enable the Secretary of the Interior to purchase, as an addition to the agency reserve of the Papago Indian Reservation, Arizona, the south half of the southwest quarter of section 25, the north half of the northwest quarter of section 36, township 17 south, range 4 east, known as the Steinfeld tract; and the southeast quarter of the northeast quarter, the northeast quarter of the southeast quarter of section 35, the north half of the southwest quarter, the south half of the northwest quarter, and the southwest quarter of the northeast quarter of section 36, township 17 south, range 4 east of the Gila and Salt River meridian, known as the Tierney tract; in all, 440 acres.

Papago Indian Reservation. Purchase of lands for agency reserve.

Description.

Approved, June 28, 1926.

Sec. 3. The right to alter, amend, or repeal this Act is hereby expressly reserved.

Amendment.

Approved, May 18, 1928.

---

**CHAP. 643.**—Joint Resolution Designating May 1 as Child Health Day.

May 18, 1928.
[H. J. Res. 1[illegible]4.]
[Pub. Res., No. 46.]

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That the President of the United States is hereby authorized and requested to issue annually a proclamation setting apart May 1 of each year as Child Health Day and inviting all agencies and organizations interested in child welfare to unite upon that day in the observance of such exercises as will awaken the people of the Nation to the fundamental necessity of a year-round program for the protection and development of the health of the Nation's children.

Child Health Day.
President authorized to issue annual proclamation designating May 1, as.
*Post*, p. 3046.

Approved, May 18, 1928.

---

**CHAP. 644.**—An Act To authorize allotments to unallotted Indians on the Shoshone or Wind River Reservation, Wyoming.

May 21, 1928.
[S. [illegible]]
[Public, No. 442.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Secretary of the Interior be, and he is hereby, authorized, under such rules and regulations as he may prescribe, to allot lands classified as nonirrigable, nontimbered grazing lands on the diminished Shoshone or Wind River Reservation, Wyoming, to all unallotted living children enrolled or entitled to be enrolled on said reservation, in areas not exceeding three hundred and twenty acres each, and to issue therefor trust patents of the form and legal effect authorized by the general allotment Act of February 8, 1887 (Twenty-fourth Statutes, page 388), as amended: *Provided*, That all minerals, including oil and gas, on any of the lands allotted hereunder are reserved in common for the benefit of the Indians having rights on the reservation, and may be leased for mining purposes under existing law.

Shoshone Reservation, Wyo.
Trust patents to unallotted children enrolled on.
Areas.
Vol. 24, p. 388.
*Proviso.*
Mineral deposits reserved for the Indians.

Sec. 2. That there is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $50,000 or so much thereof as may be necessary to pay the expenses for necessary surveys, classification of lands, and all other expenses in connection with the allotment work.

Sum authorized for surveys, etc.
*Post*, pp. 8[illegible], 1041.

Approved, May 21, 1928.

---

**CHAP. 645.**—An Act Authorizing the construction of a fence along the east boundary of the Papago Indian Reservation, Arizona.

May 21, 1928.
[S. [illegible]]
[Public, No. 44[illegible].]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the sum of $15,000, or so much thereof as may be necessary, is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, for expenditure under the direction of the Secretary of the Interior for the purchase of barbed wire and posts and transportation of the same for use in the construction of a fence on or near the east boundary of the Papago Indian Reservation, Arizona, beginning at the international boundary line and extending in a northerly direction for approximately sixty miles: *Provided*, That no part of said appropriation shall be expended in payment of labor for the erection of said fence.

Papago Indian reservation, Ariz.
Fence along eastern boundary of, authorized.
*Post*, p. 899.
*Proviso.*
No labor expenditure.

Approved, May 21, 1928.

ADDENDUM 043

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



February 21, 1931.
[H. R. 16215.]
[Public, No. 708.]

**CHAP. 266.**—An Act Authorizing the sale of surplus power developed under the Grand Valley reclamation project, Colorado.

Grand Valley reclamation project, Colo.

Sale of power privileges by Water Users' Association authorized.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That whenever a development of power is necessary for the irrigation of lands under the Grand Valley reclamation project, Colorado, or an opportunity is afforded for the development of power under said project, such development of power to be without expenditure of money from the reclamation fund or from the Treasury of the United States, the Grand Valley Water Users' Association, with the approval of the Secretary of the Interior, is authorized to enter into a contract or contracts for a period of not exceeding twenty-five years for the sale or development of any surplus power or power privileges in said Grand Valley reclamation project, Colorado.

Approved, February 21, 1931.

---

February 21, 1931.
[S. 2231.]
[Public, No. 709.]

**CHAP. 267.**—An Act To reserve certain lands on the public domain in Arizona for the use and benefit of the Papago Indians, and for other purposes.

Public lands.
Reservation of, for use of Papago Indians, Ariz.

Vol. 44, p. 775.

Requisition of privately owned lands.

*Provisos.*
Valid rights and claims unaffected.

Lands not subject to allotment.

Subject to disposition under mining laws.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That all vacant, unreserved, and undisposed of public lands within townships 11, 12, and 13 south, range 1 east; townships 11 and 12 south, range 2 east; township 11 south, range 3 east; township 11 south, range 4 east; townships 11 and 12 south, range 5 east; townships 12 and 13 south, range 1 west; townships 12, 13, and 14 south, range 2 west; townships 13 and 14 south, range 3 west; and townships 14 south, range 4 west; townships 12, 13, 14, 15, and 16 south, range 7 east; townships 14, 15, and 16 south, range 6 east; and townships 14 and 15 south, range 8 east, of the Gila and Salt River meridian, in Arizona, be, and they are, exclusive of a tribal right to the minerals therein, hereby reserved for the use and occupancy of the Papago Indians as an addition to the Papago Indian Reservation, Arizona, whenever all privately owned lands except mining claims within said addition have been purchased and acquired as hereinafter authorized: *Provided*, That all valid rights and claims which have attached to the lands prior to approval hereof shall not be affected by this Act: *Provided further*, That lands acquired hereunder shall remain tribal lands and shall not be subject to allotment to individual Indians under the General Allotment Act: *And provided further*, That all such lands shall be subject to disposition under the mining laws as provided in the Executive order of February 1, 1917, creating the Papago Indian Reservation.

Sum authorized for acquisition, etc., of certain private lands.

Limitation.

Vol. 44, p. 775.

Sec. 2. There is hereby authorized to be appropriated, from any funds in the Treasury of the United States not otherwise appropriated, the sum of $165,000, or so much thereof as may be necessary, to be used by the Secretary of the Interior in his discretion in the purchase and acquiring of title to certain privately owned lands, improvements, and equipment located within the area described in section 1 hereof; and also in sections 25, 35, and 36, townships 17 south, range 4 east, of the Gila and Salt River Meridian, in Arizona, no part of said amount to be available unless all the privately owned lands except mining claims within said addition shall be acquired for not more than said amount together with the $9,500 authorized to be appropriated to purchase lands for an addition to the Papago Indian Reservation, Arizona, by the Act of June 28, 1926 (44 Stat.

ADDENDUM 044



775): *Provided*, That in the event title to any privately owned land is acquired by purchase, the land so purchased shall become part of the Papago Indian Reservation: *And provided further*, That the State of Arizona may relinquish such tracts within the townships referred to in section 1 of this Act as it may see fit in favor of the Papago Indians, and shall have the right to select other unreserved and nonmineral public lands within the State of Arizona equal in area to that relinquished, said lieu selections to be made in the same manner as is provided for in the Enabling Act of June 20, 1910 (36 Stat. L. 558).

*Provisos.* To be part of Papago Indian Reservation, Ariz.

Option by Arizona.

Vol. 36, p. 558.

Approved, February 21, 1931.

---

February 21, 1931. [S. 4619.] [Public, No. 710.]

**CHAP. 268.**—An Act To authorize the disposition of effects of persons dying while subject to military law.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the effects in the possession of the General Accounting Office of persons dying while subject to military law, including papers of value, sabers, insignia, decorations, medals, watches, trinkets, manuscripts, and other articles valuable chiefly as keepsakes, including those of deceased inmates of the Soldiers' Home dying in any United States military hospital, where sent from said home for treatment, and similar effects hereafter received by the War Department under the provisions of the Act of June 4, 1920 (41 Stat. L. 809; U. S. C., title 10, sec. 1584), as amended, shall be delivered to the Soldiers' Home; that wills or other papers involving property rights shall be promptly delivered to proper courts of record; that the remaining effects, if the heirs or legal representatives can not be ascertained, shall be retained by the home intact until three years from the date of the death of the person on whose behalf they were received shall have expired (in the event said period shall not have already elapsed), for the purpose of delivery to the widow or legal representative of the deceased, or to the son, daughter, father (provided the father had not abandoned the support of his family), mother, brother, sister, or the next of kin in the order named, or beneficiary named in the will of the deceased, upon the establishment to the satisfaction of the home of a right thereto.

Army. Disposition of effects of persons dying while subject to military law.

Vol. 41, p. 809. U. S. C., p. 239.

Wills.

Remaining effects.

Sec. 2. (a) That after the expiration of three years from date of death of said deceased, the Soldiers' Home may sell, either at public or private sale, as deemed most advantageous, all or any of such effects to which a right thereto shall not have been established on behalf of said deceased, his heirs, or legal representatives: *Provided*, That decorations, medals, and citations shall not be sold, but shall be disposed of as in section (b) following.

Sale after three years.

*Proviso:* Decorations, medals, etc.

(b) That such of said effects as at the expiration of five years from date of death of deceased have neither been sold nor a right thereto established on behalf of the deceased shall be finally disposed of by said home in such manner as in the interest of the public it deems most fitting, helpful, and appropriate, either by permanent retention thereof, distribution to the Veterans' Administration, State or other military homes, museums, or other appropriate institutions, or by their destruction, if, in the opinion of the board of commissioners thereof, they no longer possess any value.

Effects not sold, etc., after five years.

(c) That the net proceeds received by the home from the sale of such effects shall be covered into the Treasury to the benefit of the fund "Soldiers' Home permanent fund (trust fund)," and such principal fund as thus augmented shall draw interest at 3 per centum per annum, payable quarterly to the treasurer of the home.

Proceeds to Soldiers' Home permanent fund.

shall have been so provided, such bridge shall thereafter be maintained and operated free of tolls, or the rates of toll shall thereafter be so adjusted as to provide a fund of not to exceed the amount necessary for the proper maintenance, repair, and operation of the bridge and its approaches under economical management. An accurate record of the cost of the bridge and its approaches; the expenditures for maintaining, repairing, and operating the same; and of the daily tolls collected shall be kept and shall be available for the information of all persons interested.

Record of expenditures and receipts.

SEC. 5. The right to alter, amend, or repeal this Act is hereby expressly reserved.

Amendment.

Approved, July 28, 1937.

---

[CHAPTER 527]

July 28, 1937
[S. 1806]
[Public, No. 217]

AN ACT

To extend the boundaries of the Papago Indian Reservation in Arizona.

Papago Indian Reservation, Ariz.
Area enlarged.

Lands added.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That whenever all privately owned lands except mining claims within the following-described area have been purchased and acquired as hereinafter authorized, the boundary of the Papago Indian Reservation in Arizona shall be extended to include the west half of section 4; west half of section 9, township 17 south, range 8 east; all of township 18 south, range 2 west, all of fractional township 19 south, range 2 west; and all of fractional townships 18 and 19 south, range 3 west, except sections 6, 7, 18, 19, 30, and 31 in township 18 south, range 3 west, Gila and Salt River meridian. This extension shall not affect any valid rights initiated prior to the approval hereof nor the reservation of a strip of land sixty feet wide along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907 (35 Stat. 2136). The lands herein described when added to the Papago Indian Reservation as provided in this Act shall become a part of said reservation in all respects and upon all the same terms as if said lands had been included in the Executive order issued by the President on February 1, 1917: *Provided*, That lands acquired hereunder shall remain tribal lands and shall not be subject to allotment to individual Indians.

Prior rights not affected.

Mexican boundary strip.

35 Stat. 2136.

*Proviso.*
Acquisitions to remain tribal lands, etc.

SEC. 2. That the Secretary of the Interior be, and he is hereby, authorized to purchase for the use and benefit of the Papago Indians with any available funds heretofore or hereafter appropriated pursuant to authority contained in section 5 of the Act of June 18, 1934 (48 Stat. 984), all privately owned lands, water rights, and reservoir site reserves within townships 18 and 19 south, ranges 2 and 3 west, together with all grazing privileges and including improvements upon public lands appurtenant to the so-called Menager Dam property, at the appraised value of $40,016.37.

Purchase of lands for use of Indians.

48 Stat. 985.

Menager Dam property.

SEC. 3. The State of Arizona may relinquish in favor of the Papago Indians such tracts within the townships referred to in section 1 of this Act as it may see fit and shall have the right to select other unreserved and nonmineral public lands within the State of Arizona equal in area to those relinquished, said lieu selections to be made in the same manner as is provided for in the Enabling Act of June 20, 1910 (36 Stat. 558), or in the discretion of the State of Arizona under the provisions of section 8 of the Act of June 28, 1934 (48 Stat. 1269), as amended and supplemented by the Act of June 26, 1936 (49 Stat. 842). The payment of fees or commissions is hereby waived in all lieu selections made pursuant to this section.

Tracts relinquished by State; lieu selections.

36 Stat. 557.
48 Stat. 1272; 49 Stat. 1976.
43 U. S. C. § 315g; Supp. II, § 315g.

Approved, July 28, 1937.

ADDENDUM 046



[CHAPTER 203]

AN ACT

To add certain lands to the Papago Indian Reservation in Arizona.

June 13, 1939
[S. 2149]
[Public, No. 127]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior is hereby authorized to purchase for the use and benefit of the Papago Indians with any funds heretofore or hereafter appropriated pursuant to authority contained in section 5 of the Act of June 18, 1934 (48 Stat. 984), notwithstanding any general limitation in Acts making such appropriations against the use of the appropriated funds for the acquisition of lands outside of Indian reservations in Arizona, all privately owned lands, water rights, and improvements within the south half of section 9, township 14 south, range 11 east, Gila and Salt River base and meridian, containing three hundred and twenty acres, more or less, in the State of Arizona, at the appraised value of $5,570.

Papago Indian Reservation, Ariz.
Purchase of lands authorized.

48 Stat. 985.
25 U. S. C. § 465.

SEC. 2. Title to the lands shall be taken in the name of the United States in trust for the Papago Tribe, and the lands, when purchased, shall become a part of the Papago Indian Reservation.

Title.

Acquisition to become part of reservation.

Approved, June 13, 1939.

---

[CHAPTER 204]

AN ACT

To authorize the disposal of the Portland, Oregon, old courthouse building.

June 13, 1939
[S. 2404]
[Public, No. 128]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the proviso reading as follows: "*Provided,* That the present Federal building and site at Morrison, Fifth, Yamhill, and Sixth Streets shall not be sold for an amount less than $1,750,000", limiting the paragraph making an appropriation for a courthouse and so forth, at Portland, Oregon, in the Act entitled "An Act making appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1929, and for other purposes", approved March 5, 1928 (Public, Numbered 93, Seventieth Congress; 45 Stat. 181), shall not apply to any contract providing for the demolition of said building which does not involve a sale of the land upon which the building is located.

Portland, Oreg.
Disposal of old Federal building.

45 Stat. 181.

Approved, June 13, 1939.

---

[CHAPTER 205]

AN ACT

To authorize commissioning aviation cadets in the Naval and Marine Corps Reserves upon completion of training, and for other purposes.

June 13, 1939
[H. R. 5765]
[Public, No. 129]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Naval Aviation Reserve Act of 1939" and shall take effect on July 1, 1939.

Naval Aviation Reserve Act of 1939.

SEC. 2. Aviation cadets may, if qualified after completion of training, be commissioned ensigns in the Naval Reserve or second lieutenants in the Marine Corps Reserve.

Aviation cadets, commissions after completion of training.

SEC. 3. Ensigns or second lieutenants commissioned pursuant to this Act may, after three years of service as such and if found qualified after such examinations as the Secretary of the Navy may prescribe, be commissioned lieutenants (junior grade) in the Naval Reserve or first lieutenants in the Marine Corps Reserve,

Promotions.

PL 95–361, September 10, 1978, 92 Stat 595

UNITED STATES PUBLIC LAWS

95th Congress - Second Session

Convening January 19, 1978

DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)

Additions and Deletions are not identified in this document.

PL 95–361 (HR 8397)

September 10, 1978

An Act to provide that a certain tract of land in Pinal County, Arizona, held in trust by the United States for the Papago Indian Tribe, be declared a part of the Papago Indian Reservation.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following described tract of land located in Pinal County, Arizona, and held in trust by the United States for the Papago Indian Tribe, is hereby declared to be an addition to and a part of the Papago Indian Reservation:

Beginning at the northeast corner of parcel numbered 1 within section 3, township 5 south, range 9 east, Gila and Salt River meridian, Arizona, described as follows:
line AP 1—AP 2 south 81 degrees 55 minutes west, 2,443 chains,
line AP 2—AP 3 south 20 degrees 35 minutes east, 0,800 chains,
line AP 3—AP 4 south 66 degrees 31 minutes east, 1,434 chains,
line AP 4—AP 5 south 0 degrees 55 minutes east, 3,030 chains,
line AP 5—AP 6 south 89 degrees 05 minutes west, 2,879 chains,
line AP 6—AP 7 north 0 degrees 55 minutes west, 4,212 chains,
line AP 7—AP 8 south 74 degrees 10 minutes west, 3,036 chains (end of course, intersect the north and south centre line of the southeast quarter of section 3),
line AP 8—AP 9 (on the north and south centre line of the southeast quarter) south 0 degrees 39 minutes east, 32.10 chains (end of course, the east 1/16 section corner of sections 3 and 10),
line AP 9—AP 10 (between sections 3 and 10) north 88 degrees 55 minutes east, 6.69 chains,
line AP 10—AP 1 north 0 degrees 42 minutes west, 33.33 chains (end of course, the place of beginning); consisting of 20 acres.

In accordance with applicable Federal law and regulations, these lands, which were conveyed to the United States in trust for the Papago Indian Tribe under the provisions of section 5 of the Act of June 18, 1934 (48 Stat. 985), // 25 USC 465. // are to be treated as and receive the same benefits and protection as other tribal trust lands within the boundaries of the Papago Indian Reservation.

Approved September 10, 1978.

LEGISLATIVE HISTORY:
HOUSE REPORT No. 95—1020 (Comm. on Interior and Insular Affairs).
SENATE REPORT No. 95—1133 (Comm. on Indian Affairs).
CONGRESSIONAL RECORD, Vol. 124 (1978):
Apr. 17, considered and passed House.
Aug. 25, considered and passed Senate.

PL 95–361, 1978 HR 8397

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

### Improvement of Barriers at Border

Pub. L. 104–208, div. C, title I, §102(a)–(c), Sept. 30, 1996, 110 Stat. 3009–554 , 3009-555, as amended by Pub. L. 109–13, div. B, title I, §102, May 11, 2005, 119 Stat. 306 ; Pub. L. 109–367, §3, Oct. 26, 2006, 120 Stat. 2638 ; Pub. L. 110–161, div. E, title V, §564(a), Dec. 26, 2007, 121 Stat. 2090 , provided that:

"(a) In General.-The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

"(b) Construction of Fencing and Road Improvements Along the Border.-

"(1) Additional fencing along southwest border.-

"(A) Reinforced fencing.-In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

"(B) Priority areas.-In carrying out this section [amending this section], the Secretary of Homeland Security shall-

"(i) identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

"(ii) not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

"(C) Consultation.-

"(i) In general.-In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

"(ii) Savings provision.-Nothing in this subparagraph may be construed to-

"(I) create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

"(II) affect the eminent domain laws of the United States or of any State.

"(D) Limitation on requirements.-Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

"(2) Prompt acquisition of necessary easements.-The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act [8 U.S.C. 1103(b)] (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

"(3) Safety features.-The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence

system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

"(4) Authorization of appropriations.-There are authorized to be appropriated such sums as may be necessary to carry out this subsection. Amounts appropriated under this paragraph are authorized to remain available until expended.

"(c) Waiver.-

"(1) In general.-Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section [amending this section]. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

"(2) Federal court review.-

"(A) In general.-The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

"(B) Time for filing of complaint.-Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

"(C) Ability to seek appellate review.-An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States."

ADDENDUM 051



PowerNotes

Senator GRONNA. You have an unexpended balance of $262,151.02.

Mr. MERITT. There is a considerable unexpended balance shown, but it is possible that the unexpended balance will be materially reduced when all outstanding obligations are paid. If we can not get the full amount of the appropriation we would like to have the Senate Committee increase the amount to at least $300,000, so that we can continue to encourage the Indians to become self-supporting.

Senator KING. I move that we approve the $100,000 given by the House.

The CHAIRMAN. You have heard the motion that the item be agreed to at $100,000.

(The motion was agreed to and the item was agreed to, Senator Curtis voting no.)

(The reading of the bill was resumed, as follows:)

VEHICLES FOR INDIAN SERVICE.

That not to exceed $200,000 of applicable appropriations made herein for the Bureau of Indian Affairs shall be available for the maintenance, repair, and operation of motor-propelled and horse-drawn passenger-carrying vehicles for the use of superintendents, farmers, physicians, field matrons, allotting, irrigation, and other employees in the Indian field service: *Provided*, That not to exceed $15,000 may be used in the purchase of horse-drawn passenger-carrying vehicles, and not to exceed $30,000 for the purchase of motor-propelled passenger-carrying vehicles, and that such vehicles shall be used only for official service.

Senator KING. That is quite an expense, $200,000 for vehicles for superintendents, farmers, and physicians. I think that is frightful.

Senator CURTIS. Mr. Chairman, may I suggest that we have proceeded very rapidly here, and I move that the committee now take a recess until to-morrow at 2 o'clock.

(The motion was agreed to, and at 5 o'clock p. m. the committee took a recess until to-morrow, Thursday, January 31, at 2 o'clock p. m.)

# INDIAN APPROPRIATION BILL.

THURSDAY, JANUARY 31, 1918.

UNITED STATES SENATE,
COMMITTEE ON INDIAN AFFAIRS,
*Washington, D. C.*

The committee met at 2 o'clock p. m., pursuant to adjournment, at the room of the committee in the Capitol Building, Senator Henry F. Ashurst (chairman) presiding.

Present: Senators Jones of New Mexico, Gronna, Curtis, Fernald, and Nugent.

Also present: Mr. Edgar B. Meritt, Assistant Commissioner of Indian Affairs.

The CHAIRMAN. The committee will come to order. We will resume the consideration of the bill at the point we reached at adjournment yesterday.

VEHICLES FOR INDIAN SERVICE.

That not to exceed $200,000 of applicable appropriations made herein for the Bureau of Indian Affairs shall be available for the maintenance, repair, and operation of motor-propelled and horse-drawn passenger-carrying vehicles for the use of superintendents, farmers, physicians, field matrons, allotting, irrigation, and other employees in the Indian field service: *Provided*, That not to exceed $15,000 may be used in the purchase of horse-drawn passenger-carrying vehicles, and not to exceed $30,000 for the purchase of motor-propelled passenger-carrying vehicles, and that such vehicles shall be used only for official service.

Mr. MERITT. Mr. Chairman, the justification is found on page 95 of the House hearings, and running down to page 97. We have in the Indian Service at this time approximately 278 automobiles and 854 horse-drawn passenger-carrying vehicles. Congress in recent legislation found in 38 Statutes at Large, page 508, required us to submit an estimate each year for the expenses proposed to be paid out of this item.

The CHAIRMAN. Is this the same as last year?

ADDENDUM 054



(The reading of the bill was resumed, as follows:)

SUPPRESSING CONTAGIOUS DISEASES AMONG LIVE STOCK OF INDIANS.

For reimbursing Indians for live stock which may be hereafter destroyed on account of being infected with dourine or other contagious diseases, and for expenses in connection with the work of eradicating and preventing such diseases, to be expended under such rules and regulations as the Secretary of the Interior may prescribe, $25,000.

The CHAIRMAN. I see last year you had $75,000?

Mr. MERITT. Yes, sir.

The CHAIRMAN. Can you get along with the $25,000?

Mr. MERITT. Yes, sir; we have an unexpended balance, and we can get along with the amount allowed us by the House. The justification for this item is found, beginning at page 97 of the hearings.

(The item was agreed to.)

Senator CURTIS. Before we leave this may I ask the assistant commissioner why they left out that clause in reference to the sale of intoxicating liquors, where you made it an offense for people carrying it in automobiles, etc.

Mr. MERITT. That is permanent legislation. However, in connection with that proviso, we would like to have the legislation you referred to, Senator, broadened out a little bit.

Senator CURTIS. I suggest you draw your amendment to suit that.

The CHAIRMAN. Do you mean the Peyote provision?

Senator CURTIS. Yes.

The CHAIRMAN. Have you some very definite views on that?

Senator CURTIS. I think it ought to be stopped. I have been trying to get the committee to do something for the past 10 years. I know what effect it has on some of them.

Mr. MERITT. I have the legislation drafted.

The CHAIRMAN. Very well.

(The reading of the bill was resumed, as follows:)

ARIZONA AND NEW MEXICO.

SEC. 2. For support and civilization of Indians in Arizona and New Mexico, including pay of employees, $330,000.

The CHAIRMAN. That is the same as for many years past.

Mr. MERITT. The justification for this item is found on page 101 of the House hearings, running down to page 102. This is the same amount and same language.

The CHAIRMAN. The same as last year?

Mr. MERITT. Yes, sir.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of seven hundred Indian pupils at the Indian school at Phoenix, Arizona, and for pay of superintendent, $132,000; for general repairs and improvements, $12,500; in all, $144,500.

The CHAIRMAN. I notice that you are $400 under what it was last year.

Mr. MERITT. We are satisfied with the amount allowed by the House.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of one hundred pupils at the Indian school at Truxton Canyon, Arizona, and for pay of superintendent, $21,500; for general repairs and improvements, $3,000; in all, $24,500.

The CHAIRMAN. You have increased that something over last year's. Why is that?

Mr. MERRIT. At the small schools we ask that the appropriation be increased from $167 to $200 per capita, on account of the very material increase in cost in everything relating to maintaining these schools. You will find that throughout the Indian bill.

The CHAIRMAN. That is, owing to the cost, you are unable to maintain them at $167 per capita?

Mr. MERITT. Yes, sir.

Senator CURTIS. I will state, Mr. Chairman, that there is an increase in the same item above, from $119,000 to $132,000.

The CHAIRMAN. Yes.

Mr. MERITT. At the schools having an enrollment of 500 or more, we asked for a per capita allowance of $185 per pupil.

The CHAIRMAN. I certainly was not objecting to it.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For continuing the work of constructing the irrigation system for the irrigation of the lands of the Pima Indians in the vicinity of Sacaton, on the Gila River Indian Reservation, within the limit of cost fixed by the Act of March third, nineteen hundred and five, $5,000; and for maintenance and operation of the pumping plants and canal systems, $10,000; in all, $15,000, reimbursable as provided in section two of the Act of August twenty-fourth, nineteen hundred and twelve (Thirty-seventh Statutes at Large, page five hundred and twenty-two), and to remain available until expended.

Senator CURTIS. I have no objection; but I would like to know, if the assistant commissioner will state, whether or not those Indians are taking the benefit of the irrigation project and using the lands

ADDENDUM 056



vided in the act of April fourth, nineteen hundred and ten (Thirty-sixth Statutes at Large, page two hundred and seventy-three), and for maintaining and operating the pumping plant canals, and structures, $20,000, reimbursable as provided in said act; and for continuing the purpose of securing an appropriation of water for the irrigation of approximately one hundred and fifty thousand acres of land on said reservation by the conduct of surveys and the preparation of plans and estimates for a complete irrigation system to supply water to said land, $50,000, reimbursable from funds in the Treasury of the United States to the credit of the Indians of said reservation arising from the proceeds from the sale of town lots authorized by the act of April thirteenth, nineteen hundred and eight (Thirty-fifth Statutes at Large, page seventy-seven); in all, $70,000.

Mr. MERITT. The justification for this item begins on page 113 of the House hearings. It is intended to reimburse the Government for the money advanced out of the sale of town lots, and the lands to be irrigated will also be held as liable for the irrigation cost. We have allotted each Indian on that reservation 10 acres of land, and we want to enlarge the irrigation project, and also make a thorough investigation as to the feasibility of constructing a larger project to irrigate all of the irrigable lands on the reservation.

Senator GRONNA. Have we gone over any of these irrigation projects so far?

The CHAIRMAN. No; I think this is the first one. There is one at the top of page 17, continuing an irrigation system on the Pima Reservation, of $15,000.

Senator CURTIS. That is already authorized. Senator King was here yesterday and objected to some of these items, and I notice on pages 17, 18, 19, 20, and 21, you have a lot of new matter in regard to irrigation. I also notice another thing that I think should be considered: that is an authorization for the increased cost, and would it not be wise to pass over those irrigation projects until we can have more members of the committee present?

The CHAIRMAN. I think that would be a wise thing.

Senator CURTIS. Personally, I am opposed to some of these increases, but I would just as soon settle the matter now.

The CHAIRMAN. Yes; we would not want to act definitely with such a thin attendance.

Senator CURTIS. Why not pass over to California?

The CHAIRMAN. Take the item on line 6, Senator.

Senator CURTIS. Anything about schools, or anything of that kind?

Senator GRONNA. Mr. Chairman, if I may have just a few minutes. The Chair handed to me Senate bill 3481, the bill introduced by Senator Nelson, which affects Indian timberland in the State of

The CHAIRMAN. You desire Mr. Ballinger to present your matter?
Mr. CARL. Yes, sir.
The CHAIRMAN. Mr. Ballinger, will you please come forward?

## STATEMENT OF MR. WEBSTER BALLINGER, ATTORNEY AT LAW, WASHINGTON, D. C.

Mr. BALLINGER. Senators, in order that I might present precisely the objections of the Indians to this bill, I reduced it to writing and submitted it to them and they have read it over and indorsed it.

The CHAIRMAN. Would you pardon me a minute? Will you kindly read the bill, the one you say they indorsed?

Mr. BALLINGER. I mean the members of the Chippewa delegation in Washington. The bill provides that not to exceed $50,000 of the funds derived from the sale of timber from the Red Lake Indian forest, Minnesota, under authority of the act of May 18, 1916, leaving out the statute number, may be expended by the Secretary of the Interior in the logging, booming, towing, and manufacture of timber at the Red Lake Agency sawmill, and in the reimbursement from the said timber receipts of the amounts expended from other Indian tribal funds in the prosecution of such work. I want to call the attention of the committee here to the effect of it—the last three lines of that bill to which the objection is raised, and I now want to read the statement.

Senator CURTIS. Is that the only part you object to?

Mr. BALLINGER. That is all; and I have a suggestion made in this statement with reference to that.

The CHAIRMAN. Just a moment. If you will pardon me, the delegation you represent objects to the last three lines of the language, to wit:

> And in the reimbursement from the said timber receipts of the amounts expended from other Indian tribal funds in the prosecution of such work.

If those three lines were stricken out, would the tribe you represent be favorably inclined toward this legislation?

Mr. BALLINGER. Absolutely they are for it; but if you will just let me read—it is only a page and a half here, and makes plain their proposition. I will ask the stenographer to insert the first paragraph, which states that. This is the view of the members of the delegation:

> On behalf of the legislative committee of the Chippewa General Council, duly appointed by the tribal authorities to come to Washington and represent the

ADDENDUM 058



operations, nor is there any explanation of these three lines of the bill in the report of the department. Their trust funds have been so recklessly used by the department in the past that, before such legislation as this is enacted into law, they insist that the department should furnish Congress and, through Congress, the Indians with definite and specific information as to what particular funds have been used, whether there was authority of law for their use, for what purpose they were used and when, and the necessity for reimbursement. Notwithstanding the prohibition contained in the act of July 1, 1902 (32 Stat., at 560), which provides, "Hereafter no act of Congress shall be construed to make an appropriation out of the Treasury of the United States unless such act shall in specific terms declare an appropriation to be made for the purpose or purposes specified in the act;" and the express provisions of section 2097, United States Revised Statutes, which provides, "No funds belonging to any Indian tribe with which treaty relations exist shall be applied in any manner not authorized by such treaty or by express provisions of law, nor shall money appropriated to execute a treaty be transferred or applied to any other purpose, unless expressly authorized by law." the department has been for years using trust funds of the Chippewa Indians without authority of law and has been using money appropriated from their funds for specific purposes for other and different purposes than those which Congress had authorized their use. The Chippewa Indians are unwilling that unlawful acts of the department may be validated, as they may be and probably are, by the last three lines of this bill. They therefore ask that the last three lines be stricken out and in lieu thereof the following be inserted:

"*Provided, however*, That said amount shall be used exclusively for the purposes herein named and for no other."

They also request that the department furnish this committee with a detailed statement and explanation of the last three lines of this bill, so that the Indians may be informed as to the facts.

The CHAIRMAN. For instance, we are going to appropriate $50,000 for a purpose that the Indians think is proper and the department desires, to wit, for logging, booming, and towing in timber; it may also be used in the reimbursement of such amounts as may have been heretofore expended from other funds in the prosecution of work in protecting this timber.

Mr. BALLINGER. Senator, under that there is no telling how much may be used for logging and how much may be used for reimbursement purposes. Now, they ask that those three lines be stricken out and that in lieu thereof this be inserted:

*Provided, however*, That said amount shall be used exclusively for the purposes herein named and for no other.

Confine them absolutely to the use of that money for logging purposes.

Mr. MERITT. We have no objection to that language going in the bill.

Senator GRONNA. I move, Mr. Chairman, that the last three lines

Mr. BALLINGER. That is part of the logging operations. There is no objection to that.

The CHAIRMAN. We will hear from you, Mr. Meritt.

Mr. MERITT. The reason why the department is asking for the legislation contained in the last three lines is this: This fire occurred on the Red Lake Forest last summer, and there were about 2,000,000 feet of timber that were burned, and it is necessary that that timber be manufactured at a very early date or else it will lose its value. The time to log that timber is in the winter months, when the snow is on the ground. Because of the legislation contained in the act of May 18, 1916, we are without authority to use any of the proceeds from the sale of timber. Under that legislation the proceeds must be deposited in the Treasury, and we can not use any money out of that fund without specific authority from Congress. We did have at that agency some class 4 funds, and we used about $6,000 of those class 4 funds in saving this timber, and it is only fair that that fund which we have used in saving this timber and carrying on this operation, until we could get this legislation, should be reimbursed.

Senator GRONNA. Do you mean you used $6,000 to stop these fires—that is, save the timber from burning?

Mr. MERITT. No, sir; we have been using $6,000 to carry on logging operations until we could get this $50,000 we are asking for here, and inasmuch as the time is very limited, and we must do this loggng before the close of the winter, I think we were fully justified in doing that, inasmuch as we have authority under existing law to use what are known as Class 4 funds for administrative purposes on the reservation, and I do not believe that when the Chippewa Indians understand this legislation and know the reason why this money was used, that they will have any objection to that language.

Senator GRONNA. What has already been done in the way of logging? Has it already been started?

Mr. MERITT. Yes, sir.

Senator GRONNA. And some timber has been cut and sawed.

Mr. MERITT. Yes, sir; they are working now and we have the funds to carry on that work for two weeks yet.

Senator GRONNA. Well, of course, I have no objection to that, if it is understood by Mr. Carl and these people here.

Mr. MERITT. I think I can satisfy these Indians, if they will come to the Indian Office, that our action in this matter has been for the interest of the Red Lake Indians, and I do not believe, after the matter is clearly explained to them, that they will ask that that legislation be stricken out.

structures for the development and distribution of a supply of water, and for maintenance and operation of constructed works, for Papago Indian villages in southern Arizona, $20,000.

(The item was agreed to.)

The CHAIRMAN. The next is a treaty item. Although there has been some complaint, I am frank to say that the whole sum has not been expended. The complaint is that the department has not expended this money.

(The reading of the bill was resumed, as follows:)

To enable the Secretary of the Interior to carry into effect the provisions of the sixth article of the treaty of June first, eighteen hundred and sixty-eight, between the United States and the Navajo Nation or Tribe of Indians, proclaimed August twelfth, eighteen hundred and sixty-eight, whereby the United States agrees to provide school facilities for the children of the Navajo Tribe of Indians, $100,000: *Provided*, That the said Secretary may expend said funds, in his discretion, in establishing or enlarging day or industrial schools.

The CHAIRMAN. What have you to say about that?

Mr. MERITT. We have been somewhat slow in expending this money on account of the difficulty in getting contractors to enter into agreements with the department because of the jumping of prices. We lost $50,000 of this appropriation last year because one contractor would not comply with his original bid, and there were certain misunderstandings in connection with it. That money, however, goes back into the Treasury, and, of course, no one loses anything, except that we ought to have constructed those buildings during this last year.

The CHAIRMAN. It goes back into the Treasury and you can not use it unless it is reappropriated?

Mr. MERITT. Yes, sir.

The CHAIRMAN. The statement has been made to me that there are a large number of the Navajo Indians, of school age, without school facilities.

Mr. MERITT. There are probably 5,000 Indians in the Navajo country without school facilities at this time. We have directed the office force hereafter to get these contracts entered into early after the beginning of the fiscal year, so that there can be no possibility of a repetition of this error.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For continuing the development of a water supply for the Navajo and Hopi Indians on the Navajo, Moqui, Pueblo, San Juan, and Western Navajo Reservations, $25,000, to be immediately available, reimbursable out of any funds of said Indians now or hereafter available.

The CHAIRMAN. That would seem a prudent thing to do.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For repairs, betterments, and construction of the Ganado irrigation project, Arizona, $20,000; and for maintenance and operation, $3,000; in all, $23,000: *Provided*, That the limit of cost of $60,100 specified in the act of August twenty-fourth, nineteen hundred and twelve (Thirty-seventh Statutes at Large, page five hundred and eighteen), is hereby changed to $80,100, reimbursable under such rules and regulations as the Secretary of the Interior shall prescribe.

Senator CURTIS. I ask that this one be passed over.

The CHAIRMAN. Let that be passed over. The next one also, Senator?

Senator CURTIS. Yes.

The CHAIRMAN. Let that go over, then.

(The reading of the bill was resumed, as follows:)

For additional installments of the charges for providing water rights for six thousand three hundred and ten acres of Salt River Indian allotments reimbursable as provided in the act of May eighteenth, nineteen hundred and sixteen, and for the extension of canals and laterals and for the construction of other necessary irrigation facilities to supply the said lands with water, $15,000.

Mr. MERITT. We are simply buying water in order to irrigate the lands of the Indians on the Salt River Indian Reservation.

The CHAIRMAN. Yes, sir; but they claim that you have diminished the tillable lands that the whites might use by 6,310 acres. Do the Indians own this land?

Mr. MERITT. Yes, sir.

Senator GRONNA. I think that should be a certificate of honor to you, Mr. Chairman, that you have been able to take from the white men for the benefit of the Indians.

Mr. MERITT. These Indians are very worthy people, and they could not farm their lands without water. The lands are not tillable lands unless irrigated.

The CHAIRMAN. I do not object to it. Does any other Senator object to it?

Senator GRONNA. No; I do not.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For continuing the construction of the necessary canals and structures to carry the natural flow of the Gila River to the Indian lands of the Gila River Indian Reservation and to public and private lands in Pinal County, reimbursable as provided in the Indian appropriation act approved May eighteenth, nineteen hundred and sixteen, $50,000, to remain available until expended.

The CHAIRMAN. I think that had better be passed until Senators

ADDENDUM 062



complete it, and they ask the Government to pay one-half of the $4,000.

Senator GRONNA. I move that be approved.

The CHAIRMAN. Is there any objection to that? The bridge is practically for the use of the Indians?

Mr. MERITT. This increase is made necessary because of the advance in prices since the original appropriation was made.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For the repainting and reflooring of the Government suspension bridge over the Little Colorado River near Tanners Crossing, Arizona, $4,000, to be immediately available, reimbursable from any funds now or hereafter placed in the Treasury to the credit of the Navajo Indians in Arizona, to remain a charge and lien upon the lands and funds of said tribe of Indians until paid.

The CHAIRMAN. That item is for the repair of the bridge that was agreed on before I came to Congress. It is on a reservation wholly and was in the bill, I think, in 1910. The bridge cost $90,000 and is almost exclusively used by the Indians. This seems to be an item for repair.

Senator GRONNA. It is recommended by the department, I suppose.

Mr. MERITT. Yes, sir; and our inspector reports that unless we do repair the bridge it will materially decrease in value.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For the construction of a fence along the international boundary line betweeen Mexico and the Papago Indian Reservation, in Arizona, created by Executive order of January fourteenth, nineteen hundred and six, under such rules and regulations as the Secretary of the Interior may prescribe, $10,000, to be immediately available and to remain available until expended.

Mr. MERITT. The Papago Indians have no funds in the Treasury. They have quite a large reservation, but the land is valuable for grazing purposes only. The Indians make their living very largely by raising stock. Because of conditions in Mexico they have lost a good deal of their cattle by their crossing over the boundary line, and we feel that it would be very helpful to those Indians to construct a wire fence along the boundary line so as to save the cattle of the Indians.

Senator GRONNA. Is this fence to be used only for pasture?

Mr. MERITT. Yes, sir.

Senator GRONNA. I should think it would be a very poor time to construct wire fences, due to the high cost of material. I shall not oppose it, but I should think it would be very unwise to go into a

ADDENDUM 063



Senator GRONNA. I should think it would be best to wait another year or so, until prices decline, because with the situation as it is now the Government is taking up practically all of the material the steel mills can manufacture.

Senator CURTIS. A barbed-wire fence would hardly keep those Mexicans from getting after the cattle, either.

Senator NUGENT. I guess they carry wire cutters.

The CHAIRMAN. I think the proposition is to keep these catle from straying in. You see the boundary line is marked only by white posts about a mile apart.

Senator CURTIS. If the Mexicans find Indian cattle in Mexico they have no scruples whatever, but they would hesitate about coming into the United States and taking cattle, but when they find cattle astray in Mexico they would not hesitate in having a big beefsteak right off the loin of an Indian steer.

Senator NUGENT. I do not see why they can not ride that boundary.

Mr. MERITT. The boundary is 50 or 60 miles at this point.

Senator GRONNA. If you are going to fence 50 or 60 miles, it will take a whole lot more than $10,000.

Mr. MERITT. We will not have to fence the entire reservation on account of the formation of the land there.

Senator CURTIS. Can not you get along without that this year, and let us see how it runs next year?

Mr. MERITT. The Indians have got along several years without it, but we very much need this appropriation.

The CHAIRMAN. About 25 miles of this stretch is fenced by cattle companies. They fence it themselves.

Senator CURTIS. I move to strike out the item.

(The item was stricken out.)

(The reading of the bill was resumed, as follows:)

That so much of article two of the agreement with the Indians of the San Carlos Indian Reservation, concluded on February twenty-fifth, eighteen hundred and ninety-six, accepted, ratified, and confirmed in the act approved June tenth, eighteen hundred and ninety-six, reading "and that said money shall be paid to them in cash from time to time as the same shall become available, pro rata, share and share alike, to each man, woman, and child of the tribes now living upon and entitled to the privileges of the said reservation," be, and the same is hereby, amended to read, "and that said money, as the same becomes available, may, in the discretion of the Secretary of the Interior, be paid to the Indians entitled thereto or expended in the purchase of cattle for their benefit.

Mr. MERITT. The San Carlos Indians themselves have asked for this legislation. They have now in the Treasury about $12,400, which we can not use in any other way than to make per capita payments, which would amount to only about $4.50. The Indians realize

portionate share of the amount required to construct a wagon road or highway through the Kaibab Indian Reservation is hereby made available upon the same terms, except that any labor may be used upon the construction of such road or highway, giving preference to Indian labor.

Senator GRONNA. Are those estimated for, Mr. Meritt?

Mr. MERITT. No, sir.

Senator GRONNA. Does the department ask for this legislation?

Mr. MERITT. This legislation was placed in the appropriation act two years ago and it is made reimbursable out of the funds of the Kaibab Indians. There are only a very few of these Indians, and they will not get very much benefit from this road—not as much as the white people will get in passing over the road, going to southern California. We feel that this appropriation should not be reimbursable. We have no objection to this appropriation, but it should not be reimbursable out of the funds of the Indians.

Senator CURTIS. You say you have no objection to its being reimbursable. Then, why should Congress appropriate it if it is largely for the benefit of the white people there, over which Congress has no jurisdiction? Why not let them build their own roads?

Mr. MERITT. We are not asking for the legislation, Senator.

Senator CURTIS. I move it be stricken out.

Senator GRONNA. Just a moment. What did you say about it?

The CHAIRMAN. If you will pardon me, that relates more directly to the Utah Senator who pressed that item.

Senator CURTIS. Senator King is not here. I will withdraw my motion and ask that it be passed until he is here.

(The item was passed.)

The CHAIRMAN. That concludes the Arizona items for the present.

(The reading of the bill was resumed, as follows:)

CALIFORNIA.

SEC. 3. For support and civilization of Indians in California, including pay of employees, $42,000.

Senator GRONNA. I see that has been reduced from the estimate. Can you get along with the $42,000, Mr. Meritt?

Mr. MERITT. The amount allowed by the House is the same amount as carried in the bill last year. We have had difficulty in getting along with that amount, but in view of the wish of the committee to keep the appropriations down to the limit, I shall not ask that the item be increased.

The CHAIRMAN. Is there any objection in agreeing to it?

Senator GRONNA. No objection.

ADDENDUM 065



We were told 10 years ago that one more appropriation would be about all that they would need. It was increased from $60,000 to $100,000, with the idea that we would finish it up, and they have been here every year since. From $10,000 to $40,000 is my recollection.

Mr. MERITT. We have purchased land for several thousand homeless Indians in California. We have remaining about 3,000 Indians who are without lands, and we hope within two or three years to have these Indians supplied with land. It is a long and tedious operation, because we have to make a contract with the owner of the land, have him submit his title to the land to the Attorney General and get him to pass on the title, and because of legislation affecting the purchase of lands by the Government it requires longer than otherwise.

The CHAIRMAN. Is there any further discussion?

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of 680 Indian pupils at the Sherman Institute. Riverside, Cal., including pay of superintendent. $128.400; for general repairs and improvements, $15,000; in all, $143,400.

The CHAIRMAN. Last year the bill carried $134,500.

Mr. MERITT. We asked for an appropriation for 700 pupils at this school, and at a cost of $185 per capita, in addition to the salary of the superintendent. However, we will try to get along with the amount allowed by the House.

The CHAIRMAN. Is there any objection?

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For reclamation and maintenance charge on Yuma allotments, $15,000, to remain available until expended and to be reimbursed from the sale of surplus lands or from other funds that may be available, in accordance with the provisions of the act of March 3, 1911.

Mr. MERITT. The Indians on the Yuma reservation are making good use of the land that has been irrigated. This work has been done by the Reclamation Service. We are simply reimbursing the Reclamation Service for work already done.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of 100 Indian pupils at the Fort Bidwell Indian School, California, including pay of superintendent, $21,500; for general repairs and improvements, $3,500; in all, $25,000.

ADDENDUM 066



Mr. MERITT. It is a nonreservation school.

Senator CURTIS. There are a lot of Indians living around there.

Senator GRONNA. Are there many Indians around there?

Mr. MERITT. Yes, sir.

Senator GRONNA. Is there any prospect of this becoming a large school?

Mr. MERITT. No, sir; there are quite a large number of Indians living in northern California and they are provided for at the school at Fort Bidwell and also at the school at Greenville. The per capita cost, based on average enrollment, was $190; based on average attendance, $193, which is a very good showing.

Senator GRONNA. By this policy of establishing of schools with a small attendance, with no hope of ever having an increased attendance, why establish them in some parts of the country and discontinue them in others, where we know that the attendance will increase?

Mr. MERITT. This school has been established a great many years. It is an old military post, and Congress has been making appropriations for this school for a good many years. We are not asking for an increase over appropriations heretofore allowed.

Senator GRONNA. I understand that, but I refer particularly now to the Bismarck school. The Bismarck school has been placed between two large reservations. That school will continue to grow, providing the men who are sent there to conduct it would do their duty. I am familiar with the conditions in that school. I know something about both reservations and about the Indians who live on those reservations, and I believe that if the school was properly cared for that there would be, instead of 100 pupils, 200 or 300 pupils there, and right in the face of that that school has been discontinued. Here we have an example of a school being set up and being continued with much less than 100 pupils, with no prospects of ever having any more. Now, I can not understand, Mr. Meritt, why that policy is being pursued.

Mr. MERITT. Soon after the beginning of the school year the heating plant of the school to which you refer broke down, and the commissioner, upon considering all features of the matter, decided it would be better to discontinue that school, at least for the present fiscal year, and take care of the pupils, about 100, at other schools in the States of North Dakota and South Dakota. Those schools were not filled to their capacity, and these Indians attending the Bismarck school could be provided for at those other schools, and in view of the coal condition and the high cost of everything it was thought wise

ADDENDUM 067



manufacture this briquetted coal at $1.50 to $2 a ton. That is, including all costs, the royalty, and everything. Well, I should judge they could lay it down at Bismarck at from $4.50 to $5 a ton; and it is stated by men who have used it—by people who have used it—that the coal is every bit as good as any first-class anthracite coal. Now, as far as the fuel question is concerned in that community, it can not possibly be due to the cost of the coal.

Mr. MERITT. We are asking for an appropriation for that school for the next fiscal year.

Senator GRONNA. I am simply bringing this up, with the idea that you look into it, because I have been reading the records here and it almost broke my heart when I saw you make the statement that you wanted to permanently discontinue that school.

Mr. MERITT. I do not think I made a positive statement. I think I said it would probably be discontinued.

Senator GRONNA. I hope you made it inadvertently and that you are willing to change your mind on it, because I do know the needs of those Indian children, and I am here to protest most vigorously against depriving those children from the opportunity of receiving an education; and it will not be any credit to the department to discontinue that school.

Mr. MERITT. I will speak to the commissioner about it.

Senator GRONNA. I would be much obliged if you would.

(The reading of the bill was resumed, as follows:)

For support and education of one hundred Indian pupils at the Greenville Indian School, California, including pay of superintendent, $21,500; for general repairs and improvements, $3,500; in all, $25,000.

Senator CURTIS. Those are the same conditions.

Senator GRONNA. I move that it be approved. I made a very brisk fight for that last year because I looked into it very carefully and I thought it was needed. There are a lot of poor Indians there.

Mr. MERITT. We have materially reduced the cost per capita of that school.

(The item was agreed to.)

The CHAIRMAN. Senators, the next item is one regarding which Senator Phelan came before us.

The CHAIRMAN. That was in the estimates. Do you wish that to go over until the general irrigation matters are discussed?

Senator GRONNA. I think that had better go over until we take up all of the irrigation matters. There are so many objections to these projects that I would suggest we had better take them all up at once.

ADDENDUM 068



(The reading of the bill was resumed, as follows:)

For beginning the construction of a road from Hoopa to Weitchpec, on the Hoopa Valley Reservation, in Humboldt County, California, in conformity with plans approved by the Secretary of the Interior, $10,000, to be immediately available and to remain available until expended, and to be reimbursed out of any funds of the Indians of said reservation now or hereafter placed to their credit in the Treasury of the United States: *Provided*, That the proper authorities of the county of Humboldt, California, agree to furnish, at their own expense, a competent engineer satisfactory to the Secretary of the Interior to supervise the construction of said road; to provide the use of such tools and implements as the said Secretary may deem to be justly required of them; and to maintain said road in good condition: *Provided further*, That the total cost of said road shall not exceed $30,500.

Senator CURTIS. That is a new item, and I would like to have the commissioner tell us how badly it is needed.

Mr. MERITT. This item was placed in the Indian bill at the request of Representative Lea, of California. The Hoopa Valley Reservation comprises approximately 100,000 acres, inhabited by 1,299 Indians, about 500 of whom would be directly benefited by the proposed road in going to and from the agency, marketing their products, supplies, etc., as they are practically isolated from the railroad under present conditions. The length of the road would be approximately 8.85 miles, traversed at present only by an inadequate mule trail, on a heavy grade, which is impassable for several months each year, owing to the winter rains and snows. The construction of the road, in connection with plans of the county for building a road to the coast by way of Hoopa, would bring considerable traffic through the reservation and enlarge the market for the Indians' products, and this would encourage them to raise more crops. The office would be glad to see this item carried in the Indian appropriation bill.

Senator GRONNA. It is really for the benefit of the Indians? It is not a white man's proposition?

Mr. MERITT. The road is entirely within the Indian reservation and would benefit the Indians, and is reimbursable, and the Indians have property sufficient to secure the money that would be advanced.

Senator GRONNA. It has been my experience that the Indian, as a rule, can get along with about as poor a road as you can find in the country, and that we white people are more particular about what kind of roads we have; and I have always been fearful about road building—that it is more for the purpose of establishing a road for the white men and incidentally it will be of some benefit to the Indian. Now, of course, if the commissioner tells the committee here that it is needed and that it will be for the benefit of the Indians, I have no

We are all familiar with their work, and in their report, which I have here in my hand, for the fiscal year ending June 30, 1917, on page 9 they say:

That the rights of the Indians in the suit of the San Jacinto Water Co. be effectively defended; that an appropriation of at least $5,000 be made to rebuild the bridge across the San Jacinto River, which went out in the flood of 1916; that an inexpensive building, to be used as a community house, be constructed, also a shed for the storage of agricultural implements and tools; that a simple field hospital be located at once at Soboba.

Let me read a letter I have just received from Malcolm McDowell, secretary of the Board of Indian Commissioners, addressed to me to-day:

DEPARTMENT OF THE INTERIOR,
BOARD OF INDIAN COMMISSIONERS,
*Washington, January 31, 1918.*

Hon. HENRY F. ASHURST,
*United States Senate, Washington, D. C.*

DEAR SENATOR ASHURST: The item for the repair and extension of a bridge across the San Jacinto River, near the Soboba Indian Reservation, Cal., $4,000, in the House Indian appropriation bill (H. R. 8696) was eliminated in the House on a point of order.

This bridge, which was destroyed in the great flood of 1916, connects the reservation with the town of San Jacinto. Dr. Samuel A. Eliot, a member of this board, in a special report on the Soboba Reservation, dated May 21, 1917, urges this needed appropriation.

While the bridge is off the reservation it is an essential necessity to the Indians and the Board of Indian Commissioners feels the Government should have it replaced. It is believed the county of Riverside will be willing to pay its proportion of the cost.

I am bringing the item to your attention at this time because the Senate Indian Committee, I understand, will consider the needs of the California Indians to-day.

Faithfully yours,

MALCOLM McDOWELL, *Secretary.*

The CHAIRMAN. Now, let me say that so far as I am concerned, as far as my memory serves me, we have never appropriated for a bridge off the reservation, or at least where there was not one of the two termini on the reservation, but this at least seems to take it out of the general rule.

Senator CURTIS. Here is the question: Ten or twelve years ago there was not a single bridge provided for in this bill. To-day it is getting to be a bridge bill. Ten years from now the Indian appropriation bill will be a bridge bill. Now, you are commencing off the reservation. This will be the first one. Next year, two more. We will be building bridges all over the United States, on lands off the

ADDENDUM 070



Mr. MERITT. I would like to say that the State of Florida has set aside a reservation in that State of about 100,000 acres for its Indians. We are going to endeavor to do something for the Seminole Indian.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

FLORIDA.

SEC. 4. For relief of distress among the Seminole Indians in Florida, and for purposes of their civilization and education, $10,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

IDAHO.

SEC. 5. For support and civilization of Indians on the Fort Hall Reservation in Idaho, including pay of employees, $30,000.

Senator CURTIS. Why the increase, Mr. Commissioner? You only appropriated $25,000 last year for that purpose.

Mr. MERITT. We have about completed the present irrigation project on that reservation and we desire to construct laterals to all of the Indian allotments and get the land under cultivation.

Senator CURTIS. That will hasten it very materially, will it?

Mr. MERITT. Yes, sir.

Senator CURTIS. Will the Indians there irrigate it, or will it be like it is on these other reservations?

Mr. MERITT. The Indians on that reservation are showing a disposition to cultivate their lands.

Senator CURTIS. How great a disposition? Are any of them doing it?

Mr. MERITT. Yes, sir. The area of irrigable land cultivated by Indians on this reservation is 7,788 acres, which is a very good showing.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For fulfilling treaty stipulations with the Bannocks in Idaho: For pay of physician, teacher, carpenter, miller, engineer, farmer, and blacksmith (article ten, treaty of July third, eighteen hundred and sixty-eight), $5,000.

(The item was agreed to. )

(The reading of the bill was resumed, as follows:)

For the Coeur d'Alenes, in Idaho: For pay of blacksmith, carpenter, and physician, and purchase of medicines (article eleven, agreement ratified March third, eighteen hundred and ninety-one), $3,000.

Mr. MERITT. The House allowed our estimates.

Senator CURTIS. Well, I had a letter to the effect that the calculation there had been a mistake, and that the amount was too small. I have the papers at my office. I did not bring them over.

Mr. MERITT. I think the superintendent in writing the letter was under the impression we were allowing $200 per capita for all of the schools, whereas, at the large nonreservation schools, with an enrollment of 500 or over, we only allowed in our estimates $185. We will be satisfied with the amount allowed by the House, but we would like to have included in this legislation an item for draining the Indian school farm, which would cost $10,000.

The CHAIRMAN. There at Haskell?

Mr. MERITT. At Haskell.

The CHAIRMAN. How many acres are you going to drain?

Mr. MERITT. About 600 acres of land, now useful only for pasture purposes during a portion of the year, which can be reclaimed.

The CHAIRMAN. You can have it ready for crops?

Mr. MERITT. We would like to have this item made immediately available, so if the bill passes early enough we can use the land this year.

Senator GRONNA. You would want to change the amount from $141,350 to $151,350, then put in a proviso that $10,000 shall be used for draining. Is that the idea?

Mr. MERITT. We would like to have a special item for drainage, "for completion of the construction of a drainage system on the Haskell Indian school farm $10,000, to be immediately available."

The CHAIRMAN. And remain available, until expended

Senator CURTIS. Insert before the word "in."

The CHAIRMAN. Yes; on line 9.

Senator CURTIS. I move that be adopted.

(The item as amended was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of eighty Indian pupils at the Indian school, Kickapoo Reservation, Kansas, including pay of superintendent, $17,400; for general repairs and improvements, $4,000; in all, $21,400.

Senator CURTIS. Why that increase? Last year you had $14,000 only.

Mr. MERITT. We asked for $200 per capita at this school.

Senator CURTIS. Now, Mr. Commissioner, you have the Pottawatomie Reservation there, with a superintendent, the Kickapoo Reservation, with a separate superintendent. There used to be a

(The reading of the bill was resumed, as follows:)

MICHIGAN.

SEC. 7. For support and education of three hundred and fifty Indian pupils at the Indian school, Mount Pleasant, Michigan, and for pay of superintendent, $72,000; for general repairs and improvements, $6,000; in all, $78,000.

The CHAIRMAN. Is there any discussion of the Michigan item?

Senator GRONNA. I notice the estimate has been reduced from $88,000 to $78,000. I would like to hear from Mr. Meritt about that.

Mr. MERITT. We asked for an appropriation for support and education of 400 Indian pupils at this school, the support item amounting to $82,000, and the total amount requested $88,000. This is the only nonreservation Indian school in the State of Michigan, and there are quite a large number of Indians in that State; and while the capacity of the school is 350, the average enrollment has been 350, and we thought with the improvements which have recently been authorized by Congress that we could have room for 400 pupils at that school.

Senator CURTIS. What was the average attendance? You say the enrollment was only 350.

Mr. MERITT. The average attendance was 326.

Senator CURTIS. Do you not think the House has provided for enough, if that is the average attendance?

Mr. MERITT. We can get along with it for the next year.

The CHAIRMAN. Is there any objection to agreeing to the item of $88,000?

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

MINNESOTA.

SEC. 8. For support and education of 200 Indian pupils at the Indian school, Pipestone, Minnesota, including pay of superintendent, $41,650; for general repairs and improvements, $7,000; in all, $48,650.

Senator GRONNA. That has also been reduced from the estimate.

Mr. MERITT. We asked for an appropriation for the support and education of 225 pupils at that school, and the House allowed us 200 pupils. I find that the average attendance at that school was 185, the average enrollment 201. We will be satisfied with the amount allowed by the House.

The CHAIRMAN. You will be satisfied with the $48,650?

Mr. MERITT. Yes, sir.

the sum of $1,000, or so much thereof as may be necessary, to be expended in the annual celebration of said band to be held June fourteenth, nineteen hundred and eighteen, out of the funds belonging to said band.

(The item was agreed to.)

Mr. MERITT. Before we leave Minnesota, I will say that there is an item we would like to get under the head of Minnesota, but the Indians are absent. It is a controverted item, and I will not ask to take it up in the absence of the Chippewa Indians.

Senator CURTIS. Take it up to-morrow afternoon. They will be here at 2 o'clock.

The CHAIRMAN. All right.

(The reading of the bill was resumed, as follows:)

MONTANA.

SEC. 9. For support and civilization of the Indians at Fort Belknap Agency, Montana, including pay of employees, $20,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and civilization of Indians at Flathead Agency, Montana, including pay of employees, $20,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and civilization of Indians at Fort Peck Agency, Montana, including pay of employees; $30,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and civilization of Indians at Blackfeet Agency, Montana, including pay of employees, $50,000, to be immediately available.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For maintenance and operation, including repairs, of the irrigation systems on the Fort Belknap Reservation, in Montana, $30,000, reimbursable in accordance with the provisions of the act of April fourth, nineteen hundred and ten.

Senator CURTIS. I ask that that be passed.

The CHAIRMAN. Very well.

(The reading of the bill was resumed, as follows:)

For fulfilling treaties with Crows, Montana: For pay of physician, $1,200; and for pay of carpenter, miller, engineer, farmer, and blacksmith (article ten, treaty of May seventh, eighteen hundred and sixty-eight), $3,100; for pay of second blacksmith (article eight, same treaty), $1,200; in all, $5,500.

(The reading of the bill was resumed, as follows:)

For the employment of "line riders" along the southern and eastern boundaries of the Northern Cheyenne Indian Reservation in the State of Montana, $1,500.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For the support and civilization of the Rocky Boy Band of Chippewas, and other indigent and homeless Indians in the State of Montana, including pay of employees, $10,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For continuing construction of the irrigation systems on the Flathead Indian Reservation, in Montana, $750,000 (reimbursable), which shall be immediately available and remain available until expended.

Senator CURTIS. Let that one go over.

The CHAIRMAN. Yes.

Senator CURTIS. And the next two, also.

The CHAIRMAN. That is the $100,000 item and the $75,000 item?

Senator CURTIS. And the $750,000 item.

(The reading of the bill was resumed, as follows:)

The Secretary of the Interior is hereby authorized to transfer and convey to school district numbered seventeen, Bighorn, Montana, a tract of land not to exceed two and one-half acres, of the lands ceded by the Crow Indian Tribe and reserved for agency purposes, for public-school use, upon condition that Indian children resident within said district shall be permitted to attend said school upon an entire equality with white children.

(The item was agreed to.)

Senator CURTIS. Just a question, now. Does that have school buildings on it now?

Mr. MERITT. No, sir.

Senator CURTIS. Just in case the question is asked, that is all.

The CHAIRMAN. Do you want a proviso in there that should the same cease to be used for school purposes, it shall revert to the Indians? Do you want that in there?

Mr. MERITT. We would have no objection to that going in. It is only a tract of 2½ acres. The Indian children will soon get the benefit of the value of the land.

The CHAIRMAN. All right.

(The reading of the bill was resumed, as follows:)

NEBRASKA.

Senator CURTIS. You see that gives them a leeway.

Mr. MERITT. The average enrollment 395, and the capacity of the school is 382.

Senator GRONNA. Can you get along with it this year?

Mr. MERITT. I think so.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

NEVADA.

SEC. 11. For support and civilization of Indians in Nevada, including pay of employees, $18,500.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of two hundred and ninety Indian pupils at the Indian school at Carson City, Nevada, including pay of superintendent, $60,000; for general repairs and improvements, $10,000; in all, $70,000.

Mr. MERITT. We can get along with the amount allowed by the House.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For the improvement, enlargement, and extension of the irrigation diversion and distribution system to irrigate approximately three thousand three hundred acres of Indian land on the Pyramid Lake Reservation, Nevada, $25,000, to be immediately available: *Provided*, That the cost of said entire work shall not exceed $85,000; and for maintenance and operation of the improved system, $5,000; in all, $30,000.

Senator GRONNA. Let that go over with the others.

The CHAIRMAN. Let it go over with the other irrigation items.

(The reading of the bill was resumed, as follows:)

That the unexpended balance of the appropriation of $15,000 for procuring home and farm sites and providing agricultural equipment and instruction for nonreservation Indians in Nevada, and the unexpended balance of the appropriation of $15,000 for the purchase of land and water rights for the Washoe Tribe of Indians in said State and for their support and civilization, contained in the Indian appropriation act for the fiscal year nineteen hundred and seventeen (Thirty-ninth Statutes at Large, page one hundred and forty-three), are hereby reappropriated and made available during the fiscal year nineteen hundred and nineteen, for the purchase of agricultural equipment, building material, and other supplies necessary for said Indians in utilizing the land purchased for them, and also for the expense of locating the Indians upon such land, including pay of employees where necessary.

The CHAIRMAN. Now, Senators, it seems to me that we ought to state in there how much that unexpended balance is. For instance, the unexpended balance, to wit, the sum of blank dollars. What do

ADDENDUM 076



Senator GRONNA. It may be, Mr. Chairman, that really there is no need of this legislation, if there is no necessity for a fund of this kind.

The CHAIRMAN. Senator, it works itself out very slowly. They have got to look into details, and it takes a long time to do it. Because they have not spent that particular appropriation is no criticism.

Mr. MERITT. The money is very much needed, because the Indians are very poor and need land.

The CHAIRMAN. And I want to add that they are one of the few tribes that have never been at war with the United States.

(The reading of the bill was resumed, as follows:)

NEW MEXICO.

SEC. 12. For support and education of four hundred and fifty Indian pupils at the Indian school at Albuquerque, New Mexico, and for pay of superintendent, $85,500; for general repairs and improvements, $8,000; for completing addition to mess hall, $5,000; in all, $98,500.

Mr. MERITT. We estimate to have $200 per capita for all the Indian schools with an enrollment of less than 500. The House cut the estimate for this school to $185. The superintendents of these schools with an enrollment of less than 500 will have considerable trouble in maintaining the school during the entire school year unless we give them $200 per capita. We would like to have the amount increased in accordance with our estimates, which would be $100,250 instead of $98,500, making the support fund $92,250 instead of $85,500.

Senator CURTIS. I move that amendment be made. That is a small school, is it?

Mr. MERITT. Yes sir; with 450 Indian pupils.

(The item as amended was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of four hundred Indian pupils at the Indian school at Santa Fe, New Mexico, and for pay of superintendent, $76,250; for general repairs and improvements, $8,000; for water supply, $1,600; in all, $85,850.

Mr. MERITT. The same condition prevails at that school. The House allowed us $185 per capita, and we would like to have $200 per capita, inasmuch as the enrollment is less than 500. The $78,650 should be changed to $82,250, making the total $91,850. We would be glad to have that increase on that school.

Senator GRONNA. I was about to ask the question whether the $85,850 would be enough, at $200, with last year's attendance, or is that $91,850 needed, based upon the estimate of the attendance?

Mr. MERITT. The attendance at both of these schools is very satisfactory. The average attendance of pupils is 352; the average en-

(The reading of the bill was resumed, as follows:)
(The item was agreed to.)
(The reading of the bill was resumed, as follows:)

For continuing work on the Indian highway extending from the Mesa Verde National Park to Gallup, New Mexico, on the Navajo and San Juan Reservations, $25,000; said sum to be reimbursed from any funds which are now or may hereafter be placed in the Treasury to the credit of said Indians: *Provided*, That such sums shall be expended under the direction of the Secretary of the Interior in such manner and at such times and places as he may deem proper, and in the employment of Indian labor as far as possible for the construction of said highway.

(The item was agreed to.)

The proviso of section one of the act of March fourth, nineteen hundred and seven (Thirty-fourth Statutes at Large, page fourteen hundred and thirteen), relating to the expenditure of proceeds derived from the sale of timber on the Jicarilla Reservation, is hereby amended so as to authorize the Secretary of the Interior to expend said proceeds with the consent of such allottees whose property is appropriated, to be obtained in such manner as he may prescribe, in the purchase of live stock, seeds, agricultural equipment, and for other community or individual purposes beneficial to the Indians belonging to and having rights as members of said tribe of Indians.

The CHAIRMAN. No appropriation carried and no appropriation called for.

Mr. MERITT. Mr. Chairman, under the existing law we can only expend that money for irrigation purposes, and irrigation is not very feasible on that reservation. Therefore, we would like to have the proceeds from the sale of timber, used for such purposes that will benefit the Indians.

The CHAIRMAN. Is there any objection? It does not call for anything out of the Treasury?

Mr. MERITT. No, sir.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For amount necessary for construction of a steel bridge across the San Juan River in San Juan County, State of New Mexico, at the best and most available location west or southwest and near to the town of Farmington, in said county, in addition to the $25,000 appropriated for the purpose by the act approved February twentieth, nineteen hundred and seventeen (Thirty-ninth Statutes at Large, page nine hundred and twenty-six), $4,000, or so much thereof as may be required, to be immediately available: *Provided*, That said additional sum shall be reimbursed from tribal funds as required by the said act.

The CHAIRMAN. In other words, you lack $4,000 of building the bridge?

Mr. MERITT. Yes, sir.

ADDENDUM 078



Senator CURTIS. I might make this suggestion. Of course, there are always questions asked about $25,000 appropriations. It seems to me if the assistant commissioner would just draw a little short item for the completion of the bridge$4,000—it would be simpler and would be complete. When you read that item, the first thing that strikes you is $25,000 appropriated. I simply make that suggestion.

Senator JONES. I agree, "for an amount necessary to complete the construction of a steel bridge."

The CHAIRMAN. May the clerk then change the Arizona item to read the same way, so that when the bill is read, it won't look like it is $25,000 new appropriation.

Senator CURTIS. That can be gone over later.

The CHAIRMAN. All right.

(The reading of the bill was resumed, as follows:)

NEW YORK.

SEC. 13. For fulfilling treaties with Senecas of New York: For permanent annuity in lieu of interest on stock (act of February nineteenth, eighteen hundred and thirty-one), $6,000.

(The item was agreed to.)

NEW MEXICO—(continued).

Senator JONES of New Mexico. Before leaving New Mexico, I should like to state that I want to present to the committee some time data in reference to the building of the road to the Mescalero Indian Agency, in New Mexico.

The situation is one rather demanding that some action be taken, in order to give the Indians of that reservation an opportunity, not only to get out their produce, but get supplies into the reservation from the railroad. I have quite a litle data regarding that in my office, as to the necessity for it, and it seems that the county of Otero is willing to donate half the money necessary to build this road. The matter has been taken up with the Indian Department, and my understanding is that the Commissioner of Indian Affairs thinks that it is necessary that this be done, and so I would like to offer this amendment as a separate paragraph in regard to New Mexico.

The CHAIRMAN. At a later time?

Senator JONES. Well, I can offer it now, and if any member of the committee desires to consider it further, I shall not press it at this partcielar time.

expended the said county of Otero shall contribute an equal sum for use in the construction of said road, furnish a competent engineer satisfactory to the Secretary of the Interior to supervise the work, and agree to maintain the road in good condition; the cost of all equipment, supplies, and labor, except as herein provided, to be paid by a disbursing agent of the United States, in equal proportions from the appropriation made herein and the funds contributed by the county, and any unexpended balance of said contributed fund to the returned to the county upon the completion of the road.

Senator JONES. I offer the amendment now and will not ask the present consideration.

The CHAIRMAN. All right. The clerk will take the amendment: and you will have some other data to submit later?

Senator JONES. Yes; I have some data in regard to the necessity of it.

(The reading of the bill was resumed, as follows:)

For fulfilling treaties with Six Nations of New York: For permanent annuity, in clothing and other useful articles (article six, treaty of November eleventh, seventeen hundred and ninety-four), $4,500.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

NORTH CAROLINA.

SEC. 14. For support and education of two hundred Indian pupils at the Indian school at Cherokee, North Carolina, including pay of superintendent, $33,600; for general repairs and improvements, $6,000; in all, $39,600.

Senator GRONNA. That is a material reduction there, Mr. Meritt?

Mr. MERITT. Yes, sir; we asked for 250 Indian pupils at the Indian school, and requested an appropriation of $51,600, making a total of $57,600.

Senator CURTIS. How many did you have there last year? You appropriated for 190 last year.

Mr. MERITT. We had an enrollment of 233 and an average attendance of 194.

Senator CURTIS. Well, 200 will cover it then, will it not?

Mr. MERITT. Yes, sir; according to the attendance last year.

Senator GRONNA. Can you get along with the $39,600?

Mr. MERITT. They have evidently made an error in the appropriation, Mr. Chairman. For 200 Indian pupils at $200 per capita would make that $40,000, in addition to the salary of the superintendent.

The CHAIRMAN. Suppose you bring that item before us to-morrow?

Mr. MERITT. I can furnish the figures on that Cherokee school. We need $41,600 for the support, which would make it $47,600.

Senator CURTIS. You want to change $33,600 to $47,600?

Mr. MERITT. Yes, sir.

ADDENDUM 080



(The reading of the bill was resumed, as follows:)

NORTH DAKOTA.

SEC. 15. For support and civilization of the Sioux of Devils Lake, North Dakota, including pay of employees, $5,000.

(The item was agreed to.)
(The reading of the bill was resumed, as follows:)

For support and civilization of Indians at Fort Berthold Agency, in North Dakota, including pay of employees, $15,000.

(The item was agreed to.)
(The reading of the bill was resumed, as follows:)

For support and civilization of Turtle Mountain Band of Chippewas, North Dakota, including pay of employees, $13,000.

Senator CURTIS. That is an increase of $2,000.

Mr. MERITT. The House allowed us our increase, because it was impossible for us to continue that agency with the present appropriation.

Senator CURTIS. I have no objection to it.

(The item was agreed to.)
(The reading of the bill was resumed, as follows:)

For support and education of one hundred and twenty-five Indian pupils at the Indian school, Bismarck, North Dakota, including pay of superintendent, $26,600; for general repairs and improvements, $6,000; in all, $32,600.

Senator GRONNA. Now, this was the school that I had reference to a little while ago, Mr. Meritt.

Mr. MERITT. Yes, sir.

Senator GRONNA. Why this appropriation here if the department had it in mind to discontinue the school?

Mr. MERITT. The department has not definitely decided to discontinue the school; but it was necessary to discontinue it for the present fiscal year on account of the breakdown of the heating plant; but pending the final decision in regard to this school, it was thought wise to submit an estimate for next year. I will be glad to take up this matter with the commissioner.

Senator GRONNA. Let this particular item go over, then.

The CHAIRMAN. That is the Bismarck item?

Senator GRONNA. The Bismarck.

The CHAIRMAN. All right; that will be done, Senator, if you wish.

Senator GRONNA. That is, if there is no objection.

(The item was passed.)
(The reading of the bill was resumed, as follows:)

Senator JONES. That makes how much, $104,000?

The CHAIRMAN. It would be $104,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of two hundred Indian pupils at the Indian school, Wahpeton, North Dakota, and pay of superintendent, $41,800; for general repairs and improvements, $5,000; in all, $46,800.

Senator GRONNA. That has also been reduced $4,000, Mr. Meritt.

Mr. MERITT. Yes, sir; we asked for an appropriation of 225 pupils, and the House cut us to 200.

The CHAIRMAN. What is the enrollment, Mr. Meritt?

Mr. MERITT. We find the average attendance 125, the average enrollment 180 pupils, and capacity 200.

Senator CURTIS. They allowed you for 200?

Mr. MERITT. Yes, sir.

The CHAIRMAN. Can you get along with the $46,000?

Mr. MERITT. In view of the attendance at that school, and the enrollment, we will try to get along with the amount allowed by the House.

(The item was agreed to.)

Senator CURTIS. Do you want to take up Oklahoma, in the absence of Senator Owen?

The CHAIRMAN. Just as you say, Senators.

Senator GRONNA. I do not think there is any change here whatever.

Senator CURTIS. When you get over on page 36 there is a lot of new matter in there.

Mr. MERITT. Before we leave North Dakota, Mr. Chairman, there is an item we would like to have inserted at the bottom of page 34. The item reads as follows:

That the act of May twenty-ninth, nineteen hundred and eight (Thirty-fifth Statutes at Large, page four hundred and sixty), and the act of February fourteenth, nineteen hundred and thirteen (Thirty-seventh Statutes at Large, page six hundred and seventy-five), are hereby amended so as to authorize the Secretary of the Interior, in his discretion and in such manner and under such rules and regulations as he may prescribe, to make per capita distributions to the Standing Rock Indians from the funds, principal, and interest accruing under said act.

I submit the following justification for this item:

At a general meeting of the business council of the Standing Rock Indian Tribe, on the Standing Rock Reservation, N. Dak., held on November 9, 1917, resolutions were adopted asking that a $40 per capita payment be made to the Standing Rock Indians from the

In addition to the reimbursable cattle furnished these Indians, implements and seed were also supplied them on the same plan. The proposed increase in cultivated area of their lands and the production of foodstuffs during the coming season will make heavy demands on the finances of these Indians. No cash payments have been made them since 1913, when a $40 payment was made under the act of February 14, 1913. The Indians on this reservation have shown a marked increase in their industrial activities during the past year, and it is believed that this is the most opportune time to assist them in their endeavors along this line. There is no authority of law at this time for making per capita payments to these Indians from their tribal funds. The proposed legislation will permit payments to be made from time to time under proper regulations.

Senator GRONNA. I think they had a very poor crop there this year, Mr. Meritt, if I am correctly informed.

Mr. MERITT. Yes, sir; on account of the drought they had a very poor crop. The money belongs to the Indians and we have no authority at this time to pay it out to them.

Senator GRONNA. What would be the total amount distributed at $40 per capita payment? Can you give us that?

Mr. MERITT. $138,200. They have in the Treasury at this time $81,-264, and there are 3,455 Indians on the Standing Rock Reservation.

Senator CURTIS. Would that authorize you, in case you desired, to use that money for any other purpose than to pay it out for them? That is, would it allow you to expend it for their benefit? Do you not think that amendment should be put in there? There may be some on the reservation that would not want to use it.

Mr. MERITT. I think it might well be amended to read: "To use the said money for the benefit of said Indians in the discretion of the Secretary of the Interior."

Senator GRONNA. I think that would be a very wise amendment, because conditions may arise where you have to use this in some other way that would be more beneficial than if you had to adhere strictly to this language.

Senator JONES. Or it might be necessary to appoint a guardian to receive it, and all that sort of thing.

Mr. MERITT. I think, myself, it would be wise to have the amendment suggested adopted.

(The item as amended was agreed to.)

The CHAIRMAN. Now, do you want to take up Oklahoma?

Senator CURTIS. Yes; the unobjected features.

(The reading of the bill was resumed, as follows:)

ADDENDUM 083



thereof as may be necessary, of the funds on deposit to the credit of the Kiowa, Comanche, and Apache Tribes of Indians in Oklahoma, for the support of the agency and pay of employees maintained for their benefit.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

That the Secretary of the Interior be, and he is hereby, authorized to withdraw from the Treasury of the United States, at his discretion, the sum of $250,000, or so much thereof as may be necessary, of the funds on deposit to the credit of the Kiowa, Comanche, and Apache Tribes of Indians in Oklahoma, and pay out the same for the benefit of the members of said tribes for their maintenance and support and improvement of their homesteads for the ensuing year in such manner and under such regulations as he may prescribe: *Provided*, That the Secretary of the Interior shall report to Congress on the first Monday in December, nineteen hundred and nineteen, a detailed statement as to all moneys expended as provided for herein.

Senator CURTIS. That is an old item.

The CHAIRMAN. The same as for years gone by.

(The item was agreed to.)

Senator CURTIS. You withdrew that same amount last year.

Mr. MERITT. They have been withdrawing that amount several years. We pay that money to the Indians or use it for their benefit, and we believe this appropriation should be continued.

(The reading of the bill was resumed, as follows:)

For support and civilization of the Cheyennes and Arapahoes who have been collected on the reservations set apart for their use and occupation in Oklahoma, including pay of employees, $35,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and civilization of the Kansas Indians, Oklahoma, including pay of employees, $1,500.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and civilization of the Kickapoo Indians in Oklahoma, including pay of employees, $2,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and civilization of the Ponca Indians in Oklahoma and Nebraska, including pay of employees, $8,000.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support and education of five hundred and fifty Indian pupils at the Indian school at Chilocco, Oklahoma, including pay of superintendent, $94,600;

(There being no objection, the letters are inserted, as follows:)

UNITED STATES SENATE,
*January 29, 1918.*

Hon. HENRY F. ASHURST,
*Chairman Committee on Indian Affairs,*
*United States Senate.*

MY DEAR SENATOR: Inclosed please find a letter from Dr. A. F. Watkins, president of Millsaps College, Jackson, Miss., who, as secretary, forwards a resolution adopted by the recent session of the Mississippi conference of the Methodist Episcopal Church, South, in behalf of the Mississippi Choctaws. I ask that you file the letter and resolution for consideration when the committee has under consideration the Indian appropriation bill, with special reference to the provision affecting the Mississippi Choctaws.

I am, with every expression of regard,

Very truly, yours,

JOHN SHARP WILLIAMS.

---

JACKSON, MISS.,
*January 24, 1918.*

Hon. JOHN SHARP WILLIAMS,
*United States Senate,*
*Washington, D. C.*

DEAR SIR: I am inclosing a resolution adopted by the recent session of the Mississippi conference of the Methodist Episcopal Church South.

Thanking you for giving it due consideration, I remain,

Yours, faithfully,

A. F. WATKINS, *Secretary.*
Per W. A. H.

Whereas there are now living in this State a number of Choctaw Indians who remained East at the time of the establishment of the Choctaw Nation in the Indian Territory, under the express stipulation of the treaty that by so remaining they "shall not lose the privilege of a Choctaw citizen"; and

Whereas a number of said Choctaws now living in this State were, in the years of 1899 and 1903, identified as Choctaws, entitled under the provisions of said treaty to the privilege of Choctaw citizenship; and

Whereas there are a number of other Choctaws living in this State, who, though entitled to such identification, failed, through ignorance and poverty, to present their claims for enrollment; and

Whereas the Congress of the United States is now engaged in winding up the affairs of the Choctaw Nation, and is proposing to distribute the tribal property of said Nation to those entitled thereto; and

Whereas the Choctaws in this State are poor and needy and ignorant, many of them speaking the Choctaw language and living in accordance with the usages and customs of their ancestors, and have for 80 years lived here under these conditions without the supervision of the Interior Department, which has maintained and cared for and supervised the affairs of other full-blood Indians, and without the privilege of educating their children; and

Whereas the Choctaw Indians in this State and elsewhere have always been

*Resolved further*, That the secretary of the conference send certified copies of this resolution to Mississippi's representatives in the United States Senate and the United States House of Representatives.

E. C. GUNN.
H. WALTER FEATHERSTUN.
C. F. EMERY.
T. H. O'NEIL.
J. M. MORSE.
W. C. PUGH.
W. L. LINFIELD.

The ACTING CHAIRMAN (Senator Jones of New Mexico). I want to know if you need that amount of money.

Mr. MERITT. They have a very large school farm—between 8,000 and 9,000 acres. In view of the fact that they have this land to fall back upon we will not ask for an amount greater than was allowed by the House.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

**For fulfilling treaties with Pawnees, Oklahoma**: For perpetual annuity, to be paid in cash to the Pawnees (article three, agreement of November twenty-third, eighteen hundred and ninety-two), $30,000; for support of two manual-labor schools (article three, treaty of September twenty-fourth, eighteen hundred and fifty-seven), $10,000; for pay of one farmer, two blacksmiths, one miller, one engineer, and apprentices, and two teachers (article four, same treaty), $5,400; for purchase of iron and steel and other necessaries for the shops (article four, same treaty), $500; for pay of physician and purchase of medicines, $1.200; in all, $47,100.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For support of Quapaws, Oklahoma: For education (article three, treaty of May thirteenth, eighteen hundred and thirty-three), $1,000; for blacksmith and assistants, and tools, iron, and steel for blacksmith shop (same article and same treaty), $500; in all, $1,500: *Provided*, That the President of the United States shall certify the same to be for the best interests of the Indians.

(The item was agreed to.)

The ACTING CHAIRMAN. The next is a controverted item. That wil lbe passed over until Senator Owen can be present. The next two items are also controverted.

Senator CURTIS. And the next one, down to "Five Civilized Tribe."

(The reading of the bill was resumed, as follows:)

FIVE CIVILIZED TRIBES.

Senator CURTIS. I move that change. Strike out "Superintendent" and insert "Secretary of the Interior." Strike out "superintendent for the Five Civilized Tribes" and insert the words "Secretary of the Inerior."

The ACTING CHAIRMAN. Yes.

(The item as amended was agreed to.)

Senator CURTIS. Will there be a contest with the Oklahoma Members over this next item of that $200 per capita payment? There was last year. I suggest that be passed over. I think the Mississippi Senators will probably want to be heard on that.

The ACTING CHAIRMAN. That has been in controversy for some years, as I understand it.

Senator CURTIS. Yes, sir; it has.

The ACTING CHAIRMAN. That paragraph will be passed over.

Mr. MERITT. There is no controversy about the Seminole item.

(The reading of the bill was resumed, as follows:)

That the Secretary of the Interior be, and he is hereby, authorized to pay to the enrolled members of the Creek Tribe of Indians of Oklahoma entitled under existing law to share in the funds of said tribe, or to their lawful heirs, all moneys except $50,000 belonging to said tribe in the hands of the United States Treasurer, or deposited in any bank, or held out of the Seminole school fund, or any moneys belonging to said tribe in the United States Treasury or deposited in any bank or held by an official under the jurisdiction of the Secretary of the Interior, not to exceed $100 per capita: *Provided*, That said payment shall be made under such rules and regulations as the Secretary of the Interior may prescribe: *Provided further*, That in cases where such enrolled members, or their heirs, are Indians who belong to the restricted class, the Secretary of the Interior may, in his discretion, withhold such payments and use the same for the benefit of such restricted Indians: *Provided further*, That the money paid to the enrolled members or their heirs, as provided herein, shall be exempt from any lien for attorneys' fees or other debt contracted prior to the passage of this Act: *Provided further*, That the Secretary of the Interior is hereby authorized to use not to exceed $2,000 out of said Seminole school fund, or other money of said Seminole Tribe, for the payment of salaries of all necessary employees and other expenses for the distribution of said per capita payments.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

That the Secretary of the Interior be, and he is hereby, authorized to pay to the enrolled members of the Seminole Tribe of Indians of Oklahoma entitled under existing law to share in the funds of said tribe, or to their lawful heirs, by an official under the jurisdiction of the Secretary of the Interior on June thirtieth, nineteen hundred and eighteen, the payment to be made in such a way as to equalize the pro rata share received by each member of said tribe, either in land or money of the tribe, taking into consideration the value of

ADDENDUM 087



Mr. MERITT. I know of no contest.

The ACTING CHAIRMAN. That does not involve the Mississippi Choctaws or anything of that sort?

Mr. MERITT. No, sir.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For salaries and expenses of such attorneys and other employees as the Secretary of the Interior may, in his discretion, deem necessary in probate matters affecting restricted allottees or their heirs in the Five Civilized Tribes and in the several tribes of the Quapaw Agency and for the costs and other necessary expenses incident to suits instituted or conducted by such attorneys, $85,000.

The ACTING CHAIRMAN. That seems to be the same as in previous years.

Mr. MERITT. Except the word "restricted" has been incorporated at the end of line 24. We would like to have the word "restricted" stricken out, so as to have the item read the same as it has read for a number of years.

Senator CURTIS. Why did the House put that in? Do you know why they put it in? Were you there?

Mr. MERITT. I was not there when it was put in.

Senator CURTIS. We can find it out in conference.

Mr. MERITT. There are a number of minor Indians down there whose property needs to be protected.

Senator CURTIS. I move we strike out the word "restricted." That throws it in conference, anyhow.

(The item as amended was agreed to.)

(The reading of the bill was resumed, as follows:)

For the support, continuance, and maintenance of the Cherokee Orphan Training School, near Tahlequah, Oklahoma, for the orphan Indian children of the State of Oklahoma belonging to the restricted class, to be conducted as an industrial school under the direction of the Secretary of the Interior, $31,500, for repairs and improvements, $4,500; in all, $36,000: *Provided*, That the unexpended balance of the $40,000 appropriated by the act of May eighteenth, nineteen hundred and sixteen, is hereby reappropriated and made immediately available for repairs and improvements to the school.

The ACTING CHAIRMAN. That seems to embody a like change, a reduction of $4,500 for support, continuance, and maintenance of the Cherokees. What about that?

Mr. MERITT. We are satisfied with the amount allowed by the House.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

Mr. MERITT. Several years ago.

Senator CURTIS. That was probably 12 or 13 years ago, but it has come up every year since.

Mr. MERITT. There has been a court decision in recent years, Mr. Chairman, which has affected this item. The court has held that notwithstanding the fact that restrictions have been removed on certain lands in the Five Civilized Tribes, so long as those lands are held by the Indian allottee they are not taxable.

There is a large acreage of land in the Five Civilized Tribes which is not taxable, and we feel that it is only fair that the Government pay the tuition of the Indian children in the public schools of eastern Oklahoma.

Senator CURTIS. Yes; but, Mr. Meritt, you will remember very well when the item was first put in, the restrictions applied to all of the Indians of the Five Tribes. They were not permitted to sell even their surplus, and since that time the restrictions have been removed on all of the Indians of the Five Tribes of less than half degree.

The ACTING CHAIRMAN. I suggest that we pass that item over until Senator Owen can be here.

Senator CURTIS. Yes; I think that will be advisable.

The ACTING CHAIRMAN. We will pass that item over.

(The reading of the bill was resumed, as follows:)

That the Secretary of the Interior be, and he is hereby, authorized to use not exceeding $30,000 of the proceeds of sales of unallotted lands and other tribal property belonging to any of the Five Civilized Tribes for payment of salaries of employees and other expenses of advertising and sale in connection with the further sales of such tribal lands and property, including the advertising and sale of the land within the segregated coal and asphalt area of the Choctaw and Chickasaw Nations or of the surface thereof as provided for in the act of Congress approved February nineteenth, nineteen hundred and twelve (Thirty-seventh United States Statutes at Large, page sixty-seven), and of the improvements thereon, which is hereby expressly authorized, and for other necessary to a final settlement of the affairs of the Five Civilized Tribes: *Provided*, That not to exceed $2.500 of such amount may be used in connection with the collection of rents of unallotted lands and tribal buildings: *Provided further*, That during the fiscal year ending June thirtieth, nineteen hundred and nineteen, no moneys shall be expended from tribal funds belonging to the Five Civilized Tribes, without specific appropriation by Congress, except as follows: Equalization of allotments, per capita and other payments authorized by law to individual members of the respective tribes, tribal and other Indian schools for the current fiscal year under existing law, salaries and contingent expenses of governors, chiefs, assistant chiefs, secretaries, interpreters, and mining trustees of the tribes for the current fiscal year at salaries at the rate heretofore paid, and attorneys for the Choctaw, Chickasaw, and Creek Tribes employed

ADDENDUM 089



Mr. MERITT. Yes, sir. We are satisfied with the amount allowed by the House. That legislation has been carried in the Indian appropriation bill for a number of years.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For fulfilling treaties with Choctaws, Oklahoma: For permanent annuity (article two, treaty of November sixteenth, eighteen hundred and five, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $3,000; for permanent annuity for support of light-horsemen (article thirteen, treaty of October eighteenth, eighteen hundred and twenty, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $600; for permanent annuity for support of blacksmith (article six, treaty of October eighteenth, eighteen hundred and twenty, and article nine, treaty of January twentieth, eighteen hundred and twenty-five, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $600; for permanent annuity for education (article two, treaty of January twentieth, eighteen hundred and twenty-five, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $6,000; for permanent annuity for iron and steel (article nine, treaty of January twentieth, eighteen hundred and twenty-five, and article thirteen, treaty of June twenty-second, eighteen hundred and fifty-five), $320; in all, $10,520.

Senator CURTIS. That is a treaty. I move that be adopted. We could not change it if we wanted to.

The ACTING CHAIRMAN. I am inclined to think the language there is a little unfortunate for fulfilling treaties. I rather think it should read "for fulfilling treaty obligations," or something of that sort, but I presume that language has a definite meaning and will not disturb it.

(The item was agreed to.)

(The reading of the bill was resumed, as follows:)

For the salaries and expenses of not to exceed three oil and gas inspectors and necessary clerks and field assistants, under the direction of the Secretary of the Interior, to supervise oil and gas mining operations on allotted and tribal lands in the State of Oklahoma from which restrictions have not been removed, and to conduct investigations with a view to the prevention of waste, $15,000.

The ACTING CHAIRMAN. Heretofore it was $25,000.

Mr. MERITT. We have had heretofore six oil and gas inspectors, and we ask for an appropriation of $25,000. We would like to have our estimates on that item.

Senator CURTIS. Why did they reduce that?

Mr. MERITT. It was contended by a member of the Oklahoma delegation that the State had oil and gas inspectors, and there was a duplication of work, and the number of oil and gas inspectors author-

ADDENDUM 090



The ACTING CHAIRMAN. Well, $25,000 is a pretty good item, and I am inclined to think that they should pay it.

Senator GRONNA. I have understood these Indians are very wealthy.

Mr. MERITT. Some of them are wealthy.

Senator GRONNA. And I can not really see why the Government should pay for the inspections of the property of these Indians if they are well to do.

The ACTING CHAIRMAN. They have got this money coming in and I rather think governmental inspection is advisable.

Senator GRONNA. Yes; it would be. I think it ought to be taken out of their own funds.

The ACTING CHAIRMAN. If they are getting the benefit of it, they ought to pay it, and they have these oil wells, getting a large income.

Senator GRONNA. We have Indians in many sections of the country now who are indigent and very poor. Of course, in that case the Government must help them, but in this case the Indians are rich.

The ACTING CHAIRMAN. So it strikes me. We will pass that item, then.

(The reading of the bill was resumed, as follows:)

That the Secretary of the Interior be, and he is hereby, authorized and directed to sell at a price to be fixed by him, which shall not be less than the appraised value, to the State of Oklahoma for a game preserve lands of the Choctaw and Chickasaw Tribes of Indians in Oklahoma described as sections 1, 2, 11, 12, 13, 14, 23, 24, 25, and 26, township 3 south, range 25 east, and sections 5, 6, 7, 8, 17, 18, 19, 20, 29, and 30, township 3 south, range 26 east, containing in all 12,800 acres, more or less: *Provided*, That any lands heretofore allotted and conveyed to allottees of the Chocktaw and Chickasaw Tribes of Indians, or sold at sales heretofore held to purchasers of tracts of land within said area thus described shall be excepted from such sale.

The ACTING CHAIRMAN. That is new legislation, is it not?

Senator CURTIS. Yes; all of it.

Mr. MERITT. We have no objection to that legislation, Mr. Chairman.

The ACTING CHAIRMAN. Who is asking for it?

Mr. MERITT. The State of Oklahoma.

The ACTING CHAIRMAN. For a game preserve?

Mr. MERITT. Yes, sir; covering 12,800 acres. This land is located in the southeastern part of Oklahoma, and is not valuable for farming purposes.

Senator CURTIS. In fact, you have tried to sell it two or three times, have you not, without success?

Mr. MERITT. Yes, sir.

ADDENDUM 091



Mr. MERITT. Oklahoma wants it, and the Indian people of the Choctaw and Chippewa Nations are favorable to it.

Senator GRONNA. What area do they propose to sell?

Mr. MERITT. Twelve thousand eight hundred acres.

Senator GRONNA. At what price?

Mr. MERITT. At its appraised price. The Secretary has already appraised all of the lands in the Five Civilized Tribes.

Senator GRONNA. I have no objection to it. I am rather surprised, though, to see it come in here, because I know there is great opposition to these game preserves in certain sections of the country. Personally, I have no objection to it, if Oklahoma wants it.

(The item was agreed to.)

Senator CURTIS. The next item is a pretty serious one, it seems to me, and especially as it may affect some very ignorant Indians, perhaps some full-bloods, and I think we had better pass that until Senator Owen is here.

Senator FERNALD. Mr. Chairman, that takes us to Oregon. I assume there will be no session of the Senate to-morrow, and we can easily finish the reading of the bill in the afternoon. I suggest that we adjourn until to-morrow.

(The motion was agreed to, and, at 4.30 o'clock p. m., the committee took a recess until to-morrow, Friday, February 1, 1918, at 2 o'clock p. m.)

# INDIAN APPROPRIATION BILL.

---

**FRIDAY, FEBRUARY 1, 1918.**

COMMITTEE ON INDIAN AFFAIRS,
UNITED STATES SENATE,
*Washington, D. C.*

The committee met at 2 o'clock p. m., pursuant to adjournment, at the room of the committee in the Capitol Building, Senator Henry F. Ashurst (chairman) presiding.

Present: Senators Jones, Gronna, Curtis, Fernald, McNary, and Nugent.

Also Present: Mr. Edgar B. Meritt, Assistant Commissioner of Indian Affairs.

The CHAIRMAN. The committee will come to order. We will hear Mr. Ballinger.

## STATEMENT OF MR. WEBSTER BALLINGER.

Mr. BALLINGER. Mr. Chairman and gentlemen, the members of the delegation of the Chippewa Indians and the department have reached a complete agreement with reference to a slight amendment to the bill. I will read it to the committee. It is as follows:

> At the end of line 9 strike out the comma and insert a period. Strike out all of lines 10, 11, and 12, and in lieu thereof insert the following: *Provided*, That not to exceed $15,000 of said amount may be used to reimburse the tribal fund known as Indian money proceeds of labor, Red Lake Indians, heretofore actually expended in said operations.

The CHAIRMAN. So that the committee may have it as amended, Mr. Ballinger; kindly read the whole bill as amended.

(The bill as amended was thereupon read by Mr. Ballinger.)

The CHAIRMAN. Does that amendment meet the wishes of the tribe and the delegates you represent?

Mr. BALLINGER. Yes, sir.

The CHAIRMAN. Is there any objection, Senators, to reporting the

ADDENDUM 094



Senator GRONNA. I am not opposing that, but I would suggest that the chairman be authorized to report this as a separate bill and the Senate can pass it and you can also put it in the Indian appropriation bill, then we will be sure of getting action.

The CHAIRMAN. I have no objection to whatever the committee wishes to do.

Senator GRONNA. Has this been before the House?

The CHAIRMAN. No, Senator.

Mr. MERITT. I appeared before the Appropriations Committee of the House in support of this item, and we think that this item will be incorporated in the deficiency bill when reported to the House. The deficiency bill is not yet out of the Appropriations Committee of the House. We would be glad to have the item incorporated in the Indian appropriation bill.

The CHAIRMAN. What do you say about that, Senators? Senator Curtis, have you any expression on that?

Senator CURTIS. As this makes no appropriation, simply authorizes the use of funds of these Indians, and as the delegation representing them is satisfied with the amendment and the department is satisfied with it, I think we ought to put it in the appropriation bill. If there were any opposition to it on the part of the Indians, then I think we would better put it in a separate bill.

Senator GRONNA. No; there is no opposition to it, Senator.

The CHAIRMAN. Is there any objection to putting it in the appropriation bill? There being none, it is so ordered.

## MINNESOTA.

The CHAIRMAN. Senator Nelson was here just a few moments ago and left the following amendment:

> That of the unexpended appropriation of $5,000 authorized to be taken out of the tribal funds of the Chippewa Indians of Minnesota for the construction of a bridge across the Mississippi River on the Cass Lake Reservation by the act entitled "An act making appropriations for the current and contingent expenses of the Bureau of Indian Affairs, for fulfilling treaty stipulations with various Indian tribes, and for other purposes," for the fiscal year ending June 30, 1918, $4,000 be, and the same is hereby, authorized to be expended for improving the road between the Cass Lake Indian school and village, a distance of 6 miles, upon the condition that the counties of Cass and Beltrami, in the State of Minnesota, shall file with the Secretary of the Interior a written agreement to reimburse the Government within five years to the extent of one-half of the amount expended upon said road.

Senator GRONNA. This is a matter that I wish we might let go over, as long as the delegation is here, and this is Indian funds. I think

The CHAIRMAN. The next item is:

For support and civilization of the confederated tribes and bands under Warm Springs Agency, Oreg., including pay of employees, $4,000.

It is agreed to in the absence of objection.

For support and civilization of the Indians of the Umatilla Agency, Oreg., including pay of employees, $3,000.

It is agreed to in the absence of objection.

The next item is as follows:

For support and education of 600 Indian pupils, including native Indian pupils brought from Alaska, at the Indian school, Salem, Oreg., including pay of superintendent, $113.000; for general repairs and improvements, including drainage of school farm, $20,000; in all, $133,000.

Senator CURTIS. That item, "including drainage of school farm," is a new item. Will you, Mr. Commissioner, state something to the committee as to the necessity of that drainage at this time?

Mr. MERITT. We have some valuable land there that we can use for agricultural purposes providing we can get it drained. We very much need the appropriation to use this land in order to furnish the food supply for that school.

Senator GRONNA. Let us hear what the Senator from Oregon has got to say.

Senator MCNARY. I am very much interested in that school; I have a farm adjoining it. I am in favor of anything that goes to improve and better the institution.

Senator GRONNA. You are getting here the full amount, Mr. Meritt?

Mr. MERITT. We will be satisfied with the amount allowed by the House.

The CHAIRMAN. That is, satisfied with the amount stated, $133,000?

Mr. MERITT. Yes, sir.

The CHAIRMAN. Without objection, the item will be agreed to at $133,000.

The next item is, page 49, line 1, as follows:

For support and civilization of Indians at Grande Ronde and Siletz Agencies, Oreg., including pay of employees, $4,000.

Is there any objection to that item?

Senator CURTIS. What is that new matter at the bottom of the page, "and for completing construction of the Modoc Point irrigation system within the Klamath Indian Reservation, in the State of Oregon, $3,000, to be immediately available and to remain available until ex-

ADDENDUM 096



The CHAIRMAN. That is lines 4 to 16 in the comparison?

Mr. MERITT. Yes, sir.

The CHAIRMAN. Is there any objection to that item? Is there any discussion? If not, it is agreed to at $7,000.

The next item we have had copious, and, it seems to me, complete, hearings on; that is the following:

> For the purpose of encouraging industry and self-support among the Klamath Tribe of Indians in Oregon, and to aid them in building homes, the culture of fruits, grain, and other crops, $200,000, or so much thereof as may be necessary, which sum may be used for the purchase of such animals, machinery, tools, implements, and other equipment necessary in the discretion of the Secretary of the Interior to enable the Klamath Indians to become self-supporting, to be reimbursed from the funds accruing to the credit of said tribes in the Treasury of the United States from the sale of timber and unallotted lands on the Klamath Reservation, under such rules and regulations as the Secretary of the Interior may prescribe.

The delegation composed of Mr. Brown and Mr. Hendricks was heard.

Senator CURTIS. I want to move to strike out that provision. I was drawing up a provision here in lieu thereof. I should like to suggest it and then let the office draw it up. My suggestion is as follows:

> The Secretary be and he is hereby authorized and directed to sell to the highest and best bidder, under rules and regulations prescribed by him, the merchantable timber on the Klamath Indian Reservation in Oregon.

The CHAIRMAN. You have authority?

Mr. MERITT. Yes, sir; we would like to have $500,000, as requested by the Commissioner, carried in this appropriation, and it is thought that the department will soon sell additional timber and this money can soon be reimbursed to the Government. But we would like very much to have the $500,000 now, in compliance with the expressed wishes of the Commissioner.

Senator CURTIS. Have you made an estimate of what you want to buy for those Indians with the $500,000?

Mr. MERITT. We want to buy cattle and farming implements and assist the Indians in building homes and place them upon a sure footing, so that they can make their own living hereafter.

Senator CURTIS. You have known the condition of these Indians, your office has, for years. You have got authority to sell. Why has not the department sold and had the money there ready for them?

Mr. MERITT. The timber market on the coast has not been good for the last few years.

Senator CURTIS. It is good now?

Mr. MERITT. Only recently prices have been such that they would

ADDENDUM 097



war prices for stumpage were low out on the coast, and I think the Commissioner used good judgment in not disposing of it.

Senator CURTIS. Why not leave it this way: Let the department draw the item along the lines I have suggested, leave the amount blank, then we can meet and get additional data from the Commissioner as to the number of Indians who could be helped now?

The CHAIRMAN. Has the department now authority to go ahead and sell this timber? If so, why cumber the statute books with more legislation?

Mr. MERITT. We have authority under the act of June 25, 1910.

The CHAIRMAN. Do you need any additional authority?

Mr. MERITT. None at all on that reservation.

Senator CURTIS. Why not fix it so it will be sold? If you put the item in there, making the item reimbursable out of this, and then make sale, that will reimburse the Government.

Senator NELSON. Does this legislation authorize the sale of the timber alone? Does the purchaser derive any title to the land itself?

Mr. MERITT. No, sir; nothing but the timber.

Senator CURTIS. They do not want to sell the land; they want to cultivate the land, as I understood the statement here yesterday.

The CHAIRMAN. Then I would suggest that the Senator from Oregon and the Commissioner prepare to-night the item they agree upon, if they can agree and submit it to-morrow.

Senator MCNARY. Senator Curtis had better act. I am in accord with the commissioner.

Senator CURTIS. I am perfectly willing to let the department draw the item, but what I want to know is that the timber is going to be sold, and I want him to direct it to be sold, and want it segregated; I do not want a lot of money put into the Treasury not drawing a cent interest, as with a number of tribes, and then either paid to them or expended for their benefit.

The CHAIRMAN. You can leave the amount blank, Mr. Commissioner, and draw the proposed legislation and submit it to us to-morrow.

Senator CURTIS. Can you get that up?

Mr. MERITT. I can get the legislation drafted, but in view of the fact that we have the legislation now, I do not see the necessity for that legislation, and if we do not get the money, we can not do anything for those Indians immediately, it will take some time to sell that timber.

Senator CURTIS. I had just stated, Mr. Meritt, that I was perfectly

ADDENDUM 098



Senator NELSON. How much of the timber do you propose to sell?

The CHAIRMAN. I think we ought to sell a couple of million dollars worth at least.

Senator NELSON. Without any restriction as to who it shall be sold to?

Mr. MERITT. We have recently sold approximately a million dollars worth, more than a million dollars worth of timber on that reservation.

Senator NELSON. To different people or concerns?

Mr. MERITT. To two different people, if I remember correctly.

The CHAIRMAN. The commissioner will bring the legislation at the next hearing and we will take it up then.

Regarding this item of $5,000 that Senator Nelson has brought up, the tribe has signified through the Senator that there is no objection on their part to the legislation.

Mr. MERITT. We have submitted a favorable report on this item.

The CHAIRMAN. Is there any objection to that going in the bill? It appropriates $5,000 out of their own funds, and they have no objection. In the absence of objection let it go in the bill.

## PENNSYLVANIA.

The CHAIRMAN. The next item is as follows:

SEC. 19. For support and education of seven hundred Indian pupils at the Indian school at Carlisle, Pennsylvania, including pay of superintendent, $132,000; for general repairs and improvements, $15,000; in all, $147,000.

Senator CURTIS. Do you not have more than 700 attendance there, Mr. Meritt?

Mr. MERITT. No, sir; we have been appropriating for more pupils there, but we have not had that enrollment or attendance. The superintendent has estimated for 700 pupils and that is all the appropriation we need for that school. We are satisfied with the amount allowed by the House.

(The item was agreed to.)

## SOUTH DAKOTA.

The CHAIRMAN. The next item is as follows:

SEC. 20. For support and education of three hundred and fifty Indian pupils at the Indian school at Flandreau, South Dakota, and for pay of superintendent, $72,000; for general repairs and improvements, $8,000; for repairing damages caused by fire in industrial building, $4,500; for replacing and repairing equip-

Mr. MERITT. They added the item for repairing damages caused by fire in the industrial building 4,500. That fire occurred after we had made our estimates.

Senator CURTIS. What was your attendance there last year?

Mr. MERITT. The attendance was rather low at that school that year.

Senator CURTIS. How is it starting out this year?

Mr. MERITT. We had 195 average attendance, enrollment was 227. We will try to get along with the amount allowed by the House in view of the poor showing made at that school.

Senator GRONNA. The House has increased it above your estimate.

Mr. MERITT. That includes the new item for repairing damages caused by fire.

The CHAIRMAN. It will be agreed to at $86,500 in the absence of any objection.

The next item is as follows:

> For support and education of two hundred and fifty Indian pupils at the Indian school at Pierre, South Dakota, including pay of superintendent, $52,000; for general repairs and improvements, $6,000; for installation of new boilers and construction of boiler stack, $5,000; in all, $63,000.

Mr. MERITT. We are satisfied with the amount allowed by the House.

The CHAIRMAN. The item will be agreed to at $62,000 in the absence of objection.

The next item is line 23, page 50, as follows:

> For support and education of two hundred and seventy-five Indian pupils at the Indian school, Rapid City, South Dakota, including pay of superintendent, $57,000; for general repairs and improvements, $5,000; for irrigation, drainage, and improving school farm, to remain available until expended, $3,000; additional appropriation for new school building, $15,000; in all, $80,000.

Senator GRONNA. I notice that all these South Dakota items have increased with the exception of the last one.

The CHAIRMAN. We have not heretofore made any appropriations for new school buildings in this bill, because of the war necessities. I think this is the first one I have seen—that $15,000 item.

Mr. MERITT. This appropriation is to supplement an appropriation heretofore made by Congress for a new school building. We found it was impossible, because of the high prices which have obtained since the appropriation was made, to complete the building within the original appropriation, and this item was incorporated in the House bill at the suggestion of Representative Gandy.

Senator CURTIS. I think it has been the policy of the committee to cut out new buildings, and the Treasury Department has taken the stand that no new buildings are to be built.

The CHAIRMAN. Is there any objection to striking it out? It will be stricken out in the absence of objection. The item will then read $65,000, in accordance with your estimate.

The next item is as follows:

For support of Sioux of different tribes, including Santee Sioux of Nebraska, North Dakota, and South Dakota: For pay of five teachers, one physician, one carpenter, one miller, one engineer, two farmers, and one blacksmith (article thirteen, treaty of April twenty-ninth, eighteen hundred and sixty-eight), $10,400; for pay of second blacksmith, and furnishing iron, steel, and other material (article eight of same treaty), $1,600; for pay of additional employees of the several agencies for the Sioux in Nebraska, North Dakota, and South Dakota, $95,000; for subsistence of the Sioux and for purposes of their civilization (act of February twenty-eighth, eighteen hundred and seventy-seven), $200,000: *Provided*, That this sum shall include transportation of supplies from the termination of railroad or steamboat transportation, and in this service Indians shall be employed whenever practicable; in all, $307,000.

Mr. MERITT. That is the same language and the same amount which has been carried in the bill for some time.

The CHAIRMAN. Is there any objection to agreeing to that?

Senator GRONNA. Mr. Chairman, the next item; let that go over.

The CHAIRMAN. The next item, commencing at line 21, page 51, and extending down to line 3 on the next page will be passed at the suggestion of the Senator from North Dakota.

Senator CURTIS. Senator Sterling said he would like to be notified when we reached his State; that he had an amendment or two he wanted to say something about.

The CHAIRMAN. The next item is as follows:

For subsistence and civilization of the Yankton Sioux, in South Dakota, including pay of employees, $14,000.

The item is agreed to.

The next item is as follows:

For the equipment and maintenance of the asylum for insane Indians at Canton, South Dakota, for incidental and all other expenses necessary for its proper conduct and management, including pay of employees, repairs, improvements, and for necessary expense of transporting insane Indians to and from said asylum, $40,000.

Senator CURTIS. How many insane Indians have you got there now?

Mr. MERITT. We have 73 patients into that institution at this time. It has a capacity of 93.

DEP'T. OF THE INTERIOR
RECEIVED
JAN 20 1916
INDIAN OFFICE
SEC'Y'S OFF. MAILS & FILES

File with 6842 1915

OFFICE OF INDIAN AFFAIRS
RECEIVED
JAN 20 1916
6012

# Executive Order.

Exclusive of a tribal right to the minerals contained therein, all surveyed lands and all unsurveyed lands, which when surveyed will fall within the townships and ranges hereinafter described, be and the same hereby are withdrawn and set apart as a reservation for the Papago Indians in Arizona:

| | | | |
|---|---|---|---|
| All of Township | 8 S., | Range 1 E., | G. & S. R. M. |
| do | 8 S. | " 2 E. | " |
| The W/2 " | 8 S. | " 3 E. | " |
| Secs. 13–36, inc. | 8 S. | " 5 E. | " |
| Secs. 19, 20, 29, 30, 31, and 32, | 8 S. | " 6 E. | " |
| All of Township | 9 S. | " 1 E. | " |
| do. | 9 S. | " 2 E. | " |
| " | 9 S. | " 3 E. | " |
| Secs. 13–36, inc. | 9 S. | " 4 E. | " |
| All of Township | 9 S. | " 5 E. | " |
| All of Township | 10 S. | " 1 E. | " |
| do. | 10 S. | " 2 E. | " |
| " | 10 S. | " 3 E. | " |
| " | 10 S. | " 4 E. | " |
| " | 10 S. | " 5 E. | " |
| " | 10 S. | " 1 W. | " |
| " | 10 S. | " 2 W. | " |
| The E/2 " | 10 S. | " 3 W. | " |
| All of Township | 11 S. | " 1 E. | " |
| do. | 11 S. | " 2 E. | " |
| " | 11 S. | " 3 E. | " |
| " | 11 S. | " 4 E. | " |
| " | 11 S. | " 5 E. | " |
| All of Township | 11 S., | " 1 W., | " |
| do. | 11 S., | " 2 W., | " |
| The E/2 " | 11 S. | " 3 W. | " |
| All of Township | 12 S. | " 1 E. | " |
| do. | 12 S. | " 2 E. | " |
| " | 12 S. | " 3 E. | " |
| " | 12 S. | " 4 E. | " |
| " | 12 S. | " 5 E. | " |
| " | 12 S. | " 6 E. | " |
| " | 12 S. | " 7 E. | " |
| " | 12 S. | " 8 E. | " |
| " | 12 S. | " 1 W. | " |
| " | 12 S. | " 2 W. | " |
| The E/2 " | 12 S. | " 3 W. | " |

FILED BY M. A. P.

2,700,000 acres of which 650,000 rough and mountainous } estimated

| | | | | |
|---|---|---|---|---|
| All of Township | 13 S. | Range | 1 E. | G. & S. R. M. |
| do. | 13 S. | " | 2 E. | " |
| " | 13 S. | " | 3 E. | " |
| " | 13 S. | " | 4 E. | " |
| " | 13 S. | " | 5 E. | " |
| " | 13 S. | " | 6 E. | " |
| " | 13 S. | " | 7 E. | " |
| " | 13 S. | " | 8 E. | " |
| " | 13 S. | " | 1 W. | " |
| " | 13 S. | " | 2 W. | " |
| " | 13 S. | " | 3 W. | " |
| " | 13 S. | " | 4 W. | " |
| All of Township | 14 S. | " | 1 E. | " |
| do. | 14 S. | " | 2 E. | " |
| " | 14 S. | " | 3 E. | " |
| " | 14 S. | " | 4 E. | " |
| " | 14 S. | " | 5 E. | " |
| Secs. 1–32 inc. | 14 S. | " | 6 E. | " |
| " 1–9 " | | | | " |
| " 16–21 " | | | | " |
| " 28–30 " | 14 S. | " | 7 E. | " |
| " 1–15 " | | | | " |
| " 22–27 " | | | | " |
| " 34–36 " | 14 S. | " | 8 E. | " |
| " 13–32 " | 14 S. | " | 9 E. | " |
| " 13–22 " | 14 S. | " | 10 E. | " |

The W/2 Sec. 23, NE/4 Sec. 23, and W/2 SE/4 Sec. 23; N/2 Sec. 24, SE/4 Sec. 24; W/2 Sec. 26, W/2 E/2 Sec. 26, and all of Secs. 27, 28,

| | | | | |
|---|---|---|---|---|
| 29, and 30 in Twp. | 14 S., | Range | 10 E. | G. & S. R. M. |
| Secs. 16–21 inc. T. | 14 S., | " | 11 E. | " |
| All of Township | 14 S. | " | 1 W. | " |
| do. | 14 S. | " | 2 W. | " |
| " | 14 S. | " | 3 W. | " |
| " | 14 S. | " | 4 W. | " |
| All lands in Township | 15 S. | of Range | 1 E. | " |
| do. | 15 S. | " | 2 E. | " |
| " | 15 S. | " | 3 E. | " |
| " | 15 S. | " | 4 E. | " |
| " | 15 S. | " | 5 E. | " |
| Secs. 5, 6, 7, 8, 17, 18, 19, 20, 29, 30, 31 and 32, in Township | 15 S. | " | 6 E. | " |
| The E/2 of " | 15 S. | " | 8 E. | " |
| Secs. 5, 6, 7, 8, 17, 18, 19, and 20, in Twp. | 15 S. | " | 9 E. | " |
| All lands in Township | 15 S. | " | 1 W. | " |
| do. | 15 S. | " | 2 W. | " |
| " | 15 S. | " | 3 W. | " |
| " | 15 S. | " | 4 W. | " |

| | | | | |
|---|---|---|---|---|
| All land in Township | 16 S. of | Range | 1 E. | G. & S. R. M. |
| do. | 16 S. | " | 2 E. | " |
| " | 16 S. | " | 3 E. | " |
| " | 16 S. | " | 4 E. | " |
| " | 16 S. | " | 5 E. | " |
| Secs. 5–8 inc. and Secs. 17–36 inc. in T. | 16 S. | " | 6 E. | " |

Secs. 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, 29, 30, 31, 32, 33, 34, the S/2 35, NE/4 35, W/2 NW/4 35, the SE/4 NW/4 Sec. 35, and Sec. 36, Tnp. 16 S., R. 7 E., G. & S. R. M.

Secs. 1–9 inc., N/2 Sec. 10, SE/4 Sec. 10, S/2 SW/4 Sec. 10, Secs. 11–24 inc. and Secs. 29–32 inc. of Twp. 16 S., Range 8 E. G. & S. R. M.

Secs. 7–11 inc. and Secs. 16, 17 and 18, in Twp. 16 S., Range 9 E. G. & S. R. M.

| | | | | |
|---|---|---|---|---|
| All land in Township | 16 S. of | Range | 1 W. | G. & S. R. M. |
| do. | 16 S. | " | 2 W. | " |
| " | 16 S. | " | 3 W. | " |
| " | 16 S. | " | 4 W. | " |
| All land in Township | 17 S. | " | 1 E. | " |
| do. | 17 S. | " | 2 E. | " |
| " | 17 S. | " | 3 E. | " |
| " | 17 S. | " | 4 E. | " |
| " | 17 S. | " | 5 E. | " |
| " | 17 S. | " | 6 E. | " |
| " | 17 S. | " | 7 E. | " |
| Secs. 5–8 inc. and 17–20 inc. in Twp. | 17 S., | " | 8 E. | " |
| All land in Township | 17 S. | " | 1 W. | " |
| do. | 17 S. | " | 2 W. | " |
| " | 17 S. | " | 3 W. | " |
| " | 17 S. | " | 4 W. | " |
| All land in Township | 18 S. | " | 1 E. | " |
| do. | 18 S. | " | 2 E. | " |
| " | 18 S. | " | 3 E. | " |
| " | 18 S. | " | 4 E. | " |
| " | 18 S. | " | 5 E. | " |
| " | 18 S. | " | 6 E. | " |
| " | 18 S. | " | 7 E. | " |
| " | 18 S. | " | 1 W. | " |
| " | 18 S. | " | 2 W. | " |
| " | 18 S. | " | 3 W. | " |
| " | 18 S. | " | 4 W. | " |
| All land in Township | 19 S. | " | 1 E. | " |
| do. | 19 S. | " | 2 E. | " |
| " | 19 S. | " | 3 E. | " |
| " | 19 S. | " | 4 E. | " |

| | | | | |
|---|---|---|---|---|
| All land in Township | 19 S. | of Range | 5 E. | G. & S. R. M. |
| " | 19 S. | " | 6 E. | " |
| " | 19 S. | " | 7 E. | " |
| " | 19 S. | " | 1 W. | " |
| " | 19 S. | " | 2 W. | " |
| " | 19 S. | " | 3 W. | " |
| All land in Township | 20 S., | Range | 1 E. | " |
| do. | 20 S. | " | 2 E. | " |
| " | 20 S. | " | 3 E. | " |
| " | 20 S. | " | 4 E. | " |
| " | 20 S. | " | 5 E. | " |
| " | 20 S. | " | 6 E. | " |
| The W/2 of Township | 20 S. | " | 7 E. | " |
| All land in " | 20 S. | " | 1 W. | " |
| All land in Township | 21 S. | " | 3 E. | " |
| do. | 21 S. | " | 4 E. | " |
| " | 21 S. | " | 5 E. | " |
| " | 21 S. | " | 6 E. | " |
| The W/2 of " | 21 S. | " | 7 E. | " |
| All land in Township | 22 S. | " | 6 E. | " |
| The W/2 of " | 22 S. | " | 7 E. | " |

The foregoing reservation is hereby created with the understanding that it shall not interfere with prospecting for minerals, under such rules and regulations as the Secretary of the Interior may prescribe, or the filing of entries in accordance with the mineral land laws of the United States: AND FURTHER, That nothing contained herein shall affect any existing legal right of any person to any of the lands herein described.

WOODROW WILSON

THE WHITE HOUSE,
*14 January, 1916.*

[No. 2300.]

70

ADDENDUM 106

# Executive Order.

Executive Orders, dated June 16, 1911, December 5, 1912, and January 14, 1916, withdrawing certain lands in Arizona for the benefit of the Papago Indians, be and the same hereby are revoked, and, exclusive of a tribal right to the minerals therein contained, all surveyed land and all unsurveyed land which, by protraction of the regular system of public land surveys from the township corner at the intersection of the Gila and Salt River Meridian with the Third Standard Parallel South, would fall within the townships and ranges listed below, be and the same hereby are withdrawn and set apart as a reservation for the benefit of the Papago Indians in Arizona:

T 7 S, R 5 E Sec. 25 to 36 inc.
T 8 S, R 2 E, " 22 & 27, 34, 35, 36
T 8 S, R 3 E, " 1, 2, 3, 10 to 15, 19 to 36
T 8 S, R 4 E, all
T 8 S, R 5 E, "
T 8 S, R 6 E, Sec. 5 to 8, 17 to 20, 29 to 32
T 9 S, R 1 E, S/2
T 9 S, R 2 E, all
T 9 S, R 3 E, "
T 9 S, R 4 E, "
T 9 S, R 5 E, "
T 10 S, R 3 W, E/2
T 10 S, R 2 W, all
T 10 S, R 1 W, "
T 10 S, R 1 E, "
T 10 S, R 2 E, all
T 10 S, R 3 E, "
T 10 S, R 4 E, "
T 10 S, R 5 E, "
T 11 S, R 3 W, E/2
T 11 S, R 2 W, all
T 11 S, R 1 W, "
T 11 S, R 1 E, W/2
T 11 S, R 4 E, N/2
T 11 S, R 5 E, N/2
T 12 S, R 4 W, E/2
T 12 S, R 3 W, all
T 12 S, R 2 W, "
T 12 S, R 1 W, Sec. 5 to 8 and 17 and 18 inc.
T 12 S, R 2 E, E/2
T 12 S, R 3 E, all
T 12 S, R 4 E, "
T 12 S, R 5 E, S/2
T 12 S, R 6 E, S/2
T 12 S, R 7 E, Sec. 19 to 21 and 28 to 33 inc.
T 12 S, R 8 E, S/2
T 13 S, R 4 W, all
T 13 S, R 3 W, Sec. 1 to 24 and 28 to 33 inc.
T 13 S, R 2 W, Sec. 5, 6, 7, 8,

T 13 S, R 1 W, " 25 to 29 and 32 to 36 inc.
T 13 S, R 1 E, " 1 to 5, 8 to 17, 20 to 36 inc.
T 13 S, R 2 E, all
T 13 S, R 3 E, "
T 13 S, R 4 E, "
T 13 S, R 5 E, "
T 13 S, R 6 E, "
T 13 S, R 7 E, W/2
T 13 S, R 8 E, all
T 14 S, R 3 W, Sec. 25 to 36, inc.
T 14 S, R 2 W, Sec. 1, 2, 11 to 17, 20 to 36 inc.
T 14 S, R 1 W, all
T 14 S, R 1 E, "
T 14 S, R 2 E, "
T 14 S, R 3 E, "
T 14 S, R 4 E, "
T 14 S, R 5 E, "
T 14 S, R 6 E, Sec. 1 to 32, inc.
T 14 S, R 7 E, " 4 to 9, 16 to 21, 28 to 30 inc.
T 14 S, R 8 E, " 1 to 15, 22 to 27, 34, 35, 36 inc.
T 14 S, R 9 E, Sec. 13 to 32 inc.
T 14 S, R 10 E, " 13 to 22, 27 to 30
W/2 Sec. 23, NE/4 Sec. 23,
W/2 of SE/4, Sec. 23,
N/2 of Sec. 24, SE/4 Sec. 24,
W/2 Sec. 26, W/2 of E/2, Sec. 26.
T 14 S, R 11 E, Sec. 16 to 21 inc.
116 T 15 S, R 4 W. All land lying easterly of the crest of the Ajo Mts. and including within the reservation the Indian village and wells of Kootskatsh (Wall's well).
T 15 S, R 3 W, all
T 15 S, R 2 W. "
T 15 S, R 1 W. "
T 15 S, R 1 E. "
T 15 S, R 2 E. "
T 15 S, R 3 E. "
T 15 S, R 4 E. "
T 15 S, R 5 E. "
T 15 S, R 6 E. Sec. 5, 6, 7, 8, 17, 18, 19, 20, 29, 30, 31, 32
T 15 S, R 8 E. Sec. 1, 2, 3, 10 to 15, 22 to 27
T 15 S, R 9 E. " 5, 6, 7, 8, 17, 18, 19, 20.
116 T 16 S, R 4 W. All land lying easterly of the crest of the Ajo Mountains.
T 16 S, R 3 W. all
T 16 S, R 2 W. "
T 16 S, R 1 W. "
T 16 S, R 1 E. "
T 16 S, R 2 E
T 16 S, R 3 E. all
T 16 S, R 4 E. "
T 16 S, R 5 E. "
T 16 S, R 6 E. Sec. 5, 6, 7, 8, 17 to 36

| | |
|---|---|
| T 16 S, R 7 E, | " 1, 2, 3, 10 to 15, 22 to 25, 29 to 34, 36, S/2 of Sec. 35; NE/4 Sec. 35, W/2 of NW/4 Sec. 35; SE/4 of NW/4 Sec. 35. |
| T 16 S, R 8 E, | Sec. 1 to 9, 11 to 24, 29, 30, 31, 32; N/2 Sec. 10, SE/4 Sec. 10, S/2 of SW/4 Sec. 10. |
| T 16 S, R 9 E, | Sec. 7 to 11, 16, 17, 18 |
| T 17 S, R 4 W | All land lying easterly of the crest at the Ajo Mts. |
| T 17 S, R 3 W, | all |
| T 17 S, R 2 W, | " |
| T 17 S, R 1 W, | " |
| T 17 S, R 1 E, | " |
| T 17 S, R 2 E, | " |
| T 17 S, R 3 E, | " |
| T 17 S, R 4 E, | " |
| T 17 S, R 5 E, | " |
| T 17 S, R 6 E, | " |
| T 17 S, R 7 E, | " |
| T 17 S, R 8 E, | Sec. 5, 6, 7, 8, 17, 18, 19, 20 |
| T 18 S, R 1 W, | all |
| T 18 S, R 1 E, | " |
| T 18 S, R 2 E, | " |
| T 18 S, R 3 E, | " |
| T 18 S, R 4 E, | " |
| T 18 S, R 5 E, | " |
| T 18 S, R 6 E, | " |
| T 18 S, R 7 E. | All land lying westerly of the crest of the Baboquivori Mts. |
| T 18 S, R 8 E, | same. |
| T 19 S, R 1 W, | all |
| T 19 S, R 1 E, | " |
| T 19 S, R 2 E, | " |
| T 19 S, R 3 E, | " |
| T 19 S, R 4 E, | " |
| T 19 S, R 5 E, | " |
| T 19 S, R 6 E, | " |
| T 19 S, R 7 E. | All land lying westerly of the crest of the Baboquivari Mts. |
| T 19 S, R 8 E. | same. |
| T 20 S, R 1 E, | all |
| T 20 S, R 2 E, | " |
| T 20 S, R 3 E, | " |
| T 20 S, R 4 E, | " |
| T 20 S, R 5 E, | " |
| T 20 S, R 6 E, | " |
| T 20 S, R 7 E, | All land lying westerly of the crest of the Baboquivari and Poso Verde Mts. |
| T 21 S, R 3 E, | all. |
| T 21 S, R 4 E, | " |
| T 21 S, R 5 E, | " |
| T 21 S, R 6 E, | " |

T 21 S, R 7 E, All land lying westerly of the crest of the Poso Verde Mts.
T 22 S, R 6 E, all
T 22 S, R 7 E, W/2
T 20 S, R 1 W, all

The foregoing reservation is hereby created with the understanding that all mineral lands within the reservation which have been or which may be shown to be such and subject to exploration, location and entry under the existing mining laws of the United States and the rules and regulations of the Secretary of the Interior applying thereto, shall continue to be subject to such exploration, location and entry notwithstanding the creation of this reservation; and townsites, necessary in connection with the development of the mineral resources of the reservation, may be located within the reservation under such rules and regulations as the Secretary of the Interior may prescribe, and patented under the provisions of the townsite laws of the United States: Provided, That nothing herein contained shall affect any existing legal right of any person to any of the lands herein described.

That part of Executive Order of May 28, 1912, withdrawing certain areas for use of the Chur-chaw, Cocklebur and Tat-murl-ma-kot Bands or Villages of Papago Indians be and the same hereby is revoked.

WOODROW WILSON

THE WHITE HOUSE,
*1 February, 1917.*

[No. 2524.]