**PUBLIC APPENDIX – SEALED MATERIAL IN SEPARATE SUPPLEMENT**

**No. 26-5306**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

TOHONO O'ODHAM NATION,

*Plaintiff-Appellant*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 4:26-cv-2127-RJL (Hon. Richard J. Leon)

---

**APPENDIX TO OPENING BRIEF OF APPELLANT**
**Volume I, Pages 1 to 379**

---

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634

Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant Tohono O'odham Nation*

(additional counsel listed on next page)

USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 2 of 388

Philip H. Tinker
KANJI & KATZEN, P.L.LC.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100

# TABLE OF CONTENTS

## VOLUME I

District Court Docket Sheet ..... 1

Complaint
Dkt. 1
Filed June 16, 2026 ..... 11

Motion for Preliminary Injunction of the Tohono O'odham Nation
Dkt. 3
Filed June 17, 2026 ..... 31

Declaration of Chairman Verlon M. Jose
Dkt. 3-2
Filed June 17, 2026 ..... 34

Declaration of Christopher T. Senseney, PhD. P.E.
Dkt. 3-3
Filed June 17, 2026 ..... 121

Declaration of Kendall Jose
Dkt. 3-4
Filed June 17, 2026 ..... 190

Declaration of James Cook
Dkt. 3-5
Filed June 17, 2026 ..... 211

Declaration of Samuel Fayuant
Dkt. 3-6
Filed June 17, 2026 ..... 228

Declaration of Eldellda Francisco
Dkt. 3-7
Filed June 17, 2026 ..... 261

Declaration of Laiken Jordahl
Dkt. 3-8
Filed June 17, 2026 ........................................................................264

Declaration of Gary Nabhan, PhD
Dkt. 3-9
Filed June 17, 2026 ........................................................................267

Declaration of Rebecca Ortega
Dkt. 3-10
Filed June 17, 2026 ........................................................................288

Declaration of Thomasa Rivas
Dkt. 3-11
Filed June 17, 2026 ........................................................................291

Declaration of Myles Traphagen
Dkt. 3-12
Filed June 17, 2026 ........................................................................296

Declaration of John Robert Welch, Ph.D
Dkt. 3-13
Filed June 17, 2026 ........................................................................319

Declaration of Mary Lucy Zazueta
Dkt. 3-14
Filed June 17, 2026 ........................................................................374

**<u>VOLUME II</u>**

Declaration of Riyaz A. Kanji
Dkt. 3-15
Filed June 17, 2026 ........................................................................380

Declaration of Benjamin S. Hollinder (Redacted)
Dkt. 18-1
Filed July 7, 2026 ..........................................................................617

Declaration of Paul Enriquez
Dkt. 18-2
Filed July 7, 2026 ....................................................................................624

Attachment A to Declaration of Paul Enriquez – 1907 Proclamation
Dkt. 18-3
Filed July 7, 2026 ....................................................................................647

Attachment B to Declaration of Paul Enriquez – 1937 Act
Dkt. 18-4
Filed July 7, 2026 ....................................................................................650

Attachment C to Declaration of Paul Enriquez – 1927 Statute
Dkt. 18-5
Filed July 7, 2026 ....................................................................................652

Attachment D to Declaration of Paul Enriquez – TON Legislative Council Resolution
Dkt. 18-6
Filed July 7, 2026 ....................................................................................655

Attachment E to Declaration of Paul Enriquez – 1934 Interior Opinion
Dkt. 18-7
Filed July 7, 2026 ....................................................................................661

Declaration of Paul Michael Ehlerman
Dkt. 26
Filed July 15, 2026 ..................................................................................677

Second Declaration of Riyaz A. Kanji
Dkt. 27
Filed July 15, 2026 ..................................................................................707

**<u>VOLUME III</u>**

Appendix A to Reply Memorandum of the Tohono O'odham Nation in Support of Its Motion for Preliminary Injunction
Dkt. 29
Filed July 15, 2026 ..................................................................................724

Appendix B to Reply Memorandum of the Tohono O'odham Nation in Support of Its Motion for Preliminary Injunction
Dkt. 29-1
Filed July 15, 2026 ....................................................................... 731

Transcript of Motion Hearing Held Before The Honorable Judge Richard J. Leon United States District Judge
Held July 22, 2026 ....................................................................... 734

Appendix to Supplemental Memorandum of the Tohono O'odham Nation in Support of Its Motion for Preliminary Injunction
Dkt. 37-1
Filed July 30, 2026 ....................................................................... 773

Declaration of Donna McMullen [Corrected]
Dkt. 39-2
Filed July 30, 2026 ....................................................................... 776

Notice of United States' Planned Activity on Tohono O'odham Reservation
Dkt. 41
Filed August 6, 2026 ....................................................................... 937

Attachment to Dkt. 41 – Email from S. Stoller
Dkt. 41-1
Filed August 6, 2026 ....................................................................... 941

Memorandum Opinion
Dkt. 45
Filed August 14, 2026 ....................................................................... 944

Order
Dkt. 46
Filed August 14, 2026 ....................................................................... 962

Notice of Appeal
Dkt. 48
Filed August 26, 2026 ....................................................................... 963

Motion of the Tohono O'odham Nation for Injunction Pending Appeal
Dkt. 50
Filed August 27, 2026 ....... 966

Appendix A & B to Memorandum of Points and Authorities in Support of the Tohono O'odham Nation's Motion for Injunction Pending Appeal
Dkt. 50-2
Filed August 27, 2026 ....... 969

Second Declaration of James Cook
Dkt. 50-3
Filed August 27, 2026 ....... 979

Declaration of Beverly Matthews
Dkt. 50-4
Filed August 27, 2026 ....... 1010

Third Declaration of Riyaz A. Kanji
Dkt. 50-5
Filed August 27, 2026 ....... 1053

**SEALED MATERIAL IN SEPARATE SUPPLEMENT**

SEALED Declaration of Benjamin Hollinder
Dkt. 24
Filed July 24, 2026 ....... 1059

SEALED Motion of the Tohono O'odham Nation to Strike Declaration of Benjamin S. Hollinder
Dkt. 32-1
Filed July 20, 2026 ....... 1066

Second Declaration of Paul Michael Ehlerman
Dkt. 32-2
Filed July 20, 2026 ....... 1078

SEALED Second Declaration Benjamin Hollinder
Dkt. 42-1
Filed August 6, 2026 ....... 1128

Dated: September 16, 2026

Respectfully submitted,

/s/ Riyaz A. Kanji
Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
jhandelsman@kanjikatzen.com
ajoshi@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.LC.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Appellant Tohono O'odham Nation*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2026, I electronically filed the foregoing Appendix with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

APPEAL,TYPE-D

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:26-cv-02127-RJL

TOHONO O'ODHAM NATION v. MULLIN et al
Assigned to: Judge Richard J. Leon
Demand: $0
Case in other court: USCA, 26-05306
Cause: 28:1331 Fed. Question

Date Filed: 06/16/2026
Jury Demand: None
Nature of Suit: 240 Torts to Land
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**TOHONO O'ODHAM NATION**
*a federally recognized Indian tribe*

represented by

**David A Giampetroni**
KANJI & KATZEN, PLLC
PO Box 3971
Ann Arbor, MI 48106
734-769-5400
Email: dgiampetroni@kanjikatzen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Howard Shanker**
TOHONO O'ODHAM NATION
Office of Attorney General
PO Box 830
Sells, AZ 85634
520-383-3410
Email: howard.shanker@tonation-nsn.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Logan Takao Cooper**
TOHONO O'ODHAM NATION
Office of Attorney General
PO Box 830
Sells, AZ 85634
520-954-9146
Email: logan.cooper@tonation-nsn.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip H Tinker**
KANJI & KATZEN, PLLC
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
206-344-8100
Email: ptinker@kanjikatzen.com
*ATTORNEY TO BE NOTICED*

**Riyaz A. Kanji**
KANJI & KATZEN, PLLC
P.O. Box 3971
Ann Arbor, MI 48106
734-769-5400
Email: rkanji@kanjikatzen.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **MARKWAYNE MULLIN**<br>*in his official capacity as Secretary of U.S. Department of Homeland Security* | represented by | **Stacy R. Stoller**<br>DOJ-ENRD<br>950 Pennsylvania Ave NW<br>Washington, DC 20530<br>202-598-3555<br>Email: stacy.stoller@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Adam R.F. Gustafson**<br>DOJ-Enrd<br>Environment and Natural Resources Division<br>950 Pennsylvania Ave NW<br>Washington, DC 20530<br>202-718-0703<br>Email: adam.gustafson@usdoj.gov<br>*ATTORNEY TO BE NOTICED*<br><br>**Andrew Block**<br>DOJ-OASG<br>Office of the Associate Attorney General<br>950 Pennsylvania Ave., NW<br>Washington, DC 20530<br>202-372-7565<br>Email: andrew.block@usdoj.gov<br>*ATTORNEY TO BE NOTICED*<br><br>**Bradley Thomas Craigmyle**<br>DOJ-Enrd<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br>202-532-3150<br>Email: bradley.craigmyle@usdoj.gov<br>*ATTORNEY TO BE NOTICED*<br><br>**Marissa Ann Piropato**<br>U.S. DEPARTMENT OF JUSTICE<br>ENRD<br>P.O. Box 7611<br>Washington, DC 20044-7611 |

(202) 305-0470
Email: marissa.piropato@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Shawn Ren**
DOJ-ENRD
999 18th St.
N. Terrace
Suite 600
Denver, CO 80202
202-598-3141
Fax: 303-844-1350
Email: shawn.ren2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**RODNEY SCOTT**
*in his official capacity as Commissioner of U.S. Customs and Border Protection*

represented by **Stacy R. Stoller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R.F. Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Block**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Thomas Craigmyle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shawn Ren**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROSARIO VASQUEZ**
*in his official capacity as Chief of U.S. Border Patrol*

represented by **Stacy R. Stoller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam R.F. Gustafson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Block**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Thomas Craigmyle**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa Ann Piropato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shawn Ren**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**WARREN PETERSEN** represented by **S. Lee Whitesell**
FUSION LAW
3515 Urban Woods Trail
Houston, TX 77008
856-364-6090
Email: slw@fusion.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STEVE MONTENEGRO** represented by **S. Lee Whitesell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/16/2026 | 1 | COMPLAINT against MARKWAYNE MULLIN, RODNEY SCOTT, ROSARIO VASQUEZ ( Filing fee $ 405 receipt number ADCDC-12491722) filed by TOHONO O'ODHAM NATION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons issued for Markwayne Mullin, # 3 Summons issued for Rodney Scott, # 4 Summons issued for Rosario Vasquez, # 5 Summons issued for U.S. Attorney, # 6 Summons issued for U.S. Attorney General)(Kanji, Riyaz) (Entered: 06/16/2026) |
| 06/16/2026 | 2 | NOTICE of Appearance by Riyaz A. Kanji on behalf of TOHONO O'ODHAM NATION (Kanji, Riyaz) (Entered: 06/16/2026) |
| 06/17/2026 | 3 | MOTION for Preliminary Injunction by TOHONO O'ODHAM NATION. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Chairman Verlon M. Jose, # 3 Declaration of Christopher T. Senseney, PhD. P.E., # 4 Declaration of Kendall Jose, # 5 Declaration of James Cook, # 6 Declaration of Samuel Fayuant, # 7 Declaration of Eldellda Francisco, # 8 Declaration of Laiken Jordahl, # 9 Declaration of Gary Nabhan, Ph.D, # 10 Declaration of Rebecca Ortega, # 11 Declaration of Thomasa Rivas, # 12 Declaration of Myles Traphagen, # 13 Declaration of John Robert Welch, Ph.D, # 14 Declaration of Mary Lucy Zazueta, # 15 Declaration of Riyaz A. Kanji, # 16 Text of Proposed Order)(Kanji, Riyaz) (Entered: 06/17/2026) |
| 06/17/2026 | | Case Assigned to Judge Richard J. Leon. (zmtm) (Entered: 06/17/2026) |

USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 14 of 388

| | | |
|---|---|---|
| 06/17/2026 | 4 | SUMMONS (5) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 06/17/2026) |
| 06/17/2026 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- David A. Giampetroni, Filing fee $ 100, receipt number ADCDC-12493101. Fee Status: Fee Paid. by TOHONO O'ODHAM NATION. (Attachments: # 1 Declaration of David A. Giampetroni in Support, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Kanji, Riyaz) (Entered: 06/17/2026) |
| 06/17/2026 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Philip H. Tinker, Filing fee $ 100, receipt number ADCDC-12493127. Fee Status: Fee Paid. by TOHONO O'ODHAM NATION. (Attachments: # 1 Declaration of Philip H. Tinker, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Kanji, Riyaz) (Entered: 06/17/2026) |
| 06/17/2026 | 7 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Christopher C. Miller, Filing fee $ 100, receipt number ADCDC-12493137. Fee Status: Fee Paid. by TOHONO O'ODHAM NATION. (Attachments: # 1 Declaration of Christopher C. Miller in Support, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Kanji, Riyaz) (Entered: 06/17/2026) |
| 06/17/2026 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Howard M. Shanker, Filing fee $ 100, receipt number ADCDC-12493175. Fee Status: Fee Paid. by TOHONO O'ODHAM NATION. (Attachments: # 1 Declaration of Howard M. Shanker in Support, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Kanji, Riyaz) (Entered: 06/17/2026) |
| 06/18/2026 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Logan Takao Cooper, Filing fee $ 100, receipt number ADCDC-12495858. Fee Status: Fee Paid. by TOHONO O'ODHAM NATION. (Attachments: # 1 Declaration of Logan Takao Cooper in Support, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Kanji, Riyaz) (Entered: 06/18/2026) |
| 06/18/2026 | | MINUTE ORDER. Regarding plaintiff's 3 Motion for a Preliminary Injunction, the parties are hereby ORDERED to confer and file a joint status report proposing a briefing schedule for plaintiff's motion by June 23, 2026. Per Local Civil Rule 65.1(d), the Court finds that a later hearing date will not prejudice the parties. Accordingly, the Court will hold a hearing on the motion on July 22, 2026 at 4:00 PM in Courtroom 18 (In Person) before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon on 6/18/2026. (lcrjl2) (Entered: 06/18/2026) |
| 06/22/2026 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 6/18/2026. Answer due for ALL FEDERAL DEFENDANTS by 8/17/2026. (Kanji, Riyaz) (Entered: 06/22/2026) |
| 06/23/2026 | | MINUTE ORDER. Upon consideration of the 5 6 7 8 9 Motions for Admission of Attorney Pro Hac Vice, it is hereby ORDERED that the motions are GRANTED. It is further ORDERED that David A. Giampetroni, Philip H. Tinker, Christopher C. Miller, Howard M. Shanker, and Logan Takao Cooper be, and hereby are, admitted pro hac vice in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. SO ORDERED. Signed by Judge Richard J. Leon on 6/23/2026. (lcrjl2) (Entered: 06/23/2026) |
| 06/23/2026 | 11 | Joint STATUS REPORT by TOHONO O'ODHAM NATION. (Kanji, Riyaz) (Entered: 06/23/2026) |
| 06/24/2026 | | MINUTE ORDER. Regarding the parties' 11 Joint Status Report, it is hereby ORDERED that the following briefing schedule shall apply: Defendants' response to plaintiff's 3 |

USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 15 of 388

| | | |
|---|---|---|
| | | Motion for Preliminary Injunction due July 7, 2026. Plaintiff's reply due July 14, 2026. SO ORDERED. Signed by Judge Richard J. Leon on 6/24/2026. (lcrjl2) (Entered: 06/24/2026) |
| 06/25/2026 | 12 | NOTICE of Appearance by David A Giampetroni on behalf of TOHONO O'ODHAM NATION (Giampetroni, David) (Entered: 06/25/2026) |
| 06/25/2026 | 13 | NOTICE of Appearance by Philip H Tinker on behalf of TOHONO O'ODHAM NATION (Tinker, Philip) (Entered: 06/25/2026) |
| 06/25/2026 | 14 | NOTICE of Appearance by Howard Shanker on behalf of TOHONO O'ODHAM NATION (Shanker, Howard) (Entered: 06/25/2026) |
| 06/25/2026 | 15 | NOTICE of Appearance by Logan Takao Cooper on behalf of TOHONO O'ODHAM NATION (Takao Cooper, Logan) (Entered: 06/25/2026) |
| 07/07/2026 | 16 | Unopposed MOTION for Leave to File Amicus Brief *by Arizona Senate President Warren Petersen and Arizona Speaker of the House of Representatives Steve Montenegro in Support of Defendants and in Opposition to Plaintiffs Motion for Preliminary Injunction* by WARREN PETERSEN, STEVE MONTENEGRO. (Attachments: # 1 Proposed Brief, # 2 Text of Proposed Order Proposed Order)(Whitesell, S.) (Entered: 07/07/2026) |
| 07/07/2026 | 17 | NOTICE of Appearance by Stacy R. Stoller on behalf of All Defendants (Stoller, Stacy) (Entered: 07/07/2026) |
| 07/07/2026 | 18 | Memorandum in opposition to re 3 MOTION for Preliminary Injunction *by Federal Defendants* filed by MARKWAYNE MULLIN. (Attachments: # 1 Affidavit Hollinder Declaration, # 2 Affidavit Enriquez Declaration, # 3 Exhibit Attachment A - Roosevelt Proclamation, # 4 Exhibit Attachment B - 1937 Act, # 5 Exhibit Attachment C - 1927 Act, # 6 Exhibit Attachment D - Res. No. 04-095, # 7 Exhibit M-Opinion 27656, # 8 Text of Proposed Order)(Stoller, Stacy) (Entered: 07/07/2026) |
| 07/08/2026 | 19 | NOTICE *of Filing Corrected Memorandum (Dkt. # 18) in Opposition to Motion for Preliminary Injunction (Dkt. # 3)* by MARKWAYNE MULLIN re 18 Memorandum in Opposition, (Attachments: # 1 Exhibit Corrected Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction)(Stoller, Stacy) (Entered: 07/08/2026) |
| 07/08/2026 | | MINUTE ORDER. Upon consideration of the 16 Motion for Leave to File Amicus Brief, it is hereby ORDERED that the Motion is GRANTED. The proposed amicus brief attached as Exhibit 1 to the 13 Motion is deemed filed with the Court upon entry of this order. SO ORDERED. Signed by Judge Richard J. Leon on 7/8/2026. (lcrjl2) (Entered: 07/08/2026) |
| 07/08/2026 | 20 | AMICUS BRIEF by STEVE MONTENEGRO, WARREN PETERSEN. (mg) (Entered: 07/08/2026) |
| 07/09/2026 | 21 | Unopposed MOTION for Protective Order by MARKWAYNE MULLIN. (Attachments: # 1 Text of Proposed Order)(Stoller, Stacy) (Entered: 07/09/2026) |
| 07/09/2026 | 22 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by MARKWAYNE MULLIN (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Affidavit, # 2 Text of Proposed Order)(Stoller, Stacy) (Entered: 07/09/2026) |
| 07/14/2026 | 23 | PROTECTIVE ORDER. See attached for details. Signed by Judge Richard J. Leon on 7/13/2026. (lcrjl2) Modified on 7/14/2026 (zcll). (Entered: 07/14/2026) |
| 07/14/2026 | | MINUTE ORDER granting 22 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Richard J. Leon on 7/14/2026. (lcrjl2) (Entered: 07/14/2026) |
| 07/14/2026 | 24 | SEALED DOCUMENT (AFFIDAVIT) filed by MARKWAYNE MULLIN. (This document is SEALED and only available to authorized persons.)(mg) (Entered: |

| | | |
|---|---|---|
| | | 07/14/2026) |
| 07/14/2026 | 25 | REPLY to opposition to motion re 3 Motion for Preliminary Injunction,, filed by TOHONO O'ODHAM NATION. (Kanji, Riyaz) (Entered: 07/15/2026) |
| 07/14/2026 | 30 | ENTERED IN ERROR.....SEALED DOCUMENT (DECLARATION) filed by MARKWAYNE MULLIN. (This document is SEALED and only available to authorized persons.)(mg) Modified on 7/20/2026, filed at docket entry 24 (mg). (Entered: 07/20/2026) |
| 07/15/2026 | 26 | DECLARATION *of Paul Michael Ehlerman* by TOHONO O'ODHAM NATION re 25 Reply to opposition to Motion. (Kanji, Riyaz) (Entered: 07/15/2026) |
| 07/15/2026 | 27 | DECLARATION *of Riyaz A. Kanji* by TOHONO O'ODHAM NATION re 25 Reply to opposition to Motion. (Kanji, Riyaz) (Entered: 07/15/2026) |
| 07/15/2026 | 28 | Unopposed MOTION to File Declarations in Reply in Support of Motion for Preliminary Injunction by TOHONO O'ODHAM NATION. (Attachments: # 1 Text of Proposed Order)(Kanji, Riyaz) (Entered: 07/15/2026) |
| 07/15/2026 | 29 | NOTICE *of filing of Appendix A* by TOHONO O'ODHAM NATION re 25 Reply to opposition to Motion (Attachments: # 1 Appendix B)(Kanji, Riyaz) (Entered: 07/15/2026) |
| 07/20/2026 | 31 | NOTICE of Appearance by Adam R.F. Gustafson on behalf of All Defendants (Gustafson, Adam) (Entered: 07/20/2026) |
| 07/20/2026 | 32 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by TOHONO O'ODHAM NATION (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Motion to Strike Declaration of Benjamin S. Hollinder, # 2 Declaration of Paul Michael Ehlerman, # 3 Text of Proposed Order re Sealed Motion to Strike Declaration of Benjamin S. Hollinder, # 4 Text of Proposed Order re Unopposed Motion for Leave to File Motion to Strike the Declaration of Benjamin S. Hollinder)(Kanji, Riyaz) (Entered: 07/20/2026) |
| 07/21/2026 | | MINUTE ORDER. Upon consideration of plaintiff's 28 Motion to File Declarations in Reply in Support of Motion for Preliminary Injunction, it is hereby ORDERED that the motion is GRANTED. SO ORDERED. Signed by Judge Richard J. Leon on 7/21/2026. (lcrjl2) (Entered: 07/21/2026) |
| 07/21/2026 | 33 | NOTICE of Appearance by Bradley Thomas Craigmyle on behalf of All Defendants (Craigmyle, Bradley) (Entered: 07/21/2026) |
| 07/22/2026 | 34 | NOTICE of Appearance by Andrew Block on behalf of All Defendants (Block, Andrew) (Entered: 07/22/2026) |
| 07/22/2026 | | Minute Entry for Motion Hearing held before Judge Richard J. Leon on July 22, 2026. Oral arguments submitted on Plaintiff's 3 Motion for Preliminary Injunction. The Court takes the matter under advisement. Upon receipt of the transcript of this hearing, each side may have one week to submit supplemental pleadings in light of today's hearing. These submissions shall not exceed ten pages in length. (Court Reporter: Rebecca Monroe.) (hmj) (Entered: 07/22/2026) |
| 07/23/2026 | | MINUTE ORDER. Per the Court's July 22, 2026 Order, and given the parties' receipt of the preliminary injunction hearing transcript on July 23, 2026, it is hereby ORDERED that the parties shall submit supplemental briefs by 5:00 PM on July 30, 2026. SO ORDERED. Signed by Judge Richard J. Leon on 7/23/2026. (lcrjl1) (Entered: 07/23/2026) |
| 07/28/2026 | | MINUTE ORDER granting 32 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Richard J. Leon on 7/28/2026. (lcrjl2) (Entered: 07/28/2026) |

| | | |
|---|---|---|
| 07/28/2026 | 35 | SEALED MOTION to Strike filed by TOHONO O'ODHAM NATION. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(mg) (Entered: 07/29/2026) |
| 07/30/2026 | 36 | NOTICE of Appearance by Marissa Ann Piropato on behalf of All Defendants (Piropato, Marissa) (Entered: 07/30/2026) |
| 07/30/2026 | 37 | SUPPLEMENTAL MEMORANDUM to re Order,, Scheduling Order, filed by TOHONO O'ODHAM NATION. (Attachments: # 1 Appendix)(Kanji, Riyaz) (Entered: 07/30/2026) |
| 07/30/2026 | 38 | MEMORANDUM re Order,, Scheduling Order, by MARKWAYNE MULLIN, RODNEY SCOTT, ROSARIO VASQUEZ. (Attachments: # 1 Affidavit)(Piropato, Marissa) (Entered: 07/30/2026) |
| 07/30/2026 | 39 | ERRATA *Declaration* by MARKWAYNE MULLIN, RODNEY SCOTT, ROSARIO VASQUEZ re Order,, Scheduling Order,. (Attachments: # 1 Exhibit Supplemental Memorandum, # 2 Exhibit Corrected Declaration)(Piropato, Marissa) (Entered: 07/30/2026) |
| 08/03/2026 | 40 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by MARKWAYNE MULLIN, RODNEY SCOTT, ROSARIO VASQUEZ (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Text of Proposed Order, # 2 Exhibit DEFENDANTS SEALED MEMORANDUM OF POINTS AND AUTHORITIES, # 3 Exhibit Declaration, # 4 Text of Proposed Order)(Piropato, Marissa) (Entered: 08/03/2026) |
| 08/06/2026 | | MINUTE ORDER granting 40 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Richard J. Leon on 8/6/2026. (lcrjl2) (Entered: 08/06/2026) |
| 08/06/2026 | 41 | NOTICE *of United States' Planned Activity on Tohono O'odham Reservation* by TOHONO O'ODHAM NATION (Attachments: # 1 Exhibit Email)(Kanji, Riyaz) (Entered: 08/06/2026) |
| 08/06/2026 | 42 | SEALED OPPOSITION filed by MARKWAYNE MULLIN, RODNEY SCOTT, ROSARIO VASQUEZ re 35 Sealed Motion (Attachments: # 1 Declaration)(mg) (Entered: 08/07/2026) |
| 08/10/2026 | 43 | TRANSCRIPT OF PROCEEDINGS before Judge Richard J. Leon held on 07/22/2026; Page Numbers: 1 through 47. Date of Issuance:8/10/2026. Court Reporter/Transcriber Rebecca Monroe, email: rebecca_monroe@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/31/2026. Redacted Transcript Deadline set for 9/10/2026. Release of Transcript Restriction set for 11/8/2026.(Monroe, Rebecca) (Entered: 08/10/2026) |

| | | |
|---|---|---|
| 08/12/2026 | 44 | RESPONSE re 41 Notice by MARKWAYNE MULLIN, RODNEY SCOTT, ROSARIO VASQUEZ. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Piropato, Marissa) Modified event on 8/27/2026 (mg). (Entered: 08/12/2026) |
| 08/14/2026 | 45 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 8/13/2026. (lcrjl2) (Entered: 08/14/2026) |
| 08/14/2026 | 46 | ORDER denying 3 Motion for Preliminary Injunction. See attached for details. Signed by Judge Richard J. Leon on 8/13/2026. (lcrjl2) (Entered: 08/14/2026) |
| 08/14/2026 | 47 | MOTION for Extension of Time to File Answer re 1 Complaint, by MARKWAYNE MULLIN. (Attachments: # 1 Text of Proposed Order)(Stoller, Stacy) (Entered: 08/14/2026) |
| 08/17/2026 | | MINUTE ORDER. Upon consideration of defendants' 47 Unopposed Motion for Extension of Time, it is hereby ORDERED that the motion is GRANTED. Defendants shall answer or otherwise respond to the 1 Complaint by September 14, 2026. SO ORDERED. Signed by Judge Richard J. Leon on 8/17/2026. (lcrjl2) (Entered: 08/17/2026) |
| 08/26/2026 | 48 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 46 Order on Motion for Preliminary Injunction by TOHONO O'ODHAM NATION. Filing fee $ 605, receipt number ADCDC-12635578. Fee Status: Fee Paid. (Kanji, Riyaz) (Entered: 08/26/2026) |
| 08/27/2026 | 49 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 48 Notice of Appeal to DC Circuit Court. (mg) (Entered: 08/27/2026) |
| 08/27/2026 | 50 | MOTION for Preliminary Injunction *Pending Appeal* by TOHONO O'ODHAM NATION. (Attachments: # 1 Memorandum in Support, # 2 Appendix A & B, # 3 Declaration of James Cook, # 4 Declaration of Beverly Matthews, # 5 Declaration of Riyaz A. Kanji, # 6 Text of Proposed Order)(Kanji, Riyaz) (Entered: 08/27/2026) |
| 08/27/2026 | | USCA Case Number 26-5306 for 48 Notice of Appeal to DC Circuit Court filed by TOHONO O'ODHAM NATION. (mg) (Entered: 08/28/2026) |
| 09/01/2026 | 51 | NOTICE of Appearance by Shawn Ren on behalf of All Defendants (Ren, Shawn) (Entered: 09/01/2026) |
| 09/01/2026 | 52 | NOTICE *of Intent to Respond* by MARKWAYNE MULLIN, RODNEY SCOTT, ROSARIO VASQUEZ re 50 Motion for Preliminary Injunction, (Ren, Shawn) (Entered: 09/01/2026) |
| 09/10/2026 | 53 | Memorandum in opposition to re 50 MOTION for Preliminary Injunction *Pending Appeal* filed by MARKWAYNE MULLIN. (Attachments: # 1 Text of Proposed Order)(Stoller, Stacy) (Entered: 09/10/2026) |
| 09/11/2026 | 54 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 06/23/2026. (Kanji, Riyaz) (Entered: 09/11/2026) |
| 09/11/2026 | 55 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARKWAYNE MULLIN served on 6/22/2026 (Kanji, Riyaz) (Entered: 09/11/2026) |
| 09/11/2026 | 56 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RODNEY SCOTT served on 6/22/2026 (Kanji, Riyaz) (Entered: 09/11/2026) |
| 09/11/2026 | 57 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ROSARIO VASQUEZ served on 6/22/2026 (Kanji, Riyaz) (Entered: 09/11/2026) |

USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 19 of 388

| | | |
|---|---|---|
| 09/11/2026 | 58 | Unopposed MOTION for Extension of Time to File Answer *or Otherwise Respond* by MARKWAYNE MULLIN, RODNEY SCOTT, ROSARIO VASQUEZ. (Attachments: # 1 Text of Proposed Order)(Ren, Shawn) (Entered: 09/11/2026) |

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/15/2026 10:15:54 | | | |
| **PACER Login:** | cnhall0426 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-02127-RJL |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,
P.O. Box 837
Sells, AZ 85634

*Plaintiff*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security,
2707 Martin Luther King Jr Avenue, SE
Washington, DC 20528;

RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection,
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, DC 20229;

and

ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, DC 20229

*Defendants*.

Case No. 26-cv-2127

**COMPLAINT**

## INTRODUCTION

1. The Tohono O'odham Nation ("Nation") brings this suit to enjoin the Secretary of the United States Department of Homeland Security (the "Department") and other high-ranking officials in the Department (collectively, the "Secretary")[1] from directing the construction of sixty-two miles of border wall across the Nation's Reservation (and the associated destruction of Reservation resources) without the Nation's consent. Specifically, the Nation asks this Court to prohibit the Secretary from: (1) diminishing the boundaries of the Nation's Reservation in violation of clear statutory text and constitutional separation of powers principles that proscribe such diminishment absent the express assent of Congress; and (2) trespassing on the Nation's lands by authorizing and directing the destructive use and occupancy of those lands over the Nation's strenuous objections.

2. The Nation has beneficial ownership of a 2.8-million-acre Reservation in the Sonoran Desert in Arizona, the southern boundary of which is co-extensive with approximately sixty-two miles of the international border with Mexico. Historically, the Nation's aboriginal lands and communities extended well north and south of the international line, and the establishment of that line in 1854 did not sever the Nation's cross-border ties. Today, there still exist seventeen O'odham communities and several thousand Nation members residing in Mexico, and Nation members regularly cross the border at multiple points (with the Department's knowledge) for important religious, family, and practical reasons.

---

[1] This Complaint uses the term "Secretary" to encompass Defendant Mullin as well as his subordinates, employees, and agents, including Defendants Scott and Vasquez, except where context makes clear that the reference is to the Secretary alone.

3. Given its location, the Nation has long had a critical interest in border security measures and cooperates extensively with the federal government on them. It allows the Department to maintain residential operating bases, cutting-edge fixed and mobile surveillance technology, and sophisticated vehicle barriers stretching the length of the Reservation border except where the terrain does not allow. The Nation also participates in multi-agency task forces that have experienced considerable success in interdicting both human and drug trafficking operations. Illegal crossings of the border on the Reservation are presently at record lows.

4. While the Nation values its close relationship with the Department, it has long opposed construction of a border wall on the Reservation. The Nation understands that construction of the wall would entail significant devastation on the Reservation, including the destruction of mountain peaks sacred to the O'odham. It would fray the ties between O'odham communities and families on opposite sides of the border, interfere significantly with O'odham religious rituals and practices, and destroy plant and animal resources sacred to the O'odham. Events as recent as two months ago in which Department contractors destroyed ancestral sites of great importance while constructing the wall in areas adjacent to the Reservation have only confirmed to the Nation the wisdom of not sanctioning construction of the wall across it.

5. The Department, however, has insisted on moving forward. On May 15, 2026, the Department advised the Nation that it was releasing contract solicitations (that same day) for the construction of a primary and secondary border wall and associated infrastructure on the Reservation. The Department has since released further contract specifications, and is targeting a construction award in June 2026.

6. The Secretary lacks the power to unilaterally alter the Nation's Reservation boundaries and indeed is flatly prohibited from doing so by longstanding legislation, which

provides that "[c]hanges in the boundaries of [Indian] reservations … *shall not be made except by Act of Congress*." 25 U.S.C. § 398d (emphasis added). That statute in turn reflects constitutional separation of powers principles by which the authority to adjust reservation boundaries lies solely within the province of Congress. The Secretary's actions accordingly are ultra vires.

7. Construction of the border wall and associated infrastructure will require the blasting and grading of mountain peaks that lie in the wall's path, and the building of miles of access roads and multiple staging yards (complete with concrete batching plants) that will stretch far inland from the border, all of which will be done in trespass and have a permanent, scarring impact on Reservation lands.

8. The harms resulting to the Nation and its members if the Secretary is allowed to proceed with his plans will be serious and irreparable, and they cannot be justified by appeals to border security or other considerations. "Our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 594 U.S. 758, 766 (2021) (per curiam). The Nation accordingly comes to this Court seeking relief against the Secretary's further pursuit of illegal activity on its Reservation.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362 because the Nation maintains a government-to-government relationship with the United States and its governing body is duly recognized by the Secretary of the Interior, and because the Nation asserts claims under the Constitution, laws, or treaties of the United States.

10. The Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of

Civil Procedure, 28 U.S.C. §§ 1651, 2201–02, and the Court's inherent equitable powers.

7. Venue is proper in this District because each Defendant is an officer of the United States sued in his official capacity. 28 U.S.C. § 1391(e)(1).

## PARTIES

### Plaintiff

8. The Nation is a federally recognized Indian tribe with a government-to-government relationship with the United States and whose governing body is duly recognized by the Secretary of the Interior. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 91 Fed. Reg. 4102, 4105 (Jan. 30, 2026).

9. The Nation enjoys sovereignty and jurisdiction over its approximately 37,000 members and its 2.8-million-acre Reservation located in southern Arizona, which Reservation was established by Executive Orders of President Wilson on January 14, 1916 and February 1, 1917, and the boundaries of which were thereafter statutorily ratified and enlarged by Congress.

### Defendants

10. Defendant Markwayne Mullin is the Secretary of the United States Department of Homeland Security (the "Department") and is sued in his official capacity. He is the federal official ultimately responsible under federal law for ensuring that the activities of the Department and its constituent agencies are carried out in compliance with federal law, and he possesses significant responsibilities with respect to the Department's border wall construction activity and planning.

11. Defendant Rodney Scott is Commissioner of United States Customs and Border Protection ("CBP") and is sued in his official capacity. He is responsible under federal law for ensuring that the activities of CBP, a constituent agency of the Department, are carried out in

compliance with federal law, and he possesses significant responsibilities with respect to the Department's border wall construction activity and planning.

12. Defendant Rosario Vasquez is Chief of the United States Border Patrol ("Border Patrol") and is sued in his official capacity. He is responsible under federal law for ensuring that the activities of Border Patrol, an agency within CBP, are carried out in compliance with federal law, and he possesses significant responsibilities with respect to the Department's border wall construction activity and planning.

## FACTUAL AND LEGAL BACKGROUND

### The Nation's Reservation

13. The Nation exercises sovereignty and jurisdiction over its approximately 2.8-million-acre Reservation in the Sonoran Desert in Arizona, the southern boundary of which is co-extensive with approximately sixty-two-miles of the U.S.-Mexico international border:




**FIGURE 1**

14. President Wilson initially established the Nation's main Reservation by Executive Order on January 14, 1916, setting apart approximately 2.8 million acres for the exclusive use

and occupancy of the Nation (then referred to by the United States as the "Papago Indians"). *See* S. Doc. No. 70-53, at 1008–11 (1929) ("1916 Executive Order").[2]

15. The following year, President Wilson reduced the size of the Reservation to approximately 2.3 million acres by excluding certain lands from the northern portion of the Reservation (which Congress would later restore in 1931). *See id.* at 1005–08 ("1917 Executive Order").

16. The southern boundary of the Reservation remained unchanged between the 1916 and 1917 Executive Orders. The 1917 Executive Order became the operative Order.

17. The 1917 Executive Order provides in pertinent part that "all surveyed land and all unsurveyed land … within the townships and ranges listed below be, and the same hereby are, withdrawn and set apart as a reservation for the benefit of the Papago Indians in Arizona[.]" *Id.* at 1005.

18. The listed townships and ranges in both the 1916 and 1917 Executive Orders that form the southern boundary of the Reservation—all lands within which were reserved to the Nation—are contiguous with the U.S.-Mexico international border.

19. On May 25, 1918, Congress expressly ratified the southern boundary of the Reservation as being co-extensive with the international border when it appropriated funds "[f]or the construction of a fence along the international boundary line between Mexico and the Papago Indian Reservation, in Arizona[.]" Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561, 569.

20. Department of the Interior officials shared Congress's understanding that the Nation's southern boundary was contiguous with the international border. In a 1918

[2] https://bit.ly/4oBmpno.

correspondence discussing "the construction of the fence along the International Boundary line between Mexico and the Papago Indian Reservation," for example, United States Indian Service engineers declared that the "lines of the reservation, established in January 1917" were contiguous with the international boundary as marked by the monuments of "the International Boundary Commission." A letter from the Commissioner of Indian Affairs that same year similarly referred to the "international boundary line between Mexico and the Papago Indian Reservation."

21. On March 3, 1927, Congress enacted a statute providing that "[c]hanges in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." 25 U.S.C. § 398d.

22. In 1928, Congress again expressly ratified the Nation's Reservation boundaries as extending to the international border when it appropriated funds for "the construction of a fence on or near the east boundary of the Papago Indian Reservation, Arizona, beginning at the International boundary line and extending in a northerly direction for approximately sixty miles[.]" Act of May 21, 1928, ch. 645, 45 Stat. 617, 617.

23. Congress has enacted several statutes changing the boundaries of the Nation's Reservation, adding tracts of land to it in 1926, 1931, 1937, 1939, and 1978. Those acts likewise statutorily ratified the Reservation boundaries while enlarging them.

**The Nation's Aboriginal Territory**

24. The Nation's Reservation was established in recognition of and within the boundaries of its broader aboriginal territory, which, as shown in the shaded portion of Figure 1 above, extends throughout much of present-day southern Arizona and into Mexico.

25. The present international border was established in 1854 when Mexico ceded the area to the United States by way of the Gadsden Purchase Treaty of December 30, 1853, 10 Stat. 1031 (ratified June 30, 1854).

26. That border bisected the Nation's aboriginal territory, though the Nation has since continued to thrive as an integrated tribal community throughout that territory on both sides of the international border.

27. Today, as Nation Chairman Verlon Jose testified to Congress in 2024:

> Seventeen O'odham communities with approximately 2,000 members are still located in our historical homelands in Mexico. O'odham on both sides of the border share the same language, culture, religion and history, and we continue to cross the border for sacred pilgrimages and ceremonies at important religious and cultural sites.[3]

28. Many O'odham families retain deeply rooted connections to Mexico. They have family there. They bury their dead in ancestral cemeteries there, which they visit regularly so that the dead know they are not forgotten, and because there are religious duties the O'odham must fulfill in the years following the loss of a loved one.

29. Nation members cross the border for festivals, ceremonies, and other traditional cultural gatherings that bring O'odham communities together, including the Vígítha ceremony that takes place each July in the village of Quitovac in Mexico. They also maintain strong political ties between the O'odham communities in the United States and Mexico, and the Nation has long formally recognized and supported the Mexican O'odham community's traditional form of government.

---

[3] *Examining the Impacts of International Cartels Targeting Indian Country Before the Subcomm. on Oversight & Investigations of the H. Comm. on Nat. Res.*, 118th Cong. 1 (2024) (testimony of Hon. Verlon Jose, Chairman, Tohono O'odham Nation) ("Jose Congressional Testimony").

30. Historically, travel was integral to O'odham religious practices, and that remains so today. Many O'odham traditional practices involve running across the sacred landscape on both sides of the border, including, for example, the annual Baboquivari Run. Baboquivari Mountain is the center of the universe for the O'odham community, home of the Creator, I'itoi. Every year, following an ancient trail that has been used for centuries, the runners travel from Pozo Verde in Mexico to Baboquivari Mountain on the Reservation to perform a blessing to I'itoi. Where that trail crosses the border, they cross too (with the knowledge and cooperation of Border Patrol). Likewise, each year, a group of O'odham boys crosses the border as part of the Salt Run, in which they pass among important religious landmarks while traveling from the Reservation to the Sea of Cortez in Mexico.

31. The Magdalena Pilgrimage, which takes place every fall, involves O'odham pilgrims walking from the Reservation to the town of Magdalena de Kino in Mexico to pay homage to the town's patron saint of San Francisco Javier. And every July, O'odham from the Reservation attend the Feast of Our Lady of Mount Carmel at the Catholic church in Sonora, an important mass where they perform Catholic and traditional songs and rain dances to encourage rain to fall in their desert environment.

32. Pursuing its constitutionally enshrined ability "to show our gratitude to I'itoi our Maker," Tohono O'odham Const., pmbl., to "provide for … morals … of the Tohono O'odham Nation and its members," *id.* art. VI, § 1(c)(2), and to "preserve and cultivate native … traditions," *id.* § 1(c)(8), the Nation officially fosters these traditional cross-border religious practices.

33. The Nation also protects the sacred plants used in these ceremonies, many of which grow along the border, including the Ha:ṣan, or Saguaro cactus, which has held an essential place in the religious practices of the O'odham since time immemorial.

**The Nation's Commitment to Border Security**

34. While maintaining its flourishing cross-border tribal community, the Nation's efforts on matters of border security and enforcement have been exemplary. As Chairman Jose testified in 2024:

> The Nation has long been at the forefront on border issues. Over the years we have developed a long-standing cooperative relationship with U.S. Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE) and other federal law enforcement agencies. Working in concert with CBP, our own Tohono O'odham law enforcement officers are regularly involved in drug interdiction and immigrant apprehension actions…. We have supported CBP efforts on our Reservation by providing lands for a checkpoint, forward operating bases, and integrated fixed towers to facilitate critical electronic surveillance efforts.[4]

35. The Nation expends significant resources on border security issues. The Tohono O'odham Police Department has devoted substantial manpower over many years to patrolling the border and preventing illegal crossings, drug trafficking, and other forms of smuggling, with the Nation expending on average $3 million of its own funds annually in support of such efforts. In addition, the Nation has long-standing cooperative relationships with multiple federal law enforcement agencies, including the Federal Bureau of Investigations, the Department (including Border Patrol and Immigration and Customs Enforcement), the Drug Enforcement Agency, the Bureau of Indian Affairs, and the National Counterterrorism Center. The Nation also played a lead role in forming the Shadow Wolves, the Department of Homeland Security's only all-Native

[4] Jose Congressional Testimony, *supra* note 3, at 2.

American tactical security force, which combines traditional tracking knowledge with cutting-edge technology to identify, trace, and intercept smuggling operations within the Reservation.

36. The Nation has an extensive relationship with the Department. The Nation authorized the first on-Reservation office for the Department's predecessor agency in 1974, and it has since authorized the construction and operation of two Customs and Border Protection Forward Operating Bases on the Reservation, which include administrative facilities and living quarters for CBP personnel and from which they conduct extensive surveillance and other operations. In 2012, the Nation approved the lease of ten sites across the Reservation on which CBP has constructed 160-foot tall Integrated Fixed Towers. Each tower is equipped with long-range and wide-angle surveillance cameras, night vision, thermal sensors, and ground sweeping radar, which feed real-time data to Border Patrol agents at Border Patrol's facilities within the Reservation.

37. CBP also operates mobile vehicle surveillance units on the Reservation, which consist of sophisticated surveillance systems mounted on the beds of all-terrain pickup trucks. And the Nation has allowed CBP to maintain a vehicle checkpoint on the main highway leading from the Reservation to Phoenix. CBP maintains a separate checkpoint just outside of the Reservation's boundary, on the main highway connecting the Reservation to Tucson.

38. In 2006, the Nation agreed to the construction of vehicle barriers and a patrol road along the vast majority of the border, with the exception of those areas where vehicle access is impossible due to mountainous terrain. That agreement grew out of numerous collaborative discussions between the Nation and the Department, as a result of which the Nation allowed the government to install vehicle barriers that did not disrupt the environment or disturb O'odham ancestors' resting places. The Nation and the Department also entered an agreement that Border

Patrol would continue to allow tribal members (from either side) to continue to cross freely through three traditional crossing gates. When the O'odham need to cross at places other than these gates, such as for ceremonial runs which must follow specific trails, or for certain gathering activities or other ceremonies, they let Border Patrol know.

39. The vehicle barriers have eliminated unauthorized vehicle transit across the border. More generally, the measures that the Nation and Border Patrol have put in place on the Reservation have proven to be highly effective in preventing, deterring, and intercepting illegal crossings and smuggling within the Reservation. Illegal activity across the Reservation border has decreased significantly in recent years, with the Department's numbers confirming that apprehensions on the Reservation were down by roughly 90% over the last eighteen months compared to the same timeframe in the preceding period.

**The Illegal Immigration Reform and Immigrant Responsibility Act of 1996**

40. Congress enacted the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA) in 1996 to provide federal agencies direction regarding the construction of border barriers. *See* Pub. L. No. 104-208, § 102, 110 Stat. 3009-1, 554–55 (codified as amended at 8 U.S.C. § 1103 note).

41. Section 102(a) directed the Attorney General (now the Secretary of the Department of Homeland Security) to "take such actions as may be necessary to install additional physical barriers and roads … in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." *Id.* § 102(a).

42. Section 102(b) directed that specific border barriers be constructed and established deadlines and other requirements for the construction of such barriers. The only

border fence segment initially mandated by Congress under Section 102(b) was a 14-mile segment near San Diego, California. *See id.* § 102(b)(1).

**The 2005 REAL ID Act Amendments to IIRIRA Section 102**

43. Enacted in 2005 as an unrelated legislative rider to the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005," Section 102 of the REAL ID Act amended Section 102 of the IIRIRA. *See* Pub. L. No. 109-13, § 102, 119 Stat. 231, 306.

44. That amendment permitted the Secretary "to waive all legal requirements [that] such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of … barriers and roads" in areas of high illegal entry. *Id.* § 102(c); *see* IIRIRA § 102(a).

**The 2006 Secure Fence Act Amendments to IIRIRA Section 102(b)**

45. The Secure Fence Act of 2006 further amended the IIRIRA. *See* Pub. L. No. 109-367, § 3, 120 Stat. 2638, 2638–39. Congress removed the provisions in IIRIRA Section 102(b) referring specifically to the 14 miles of fencing in San Diego and instead directed the Secretary to "provide for [at] least 2 layers of reinforced fencing [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific segments along the U.S.-Mexico border totaling approximately 850 miles. *Id.*

**The 2008 Consolidated Appropriations Act Amendments to IIRIRA Section 102**

46. Section 564 of the 2008 Consolidated Appropriations Act again amended Section 102 of IIRIRA. *See* Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090–91. These modifications (which remain in effect) include eliminating Congress's prior directive that border barriers be built in specific locations and instead directed that such barriers be placed "along not less than

700 miles of the southwest border where fencing would be most practical and effective," and directed the Secretary to identify and construct 370 miles of border barriers in areas of high illegal entry by December 31, 2008. *Id.* (codified at 8 U.S.C. § 1103 note).

47. That amendment preserved the Section 102 waiver authority, which provides that, "[n]otwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section." 8 U.S.C. § 1103 note.

48. On April 8, 2008, the Secretary exercised his authority under this provision and waived the requirements of several laws including the Administrative Procedure Act with respect to areas along the international border that include the Nation's Reservation. *See* Determination Pursuant to Section 102 of the IIRIRA, as Amended, 73 Fed. Reg. 19078, 19078–80 (Apr. 8, 2008).

**The Secretary's Planned Construction of a Border Wall and Associated Infrastructure Within the Nation's Reservation**

49. In the spring of 2026, the Secretary informed the Nation of his plans to construct a border wall and associated infrastructure along the international border within the Nation's Reservation. Paul Enriquez, the Director of the Infrastructure Program for U.S. Border Patrol's Program Management Office Directorate, sent the Nation's Chairman Verlon Jose and Vice Chairwoman Carla Johnson an email in which he stated:

> I am writing to inform you that CBP will be releasing the contract solicitation for the border wall project located adjacent to the Tohono O'odham Nation (Tucson 5 Wall Project) today, Friday, May 15. The contract solicitation will include the construction of approximately 62 miles of primary and secondary border wall, technology, a patrol road, cameras, and lighting. CBP is targeting a construction contract award in June 2026, followed by design and schedule for construction. The construction schedules will be known following the contract award and CBP

will share the schedule with the Nation as soon as received by the construction contractor.

50. On May 27, Director Enriquez provided the Nation with a "Statement of Work" and "contract project specs" for the proposed border wall project, including requirements and specifications for a "new 30-ft primary vertical barrier" and a "secondary vertical barrier [to] be contained within [sixty feet of the international boundary line]." The Statement of Work further provides that the contractors "shall have full use of the project real estate limits," but that "[l]ocating and acquiring staging areas on private lands" and "construction access road[s]" will be the "responsibility of the contractor." On June 1, Mr. Enriquez provided the Nation with a map including proposed access routes for the construction project running through the interior of the Nation's Reservation. And on June 4, CBP officials conducted a "planned bidders site visit" on the Reservation with representatives from five potential contractors.

51. The Nation has not consented to the construction of a border wall or associated infrastructure across its Reservation. In 2017, the Nation's Legislative Council enacted a Resolution detailing the reasons for its opposition to a wall while reaffirming its commitment to vigorous border protection measures. *See* Resolution of the Tohono O'odham Legislative Council No. 17-053. The Nation remains firm in its position, as a border wall would have devastating effects on the Nation's lands and its people.

**Irreparable Harm to the Nation**

52. The Secretary's planned border wall and associated infrastructure will, if not enjoined, irreparably harm the Nation by permanently relocating the southern boundary of the Nation's Reservation from its current location on the U.S.-Mexico international border as established by the 1916 and 1917 Executive Orders and subsequent statutes, to a new location north of the existing border, demarcated by 30-foot-high steel walls set in concrete.

53. In so doing, the Secretary's border wall and associated infrastructure will permanently extinguish the Nation's federally guaranteed rights of exclusive use and occupancy and disestablish the reservation status of the lands occupied by the Secretary's border wall and associated infrastructure.

54. No Act of Congress exists authorizing the Secretary to alter the boundaries of the Nation's Reservation or to disestablish the reservation status of its lands.

55. The irreparable harm to the Nation will extend well beyond the walls and the border of the Nation's Reservation. Given the complex and varied desert and mountain topography along the Reservation's southern boundary, the Secretary's project will be a massive earth-moving and engineering endeavor, requiring the blasting of mountain features in the path of the wall; significant grading, leveling, and embankment fill work; the establishment of concrete batch plants and the blading of vast staging areas for equipment, materials, and personnel; the grading of a network of additional access roads for construction vehicles and equipment; and the permanent obliteration not only of mountain features but of the fragile vegetative mantle of the desert floor.

56. Again, no Act of Congress exists authorizing the Secretary to appropriate and degrade a vast swath of the Nation's Reservation lands in this or any other fashion.

57. The construction of the border wall and associated infrastructure will severely disrupt the Nation's cross-border community and family ties. It will destroy sacred peaks upon which the O'odham have prayed for generations. It will destroy petroglyphs that constitute "perpetual prayers." It will destroy access to specific Saguaro cacti that O'odham communities and their ancestors have used for generations to create the Saguaro wine essential for certain

religious ceremonies. And it will block the ancient trails used for the Baboquivari and Salt Runs that are central to O'odham culture.

## CLAIMS FOR RELIEF

### COUNT I

***Ultra Vires Diminishment of the Nation's Reservation***

58. The Nation restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

59. The Secretary's planned construction of a border wall and associated infrastructure on the Reservation will permanently change and diminish the Nation's Reservation boundaries as established by the 1916 and 1917 Executive Orders and ratified and enlarged by subsequent acts of Congress.

60. The Secretary's planned construction of a border wall and associated infrastructure is therefore ultra vires because it violates 25 U.S.C. § 398d, which prohibits changes to the boundaries of Indian reservations established by executive order absent the assent of Congress, and violates the constitutional separation of powers principle pursuant to which only Congress can divest a reservation of its land and diminish its boundaries.

### COUNT II

***Federal Common Law Trespass***

61. The Nation restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

62. The Secretary's planned construction of a border wall and associated infrastructure will permanently trespass on the Nation's Reservation lands adjacent to the international border and destroy the Nation's exclusive possessory rights to use and occupy those lands.

63. The Secretary's planned construction of a border wall and associated infrastructure will entail destructive activities that will permanently alter and degrade Reservation lands and features extending well beyond the border itself.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Nation respectfully requests that the Court:

A. Declare that the Secretary's planned construction of a border wall and associated infrastructure on the Nation's Reservation is ultra vires because it violates 25 U.S.C. § 398d, which prohibits changes to the boundaries of Indian reservations established by executive order absent the assent of Congress, and violates the constitutional separation of powers principle pursuant to which only Congress can divest a reservation of its land and diminish its boundaries.

B. Declare that the Secretary's planned construction of a border wall and associated infrastructure on the Nation's Reservation will constitute a trespass.

C. Preliminarily and permanently enjoin the Secretary from taking, or authorizing or directing any other person to take, any steps in furtherance of construction of the planned border wall or associated infrastructure on the Nation's Reservation, including entering into any contracts or agreements in furtherance of such construction.

D. Grant such other relief as the Court deems just and proper.

Dated: June 16, 2026

Respectfully submitted,

/s/ Riyaz A. Kanji
Riyaz A. Kanji, D.C. Bar 455165
David A. Giampetroni*
Christopher C. Miller*
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
cmiller@kanjikatzen.com

Philip H. Tinker*
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Howard M. Shanker, D.C. Bar 426359*
Attorney General
Logan Takao Cooper*
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Plaintiff Tohono O'odham Nation*

*Pro Hac Vice Application Forthcoming

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**MOTION FOR PRELIMINARY INJUNCTION
OF THE TOHONO O'ODHAM NATION**

Pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65.1(c), Plaintiff Tohono O'odham Nation (the "Nation") hereby moves for a preliminary injunction enjoining Secretary of the Department of Homeland Security Markwayne Mullin, United States Customs and Border Protection Commissioner Rodney Scott, and United States Border Patrol Chief Rosario Vasquez (all sued in their official capacities)—and their employees, subordinates, and agents—from taking, or authorizing or directing any other person to take, any steps in furtherance of construction of the planned border wall or associated infrastructure on the Nation's Reservation, including entering into any contracts or agreements in furtherance of such construction.

The attached memorandum of points and authorities, along with the attached supporting declarations and attachments to those declarations, set forth the grounds for this motion. A proposed order is also attached.

The Nation is in the process of serving this motion and attachments (memorandum of points and authorities, declarations and attachments thereto, and proposed order) in hard copy on Defendants in this matter, along with the Nation's complaint and summons. The Nation is also effectuating service by emailing the papers to the United States Attorney's Office for the District of Columbia at USADC.ServiceCivil@usdoj.gov and peter.pfaffenroth@usdoj.gov (pursuant to the instructions at http://www.justice.gov/usao-dc/civil-division) and is additionally serving hard copies of the papers on the same, and is providing courtesy copies of the papers via email to the Department of Homeland Security at OGC@hq.dhs.gov and to United States Customs and Border Protection at cbpserviceintake@cbp.dhs.gov. The Nation's counsel is presently unaware of the identity of opposing counsel.

Pursuant to Local Rule 65.1(d), the Nation respectfully requests a hearing on this Motion within twenty-one days of its filing (i.e., on or before July 8, 2026), and ideally on or before June 30, 2026. As explained in the Nation's briefing, Defendants are moving swiftly to direct construction of a double border wall and associated infrastructure on the Nation's Reservation without the consent of the Nation. Defendants' announced plans include the completion of a construction contract award later this month.

Dated: June 17, 2026

Respectfully submitted,

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji, D.C. Bar 455165
David A. Giampetroni*
Christopher C. Miller*
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
cmiller@kanjikatzen.com

Philip H. Tinker*
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Howard M. Shanker, D.C. Bar 426359*
Attorney General
Logan Takao Cooper*
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Plaintiff Tohono O'odham Nation*

*Pro Hac Vice Application Forthcoming

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION, a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF CHAIRMAN VERLON M. JOSE**

I, Verlon Jose, declare the following on the basis of personal knowledge to which I am competent to testify:

1. I am a citizen of the Tohono O'odham Nation and a member of the Chukut Kuk District, from the community of Tecalote. Since September of 2023, I have served as Chairman of the Tohono O'odham Nation.

2. The Nation is a federally recognized tribal government with a federally protected Reservation consisting of over 2.8 million acres in the Sonoran desert region of southern Arizona, virtually all of which are held in trust for the Nation by the United States under a 1917 Executive Order which established the Reservation's initial boundaries. Executive Order 2524, Reserving Certain Lands in the State of Arizona for the Papago Indians in Arizona (Feb. 1, 1917). Today, the Nation has over 37,000 members, 13,300 of whom live within the Nation's

Reservation within the United States. Another approximately 3,000 Nation members live within the Nation's traditional territories in Mexico. There are 17 traditional O'odham communities in Mexico which O'odham members call home to this day.

3. Other than a brief period during my childhood where I left the Reservation to attend boarding school, and another brief period as a young man when I went to Tucson for work, I have lived my entire life on the Nation's Reservation and within the Nation's traditional territory.

4. I was born on the Reservation, in Sells, Arizona, in 1967. My family were ranchers. In the summers we lived and worked on our land approximately four miles north of the border. In the winter, we would go to our land in the south, on the Mexico side about five miles south of what is now Serapo's gate, because there was water there during that season. It was all hard work back then, but I loved to do it. I would travel from Sells on the weekends and during the summer, so that I could work the land and take care of the cattle and horses and crops.

5. My father trained horses, and I am told that I was riding horses before I could walk. I would go out onto the land and gather the horses and bring them back. I would have to control them with no saddle or bridle, just bareback. I would ride down south across the border and back all the time.

6. I would travel with my father a lot, down across the border. We would go to visit my grandparents and other relatives, and we would go for community meetings. I was not aware of any border at that time. It was just an imaginary line that did not mean anything to us. In most places there were no markers or barriers along the border at all, except for maybe a barbed-wire fence and a cattle guard at the road crossings. There were no indications at those places that you were crossing over into a different country.

7. There was a church that we would go to every year, on the Mexico side, where they had a fiesta, a big community celebration. I never knew until I was older why we always went to this church, but later I learned that my grandfather had helped to build that church. So every year we went, and we helped to prepare the feast. My dad would meet with community elders. They held a traditional council, where all the men would gather and talk.

8. My father and my grandfather before him had been involved with helping the O'odham communities in Mexico since long before I was born. There were problems that the community members were having with ranchers taking their lands or their water, problems with accessing healthcare and schools and other things. So my father would go around to all of the communities and talk to people, attend community meetings to address these issues. He would drive out to an elder's home and spend all day visiting with them under a tree or on the porch, share what he had heard. This is how we communicated, before computers and cell phones. He would pick people up in his truck and take them into town to get medical treatment or groceries or to visit family, bring them water from the wells in big barrels, and help them with whatever they needed. If someone was stranded on the road, he would always stop to help them. When I asked my Dad why we always helped everyone, he said because that's just what we do, because we can. And later, that's what I told my own son when he asked me the same thing.

9. I would go with my dad on these visits and to these community meetings before I was even old enough to understand what we were doing. My father understood that, even though I was just a small child, I was still able to watch and learn about what was happening, learn why it was important to listen to people, and to help people. He told me that one day I would understand what the people were saying, and that I would remember, and be glad that I learned

what they had to say. When my son was little I did the same thing with him, took him with me to see how things were done, the same way my father did with me.

10. While my son was still young, I was going to school in Tucson but I also needed a job, so I began working at the Nation's Attorney General's office. I did not have any experience with the law, but I knew our people's traditional ways, our customs and teachings, that I learned from my father and his father, and I had seen them in our community all of my life growing up. I worked as an independent lay advocate for several years.

11. It was during this time that I first ran for public office. I was first elected to the District Council for my district, Chukut Kuk, in 1999. Later I ran for and served two terms, or eight years, on the Nation's Legislative Council. In 2011, I ran for Chairman of the Chukut Kuk district council, where I served for four years. I was then asked by one of my elders to run on a ticket for Chairman with him, with him as the Chairman and myself as the Vice Chairman. We won that election and served for four years, until 2019, when we lost our re-election bid.

12. After the 2019 election I was no longer an elected representative of the Nation, but I had other projects to keep me busy. I was serving on the board of a non-profit organization called First Americans Resources & Services, and it was during this time that they asked me to be President of that Board. I was also serving as the Governor of the Traditional O'odham Leaders, a governing council for the Mexican O'odham that was recognized in 1995. A true and correct copy of the Tohono O'odham Legislative Council's December 5, 1995 Resolution No 95-562 recognizing the Traditional O'odham Leaders' traditional form of governmental structure is attached as **Attachment A** of this Declaration.

13. When the COVID-19 pandemic struck, I was in a position to help provide services, food, and protective equipment to the O'odham communities in Mexico. We organized

the delivery of medical supplies, food, and donations across the border. The border gates were closed at that time, because of the pandemic. But we needed to provide these supplies to the communities, which had no other means of getting these things at that time. So we organized supply drop-offs, where we would back trucks full of supplies up to the vehicle barriers across the border, and transfer them to trucks on the other side. We coordinated with Border Patrol for these drop-offs, who would come out to make sure that we were not moving contraband. Once they had verified that everything was on the level, they would often help us pass supplies over the border.

14. When the vaccine was released, we organized a vaccination site for our O'odham community in Mexico at the CBP Port of Entry in Lukeville, Arizona. It was not feasible to have people crossing the border through the regular process in order to be vaccinated, so CBP allowed us to set up a vaccine station in their sally-port at the way-station. O'odham in Mexico would be allowed to come in, ten or twenty at a time, receive their vaccination, and go back out without having formally crossed over into the United States. After we had vaccinated all of the O'odham who chose to receive it, we opened the program up to anyone in Mexico who wished for it and could make it to the site. All told, we gave out about 17,000 vaccinations.

15. In 2023 I ran again for tribal office, this time to be the Chairman. I won that election and I have been honored to serve as the Nation's Chairman since that time.

16. The Nation has a long history of working with the United States, including the Department of Homeland Security, Customs and Border Protection (CBP), and Border Patrol, to protect the United States and the Nation and Nation citizens from problems such as crime and drugs and violence that can occur across an unregulated border in this modern world. The Nation is well aware of these problems, and has a critical interest in eliminating illegal activity at the

border—be it in the form of drug trafficking, human trafficking, or other dangerous activity—and in ensuring the safety of migrants who want to come and cross into the United States in a safe and legal way. We as a Nation and a community work with CBP and Border Patrol every single day to help accomplish these goals.

17. When the federal government first started to put in border walls in the 1990s, we reached out to discuss security measures for the Nation. At that time, a big problem for the Nation was cattle rustlers coming over from Mexico to take O'odham livestock back across the border. Another problem was abandoned cars. Cartel members would go to Tucson or Phoenix and steal a vehicle and drive across the border to bring back drugs or people. When Border Patrol would catch them on the way back, oftentimes those vehicles would become disabled and abandoned on the Nation's lands, and it was very difficult to remove them.

18. The Nation worked with the United States to come up with a solution. But it was not an easy process. Any solution on the Nation's lands would have to be approved by the people. We make our decisions based on consensus. We do not simply do something because a person who is in charge says that we should. We take our time to make decisions. First, we will inform everyone of what the issue is. Everyone must go back to their districts, go back to their families, and talk about it, hear everyone's point of view, and decide together what they want. Not everyone is going to agree with every decision. But it is important that everyone is given a chance to speak their piece, and to take their time to think through their decision along with their family and neighbors. This is a fundamental part of our community organization, it is part of who we are.

19. For the border crossings, people were concerned about any structures digging up our lands around the border and potentially disturbing the resting places of our ancestors, or

desecrating or violating cultural sites. They also insisted that any barriers not affect the migration of the animals, which must be able to cross freely to roam, eat, and mate as they have always done. Lastly, they insisted that there be a way for them to still cross the border freely, to visit family in Mexico, perform and attend ceremonies, and take care of their relatives who have passed on and, like many of our people, are buried in churches and traditional resting places on the Mexico side of the border.

20. We worked through these issues with CBP and Border Patrol and came to an agreement to allow the government to put in vehicle barriers that did not disrupt the environment or disturb our ancestors' resting places. Before the barriers were installed, the Cultural Affairs Office worked with contractors hired by Border Patrol to conduct a cultural resources survey across the entire southern border of the Nation. For areas with particular cultural or ecological sensitivities, Border Patrol agreed to install non-invasive "Normandy-Style" barriers that sit on top of the soil but do not penetrate the earth so as not to disturb whatever important resources the survey had identified. A true and correct copy of the Tohono O'odham Legislative Council's July 19, 2006 Resolution No 06-465 authorizing the installation of these barriers is attached as **Attachment B** of this Declaration.

21. We also have an understanding since that time that Border Patrol will continue to allow tribal members (from either side) to continue to cross freely through three traditional crossing gates—the San Miguel Gate towards the eastern side of the Reservation, the Papago Farms Gate in the west, and Serapo's Gate in the center. These gates are locked when unattended, but tribal members who wish to cross can call Border Patrol, who will come out and open the gate and also make sure that the tribal members are not involved in any dangerous or inappropriate activities. When we need to cross at places other than these gates, such as for our

ceremonial runs which must follow specific trails, or for certain gathering activities or other ceremonies, we call Border Patrol to let them know that we will be crossing at different locations. This arrangement does not always function perfectly, for our members or for Border Patrol, and some tribal members do not like that they have to show their I.D.s and have their vehicles searched by border patrol whenever they are going across to see their families or for ceremonies or to take care of their relatives who have passed on. But this is a compromise that we have made with the government to ensure the safety of all of our people, and we work with Border Patrol as best we can to make sure that our members have the right and the ability to continue to travel and to conduct our ceremonies as we always have.

22. We have also agreed to allow Border Patrol to install a surveillance system of ten Integrated Fixed Towers (IFTs) on our lands, from which Border Patrol can monitor virtually the entire border at all times, day and night. This again was a security measure that we had to work through with our community to overcome their significant concerns. While the purpose of these towers is to monitor the border for potential illegal activity, they have the ability to monitor the homes and lands and ceremonial grounds of all O'odham citizens who live in the border regions. Our people understandably had very significant privacy concerns about these towers going in. We took our time to meet with everyone and explain the situation, explain why this monitoring would be important to keep us all safe from unlawful border activity. We explained that, when we are having ceremony or doing other traditional activities that require privacy, we can call border patrol and let them know to black out the cameras in those areas during those times. Again, not everyone is happy with this compromise that we made. Some people do not feel that they have true privacy if they have to call and tell the government when they are going to do something that is private. Allowing those towers to go up was not an easy decision for us. But we

understand the importance of keeping our border safe, and we wanted to help Border Patrol have the resources that it needed to do this. It took years for us to come to this decision as a community, to conclude that the loss of some of our privacy was a price that we were willing to pay in exchange for the safety benefits that these towers would provide. A true and correct copy of the Tohono O'odham Legislative Council's March 25, 2019 Resolution No 19-088 authorizing the installation of these towers is attached as **Attachment C** of this Declaration.

23. In 2024, I spoke to the United States House of Representatives Committee on Natural Resources, Subcommittee on Oversight and Investigations, regarding the Nation's longstanding and successful partnership with CBP and Border Patrol, including these and numerous other border security and safety measure. A true and correct copy of this testimony is attached as **Attachment D** to this Declaration.

24. The wall that the government wants to build across our lands is a different matter. This is a drastic measure that we cannot accept. It would cost us too much as a people to do so, and we do not believe that it will make us any safer if we do.

25. We have no word for "wall" in our language, or for "barrier." These concepts are not part of our cultural traditions. We believe in hospitality, in being welcoming. When someone comes to our homes, we invite them in. We give them food. If we don't have any food, we give them water, or at least a place to sit and rest. We do not know what it means to turn people away, to block them out of our lives. A wall is a physical representation of these things that we do not believe in, a symbol of something that is fundamentally in opposition to everything that we stand for as a people.

26. We know what this wall has done in other places where it has been put up. Border wall construction in 2019 and 2020 caused significant destruction to our traditional sacred sites

to the west of the Reservation, at Quitobaquito Springs and Monument Hill, in what today is called the Organ Pipe National Monument. These sites are extremely important to our people. For all of our history, the O'odham have used Quitobaquito Springs for its waters and the plant and animal life that these waters support. It is a place that we visit on our pilgrimages and the site of many important ceremonies that have been handed down from our ancestors. And Monument Hill is the site that was used for ceremonies by our O'odham ancestors and is the final resting place of many of our people. Although we informed the government in 2019 of the importance of these sacred sites and requested consultation regarding how they might be protected, in 2020 CBP contractors conducted blasting on Monument Hill without even notifying the Nation beforehand, critically desecrating the site without paying any heed to our pleas to identify alternatives and mitigation measures.

27. After the government built the wall at Organ Pipe, I traveled to the site with a group of O'odham elders to see what had been done. The elders cried to see the wall there. It affected them so deeply. They knew that it was not right for the wall to be there, and they felt that pain deep within their spirits.

28. I wish that we could believe that the government has learned to take greater care after the desecration of our cultural sites at Organ Pipe. Unfortunately, we know that it has not. Just two months ago, CBP contractors working on border wall construction in the Cabeza Prieta National Wildlife Refuge roughly 50 miles west of the Nation's Reservation destroyed part of the Las Playas Intaglio, a geoglyph created by our O'odham ancestors at least 1,000 years ago, and which some experts estimate to be as much as 8,000 years old. As I informed Commissioner Scott of CBP after the devastating event:

> The destruction of our Intaglio is a direct and irreversible act against our culture, identity, and existence as O'odham people. Our Intaglio are not artifacts of the

> past. They are living expressions of *Himdag*, *Our way of life*, our laws, our relationship to the land, and our responsibility to all living things. These sacred formations encode our history, migration, and ceremonies. They mark spiritual relationships between land, water, and people. They serve as places of prayer, teaching, and cultural continuity. To destroy the Intaglio is to erase a living record of O'odham existence, one that predates the United States and continues into the future through our children. The Nation mourns this loss. The impact of the destruction of this ancient, sacred place on the Nation's members cannot be overstated.

Letter from V. Jose to R. Scott, May 4, 2026. A true and correct copy of my letter is attached as **Attachment E** to this Declaration.

29. If I had to see a 30-foot wall across our lands, separating our people between the north and the south, separating and dividing our communities and keeping families apart from each other, keeping people away from the graves of their relatives and ancestors, it would break my heart. I could not bear to see that. The wall would cut me and my family, and our people, off from one other, and from our important ceremonial places.

30. There is a mountainous peak along the border, a place that is sacred to our people and very significant for my family. It is the place where I go to pray, where I can walk up the slope and see all of our lands to the north and south, and I pray for all of the people all across those lands. It is where my family harvest the Saguaro fruits during the season. The border passes right through this place, directly across the peak. If a wall were built across this peak, it would completely destroy this sacred and special place. They would need to reshape the mountain, to blow holes in it by blasting or carve it up with heavy machinery. They would need to build roads all up and down the slopes for their equipment and machinery. They would have to plow over or tear up the saguaro, and the wall would block us from gathering the fruit on the other side.

31. The government has told us that they intend to construct this wall within the Nation's territory, that we have no choice but to accept this inevitability. On May 15, 2026, Paul Enriquez, the Director of the Infrastructure Program for U.S. Border Patrol's Program Management Office Directorate, sent me and Vice Chairwoman Johnson an email in which he stated:

> I am writing to inform you that CBP will be releasing the contract solicitation for the border wall project located adjacent to the Tohono O'odham Nation (Tucson 5 Wall Project) today, Friday, May 15. The contract solicitation will include the construction of approximately 62 miles of primary and secondary border wall, technology, a patrol road, cameras, and lighting. CBP is targeting a construction contract award in June 2026, followed by design and schedule for construction. The construction schedules will be known following the contract award and CBP will share the schedule with the Nation as soon as received by the construction contractor.

A true and correct copy of Director Enriquez's email is included as **Attachment F** to this Declaration. On May 27, Director Enriquez provided the Nation with a statement of work on the best management practices and contract project specifications for the proposed border wall project within the Nation, and on June 1 he provided the Nation with a Reservation map identifying proposed access routes for the project. True and correct copies of these documents are included as **Attachments G to I** to this Declaration. Furthermore, on June 4, CBP officials conducted a "planned bidders site visit" with representatives from five potential contractors, in order to look at sensitive areas along the proposed wall on the southern border of the Nation.

32. The Nation, in an exercise of its sovereign governmental authority to uphold and effectuate the will of the O'odham people, has already spoken on this issue. On February 8, 2017, the Tohono O'odham Legislative Council enacted Resolution No. 17-053 which, while affirming the Nation's ongoing commitment to working with the United States to meet our mutual border security goals, enshrined into law the Nation's opposition to the construction of

any wall along the Nation's southern border. A true and correct copy of this Resolution is included as **Attachment J** to this Declaration.

33. Because the Nation cannot accept a border wall across our Reservation as an inevitability, because we will not consent to use and destruction of our lands for such a purpose, and because we cannot fathom a wall being placed across our lands to divide our territory in two and to forever keep our people apart from one another, we have no other option but to bring this lawsuit, to protect our rights and our way of life. This is an obligation that we owe to our ancestors, who have given us everything that we have in this life and shown us the way that we are to live. And it is one that we owe to our children, and to the generations that will come after them, so that they will be able to continue to follow this way of life after we are gone.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 16, 2026

*<u>/s/ Verlon Jose</u>*
Verlon Jose, Chairman
Tohono O'odham Nation

# ATTACHMENT A

# RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL
## (Recognition of the O'odham in Mexico Communities and Traditional Government)

RESOLUTION NO. 95-562

**WHEREAS,** The Tohono O'odham Tribe has occupied lands from Onk Akimel (Salt River) to Ge Pisin (Hermosillo) and from Kawk Su:d (San Pedro River) to Ge Ka:ck (Gulf of California) since time immemorial; and

**WHEREAS,** from the time of European Arrival to today these lands remain with the O'odham people who have resisted assimilation for over 500 years; and

**WHEREAS,** regardless of the artificial barrier made by the United States of America (USA) and the United States of Mexico, the O'odham are one people through blood, language, culture, and tradition; and

**WHEREAS,** as it was the will of the elders expressed in meetings in the 1970's that solutions be sought for O'odham in Mexico to be legally recognized by the Governments of the USA and Mexico that we are from time immemorial one people; and

**WHEREAS,** Papago Council Resolution #43-79 (exhibit A) states [in lines 1-5]: "the lands traditionally constituting the patrimony of the Papago Indian People, known as the Papagueria, were by the Treaty of

Guadalupe Hidalgo and the Gadsden Purchase bisected by the international border separating the United States from Mexico; and

WHEREAS, [in lines 6-9] such actions dividing historical Papagueria into two areas under separate flags and allegiances were accomplished without consultation with or consent of the indigenous Papago population; and

WHEREAS, [in lines 10-14] such division nessitated the creation of two separate tribes under independent governments, i.e., the Papago Tribe of Arizona and the Papago Tribe of Mexico now established under the separate government in the State of Sonora; and

WHEREAS, [in lines 14-17] ...recognize[d] the Papago Tribe of Mexico and its government, and that the officials of both governments meet as necessary on issues of common concern to both tribes; and

WHEREAS, recognizing the first step for unity needs to be the Tohono O'odham Nation's recognition of the O'odham of Mexico's traditional governmental structure, the Traditional O'odham Leaders (T.O.L.) and their representatives (exhibit B), and recognizing that the second

step will be the inclusion of these people as a 12th District of the Tohono O'odham Nation; and

WHEREAS, O'odham in Mexico live in the I) Legally Titled Communities of Pozo Verde, San Francisquito (and annex Carrizalito), Sonoyta, Quito Vac (and annex Chujubabi), Las Norias (and annex Santa Elena), Pozo Prieto (and annex Calenturas) and other II) O'odham Communities held by Possession: El Bajio, Cumalito, Cubabie, Mochomera, Rancho Espuma, Rancho San Pedro; and

WHEREAS, III) O'odham Live in the Communities of: Caborca, Pitiquito, Puerto Penasco, Magdalena, Hermosillo, and Sasabe, and IV) O'odham hold in their memory many other villages, ranches and sacred sites considered within the O'odham Patrimony (partial listing in (exhibit C); and

WHEREAS, All O'odham people have a right to share in the traditional knowledge and wisdom of O'odham elders and their families who live in the lands described herein; and

**WHEREAS,** the O'odham people, regardless of where they live, have guarded and struggled to preserve the integrity and character of O'odham as one people and so desire to support the aspirations of the Traditional O'odham Leaders through their recognition as legitimate representatives of the communities where Traditional O'odham Leaders reside and as legitimate representatives concerned for the patrimony of O'odham Lands.

**WHEREAS,** O'odham Unity is crucial for the present and future generations of all O'odham.

**NOW, THEREFORE, BE IT RESOLVED** that the Legislative Council of the Tohono O'odham Nation hereby starts the process of undertaking the will of its people by officially and formally recognizing the Traditional O'odham Leaders' (TOL) Traditional form of governmental structure and its notes on traditional government as binding (Exhibit D).

RESOLUTION NO. 95-562
(Recognition of the O'odham in Mexico Communities and Traditional Government)
Page 5 of 6

The foregoing Resolution was passed by the Tohono O'Odham Council on the 05TH. day of DECEMBER, 1995 at a meeting at which a quorum was present with a vote of 910.5 FOR; 808.5 AGAINST; 157.0 NOT VOTING; and [01] ABSENT, pursuant to the powers vested in the Council by Section 3 of Article II and Article VI Section 1(b) of the Constitution of the Tohono O'Odham Nation, adopted by the Tohono O'Odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984).

TOHONO O'ODHAM LEGISLATIVE COUNCIL

Dennis Ramon, Legislative Chairman

13th day of December, 1995

ATTEST:

Frances Antone, Legislative Secretary

13th day of December, 1995

Said Resolution was submitted for approval to the office of the Chairman of the Tohono O'Odham Nation on the 13th day of December, 1995 at 2:17 o'clock, P.M., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon his approval or upon his failure to either approve or disapprove it within 48 hours of submittal.

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

Den Ramon
**Dennis Ramon, Legislative Chairman**

[X] **APPROVED** on the 14 day of December, 19 95

[ ] **DISAPPROVED** at 9:35 o'clock, A.M.

Henry A. Ramon for
**EDWARD D. MANUEL, Chairman**
**TOHONO O'ODHAM NATION**

**Returned to the Legislative Secretary on the** 14th **day of** December**, 19** 95**, at** 11:06 **o'clock,** A**.M.**

Lucinda Allen for
**Frances Antone, Legislative Secretary**

**RESOLUTION NO.** 95-562

**ACTION:** RECOGNITION OF THE O'ODHAM IN MEXICO COMMUNITIES AND TRADITIONAL GOVERNMENT

**MOVED:** COUNCILWOMAN MARY JANE JUAN-MOORE **SECOND:** COUNCILMAN DAVID GARCIA

**DATE:** DECEMBER 05, 1995

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| SIF OIDAK 160.0 | 1. MARY ANN ANTONE (Nellie Miguel) | 80.0 | | X | | X |
| | 2. RITA MARTINEZ (Maxine Norris) | 80.0 | | X | | |
| SELLS 314.0 | 1. JOSEPH T. JOAQUIN (Allen W. Garcia, Jr.) | 157.0 | | | X | |
| | 2. LUCILLE ENCINAS (Cynthia Chico) | 157.0 | | X | | |
| SCHUK TOAK 117.0 | 1. KENNETH J. ANTONE ( ) | 58.5 | X | | | |
| | 2. MARY JANE JUAN-MOORE ( ) | 58.5 | X | | | |
| SAN XAVIER 142.0 | 1. DENNIS RAMON ( ) | 71.0 | X | | | |
| | 2. TONY BURRELL ( ) | 71.0 | X | | | |
| BABOQUIVARI 257.0 | 1. EDWARD KISTO ( Idella Stanley) | 128.5 | X | | | |
| | 2. FRANCES MIGUEL (Kenneth Chico, Sr.) | 128.5 | | X | | |
| GU ACHI 187.0 | 1. ALEX J. RAMON (Marian Johnson) | 93.5 | | X | | |
| | 2. WILLARD ANITA (Louis Johnson) | 93.5 | | X | | |
| PISINEMO 135.0 | 1. JOHNSON JOSE (Roseleen Antone) | 67.5 | X | | | |
| | 2. BARBARA SALVICIO ( ) | 67.5 | X | | | |
| SAN LUCY 105.0 | 1. ALBERT MANUEL, JR. ( ) | 52.5 | | X | | |
| | 2. JOHN RENO (Mary Hoffman) | 52.5 | | X | | |
| GU VO 134.0 | 1. MICHAEL FLORES ( ) | 67.0 | X | | | |
| | 2. FERN SALCIDO (Larry Montana) | 67.0 | X | | | |
| HICKIWAN 142.0 | 1. LLOYD FRANCISCO ( ) | 71.0 | | X | | |
| | 2. ALEX JOSE ( ) | 71.0 | X | | | |
| CHUKUT KUK 183.0 | 1. KENNETH WILLIAMS ( ) | 91.5 | X | | | |
| | 2. DAVID GARCIA (Marvin Thomas ) | 91.5 | X | | | |
| | **TOTAL** | **1,876.0** | 910.5 | 808.5 | 157.0 | [01] |

****PASSED VOTES**

# ATTACHMENT B

# RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL

**(Approving Border Vehicle Barrier Design Pursuant to Resolution No. 04-095, "Supporting Vehicle Barriers and All-weather Road Project Along the International Boundary Within the Tohono O'odham Nation")**

**RESOLUTION NO. 06-465**

**WHEREAS,** the Tohono O'odham Legislative Council is vested with the power to "administer land and other public property, and by law, ordinance or resolution .... to manage, protect, preserve and regulate the use of the property, wildlife, land, air and natural resources (including surface and ground waters) of the Tohono O'odham Nation" and the power to consult "appropriate federal agencies regarding federal activities that affect the Tohono O'odham Nation" (Constitution of the Tohono O'odham Nation, Article VI, Section 1(i)(2) and 1(j)); and

**WHEREAS,** the Tucson Sector of the United States Border Patrol ("USBP") is responsible for enforcing homeland security within the United States of America, including the Tohono O'odham Nation ("Nation") lands along the international boundary with Mexico ("International Boundary"); and

**WHEREAS,** the USBP has consulted with the Nation and has developed designs, construction processes, and enforcement techniques utilizing border vehicle barriers and all-weather roads in conjunction with other technologies to prevent and deter illegal entry into the Nation's lands within the United States by motor vehicles; and

**WHEREAS,** the USBP has agreed, subject to Congressional appropriation, to design, build, manage and maintain an effective border enforcement barrier and an all-weather road along the International Boundary within the Nation in consultation with the Nation's Districts, Legislative Committees, Legislative Council and Executive Branch, at no cost to the Nation; and

**WHEREAS,** pursuant to Resolution No. 04-095, the Tohono O'odham Legislative Council did support "the USBP's border vehicle barrier and all-weather road construction proposal along the entire International Boundary within the Nation's lands, and supports Congressional appropriation for the project," subject to several conditions, including that "that the design of the border vehicle barriers and the all-weather road is subject to the approval of the Nation"; and

**WHEREAS,** Chukut Kuk District, by Resolutions No. 2003-18 and No. 2003-57, and Gu Vo District, by Resolution No. GV03-80, previously expressed support for the border vehicle

**barrier and the all-weather road project, as well as a preference for the "corral fence" or "rail on rail" design of barrier; and**

**WHEREAS, the USBP is now requesting that the Nation approve the use of three types of vehicle barriers, corral (rail-on-rail), temporary (Normandy), and Bollard-style fencing, based on terrain features, soil quality, and the presence of cultural or natural resources; and**

**WHEREAS, the USBP has made presentations on the use of the three vehicle barriers to the Chukut Kuk and Gu Vo Districts, which have passed resolutions supporting the installation of a variety of barriers by Chukut Kuk District Resolution No. 2006-35 and Gu Vo District Resolution No. GV03-80 as amended by Resolution No. GV06-082; and**

**WHEREAS, the USBP has further requested that the vehicle barrier be augmented with cable and/or barbed wire fencing to prevent cattle rustling and keep undesirable livestock from entering the United States.**

**NOW, THEREFORE, BE IT RESOLVED that the Tohono O'odham Legislative Council hereby reaffirms its support for the USBP's border vehicle barrier and all-weather road construction project along the International Boundary within the Nation's lands, and supports congressional appropriation for the project, subject to the conditions set forth in Resolution No. 04-095 and further provided that the barrier contain openings at the traditional crossing areas along the border known as San Miguel Gate, Serapo's Gate, and Papago Farms Gate with 24 hour surveillance by US Customs and USBP.**

**BE IT FURTHER RESOLVED that, pursuant to the terms of Resolution No. 04-095, the Tohono O'odham Legislative Council hereby approves the use of (1) Bollard-style, corral (rail-on-rail), and/or temporary (Normandy) fencing in the design and construction of the USBP's border vehicle barrier as appropriate depending upon factors including the location of washes, archaeological sites, mountainous areas and areas deemed biologically sensitive to the Nation, etc. and (2) cable and/or barbed wire fencing to augment the vehicle barrier to prevent cattle rustling and keep undesirable livestock from entering the United States.**

**BE IT FINALLY RESOLVED by the Tohono O'odham Legislative Council that the Nation's approval of the USBP's border vehicle barrier is subject to the terms and conditions set forth in this Resolution and Resolution No. 04-095; the USBP must therefore receive**

**prior approval from the Nation before taking any action contrary to the terms and conditions embodied in these Resolutions.**

**The foregoing Resolution was passed by the Tohono O'odham Legislative Council on the 12TH Day of JULY, 2006 at a meeting at which a quorum was present with a vote of 2,440.80 FOR; -0- AGAINST; -0- NOT VOTING; and [02] ABSENT, pursuant to the powers vested in the Council by Article VI, Section 1 (i)(2) and 1 (j) of the Constitution of the Tohono O'Odham Nation, adopted by the Tohono O'Odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984).**

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

[signature]
**Evelyn B. Juan Manuel, Legislative Chairwoman**

19th **day of** July **, 2006**

**ATTEST:**

[signature]
**Lucille Lopez, Acting Legislative Secretary**

12 **day of** July **, 2006.**

**Said Resolution was submitted for approval to the office of the Chairwoman of the Tohono O'Odham Nation on the** 19th **day of** July **, 2006 at** 4:07 **o'clock,** P **.M., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon her approval or upon her failure to either approve or disapprove it within 48 hours of submittal.**

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

[signature]
**Evelyn B. Juan Manuel, Legislative Chairwoman**

**[✓] APPROVED** **on the** 19 **day of** July **, 2006**

**[ ] DISAPPROVED** **at** 6:50 **o'clock,** P **.M.**

[signature]
**VIVIAN JUAN-SAUNDERS, CHAIRWOMAN**
**TOHONO O'ODHAM NATION**

**Returned to the Legislative Secretary on the** 20 **day of** July**, 2006, at** 10:05 **o'clock,** A**.M.**

[signature]

**Lucille Lopez, Acting Legislative Secretary**

**RESOLUTION NO. 06-465**

**ACTION:** **APPROVING BORDER VEHICLE BARRIER DESIGN PURSUANT TO RESOLUTION NO. 04-095, "SUPPORTING VEHICLE BARRIERS AND ALL-WEATHER ROAD PROJECT ALONG THE INTERNATIONAL BOUNDARY WITHIN THE TOHONO O'ODHAM NATION"**

**MOVED:** **VICE CHAIRMAN VERLON JOSE** **SECOND:** **COUNCILWOMAN FRANCES ANTONE**

**DATE:** **JULY 12, 2006**

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| **BABOQUIVARI**<br>**310.8** | 1. FRANCES MIGUEL *(Absent)*<br>(Vernon J. Smith) *(Present)*<br>2. FRANCES G. ANTONE<br>(Lucilda J. Valenzuela (Norris)) | 155.40<br>155.40 | X<br>X | | | |
| **CHUKUT KUK**<br>**258.7** | 1. ETHEL GARCIA<br>( )<br>2. VERLON M. JOSE<br>(David Garcia) | 129.35<br>129.35 | X<br>X | | | |
| **GU ACHI**<br>**221.6** | 1. TIMOTHY L. JOAQUIN<br>(Jonas Robles)<br>2. CYNTHIA E. MANUEL<br>(Louis L. Johnson) | 110.80<br>110.80 | X<br>X | | | |
| **GU VO**<br>**193.1** | 1. RAYMOND VICTOR<br>( )<br>2. MICHAEL FLORES<br>(Grace Manuel) | 96.55<br>96.55 | X<br>X | | | |
| **HICKIWAN**<br>**167.4** | 1. DELMA GARCIA<br>(Mary E. Sam)<br>2. SANDRA ORTEGA<br>( ) | 83.70<br>83.70 | X<br>X | | | X |
| **PISINEMO**<br>**171.8** | 1. BARBARA SALVICIO<br>( )<br>2. GERALD FAYUANT<br>( ) | 85.90<br>85.90 | X<br>X | | | |
| **SAN LUCY**<br>**169.0** | 1. JOHN W. LAWSON, SR.<br>( )<br>2. GLORIA RAMIREZ<br>( ) | 84.50<br>84.50 | X<br>X | | | |
| **SAN XAVIER**<br>**193.8** | 1. FELICIA NUÑEZ<br>( )<br>2. OLIVIA VILLEGAS-LISTON<br>(Eileen A. Estrada-Lopez) | 96.90<br>96.90 | X<br>X | | | X |
| **SCHUK TOAK**<br>**146.9** | 1. FRANCES B. CONDE<br>( )<br>2. PHYLLIS JUAN<br>( ) | 73.45<br>73.45 | X<br>X | | | |
| **SELLS**<br>**421.0** | 1. MARLENE SARAFICIO-JUAN<br>( )<br>2. EVELYN B. JUAN MANUEL<br>(Kimberly Listo) | 210.50<br>210.50 | X<br>X | | | |
| **SIF OIDAK**<br>**186.7** | 1. WAVALENE SAUNDERS<br>(Isidro Lopez)<br>2. DARLENE ANDREW *(Absent)*<br>(Rita Martinez) *(Present)* | 93.35<br>93.35 | X<br>X | | | |

# ATTACHMENT C

# RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL

**(Consenting to Grants of Easement for Rights-of-Way across Nation's lands for the United States Customs and Border Protection's Integrated Fixed Tower Project)**

**RESOLUTION NO. 19-088**

**WHEREAS,** "The unallotted lands of the Tohono O'odham Nation and all lands hereafter acquired by the nation, or held for the use of the nation or its members, are a valuable public resource and shall be held as national lands forever. Control and management thereof are vested in the Tohono O'odham Council, which may enact laws governing the use, assignment, permit, lease or other disposition of lands, interests in land and resources of the nation consistent with Federal law." (Constitution of the Tohono O'odham Nation, Article XVI, Section 1); and

**WHEREAS,** the Legislative Council has a duty "to manage, protect, preserve and regulate the use of the property, wildlife, land, air and natural resources (including surface and ground waters) of the Tohono O'odham Nation" and to "administer land and other public property, and by law, ordinance or resolution . . . to prevent the sale, disposition, lease, use or encumbrance of Tohono O'odham national lands, interests in lands, rights-of-way, or other public resources when such sale, disposition, lease, use or encumbrance will, in the opinion of the Tohono O'odham Council, be injurious to the best interests of the Tohono O'odham Nation as a whole" (Constitution, Article VI, Section 1(i)(1) and (2)); and

**WHEREAS,** uses of unallotted national lands by federal agencies must be approved by Legislative Council resolution, Nation's law, or a lease or other agreement authorized or approved by the Legislative Council, and the Council is accordingly empowered to "consult, negotiate and conclude agreements and contracts on behalf of the Tohono O'odham Nation" with federal agencies and to consult with "appropriate federal agencies regarding federal activities that affect the Tohono O'odham Nation" (Constitution, Article VI, Section 1(f) and (j)); and

**WHEREAS,** when federal agencies propose uses of national lands, the Legislative Council strongly supports consultation with affected members, communities, and districts before the Council considers approving any proposed use; and

**WHEREAS,** unlike national forests, wilderness areas, and other federal lands on the international boundary dividing the United States and Mexico, the Nation's reservation is not public land, and the Nation has a duty to ensure that tribal members' interests and the Nation's jurisdiction to perform its constitutional obligations are protected; and

**WHEREAS,** the duty to protect Nation's lands, its jurisdiction, and members' interests, including in the Nation's dealings with the United States Customs and Border Protection ("CBP"), is consistent with the Department of Homeland Security's

Tribal Consultation Policy in which, "The United States recognizes the right of Federally-recognized Indian Tribes ("Indian Tribes") to self-government. Indian Tribes exercise inherent sovereign powers over their members and territories." DHS Tribal Consultation Policy, I.A.; and

**WHEREAS,** the Tucson Sector of the United States Border Patrol, as part of CBP of the Department of Homeland Security, is responsible for securing the border along the international boundary with Mexico ("International Boundary"), including the areas on the Nation's lands; and

**WHEREAS,** CBP has proposed to construct an Integrated Fixed Tower ("IFT") system on the Nation and has requested that the Nation consent to grants of easement for rights of way for IFT tower sites and related roadways; and

**WHEREAS,** pursuant to Resolution Nos. 12-121 and 13-142, the Legislative Council authorized CBP to conduct initial site visits and pre-development activities; and

**WHEREAS,** by Resolution No. 15-479, the Legislative Council gave its preliminary support to the IFT Project subject to the following five conditions being met:

1. CBP's completion of environmental, cultural and other requirements identified by the Nation's Cultural Affairs, Planning, Realty, Roads, and Wildlife and Vegetation Management staff (the "IFT Conditions");
2. the Nation's final evaluation of the IFT project;
3. negotiation and approval of compensation for related rights-of-way for the IFT project;
4. the approval and execution of a written agreement between the Nation and CBP that will protect the Nation's lands, its jurisdiction, and members' interests; and
5. a resolution granting the Nation's consent for a grant of easement for rights-of-way for the IFT project; and

**WHEREAS,** the five conditions of support listed in Resolution No. 15-479 have been met or will be met with the approval of this Resolution; and

**WHEREAS,** the Domestic Affairs, Cultural Preservation and Agricultural and Natural Resources Committees have reviewed the following documents relating to the grants of easement for rights-of-way for the IFT project and recommend their approval:

1. Grant of Easement for Right-of-Way for TCA-AJO-0450 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

2. **Grant of Easement for Right-of-Way for TCA-AJO-0448 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
3. **Grant of Easement for Right-of-Way for TCA-AJO-0446 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
4. **Grant of Easement for Right-of-Way for TCA-CAG-0442 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
5. **Grant of Easement for Right-of-Way for TCA-CAG-0440 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
6. **Grant of Easement for Right-of-Way for TCA-CAG-0438 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
7. **Grant of Easement for Right-of-Way for TCA-CAG-0436 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
8. **Grant of Easement for Right-of-Way for TCA-CAG-0434 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
9. **Grant of Easement for Right-of-Way for TCA-CAG-0430 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
10. **Grant of Easement for Right-of-Way for TCA-CAG-0444 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**
11. **Grant of Easement for Right-of-Way for Portions of the Traditional Northern Road.**
12. **Grant of Easement for Right-of-Way for Low Water Crossings**
13. **The Agreement between the Tohono O'odham Nation and United States Customs and Border Protection for Conditions for Grants of Easement for Right-of-Way for Integrated Fixed Tower Project, Access and Approach Roads, Low Water Crossings and Traditional Northern Road.**
14. **The Right-Of-Way Compensation Agreement between the U.S. Department of Homeland Security/Customs and Border Protection and the Tohono**

O'odham Nation for Integrated Fixed Tower sites, approach roads, access roads, the Traditional Northern Road and Low Water Crossings.

**NOW, THEREFORE, BE IT RESOLVED** that the Legislative Council consents to the following grants of easement for rights-of-way by the U.S. Bureau of Indian Affairs to the U.S. Department of Homeland Security/Customs and Border Protection for the IFT project, subject to the finalization and signing by all parties of the documents and agreements attached to or incorporated by this reference in the following grants of easement for rights-of-way:

1. Grant of Easement for Right-of-Way for TCA-AJO-0450 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.
2. Grant of Easement for Right-of-Way for TCA-AJO-0448 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.
3. Grant of Easement for Right-of-Way for TCA-AJO-0446 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.
4. Grant of Easement for Right-of-Way for TCA-CAG-0442 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.
5. Grant of Easement for Right-of-Way for TCA-CAG-0440 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.
6. Grant of Easement for Right-of-Way for TCA-CAG-0438 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.
7. Grant of Easement for Right-of-Way for TCA-CAG-0436 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.
8. Grant of Easement for Right-of-Way for TCA-CAG-0434 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.
9. Grant of Easement for Right-of-Way for TCA-CAG-0430 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

**10. Grant of Easement for Right-of-Way for TCA-CAG-0444 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.**

**11. Grant of Easement for Right-of-Way for Portions of the Traditional Northern Road.**

**12. Grant of Easement for Right-of-Way for Low Water Crossings.**

**BE IT FURTHER RESOLVED that the Legislative Council approves the "Agreement between the Tohono O'odham Nation and United States Customs and Border Protection for Conditions for Grants of Easement for Right-of-Way for Integrated Fixed Tower Project, Access and Approach Roads, Low Water Crossings and Traditional Northern Road" in substantially the form attached and authorizes the Chairman of the Nation to execute it and any related documents reasonably necessary to carry out the intent of this Resolution.**

**BE IT FURTHER RESOLVED that the Legislative Council approves the "Right-Of-Way Compensation Agreement between the U.S. Department of Homeland Security/Customs and Border Protection and the Tohono O'odham Nation for Integrated Fixed Tower sites, approach roads, access roads, the Traditional Northern Road and Low Water Crossings" in substantially the form attached and authorizes the Chairman of the Nation to execute it and any related documents reasonably necessary to carry out the intent of this Resolution.**

**BE IT FURTHER RESOLVED that the compensation received from U.S. Department of Homeland Security/Customs and Border Protection for the rights-of-way shall be distributed as follows: Fifty percent (50%) to the Nation and fifty percent (50%) to be divided between the Chukut Kuk and Gu Vo Districts based on the percentage of the total acreage of the rights-of-way approved through this Resolution present in each District, as determined by the Nation's Office of Real Estate Management Program.**

**BE IT FINALLY RESOLVED that, pursuant to 25 C.F.R. §169.110, the Legislative Council:**

**(1) finds that the compensation agreed to in the "Right-Of-Way Compensation Agreement between the U.S. Department of Homeland Security/Customs and Border Protection and the Tohono O'odham Nation for Integrated Fixed Tower sites, approach roads, access roads, the Traditional Northern Road and Low Water Crossings" is satisfactory to the Tohono O'odham Nation;**

**(2) waives valuation by the Bureau of Indian Affairs; and**

**(3)** **determines that accepting the agreed-upon compensation and waiving valuation is in the Nation's best interest.**

**The foregoing Resolution was passed by the Tohono O'odham Legislative Council on the 22ND day of MARCH, 2019 at a meeting at which a quorum was present with a vote of 3,084.6 FOR; -0- AGAINST; -0- NOT VOTING; and [03] ABSENT, pursuant to the powers vested in the Council by Article VI, Section 1(f) 1(i) and 1(j); Article XVI of the Constitution of the Tohono O'odham Nation, adopted by the Tohono O'odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat.984).**

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

**Timothy Joaquin, Legislative Chairman**

25 **day of** March **, 2019**

**ATTEST:**

**Evonne Wilson, Legislative Secretary**

25 **day of** March **, 2019**

**Said Resolution was submitted for approval to the office of the Chairman of the Tohono O'odham Nation on the** 25 **day of** March **, 2019 at** 1:23 **o'clock,** P **.m., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon his approval or upon his failure to either approve or disapprove it within 48 hours of submittal.**

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

**Timothy Joaquin, Legislative Chairman**

**[X] APPROVED** **on the** 25 **day of** March **, 2019**

**[ ] DISAPPROVED** **at** 4:26 **o'clock,** P **.m.**

**EDWARD D. MANUEL, CHAIRMAN**
**TOHONO O'ODHAM NATION**

**Returned to the Legislative Secretary on the** 25 **day of** March, **2019, at** 4:42 **o'clock,** p **.m.**

[signature]

**Evonne Wilson, Legislative Secretary**

RESOLUTION NO. 19-088

**ACTION:** CONSENTING TO GRANTS OF EASEMENT FOR RIGHTS-OF-WAY ACROSS NATION'S LANDS FOR THE UNITED STATES CUSTOMS AND BORDER PROTECTION'S INTEGRATED FIXED TOWER PROJECT

**MOVED:** COUNCILWOMAN GLORIA RAMIREZ **SECOND:** COUNCILWOMAN LUCINDA J. ALLEN

**DATE:** MARCH 22, 2019

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| SIF OIDAK 235.8 | 1. MARY LOPEZ ( ) | 117.9 | X | | | |
| | 2. LUCINDA ALLEN (Yolonda Garcia) | 117.9 | X | | | |
| SELLS 527.2 | 1. ARTHUR WILSON (Evelyn Juan Manuel) | 263.6 | X | | | |
| | 2. ADRIANNE TILLER ( ) | 263.6 | X | | | X |
| SCHUK TOAK 185.7 | 1. ANTHONY J. FRANCISCO JR. *(Absent)* (Teresa F. Donahue) *(Present)* | 92.85 | X | | | |
| | 2. QUINTIN C. LOPEZ (Agnes V. Joaquin) | 92.85 | X | | | |
| SAN XAVIER 232.3 | 1. DANIEL L.A. PRESTON III (Felicia Nunez) | 116.15 | X | | | X |
| | 2. JANICE FELIX (Adam Andrews) | 116.15 | X | | | |
| SAN LUCY 231.1 | 1. JANA MONTANA (Diana Manuel) | 115.55 | X | | | |
| | 2. GLORIA RAMIREZ (Lorraine Eiler) | 115.55 | X | | | |
| PISINEMO 225.9 | 1. CHESTER ANTONE *(Absent)* (Caroline D. Garcia) *(Present)* | 112.95 | X | | | |
| | 2. MONICA K. MORGAN ( ) | 112.95 | X | | | |
| HICKIWAN 209.0 | 1. LOUIS R. LOPEZ *(Absent)* (Shirley Molina) *(Present)* | 104.5 | X | | | |
| | 2. SANDRA D. ORTEGA ( ) | 104.5 | X | | | |
| GU VO 256.9 | 1. GRACE MANUEL ( ) | 128.45 | X | | | |
| | 2. DALLAS LEWIS (Nacho Flores) | 128.45 | X | | | |
| GU ACHI 270.9 | 1. TIMOTHY L. JOAQUIN (Louis L. Johnson) | 135.45 | X | | | |
| | 2. LORETTA LEWIS (Victoria Hobbs) | 135.45 | X | | | |
| CHUKUT KUK 337.7 | 1. BILLMAN LOPEZ (Patricia Antone) | 168.85 | X | | | |
| | 2. VIVIAN JUAN-SAUNDERS (Juanita Homer) | 168.85 | X | | | |
| BABOQUIVARI 372.1 | 1. FRANCES MIGUEL *(Absent)* (Roberta E. Harvey) *(Present)* | 186.05 | X | | | X |
| | 2. LEANDER MASE (Francine Schooling) | 186.05 | X | | | |
| | TOTAL | 3,084.6 | 3,084.6 | -0- | -0- | [03] |

# ATTACHMENT D

**THE TOHONO O'ODHAM NATION OF ARIZONA**

**TESTIMONY OF THE HONORABLE VERLON JOSE, CHAIRMAN**

**U.S. HOUSE OF REPRESENTATIVES COMMITTEE ON NATURAL RESOURCES**
**SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS**
**ON**
**EXAMINING THE IMPACTS OF INTERNATIONAL CARTELS TARGETING INDIAN COUNTRY**

**April 10, 2024**

---

## INTRODUCTION & HISTORICAL BACKGROUND

Good morning Chairman Gosar, Ranking Member Stansbury and distinguished Members of the Subcommittee. I am Verlon Jose, the Chairman of the Tohono O'odham Nation of Arizona. It is an honor to have the opportunity to testify before you today on behalf of my Nation and our more than 36,000 enrolled Tribal members.

The O'odham have lived in what is now Arizona and northern Mexico since time immemorial. In 1854, the international boundary between the United States and Mexico was drawn through the middle of our ancestral territory. As a result, today the Tohono O'odham Nation shares a 62-mile border with Mexico – the second-longest international border of any tribe in the United States, and the longest on the southern border. Seventeen O'odham communities with approximately 2,000 members are still located in our historical homelands in Mexico. O'odham on both sides of the border share the same language, culture, religion and history, and we continue to cross the border for sacred pilgrimages and ceremonies at important religious and cultural sites.




**Map of Tohono O'odham Ancestral Territory**

The Nation has long been at the forefront on border issues. Over the years we have developed a long-standing cooperative relationship with U.S. Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE) and other federal law enforcement agencies. Working in concert with CBP, our own Tohono O'odham law enforcement officers are regularly involved in drug interdiction and immigrant apprehension actions, which have been made more challenging due to international criminal cartel activity. Every year, the Tohono O'odham Nation spends its own funds to help meet the federal government's border security responsibilities. We have supported CBP efforts on our Reservation by providing lands for a checkpoint, forward operating bases, and integrated fixed towers to facilitate critical electronic surveillance efforts.

## THE NATION'S UNIQUE BORDER SECURITY AND LAW ENFORCEMENT CHALLENGES

The Nation faces major, unique law enforcement and public safety challenges due to its shared border with Mexico and the large size of its main Reservation. The Tohono O'odham Police Department (TOPD) must police a huge geographic area with limited resources, including remote and isolated areas and land along the border. The Nation also devotes significant resources to these efforts, spending an *annual* average of **$3 million of its own tribal funds** on border security and enforcement to help meet the United States' border security obligations. The Tohono O'odham Police Department (TOPD) responded to over 100,000 incidents in 2023, some of which are of a

general non-border criminal nature but many of which are related to drug seizures, illegal immigration, border-related criminal activity.

Further, the Nation is responsible for the recovery and disposition of immigrants who have perished on our Reservation. Since 2003, our Nation's law enforcement has spent nearly $6 million dollars on over 1,500 *migrant death investigations and recoveries* without any federal financial assistance. The Nation's police force typically spends about half of its time on border issues, including the investigation of immigrant deaths, illegal drug seizures, and human smuggling.[1] In addition, the Nation has incurred hundreds of thousands of dollars and hundreds of hours of police investigative time to address the impacts of drug trafficking, including overdose investigations, criminal evidence analysis, and Narcan (Naloxone HCL) training. Criminal cartel activity has exacerbated the negative effect of drug and migrant smuggling on the Nation. As the Government Accountability Office has reported, smugglers have held tribal families hostage, damaged and stolen property, and recruited tribal youth to engage in smuggling activity.[2]

Despite strained resources, the Nation has initiated innovative law enforcement solutions to meet these challenges:

- **High Intensity Drug Trafficking (HIDTA) Task Force**
  - Studies show that most illicit drug seizures occur at legal ports of entry (*i.e.,* outside the Nation's Reservation). Nevertheless, the Nation's is not immune from illicit drug activity and its location creates unique drug interdiction challenges. To address these challenges, in 2013, the Nation formed and now leads a multi-agency anti-drug smuggling task force staffed by Tohono O'odham Police Department detectives, ICE special agents, Border Patrol agents, and the FBI. This is the only tribally-led High Intensity Drug Trafficking (HIDTA) Task Force in the United States. In 2018, the Nation's Task Force Commander W. Rodney Irby received an award recognizing him as the National Outstanding HIDTA Task Force Commander.
  - In 2020, the Nation's HIDTA Task Force partnered with two other task forces to conduct a year-long investigation into a major cell of the Sinaloa Cartel that was smuggling drugs through the Tohono O'odham Nation. That single investigation resulted in the seizure of 575,000 counterfeit Oxycodone pills, 140 pounds of heroin and 9 kilograms of pure fentanyl powder. The seized fentanyl powder had the capacity to kill every person in Arizona eight times over. As of the first quarter of

---

1 Government Accountability Office, GAO-24-106385, U.S. Immigration and Customs Enforcement: Improvements Needed to Workforce and Expansion Plans for Unit of Native American Law Enforcement Personnel 2 (January 30, 2024).

2 *Id.*

this year, the Nation's HIDTA Task Force has seized or assisted in the seizure of 727.9 pounds of methamphetamine, 97.5 kilograms of heroin, 626,303 illicit Oxycodone pills, 10 kilograms of fentanyl powder, and nearly 2 million dose units of fentanyl.[3]

- **Shadow Wolves, an ICE tactical patrol unit**
  - The Nation has officers that are part of the Shadow Wolves, a tactical patrol unit based on our Reservation that the Nation helped create in 1974. Thanks to recent bipartisan legislation championed by Congressman John Katko in the House and enacted in the 117th Congress, the Shadow Wolves are now reclassified as ICE Special Agents.
  - The Shadow Wolves are the only Native American tracking unit in the country, and its officers are known for their ability to track and apprehend immigrants and drug smugglers using traditional tracking methods, including "cutting for sign," which involves identifying physical evidence left behind by smugglers, such as footprints, tire tracks, or clothing. The Shadow Wolves have apprehended countless smugglers and seized thousands of pounds of illegal drugs. To better combat cartel activity, the Shadow Wolves have increased investigative efforts in recent years, including plainclothes actions to blend in with the population.

In addition, the Nation has entered into several cooperative agreements with CBP and ICE, and pursuant to numerous Tohono O'odham Legislative Council resolutions has authorized a number of border security measures on its sovereign lands to assist CBP. Some examples include:

- **ICE office and CBP forward operating bases:** Since 1974, the Nation has authorized a long-term lease for an on-Reservation ICE office. The Nation also approved leases for two CBP forward operating bases that operate on the Nation's lands 24 hours, 7 days a week. One of these forward operating bases (at Papago Farms) was recently renovated and upgraded with state-of-the-art improvements and technology, including an expanded perimeter fence, helipad, and new officer living quarters and administrative facilities.

- **Vehicle barriers on our lands:** CBP has constructed extensive vehicle barriers that run the entire length of the Tribal border and a patrol road that runs parallel to the border.

- **CBP checkpoint on our lands:** The Nation has authorized a CBP checkpoint on the major highway that runs through the Nation.

---

[3] Figures provided by the Tohono O'odham Department of Public Safety, 2015-2024.

- **Integrated Fixed Towers:** The Nation approved a lease of its lands to allow CBP to build an Integrated Fixed Tower (IFT) system that includes surveillance and sensor towers with associated access roads on the Nation's southern and eastern boundaries to detect and help interdict illegal entries.

## Additional Federal Resources Are Desperately Needed to Address these Challenges

While the Nation is unique in the nature of its law enforcement and border security needs, it is not alone when it comes to Indian Country public safety concerns. Existing federal funding is wholly inadequate to meet the public safety and justice needs of Indian Country and to support tribal law enforcement generally. In 2018, the Bureau of Indian Affairs provided a report to Congress that estimated that $1 billion was needed for tribal law enforcement, with another $1 billion needed for tribal courts,[4] just to provide a minimum base level of service to all federally recognized tribes. The estimated need has only grown since that time as federal appropriations levels are nowhere near the amounts needed.[5] This failure to fund tribal justice systems undermines public safety in Indian Country.

**Drug Treatment Funding Deficits Exacerbate Public Safety Funding Deficits.** The epidemic of drug trafficking facing the Nation and the rest of the country is just that – an epidemic, and one that requires a sustained public health response. Unfortunately, this public health response has been subject to the same chronic underfunding as Indian Country public safety services. Most notoriously, the federal government has repeatedly failed to adequately fund the Indian Health Service (IHS), including behavioral health, mental health, and substance abuse services. Alongside the increase in drug trafficking over the past decade, the Nation has witnessed a steady rise in addiction, and in drug-related deaths. Unfortunately, the same rural environment that imposes significant challenges for drug interdiction efforts also imposes barriers to tribal members seeking treatment. Due to a lack of funding, there is no dedicated facility to address addiction recovery on the Nation, and while the Nation contracts for these services off-Reservation, a lack of public transportation infrastructure means that Tribal members must drive several hours (sometimes 100 miles or more) to obtain these services. Moreover, as in any culture, Tribal members are most comfortable (a threshold behavioral health requirement for treatment) seeking recovery in their own communities, with access to traditional healing and other culturally appropriate methods.

---

[4] *See* Bureau of Indian Affairs, Office of Justice Services, Report to the Congress on Spending, Staffing, and Estimated Funding Costs for Public Safety and Justice Programs in Indian Country, 2018 at 1 (July 2020).

[5] *See* National Congress of American Indians, U.S. Senate Committee on Indian Affairs, Oversight Hearing on the President's FY 2020 Budget Request at 4 (May 8, 2019).

At the same time, aging IHS infrastructure is inadequate to meet these needs. The Nation's 50-year-old hospital in Sells, Arizona is one of the oldest IHS facilities. Due to its age and lack of updated equipment and facilities, the Nation's Sells Hospital can only address minor medical issues and is entirely inadequate to serve the healthcare needs of the Nation's members. The Sells Replacement Hospital has been on the IHS facilities construction priority list for over thirty years, since 1993. Although the Nation, beginning in FY 2018, has begun to receive funding for the Sells Replacement Hospital, construction has not yet begun, and it will be several years before construction of the new facility will be complete (assuming it continues to receive the funding that is projected in the IHS budget).

**Border Security Goals Are Better Met With Public Health And Safety Funding Than Border Barrier Construction.** As we know, border wall construction came at great cost to the American taxpayer. Thanks to the no-bid contracts, diversion of badly needed drug interdiction and defense resources, and the massive environmental mitigation efforts required to address construction, we may never know the true cost. The Government Accountability Office found that by the end of 2020, the Army Corps of Engineers had obligated more than $10 billion to border wall construction alone.[6] Billions more have and will continue to be needed to mitigate the environmental and cultural harms caused by construction.

As the Nation and others have warned for years, the border wall is particularly ineffective in remote geographic areas like our homelands, where it can easily be circumvented by climbing over, tunneling under, or sawing through it. And that is precisely what has taken place. As noted by the Cato Institute:

> Immigrants used cheap ladders to climb over it, or they free climb it. They used cheap power tools to cut through it. They cut through small pieces and squeezed through, and they cut through big sections and drove through. In one small section in 2020, they sawed through at least 18 times that Border Patrol knew about in a month. They also made tunnels. Some tunnels were long, including the longest one ever discovered, but some were short enough just to get past the barrier.[7]

CBP records have revealed that the border wall is breached with staggering (but unsurprising) regularity – between more than 2,000 times and more than 4,000 times per year between 2017 and

[6] Government Accountability Office, Southwest Border: Award and Management of Border Barrier Construction Contracts, GAO-23-106893, at 6 (July 23, 2023).

[7] Id.

2022.[8] These breaches typically are performed with "inexpensive power tools widely available at retail hardware stores,"[9] or with five dollar ladders.[10]

Unsurprisingly, the border wall does not effectively deter illegal immigration and drug trafficking. CBP data shows that most illegal drugs (including the vast majority – 90% – of illegal fentanyl) are smuggled through ports of entry rather than in between them.[11] Moreover, the drug couriers (known as mules) who ferry these drugs through ports of entry are predominantly U.S. citizens, not migrants.[12]




**Source: NPR analysis of U.S. Customs and Border Protection data, October 2022- June 2023.**

---

[8] David J. Bier, "Border Wall Was Breached 11 Times Per Day in 2022," Cato Institute (December 30, 2022), available at https://www.cato.org/blog/border-wall-was-breached-11-times-day-2022-2.

[9] Nick Miroff, "Trump's border wall has been breached more than 3,000 times by smugglers, CBP records show," The Washington Post (March, 2, 2002), available at https://www.washingtonpost.com/national-security/2022/03/02/trump-border-wall-breached/.

[10] Jenna Romaine, "Trump's $15 billion border wall is being easily defeated by $5 ladders," The Hill, April 22, 2021), available at https://thehill.com/changing-america/resilience/refugees/549758-trumps-15-billion-border-wall-is-being-easily-defeated/.

[11] *See, e.g.,* Joel Rose, "Who is sneaking fentanyl across the southern border? Hint: it's not the migrants," NPR (August 9, 2023), https://www.npr.org/2023/08/09/1191638114/fentanyl-smuggling-migrants-mexico-border-drugs; Christian Penichet-Paul, "Illicit Fentanyl and Drug Smuggling at the U.S.-Mexico Border: An Overview," National Immigration Forum (October 25, 2023) https://immigrationforum.org/article/illicit-fentanyl-and-drug-smuggling-at-the-u-s-mexico-border-an-overview/.

[12] NPR, *supra* n.11.

Rather than constructing ineffective barriers, the data clearly shows that federal funds would be put to much better use supporting tribal and federal law enforcement and border security services and public health services.

**CONCLUSION**

The Nation genuinely appreciates the Subcommittee's interest in the impact of cartels in Indian Country. We welcome a continued dialogue with you on these issues.

# ATTACHMENT E

TOHONO O'ODHAM NATION OFFICE OF THE CHAIRMAN AND VICE CHAIRWOMAN

Verlon M. Jose
CHAIRMAN

Carla L. Johnson
VICE CHAIRWOMAN

May 6, 2026

Rodney Scott, Commissioner
U.S. Customs and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue NW
Washington, DC 20229

Re: **Tohono O'odham Nation Opposition to Secondary Border Wall Construction Destroying Sacred Sites in Organ Pipe Cactus National Monument and the Cabeza Prieta National Wildlife Refuge**

Dear Commissioner Scott:

Thank you for meeting with the Tohono O'odham Nation's Border Security Delegation on May 2, 2026. We appreciate your willingness to discuss issues of great importance to the Tohono O'odham Nation (the Nation). I am writing this letter to reiterate the Nation's strong opposition to the construction of any new border wall, border security infrastructure, or border roads within Organ Pipe Cactus National Monument (ORPI) and Cabeza Prieta National Wildlife Refuge (CPNWR) that impact sites that are sacred to the members of the Tohono O'odham Nation. In our meeting with Secretary Mullin we explained that the Nation opposes any wall construction impacting the Nation's cultural resources. Moreover, given the drastic reduction in illegal immigration that has been accomplished without a secondary wall, the urgency to construct a secondary wall through ORPI and CPNWR is not apparent to the Nation.

As you know, as part of ground scraping for secondary wall construction in CPNWR, the Department of Homeland Security destroyed our sacred O'odham Intaglio known as the Las Playas Intaglio. The Intaglio was carved into the ground by our ancestors over 1,000 years ago (and some experts estimate maybe as long as 8,000 years ago). The destruction of our Intaglio is a direct and irreversible act against our culture, identity, and existence as O'odham people. Our Intaglio are not artifacts of the past. They are living expressions of *Himdag*, *Our way of life*, our laws, our relationship to the land, and our responsibility to all living things. These sacred formations encode our history, migration, and ceremonies. They mark spiritual relationships between land, water, and people.

They serve as places of prayer, teaching, and cultural continuity. To destroy the Intaglio is to erase a living record of O'odham existence, one that predates the United States and continues into the future through our children. The Nation mourns this loss. The impact of the destruction of this ancient, sacred place on the Nation's members cannot be overstated. We are urging you to ensure that construction activities will not damage or impact, for example, the remaining Huhugam burial site in CPNWR.

The Nation also has grave concerns about the safety of *A'al Waipia*, also known as Quitobaquito Springs (Quitobaquito) in ORPI. Quitobaquito is an O'odham Traditional Cultural Landscape.[1] It is an irreplaceable sacred site, one of the only remaining perennial water sources in the Sonoran Desert. It also provides critically important habitat to three federally protected endangered species. The proposed construction of a "secondary wall" adjacent to the existing border wall—which is currently only approximately 175 feet from the southern edge of Quitobaquito—poses a direct, imminent, and existential threat to Quitobaquito's continued existence as a Traditional Cultural Landscape and a rare riparian Sonoran Desert ecosystem. It is the Nation's understanding that DHS plans to build a secondary wall between 150-200 feet from the existing wall, which would require the new wall to be built directly through the Quitobaquito pond. Moreover, the secondary wall will be built much closer to the geological fault from which Quitobaquito's sacred waters emerge, potentially severely diminishing, or even halting, the production of water from its springs for the first time in human history. The proposed construction/destruction appears to be moving forward without adequate government-to-government consultation and/or even a full understanding of the significant cultural and environmental impacts this project will have.

**<u>Government-to-Government Consultation</u>**

It is imperative that the federal government honor its trust responsibility to the Nation and avoid any further desecration of sacred places. Meaningful government-to-government consultation not only acknowledges the sovereign status of the Nation, it helps to ensure that DHS fully understands the significant cultural and environmental impacts of the proposed project. Consultation would have helped avoid the destruction of the Las Playas Intaglio, and it would have

---

1 "Quitobaquito can be considered a Traditional Cultural Property due to its long and ongoing association with the cultural practices, traditions, beliefs, and lifeways of the indigenous people of the Sonoran Desert, specifically the O'odham and their ancestors. Indigenous people have sought the resources of the Quitobaquito oasis for subsistence and to carry out traditional cultural and religious practices for millennia. The site continues to hold importance to the O'odham people for ritual and ceremonial purposes." Gina Chorover and Teresa Dekoker, QUITOBAQUITO ORGAN PIPE CACTUS NATIONAL MONUMENT CULTURAL LANDSCAPE REPORT (January 2024), https://capla.arizona.edu/sites/default/files/2024-06/Quitobaquito%20Cultural%20Landscape%20Report%20FINAL%201-11-24.pdf.

helped to avoid the earlier destruction of Monument Hill in Quitobaquito, a sacred site near Quitobaquito where ancestral remains are buried.

In 2019, federal contractors bulldozed and bladed a large area near Quitobaquito, with no advance notice to the Nation, and blasted through Monument Hill. These wall-related construction activities irreparably damaged the areas of ORPI adjacent to the US-Mexico Border. There was no advance consultation about the destruction of these sites, no advance notice given, and no effort to mitigate or avoid damage. During DHS's construction of the first border wall, excavation for the wall's foundation and the building of a new road caused extensive and severe ground disturbance in the Quitobaquito area. Again, DHS damaged numerous cultural sites and shrines, disturbed ancestral remains, and destroyed portions of the historic pilgrimage trails. In addition, surface hydrology at Quitobaquito was significantly altered by sediment buildup and the excavation of a ditch running alongside the road next to the border wall.

Hopefully, similar missteps will not be repeated with exponentially greater and more disastrous results. The Nation respectfully requests formal government-to-government consultation on the construction of the secondary border wall at ORPI and CPNWR before it proceeds through or near our sacred sites. We also urge DHS to consider technological alternatives to a secondary wall. The Nation's understanding is that illegal immigrants cannot, for example, go through or over a linear ground detection system without being identified.

**Quitobaquito is Sacred and of Ongoing Cultural Importance to the Nation**

Quitobaquito and the surrounding lands in ORPI and CPNWR are part of our O'odham ancestral lands, lands our ancestors have lived in and utilized for thousands of years. Since 1937, Quitobaquito has been contained within ORPI, which encompasses more than 330,000 acres, and borders the Nation's main reservation along part of its western boundary. The entirety of ORPI and CPNWR are of great cultural significance to the Tohono O'odham Nation. They are, however, of particular importance to the Hia-Ced O'odham, who historically inhabited these lands and whose descendants are enrolled members of the Tohono O'odham Nation.

Our ancestors' use of Quitobaquito is well-documented. Human habitation in and around Quitobaquito dates back approximately 16,000 years. It is the second largest spring-fed oasis in the Sonoran Desert. The water that emerges from the ground at Quitobaquito is sacred to O'odham, as it has sustained our people, and the plants and wildlife that we have in turn relied on for millennia. It has always served as a vital stop along our traditional salt pilgrimage trails, which start from villages on our reservation, stretch across what is now northern Sonora, Mexico, and end at the salt

flats at the Sea of Cortez.[2] O'odham have also lived around Quitobaquito throughout history. As early as 1698, the Jesuit Missionary Eusebio Kino wrote about visiting the spring and an O'odham farming community there. The last O'odham family to live at Quitobaquito was forced by the federal government to leave the area in 1957.

Quitobaquito is not solely an archaeological site. Although O'odham were forced to stop residing at Quitobaquito in the 1950s and our O'odham traditional homes, fencing, and grinding stones were removed from the area by the National Park Service in the 1960s, we continue to travel to Quitobaquito for traditional cultural, religious, and ceremonial purposes of deep importance to our O'odham *himdag,* our O'odham Way of Life. We still visit Quitobaquito to gather plants and engage in our traditional ceremonies. There is an O'odham cemetery located adjacent to Quitobaquito containing thirty-four graves, and O'odham families continue to travel to this area to pray and pay their respects. Additionally, six miles of the main access road to Quitobaquito, Puerto Blanco Road, runs immediately adjacent to the existing border wall. The destruction of this road would likely disrupt tribal members' ability to visit their ancestors' graves at the O'odham cemetery. It will also likely prevent ORPI's ecologists from accessing the spring to monitor all three protected species and the mud turtle critical habitat.

**Quitobaquito is an Integral Part of the Sonoran Desert Ecosystem in ORPI and Critical Habitat to Three Endangered Species**

In addition to its deep cultural significance to the Nation, Quitobaquito is an integral part of the pristine Sonoran Desert ecosystem in ORPI, which has been designated a Biosphere Reserve by the United Nations Education, Scientific, and Cultural Organization (UNESCO) because of its global significance. Again, it is a unique riparian oasis that, in part, contains critical habitat for three endangered species: the Sonoyta mud turtle (*Kinosternon sonoriense longifemorale*); Sonoyta pupfish (*Cyprinodon eremus*); and the Quitobaquito Tryonia (*Tryonia quitobaquitae*). There are only five known wild populations of the Sonoyta mud turtle globally, and Quitobaquito contains the only population in the United States. Because the four populations in Mexico have been steadily decreasing, the population at Quitobaquito is crucial to ensuring the Sonoyta mud turtle does not go extinct. Similarly, the Quitobaquito populations of Sonoyta pupfish—which can persist in water nearing 100 degrees Fahrenheit with a salinity three times that of the ocean—and Quitobaquito Tryonia—a snail the size of a peppercorn—are the only wild populations of these species that exist in the world. Quitobaquito also provides rare aquatic habitat for migratory waterfowl and other mammals such as the Mastiff Bat. Quitobaquito is also most likely the only U.S. breeding habitat for the Giant White

---

[2] Our O'odham salt pilgrimage is also well-documented in the historical record. *See* Eric Jay Toll, *The Ancient Salt Trails: Once a Journey for Life; Now It's a Ceremonial Quest*, National Parks Traveler (May 8, 2023), https://www.nationalparkstraveler.org/2023/05/ancient-salt-trails-once-journey-life-now-its-ceremonial-quest.

(*Ascia howarthi*), a rare butterfly, that is dependent upon the desert caper (*Atamisquea emerginata)*, a rare tree whose only known location in the United States is within ORPI.

Wall-related construction activities will further degrade Quitobaquito. The use of heavy equipment and prolonged pedestrian activity in and around Quitobaquito will cause severe disturbances to the Sonoyta mud turtle, Sonoyta pupfish, the Quitobaquito Tryonia, and the multitude of non-endangered species that also rely on its rare aquatic Sonoran Desert habitat. Construction activities in the pond will alter natural basking, breeding, and foraging behavior for these species, as they are normally very isolated from human activity. Fuel leaks from heavy equipment, erosion, and road degradation will negatively impact the water quality at Quitobaquito, in turn harming all species that live in, and rely on, the water.

Overuse of the area's extremely limited subsurface water resources for construction of a secondary border wall and associated road and other infrastructure is also an issue. Water is a scarce and valuable commodity in the southwest desert. For construction of the first border wall, U.S. Customs and Border Protection (CBP) installed two wells to the west and to the east of Quitobaquito. CBP drew water from these two wells, along with a third existing well between the Nation and Highway 85, for constructing the road and mixing cement for the wall footer. The massive increase in use of water from these wells for secondary border wall construction, roads, and dust control throughout ORPI would likely permanently alter the subsurface hydrology in and around Quitobaquito.

This type of disruption to Quitobaquito's subsurface hydrology will have a catastrophic impact on all species, animal and plant, that rely entirely on the water at Quitobaquito for their continued survival. It would potentially affect the connectivity of all of Quitobaquito's linked aquatic habitats, including the main pond and the channel, which is crucial habitat for smaller turtles and, essentially, the *only* habitat for Tryonia. Construction of a second border wall through their only stable habitat will lead to degradation, fragmentation, and potentially complete habitat loss.

The Nation appreciates the enduring and positive relationship DHS has otherwise maintained with the Nation over many decades, as well as DHS's recognition of the Nation as a strong partner in ensuring the security of the United States border. However, the Nation has always made clear that border walls are not the most effective nor efficient use of the federal government's resources. The cost of a border wall through Quitobaquito—which would amount to the destruction of one of our most important Traditional Cultural Landscapes—is simply too high for the Nation to endure. Quitobaquito is a living Traditional Cultural Landscape that reflects the spiritual, historical, and ongoing lifeways of the O'odham (people). It is an interconnected system of sacred water, land, and the salt pilgrimage that continues to sustain our cultural identity. Any disruption to its waters, landforms, access, or surrounding environment directly impacts our religious practices, cultural continuity, and responsibilities to future generations, including disruption

of traditional pathways such as the salt pilgrimage routes, which are essential to the exercise of our cultural practices.

These concerns apply broadly across the Nation's traditional lands along the international border, where similar construction actively threatens, and has already destroyed, other culturally significant landscapes, sacred sites, and traditional use areas. Some harms are irreversible and unacceptable, like the destruction of the Las Playas Intaglio. The Tohono O'odham Nation does not consent to the construction of a secondary border wall or related infrastructure at or near Quitobaquito or any other culturally significant O'odham sites, including the remaining Huhugam burial site in CPNWR.

The Nation urgently requests that DHS: (1) not construct a secondary border wall where it will impact sacred sites including the area of Quitobaquito or the Huhugam burial site in CPNWR; (2) immediately engage in meaningful government-to-government consultation, which would include, if necessary, a discussion of alternatives to construction of a secondary border wall near sacred sites in ORPI and CPNWR; and (3) utilize a Nation-selected, independent Compliance Inspection Contractor to ensure that any construction activity will avoid impacts to areas of cultural significance.

Thank you. Again, we greatly appreciate your willingness to discuss these important issues with the Nation.

Sincerely,

Verlon M. Jose
Chairman

# ATTACHMENT F

| | |
|---|---|
| **From:** | ENRIQUEZ, PAUL |
| **To:** | Verlon M. Jose; Carla L. Johnson |
| **Cc:** | SCOTT, RODNEY S; VITIELLO, RONALD D.; SLOSAR, WALTER N; SINGLETON, RUYNARD R; WATKINS, DORION D; HYLAND, MARY; GITHENS, DANIEL A; ALMETICA, SUZANNE N (OCC); FELTS, MICHAEL F (OCC); SHAW, CHRISTOPHER D (OCC); Howard Shanker; Michael Ehlerman; Sibbison V. Heather; MODLIN, JOHN R |
| **Subject:** | CBP Notification of the Border Wall Contract Solicitation |
| **Date:** | Friday, May 15, 2026 5:16:31 AM |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Chairman Jose and Vice Chairwoman Johnson,

I am writing to inform you that CBP will be releasing the contract solicitation for the border wall project located adjacent to the Tohono O'odham Nation (Tucson 5 Wall Project) today, Friday, May 15. The contract solicitation will include the construction of approximately 62 miles of primary and secondary border wall, technology, a patrol road, cameras, and lighting. CBP is targeting a construction contract award in June 2026, followed by design and schedule for construction. The construction schedules will be known following the contract award and CBP will share the schedule with the Nation as soon as received by the construction contractor.

CBP will coordinate with the Nation to identify an alignment for the barrier that avoids identified sacred sites and burials and will have environmental and tribal monitors present during construction activities.  CBP remains committed to ongoing communication and coordination with the Tohono O'odham Nation throughout the planning and implementation of this project. We look forward to our next meeting on May 18th to discuss additional aspects of the project.

Please feel free to reach out to me directly with any questions or concerns.

Thank you,

**Paul Enriquez**
Director
U.S. Border Patrol
Program Management Office DIrectorate
Infrastructure Program
(202) 222-5170

# ATTACHMENT G

# ATTACHMENT B

## Best Management Practices (BMPs)

**TCA-5 Tohono O'odham**
**Vertical Barrier & Attributes**
**Design Build Construction Project**

Pima County, AZ

US CUSTOMS and BORDER PROTECTION (CBP) BORDER PATROL PROGRAM MANAGEMENT OFFICE DIRECTORATE (PMOD)

## Customs and Border Protection Best Management Practices

| | |
|---|---|
| Project Name: | TCA-5 |
| Project Type: | Replacement Vehicle Barrier and Secondary Border Wall |
| Created: | April 2026 |
| Updated: | |

**General Construction Activities**

1. Implement Customs and Border Protection (CBP) best management practices (BMPs) during all construction activities including proper handling, storage, and disposal of hazardous or regulated materials.
2. Collect and store all fuels, waste oils, and solvents in tanks or drums within a secondary containment system that consists of an impervious floor and earthen dike capable of containing 125 percent of the volume of the containers stored therein. These materials will be removed from the site during demobilization.
3. Refuel machinery following accepted guidelines, including refueling and storage shall take place away from the aquatic habitat; (not within 100 feet of a drainage channel, wetland, or other surface waters). A designated refueling area with spill protections readily available shall be reviewed by CBP prior to implementation. A contingency plan to control petroleum products accidentally spilled during the project shall be developed as part of all aquatic/in-water projects.
4. A CBP-approved Spill Protection Plan (SPP) must be prepared and implemented by the contractor at the construction site to ensure that toxic substances are properly handled, stored, and disposed of. Contain spills immediately and use an absorbent (e.g., granular, pillow, sock) to absorb and contain the spill. Immediately report any spill of a hazardous or regulated substance to the CBP Project Manager and on-site environmental monitor. Drip pans will be used beneath equipment, and containment zones will be used when equipment is not being used, or when refueling vehicles and equipment.
5. Collect non-hazardous solid waste (trash and waste construction materials) and deposit in on-site receptacles. Maintain solid waste receptacles and dispose as required.
6. Only authorized contractors and Government personnel are allowed within the construction site. With the exception of service dogs, no pets including emotional support pets, owned or under the care of any and all construction workers will be permitted inside the project's construction boundaries, adjacent native habitats, or other associated work areas. Service animals shall have formal official documentation from a licensed physician for CBP approval prior to being allowed onsite.
7. If construction or maintenance work activities will occur during nighttime hours, all lights will be shielded to direct light only onto the work site, the minimum wattage needed will be used, and the number of lights will be minimized. If birds are roosting on temporary light poles and other pole-like structures used for construction activities, then anti- perch devices would be used to discourage roosting by birds. Light poles will be designed to prevent hunting perches for ravens and raptors. Unnecessary lights will be turned off to avoid attracting wildlife.
8. A Stormwater Pollution Prevention Plan (SWPPP) will be prepared prior to construction activities. Additional site-specific BMPs will be implemented as described in the SWPPP to reduce erosion and the impact of non-point source pollution during construction

activities, giving special consideration to areas with highly erodible soils. Address highly erodible soils in the SWPPP. BMPs include such things as buffers around washes to reduce the risk of siltation and installation of water bars to slow the flow of water downhill.

9. Vehicular traffic associated with the construction activities must remain on established roads to the maximum extent practicable. No off-road vehicle activity will occur outside of the project footprint. Vehicle parking will be confined to the project footprint. Vehicles will not exceed 25 mph within the project area.
10. The project site will be accessed exclusively via designated access roads. Any new or improved access roads will include road construction and maintenance BMPs in their design and plan.
11. Maintain existing roads during construction and return the existing roads and staging areas to pre-construction conditions, if requested by the Government, once construction is complete. The widening of existing or created roadbed beyond the design parameters due to improper maintenance and use will be avoided or minimized. The width of all roads that are created or maintained by CBP should be measured and recorded using GPS coordinates and provided to the Government. Photo document and provide GPS coordinates where correction is needed. Government to acquire GIS shape files from construction contractor at end of project.
12. The minimum number of roads needed for proposed actions must be constructed and maintained to proper standards. Roads constructed for project access must be closed and restored to natural surface and topography using appropriate techniques once no longer needed for the project. The GPS coordinates of roads that are thus closed must be recorded and provided to the Government. A record of acreage or miles of roads taken out of use must be maintained. Photo document efforts if they occur prior to completion of project. GIS files from the Contractor must be provided to CBP.
13. Areas disturbed by past activities must be used for staging, parking, and equipment storage. All staging, parking, equipment storage areas, and access roads, with their requested uses, will be approved by CBP. Prior to beginning any construction activity (including equipment mobilization, tree- trimming, clearing and grubbing, and road grading), contractor must stake and flag the perimeter of the work area, access routes, laydown yards, staging areas, turnarounds, and other areas approved for use. Recommend flagging and staking occur every 25-linear feet to prevent unauthorized impacts outside of the approved work area. Photo document and provide GPS coordinates of these areas to CBP.
14. If soil-binding agents are utilized, they must be applied during the late summer/early fall months to avoid impacts on federally listed species. Soil-binding agents must not be used in or near surface (within 100 feet) of waters (e.g., wetlands, perennial streams, intermittent streams, washes). Only apply soil-binding agents to areas that lack any vegetation.
15. All disturbed soils not paved that will not be landscaped or otherwise permanently stabilized by construction must have topsoil set aside to be used with species native to the project vicinity. CBP will provide a list of seed mix for each project area.
16. To prevent invasive species seeds, all hauling and construction equipment, including work and personal vehicles, must be washed at the identified facility prior to mobilization to the project area. All vehicles and equipment must be free of all attached soil, mud, vegetation, and other debris prior to mobilization to the construction site.
17. Invasive plants on any work area must be treated through chemical or mechanical means. Herbicides must be used according to label directions. Herbicide application must be

conducted by a licensed applicator, and daily report of chemical application rate must be reported to CBP Construction Project Manager or Environmental. Mechanical removal must be done in ways that eliminate the entire plant and remove all plant parts to a disposal area, with the exception of root mass left in-place for bank stabilization.

18. Any off-site materials (e.g., fill and gravel, straw bales, wattles, fiber rolls) must be weed-free to prevent the introduction of non-native species.
19. Preventative measures will be implemented to avoid the introduction of invasive plant species, including soil sourcing, topsoil oversight, and material inspection.
20. Dust control measures will be implemented to prevent hazardous conditions in terrestrial land associated with the project (staging areas, access roads).
21. Concrete wash water will be collected in an area with an impervious floor and removed off-site for proper disposal to prevent toxicity to aquatic life.
22. A CBP-approved Fire Prevention and Suppression Plan (FPSP) must be developed and implemented for all activities that require welding or otherwise have a risk of starting a fire.
23. Groundwater extraction can occur with written approval by CBP. Groundwater wells shall be metered daily and meter readings provided to the onsite environmental monitor and CBP Project Manager daily.
24. Activities will pause during heavy rain or hazardous weather conditions, including avoiding traversing vehicles or equipment across flowing or standing watercourses.
25. Spray painting bollards shall be performed using equipment designed to minimize overspray. Spray painting bollards should not be conducted in high winds to prevent over spraying into adjacent vegetation.
26. Areas that are hydro-seeded for temporary erosion-control measures must use only native plant species appropriate to surrounding habitat types. Seed list must be approved by CBP Environmental prior to application.
27. If cultural resources (artifacts, features, sites, structures) are encountered work shall stop in the immediate area (100-foot radius) until the environmental monitor can assess the significance of the find.
28. If human remains are encountered, work will stop within 250 feet of the find. Appropriate Tribal, Federal and State agencies will be consulted for a path forward.
29. Areas around and beneath equipment in terrestrial and aquatic settings must be checked for listed species and wildlife to avoid "take" situations.
30. Tree and brush removal in threatened and endangered species habitats will be minimized and will not interfere with active nesting as per the Migratory Bird Treaty Act.
31. Ground disturbing activities (e.g. vehicular travel, grubbing, vegetation removal, grading, storage of materials, installation of aerial targets, excavation, scraping, removal of large boulders etc.) shall not be undertaken outside the approved project area.
32. Prior to ground disturbing activities, vegetation removal or trimming, a Government biologist will present an environmental awareness program to all personnel who will be onsite, including but not limited to Government employees, contractors, contractor employees, supervisors, inspectors, and subcontractors. Included also will be general identification of the species, description of habitat, sensitivity of the species to human activity and describe measures for avoidance and protection of the species during construction. Following the education program, the photograph of the species will be posted in the office of the Contractor and resident engineer, where they must remain

through the duration of the project. The Contractor will be responsible for ensuring that all their employees are aware of these species and that they may be present within the project area.

33. If construction or clearing activities are scheduled during the nesting season (typically March 1 - September 15) the Government will perform a preconstruction survey for migratory bird species to identify active nests prior to the start of any construction or clearing activity. If construction activities will result in the disturbance or harm of a migratory bird, then CBP may coordinate with the U.S. Fish and Wildlife Service (USFWS). Establish buffer zones around active nests until nestlings have fledged and abandoned the nest.
34. When an individual of a federally listed species is found within the project limits, notify the Project Manager or CBP Construction Site Manager. Work may resume when the Government biologist safely removes the individual, or it moves away on its own. Individuals of federally listed species found in the project area and requiring relocation will be relocated by the Government biologist.
35. To prevent entrapment of wildlife species during construction, all excavated, steep walled holes or trenches more than 2-feet deep will either be entirely covered at the close of each working day with plywood or trench cover plates or provided with one or more escape ramps constructed of earth fill or wooden planks. The ramps will be located at no greater than 1,000-foot intervals and will be sloped less than 45 degrees. Each morning before the start of construction and before such holes or trenches are filled, they will be thoroughly inspected for trapped animals. Any animals discovered will be allowed to escape voluntarily (by escape ramps or temporary structures), without harassment, before construction activities resume, or removed from the trench or hole by a qualified biologist and allowed to escape unimpeded.

**Species Specific**

36. Cactus Ferruginous Pygmy-owl (*Glaucidium brasilianum cactorum*): In Arizona, this species can nest in columnar cacti. Pre-construction surveys will be performed by Government biologists in suitable habitat of the pygmy-owl to determine the presence or absence of the species prior to any clearing or grubbing. If present, a buffer of a 1,000-foot radius will be marked for avoidance. If a pygmy-owl is sighted, the construction contractor should immediately inform the environmental monitor and the CBP Project Manager. CBP Environmental will contact the US Fish and Wildlife Service to report sightings. The environmental monitor will document and report any sightings.
37. Sonoyta Mud Turtle (*Kinosternon sonoriense longifemorale*): No in-water work would occur within ponds, pools, streams or other waterbodies with known occurrences, suitable habitat or designated critical habitat for the Sonoyta Mud Turtle without CBP approval. To the extent practicable, removal of riparian vegetation within 100 feet of aquatic habitats would be avoided to provide a buffer area to protect the habitat from sedimentation. Cleaning or modification of culverts and other work within drainages that could cause sedimentation or otherwise affect water quality or quantity would not occur within, or within, 0.25 miles upstream of, critical habitat or other suitable habitat without further CBP approval.
38. Chiricahua Leopard Frog (*Rana chiricahuensis*): Endangered and sensitive aquatic and riparian species are known to occur in this project area. Prior to construction activities,

CBP biologist would survey project footprint and mark areas for avoidance. If construction is to occur in an intermittent or perennial waterway, species relocation may be required.

39. Snakes: If more than 5 venomous snakes a day are appearing in the construction area, contractor must hire a snake relocation company to survey the project area at the start of every day.
40. Mesquite: All removed mesquite with a diameter of 4 inches or more shall be salvaged.
41. Columnar Cactus: The Contractor will subcontract a certified arborist for the relocation of columnar cacti 10 feet in height or greater. Cacti less than 10 feet in height would be replaced with a nursery stock at a 3:1 ratio in an area proximate to the project area. The Contractor will work with a certified arborist in preparing and modifying a relocation plan, prior to scheduled work in impacted areas. CBP's Natural Resources SME will oversee the operation of the relocations.
    - Relocate affected plants north of the project area. Species should be relocated a minimum of 10' away from proposed lighting & electrical features.
    - The north face of cactus will be marked so that the species are translocated in the same position.
    - Provide a 12-month establishment period for all relocated affected plant species.
    - Impacts to all saguaros that provide the suitable nesting habitat for the cactus ferruginous pygmy-owl (*Glaucidium brasilianum cactorum*) will be avoided. If any saguaros are damaged during construction activities, CBP will be notified and the Contractor shall replace at an appropriate ratio. Qualifications - Certified Arborist
    - The certified arborist must adhere to the existing plant relocation BMPs. The relocation of the saguaro and organ pipe cacti will be scheduled prior to any impacts from work in designated areas.
        - The certified arborist subcontractor must provide the following prior to plant salvage and relocation:
        - Record of certification;
        - Method of removal and placement;
        - Procedures for feeding & watering, if applicable;
        - Methods of bracing & for providing physical stability;
        - Marking provisions for relocated plants identifiable during establishment period;
        - Establishment period measures to be employed; and
        - A monitoring plan for relocated species.

**Tribal Specific**

42. For any maintenance and repair service to access roadways outside of the immediate project area: CBP will provide written notice via email, including a scope of work and schedule, in advance to the Tohono O'odham Nation (TON).
43. Construction and maintenance crews will avoid traversing roads through saguaro fruit harvesting areas during the saguaro cactus harvesting festival to the maximum extent practicable.
44. The project corridor will deviate in certain areas to avoid sensitive resources to the greatest extent possible.
45. Construction crew will be respectful to the cultural heritage of the Tohono O'odham.

# ATTACHMENT H

**[Page 6]**

b. **BASE WORK** – TCA-5 Primary Vertical Barrier, Patrol Road & Design and Construction Segments 1, 2, 3a and 3c: Provide the design and construction of approximately 23.72 miles in segment 1, 23.36 miles in segment 2, 5.52 miles in segment 3a and 4.95 miles in segment 3c of new 30-ft primary vertical barrier, demolition of legacy vehicle barrier and 20-ft wide patrol road. The Contractor shall provide full design and construction for the alignment shown in SOW Attachment A – Location Maps.

1. The West and East ends of each segment shall be tied into the adjacent segment terminations. Note the following special requirements:

a) Segment 1 West termination shall be tied into the TCA-4 project East terminations. This will require extending approximately 50 feet West of the Tohono Oodham boundary. Demolition of the North-South connector at this location is required as part of the TCA-5 project scope.

b) Segment 3c East termination shall be tied in with the TCA-2 project West termination.

c) The legacy vehicle barrier shall be demolished and disposed of at an approved offsite facility.

2. Primary vertical barrier steel is contractor provided.

**[Page 7]**

d. **BASE WORK** – Access Road Repair Work: Repair of existing access road pavement sections shall be comprised of road blading and placement of 4-in of compacted aggregate base (no caliche) across a maximum 20-ft road width up to the mileage indicated in the price schedule. For purposes of this Work, access road is considered any road approved for use to access a project segment. Contractor to provide not to exceed (NTE) cost per mile of access road repair. Notice to Proceed (NTP) for this work can be requested at any time within the overall project duration. To request NTP, the Contractor shall submit the request via email to the COR for review and approval. The request shall include a map of the access road(s) to be repaired with end coordinates and the total mileage being requested. Access road repair requests made by the Contractor shall be made by the Contractor as they become necessary for construction access to one or more project segments associated with new vertical barrier work. The exact roads approved for access are To Be Determined. The roads shown on the location maps shall not be assumed to be approved for accessing the TCA-5 work area.

**[Page 7]**

f. **OPTION WORK:** TCA-5 Secondary Vertical Barrier Design and Construction Segments 1, 2, 3a, 3b and 3c: Provide the design and construction of approximately 23.72 miles in segment 1, 23.36 miles in segment 2, 5.52 miles in segment 3a, 4.14 miles in segment 3b and 4.95 miles in segment 3c of new 30-ft primary vertical barrier. The Contractor shall provide full design and construction for the alignment shown in SOW Attachment A – Location Maps.

1. The secondary vertical barrier shall be contained within the 60-ft Roosevelt Reservation. The standard secondary vertical barrier requirements of a patrol road on the South side of the secondary vertical barrier and a maintenance road on the North side of the secondary vertical barrier do not apply however the south side of the secondary vertical barrier shall be provided with unobstructed access for four wheel drive maintenance vehicles. As indicated in the BASE Attribute scope section, the design shall ensure that all of the following features can be contained to the Roosevelt Reservation: primary vertical barrier, primary LGDS, 20-ft wide patrol road, attributes, secondary LGDS and secondary vertical barrier. This may require alternative (and more expensive) construction equipment, techniques and methods.

**[Page 8]**

i. **BASE and OPTION WORK** – Vertical Barrier Requirements: All vertical barriers shall be per the TIDS and shall be 30-ft steel bollard panels with anti-climb plates and mitered tops with plate and in-ground foundation. Grout filling and capping of bollards shall be completed within 5 calendar days of bollard panels being set. All new vertical barrier Work shall be painted and include associated drainage and erosion control, vegetation/debris clearing, structures/obstructions clearing, patrol road maintenance road, all along the entire length all vertical barrier segments. In no case shall any road surface be caliche. Vertical barrier Work shall require flood mitigation measures consisting of either rotated bollard panels or drainage gates to be designed and constructed by the Contractor. For bid purposes, assume all flood mitigation is handled by use of rotated bollards. All drainage gates shall be AVLG for flood mitigation measures and rotating drainage gates local drainage crossings. Final flood mitigation requirements shall be included as further described in Design After Award below. Automated slide gates shall be provided per GFI – Automated Vehicle Gate Sizing, Quantities and Preliminary General Placement KMZ (exact location DOR responsibility). Small wildlife passages are required; base bid shall assume

124 the primary vertical barrier and 124 in the secondary vertical barriers. The exact locations will be provided after contract award.

**[Page 12 & 13]**

r. **BASE AND OPTION WORK** – Vegetation, Debris, Structures & Obstructions Clearing and Relocation Requirements: The Contractor shall remove all structures and obstructions including but not limited to culverts, chain link fence, razor/concertina wire and temporary fence panels within the project limits. All structures and obstructions shall be salvaged or disposed of by the contractor and approved location. ~~The contractor shall remove vegetation from the patrol road to the river's edge to a height not to exceed 6-in.~~ Native trees, that are outside the limits of barrier, road and drainage control construction, with a diameter of more than 6-in shall not be removed. In no case shall vegetation removal result in ground disturbance of more than 10% (no root removal). All debris within the enforcement zones, including vegetation, shall be disposed of by the Contractor at an approved off-site landfill. No burning of either live vegetation or any debris shall be permitted. See provided KMZ files within GFI links for use in estimating quantity of vegetation clearance.

1. Cacti Relocation. The following outlines requirements associated with the avoidance and/or relocation of certain plant species: Avoidance of impacts to federally and state listed plant species is the preferred conservation measure. However, if it is determined that columnar cactus and other protected species cannot be avoided in place, salvage and translocation of plants to an area adjacent to the project area will be required. The contractor's ISA certified arborist shall prepare a plant salvage and translocation plan identifying plant species of concern that will be impacted by construction operations within the TCA-5 project area prior to scheduled construction activities. The plan shall include the following information:

i. An ISA certified arborist will be on site to oversee all translocation of plants identified in Attachment B - BMPs. Protected Native Plants by Category of the Arizona Native Plant Law and other vegetation identified by Customs and Border Protection (CBP) Natural Resources Subject Matter Expert (SME).

ii. Record of ISA arborist certification.

iii. Method of removal and placement.

iv. Procedures for feeding & watering, if applicable.

v. Methods of bracing & for providing physical stability.

vi. Marking provisions for relocated plants identifiable during establishment period.

vii. Establishment period (minimum 12 months) measures to be employed.

viii. A monitoring plan for relocated species.

ix. Relocate affected plants north of the TCA-5 project area.

x. Species should be relocated a minimum of 10' away from proposed lighting & electrical features.

xi. The north face of cactus, ocotillo, and agave species will be marked so that the species are translocated in the same position.

xii. Impacts to all saguaros that provide suitable nesting habitat for the cactus ferruginous pygmy-owl (Glaucidium brasilianum cactorum) will be avoided. If any saguaros are damaged during construction activities, CBP will be notified and the Contractor shall replace at an appropriate ratio.

**[Page 13]**

l. **BASE WORK** – Local Drainage & Erosion Control Requirements: The Contractor shall provide full design and construction of drainage control that enables the local design storm per the TIDS to be conveyed across the vertical barrier enforcement zone and the waterborne barrier patrol road and protects against associated scour and erosion. At each drainage crossing, the Contractor shall complete the necessary site grading, approach road construction, erosion and scour protection, guardrail, wingwalls, inlets/outlets, concrete low water crossings, flow dissipaters, debris posts, culverts, and bridges as needed to complete the drainage control Work. Construction of all roadside ditches as needed to convey site drainage to road drainage crossings shall be included under drainage control work.

- Loose riprap shall have a minimum D50 of 12-inches.

- All local drainage crossings at the vertical barrier location shall be analyzed as concrete low water crossings (LWC), unless otherwise specified to require culverts in these Project Specifications, with rotated bollard panels and zero drainage gates. If the solution produces 12-in or less of rise in water surface elevation (WSE) for rural settings and 3-in or less for urban settings, then the information shall be fully documented within the WSE waiver template, and no further analysis is required. If the rise in WSE due rotated bollard panels within the drainage crossing is greater than 12-in for rural settings and 3-in or less for urban settings, then the Contactor shall analyze up to three additional solutions that

could include grading, culverts at the patrol road, rotating drainage gates or a combination thereof that result in lowering the rise WSE. Details associated with the approved waiver request shall be incorporated into the drainage report and construction plans.

- All local drainage crossings within vertical barrier segments shall be completely closed off by either vertical barrier or vertical barrier with rotating drainage gates. All drainage crossings that do not specifically call for VB culvert shall be designed to meet TIDS requirements using LWC, culverts or combination. All culverts at or over 5-ft clear height shall have rotating drainage gates installed. See SOW Attachment H – Rotating Drainage Gates Concept Design

- The Contractor is responsible for removing all sediment and debris from all the drainage crossings within the project limits at the start of the project and following storm events.

**[Page 14]**

t. **BASE WORK** – External stakeholder Coordination: The Design-Build Contractor shall coordinate with external stakeholders impacted by this project that include, but are not limited to, the International Boundary & Water Commission (IBWC), Tohono O'odham, County and local landowners. The Design-Build Contractor is required to obtain final IBWC concurrence (excluding local drainage gates) that all BASE design meets IBWC requirements for construction within the Roosevelt Reservation. See Attachment D – TIDS v6. The Contractor shall not reach out to any stakeholder until CBP provides the initial introduction and point of contact. The Contractor shall be the lead for all US-IBWC coordination and shall include CBP on all coordination. CBP shall be the lead for all other stakeholder coordination. Contractor participation for all external coordination shall include attending in-person meetings, proposed design exhibits and/or design documents and meeting minutes for all meetings attended by the Contractor. A minimum of twenty on-site meetings will be required for purposes of coordinating with stakeholders regarding details of the project design. The Tohono O'odham reviewers require an in-person presentation of every design submission so depending on how the contractor breaks up the design packages, there could be more than twenty in person meetings required.

**[Page 15]**

1.3 CONTRACTOR'S USE OF SITE AND PREMISES

A. The Contractor shall have full use of the Project real estate limits, upon availability as notated in the SOW, to complete the work. All work shall be contained within

the project easements. Locating and acquiring staging areas on private lands is the responsibility of the Contractor. Locating and acquiring staging areas on federal/public lands is the responsibility of the Contractor but shall be coordinated through CBP. Maps showing staging areas size and location shall be provided to CBP, in addition to other staging area requirements as described throughout these specifications.

B. See Attachment A – Location Maps for depiction of the areas of Work and construction access road locations for all BASE Work. Any additional construction access through public/federal lands may be requested by the Contractor. Availability of additional construction access through public/federal lands will be researched by CBP and results will be reported back to the Contractor. CBP does not guarantee and additional construction access through public/federal lands will be available beyond what is shown in Attachment A. Any additional construction access through private lands may be acquired by the Contractor and is the responsibility of the Contactor. Upon completion of construction, the Contractor shall be responsible

**[Page 28 & 29]**

14. The Contractor shall coordinate and attend one design site visit covering all areas of the project site(s) with CBP and any stakeholders identified by CBP prior to the submission of the 100% design submittal. The Contractor shall be responsible for coordinating the specific day(s) and duration of the site visit and attendees that are agreeable to both CBP and the Contractor. The design site visit shall occur at least 10 working days prior to the 100% design submittal date and the Contractor shall initiate coordinate of the site visit at least 10 working days prior to the proposed site visit dates. The purpose of the site visit will be to clarify design questions and approach throughout the project. Within 5 working days of the completion of the site visit, the Contractor shall submit meeting minutes covering the topics of discussion, agreed upon resolutions and action items.

# ATTACHMENT I

# ATTACHMENT A

## Location Maps

**TCA-5 Tohono O'odham**
**Vertical Barrier & Attributes**
**Design Build Construction Project**

Pima County, AZ

US CUSTOMS and BORDER PROTECTION (CBP) BORDER PATROL PROGRAM MANAGEMENT OFFICE DIRECTORATE (PMOD)

# TCA-5 Project: Tucson Sector

*Overview*




## LEGEND

Ports of Entry

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))

Segment 1 Secondary VB (Option (~23.72 miles))

Segment 2 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.36 miles))

Segment 2 Secondary VB (Option (~23.36 miles))

Segment 3a Primary VB Full Attributes Vehicle Barrier Demolition (Base (~5.52 miles))

Segment 3a Secondary VB (Option (~5.52 miles))

Segment 3b (Fast Track) Primary VB Full Attributes Vehicle Barrier Demolition (Base (~4.14 miles))

Segment 3b Secondary VB (Option (~4.14 miles))

Segment 3c Primary VB Full Attributes Vehicle Barrier Demolition (Base (~4.95 miles))

Segment 3c Secondary VB (Option (~4.95 miles))

**State Land**

State Land

**Federal Land**

Tribal Land

National Park Service Land

U.S. Fish and Wildlife Service Land

National Forest Service Land

Bureau of Land Management Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:396,000 1:396,000




AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.




USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 113 of 388

Case 1:26-cv-02127 Document 3-2 Filed 06/17/26 Page 71 of 87

# TCA-5 Project: Tucson Sector

*Route 1*




## LEGEND

- Ports of Entry
- Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

- Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))
- Segment 1 Secondary VB (Option (~23.72 miles))

**State Land**

- State Land

**Federal Land**

- Tribal Land
- National Park Service Land
- U.S. Fish and Wildlife Service Land
- Bureau of Land Management Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:237,000 1:237,000




AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO).** It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 115 of 388
Case 1:26-cv-02127 Document 3-2 Filed 06/17/26 Page 73 of 87

# TCA-5 Project: Tucson Sector

*Route 21*




## LEGEND

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

- Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))
- Segment 1 Secondary VB (Option (~23.72 miles))
- Segment 2 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.36 miles))
- Segment 2 Secondary VB (Option (~23.36 miles))

**Federal Land**

- Tribal Land
- National Park Service Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:248,000 1:248,000




**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

# TCA-5 Project: Tucson Sector

*Route 19*




## LEGEND

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

- Segment 2 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.36 miles))
- Segment 2 Secondary VB (Option (~23.36 miles))
- Segment 3a Primary VB Full Attributes Vehicle Barrier Demolition (Base (~5.52 miles))
- Segment 3a Secondary VB (Option (~5.52 miles))
- Segment 3b (Fast Track) Primary VB Full Attributes Vehicle Barrier Demolition (Base (~4.14 miles))
- Segment 3b Secondary VB (Option (~4.14 miles))
- Segment 3c Primary VB Full Attributes Vehicle Barrier Demolition (Base (~4.95 miles))
- Segment 3c Secondary VB (Option (~4.95 miles))

**State Land**

- State Land

**Federal Land**

- Tribal Land
- U.S. Fish and Wildlife Service Land
- National Forest Service Land
- Bureau of Land Management Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:210,000 1:210,000




AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

# TCA-5 Project: Tucson Sector

*Ajo Station/Casa Grande Station*




## LEGEND

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))

Segment 1 Secondary VB (Option (~23.72 miles))

**Federal Land**

Tribal Land

National Park Service Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:63,000 1:63,000




**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

# TCA-5 Project: Tucson Sector

*Casa Grande Station*




## LEGEND

- Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

- Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))
- Segment 1 Secondary VB (Option (~23.72 miles))

**Federal Land**

- Tribal Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:58,000 1:58,000




**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.




USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 118 of 388
Case 1:26-cv-02127 Document 3-2 Filed 06/17/26 Page 76 of 87

# TCA-5 Project: Tucson Sector

*Casa Grande Station*




## LEGEND

**Proposed Alignment**

- Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))
- Segment 1 Secondary VB (Option (~23.72 miles))
- Segment 2 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.36 miles))
- Segment 2 Secondary VB (Option (~23.36 miles))

**Federal Land**

- Tribal Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:80,000 1:80,000




**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 1172v2

May 8, 2026

# TCA-5 Project: Tucson Sector

*Casa Grande/Three Point Station*




## LEGEND

**Proposed Alignment**

- Segment 2 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.36 miles))
- Segment 2 Secondary VB (Option (~23.36 miles))
- Segment 3a Primary VB Full Attributes Vehicle Barrier Demolition (Base (~5.52 miles))
- Segment 3a Secondary VB (Option (~5.52 miles))

**Federal Land**

- Tribal Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:74,000 1:74,000




AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.




USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 120 of 388

Case 1:26-cv-02127 Document 3-2 Filed 06/17/26 Page 78 of 87

# TCA-5 Project: Tucson Sector

*Three Point/Tucson Station*




## LEGEND

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

- Segment 3a Primary VB Full Attributes Vehicle Barrier Demolition (Base (~5.52 miles))
- Segment 3a Secondary VB (Option (~5.52 miles))
- Segment 3b (Fast Track) Primary VB Full Attributes Vehicle Barrier Demolition (Base (~4.14 miles))
- Segment 3b Secondary VB (Option (~4.14 miles))
- Segment 3c Primary VB Full Attributes Vehicle Barrier Demolition (Base (~4.95 miles))
- Segment 3c Secondary VB (Option (~4.95 miles))

**State Land**

- State Land

**Federal Land**

- Tribal Land

**If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:61,000 1:61,000




AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

# ATTACHMENT J

**RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL**
**(Border Security and Immigration Enforcement on the Tohono O'odham Nation)**

**RESOLUTION NO. 17-053**

**WHEREAS,** the Tohono O'odham and our ancestors have from time immemorial inhabited lands from the Gila River area in present-day Arizona south to the Sea of Cortez in northern Mexico and the Constitution of the Tohono O'odham Nation provides, "It shall be the policy of the Tohono O'odham Nation to seek the return to the Tohono O'odham Nation of lands and natural resources, including minerals and water rights, within or adjacent to the Tohono O'odham Nation, or which originally were a part of the historic Papagueria." (Constitution, Article XVI, Section 9); and

**WHEREAS,** in 1854 the United States created an international boundary with Mexico that cuts through Tohono O'odham lands and that forms the 62-mile southern boundary of the Tohono O'odham Nation's main reservation; and

**WHEREAS,** the Nation's members experience the direct negative impacts from illegal immigration and drug trafficking across the international boundary, including violence and crime, damage to the Nation's cultural resources, increased demands on tribal law enforcement, illegal dumping, and environmental degradation; and

**WHEREAS,** unlike national forests, wilderness areas, and other federal lands on the international boundary dividing the United States and Mexico, the Nation's reservation is not public land, it is reserved for the benefit of the Nation and its members, and the Nation has a duty to ensure that tribal members' rights and the Nation's sovereignty are protected; and

**WHEREAS,** the Constitution of the Tohono O'odham Nation vests the Tohono O'odham Legislative Council with the power to consult with the Congress and federal agencies regarding federal activities that affect the Tohono O'odham Nation, and federal agencies are required by Executive Order No. 13175, presidential memorandums, and departmental and agency policies to consult and collaborate with affected Indian tribes on federal policies and actions having a substantial direct effect on tribes (Constitution, Article VI, Section 1(f) and (j)); and

**WHEREAS,** the duty to protect Nation's lands and resources, and its sovereignty and jurisdiction, including in the Nation's dealings with the United States Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and other agencies within the United States Department of Homeland Security ("DHS") operating on the Nation's boundary with Mexico, is consistent with the DHS Tribal Consultation Policy in which, "The United States recognizes the right of Federally-recognized Indian Tribes ("Indian Tribes") to self-government. Indian Tribes exercise inherent sovereign powers over their members and territories." DHS Tribal Consultation Policy, I.A.; and

**WHEREAS,** the Nation has for decades authorized border security measures designed to counter drug- and human-trafficking and other border crimes when those measures protect Nation's members, lands and resources, and the security of the United States while respecting the Nation's sovereignty and members' rights; and

**WHEREAS,** the Nation has authorized the construction and maintenance of physical vehicle barriers along the Nation's southern border subject to compliance with the National Environmental Policy Act, Federal Water Pollution Control Act, the National Historic Preservation Act, Native American Graves Protection and Repatriation Act and additional laws (Resolution No. 04-095, as amended; Resolution No. 08-705); and

**WHEREAS,** the Nation has supported the construction and operation of two CBP forward operating bases on the Nation's lands, an on-reservation ICE office, and CBP checkpoints on reservation highways, provided that human and civil rights of the Nation's members are respected and subject to additional conditions; and

**WHEREAS,** the Nation leads a multi-agency anti-drug smuggling task force staffed by Tohono O'odham Police Department detectives, ICE Homeland Security Investigations special agents, Border Patrol agents, and the Federal Bureau of Investigation through the Native American Targeted Investigations of Violent Enterprises task force, the only tribe-led High Intensity Drug Trafficking Area ("HIDTA") task force in the United States, and the Nation continues to support

**the federal funding, full staffing, and deployment of ICE's all-Native American Shadow Wolf tactical unit on Nation's lands; and**

**WHEREAS,** **the Nation has supported the construction and maintenance of the roadway along the Mexican border that CBP uses to patrol the international boundary, and the Nation continues to work on and seek funding to improve its roadways near the border, which are heavily used and impacted by CBP, for the benefit of Nation's members and law enforcement; and**

**WHEREAS,** **the Nation supports entering into a government-to-government agreement with the DHS as recommended by the Government Accountability Office Report GAO-13-352 to improve coordination between DHS and the Nation; and**

**WHEREAS,** **on January 25, 2017, President Trump issued Executive Order 13767, "Border Security and Immigration Enforcement Improvements," directing the construction of a physical wall on the United States's southern border with Mexico (Executive Order 13767, Section 2(a) and Section 4(a)); and**

**WHEREAS,** **while the Nation coordinates closely with CBP and ICE and has supported the construction of vehicle barriers, the Nation opposes the construction of a wall on its southern boundary with Mexico; and**

**WHEREAS,** **a continuous wall on the Nation's southern boundary would**

- **further divide the Nation's historic lands and communities; and**
- **prevent Nation's members from making traditional crossings for domestic, ceremonial, and religious purposes, including the annual St. Francis pilgrimage to Magdalena, Mexico and cultural runs;**
- **deny tribal members access to cultural sites, ceremonies, and traditional cemeteries for burying family members;**
- **prevent wildlife from conducting migrations essential for survival and general life, health and existence;**
- **injure endangered species such as the jaguar and other wildlife sacred to the Tohono O'odham;**
- **destroy saguaro cactus and other culturally significant plants;**
- **militarize the lands on the Nation's southern boundary;**

- **disturb or destroy tribal archeological, sacred sites, and human remains; and**

**WHEREAS,** **the Nation has likewise opposed the waiver of federal, state, and other laws under section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), as amended, for the construction of border fencing and roads as unnecessary, destructive, and in violation of the federal obligation to interact with Indian tribes on a government-to-government basis and to respect tribal sovereignty and self-determination (Resolution No. 08-062); and**

**WHEREAS,** **Executive Order 13767 also cites the need for additional federal agents on the southern border but does not provide funding for ICE's Shadow Wolf tactical patrol unit, an all-Native American force of ICE tactical officers operating on the Nation's lands that is staffed at less than 50% of its originally authorized strength; and**

**WHEREAS,** **the Domestic Affairs, Agricultural and Natural Resources, Appropriations, and Cultural Preservation Committees, in consultation with the Nation's Chairman, recommend that the Legislative Council affirm the Nation's position on border security and immigration enforcement on the Tohono O'odham Nation.**

**NOW, THEREFORE, BE IT RESOLVED that the Tohono O'odham Legislative Council supports**

**(1)** **the construction and maintenance of vehicle barriers on the Nation's southern boundary with Mexico in accordance with prior Legislative Council resolutions and laws of the Nation, and federal laws and regulation governing the use of tribal lands;**

**(2)** **consultation, collaboration, and direct tribal participation by the Nation and all affected tribes in the development of the DHS Secretary's comprehensive study of the security of the southern border and any policies or actions implementing Executive Order 13767 and other border security measures;**

**(3)** **entering into a government-to-government agreement with the DHS to improve on-reservation border security coordination; and**

**(4)** **adequate funding for the maintenance and repair of reservation roadways jointly used by CBP and Nation's members;**

**(5)** **funding for the Native American Targeted Investigations of Violent Enterprises HIDTA Task Force;**

**(6)** **funding and restored staffing of the ICE Shadow Wolf tactical unit; and**

**(7)** **funding to fill on-reservation public safety radio coverage gaps and allow for Tohono O'odham Department of Public Safety to communicate directly with CBP and other law enforcement partners.**

**BE IT FURTHER RESOLVED that the Tohono O'odham Legislative Council opposes**

**(1)** **the construction of a physical wall on the Nation's southern boundary; and**

**(2)** **the application of IIRIRA Section 102(c) waivers of federal and other laws on the Nation's lands.**

**BE IT FINALLY RESOLVED that the Nation's official representatives are authorized to present the terms of this resolution and other resolutions and positions previously approved by the Tohono O'odham Legislative Council to the federal government, state and local governments and other Indian tribes or their departments, agencies, or political subdivisions, private persons and organizations, including but not limited to the National Congress of American Indians and Inter Tribal Council of Arizona.**

**The foregoing Resolution was passed by the Tohono O'odham Legislative Council on the 07TH day of FEBRUARY, 2017 at a meeting at which a quorum was present with a vote of 2,279.3 FOR; 742.1 AGAINST; -0- NOT VOTING; and [04] ABSENT, pursuant to the powers vested in the Council by Article III; Article VI, Section 1(c)(f)(i)(j), and Section 2(d); Article XVI; and Article XVIII of the Constitution of the Tohono O'odham Nation, adopted by the Tohono O'odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat.984).**

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

Lucinda J. Allen For

**Timothy Joaquin, Legislative Chairman**

7th **day of** February **, 2017**

**ATTEST:**

[signature]
**Evonne Wilson, Legislative Secretary**

7 **day of** February **, 2017**

**Said Resolution was submitted for approval to the office of the Chairman of the Tohono O'odham Nation on the** 7 **day of** February**, 2017 at** 5:40 **o'clock,** P **.m., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon his approval or upon his failure to either approve or disapprove it within 48 hours of submittal.**

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

Lucinda J. Allen, FOR
**Timothy Joaquin, Legislative Chairman**

**[X] APPROVED** **on the** 8 **day of** February **, 2017**

**[ ] DISAPPROVED** **at** 11:05 **o'clock,** A **.m.**

[signature: Edward D. Manuel]
**EDWARD D. MANUEL, CHAIRMAN**
**TOHONO O'ODHAM NATION**

**Returned to the Legislative Secretary on the** 8th **day of** February **, 2017, at** 11:15 **o'clock,** A **.m.**

[signature] for
**Evonne Wilson, Legislative Secretary**

**RESOLUTION NO. 17-053**

**ACTION:** BORDER SECURITY AND IMMIGRATION ENFORCEMENT ON THE TOHONO O'ODHAM NATION

**MOVED:** COUNCILMAN BILLMAN LOPEZ **SECOND:** COUNCILMAN ANTHONY J. FRANCISCO, JR.

**DATE:** FEBRUARY 07, 2017

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| BABOQUIVARI 367.2 | 1. FRANCES MIGUEL (Roberta E. Harvey) | 183.60 | X | | | |
| | 2. VERNON J. SMITH *(Absent)* (Gloria Zazueta) *(Present)* | 183.60 | X | | | X |
| CHUKUT KUK 332.1 | 1. ETHEL GARCIA (Marla Kay Henry) | 166.05 | X | | | |
| | 2. BILLMAN LOPEZ (Patricia Vicenti) | 166.05 | X | | | |
| GU ACHI 265.0 | 1. TIMOTHY L. JOAQUIN (Louis L. Johnson) | 132.50 | X | | | X |
| | 2. LORETTA LEWIS ( ) | 132.50 | X | | | |
| GU VO 250.6 | 1. GRACE MANUEL (Dallas Lewis) | 125.30 | X | | | |
| | 2. PAMELA ANGHILL (Jeffery Antone, Sr.) | 125.30 | X | | | |
| HICKIWAN 205.8 | 1. LOUIS R. LOPEZ *(Absent)* (Shirley Molina) *(Present)* | 102.90 | X | | | |
| | 2. SANDRA ORTEGA ( ) | 102.90 | X | | | |
| PISINEMO 219.9 | 1. CHESTER ANTONE *(Absent)* (Caroline D. Garcia) *(Present)* | 109.95 | X | | | |
| | 2. MONICA K. MORGAN ( ) | 109.95 | X | | | |
| SAN LUCY 226.5 | 1. DIANA MANUEL (Lorraine Eiler) | 113.25 | X | | | |
| | 2. JANA MONTANA (Gloria Ramirez) | 113.25 | X | | | |
| SAN XAVIER 228.6 | 1. DANIEL L.A. PRESTON III *(Absent)* (Felicia Nunez) *(Present)* | 114.3 | | X | | |
| | 2. RACHEAL VILSON-STONER (Olivia Villegas-Liston) | 114.3 | | X | | |
| SCHUK TOAK 180.6 | 1. ANTHONY J. FRANCISCO JR. ( ) | 90.3 | X | | | |
| | 2. QUINTIN C. LOPEZ (John Fendenheim) | 90.3 | X | | | |
| SELLS 513.5 | 1. ARTHUR WILSON (Beverly Rivas) | 256.75 | | X | | |
| | 2. BARBARA HAVIER (Idaleen Reyes) | 256.75 | | X | | X |
| SIF OIDAK 231.6 | 1. LUCINDA ALLEN ( ) | 115.80 | X | | | |
| | 2. MARY LOPEZ ( ) | 115.80 | X | | | X |
| | TOTAL | 3,021.4 | 2,279.3 | 742.1 | -0- | [04] |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,

*Plaintiff*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants*.

Case No. 26-cv-2127

**DECLARATION OF CHRISTOPHER T. SENSENEY, PhD. P.E.**

# Analysis of Construction of Pedestrian and Vehicle Barrier Replacement at Tohono O'odham Reservation

Christopher T. Senseney, PhD. P.E.
Senseney Engineering, LLC

13 June 2026

Prepared for:
Tohono O'odham Nation
Sells Business Loop
Sells, AZ 85634

Senseney Engineering Job No: 04.26

## I. ASSIGNMENT

1. I have been retained by Kanji & Katzen, P.L.L.C., on behalf of the Tohono O'odham Nation ("Nation"), to provide analysis and opinions on the feasibility, from a construction and engineering standpoint, of building vertical wall(s) or barrier(s), a patrol road, and associated infrastructure within a 60-foot wide footprint adjacent to the international border along the southern boundary of the Tohono O'odham Reservation ("Reservation"). I have also been asked to assess the likely impacts of such construction on Reservation lands, whether within or outside of the 60-foot wide strip.

2. It is my understanding that the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP") intends to construct a single or double 30-foot-tall vertical barrier and patrol road along the entire 62-mile southern border of the Reservation. The purpose of this declaration is to assess various aspects and impacts of construction operations for the building of the barriers and patrol road, and to do so in light of the specific terrain located at the southern boundary of the Reservation.

3. My opinions and analysis are based on experience and knowledge gained by over twenty years as a civil engineer in the United States Air Force ("Air Force"), one year as a forensic engineer at Higgins & Associates, Inc. ("Higgins"), two years as a pavement engineer at Kiewit Engineering Group ("Kiewit"), and six years as a professor of civil engineering for the University of Colorado Boulder ("CU-Boulder"). During my career, I have worked on several construction projects with a similar magnitude and similar characteristics as the proposed border wall construction project on the Reservation. A summary of my credentials is presented below, and a more detailed resume can be found in my CV in Appendix A of this Declaration.

**II. CREDENTIALS**

4. I served as a Civil Engineering Officer in the Air Force from 1997 to 2017. During my military service, I completed two year-long deployments to Afghanistan from 2005 to 2006 and then again from 2012 to 2013, both in engineering positions supporting the U.S. Army. In 2003 to 2004, the Air Force sponsored me to obtain a Masters degree in Civil Engineering from the University of Colorado Boulder. In 2008 to 2011, the Air Force sponsored me to earn a PhD in Civil Engineering from Colorado School of Mines. I taught a variety of civil engineering courses as an instructor at the U.S. Air Force Academy from 2013 to 2017. While serving in the Air Force, I programmed and managed numerous large-scale construction projects with complex contract elements, specifications, and construction requirements.

5. From 2017 to 2018, I served as a Senior Engineer with Higgins, located in Morrison, Colorado. While at Higgins, I worked as a forensic engineer and expert witness for numerous construction defect law cases, including a dispute over alleged construction defects on irrigation canal headgates at the Wind River Indian Reservation in northwest Wyoming.

6. From 2018 to 2020, I was employed as a Senior Pavement Engineer at Kiewit, located in Lone Tree, Colorado. While with Kiewit (operating under Southwest Constructors), I worked on the design and construction of two CBP projects: the Tucson Project 1, 2, 3 FY19 Vehicle and Pedestrian Barrier Replacement Project ("Tucson 63") near Lukeville, Arizona, and the Naco 31 Barrier Project ("Naco 31") near Douglas, Arizona. I served as the Engineer of Record for the structural pavement design of the gravel patrol roads and concrete low water crossings for both Tucson 63 and Naco 31. For Tucson 63, I prepared 659 pages of construction specifications in the Unified Facilities Guide Specifications (UFGS) format and stamped/certified four sections of the specifications, including Earthwork, Base Course for Rigid Paving, HMA Wearing Surfaces for Concrete Bridge Decks, and Aggregate Surfacing. I served as the Engineer of Record for the design of a 0.75-mile section of steeply sloped concrete pavement on the patrol road at Monument Mountain on Tucson 63 near Lukeville, Arizona. I co-authored a research paper titled "Design, construction and monitoring of concrete roadway pavement at extremely steep longitudinal slopes," published in the International Journal of Pavement Engineering in 2023 (see Appendix B), that described the process that I took to design the complicated pavement structure and explained the techniques the contractor used to build the concrete roadway.

7. While working for Kiewit, I made three site visits to border barrier construction projects between December 2019 and December 2020, two at Tucson 63 and one at Naco 31. I observed different phases of barrier construction over approximately 35 miles on the Tucson 63 project and approximately 10 miles at Naco 31. During each site visit, I spent one full day traveling by vehicle along the border with representatives from the construction trades, from the U.S. Army Corps of Engineers, and from CBP. My site visits often focused on areas of steep terrain at arroyos and at water crossings, where some of the more difficult patrol road and barrier civil engineering and construction would be encountered.

8. From 2020 to present I have served as an Associate Teaching Professor in Civil, Environmental and Architectural Engineering at the CU-Boulder. Amongst other classes, I teach CVEN 2012 Introduction

to Geomatics and CVEN 3256 Construction Equipment and Methods. In CVEN 2012, we introduce topics relevant to this assignment, including horizontal/vertical curves, right of way, and property/boundary surveys. In CVEN 3256, I teach heavy equipment productivity, design of temporary structures, construction site layout, and construction site dewatering. I teach other classes within the civil engineering and architectural engineering curriculum that cover construction law, contracts, scheduling, cost estimating, and engineering economics. I also perform research related to construction specifications, pavement engineering, and material science.

**III. DOCUMENTS REVIEWED**

9. As part of this assignment, I have reviewed the following documents and media:

a. Statement of Work: TCA-5 Primary Vertical Barrier, Patrol Road & Design and Construction Segments 1, 2, 3a and 3c, with Attachment A Location Maps (8 May 2026)
b. Best Management Practices (BMPs): TCA-5 Tohono O'odham Vertical Barrier & Attributes Design Build Construction Project, Pima County, AZ, US Customs and Border Protection (CBP) Border Patrol Program Management Office Directorate (PMOD), (undated)
c. Cultural Resources Study: Archaeological Survey for Permanent Vehicle Barriers and Related Improvements along the International Border on the Tohono O'odham Nation, U.S. Border Patrol, Tucson Sector, Pima County, Arizona, by David R. Hart and John Lindemuth, Project No. F05-31, Prepared for Gulf South Research Corporation, U.S. Army Corps of Engineers, and U.S. Customs and Border Patrol (April 2006)
d. Topographic maps of the southern border of the Tohono O'odham Reservation (various dates)
e. Tucson Project 1, 2, 3 FY19 Vehicle and Pedestrian Barrier Replacement Project (63 Miles) Drainage Gate, Light Pole Foundation, Vehicle Gate, and Concrete Roadway Pavement Construction Plans (11 May 2020)
f. Tucson Project 1, 2, 3 FY19 Vehicle and Pedestrian Barrier, Tucson, AZ, W912PL190015, Construction Specifications, Revision 12 (24 June 2020)
g. Tucson Project 1, 2, 3 FY19 Vehicle and Pedestrian Barrier Replacement Project (63 Miles), P2MM Concrete Anchor Key & Spacing Laying Shop Drawings for Tucson 63, prepared by Conrad L. Lay (undated)
h. Tucson Project 1, 2, and 3, Vehicle and Pedestrian Barrier Replacement Project, Cochise County, Arizona, Patrol/Maintenance Roads – Pavement Design Basis Memorandum, prepared by Christopher T. Senseney (5 May 2020)
i. Naco 31 Project, Naco, Arizona, Patrol/Maintenance Roads – Pavement Design Basis Memorandum, prepared by Christopher T. Senseney (29 May 2020)
j. Drone footage, images and videos collected by the Center for Biological Diversity at various border wall construction projects (various dates)[1]

[1] Available at https://www.biologicaldiversity.org/resourcespace/pages/search.php?search=%21collection1676&k=ec6

k. Southwest Border: Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction, Government Accountability Office, Report to the Ranking Member, Committee on Natural Resources, House of Representatives Washington D.C. (September 2022)
l. Google Earth historical satellite imagery and survey data of the southern border of the Reservation (various dates)

**IV. NARRATIVE OF BORDER REGION INSPECTION**

IV.a. 26 May 2026 Field Inspection of Reservation Southeastern Border Boundary

10. On 26 May 2026, I was escorted by Rangers from the Nation to visit the southern border of the Reservation. We reached the border by vehicle near the town of Newfield, Arizona and proceeded to travel east along the border patrol access road for approximately 5.6 miles to the base of the Baboquivari Mountains. At this point we turned around and headed west back towards Newfield, and then traveled another 9.0 miles to the west of Newfield to the base of Horse Peak. During this inspection, I took three slope measurements with a handheld digital level, two near the base of the Baboquivari Mountains and one near the base of Horse Peak. I took height measurements of the currently installed vehicle barrier along the U.S.-Mexico border with a handheld tape measure. I measured the width of the patrol road with a handheld tape measure and a laser distance meter. I photographically documented the 26 May 2026 site visit as shown in Photographs 1 to 55 included in Appendix C of this Declaration.

IV.b. 27 May 2026 Field Inspection of Nogales Border Barrier Construction

11. On 27 May 2026, I inspected the construction of a double 30-foot-tall barrier and patrol road project near the base of the Patagonia Mountains approximately 8.0 to 9.5 miles east of Nogales, Arizona. It is my understanding that Fisher Sand & Gravel is under contract from CBP to construct 15 miles of double barrier in this area. I measured the distance between the primary and secondary barrier using calibrated pacing, which was estimated to be approximately 110 feet at this area of the barrier. I photographically documented the 27 May 2026 site visit as shown in Photographs 56 to 73 included in Appendix C of this Declaration. During this inspection, I observed three gravel construction side access roads within a 1.5-mile area, that were built along the active construction zone to facilitate the transport of equipment, steel bollards, and concrete to the jobsite.

IV.c. Office Study of Topographic Maps

12. Following the field visits, I returned to the office and studied every mile of the terrain and topography along the 62-mile southern border of the Reservation using U.S. Geological Survey

2b7a480;
https://www.biologicaldiversity.org/resourcespace/pages/search.php?search=%21collection1485&k=325e5dc40d#

topographic maps and imagery and survey data from Google Earth. I make references to the topographic maps and Google Earth data in the Analysis and Findings section of this declaration.

## V. ANALYSIS AND FINDINGS

13. It is my opinion that the proposed vertical barriers, patrol road, and associated infrastructure cannot be constructed within a narrow 60-foot-wide footprint at the terrain at the southern boundary of the Reservation. Furthermore, construction of the barriers along the border will have permanent and lasting impacts on the natural landscape and the drainage on the Reservation. My opinions are supported by the following findings and analysis of evidence with the abbreviated titles of V.a. Staging Areas, V.b. Access Roads, V.c. Steep Terrain, V.d. Earthwork, and V.e Drainage.

### V.a. Oversized Construction Materials and Equipment Staging Areas

14. The construction of the type of barriers (i.e., 30-foot-tall vertical walls), patrol roads, and associated infrastructure proposed at the Reservation requires massive construction materials and equipment staging areas that would extend, by necessity, well beyond a 60-foot-wide footprint at the border. Amongst other miscellaneous building materials, these types of construction staging areas generally include construction trailers, parking for construction workers, equipment storage trailers, portable restrooms, aggregate material storage, heavy equipment parking, steel bollard material storage, construction waste, and demolished barrier material. Typical barrier construction staging areas contain three primary components, namely laydown parking and trailers; construction material and equipment storage; and portable concrete batch plants. Some staging areas may include all three of these components, two of the components, or just one of the components.

15. **Figure 1** below shows one of the past Tucson 63 construction staging areas near Lukeville, Arizona from historical Google Earth satellite imagery dated 06 September 2019 for the construction of a single 30-foot-tall barrier along the border. The image of the Tucson 63 staging yard shows construction trailers, aggregate storage, construction worker parking, and equipment parking. The staging area encompassed an area of approximately 423,000 square feet, or 9.7 acres. The northern boundary of the staging yard extended approximately 2,300 feet from the international border with Mexico into the United States. This Tucson 63 staging area contained all three components of parking/trailers, material/equipment storage, and a concrete batch plant.




**Figure 1.** Google Earth imagery from 06 Sep 2019 showing a construction staging area from the Tucson 63 project (single 30-foot-tall barrier) that extends approximately 2,300 feet from the U.S.-Mexico border near Lukeville, Arizona

16. **Figure 2** below shows an image of a construction staging area taken by a drone on 22 May 2026 at the primary and secondary barrier construction project located approximately 9.5 miles east of Nogales, Arizona, at the base of the Patagonia Mountains. This same staging area is also shown in Photographs 60 to 65 (taken during the 27 May 2026 site visit) found in Appendix C of this Declaration. It is estimated this staging yard extends approximately 600 horizontal feet to the north of the U.S.-Mexico border with a margin of error of plus or minus 100 feet. The horizontal distance measurement was estimated by two techniques. First, the distance from the primary barrier to the secondary barrier was estimated to be 110 feet through calibrated pacing by the author during a site visit on 27 May 2026. It appears that the horizontal distance from the international border to the north end of the laydown yard is approximately 5-6 times the width of the gap between the primary and secondary barrier. Second, the north-south width of the staging yard was measured at approximately 600 feet, using Google Earth satellite imagery from the site taken on 06 January 2023. It should be noted that the distance measurement in Google Earth was based on vegetative and terrain features shown in the satellite image before the laydown yard was constructed. As shown in Figure 2, extensive earthwork was imported to the site of the staging yard to level the ground in an area of steep terrain. This staging area contains two of the three primary components of laydown yards: parking/trailers and construction equipment/materials.




**Figure 2.** Drone imagery from 22 May 2026 showing a construction staging yard for the Patagonia Mountains project that extends approximately 600 feet northwards from the U.S.-Mexico border at a location approximately 9.5 miles east of Nogales, Arizona

17. Construction of 30-foot-tall border barrier requires a significant supply of concrete to construct foundations for the steel bollards. Because of the remote and expansive nature of the Reservation, there are no permanent, large-scale ready-mix concrete batch plants physically located within the Reservation borders. Concrete should generally be discharged 1.5 to 2 hours after mixing starts to prevent the concrete from setting up in the truck, although this can be extended to 3 to 4 hours with chemical admixtures to slow the cement hydration process. It should be noted that the use of delaying admixtures carries some risk since incorrect dosage impacts finishing times and early age strength development. The nature of concrete construction in remote areas such as the Reservation would almost certainly require a contractor working on a barrier construction project to construct its own portable batch plants on the jobsite. In my experience, the infrastructure of a concrete batch plant for a project with similar concrete requirements would require an operating footprint of approximately 15,000 square feet. Furthermore, concrete batch plant operations would require the storage of cement, coarse/fine aggregate, and water, which would require another 50,000 square feet.

18. **Figure 3** below shows a typical portable batch plant extending approximately 500 to 1,000 feet from the international border on the single barrier construction at Buenos Aires National Wildlife Refuge in Arizona prior to 2022. The image shows a water reservoir, aggregate stockpiles for different sizes of aggregate, and an aggregate crushing operation. The portable batch plant is visible in the center of the image with a tall silo for cement storage, aggregate bins, a mixing unit, and likely some type of weighing system to correctly proportion the ingredients based on the mix design. Concrete from a portable plant like this is typically transported by concrete trucks but could be transported short distances by dump trucks or even front-end loaders.



**Figure 3.** Photo from drone footage prior to 2022 showing a typical portable concrete batch plant for the single barrier construction at the Buenos Aires National Wildlife Refuge in Arizona

19. In my experience it would be impossible to confine a laydown yard for border barrier construction in a narrow section of a 60-foot-wide footprint along the border, especially in an active barrier construction zone. The installation of construction staging areas would have permanent impacts on the terrain and drainage extending far beyond the 60-foot footprint. It would be highly unlikely that the land and natural resources at the staging yards could ever be completely reclaimed to their original condition after the construction was completed. Deep soil compaction and vehicle traffic permanently alter the hydrology and soil crusts on the "desert pavement" (also known as desert armor or desert varnish) on the surface of the Reservation lands. The natural revegetation and the reformation of the protective stone layer for desert pavement can take decades, if not centuries, to re-establish in extremely dry environments. **Figure 4** shows the condition of the Lukeville staging area circa 11 May 2023, where it can be observed that the landscape appears to be disturbed and the natural vegetation does not appear to be restored.




**Figure 4.** Satellite image of the Lukeville staging area circa 11 May 2023 from Google Earth

V.b. Impact of Construction Access Roads

20. As a result of the physical constraints of border barrier construction, due to the rugged terrain along the U.S.-Mexico border, and because of the remoteness of the Reservation, construction access roads will need to be built on the Reservation outside of the narrow 60-foot-wide footprint along the border. As is the case with construction staging areas, the construction of access roads will disrupt the desert pavement, natural landscape, and drainage of the Reservation.

21. Barrier construction relies on heavy haul roads to transport materials, specifically steel bollards, concrete, and equipment to the jobsite. During my 27 May 2026 site visit to the Patagonia Mountain barrier construction site 8.0 to 9.5 miles east of Nogales, Arizona, I observed three heavy haul roads in a 1.5-mile stretch leading to the construction site. These haul roads were approximately 20 feet wide and traversed washes and valleys where culverts were installed. One of these roads can be seen in Photographs 69, 70, and 71 in Appendix C of this Declaration. I observed numerous flatbed semi-tracks carrying steel bollards and concrete trucks traveling the haul road approximately every 15 minutes.

22. Attachment A (Location Maps) to the 8 May 2026 TCA-5 Tohono O'odham Vertical Barrier & Attributes Scope of Work shows three proposed north-south construction access roads which CBP proposes to be built for the construction effort on the 62-mile border. It is my opinion, based on industry standards and historical precedent, that additional access roads would need to be built at a maximum distance of 5 miles apart along the 62-mile southern border. A notional rendering of a total of 12 access roads is shown below in **Figure 5** where the 3 CBP proposed roads are in red and the additional 9 roads (minimum required in my opinion) are shown in green. It would be excessively impractical for a contractor to only use three access roads along the 62-mile stretch of remote and rugged terrain along the border at the reservation. From a construction logistics standpoint, contractors will need to be able to construct wall sections at multiple points along the Reservation's border simultaneously. It will not be possible for them to transport construction materials, equipment, and heavy machinery along the patrol road while simultaneously engaging in active construction. Therefore, additional construction access roads will need to be built. Furthermore, transportation along the patrol roads would not be feasible during the construction of culverts and concrete water crossings at the numerous washes that exist along the border. It is my opinion that a significantly greater number of access roads would ultimately need to be built along the 62-mile border during construction, possibly two or three times more than the bare minimum of twelve shown in **Figure 5**. As stated earlier, three access roads were observed in a 1.5-mile stretch of similar terrain at the Nogales/Patagonia Mountains barrier construction site.




**Figure 5.** Proposed construction access roads by CBP (shown in red) and notional access roads (shown in green) needed for barrier construction on the Reservation

23. The construction of access roads will have permanent and lasting impacts on the landscape and drainage on the Reservation. Construction of these roads will destroy the plant life and the desert pavement along the border on the Reservation. The access roads would require maintenance in perpetuity to maintain a smooth driving surface, to repair erosion, and clean out culverts that routinely become clogged during periods of heavy rain. Furthermore, unlike the primary patrol roads along the border boundary, there would be no reason for CBP to maintain this network of construction access roads after construction of the barriers is complete. Without maintenance, even more significant drainage and erosion damage will occur on these access roads well into the future. Nor would it be feasible for CBP to have these construction access roads decommissioned and to restore the lands to their prior condition because the desert pavement requires decades, if not centuries, to be restored.

V.c. Transportation and Access Across Steep and Rugged Terrain

24. The terrain along the southern boundary of the Tohono O'odham Reservation and the U.S.–Mexico border is a harsh, remote expanse of the Sonoran Desert. The terrain consists of jagged, rugged mountain ranges, including the Baboquivari and La Lensa Mountains, that are often impassable by vehicles. Between the mountains there are expansive desert valleys and open plains. The plains are cut by wide dry washes (or arroyos) that remain dry for most of the year but act as flash flood channels during the seasonal monsoon rains.

25. The Baboquivari Mountains and Pazo Verde Mountains extend north to south along the eastern edge of the Reservation. Topographic maps and Google Earth demonstrate that sections of the Baboquivari Mountains on the eastern edge of the Reservation, adjacent to the border, exhibit slopes of 42 feet horizontal to 100 feet vertical (or 42 percent). As shown in Photos 19, 20, and 21 in Appendix C of this Declaration, the slope of a representative section of terrain at the base of the Baboquivari Mountains was

measured at 41 percent. **Figure 6** shows the elevation profile of at the base of the Baboquivari Mountains as measured by Google Earth, with the maximum slope given as 42 percent.[2]




**Figure 6.** Elevation profile of the terrain at the base of the Baboquivari Mountains from Google Earth

26. Horse Peak at Morena Mountain is located near the U.S.-Mexico border approximately 16 miles west of the eastern boundary of the Reservation. Topographic maps and Google Earth demonstrate that sections of the terrain rising on the east side of Horse Peak, adjacent to the border, exhibit slopes of 67 feet horizontal to 100 feet vertical (or 67 percent). As shown in Photos 52 through 55 in Appendix C of this Declaration, the slope of a representative section of terrain on the east side of Horse Peak was measured at 31 percent. **Figure 7** shows the elevation profile at the east side of Horse Peak as measured by Google Earth, with the maximum slope given as 67 percent.




---

[2] Slope measurements performed by the author were obtained utilizing a two-foot hand level measuring localized, representative segments of terrain. Slope measurements provided by Google Earth are based on a pixel-by-pixel elevation difference with horizontal resolutions that range from 90 feet to 270 feet per pixel depending on the region.

**Figure 7.** Elevation profile of the terrain at the east side of Horse Peak from Google Earth

27. Wolf's Hang at the La Lesna Mountains is a remote 1,962-foot summit located along the U.S-Mexico border near Ak Komelik, Arizona, and about 36 miles west of the eastern border of the Reservation. Topographic maps and Google Earth demonstrate that sections of the terrain rising up the east side of La Lensa Peak, adjacent to the border, exhibit extreme slopes of 76 feet horizontal to 100 feet vertical (or 76 percent). **Figure 8** shows the elevation profile of La Lesna Peak as measured by Google Earth, with the maximum slope given as 76 percent.



**Figure 8.** Elevation profile of Wolf's Hang at La Lensa Mountains from Google Earth

28. Another section of extremely steep mountainous terrain on the border is located 1.5 miles southwest of Ali Chuk and approximately 56 miles to the west of the eastern boundary of the Reservation. Topographic maps and Google Earth demonstrate that sections of the terrain rising up the west face of the mountainous terrain near Ali Chuk, adjacent to the border, exhibit extreme slopes of 85 feet horizontal to 100 feet vertical (or 85 percent). **Figure 9** shows the elevation profile of the mountainous terrain southwest of Ali Chuk as measured by Google Earth, with the maximum slope given as 85 percent.




**Figure 9.** Elevation profile of steep terrain southwest of Ali Chuk from Google Earth

29. Construction on extremely steep terrain on the Reservation will require extensive rock removal and permanent destruction of the mountainous landscape. Fundamentally, the ridges and slopes on rugged rocky terrain at 40 to 85 percent slopes must be altered and leveled to allow construction equipment to operate and excavate rock to build foundations for the barrier walls. **Figure 10** below shows an example of rock removal at the Tinajas Atlas Mountains near Yuma, Arizona during construction prior to 2022. Contractors utilized dynamite blasting and heavy excavation equipment to cut through the solid rock of the Tinajas Altas range, fundamentally altering the natural topography. Similar blasting and heavy equipment for rock removal would be required for border barrier construction on the Reservation.




**Figure 10.** Drone footage of the construction and slope and rock removal (within illustrative circles) of sections of barrier construction at the Tinajas Atlas Mountains near Yuma, Arizona prior to 2022

30. Moreover, the steep terrain will preclude large construction vehicles from accessing parts of barrier construction simply because most construction vehicles are unable to operate on such steep terrain. While I was working on the Tucson 63 barrier project, I witnessed the construction of a concrete paved road up the east side of Monument Mountain just west of Lukeville, Arizona. The construction was extremely challenging and required construction vehicles to use side access roads to enter the jobsite. According to the May 2019 P2MM Concrete Anchor Key & Spacing Laying Shop Drawings for Tucson 63, the maximum slope on the Monument Mountain concrete patrol road was 57.7 percent. I personally observed that wheeled vehicles were unable to travel up the 57.7 percent grade and that only specialized tracked equipment could be used.

31. **Figure 11** shows the construction of a switchback access road at the Coronado National Forest as part of a shipping container border barrier construction project funded by the State of Arizona. The switchback roads are another type of invasive construction vehicle access that would be necessary for barrier construction on the Reservation, and these roads would leave permanent invasive damage to the Reservation landscape.



**Figure 11.** Drone footage of switchback access road construction at Coronado National Forest

32. In my opinion it is not feasible to construct the vehicle barrier and patrol road at extremely steep slopes approaching 70 percent to 85 percent grade without significantly encroaching outside of the 60-foot-wide footprint along the border with new earthwork; switchback access roads that extend significantly outside of the project footprint; and extensive rock removal. From an engineering and construction perspective, mountaintop removal and blasting will be required on the steepest sections of the Reservation in areas like the Baboquivari Mountains, Horse Peak, La Lensa Mountains, and mountainous terrain near Ali Chuk.

<u>V.d. Cut and Fill Earthwork for the Barrier Construction will have Sizeable Impacts on Reservation Landscape</u>

33. Whether a single barrier or a double barrier, the proposed 30-foot vertical barrier could not be physically constructed along the terrain at the southern border of the Reservation within a narrow 60-foot-wide footprint due to the earthwork needs of the proposed project.

34. The proposed double 30-foot-tall barrier, with a primary barrier, a patrol road, and an "optional" secondary barrier, could not be properly constructed in a 60-foot-wide footprint in any type of terrain. For several reasons, including the need to operate construction equipment on both sides of the barrier during construction and the need for embankment material, the primary barrier wall must be offset from the international border. In relatively flat terrain this offset could be as little as three feet, although in parts of the Reservation with more variable terrain there would need to be a significantly larger offset, which could be as much as a 50-foot offset in some locations. As confirmed by calibrated pacing on my 27 May 2026 site visit to the Patagonia Mountain project outside of Nogales, the gap between the primary barrier and secondary barrier is approximately 110 feet. There is another 20 feet of embankment on the north side of the secondary barrier, which results in the total construction footprint of the double barrier being a minimum of 145 to 150 feet on relatively flat terrain. This distance would be higher on rugged terrain for the double barrier. While it is possible that the gap between the primary and secondary barriers could be reduced below the 110 feet that was observed at the Nogales site, in my opinion it is simply not feasible for a functional double barrier to be confined within a 60-foot footprint, even on flat terrain.

35. A single 30-foot-tall barrier with a patrol road could not be constructed in a 60-foot-wide footprint along all the terrain at the southern border of the reservation, especially in valleys and on mountains/peaks. Due to the sharp changes in elevation, the valleys or gullies would need to be filled with embankment material, and the peaks would need to be scraped down to level the terrain for construction. **Figure 12** shows embankment being placed in valleys in the Patagonia Mountains project outside of Nogales. The terrain in the Patagonia Mountains is similar to the terrain on the southern border of the Reservation at the Baboquivari and La Lensa Mountains, which would also require embankment in the valleys. Simply due to geometry and physics, embankment will require engineered edges with sufficiently gradual slopes to provide structural stability and prevent the fill material from collapsing under its own weight. That will require fill material in many instances to extend well beyond the 60-foot-wide footprint. For the cohesionless, sandy soil found throughout Arizona, the Occupational Health & Safety Administration (OSHA) requires a minimum embankment slope of 1.5 horizontal to 1 vertical. For a hypothetical 10-foot-high embankment elevation on a patrol road above the desert floor, the embankment would be required to slope a minimum of 15 feet horizontally at the edges of the patrol road.




**Figure 12.** Drone imagery from 22 May 2026 showing construction of a double barrier and patrol road on the Patagonia Mountains projects approximately 10.0 miles east of Nogales

36. From the September 2022 Southwest Border: Additional Actions Needed to Address Cultural and Natural Resource Impacts report by the Government Accountability Office ("GAO report"), **Figure 13** below shows the significant amount of cut and fill earthwork necessary to construct a border wall segment on steep terrain in the Coronado National Forest prior to 2022. The photo shows an earthen cut on the south side of the barrier and earthen fill to north of the barrier and patrol road to horizontally level out the patrol road for vehicular access. This type of earthwork is necessary on steep sections of the barrier construction and obviously extends greater than 60 feet from the international border. There is additional erosion of the embankment earthwork to the north of the patrol road that appears to be eroding into the natural landscape. Similar types of earthworks would be necessary to construct border barriers and patrol roads at steep sections of terrain on the Reservation at the southern border.



**Figure 13.** Photo from May 2022 from the September 2022 GAO report showing erosion at the base of a construction staging yard near the border at Coronado National Forest in Arizona

<u>V.e. Drainage at Washes (or Arroyos) will be Impacted by the Installation of Barriers, Patrol Roads, and Associated Infrastructure</u>

37. The drainage at washes (and at locations outside of the washes) along the border and on adjacent haul roads will be negatively impacted by the installation of barriers, patrol roads, and associated infrastructure on the Reservation.

38. According to the GAO report, "the barrier system itself can disrupt the natural flow of water in heavy rain events. These rain events can occur regularly along rivers and drainages near the border, and barrier-related obstructions can exacerbate flooding, according to National Park Service and Bureau of Land Management officials."

39. The GAO report further states, "During construction, the contractor built the patrol road several feet above the desert floor in Organ Pipe Cactus National Monument, in some places by as much as 8 feet. As a result, the raised road acts as a natural dam by impeding water flow during rain events. During heavy rains, water typically flows south across the desert into Mexico but now hits the side of the raised road, according to a National Park Service official. As of the January 2021 pause in construction, the contractor had not yet regraded the road to allow for proper drainage." The raised patrol road referenced in the report can be seen in **Figure 14** below.



**Figure 14.** Photo from May 2022 from the September 2022 GAO report showing a raised patrol road above the desert floor in Arizona

40. The impacts on drainage from infrastructure along the border can already be seen at the Vamori Wash approximately 3.5 miles west of Newfield, as documented by Photographs 36 to 41 in Appendix C of this report. As shown in Photographs 37 and 38, the culvert bridge over the Vamori Wash had caused sediment and debris to build up and accumulate within the culverts of the bridge. The accumulation of sediment and debris will cause constriction of water flow through the channel during the rainy monsoon season, and the debris could contribute to unnecessary flooding on the Reservation.

41. The construction of embankments for patrol roads and access roads that do not currently exist in mountainous areas on the Reservation, such as the Baboquivari and La Lensa Mountains, will cause drainage problems. The embankment material is notorious for eroding into washes and valleys, causing sediment buildup in culverts further downstream. The culverts become prone to flooding during the rainy monsoon season.

42. The construction of a 30-foot-tall barrier system and patrol road has the potential to cause additional excessive flooding on the Reservation. Flooding from border barrier construction has the potential to reach towns along the border such as Newfield, Vamori, San Miguel, Papago Farms, and Ali Chuk. This type of flooding could affect the livelihoods of Reservation residents in these towns by altering their agricultural operations, impacting their livestock herds, or even flooding their homes.

**V. CONCLUSION**

43. My analysis was completed to review the feasibility from a construction and engineering standpoint of building vertical barriers, a patrol road, and associated infrastructure within a 60-foot-wide footprint adjacent to the international border along the southern boundary of the Reservation. I was also asked to assess the likely impacts of such construction on Reservation lands, whether within or outside of the 60-footwide strip. My conclusions are as follows:

a. Based on observations of recent and historical border barrier projects, construction of 30-foot-tall barriers requires extensive staging areas, material storage, equipment parking, and portable concrete batch plants that extend hundreds to thousands of feet beyond the immediate border corridor, making confinement to a 60-foot-wide construction footprint impracticable. These activities result in substantial and long-lasting disturbances to soils, hydrology, desert pavement, and vegetation communities, and these impacts are unlikely to be fully reclaimed for centuries in the arid environment of the Reservation.

b. Numerous construction access roads extending well beyond the proposed 60-foot-wide corridor would be necessary to transport materials, equipment, and personnel to active work areas. The construction and subsequent abandonment of these roads would permanently alter desert pavement, natural drainage patterns, and landscape features. Additionally, if the access roads were to remain operational, perpetual maintenance would be necessary to keep the roads smooth, repair erosion, and to clean/maintain culverts.

c. The rugged and mountainous terrain along the southern Reservation border includes areas with slopes ranging from approximately 30 percent to more than 80 percent, creating significant engineering and construction challenges for barrier and patrol road installation. Construction in these areas would require substantial earthwork, blasting, mountaintop removal, and the development of access roads extending beyond the proposed 60-foot-wide corridor, resulting in permanent and irreversible alterations to the natural landscape and topography of the Reservation.

d. Based on engineering constraints, construction methods, and previously observed border barrier projects, neither a single 30-foot-tall barrier with a patrol road nor a double-barrier system can be constructed within a continuous 60-foot-wide corridor along the southern boundary of the Reservation. The extensive cut-and-fill earthwork, embankment construction, terrain leveling, and equipment access requirements necessary to accommodate steep slopes, valleys, and mountainous terrain would inevitably extend the construction footprint well beyond 60 feet and result in substantial, long-term alterations to the natural landscape.

e. The construction of border barriers, patrol roads, access roads, and associated drainage structures has the potential to significantly alter natural hydrologic patterns on the Reservation by impeding water flow, increasing sediment accumulation, and exacerbating erosion and flooding in washes and low-lying areas. These drainage impacts could extend beyond the immediate construction corridor, increasing flood risks to nearby communities, agricultural operations, livestock, and other natural and cultural resources located along the southern border of the Reservation.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: June 12, 2026

Christopher Senseney, PhD, P.E.
Principal, Senseney Engineering, LLC

# APPENDIX A

# CV OF CHRISTOPHER SENSENEY

CV of
**Christopher T. Senseney, PhD, P.E.**
Associate Teaching Professor & Civil/Geotechnical/Pavement Engineer

*Senseney Engineering, LLC*
*1655 Snowy Owl Drive*
*Broomfield, CO 80020*
*chrissenseney@gmail.com*

EDUCATION

- PhD in Civil Engineering with emphasis in Geotechnical Engineering, 2011, Colorado School of Mines, Golden, Colorado (Advisor: Michael A. Mooney)
  - Dissertation title: "Exploring the influence of tactical airfield layer properties on light weight deflectometer response"
  - Research included numerical and analytical analysis of layered pavement systems and non-destructive testing (NDT) of surfaced and unsurfaced pavements
- Master of Science in Civil Engineering with emphasis in Geotechnical Engineering, 2004, University of Colorado, Boulder, Colorado
- Bachelor of Science in Civil Engineering, 1997, United States Air Force Academy, Colorado

REGISTRATION

- Registered Professional Engineer - State of Ohio No. 7026
- Registered Professional Engineer - State of Colorado No. 53132
- NCEES Record No. 1843093

SKILLS

- Forensic Engineering, AASHTO 93/Pavement ME design, USACE/Federal project specification writing and editing, DoD rigid/flexible/unsurfaced airfield pavement design, Pavement Condition Index (PCI) surveys, structural pavement evaluations, FWD/LWD testing/interpretation
- Oracle Primavera P6, SpecsIntact, MATLAB, Fortran, Python, Pavement ME, RealCost, ProVal, PAVER, PCASE, FAARFIELD, HIPERPAV, ELMOD, AutoDesk Civil 3D, Emerald Eco Label, openLCA, LCA Pave

EMPLOYMENT SYNOPSIS

**University of Colorado, Boulder, Colorado** Aug 2020 to present
**Civil, Environmental and Architectural Engineering**
Associate Teaching Professor

- Serves as instructor in the Construction Engineering and Management program
- Associate Chair for Undergraduate Education responsible for the curriculum, teaching schedules, and administrative affairs for the civil engineering and architectural engineering majors
- Kiewit Design Build Scholars Program faculty fellow
- Department expert on transportation infrastructure, highway alternative delivery construction, temporary construction design, heavy equipment, surveying, and geomatics
- Research focuses on non-destructive testing of pavements and soils, pavement structural design, roadway roughness/smoothness, QA/QC testing of earthwork and pavement materials, pavement Life Cycle Cost Analysis (LCCA), expedient concrete pavement repairs, pavement sustainability, construction Life Cycle Analysis (LCA), and construction material Environmental Product Declarations (EPDs)

**Senseney Engineering, LLC, Broomfield, Colorado** Jul 2020 to present
Principal

- Provides independent consulting services for heavy civil construction engineering, highway pavement design and forensic investigations, DoD and civilian airport structural pavement design services, and pavement design and construction education
- Analysis of unpaved roads, unpaved airfields, geosynthetics for pavement applications, dust abatement, and airfield damage repair
- Prepares and edits heavy civil and vertical construction specifications for FAA, USACE, and Department of Interior projects
- Prepares Environmental Product Declarations (EPDs) for asphalt, concrete, and aggregate base course pavement materials

**Kiewit Infrastructure Engineers, Englewood, Colorado** Jan 2019 to Aug 2020
Senior Pavement Engineer

- Subject matter expert for pavement engineering on infrastructure projects for all Kiewit construction regional districts throughout North America.
- Designs concrete and asphalt roadways using AASHTO 93, AASHTO Pavement ME, in-house software, and local agency procedures.
- Responsible for evaluating pavement designs developed by third-party engineers.
- Develops pavement related alternative technical concepts and value engineering for public-private partnership (P3) and design-build (DB) pursuits.
- Reviews concrete mix designs and asphalt mix designs.
- Formulates and interprets non-destructive testing of pavement systems to select or verify layer strength parameters.
- Develops pavement related operations and maintenance specifications for the operating period of P3 infrastructure projects
- Engineer of Record (EOR) for pavement designs for Border Infrastructure Program in Arizona

**Higgins & Associates, Inc., Morrison, Colorado** 2017 to Dec 2018
Senior Forensic Engineer

- Typical assignments included technical investigations of foundation failures, pavement damage, leaks, construction defects, code-deficient design, deterioration, and improper construction in residential/commercial structures and infrastructure.
- Investigations included evaluation of damage from soil movement, fire, flooding, hail, wind, moisture intrusion, vehicle impact, construction defect, and design defect.
- Authored expert witness reports and testified as expert witness during trials and depositions.

**United States Air Force Academy, Colorado** 2013 to 2017
**Department of Civil and Environmental Engineering**
Assistant/Associate Professor

- Pavement subject matter expert for the department.
- Lead instructor for Pavement Design and Rehabilitation, Introduction to Soil Mechanics, Foundation Design, Lightweight Concrete Design, Field Engineering, Introduction to Engineering, and the Fundamental of Engineering (FE) Review courses.
- Developed lesson plans, lectured, assessed courses, participated in research, and supervised junior faculty.
- Served as the department's Geotechnical Division Chief, Budget Director, and Director of Curriculum.

- Advised and mentored over 30 students in course scheduling, independent study courses, and research projects.

**Joint Engineering Directorate, US-Forces, Kabul, Afghanistan** 2012 to 2013
MILCON Division Chief

- Responsible for $4.6 billion major construction program and supervised a staff of five during a year-long deployment to the Joint Engineering Directorate headquarters staff for US forces in Afghanistan.
- Programmed new construction, cancelled unnecessary projects, and participated in construction project site surveys.
- Managed $1.2 billion in airfield pavement construction projects.
- Developed repair plans for pavements and structures damaged by enemy attacks.

**50th Civil Engineer Squadron, Schriever Air Force Base, Colorado** 2011 to 2012
Operations Flight Commander

- Supervised a workforce of 143 personnel that maintained and repaired 63 facilities and critical infrastructure worth over $1 billion.
- Responsible for the base's most critical facility, the 19 megawatt stand-by power plant that included a 5,250 ton chilled water system and 56 mega BTU steam boiler.

**Civil Engineering School, Wright-Patterson Air Force Base, Ohio** 2004 to 2008
Instructor

- Instructor of continuing education courses in both in-person and distance learning formats (synchronous and asynchronous) with a primary focus in pavement design, maintenance, and inspection.
- Taught Air Force officers and civilians how to design and evaluate pavements, to inspect pavement construction projects, and to use PCASE software.

**Bagram Airbase Provincial Reconstruction Team, Afghanistan** 2006 to 2007
Senior Engineer

- Served as the lead engineer for reconstruction and civil-military operations in Parwan and Kapisa Provinces in Afghanistan. Using local Afghan contractors, his team built roads, schools, clinics, wells, and government facilities.
- Responsible for designing projects, writing scopes of work, evaluating contractor proposals, performing quality assurance/quality control, and establishing payment milestones.
- Evaluated airfield pavements at US and NATO bases.

**43rd Civil Engineer Squadron, Pope Air Force Base, North Carolina** 2001 to 2003
Chief of Maintenance Engineering

- Supervised 32 personnel that were responsible for designing and managing contracts to maintain and repair 785 facilities and 2,024 acres of grounds with a plant replacement value of over $840 million.

AWARDS

- CEAE Faculty Appreciation Award (Civil Engineering), as voted on by students (2023-2024)
- ASCE Outstanding Faculty Advisor Award – Region 7 (2022-2023)
- Outstanding Academy Educator for top instructor in Department of Civil and Environmental Engineering, USAFA (2015-2016)
- Outstanding First Year Instructor, runner-up, Department of Civil and Environmental Engineering, USAFA (2013-2014)

- Team of the Month, MILCON Division, 966th Air Expeditionary Squadron (2012)
- Nominee, Best Practice Ready Research Paper, *Transportation Research Record: J. Transportation Research Board* (2010)
- National Society of Professional Engineers, Federal Engineer of the Year, Military Category (2008)
- Highest Score on Professional Engineer Exam in Ohio (2005)
- Company Grade Officer of the Year, 43rd Civil Engineering Squadron (2002)
- Distinguished Graduate, Air Force Civil Engineer Basic Course (2001)
- Bronze Star Medal, Defense Meritorious Service Medal, Meritorious Service Medal, Air Force Combat Action Medal (various years)

<u>FUNDED RESEARCH</u>

**External Grants as Principal Investigator, Co-Principal Investigator, or Investigator**
(12 external grants awarded totaling $13.126M)

1. Using a 2D Discrete Element Model to Characterize C-17 Loading on Semi-prepared runways, Defense Advanced Research Projects Agency (DARPA), PI, US Air Force Academy, 2014-2015, $5k.
2. Feasibility of Asphalt Surface Treatments on Airfield Pavement, Air Force Civil Engineer Center, co-PI (PI: J. Rushing), US Air Force Academy, 2014-2015, $6k.
3. Using the Discrete Element Method to Evaluate Army and Air Force Aggregate Base Course Specifications, Air Force Office of Scientific Research (AFOSR), PI, US Air Force Academy, 2015-2016, $3k.
4. Combined Discrete Element - Finite Element Modeling of Wheel Vertical Loading on Cohesionless Soils, DoD High Performance Computing Modernization Project (HPCMO) and AFOSR, PI, US Air Force Academy 2015-2016, $73k.
5. Development of Environmental Product Declarations (EPDs) for Sustainable Pavement Procurement, Grant No. 22-HTD-ZH-00013, Colorado Department of Transportation (CDOT), PI, University of Colorado, 2021-2023, $90k.
6. Evaluating the Structural Properties and Cost-effectiveness of Graphene-modified Asphalt, Grant No. 22-HTD-ZH-00061, Colorado Department of Transportation (CDOT), PI, University of Colorado, 2022-2024, $95k.
7. Best Practices for Rapid Repair, Rehabilitation and Reconstruction of Concrete Airport Pavements, Airport Concrete Pavement Technology Program (ACPTP)-2021-3, Federal Aviation Administration (FAA), co-PI (PI: S. Murrell, Applied Research Associates, Inc.), Senseney Engineering, LLC, 2022-2025, $750k ($68k subcontract to Senseney Engineering, LLC).
8. Determination of Immediate Claystone Scour Potential, Study No. R223.03, State Planning and Research, Grant No. 23-HTD-ZH-00067, Colorado Department of Transportation (CDOT), PI, University of Colorado, 2023-2025, $135k.
9. Reinforced Concrete Repair by an Evolving Visualized Internal Vascular Ecosystem (RC-REVIVE), Defense Advanced Research Projects Agency (DARPA), Co-PI (PI: M. Hubler, University of Colorado Boulder), 2023-2027, $1.727M.
10. EPD Data Analysis and Benchmarking in Support of HB 21-1303, Grant No. 24-HTD-ZH-00078, 2022 Federal Highway Administration (FHWA) Climate Challenge, Colorado Department of Transportation (CDOT), PI, University of Colorado, 2023-2025, $117k.
11. Design and Performance of Thin Concrete Airfield Pavement, Airport Concrete Pavement Technology Program (ACPTP)-2023-7, Federal Aviation Administration (FAA), co-PI (PI: S. Murrell, Applied Research Associates, Inc.), Senseney Engineering, LLC, 2023-2026, $750k ($30k subcontract to Senseney Engineering, LLC).
12. Sustainable Pavement Program Cooperative Center (SPPCC), Federal Highway Administration (FHWA), Investigator (PI: J. Harvey, University of California, Davis), Senseney Engineering, LLC, 2023-2028, $9.375M.

13. Load Transfer in Airfield Concrete Pavements, Airport Concrete Pavement Technology Program (ACPTP)-2024-10, Federal Aviation Administration (FAA), co-PI (PI: S. Murrell, Applied Research Associates, Inc.), Senseney Engineering, LLC, 2026-2029, $750k ($30k subcontract to Senseney Engineering, LLC).
14. Evaluation of Carbon Reduction Technology's Impact on Concrete Performance and Life Cycle Emissions, Grant No. 25-HTD-ZH-00032, Colorado Department of Transportation (CDOT), PI, University of Colorado, 2025-2028, $99k.
15. Impact of State Highway Pavement Traffic Overloading Following Natural Disasters, Grant No. 25-HTD-ZH-00037, Colorado Department of Transportation (CDOT), PI, University of Colorado, 2025-2028, $125k.
16. Cause and Progression of Rutting on Mountain Passes, Grant No. 25-HTD-ZH-00035, Colorado Department of Transportation (CDOT), PI, University of Colorado, 2025-2028, $158k.
17. Illinois Department of Transportation (LCTM) Low Carbon Transportation Materials (LCTM) Program, Bureau of Materials, Job No. MT-85-002-25 Phase I Environmental Services and Support, subconsultant (PI: L. Miller, WAP Sustainability), Senseney Engineering, LLC, 2026-2031, $2.5M ($225,000 subcontract to Senseney Engineering, LLC).

**Internal Grants as Principal Investigator and Co-Principal Investigator**

1. Recruiting and Retaining Underrepresented Minorities in Civil Engineering, Discovery Learning Apprenticeship, CU Summer Program for Undergraduate Research (CU-SPUR), University of Colorado, PI, University of Colorado, $5.7k.
2. Evaluation of Carbon Reduction Technology's Impact on Concrete Performance and Life Cycle Emissions, CU Summer Program for Undergraduate Research (CU-SPUR), University of Colorado, PI, University of Colorado, $5.7k.

PATENTS

1. Jumping Weight Deflectometer, Provisional Patent Application, prepared by Brent Johnson of Berg, Hill, Greenleaf, and Rescitti, LLC., CU Disclosure CU6369B, filed September 2023.

PUBLICATIONS

**Refereed Journal Papers**

1. Senseney, C.T. and Mooney, M.A. "Characterization of a Two-Layer Soil System Using a Lightweight Deflectometer with Radial Sensors," *Transportation Research Record: J. Transportation Research Board*, No. 2186, 2010, 21-28.
2. Senseney, C.T., Krahenbuhl, R.A., and Mooney, M.A. "Genetic Algorithm to Optimize Layer Parameters in Lightweight Deflectometer Backcalculation," *Int. J. Geomechanics*, ASCE, 2012, 13(4), 473-476.
3. Senseney, C.T. "Expedient Mitigation of Collapsible Loess in Northern Afghanistan," *Int. J. of Geoengineering Case Histories*, 2013, 2(4), 252-257.
4. Grasmick, J.G., Mooney, M.A., Surdahl, R., Voth, M., and Senseney, C.T. "Capturing a Layer Response during the Curing of Stabilized Earthwork Using a Multiple Sensor Lightweight Deflectometer," *J. of Mater. Civ. Eng.,* ASCE, 2015, 27(6).
5. Senseney, C.T., Grasmick, J.G., and Mooney, M.A. "Sensitivity of Lightweight Deflectometer Deflections to Layer Stiffness via Finite Element Analysis," *Canadian Geotechnical J.,* 2015, 53(7), 961-970.
6. Grasmick, J.G., Mooney, M.A., Senseney, C.T., Surdahl, R., and Voth, M. "Comparison of Multiple Sensor Deflection Data from Lightweight and Falling Weight Deflectometer Tests on Layered Soil," *Geotechnical Testing J.,* ASTM, 2015, 38(6).

7. Senseney, C.T., Duan, Z., Zhang, B., and Regueiro, R.A. "Combined Spheropolyhedral Discrete Element (DE) – Finite Element (FE) Computational Modeling of Vertical Plate Loading on Cohesionless Soil," *Acta Geotechnica*, 2017, 12(3), 593-603.
8. Senseney, C.T., Smith, P.J., Snyder, M.B. "Precast Concrete Paving Repairs at Vancouver International Airport," *Transportation Research Record: J. Transportation Research Board*, 2021, No. 2675, Vol. 9, 439-448, doi 10.1177/03611981211002518.
9. Senseney, C.T. and Suermann, P.C. "Design, Construction and Monitoring of Concrete Roadway Pavement at Extremely Steep Longitudinal Slopes," *International J. of Pavement Engineering*, 2021, 1-9, doi: 10.1080/10298436.2021.2011277
10. Mitchell, M.M., and Senseney, C.T. "Engineering Project Builds Skills and Showcases Ingenuity," *Civil Engineering*, 2022, 92(6), 22-23.
11. Senseney, C.T., Harvey, J.T., Butt, A.A., Meijer, J. "Recommendations for Cradle-to-Gate Environmental Product Declarations (EPD) in 'Buy Clean' Procurement based on CDOT's experience", *Environmental Research: Infrastructure and Sustainability*, 2023, 3, 35004, doi 10.1088/2634-4505/acf06d.
12. Tucker, J. and Senseney, C.T. Forthcoming "Life cycle cost analysis of graphene oxide modification of a neat asphalt binder for flexible pavement", *ASCE J. of Materials Engineering*, doi: 10.1061/JMCEE7/MTENG-19097.
13. Donado-Quintero, D. and Senseney C.T. "Development of a consumption-weighted benchmarking methodology for asphalt cradle-to-gate global warming potential impacts in Colorado", *Transportation Research Record: J. Transportation Research Board,* 2025
14. Donado-Quintero, D., Senseney, C.T., and Han, S. "Toward Reliable Benchmarking of Concrete's Global Warming Potential: Comparing EPDs and Concrete Mixes in Colorado at a Roadway Network-Level", *ASCE J. of Transportation Engineering, Part B: Pavements*, 2026.
15. Donado-Quintero, D., Han, S., and Senseney C.T. "Comparative Analysis of Life Cycle Greenhouse Gas (GHG) Emissions of Asphalt from Stationary and Portable Plants: An Assessment for Colorado, USA", *Environmental Research: Infrastructure and Sustainability*. 2026, doi 10.1088/2634-4505/ae7154.

**Conference Proceedings**

1. Suermann, P.C., Pocock, J.B., Senseney, C.T. "Evaluating U.S. Air Force Construction in Afghanistan: Applying Lessons Learned to Future Austere Construction," Proc. Seventh International Conference on Construction in the 21st Century (CITC-VII), Bangkok, Thailand, December 19-21, 2013.
2. Senseney, C.T. and Dossett, C.S. "Feasibility of Surface Treatments on Asphalt Surfaced Runways," Proc. Transportation Research Board 94th Annual Meeting, Washington, D.C., January 11-15, 2015.
3. Peloquin, C.P. and Senseney, C.T. "Evaluation of Coal Tar Slurry Seal on Airfield Runways," Proc. Transportation Research Board 95th Annual Meeting, Washington, D.C., January 10-14, 2016.
4. Amaddio, C.A. and Senseney, C.T. "Characterizing Strength Gain of a Cement Treated Base Using a Lightweight Deflectometer (LWD)," Proc. Transportation Research Board 96th Annual Meeting, Washington, D.C., January 8-12, 2017.
5. Senseney, C.T., Colby, C., Spencer, T., and Kumar, N. "Mitigating Expansive Soils in Residential Construction," American Society of Civil Engineers Annual Convention (ASCE 2018), Denver, Colorado, October 12-15, 2018.
6. Senseney, C.T. and Sagisi, E. "A Correlation Between ACN and ACR for the C-17 Aircraft on Flexible Pavement in the ACN-PCN and ACR PCR Airport Pavement Rating Systems," International Conference on Transportation & Development, Austin, Texas, June 14-17, 2023.
7. Senseney, C.T. "Post-fire impact of pavement overloading during Marshall Fire rebuild," Proc. Transportation Research Board 103rd Annual Meeting, Washington, D.C., January 7-11, 2024.

8. Donado-Quintero, D. and Senseney, C.T. "Case Study: Cradle-to-laid Life Cycle Assessment of a Concrete Pavement Reconstruction Project in Colorado," 6th International Symposium on Pavement, Roadway, and Bridge Life Cycle Assessment, Arlington, Virginia, June 6-8, 2024.
9. Senseney, C.T., Parsons, T.A., "Recommendations for Fast-Track Repairs of Airport Concrete Pavement," ASCE Airfield and Highway Pavements 2025, Phoenix, Arizona, June 5, 2025.
10. Senseney, C.T., Donado-Quintero, D. "Calculation of embodied greenhouse gas emissions from state-wide concrete mix design data," RoadLCA 2026, Palermo, Italy, September 28 – October 4, 2026 (accepted for presentation).

**Technical Reports**

1. Mooney, M.A., Nocks, C.S., Selden, K.L., Bee, G.T., and Senseney, C.T. "Improving Quality Assurance of MSE Wall and Bridge Approach Earthwork Quality Assurance," Report CDOT-2008-11, Colorado Department of Transportation, 2008, 79 pp.
2. Mooney, M.A., Senseney, C.T., and Rudkin, C.R. "Feasibility/Proof of Concept Study for Air Force use of Light Weight Deflectometer in Airfield Evaluation," Study FA4819-07-D-0001, Air Force Research Laboratory, 2009, 44 pp.
3. Senseney, C.T. "Structural Evaluation of Attack Damage at Camp Bastion," Report to Regional Command – Southeast, Afghanistan, 2012, 8 pp.
4. Mooney, M.A., Grasmick, J.G., Senseney, C.T., and Stamp, D.H. "Feasibility/Proof of Concept Study for Air Force use of Light Weight Deflectometer in Airfield Evaluation Phase II: Advancing LWD Capabilities," Study W912HZ-10-1-0006, U.S. Army Corps of Engineers, 2013, 163 pp.
5. Senseney, C.T., Wieden, C.A., Schiebel, W.R., Goodale, H., Meijer, J., "White Paper: CDOT Implementation of House Bill (HB) 21-1303 (Buy Clean Colorado Act) for EPD Colleaction on Key Construction Materials Used in Publicly Funded Transportation Projects," August 15, 2022, 8 pp.
6. Senseney, Christopher T. "Development of Environmental Product Declarations (EPDs) for Sustainable Pavement Procurement." No. CDOT-2023-01. Colorado. Dept. of Transportation. Research Branch, 2023.
7. Senseney, C.T., Donado-Quintero, D., Wieden, C.A., Goodale, H., Meijer, J., "White Paper: On the Development of CDOT Embodied Carbon Benchmark Limit Values for the Buy Clean Colorado Act," May 2, 2025, 12 pp.

WEBINARS

1. Senseney, C.T., Donovan, P.R., Dawson, A.R. "Evaluating and Rating Unsurfaced Roads", Transportation Research Board, August 25, 2021.
2. Senseney, C.T. "AASHTO '93 Pavement Design", American Society of Civil Engineers, December 15, 2021.

INVITED TALKS

1. The LWD as a QA Tool, 17th Falling Weight Deflectometer User's Group, Colorado Springs, CO, October 6, 2008.
2. Comparing LWD to FWD Results, 18th Falling Weight Deflectometer User's Group, Reno, NV, October 5, 2009.
3. Simulating sand grain fracture using a bonded spheropolyhedra DEM model, Technology Coordination Group XI, Sandia National Lab, Albuquerque, NM, December, 9, 2015.
4. Combined spheropolyhedral DE – FE computational modeling of vertical plate loading on cohesionless soil, Transportation Research Board AFP30: Soil and Rock Properties Committee, Washington D.C., January 12, 2016.

5. Realistic particle shapes in DEM modeling, Army Research Office Workshop on Characterizing the Dynamics of Geo-Surface Materials, Chicago, August 18, 2016.
6. Realistic grain shapes in the discrete element method with dilated polyhedra, Caltech Mechanical and Civil Engineering Seminar, Pasadena, CA, October 20, 2016.
7. A discrete element method fracture model with shperopolyhedra, Transportation Research Board AFP30: Soil and Rock Properties Committee, Washington D.C, January 11, 2017.
8. A discrete element method fracture model with dilated polyhedra, University of Colorado - Colorado Springs, Mechanical and Aerospace Engineering Research Seminar Series, Colorado Springs, CO, February 3, 2017.
9. Construction Defect Law and Forensic Engineering, United States Air Force Academy, Colorado Springs, CO, March 8, 2017.
10. A discrete element method fracture model with dilated polyhedra, University of Colorado-Boulder, Geotechnical Engineering and Geomechanics Seminar, Boulder, CO, October 8, 2017.
11. Selection of Subgrade Resilient Modulus for Pavement Design Using FWD Testing, 2019 Falling Weight Deflectometer User's Group Meeting, Alpharetta, GA, September 9, 2019.
12. Radial Sensor Selection for AASHTO 93 Backcalculation Formula, 2020 Falling Weight Deflectometer User's Group Meeting, On-line, October 7, 2020.
13. Moderator - Resilient Modulus Specification and QA/QC Acceptance for Construction, Lectern Session 1147, 2021 Transportation Research Board Annual Meeting, On-line. January 26, 2021.
14. Development of CDOT EPD Protocols, CDOT Internal EPD Workshop, Denver, CO, June 8, 2022.
15. A History of Buy Clean Legislation, CDOT Industry Stakeholder EPD Workshop, Boulder, CO, August 16, 2022.
16. CDOT's Environmental Product Declaration Program for Buy Clean Colorado, Lectern Session, 2023 Transportation Research Board Annual Meeting, Washington D.C., January 8, 2023.
17. Moderator - Assessing Uncertainty and Risk in Geotechnical Analyses, Lectern Session, 2023 Transportation Research Board Annual Meeting, Washington D.C., January 9, 2023.
18. Moderator – Decarbonization of the Built Environment, Workshop Session, ASCE INSPIRE 2023, Arlington, VA, November 17, 2023.
19. Post-fire Impact of Road Pavement Overload During Marshall Fire Rebuild, Lectern Session, 2024 Transportation Research Board Annual Meeting, Washington D.C., January 7, 2024.
20. Accelerating the Use of Low-Carbon Concrete, 2024 Executing Low Carbon Concrete Symposium, National Ready Mixed Concrete Association, Greenwood Village, Colorado, April 23, 2024.
21. Development of Concrete GWP Benchmark Recommendations, CDOT Benchmarking Update to Concrete Industry, Denver, Colorado, May 21, 2024.
22. Development of Asphalt GWP Benchmark Recommendations, CDOT Benchmarking Update to Asphalt Industry, Denver, Colorado, June 10, 2024
23. Development of Concrete GWP Benchmarks for CDOT, Embodied Carbon Bootcamp, University of Colorado, Boulder, July 26, 2024.
24. Development of a Consumption-weighted Benchmarking Methodology for Asphalt Cradle-to-gate Global Warming Potential in Colorado, Transportation Research Board Annual Meeting, Washington D.C.

PHD AND MASTER'S, COMMITTEE CHAIR/CO-CHAIR

1. Michael Seamon, MS (Architectural Engineering), Graduated in Fall 2022

Project topic: Literature Review of Colorado Ready Mix Concrete Environmental Product Declarations and Comparison to the NRMCA Benchmark

2. Erin Sagisi, MS (Civil Engineering), Graduated in Fall 2023
   Thesis topic: Evaluating the Operational Impacts of Transitioning Bearing Capacity Rating Systems for Airfield Pavements in the United States Air Force
3. Joseph Tucker, MS (Civil Engineering), Graduated in Fall 2023
   Thesis topic: Evaluating the Structural Properties and Cost-effectiveness of Graphene-modified Asphalt
4. Daniel Donado, PhD (Civil Engineering), Expected to graduate in Spring 2026
   Dissertation topic: Development of Benchmarks for Environmental Impact Data for “Buy Clean” Procurement Policies
5. Kathryn Stelwagon, MS (Civil Engineering), Graduated in Summer 2024
   Project topic: Prediction of Claystone Scour Potential for Bridge Pier and Abutment Foundations
6. Merrick Choate, MS (Civil Engineering), Expected to graduate in Fall 2024
   Project topic: Evaluation of Carbon Reduction Technology’s Impact on Concrete Performance and Life Cycle Emissions
7. Suttichai Charoenkij, PhD (Civil Engineering), Expected to graduate in Spring 2028
   Dissertation topic: TBD
8. Alexandr Roche, MS (Civil Engineering), Expected to graduate in Fall 2027
   Thesis topic: Cause and Progression of Rutting on Mountain Highway Passes

UNDERGRADUATE ADVISING

- AY 2020-2021: Advised 12 students
- AY 2021-2022: Advised 17 students
- AY 2022-2023: Advised 16 students
- AY 2023-2024: Advised 12 students
- AY 2024-2025: Advised 9 students
- AY 2025-2026: Advised 11 students

TEACHING

**Continuing education courses at the Air Force Civil Engineering School:**

- Airfield Pavement Rehabilitative Design and Maintenance (ENG 550)
- Airfield Pavement Construction Inspection (ENG 555)
- Simplified Facility Design (ENG 481)
- Air Force Civil Engineer Basic Course (MGT 101)
- Contingency Engineer Command Course (MGT 585)
- Readiness Flight Commander Course (MGT 434)

**Undergraduate classes at the U.S. Air Force Academy:**

- Introduction to Air Force Engineering (Engr 101)
- Introduction to Soil Mechanics (Civ Engr 390)
- Pavement Design and Rehabilitation (Civ Engr 488)
- Professional Engineering Development (FE Exam Review) (Engr 402)
- Civil Engineering Practices – Field Engineering (Civ Engr 351)
- Lightweight Concrete Design (Civ Engr 352)

**Courses at the University of Colorado, Boulder**

| Number | Level | Title | Semester | Size |
|---|---|---|---|---|
| CVEN 2012 | U | Intro to Geomatics | SP-26 | 48 |
| CVEN 3256 | U | Construction Equip/Methods | SP-26 | 37 |
| AREN 4319 | U | AREN Design II | SP-26 | 35 |
| CVEN 2012 | U | Intro to Geomatics | FA-25 | 47 |
| AREN 4318* | U | AREN Design I | FA-25 | 35 |
| GEEN 1400 | U | First Yr Engr Projects | SP-25 | 30 |
| CVEN 2012 | U | Intro to Geomatics | SP-25 | 26 |
| AREN 4319* | U | AREN Design II | SP-25 | 35 |
| CVEN 2012 | U | Intro to Geomatics | FA-24 | 39 |
| AREN 4318* | U | AREN Design I | FA-24 | 36 |
| GEEN 1400 | U | First Yr Engr Projects | SP-24 | 30 |
| CVEN 2012 | U | Intro to Geomatics | SP-24 | 34 |
| AREN 4319* | U | AREN Design II | SP-24 | 28 |
| CVEN 2012 | U | Intro to Geomatics | FA-23 | 41 |
| AREN 4318* | U | AREN Design I | FA-23 | 36 |
| GEEN 1400 | U | First Yr Engr Projects | SP-23 | 30 |
| CVEN 2012 | U | Intro to Geomatics | SP-23 | 35 |
| AREN 4319* | U | AREN Design II | SP-23 | 28 |
| CVEN 2012* | U | Intro to Geomatics | FA-22 | 36 |
| CVEN 3256 | U | Construction Equip/Meth | FA-22 | 24 |
| CVEN 4897 | U | Prof Issues Civ Engr | FA-22 | 54 |
| AREN 4318* | U | AREN Design I | FA-22 | 32 |
| GEEN 1400 | U | First Yr Engr Projects | SP-22 | 29 |
| CVEN 3246 | U | Intro to Construction | SP-22 | 21 |
| AREN 4319* | U | AREN Design II | SP-22 | 31 |
| CVEN 2012* | U | Intro to Geomatics | FA-21 | 34 |
| CVEN 3256 | U | Construction Equip/Meth | FA-21 | 27 |
| CVEN 4897 | U | Prof Issues Civ Engr | FA-21 | 62 |
| AREN 4318* | U | AREN Design I | FA-21 | 32 |
| CVEN 3246 | U | Intro to Construction | SP-21 | 12 |
| CVEN 3256 | U | Construction Equip/Meth | SP-21 | 65 |
| AREN 4317* | U | AREN Senior Design | SP-21 | 45 |
| CVEN 3256 | U | Construction Equip/Meth | FA-20 | 33 |
| CVEN 4897 | U | Prof Issues Civ Engr | FA-20 | 66 |
| CVEN 3246 | U | Intro to Construction | SP-20 | 25 |

* - indicates co-taught course

<u>SERVICE</u>

**National/International**

- Portland Cement Concrete Pavement TRI-Service and Industry Criteria Review Committee, 2014-present
- Asphalt Pavement TRI-Service and Industry Criteria Review Committee, 2014-present
- DoD/DoE Technology Coordination Group-XI (Penetration Mechanics), 2015-2017
- Transportation Research Board (TRB) AKG30: Standing Committee on Soil and Rock Properties and Site Characterization, 2016-present
- American Society for Testing and Materials (ASTM) Committee E17 on Vehicle-Pavement Systems, 2020-present
- Academy of Pavement Science and Engineering (ASPE), Task Force on Pavement Sustainability and Resilience, 2021-present

- Federal Highway Administration (FHWA), Sustainable Pavements Technical Working Group (SPTWG), 2022-present
- ASCE Infrastructure 2050, executive member, 2022-present
- Designated Steel Construction Products PCR Committee, member, 2023-present

**Journal Reviews**

- Transportation Research Record, Journal of the TRB, 2014-present
- Arabian Journal of Geosciences, 2014
- Geotechnical Testing Journal, ASTM, 2014-present
- Inverse Problems in Science & Engineering, 2016
- Canadian Geotechnical Journal, 2016
- International Journal of Pavement Engineering, 2020-present
- Journal of Transportation, Part B Pavements, ASCE, 2022-present
- Journal of Materials in Civil Engineering, ASCE, 2022-present

**University**

- Quarterly Awards Board, USAFA, 2013
- Core Curriculum Review Committee, USAFA, 2013-2014
- Contract Review of Airfield Improvements, USAFA, 2015-2016
- Undergraduate Scholarship Committee, College of Engineering and Applied Science, CU-Boulder, 2020-2023
- Director, Kiewit Design-Build Scholarship Program, College of Engineering and Applied Science, CU-Boulder, 2020-2024

**Departmental**

- Academic Review Committee, Civil and Environmental Engineering, USAFA, 2013
- Department Cost Center Manager, USAFA, 2013-2017
- Government Purchase Card Approving Official, USAFA, 2013-2017
- Geotechnical Division Head, USAFA, 2014-2016
- ASCE Faculty Advisor, USAFA, 2015-2017
- Director of Curriculum, USAFA, 2017
- CEM Group Coordinator, CU-Boulder, 2020-2022
- CEAE Curriculum Committee, CU-Boulder, 2020-2023
- Undergraduate Pathways Committee, CU-Boulder, 2023-present
- ASCE Faculty Advisor, CU-Boulder, 2021-present
- Colorado Contractor's Association (CCA) Faculty Advisor, CU-Boulder, 2021-present
- CEAE Representative to Transfer Credit Committee, CU-Boulder, 2022-present
- Associate Chair for Undergraduate Education, CU-Boulder, 2024-present

EXPERT WITNESS

| Representing Law Firm | Case Caption | Attorney's Client | Testimony | Date |
|---|---|---|---|---|
| Daniel B. McConnel, Esq<br>Assistant Counsel<br>US Army Corps of Engineers<br>Winchester, VA | Appeal of ECC International LLC Under Contract No. W912-DQ-11-C4009<br>ASBCA No. 58993<br>Armed Services Board of Contract Appeals | US Army Corps of Engineers, Middle East District | Deposition | 3/9/2017 |
| Daniel B. McConnel, Esq<br>Assistant Counsel<br>US Army Corps of Engineers<br>Winchester, VA | Appeal of ECC International LLC Under Contract No. W912-DQ-11-C4009<br>ASBCA No. 58993<br>Armed Services Board of Contract Appeals | US Army Corps of Engineers, Middle East District | Trial | 5/16/2017 |
| Matthew J. Ninneman<br>Hall & Evans, LLC<br>Denver, CO" | Mountain Vista Builder Services, LLC v. R & M Parker Tech Center, Inc.<br>Case No. 2016CV32538<br>Arapahoe County District Court | R & M Parker Tech Center, Inc. | Deposition | 11/15/2017 |
| M. Kate Strauss<br>Overturf McGath & Hull, P.C.<br>Denver, CO | The Latitude at Vista Ridge Homeowners Association, Inc. v. Vista Ridge Development, LLC, dba Chartered Homes of Colorado, Stoney Creek Concrete Co, Inc., et. Al<br>Case No. 2016CV30918<br>Weld County District Court | Stoney Creek Concrete Co, Inc. | Deposition | 12/19/2018 |
| Craig Flinders<br>Flinders Law, LLC<br>Englewood, CO | Sean Dixon and Crystal Dixon v. James L. McMillin and Jan T. McMillin<br>Case No. 2017CV032965<br>El Paso County District Court | James L. McMillin and Jan T. McMillin | Trial | 2/26/2019 |
| Abigail Frame<br>Woods & Aiken, LLP<br>Denver, CO | Don Kehn Construction, Inc. v. ABCO Contracting, Inc.<br>Case No. 2022CV30750<br>Larimar County District Court | ABCO Contracting, Inc. | Deposition | 2/15/2023 |

# APPENDIX B

## JOURNAL PAPER TITLED 'DESIGN, CONSTRUCTION AND MONITORING OF CONCRETE ROADWAY PAVEMENT AT EXTREMELY STEEP LONGITUDINAL SLOPES'




Taylor & Francis
Taylor & Francis Group

International Journal of Pavement Engineering

ISSN: 1029-8436 (Print) 1477-268X (Online) Journal homepage: www.tandfonline.com/journals/gpav20

# Design, construction and monitoring of concrete roadway pavement at extremely steep longitudinal slopes

Christopher T. Senseney & P. C. Suermann

**To cite this article:** Christopher T. Senseney & P. C. Suermann (2023) Design, construction and monitoring of concrete roadway pavement at extremely steep longitudinal slopes, International Journal of Pavement Engineering, 24:1, 2011277, DOI: 10.1080/10298436.2021.2011277

**To link to this article:** https://doi.org/10.1080/10298436.2021.2011277

Published online: 14 Dec 2021.

Submit your article to this journal

Article views: 257

View related articles

View Crossmark data

Citing articles: 2 View citing articles

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=gpav20

JA0156

INTERNATIONAL JOURNAL OF PAVEMENT ENGINEERING
2023, VOL. 24, NO. 1, 2011277
https://doi.org/10.1080/10298436.2021.2011277

Taylor & Francis
Taylor & Francis Group

Check for updates

# Design, construction and monitoring of concrete roadway pavement at extremely steep longitudinal slopes

Christopher T. Senseney [a] and P. C. Suermann [b]

[a]Department of Civil, Environmental and Architectural Engineering, University of Colorado, Boulder, CO, USA; [b]Department of Construction Science, Texas A&M University, College Station, TX, USA

**ABSTRACT**

Most conventional roadway pavements are not constructed at grades greater than 15% due to construction limitations and/or motor vehicle operator safety concerns; however, there are conditions, especially in the developing world, where roadways must be built at extremely steep longitudinal slopes. Currently, there are limited published design procedures for extremely steep concrete roadways, and little guidance on either the type, shape, or spacing of sliding restraint devices for these pavements. This paper presents an original design methodology for concrete roadways at slopes of 15–60% with integral concrete lug anchors to resist sliding where the design computes a sliding factor of safety of the earth pressure resistance developed by the lug anchors as compared to the downhill forces acting on the concrete pavement from gravity, vehicle loading and vehicle braking. A case study of a concrete roadway construction project, which uses the lug anchor design methodology with slopes of 23–58% and with limited right of way, is also presented. Many valuable lessons were learned during the construction of a roadway at such steep grades, including novel ways to transport and place fresh concrete and the fabrication of specialised equipment to screed and smooth concrete on a steep slope.

**ARTICLE HISTORY**
Received 17 May 2021
Accepted 22 November 2021

**KEYWORDS**
Steep slope concrete pavement; pavement design; concrete pavement construction; concrete pavement smoothness; lateral earth pressure

## Introduction

Roadway pavements, i.e. asphalt pavement or portland cement concrete pavement, are not conventionally built at extremely steep longitudinal slopes (greater than 15% grade) due to motor vehicle operator safety concerns and construction limitations. A longer indirect alignment with gradual grades through hilly or mountainous regions is often established; however, there are conditions where the right of way for a road is limited to an alignment directly on steep longitudinal grades. One such condition is in developing countries, where an existing low volume road may be aligned on a steep grade and the roadway may not be able to be easily re-aligned due to cost, conflict with dwellings and infrastructure, and/or availability of materials and equipment.

The installation of concrete pavement on steeply sloped roadways has advantages over asphalt, gravel, or unsurfaced conditions due to the increased strength, increased durability, and the ability to better resist damage from intense precipitation events. On rising grades, the loads on the rear axles of trucks are increased due to force equilibrium (Razouki and Radeef 2005), and it has been shown that overloaded and tall trucks can cause excessive damage to flexible pavements when driving up steep slopes, especially in developing countries (Karim *et al.* 2013, Razouki *et al.* 2020). The stability and rigidity of concrete makes it more resistant to the higher stress levels induced by trucks and motor vehicles on step grades. Furthermore, the World Bank (Dos Anjos Ribeiro Cordeiro *et al.* 2017, Johnson *et al.* 2019) has reported that concrete pavement can provide improved resilience to flooding, inundation, erosion, and heavy surface runoff that may arise from extreme weather events happening at an increased rate, possibly due to global climate change. For these reasons, rigid concrete is a preferred alternative to asphalt or gravel on steeply sloped roadways, especially at grades greater than 15%.

There are scarce published design procedures and criteria for the design and construction of concrete pavement at steep longitudinal grades. ACI 330.2R-17 (ACI Committee 318 2019) provides recommendations for restricting concrete slab movement at industrial and trucking facilities where fine-grained subgrade soils, steep slopes, and forces of braking and vehicle turning can cause in-plane sliding of the concrete pavement panels and lead to overly wide joints and reduced joint stability. The ACI states that tie bars are often used to restrain concrete slabs, but this practice alone may not be sufficient where the loads are higher than usual (e.g. extremely steep slopes), and especially where sliding forces are present over large areas. The ACI guide identifies pre-set or integrally placed trench footings (lug anchors), post-style anchors, or thickened edges as additional sliding mitigation techniques, but the guide does not offer a design methodology to layout the restraints. Perrie (Perrie 2000) provides recommendations for lug anchors across the full width of steep concrete low volume roads for two situations, (1) the placement of anchors at the bottom end of the grade for slopes between 5 and 10%; and (2) the placement anchors at the bottom end of the grade and at 100 ft (30 m) intervals thereafter uphill for slopes greater than 10%.

**CONTACT** Christopher T. Senseney senseney@colorado.edu
© 2021 Informa UK Limited, trading as Taylor & Francis Group

The objective of this paper is to introduce an original design methodology for a unique concrete road condition, namely extremely steep longitudinal grades (15%–60%), for which a design procedure does not currently exist to the authors' knowledge. The new methodology uses integral concrete lug anchors and was developed for specific project along the United States and Mexico international border, presented here as a case study, where concrete pavement was specified by the owner/agency to prevent washouts and erosion, and where there was little right of way to allow construction of a more gradual roadway slope. The methodology computes the sliding factor of safety of the passive earth pressure resistance developed by the lug anchors as compared to the downhill forces acting on the concrete pavement from gravity, vehicle loading and vehicle braking. A secondary objective of this paper is to present lessons learned from the transport, placement, screeding, and finishing of concrete at such steep grades and where roadway smoothness specifications must be met. Additionally, survey data from a closed traverse survey conducted during construction and three months later is presented. The maximum horizontal concrete pavement movement was measured at 0.71 in (18 mm) between the two surveys, which is within an acceptable range of movement for similar types of concrete roads.

## *Project background and soil conditions*

The concrete road construction project was located along the United States side of the international border with Mexico, where the climate in the region is arid desert with an average yearly high temperature 84° F (29° C), average yearly low temperate of 60° F (16° C), and average annual rainfall of 7.74 in (19.6 cm). The project required the construction of a gravel road at slopes less than 15% grade, and construction of a 12-ft (3.7-m) wide unreinforced concrete paved road, with load transfer dowels, at slopes between 15 and 60%. Concrete durability was not a major concern due to the arid environment, negligible sulphate exposure, and limited number of days with temperatures below freezing. This paper will focus on a specific section of the 12-ft (3.7-m) wide concrete road pavement at the east side of a high point on the project, referred to as Promontory Point, where a 1465-ft (447-m) long section of road begins at the base of the mountain with a grade of 23% and continuously steepens to a grade of 58% near the summit. Promontory Point is used a pseudonym in this paper for the actual name of the mountain peak on the project site to preserve the confidentiality of the project.

This project included specialised requirements and limitations not normally found on conventional roadway construction projects or not normally specified for concrete placed at steep slopes (e.g. dam spillways, concrete drainage structures, etc.). The construction specifications required the pavement to be smooth and true to grade and cross section. When tested with a 10-foot (3.05-m) straightedge parallel with the centreline of the pavement, the surface could not vary more than 1/4 in (6.35 mm) from the testing edge of the straightedge. Rock rip rap or a concrete apron was required on the south side road to prevent erosion, and the project team elected to pave the apron with concrete, which the team completed prior to the roadway pavement construction, allowing the edge of the concrete apron to serve as an edge form and construction joint for the concrete road paving. The project team was restricted to a narrow 60-ft (18-m) wide right-of-way through the Promontory Point alignment during construction since there was an international border on one side and a national park on the other side of the alignment. The project team was not allowed to construct access roads to enter the right of way from either side of the alignment, which significantly limited the options for transporting materials and moving equipment, especially over such steep terrain.

The steep grades and rock formations within the road alignment are part of a mountain range, which was formed as a result of ancient volcanic activity from the Quaternary period. Soil borings were taken at either 500- or 1000-ft (152- to 304-m) intervals along the alignment to depths of 10–20 ft (3–6 m). As shown in Table 1, soil samples of three borings taken along the Promontory Point alignment indicated the in-situ near surface soils, to a depth of approximately 5 ft (1.5 m) are generally classified as very dense sandy silt with gravel (ML), very dense well graded gravel with sand (SM), and very dense silty sand (SM). There were no soil strength or stiffness tests conducted on the subgrade soil at the Promontory Point site; however, California Bearing Ratio (CBR) tests were conducted on 10 nearby soil samples with similar soil classifications, which yielded a 25th percentile CBR value of 35 based on cumulative distribution function of the dataset. A CBR of 35 would correlate to a resilient modulus ($M_R$) value of approximately 25,000 psi (172 MPa) based on AASHTO 1993 Design Guide correlation of $M_R = 2555(CBR)^{0.64}$ (AASHTO 1993).

## Lug anchor design methodology

The shape and orientation of the full width lug anchors were based on recommendations in ACI 330.2R-17 (ACI Committee 330 2017), which provides details of lug anchors with the stated purpose of minimising concrete pavement panel sliding in areas with fine-grained subgrade soils, steep pavement grades, and locations where heavy vehicles brake and turn. The ACI guide's example cross-section detail shows a lug anchor that is 18-in (460-mm) wide and 24-in (600-mm) deep and includes a 4-ft (1.2-m) thickened edge extending longitudinally from both sides of the lug. The lug is longitudinally and transversely reinforced with No. 4 rebar. The ACI guide states that some roadway agencies recommend lug anchor spacings of less than 40 ft (12.2 m) and as much as 200 ft (61 m); however, the guide does not provide a design methodology or a procedure to determine lug anchor spacing.

The lug anchor detail in ACI 330.2R-17 is intended for jointed plain concrete pavement (JPCP) at industrial and

**Table 1.** Soil properties of in-situ soil from near surface soil borings taken at Promontory Point.

| Boring | Soil classification | Dry unit weight | Angle of internal friction |
|---|---|---|---|
| P2-002 | ML | 129.4 | 33 |
| P2-003 | SM | 133.5 | 34 |
| P2-003.5 | SC-SM | 124.0 | 31 |

trucking facilities; however, the ACI lug anchor is similar in form and concept to the lug anchor designs used for the ends of continuously reinforced concrete pavement (CRCP). All concrete pavements exhibit movement, primarily due to volume changes from temperature fluctuations, but also due to drying shrinkage and moisture changes. CRCP exhibits more movement than JPCP since CRCP is constructed without contraction joints. Lug anchors, as well as other expansion control devices, are generally installed at CRCP terminal joints to prevent damage to adjacent structures, e.g. bridge foundations, from CRCP expansion. Various terminal lug anchor systems for CRCP have been proposed and evaluated by researchers and highway agencies (Mitchell 1963, McCullough 1971, McCullough and Wu 1992, Zollinger and Soares 1999, Jaiswal 2012, Ryu *et al.* 2012, Ren *et al.* 2013, Roesler *et al.* 2016, Oh *et al.* 2016, Cargnin and Balbo 2021). Lug anchors have been used in the past for terminal systems at bridge approaches with JPCP (Shelby and Ledbetter 1962), but the use lug anchors in modern JPCP roadways is limited.

Since the forces acting on the JPCP roadway lug anchors for this project were different than the forces acting on conventional CRCP and JPCP roadway terminal anchorage systems, the team needed to develop an original lug anchor design methodology. The methodology for the lug anchor restraint system assumed that downhill pavement sliding from the gravitational force of the concrete pavement mass, the vehicle load, the vehicle braking force, and active earth pressure are restrained by the passive earth pressure resistance of the in-situ subsoil at downhill side the anchors.

As specified in the project documents, the design vehicle for the roadway, and the associated restraint system, was a single 35,000-lb (16,000-kg) truck. The net downhill load ($F_{downhill\text{-}net}$) from the design vehicle and concrete was taken as the sum of the orthogonal component ($F_{truck\text{-}orthog}$) and braking force ($F_{braking\text{-}orthog}$) of a truck between proposed lug anchors, plus the gravitational force of the concrete mass ($F_{concrete\text{-}orthog}$), minus the friction resistance between the cast-in-place concrete and the native subgrade ($R_{concrete\text{-}friction}$) as shown in Figure 1. The braking force was assumed to be 80% of the normal component of the vehicle weight, a value that has been demonstrated to be the maximum braking force that could be applied before the vehicle's tyres disengage with the pavement (Barber 1963). Vehicle traffic information provided in the project documents indicated that no more than one 35,000-pound (16,000-kg) truck at a time would be expected on the extreme slopes between lug anchors with our recommended lug anchor spacing.




**Figure 1.** Profile view of concrete lug anchor schematic with applied loads used in the design methodology.

### *Factor of safety against sliding*

The factor of safety against sliding of the lug anchor design was computed by dividing the passive resistive force on the downhill side of the anchor ($R_{anchor\text{-}passive}$) by the net downhill load of the vehicle and concrete plus the active earth pressure on the uphill side of the anchor ($F_{anchor\text{-}active}$). The sliding factor of safety of the anchor ($FS_{sliding}$) follows as Equation (1):

$$FS_{sliding} = \frac{R_{anchor\text{-}passive}}{F_{downhill\text{-}net} + F_{anchor\text{-}active}} \quad (1)$$

where $F_{downhill\text{-}net}$ equals $F_{truck\text{-}orthog}$ plus $F_{braking\text{-}orth}$ minus $F_{concrete\text{-}orthog}$. Consistent with the industry standard for sliding factors safety in the design of retaining walls, $FS_{sliding}$ was limited to a minimum of 1.5. During the design process, the anchor key spacing was optimised to keep $FS_{sliding}$ close to, but not less than, 1.5.

### *Lateral earth pressure calculation*

Lateral earth pressure calculations were based on the Logarithmic Spiral earth pressure theory developed by Terzaghi (Terzaghi 1943). Duncan and Mowka (Duncan and Mokwa 2001) found the Logarithmic Spiral passive pressure theory provided the most accurate method for computing ultimate passive soil resistance as compared to the Coulomb and Rankine theories. Logarithmic earth pressure coefficients were selected from charts for a sloping wall with granular soil and wall friction from NAVFAC Design Manual 7.02 (NAVFAC 1986), which are derived from tables by Caquot and Kerisel (Caquot and Kérisel 1948). The ratio of the friction between soil-concrete interface ($\delta$) and the coefficient of friction of the soil ($\varphi$) was assumed to be $\delta/\varphi = 0.8$ based on the friction of similar materials reported by Potyondy (Potyondy 1961). With the Logarithmic Spiral method, the passive earth pressure resistance at the downhill side of the lug anchor $R_{anchor\text{-}passive}$ and the active earth pressure force on the uphill side of the lug anchor $F_{anchor\text{-}active}$ were calculated in Equations (2) and (3), respectively:

$$R_{anchor\text{-}passive} = \frac{1}{2} K_P \gamma H^2_{downhill} \quad (2)$$

$$F_{anchor\text{-}active} = \frac{1}{2} K_a \gamma H^2_{uphill} \quad (3)$$

where $K_p$ is the passive earth pressure coefficient, $K_a$ is the active earth pressure coefficient, $\gamma$ is the soil unit weight, $H_{downhill}$ is the height of the downhill face of the lug anchor and $H_{uphill}$ is the height of the uphill face of the lug anchor.

Case 1:26-cv-02127 Document 3-3 Filed 06/17/26 Page 40 of 69

USCA Case #26-5306 Document #2193482 Filed: 09/16/2026 Page 169 of 388

**Table 2.** Earth pressure coefficients, anchor spacing, and factors of safety against sliding for the slopes on the project based on the design methodology presented in this paper.

| Slope (%) | Slope-β (degrees) | Soil internal angle of friction (degrees) | Passive earth pressure coeff. | Active earth pressure coeff. | Anchor key spacing (ft) [m] | FS against sliding |
|---|---|---|---|---|---|---|
| 20 | 11.3 | 31 | 8.13 | 0.33 | 120 [36] | −1.93 |
| 30 | 16.7 | 31 | 9.11 | 0.37 | 120 [36] | −23.82 |
| 40 | 21.8 | 31 | 10.22 | 0.41 | 120 [36] | 3.10 |
| 50 | 26.6 | 32 | 12.19 | 0.54 | 72 [22] | 1.58 |
| 60 | 31.0 | 33 | 15.33 | 0.83 | 48 [14.6] | 1.53 |
| 70 | 35.0 | 35 | 19.98 | 0.95 | 24 [7.3] | 1.96 |

The roadway slopes, internal angle of friction of the soil, calculated earth pressures, our slected lug anchor spacings, and $FS_{sliding}$ for the lug anchors are shown in Table 2. The $FS_{sliding}$ values at slopes of 20% and 30% are negative since the friction resistance term ($R_{concrete\text{-}friction}$) is large at lower slopes and is subtracted in the calculation of the $F_{downhill\text{-}net}$ term, which makes the $F_{downhill\text{-}net}$ negative. In Equation (1), if $F_{downhill\text{-}net}$ term is more negative than the positive value of $F_{anchor\text{-}active}$, then the $FS_{sliding}$ value will be negative. This simply means that friction between the concrete and the subgrade overcomes all downhill forces and potentially no additional sliding restraint (i.e. lug anchor) would be necessary; however, we specified the construction of lug anchors at slopes of 20% and 30% with a spacing of 120 ft (36 m) to be relatively consistent with lug anchor recommendations by Perrie (Perrie 2000).

### *Reinforcement design*

The design and sizing of the longitudinal reinforcement for the concrete lug anchors was based on possible failure by shear sliding along a crack in the concrete pavement slab. It was assumed that a crack will form in the slab on the downhill side of the lug anchor where a weakened plane sawcut contraction joint was specified. The contraction joint was placed at a slight offset from the lug anchor, to create a crack at the weakened plane that would extend perpendicular to the reinforcement, as shown in Figure 2. When shear acts along the crack, the crack faces attempt to separate since the faces are rough and irregular, thus causing tension in the reinforcement. The applied shear from vehicle loading will be resisted by friction between the crack faces, by resistance to the shearing of aggregate protrusions on the crack faces, and by dowel action of the reinforcement crossing the crack.




**Figure 2.** Profile view of concrete lug anchor schematic with tension in shear-friction reinforcement loads.

According to ACI 318–19 (ACI Committee 318 2019), the required area of shear-friction reinforcement $A_{vf}$ can be calculated with Equation (4) as:

$$A_{vf} = \frac{V_u}{\varphi f_y \mu} \quad (4)$$

where $V_u$ is the factored shear load, $\varphi$ is the strength reduction factor ( = 0.75 for shear loading), $f_y$ is the yield strength of the steel (=40,000 psi [275 MPa]), and $\mu$ is the coefficient of friction ( = 1.4 for concrete placed monolithically). The 35,000-lb (16,000-kg) truck, with 8750 lb (4000 kg) per tyre, generates the factored shear load $V_u$ on the reinforcement and this load was distributed to the bars through dowel group action per Huang (Huang 1993). The dowel group action assumes the load from truck tyre or tyres is shared by each of the reinforcement bars with the bar directly underneath the tyre experiencing the greatest shear load and the load decreases inversely proportional to distance of the tie bar from the point of loading. The shear-friction analysis calculated the maximum projected shear load on a reinforcement bar and led to selection of No. 4 (12.7-mm diameter) bars with 16-in (40-cm) centre-to-centre spacing for the longitudninal lug anchor reinforcement.

## Concrete roadway pavement design methodology

The JPCP structural roadway design followed the concrete pavement design procedure outlined in U.S. Army Corps of Engineers UFC 3-250-01 (UFC 3-250-01 2016), which uses a Westergaard analysis (Westergaard 1926) to calculate stresses in the pavement acting under the wheel load and uses a separate fatigue analysis model to determine the allowed number of wheel load repetitions. The inputs into the UFC 3-250-01 JPCP design chart for a 3-axle, 35,000-lb (16,000-kg) vehicle were a concrete flexural strength of 600 psi (4137 kPa), a modulus of subgrade reaction (k-value) of 200 pci (54 MPa/m), and a traffic load of 55,000 truck passes. The 55,000 truck passes represent the total predicted 35,000-lb (16,000-kg) truck loadings for a 25-year design life of the roadway based on traffic information provided in the project documents. The CBR 35 subgrade soil near Promontory Point would correspond to a k-value of 375 pci (101 MPa/m) based on the UFC 3-250-01 correlation of $k = (1500 * CBR/26)^{0.7788}$ (for imperial units); however, we chose to use a k-value of 200 pci (54 MPa/m) since




**Figure 3.** Profile view of concrete lug anchor and roadway pavement showing dimensions and taper of roadway on both sides of lug anchor.

stiffness testing of the Promontory Point subgrade soil was not directly conducted. The UFC 3-250-01 JPCP design chart yielded a required concrete thickness of 5.75 in (14.6 cm), which we rounded up to 6 in (15.2 cm) for constructability purposes. Figure 3 shows a profile view of the pavement section and how the pavement was designed with a thickened edge (or taper) into the lug anchor at both the uphill and downhill sides of the anchor.

The mix design for the 4000 psi (27.6 MPa) compressive strength concrete used on the project is shown in Table 3. A 4000 psi (27.6 MPa) mix, as opposed to a conventional 3000 psi (20.7 MPa) roadway mix, was used to improve the shear resistance at the reinforcement bars and to provide added strength to the lug anchor structures. A 2-in (5-cm) slump mix was selected after some trial-and-error experimentation by the concrete labour crew at test sections with workability and screeding on an incline slope. Although fly ash was not required due to limited durability and environmental concerns, 20-percent fly ash replacement by weight was added to the mix to improve the workability and finishability of the fresh concrete to help achieve the smoothness specifications required for the roadway. Water reducer and hydration stabilizer admixtures were included to increase workability and to extend initial set time, respectively.

## Construction process

Placement of concrete at extreme longitudinal slopes was challenging due to difficulties with material transport, concrete forming, equipment constraints, and safety. For the Promontory Point section of the project, concrete could not be delivered directly to the forms by mixer truck since large trucks could not safely travel up or down the nearly 60% grade and there was no right of way on either side of the alignment to allow the building of temporary access roads. Pumping of concrete to the forms was also not feasible because an expensive staged pumping system would be needed to generate enough pressure to pump the concrete a horizontal distance of approximately 1500 ft (457 m) and to an elevation increase of approximately 400 ft (122 m) to the summit of the mountain. A concrete pumping system could not be economically placed on the top of Promontory Point either, since the slope and limited right of way restrictions are similar on the west side of the mountain as on the east side of the mountain. The only realistic option for the Promontory Point roadway construction was to haul the fresh concrete to the forms up the slope with a tracked loader.

The transport of the concrete and the other sequential steps of the concrete roadway construction process are explained in the following sections.

**Table 3.** The 4000 psi compressive strength concrete mix design used on the Promontory Point roadway project.

| Mix proportions | | | |
|---|---|---|---|
| Water/cement ratio | | 0.52 | |
| Calculated unit weight | | 142.5 lb/ft$^3$ | |
| Target slump | 2 in +/− 1 in | | |
| Target air content | | 1.5% | |
| **Material** | **Quantity (per/yd$^3$)** | **Specific gravity** | **Volume (ft$^3$ per yd$^3$)** |
| Cement (Type I/II) | 480 lb | 3.14 | 2.45 |
| Fly ash (Class F) | 120 lb | 2.2 | 0.87 |
| Water | 315 lb (37.8 gal) | 1.0 | 5.05 |
| Fine aggregate | 1288 lb | 2.591 | 7.94 |
| Coarse aggregate | 1650 lb | 2.590 | 10.21 |
| Air content | 1.5% | | 0.40 |
| Water reducer | 4.0 oz/cwt | | |
| Hydration stabilizer | 5.0 oz/cwt | | |
| | | **Total** | 26.9 |

### *Lug anchor trench and reinforcement*

The 24-in (600-mm) deep and 18-in (450-mm) wide trenches, which served as earthen forms for the concrete lug anchors, were excavated with a mini-excavator and hand shovels at an interval equal to or less than the lug anchor spacing specified in Table 2. Inverted standee, or U-shaped, No. 4 (12.7-mm diameter) longitudinal reinforcement bar sections were placed in the trenches at 16-in (40-cm) transverse spacing with transverse reinforcement bar for support and rebar chairs to maintain proper cover as shown in Figure 4(a). At the steepest sections of the roadway, extra transverse bar supports and rebar chairs were used to prevent displacement of the bar cage during concrete pours.

### *Concrete transport*

Fresh was concrete was delivered to the base of the hill from a nearby mobile batch plant by mixer truck to a track loader equipped with a 2-yd$^3$ (1.5-m$^3$) capacity side dump bucket (see Figure 4(b)). The track loader would transport an approximate 3/4-yd$^3$ (0.57-m$^3$) load of concrete up the steep grade and side dump the fresh concrete into to a 1-



**Figure 4.** Sequential photographs of the construction process showing (a) an excavated trench footing for a concrete lug anchor with an inverted standee reinforcement bar section inserted, (b) the concrete delivered to a track loader equipped with a hydraulic side-dump bucket, (c) the concrete delivered to the forms via a crane bucket attached to a feller buncher machine, (d) the paving skid above concrete slab placement with winches attached to a concrete roller screed, (e) the roller screed being pulled up the grade to form the fresh concrete, and (f) the finished concrete surface with a plastic preformed contraction joint, transverse tining, and liquid spray on curing membrane.

$yd^3$ ($0.75\text{-}m^3$) capacity crane bucket attached to the arm of a feller buncher machine parked adjacent to the formwork. A feller buncher machine, traditionally used in logging operations, was utilised for this project since the machine offers a self-levelling cabin for operator comfort and improved safety on steep terrain.

### *Concrete placement in forms*

The feller buncher operator would manoeuvre the crane bucket over the formwork for placement (see Figure 4(c)). A concrete labourer in the forms controlled the rate and quantity of concrete discharged from the crane bucket with a lever on




**Figure 5.** (a) Plan and (b) profile views of survey points, benchmarks, lug anchor locations, elevations, and grades for the concrete roadway pavement at Promontory Point.

the bucket, which allowed the labour crew to distribute concrete to sections of the slab starting at the low end of the form and working to the high end of the form. Portions of the 3/4-yd$^3$ (0.57-m$^3$) load would be discharged into the form with two labourers manually distributing the fresh concrete throughout the form with heavy-duty concrete placer rakes and another labourer distributing concrete with a flat blade shovel. This step usually required the labourers to pull and move the fresh concrete up the grade against gravity. When the concrete load was uniformly distributed in the form, a labourer would vibrate the mix to remove entrapped air using a concrete consolidation vibration tool.

## Concrete screeding and smoothing

A custom fabricated paving skid, which supported a roller screed used to create a smooth roadway surface, was anchored into subgrade above the slab being poured. Each corner of the bottom of the skid had a height adjustable leg that was driven and secured into the subgrade at a specified height to level the skid platform. The skid platform held two hydraulic pumps and two 11-horsepower motors that were paired together to power two winches connected to the sides of a roller screed (see Figure 4(d)). The two winches could independently pull the rotating roller screed up the slope with 1/2-in (13-mm) diameter steel cables that provided the force for the roller screed to distribute and form the concrete surface in conjunction with two concrete labourers who manipulated pull handles positioned at each end of the roller screed (see Figure 4(e)). The roller screed operation helped ensure the pavement surface met the 1/4-in (0.64-cm) smoothness specification as measured with a 10-foot (3.05-m) long straightedge.

## Concrete jointing, finishing, and tining

Preformed, 1-1/2-in (3.8-cm) deep, plastic contraction joint formers, longitudinally spaced every 12 ft (3.7 m), were placed in the concrete to control random cracking. The preformed joint former is a two-piece system that is inserted into fresh concrete and then the top section is pulled free after the concrete is cured (see Figure 4(f)). Sawcutting of contraction joints with a hand-held concrete cutting saw was not allowed by specification. Sawcutting with a walk-behind saw was not feasible at slopes greater than 30% since gas powered walk-behind concrete saw engines have safety cutoff switches when the equipment tilt angle is exceeded to prevent problems with engine oil circulation, and the walk behind saws can also become unstable and unsafe at these slopes. The concrete was further smoothed and finished with bull floats and other hand tools. The surface was manually tined in the transverse direction with a tine rake to enhance surface friction and sprayed with a liquid curing compound membrane. Figure 4(f) shows a close-up view the preformed plastic control joint, tining, and curing compound on the surface of the concrete roadway.

Concrete roadway construction at steep slopes presented unique safety issues that required creative procedures to mitigate. The primary safety concern of the concrete labour crew was losing their footing. The labourers wore high traction

boots and kept the soles of their boots clean to avoid slips and falls. To aid in walking up and down the slope, a ladder walkway with wooden rungs and rubber side rails was fastened to the concrete apron adjacent to the concrete roadway forms. There was also a safety concern that equipment, e.g. the roller screed, could break free and tumble down the slope; and therefore, no personnel were permitted below the roller screed when concrete was being placed or finished. In some cases, it was nearly impossible for the equipment operators to see the concrete labourers, especially when the feller buncher was delivering concrete via the crane bucket. In addition to normal visibility safety protocol for equipment operations, the concrete labour crew always utilised an extra spotter on the ground when delivering concrete to the forms with the crane bucket.

### *Construction lessons learned*

(1) The placement of concrete on extremely steep slopes required some experimentation to achieve the proper slump. The concrete could have slid down the slope with too high of a slump and the roller screed and the concrete labourers could have been unable to pull the concrete up the slope with too low of a slump. The construction team settled on a relatively dry 2-in (5-cm) slump mix with a water-to-cement ratio of 0.52 for optimal placement.
(2) The work zone was limited to a 60-ft (18-m) wide right-of-way within the road alignment. If more right-of-way was available and/or side access roads could have been built, a more efficient concrete pumper truck and/or pumping system could have reached the roadway project. The pumper truck option was implemented successfully at other steep slope locations of the project where side access roads were permitted.
(3) The custom fabricated paving skid with the attached roller screed was critical to efficient placement of the concrete slabs. The construction team estimated the concrete placement would have taken four times as long without the paving screed.
(4) Placement of transverse tines (or grooves), with a tine rake, in the concrete was critical for vehicle traction. At other sections of the project where concrete sections were placed at similar slopes, but without grooves, conventional four-wheel drive pickup trucks lost traction when attempting to drive up the roads. At the Promontory Point roadway with transverse grooves, the same types of trucks were able to travel up and down the roadway in dry conditions without losing traction.

### Pavement monitoring

Concrete pavement movement was evaluated through a closed traverse angle and distance survey during initial construction and again three months after initial service, using a total station survey and established survey benchmarks. The survey points, survey benchmark, lug anchor locations, elevations, roadway grades, and a North arrow are presented in plan and profile views in Figure 5. The survey points were selected to capture potential movement at the steepest grades, which would likely translate to survey point 1 (SP-1), and to capture any movement below the steepest grade, which would be detected at SP 2 and SP-3. Also, as shown in Figure 5, some of the lug anchor spacings, namely the 24-ft (7.3-m) anchor spacings shown on the left side of SP-1 in the plan view, were narrower than the maximum spacing specified in Table 2 for the associated road grade; however, the narrow spacings were chosen by the project team for added conservatism.

The coordinates and elevations of the survey points during the initial survey were compared to coordinates and elevations of the same points after three months of service to evaluation potential movement. The initial survey was conducted while the concrete road (at the east side of Promontory Point and being built from the bottom up) was two-thirds complete with approximately 1000 ft (305 m) of roadway constructed. Some of the test points for the initial survey were taken on concrete that had been placed five to six days prior to the survey. The coordinates and elevations from the first survey and second survey are shown in Table 4. The change in lateral position was calculated by taking the root sum of squares of the horizontal change in easting and northing coordinates from the two surveys and dividing by the cosine of the slope angle where the survey measurement was taken. There are uncertainty factors that could influence the measured position change, namely, survey error, changes in volume due to curing and drying shrinkage, changes in volume due to concrete temperature differences during the two surveys, and potential elastic deformation of the concrete as the remaining one-third of concrete pavement was placed after first survey. The combined effect the uncertainty factors was not computed since data on each of the factors was either limited or not available.

The authors are not aware of any state highway agency or industry standards that govern acceptable lateral movement of JPCP roadways. As previously stated, CRCP moves more than JPCP since contraction joints are not used. One standard of satisfactory performance used in Illinois for CRCP horizontal movement from temperature fluctuations with lug anchor terminal systems was 3/4 in (19 mm) (Dhamrait and Taylor 1977). It should be noted that lateral movement of CRCP, usually without lug anchors or similar terminal systems, has

**Table 4.** Survey data, lateral position change, and vertical position change of surveys taken during initial construction and three months after initial service.

| | Coordinates – 1st Survey | | Coordinates – 2nd Survey | | | | |
|---|---|---|---|---|---|---|---|
| Point | Northing (ft) | Easting (ft) | Northing (ft) | Easting (ft) | Elevation of Initial Survey (ft) | Elevation of 2nd Survey (ft) | Lateral Position Change (in) |
| SP-01 | 412870.63 | 324049.60 | 412870.53 | 324049.65 | 1654.56 | 1654.52 | 0.71 |
| SP-02 | 413008.43 | 323997.97 | 413008.34 | 323997.98 | 1601.26 | 1601.21 | 0.54 |
| SP-03 | 413132.27 | 323950.93 | 413132.17 | 323950.89 | 1557.86 | 1557.81 | 0.65 |

been reported at greater than 2 in (Burke and Dhamrait 1967, Teng and Coley 1970).

The short-term, three-month observation of the roadway and the movement survey indicate the lug anchors have performed satisfactory over a limited time of service. Surveys of three points, found the maximum amount of lateral movement to be 0.71 in (18 mm), less the than the 3/4-in (19-mm) movement standard for CRCP lug anchors in Illinois. Some of the lateral movement measured on the Promontory Point pavement could possibly be attributed to temperature gradients since the weather conditions were different during the two survey dates. As further evidence of satisfactory initial performance, the authors observed no cracking or faulting in the concrete that could signify excessive movement or distress at the lug anchors. Although three months is a short period of time, the concrete would likely experience most of the curing and shrinkage stresses during this period. The authors will continue to monitor the movement of the roadway as access and approval allows.

## Conclusion

The Promontory Point concrete roadway project represented the implementation of an original design methodology, using integral lug anchors, for a concrete road at longitudinal slopes of 15–60%. The lug anchor design methodology and unique project restrictions (e.g. limited right of way, smoothness specifications) required the construction team to develop new construction techniques for the transport, placement, and screeding of concrete. Future roadway surveys and research aim to monitor roadway pavement at Promontory Point and other steep sections on the project, to evaluate the roadway performance and better establish concrete roadway movement tolerances. These future surveys and studies will help to assess the effectiveness of the design methodology and construction practices presented in this paper and provide the opportunity to update the procedures as necessary.

## Disclosure statement

No potential conflict of interest was reported by the author(s).

## ORCID

*Christopher T. Senseney* http://orcid.org/0000-0001-9709-1268
*P. C. Suermann* http://orcid.org/0000-0002-2322-5486

## References

AASHTO, 1993. *Guide for the design of pavement structure*. Washington: American Association of Highway and Transporations Officials.

ACI Committee 318, 2019. *Building code requirements for structural concrete (ACI 318-19) and commentary on building code requirements for structural concrete (ACI 318R-19)*. Farmington Hills: American Concrete Institute.

ACI Committee 330, 2017. *Guide for the design and construction of concrete site paving for industrial and trucking facilities (ACI 330.2R-17)*. Farmington Hills: American Concrete Institute.

Barber, E. S, 1963. Shear loads on pavements. *Public Roads*, 32, 141–144.

Burke, J. E., and Dhamrait, J. S, 1967. A twenty-year report on the Illinois continuously reinforced pavement. *Highway Research Record*, 189, 197–211.

Caquot, A. I., and Kérisel, J. L, 1948. *Tables for the calculation of passive pressure, active pressure and bearing capacity of foundations*. Paris: Gauthier-Villars.

Cargnin, A. P., and Balbo, J. T, 2021. Cracking patterns of continuously reinforced concrete pavement using black and galvanized steel under tropical climate. *International Journal of Pavement Engineering*, 22, 41–53.

Dhamrait, J. S., and Taylor, R. K, 1977. Terminal Treatments for Illinois Continuously Reinforced Concrete Pavements. *Interim Report IHR-36*. Springfield, IL: Illinois Department of Transportation.

Dos Anjos Ribeiro Cordeiro, M. J, *et al.*, 2017. Climate and disaster resilient transport in small island developing states: a call for action. The World Bank.

Duncan, J. M., and Mokwa, R. L, 2001. Passive earth pressures: theories and tests. *Journal of Geotechnical and Geoenvironmental Engineering*, 127, 248–257.

Huang, Y. H, 1993. *Pavement analysis and design*. Upper Saddle River: Pearson Prentice Hall.

Jaiswal, H, 2012. *Rational use of terminal systems in Portland cement concrete pavements*. Texas Tech University.

Johnson, S, Faiz, A, and Visser, A, 2019. Concrete Pavements for Climate Resilient Low-Volume Roads in Pacific Island Countries. The World Bank.

Karim, M. R., *et al.*, 2013. Degree of vehicle overloading and its implication on road safety in developing countries. *Civil and Environmental Research*, 3, 20–31.

Mccullough, B. F, 1971. Evaluation of terminal anchorage installations on rigid pavements. *Highway Research Record*, 21–29.

Mccullough, B. F, and WU, W.-Y., 1992. Terminal movement in continuously reinforced concrete pavements. *Research Report No. 1169-4*. Austin, TX: Texas Department of Transportation.

Mitchell, R. A, 1963. End anchors for continuously-reinforced concrete pavements. *Highway Research Record*, 50–82.

NAVFAC, 1986. *Design Manual 7.02, foundations & earth structures*. Alexandra: Department of the Navy, Naval Facilities Engineering Command.

Oh, H. J., *et al.*, 2016. Experimental evaluation of longitudinal behavior of continuously reinforced concrete pavement depending on base type. *Construction and Building Materials*, 114, 374–382.

Perrie, B, 2000. *Low-volume concrete roads*. Midrand: Cement and Concrete Institute.

Potyondy, J. G, 1961. Skin friction between various soils and construction materials. *Geotechnique*, 11, 339–353.

Razouki, S. S., Al-Muhanna, R., and Hashim, Z, 2020. Average full-trailer truck equivalency factors for uphill flexible pavements in developing countries. *International Journal of Pavement Engineering*.

Razouki, S. S., and Radeef, H. Y, 2005. Increased damage to uphill flexible pavements from trucks. *Proceedings of the Institution of Civil Engineers-Transport*, 158, 33–34.

Ren, D, Houben, L, and Rens, L, 2013. Cracking behavior of continuously reinforced concrete pavements in Belgium: characterization of current design concept. *Transportation Research Record*, 2367, 97–106.

Roesler, J. R, Hiller, J. E., and Brand, A. S., 2016. Continuously Reinforced Concrete Pavement Manual, Guidelines for Design, Construction, Maintenance, and Rehabilitation. United States. Federal Highway Administration.

Ryu, S. W., *et al.*, 2012. Rational use of terminal anchorages in Portland cement concrete pavement. *Transportation Research Record*, 2305, 62–73.

Shelby, M. D., and Ledbetter, W. B, 1962. Experience in Texas with terminal anchorage of concrete pavement. *Highway Research Board Bulletin*.

Teng, T, and Coley, J, 1970. Continuously Reinforced Concrete Pavement Observation Program. *Report No. 1*. Jackson, MS: Mississippi State Highway Department.

Terzaghi, K, 1943. *Theoretical soil mechanics*. New York: John Wiley & Sons.

UFC 3-250-01, 2016. *Pavement design for roads and parking areas*, U.S. Army Corps of Engineers.

Westergaard, H.M, 1926. Stresses in concrete pavements computed by theoretical analysis. *Public Roads*, 7, 25–35.

Zollinger, D. G., and Soares, J, 1999. Performance of Continuously Reinforced Concrete Pavements, Volume VII-Summary. Federal Highway Administration (FHWA).

# APPENDIX C

# INSPECTION PHOTOGRAPHS

**Analysis of Construction of Pedestrian and Vehicle Barrier Replacement at Tohono O'odham Reservation**
Tohono O'odham Nation
Sells Business Loop
Sells, AZ 85634

Job No: 04.26

**PHOTOGRAPH INDEX**

26 May 2026

**Tohono O'odham Southeastern Border Boundary Inspection, Tohono O'odham Reservation**

Photograph 1 – View standing on the gravel border patrol access road looking in a westerly direction showing the Normandy style vehicle barrier near the north-south gravel road from the town of Newfield. For the purposes of this photo log, the relatively abandoned town of Newfield will serve as the baseline horizontal zero milepost to reference subsequent photographs.

Photograph 2 – View looking in an easterly direction at the same location as photo #1.

Photograph 3 – View looking in a northerly direction showing the intersection of the north-south gravel road from Newfield with the border patrol access road.

Photographs 4 and 5 – Views looking in a southerly direction showing that the width of the gravel border patrol access road is approximately 25 feet wide. The border patrol access road appears to be well maintained, with few potholes and washboards at this location. There is a small drainage ditch along the north side of the access road that also appears to be well maintained. At this location, the width of the barbed wire fence to the vehicle barrier is approximately 6 feet, with another 5 to 10 feet to the actual international boundary.

Photograph 6 – View showing the height of the horizontal steel rails of the Normandy style vehicle barrier at this location are approximately 3.5 feet high. This style of barrier is an X-shaped steel metal obstacle without a foundation that is used to halt or redirect vehicle traffic. It is believed that the Normandy style barriers may be less disruptive to the archaeological or cultural features along the border since they do not require foundations to construct.

Photographs 7, 8, and 9 – Views showing a transition to the post and beam style barrier with steel posts filled with concrete installed into the earth with concrete foundations at the base. The

horizontal steel beams are similar in style to railroad track, are welded to the posts at an approximate height of 2.5 feet and run relatively contiguously along the length of the boundary. There is barbed wire running below and above steel beams to help prevent cattle from crossing. The steel posts alternate in height from smaller-size posts at 3 feet high, to medium-size posts at 4 feet high, to large-size posts at 5 feet high. It is my understanding that the varying height of the posts helps prevent vehicle ramps from being securely positioned on top of the vehicle barrier.

Photographs 10 and 11 – Views showing the approximately 7-foot-tall obelisk survey monument labeled number 142A that is located approximately 4 feet on center to the south of the vehicle barrier. Monument 142A is located approximately 0.7 miles east of Newfield. The plaque on the monument states "the treaties of 1932 and 1939…the destruction of the monument is punishable by the U.S. or Mexico". It appears there are remnants of other monuments or monument foundations located approximately 6-10 feet south of the vehicle barrier.

Photograph 12 – View looking in a southerly direction showing the Normandy style barrier at a wash (or arroyo) creek crossing across the border.

Photographs 13 and 14 – Views showing a culvert running under the secondary border patrol access road located approximately 80 feet to the north of the international border. The culvert is constructed with two approximately 3-foot diameter steel pipes, and is armored with riprap and shotcrete.

Photographs 15, 16, 17, and 18 – Views showing the termination of the Normandy style barrier at a location approximately 5.6 miles to the east of Newfield, where the Baboquivari Mountain range begins to increase the grade of the terrain starting from a wash (or arroyo). At this location, the Normandy style vehicle barrier transitions to a barbed wire fence at the steeper terrain, presumably to help prevent cattle crossing. The eastern boundary of the Tohono O'odham reservation is approximately 0.75 miles east of this location.

Photographs 19, 20, and 21 – Views showing the slope of the terrain located approximately 45 feet to east of the wash (or arroyo) in the previous photos (approximately 5.6 miles to the east of Newfield). The slope coming out of the wash to the east at the relatively steepest point is approximately 41%, about 16 feet to the north of a barbed wire fence at the international border.

Photographs 22, 23, and 24 – Views showing the slope of the gravel border access road at a location approximately 5.3 miles to the east of Newfield. The slope is approximately 29% at one of the steepest points of the road, and the measurement is taken approximately 12 feet to the north of the vehicle barrier.

Photographs 26, 27, and 28 – Views the transition from the post and beam vehicle barrier to the bollard vehicle barrier system located approximately 1.5 west of Newfield. This new barrier system consists of a 4.5-foot-tall bollard followed by a 6-foot-tall bollard, both with a diameter of approximately 11 inches. There is a horizontal 1/2-inch diameter steel cable running approximately 3.5 feet above grade and two sections of horizontal barbed wire.

Photographs 28 and 29 – Views showing the obelisk boundary monument number 144 located approximately 2.4 miles to the west of Newfield.

Photographs 30 through 33 – Views showing the San Miguel Gate located 3.0 miles west of Newfield, which is a vehicle and pedestrian access gate to the Mexico side of border for tribal members traveling between the U.S. and Mexico. The San Miguel Gate is located approximately 5.0 miles south of the town of San Miguel. It is my understanding that there are two other gates similar to this one along the border in the Tohono O'odham Reservation.

Photographs 34 and 35 – Views of a modified circular bollard vehicle barrier system beginning just west of the San Miguel Gate. There are a steel rail and a 1/2-inch cable running horizontally. The second photo shows there is a steel wing flange at the base of the bollard longitudinally in line with the barrier.

Photographs 36 through 41 – Views showing images of the Vamori Wash and the associated culvert/bridge structure crossing across the wash located approximately 3.5 miles west of Newfield. The Vamori Wash flows north to south from a large watershed on the U.S. side of the border into the Mexico side of the border. The culvert structure is approximately 300 feet long with a concrete armored stream crossing located below and north of the culvert, presumably to permit crossing even if the bridge has failed and/or to protect the bridge. The armored structure extends more than 60 feet north of the international border and exhibits severe erosion and potential erosion failure along the northern end of the structure.

Photograph 42 – View showing the vehicle barrier transition from the bollard system to the beam and post system at a location approximately 3.8 miles to the west of Newfield.

Photographs 43 and 44 – Views showing obelisk survey monument number 145 located approximately 5.5 miles west of Newfield and located approximately 45 feet to the south of the existing vehicle barrier.

Photograph 45 – View showing erosion of the post and beam style vehicle barrier at the base of the foundation that has eroded due to drainage in the area.

Photographs 46 and 47 – Views showing a wash at the vehicle barrier located approximately 8.5 miles to the west of Newfield near the base of Horse Peak.

Photographs 48 and 49 – Views showing a wash near the vehicle barrier located approximately 9.0 miles to the west of Newfield midway up the rise in terrain heading up to Horse Peak.

Photographs 50 and 51 – Views showing the near termination of the Normandy style barrier approximately 9.0 miles west of Newfield near the wash in the previous photos.

Photographs 52 through 55 – Views showing the slope of terrain at the wash located approximately 9.0 miles west of Newfield. The slope is approximately 31% at a location approximately 3 feet to north of the vehicle barrier.

27 May 2026

**8.0 to 9.5 miles east of Nogales at the U.S.-Mexico barrier construction, Santa Cruz County, Arizona**

Photograph 56 – View looking in an easterly direction at an approximately 25-foot-tall single vertical barrier with concertina wire located approximately 8.0 miles east of the city of Nogales, Arizona at the base of the Patagonia Mountains. It appears there is no active construction in this specific location; however, a large construction laydown yard with both a new, approximately 30-foot-tall primary vertical barrier and a new, 30-foot-tall secondary vertical barrier, is undergoing installation approximately 1.5 miles east of this location. It is our understanding that construction of 15 miles of double barrier is being constructed by Fisher Sand & Gravel under a contract with CBP and the Department of Homeland Security.

Photograph 57 – View looking in a westerly direction in the same location as the previous photo.

Photographs 58 and 59 – Views showing a point at the end of the tape measure near the northern edge of a gravel patrol road that is approximately 60 feet north of the single vertical barrier at the same location as the previous two photos.

Photographs 60 – View looking in a southeasterly direction at part of the construction laydown yard and active construction site for a barrier section that consists of a primary 30-foot-tall vertical barrier, an approximately 105-foot-wide gravel patrol road, and 30-foot-tall secondary vertical barrier. This laydown yard is located approximately 9.5 miles east of the city of Nogales, Arizona.

Photograph 61 – View looking in a southwesterly direction, showing the active construction installation of the secondary 30-foot-tall vertical barrier.

Photograph 62 – View looking in a westerly direction showing the active construction operations of the 30-foot-tall secondary barrier, which appears to be similar to the technique used on the primary barrier. The barrier appears to come in prefabricated sections of 35-foot-long hollow steel bollards filled with concrete in joined columns of 4 bollards. An approximate 8- to 10-foot-deep trench appears to be excavated, and then the columns of 4 bollards are placed contiguously along the barrier line. The 4-bollard sections are joined to each other by either bolting or welding. There is a continuous 4-foot-wide section of anti-climb metal sheathing located at the top of all sections of the barrier. It should be noted that there is an obelisk survey monument on the left side of the photo that appears to be located 30 to 40 feet south of the primary barrier.

Photograph 63 – View looking in an easterly direction, showing the active construction of both the primary and secondary 30-foot-tall barrier sections. It appears there are active earthwork and construction operations on the mountainside located approximately 2.0 miles from this location, or 11.5 miles east of the city of Nogales, Arizona. The mountainside construction is approaching steeper sections of the Patagonia Mountains to the east.

Photograph 64 – View looking in an easterly direction showing construction workers accessing joined columns of 35-foot-tall steel 4-bollard sections of barrier. The workers appear to be loading the 4-bollard sections onto a telehandler for transport into a new installation of barrier.

Photographs 65 and 66 – Views, looking first in an easterly direction and then in a westerly direction, showing a section of border where the barrier transitions from the new 30-foot-tall primary barrier to the older style 25-foot-tall barrier with concertina wire. There is another material laydown yard in this area. The laydown yard is located approximately 0.5 miles west of the laydown yard in the previous photographs and 9.0 miles east of the city of Nogales, Arizona.

Photographs 67 and 68 – Views looking in a westerly direction, showing the transition from the new 30-foot-tall primary barrier to the older style 25-foot barrier.

Photographs 69, 70, and 71 – Views looking in a northerly direction at the gravel side access road to the gravel patrol road and laydown yard located approximately 9.0 miles east of the city of Nogales, Arizona. The gravel side access road is approximately 20 feet wide with soil embankment from motor grader operations on both sides of the road to a horizontal distance of 4 to 6 feet and to a height of 1 to 3 feet.

JA0172










r


r


r


r


r


r
BOUNDARY
UNITED STATES


r
A
BOUNDARY
UNITED STATES


r















JA0176















r


r




r


r
144
BOUNDARY
UNITED STATES

JA0179


144




To pass through this gate heading North or South you first must be inspected. Press the button and an agent will be with you momentarily. For any additional assistance, please call 520-383-0851.
Para pasar a traves de esta puerta hacia el norte o el sur primero debe ser inspeccionado. Presione el boton y un agente estara con usted momentaneamente. Para obtener aistencia adicionol, llame 520-383-0851.
Mapt am 'o sa: 'i-wa: ko:li ki:jig 'ed k ab 'o i-wu:s ko:li ki:jig amjed at we:peg am 'o hema m-ceega k Ab 'o i-dagspg wo:toñ k am 'o ha-ñenida 'at am 'o hema i: ji:wa g agent k mapt i: ba'ic ep 'o taccui e-we:mta e-wai g 520-383-0851.








JA0180











JA0181














r



r




JA0183

r



r






CHEVROLET

















JA0185


r


r


r


r










r


r
NO


r


r







IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,

*Plaintiff*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants*.

Case No. 26-cv-2127

**DECLARATION OF KENDALL JOSE**

I, Kendall Jose, declare the following on the basis of personal knowledge to which I am competent to testify:

1. I am a citizen of the Tohono O'odham Nation and the Vice Chairman of the Nation's Chukut Kuk District. I was elected in 2015 and have served in this position for eleven years over the course of three four-year terms. The Chukut Kuk District is on the U.S.–Mexico border for 52 of the 62 miles that the border runs along the Reservation.

2. My extensive service to the Chukut Kuk District also includes roles as Community Representative, Chairman of the District Youth Committee, member of the District Budget Committee, and Advisor to the District's Youth Council for the past 15 years.

3. I am also the President and Legal Representative for the Cedagi Waihia Wo'oson O'odham Civil Association in Mexico, a Mexican civil association that serves as an institutional bridge for the O'odham whose territory and identity surpass the U.S.–Mexico border line. It exists to defend and promote O'odham traditions, culture, and ancestral land rights; to advocate for the peoples interests before government at the federal, state, and municipal levels and before international bodies; and to drive regional development and well-being across the Sonora–Arizona corridor. It operates as a vehicle for Tohono O'odham legal representation in Mexico.

4. Before I was elected to serve my District and my people, I taught language, culture, history, and Native American Studies at Baboquivari High School for two years. I graduated from the same high school and am currently working toward an associate degree in general studies at the Nation's community college.

5. I am also a traditional singer and a ceremony leader. I grew up performing O'odham traditional songs and participating in our sacred ceremonies and cultural and religious practices. I enjoy coordinating, teaching, and sharing these practices and our language with my community. It is important to pass them to the next generations, and I teach these traditions to my own children.

6. I was born in Tucson, Arizona. My parents and grandparents were born in Sells within the Nation. My paternal grandmother's family originally migrated from what is now San Juan, Sonora, Mexico. The story goes that they were pushed out by the settlers who came to take our land long ago. A lot of people left Mexico and settled or passed through Pozo Verde, Sonora, a traditional community at the end of the Baboquivari Mountains and settled to the north in what is the Tohono O'odham Nation of Arizona, including my family.

7. Like my parents and grandparents, and our ancestors before them, I grew up crossing through what is now the international border that divides our people and our land. My family has deep connections on both sides. We consider the whole area to be our traditional homelands. We view our community on both sides as one. That is why we grew up knowing that we must support our O'odham in Mexico. We were told that the plight of our people in Sonora to seek resources and services is our plight. In the 1940s, my family tried to get our people in the farthest reaches of Sonora schools, water, and infrastructure so they would not be removed and lose their land. As a child, I went across with my grandparents to meet with the elders to seek rights to our lands in Sonora. I also crossed the border with my family to participate in ceremonies and pilgrimages and to attend meetings and hear the government's plans for the Sonoran land and people.

8. Now, I assume many of these roles and responsibilities from my elders. I am still involved and still cross into Mexico for many of the same reasons. That is why I am a dual citizen of Mexico and the United States.

9. Tohono means "Desert" in our language, and O'odham means "people." We are the people of the desert. Our traditional homeland stretches from the Gila River in the North to Hermosillo, Sonora, in the South, and from the Sea of Cortez in the West to the San Pedro River in the East. We are traditionally a semi-nomadic people who moved with the seasons, the animals, the plants, and the water across the Sonoran Desert. We moved from our winter villages in the mountains in the north to our summer villages in the valleys to the south.

10. We traditionally lived off the land. We moved freely across the land to meet our needs and fulfill our duties to one another and to creation. The Creator taught us to do this. We lived in the desert but knew that the desert is not barren. We harvested food in spring and

dehydrated and stored it in the winter. We searched for plants, animals, and soil that are available only in certain areas and only at certain times. We shared food, education, and healing practices. We did these things before there was an international border, and we still do them today.




11. Through much of the 19th and 20th centuries, the only signs of the border were a cattle fence and occasional international markers. Now, since 2008, there is a vehicle barrier at the border within my District. There are also three informal border gates through the vehicle barrier where only tribal members can pass. These are the San Miguel, Serapo's, and Papago Farm gates, which were built in cooperation with U.S. Customs and Border Protection (CBP) along traditional paths that O'odham have taken to cross our lands since time immemorial. Our people are able to cross the vehicle barrier at these gates to visit our sacred sites and practice our traditions.




Chukut Kuk District
284,880 Acres
Approx. 52 Miles of US/Mex. Boundary
Three Traditional Crossing Points (Gates):
Papago Farms Gate, Serapo's Gate, and San Miguel Gate

12. Our religion is inseparable from our cultural practices. It is how we live the days, seasons, and stages of life and death, and it is rooted in the land. Through rituals, ceremonies, celebrations, and rites of passage, we fulfill our obligations to each other, to our ancestors, to the spiritual and natural worlds, and to the Creator. These rituals are not optional. We must perform them. They are obligations that keep us, our communities, and the world in balance.

13. Our people are runners, and many of our traditional practices require our men to run across the sacred landscape from point to point on both sides of the border. Our runs, like so many of our other religious ceremonies and practices, are tied to specific places in our homeland. Landmarks in the natural landscape identify our sacred sites and other places of great cultural and religious significance to us. They are how we pray.

14. Baboquivari Mountain is one of these places. It is the center of the universe for my community. It is a home of the Creator, I'itoi. Every year, our people run from Pozo Verde in Mexico to Baboquivari Mountain on the Reservation to perform a blessing to nature and land, and ultimately I'itoi. This practice helps to combat the wildfires in the mountains in our traditional spiritual sense. Western methods alone do not work. Through this ceremony, we remember that our Creator lives there, we bring him offerings and turn to him for help. Our runners follow the ancient trail from San Juan that has been used for centuries. Where it crosses the border, they cross too. Then there are four days of cleansing and traditional singing and dancing to bring the people together. Runners bring the spirit of the people to the mountain and cleanse any negativity. They must bring forth blessings and positivity for the ceremony to occur. There is no wall there, only the vehicle barrier. They can jump over or climb under the barrier. We cooperate with the Border Patrol so that we can do this while keeping the border safe, but a wall would make this impossible.

15. I know that I am home when I see the Baboquivari. We can see this mountain from every part of the Reservation. Elders have long expressed Baboquivari's importance to me. They told me of the boarding school era, when they were taken from us and sent to the Carlisle boarding school in Pennsylvania. They were forced to assimilate into Western culture and to practice Western religion. They were not allowed to speak their language or pray the prayers of their people. When survivors ran away, they would tell themselves that home is just right over the mountain. When they returned and saw Baboquivari, they knew they were home. They could pray their prayers into the land to I'itoi and the spirits and be whole.

16. The Sea of Cortez is another location that is sacred to us. When we pray, we pray to the sea so that the sea can take away our sickness and grief. And we run to the sea. Each year,

a group of boys makes the Salt Run. This is an ancient tradition and rite of passage that is required for a boy to become a man. The route runs from the Reservation into Mexico, where the boys join our relatives south of the border to run to the salt flats near the Sea of Cortez. The runners gather salt, water, and shells from the Sea of Cortez and run back north. The salt runners do not use roads. Instead, they run along traditional sacred paths marked by important religious landmarks on the visual landscape. These landmarks create a map that is read by our people, not with actual words or writing but by memories of stories and songs embedded in our memories. Each has its own sacred meaning. The run is a test for survival, and the boys hunt rabbits and live off the land during their days in the wilderness. The run teaches them to provide for themselves and their families. When they return, they can marry and live full lives.

17. Since the wall was built in the Organ Pipe Cactus National Park, in our traditional homelands off the Reservation, the salt runners have not been able to access Quitobaquito Springs to present their offerings to the spirits there. Comparing this to the rites of the Catholic church, it is like we are physically blocked from receiving communion from the priest or at the altar and have to instead receive communion through a fence outside the church. Once the second wall is built there, we will not be able to do even this because will not be able to reach through. The ceremony will be impossible.

18. Other ancient and traditional paths of the Salt Run cross the international border on the Reservation. Our people still run these paths during the Salt Run. To block these traditional migratory and spiritual paths would harm the practice and cut our relationship to our ancestors, our spirits, and our land. We cannot practice the run through other gates or points of entry because those are not where our ancestors ran. It would cause the same harms that are occurring at Quitobaquito Springs. We would not be able to perform our rites as our ancestors

performed them for centuries. Our traditions will change. We will lose ourselves, and our minds and our spirits will be sick. The wall will change the practice and meaning and further dilute what we are still fortunate to hold on to.

19. To keep our community together and to preserve our cultural and religious traditions, we also began to perform the unity run in the 1990s. This run crosses at the San Miguel gate and brings O'odham runners from both sides of the border together to unite in prayer. It is based on our ancient practice of running to nearby villages to deliver news, prayer, and social invitations to bring together our people from the faraway reaches of our homelands, including our sister tribes the Salt River Pima Maricopa Indian Community, Ak Chin Indian Community, Gila River Indian Community, and the O'odham in Mexico. We carry our prayers along with us across the land so that we may heal our community and continue as United O'odham.




20. Throughout the year, we travel to Sonora to visit Catholic and traditional sacred sites to fulfill our religious obligations and join with our relatives in ceremony. Whenever we hold a ceremony or ritual practice, it ends in a feast. The point is for our community to come together. We play traditional games, including running games, to pass on our traditions and stories of creation to the younger generations so they will know their identity and culture, who they are, and where they come from. If we cannot perform our ceremonies and traditions, our people suffer mentally and spiritually.

21. At Pozo Verde, we revere the natural springs and perform ceremonies to honor creation. It is told that a monster was eating children there. The Creator, the medicine people, and the elders sat down together and danced with the creature for four days to defeat her. People go

to this site to honor the great minds who came together to defeat this powerful being and present offerings and blessings. They ask the Creator and ancestors for strength and to receive their gifts and purpose in life.

22. In July, we attend mass at the Feast of Our Lady of Mount Carmel at the Catholic church in Sonora. The father speaks of the relationship between Our Lady of Mount Carmel and the rain in his homily. After the mass, there is a procession at the chapel and then through the grounds to bless the grounds. We perform Catholic and traditional songs and rain dances to encourage the rain and to invoke the elements of rain. We appease the spirits and imitate what we want to happen so that they will bring the rain. For many years, an elder held the Wo'osan cemetery blessing during the feast. This was another way for families to come together to clean the burial sites of loved ones and to receive a blessing if they could not make the journey for All Souls' Day.

23. The feast and mass must be held at the church because the chapel is dedicated to Our Lady of Mount Carmel. One year, when the gate at our traditional crossing was closed, and we could not perform the ceremony there. We held it at the home of a community member. The elders felt sick from this displacement. Having the feast at the chapel and on the grounds is part of what makes it feel safe and intimate. It is natural and powerful to do it there. Each change we make takes us further away from our traditions.



Our Lady of Mount Carmel Church
Wo'osan (El Bajio), Altar, Sonora, Mexico



Interior of Our Lady of Mount Carmel Church
Wo'osan (El Bajio), Altar, Sonora, Mexico

24. We cross the border for the Magdalena Pilgrimage every September. O'odham pilgrims walk from sites on the Reservation to Pozo Verde in Sonora, eight miles south of the border. Along the way, we camp in the wilderness. We cross into Mexico through the existing San Miguel gate. The Pilgrimage ends with the Catholic feast of San Francisco. If the group cannot cross at the San Miguel gate, then we would have to travel by foot for four to five days to cross at the nearest port of entry.



K.Jose's Great Grandmother
Sleeping at Roadside Altar on Pilgrimage to Magdalena, Sonora, Mexico
Puente Las Pedradas, Sonora, Mexico c. Oct 2007

25. Some families bury their loved ones in their ancestral villages in Mexico to keep the family together. Since 2016, we had three deaths on the Reservation when the gates at traditional crossings were closed. Because we could not cross there, we passed the caskets of our loved ones to our relatives on the other side of the border. Some of us were able to make the long journey to an official port of entry to cross there. But for others it was too far, and they were unable to bury their dead. When we miss the chance to bury and grieve our dead, we can never get it back.

26. We as O'odham have ongoing relationships with our deceased relatives. Our religious obligations to the dead begin when a person passes on, but they extend throughout our lives and through the generations. Communing with our deceased ancestors is an essential part of

our belief system. There are religious commands and duties we must fulfill in the immediate years following the loss of a loved one. To mark the first and fourth anniversaries of a person's death, we observe sacred religious rites. We gather to pray and create a memorial of candles and flowers that is taken to the burial site. We make sure that there is a grave marker by the fourth year, the final mourning, when we let the physical presence of the deceased go.

27. We also visit our burial sites on holidays and special occasions and birthdays to bring fresh offerings, renew our connections to our ancestors, and appease spirits of the recently departed. Sometimes we bring the deceased their favorite foods from the Earth or a cup of water. These practices and rituals help us grieve and heal and feel spiritually whole.

28. Starting in late October, in the weeks leading up to All Souls' Day and Dia de Los Muertos in November, we refresh our ancestors' graves to renew our relationships with the deceased. We remove old flowers and decorations and add new ones. We replace old wooden crosses and light new candles. After we gather at the cemetery, families go home and prepare a meal to set out on a table for the deceased. Some families hunt and prepare rabbit and the other foods that are the favorites of the elders. We light candles so that the spirits can find their way to us and find our offerings. The next day, our families serve the meal to the community. It is the same as an almsgiving. Some families save up all year to do this. Through the act of feeding the spirits, we feed our community, and we give everything away, including the table settings.

29. All Souls' Day and Dia de Los Muertos are communal gatherings. Like many of our feasts, they require planning and work to set up. We transfer tables and chairs, water, food, and other supplies over the border at the traditional crossings. We carpool and work together so that everyone who is able to attend can make the trip. One year, the gate at our traditional crossing was closed, and the elders tried to take food and other supplies through an official port

of entry. They had to pay high entry fees and some of the offerings for our dead were confiscated by Mexican Immigration.

30. We fear that the construction of a wall will block the spirits of our ancestors. I am not a spirit, so I cannot know for certain which harms the spirits will feel. But we believe that the spirits travel back and forth across our lands. When someone dies, they must be able to find the specific pathway to complete their journey south. When we bury the deceased in a wooden box, we do not nail the lid down all the way so the spirit can push its way out and make that journey. We also guide the spirits to commune with the living. We do this through physical markers. During All Souls' Day, we light candles in the cemetery, on the table set with their favorite foods, and on top of the family home so that the spirits can find their way to us. If the All Souls' Day table is inside of our homes, we leave the windows open so they can enter. We remove obstacles and physical barriers to their journey. That way, they can be with us and receive our offerings. We do not know if a wall will cause the spirits to lose their way.

31. Our ancient ancestors are not just buried in marked cemeteries, they are buried across the landscape of our traditional homelands. If an ancient ancestor is disturbed from eternal rest, we must appease them with food and other offerings. Because our ancestors ate off the land, our people will hunt rabbits and gather natural foods to make the offering so they can go back to eternal rest. If the construction of a wall disturbs our ancestors in their rest and their human remains are not repatriated to us, we will not be able to appease them. Their spirits will remain offended, and our people will suffer as a result.

32. We must also make offerings to spirits at specific sites throughout our homelands to cure sickness. Some illnesses are caused when we offend another being, like the ocean, the wind, or an animal. To cure the illness, the sick person may need to travel to the ocean, to a

mountain where the wind lives, or to a site where the spirit of the animal lives to make offerings and appease them. These sites are generally known by our people and our elders, and they are on both sides of the border. If the sick person cannot gain physical access to make this journey, then the sick person cannot complete the healing process and their illness will not be cured.

33. A wall will divide us from the natural world, where we hunt and gather essential components for our ceremonies and rituals. We have long told stories of the saguaro cactus, teaching our future generations that in the creation story, saguaro was born of a child and that it has personhood. We use the fruit of the saguaro for food, we dry it for use in the winter. For O'odham to harvest saguaro fruit and other plants for food and ritual use, we must go to the mountains along the border, where there are many. We save the first fruit of the saguaro for the bats and the other animals. They are the pollinators who keep the cycle of life going so each year the process can begin again.

34. Our religious practices also require spiritual materials that are found only in certain areas throughout our ancestral homelands. We use red clay and white clay for our pottery. It also has a spiritual property. When an O'odham child is born and first begins to eat solid foods, we give the child a small drink of that clay because it makes them whole as a person. This is a rite, and it must be done. Only in this way can the child be connected to the land. Women drink the clay again at the time of their first menstruation, signaling their entry into womanhood. At other times of our lives, we may be told by a traditional healer that we must take the clay again. There are only certain places that our practitioners gather this sacred clay. We rely on the land to move from one stage of life to another. We need access to all our lands to perform our rites and complete our life cycle.

35. We hunt animals like deer and rabbit for some of our ceremonies. Our men plan and discuss if they have seen animals on our hunting lands months ahead of a ceremony. If there are no animals, we cannot hunt them. And if we cannot hunt them, our ceremonies that require them cannot be performed. One year we could not find any mule or white-tailed deer to perform a deer dance. The dance harmonizes the desert by bringing rain, drives away sickness, and provides an abundance for winter. We went out every Friday and Saturday for a month to look for them but found nothing. We felt this was not a good omen. We were concerned that we would not have an abundant winter.

36. We are afraid of how a wall will harm the animals. We fear that a wall will separate animal communities and change their migration and mating patterns. Harm to the animals will cause harm to us. We will not be able to find them at the traditional places where we look for them. If we cannot find them, we cannot perform the religious practices that require us to harvest them. This will cause physical harm if we cannot eat, and harms that we cannot see to our minds, spirits, and emotions. Over time, we will have to alter our practices and our traditions will change. We will lose our culture. Eventually, our people will be erased.

37. Keeping our community together is essential to who we are. It reminds us where we came from, and helps us fulfill our obligations to one another, to our ancestors, to our creator, and to the spirits. We cannot raise our children without our core beliefs and practices. We must take our children to the O'odham Church in Sonora to learn about their Catholic faith and their traditional religious and cultural practices. They must participate in religious feasts and perform acts of community service, such as bringing Christmas gifts to O'odham in Sonora. Just as I learned as a child, the next children and their children must learn that we are one community

across the border. We must continue to share essential resources and services like medical care, groceries, food, and water.

38. Although the vehicle barrier creates obstacles, it still allows us to cross to be together and to be united in our faith. Even during the COVID-19 pandemic, we took care of each other. O'odham parked on either side of the barrier to distribute community donations, personal protective equipment, food, and other supplies over the barrier. This has always been our way. It is all I have ever known. A border wall would make these practices difficult or impossible.



39. At the same time, our community recognizes the need for border security, and we have worked with Border Patrol to secure the border. From 2003 to 2008, the Chukut District and the Nation cooperated with CBP to install the existing vehicle barrier along the border. We also approved the integrated fixed towers that surveil our lands. We compromised by allowing these measures because it was important to us not to have a wall. We wanted the animals to travel through the barrier and for us to cross on foot and by car for our religious ceremonies. We have not been consulted about a wall, and we have not been asked how it will affect us as people.

---



**Ha:san (Saguaro) Mitigation**
**Vehicle Barrier**
**La Lesna Pass West, Chukut Kuk District**

40. If a wall is built and our gates are closed, our people will suffer. Our people will not be able to cross to perform the religious obligations on both sides of the border that I have

described. In the past, when one or more of our three gates at the traditional crossings was closed, our people had to travel long distances to an official border crossing. We traveled thirty minutes to one stop, forty minutes to another, and another thirty minutes after that to an official port of entry. This cut us off from our traditional paths, where our ancestors prayed and left us guidance, and from our sacred sites, where we turn to our Creator and consult our ancestors and other powerful beings. It also became a trip of many hours, too long and expensive for some people to make, especially the elders. At official ports of entry, Border Patrol inspected our sacred bundles and ceremonial items and taxed our ritual objects. These are not for them to see or handle.

41. A wall will cause harm to us and our ancestors on the spiritual plane. It is important that we perform our rites of passage, pilgrimages, and ceremonies in the traditional ways, the proper ways, just as our ancestors did it. As we perform our traditions, we must have the right mental process and be able to observe the natural landscape, the pathways and sacred sites, central to our beliefs and heritage. The quality of our participation in our traditions will reflect our mental state. If we are hindered in our practice, if we cannot fully express our beliefs, give our offerings, and receive what is sacred to us, it will hurt us mentally, emotionally, and spiritually.

42. As a people, if we are divided by a wall, then we cannot hold on to our history and traditions, and we will lose our purpose and our way. The Creator put us here to live the way he taught us, and we have been here performing these rituals since time immemorial. I do not know how we can pass on the Creator's wisdom and teachings and tell the story of our people if we cannot practice our religious traditions and beliefs with our children and their children.

I declare under penalty of perjury that the following is true and correct.

Dated: June 13, 2026

/s/ *Kendall Jose*
Kendall Jose

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF JAMES COOK**

I, James Cook, declare the following on the basis of personal knowledge to which I am competent to testify:

**Background and Experience**

1. I currently serve as the interim Chief of Police for the Tohono O'odham Nation ("Nation").

2. I graduated from the Northern Arizona Regional Training Academy (NARTA) in May 2006, where I earned my Arizona Peace Officer Standards and Training certification and graduated near the top of my class in academic achievement.

3. My first law enforcement position after graduating from NARTA was as a patrol officer with the Tohono O'odham Police Department (TOPD). Then, from 2009 through 2012, I served as a full-time K-9 Officer assigned primarily to narcotics and illegal alien interdiction operations. During this assignment, I conducted numerous interdiction investigations and enforcement actions along the international border within the Reservation, and worked closely with federal law enforcement partners, including Homeland Security Investigations (HSI), the United States Border Patrol, and other federal agencies engaged in border security and transnational criminal investigations. I was subsequently promoted to Sergeant, where I supervised patrol operations and was responsible for shift management, officer training, impaired driving enforcement initiatives, policy implementation, and operational oversight.

4. In 2020, I was promoted to Lieutenant, and assumed command-level responsibilities in the Department. As a Lieutenant, I supervised TOPD's Special Investigations Division, and oversaw complex criminal investigations, including sophisticated financial crime investigations involving multi-state jurisdictions and coordination with numerous law enforcement and regulatory agencies. My responsibilities included directing investigative strategies, reviewing case findings, ensuring legal and procedural compliance, and coordinating investigative efforts with local, tribal, state, and federal partners.

5. I have served as TOPD's Interim Chief of Police since 2025. In this capacity, I am responsible for the overall administration and leadership of the department, operational readiness, intergovernmental partnerships, public safety strategy, and coordination with tribal, federal, state, and local stakeholders. Much of this work focuses on border security measures.

6. I also serve as a Terrorism Liaison Officer for the State of Arizona and the Arizona Counter Terrorism Information Center. In this role, I have received specialized training

and participate in intelligence-sharing initiatives involving terrorism prevention, threat recognition, critical infrastructure protection, homeland security matters, and threat assessment activities.

**TOPD's Operations and Border Security Efforts**

7. The TOPD has approximately 78 sworn police officers on the force. All of the Nation's officers are empowered to arrest and detain non-Indian individuals for violations of State law. The vast majority of our officers have attended State of Arizona police academies and are certified by the State's Peace Officers Standards and Training Board, and this certification confers on them authority to enforce State laws. We also have a handful of officers who have been trained and certified through the Bureau of Indian Affairs, rather than by the State. The Bureau's certification does not confer on officers the authority to enforce State laws, but all of our Bureau-trained officers have been cross-deputized by the Sheriffs for the three counties whose jurisdictions overlap with the Nation's Reservation boundaries, and are empowered to enforce State laws pursuant to those agreements.

8. During my time as a patrol officer, I was frequently involved with Border Patrol work, including interdictions for illegal crossings and anti-smuggling operations. The Nation's laws criminalize border-related crimes such as drug trafficking, smuggling, and transporting or harboring individuals who have crossed the border illegally. When we encounter tribal citizens engaged in such activities, we arrest them, and the Nation and/or the United States Attorney's office will prosecute them. When we encounter non-tribal U.S. citizens or residents engaged in such activities, we arrest them and contact Border Patrol and state authorities, and the State and/or United States Attorney's office may prosecute them. When we encounter undocumented

individuals, we detain them and contact Border Patrol, who come out and take over those individuals' cases.

9. TOPD has long-standing and highly cooperative relationships with multiple federal law enforcement agencies, including the Federal Bureau of Investigation, the Department of Homeland Security (including Border Patrol and Immigration and Customs Enforcement), the Drug Enforcement Agency, the Bureau of Indian Affairs, and the National Counterterrorism Center. Because federal law enforcement agents frequently lack authority to investigate, make arrests and detentions for, or prosecute violations of state law, these agencies frequently partner with us in order to leverage our tribal and State law enforcement powers, which results in broadening the scope of investigations that can be undertaken on the Reservation.

10. On behalf of the TOPD, I attend quarterly meetings of the Alliance to Combat Transnational Threats (ACCT), a joint working group consisting of the heads of the local Customs and Border Protection (CBP) districts and state, local and tribal law enforcement personnel. At these meetings we share information and engage in strategic planning with the purpose of addressing issues related to transnational criminal organizations, border security, narcotics trafficking, human smuggling, financial crimes, and emerging public safety threats.

11. TOPD also participates in the Native American Targeted Investigations Against Violent Enterprises (NATIVE) Task Force, a joint operation between the TOPD and federal agencies focusing on disrupting and dismantling drug trafficking operations within the Nation's borders. This task force was established by former TOPD Assistant Chief of Police William Irby, who served as the HSI Assistant Special Agent in Charge in Sells, Arizona, before he took on the role of Assistant Chief of TOPD. Drawing on his connections with the Federal Bureau of Investigation, the Drug Enforcement Administration, and the Department of Homeland Security

(DHS), Assistant Chief Irby launched the Task Force in August of 2013, and since that time it has successfully completed numerous high-value efforts, including the dismantling of major drug trafficking operations and the seizure of millions of dollars' worth of illicit drugs and other contraband.

12. The Nation was also instrumental in forming the Shadow Wolves, the DHS's only all-Native American tactical security force, which combines generational environmental knowledge, wilderness tracking skills, and other traditional knowledge with modern cutting-edge techniques to identify, trace, and intercept smuggling operations within the Reservation. According to U.S. Immigration and Customs Enforcement, "[b]etween 2010 and 2020, interdiction and investigative efforts the Shadow Wolves have led or participated in have resulted in 437 drug and immigration arrests along with the seizure of over 117,264 pounds of drugs, 45 weapons, 251 vehicles and $847,928 in U.S. currency."[1] This elite unit has also been deployed abroad to train border guards and customs agents in multiple allied nations and has participated in anti-terrorism operations and trainings in Afghanistan and Pakistan.

**The Nation's Support for Border Protection Operations within the Reservation**

13. As part of our cooperation with the United States on border security issues, the Nation has authorized Border Patrol to maintain patrol roads along the border, under right-of-way agreements with the Nation. Along these roads, Border Patrol are able to quickly access virtually all of the Nation's border with Mexico, with the exception of those areas where vehicle access is impossible due to the rugged mountainous terrain.

14. The Nation has also worked with Border Patrol to erect and maintain vehicle barriers along the vast majority of the Nation's southern border. A selection of photographs of

[1] https://www.ice.gov/hsi/our-partners/shadow-wolves.

these barriers along various sections of the Reservation's borders is included as Attachment A of this Declaration.

15. These vehicle barriers have virtually eliminated unauthorized vehicle transit across the border. One clear indication of this fact is that, before the barriers were erected, vehicles would frequently get stuck or damaged in the difficult terrain on the Reservation, and drivers who were attempting to evade detection would abandon them. Since the vehicle barriers have been installed, the problem of abandoned or disabled vehicles in the border areas has decreased considerably.

16. We have also authorized Border Patrol to deploy a significant amount of personnel, technology, infrastructure, and other resources on the Nation's Reservation. The Nation leases land on the Reservation to Border Patrol to house its Forward Operating Base stations at San Miguel near the community of Sells and Papago Farms. These bases include administrative facilities and living quarters, from which Border Patrol agents monitor the border and patrol units are dispatched to investigate any suspicious activity. The Nation also authorizes Border Patrol to deploy various border security technologies and methodologies, including the following:

a. Along with TOPD, Border Patrol engages in regular patrols in Border Patrol vehicles along the border roads and interior access roads.

b. Border Patrol engages in constant aerial patrols and surveillance, including manned helicopter flights and a significant fleet of surveillance drones.

c. Border Patrol maintains an Integrated Fixed Tower system consisting of ten 160-foot-tall towers that are spread across the border on the Reservation, on lands that the Nation leased to CBP in 2019. Each tower is equipped with night vision, thermal sensors, and

ground sweeping radar, which feed real-time data to Border Patrol agents at Border Patrol's facilities within the Reservation. The towers also have long-range and wide-angle surveillance cameras. Border Patrol uses the combination of cameras, sensors and radar to monitor every person and vehicle along the entire span of the international border along the Reservation's boundaries. The system also stores an archive with the ability to rewind and track individuals' movements across time—an ability known as "wide-area persistent surveillance."

d. Border Patrol also utilizes mobile vehicle surveillance units, which consist of sophisticated camera and surveillance systems mounted on the beds of all-terrain pickup trucks, which can be parked at various vantage points across the Reservation to detect and track suspicious activity.

The Nation has also authorized Border Patrol to erect and maintain a vehicle checkpoint on Route 15, the main route from the Reservation to Phoenix. Border Patrol also maintains a checkpoint on Highway 86, between the Nation and Tucson.

**The Nation's and Border Patrol's Proven Border Security Measures Are Highly Effective.**

17. The measures that the Nation and Border Patrol have put in place on the Reservation have proven to be highly effective in preventing, deterring, and intercepting illegal crossings and smuggling within the Reservation. TOPD, in cooperation with Border Patrol and other federal law enforcement partners, has achieved significant successes in dismantling smuggling operations and cartel activity within the Reservation, including through the following high-value operations:

a. the February 2025 arrest of Jesús Humberto Limón López, alias "El Chubeto," founding leader for Los Cazadores Cartel in Sinaloa, and José Bibiano Cabrera Cabrera, alias "El Durango," operations leader for Los Chapitos in Sonora;

b. the March 2025 arrest of three U.S. citizens for suspicion of human smuggling and sex trafficking, and the liberation of the three undocumented women being transported in their vehicle, who served as material witnesses in the prosecution;[2]

c. the May 2025 apprehension by TOPD of two vehicles containing ten undocumented individuals and three suspected human traffickers, after the vehicles fled onto the Nation's Reservation while attempting to evade a Border Patrol checkpoint;[3]

d. the dismantling of a major narcotics distribution and human smuggling operation in 2023, resulting in the seizure of nearly 700 grams of fentanyl, other drugs and drug paraphernalia, guns, ammunition, and U.S. currency;[4]

e. the August 3, 2020 seizure of 400 pounds of methamphetamine and 10 pounds of fentanyl, which NATIVE task force and Border Patrol agents tracked from an illegal border crossing on the Reservation to a distribution site in Phoenix;[5]

f. a 2019 joint operation with the Department of Interior Opioid Reduction Task Force, resulting in 50 arrests and the seizure of $2.3 million worth of narcotics;[6] and

---

[2] https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-arrest-sex-offender-among-group-smuggling-three.
[3] https://www.facebook.com/Border PatrolChiefTCA/posts/two-human-smuggling-loads-one-awesome-partnership-58-agents-from-the-three-point/1276916427768567/.
[4] https://www.justice.gov/usao-az/pr/seven-individuals-charged-distribution-fentanyl-and-methamphetamine-tohono-oodham-nation.
[5] https://arizonadailyindependent.com/2020/08/03/native-task-force-bust-nets-400-lbs-meth-fentanyl-cash-4-suspects/.
[6] https://www.doi.gov/pressreleases/interior-department-law-enforcement-seizes-23-million-illegal-drugs-southern-border.

g. the 2019 dismantling of a Sinaloa cartel smuggling operation within the Nation's borders, in which cartel operatives would camp out in the remote and mountainous areas of the Reservation with binoculars and communications equipment, and alert smugglers to the presence and location of law enforcement resources to help them avoid detection. Through a sophisticated multi-agency law enforcement collaboration known as Operation Rocky Top 2, we were able to identify the location of these cartel operatives, seize their contraband, and successfully prosecute 18 individuals.[7]

In honor of NATIVE's stellar accomplishments in the effort to stem the tide of drugs, human smuggling, and illegal crossings over the Nation's southern border, in 2018 NATIVE was a recipient of the White House Office of National Drug Control Policy's United States Interdiction Coordinator award for exceptional performance, which recognizes "individuals and units which have demonstrated exceptional innovation, tactics, aggressiveness, and results in the effort to stem the flow of drugs into the United States."[8]

18. The success of these efforts is borne out by the numbers as well. Currently, TOPD's border-related interdiction numbers are the lowest that I have ever seen. Calls coming in from our community members to report trespassers from across the border, smuggling activity, or other border-related incidents have almost disappeared. During the 18-month period between July of 2023 and December of 2024, TOPD incident reports recorded 766 incidents of illegal entry on the Reservation. During the last 17 months, from January 1 of 2025 through June 1 of this year, that number has plummeted to 70 recorded incidents of illegal entry, which amounts to

[7] https://www.justice.gov/usao-az/pr/final-defendant-largest-cartel-drug-scout-prosecution-arizona-sentenced-prison.
[8] https://trumpwhitehouse.archives.gov/briefings-statements/white-house-recognizes-superior-drug-interdiction-efforts/.

a roughly 90% decrease since the beginning of 2025. Below is a true and correct copy of a chart documenting TOPD service calls relating to illegal entry for each six-month period starting on July 1, 2023.




19. The Nation's recorded incidents are consistent with those reported by Border Patrol. In conjunction with our quarterly ACCT meetings, Border Patrol will frequently provide briefing regarding apprehension metrics, and the numbers reported in recent meetings are consistent with the roughly 90% decreases in interdictions experienced by the Nation. They are also consistent with the nationally reported declines that CBP has publicly reported under the current administration. *See* https://www.cbp.gov/newsroom/national-media-release/trump-administration-delivers-11-straight-months-zero-releases ("With daily apprehensions down 95% from the previous administration and 14 consecutive months of fewer than 9,000 southwest border apprehensions, the border remains more secure than at any point in history[,]" as of April 09, 2026.).

20. Based on my knowledge and experience in law enforcement and Border Patrol operations within the Reservation, I am confident that building a wall across the Reservation's

border will not make an appreciable difference for border security. From my participation in the various inter-agency working groups, task forces, and other information sharing, as well as my specialized training in border security and counter-terrorism methods and practices, I know that static security measures such as a wall are ineffective, because sophisticated operators like the drug and smuggling cartels will discover the system's vulnerabilities and work around them. Where there is a vulnerability in a static system, these operators will find and exploit them. It is a cat-and-mouse game, where the methodologies need to evolve to avoid being exploited. The only effective measures are those that enable us to strategically stagger our resources and change up our tactics, so that they cannot anticipate what the security protocols will be and therefore cannot plan their way around them.

21. And our existing methods have proven to be effective. In 2025, as part of the Joint Task Force – Southern Border operation, the Department of Defense deployed significant resources to bolster the border security operations on either side of the Reservation's border. The operation's commanders warned us that the increased security presence outside of the Reservation would funnel illegal border activity onto the Reservation. After being briefed on the operation, Border Patrol officials also predicted a major surge in illegal border activity on the Reservation. "It's gonna be the wild west," one Border Patrol area director told me. But, rather than lead to a spike in border-related crimes, 2025 saw a 96% decrease in Border Patrol apprehensions and a 90% decrease in TOPD apprehensions as compared to previous reporting periods. The fact is, there was no spike in border crimes on the Reservation, because the security measures being implemented by the Nation and its federal partners have worked.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 16, 2026

James Cook

James Cook
Chief of Police
Tohono O'odham Nation Police Department

# ATTACHMENT A









**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF SAMUEL FAYUANT**

I, SAMUEL FAYUANT, declare the following on the basis of personal knowledge to which I am competent to testify:

1. I am a tribal member of the Tohono O'odham Nation. I currently serve as the Nation's Cultural Affairs Specialist, a position included under the Nation's Department of Natural Resources. I have held this role since 2017.

2. My principal duties as the Nation's Cultural Affairs Specialist include ensuring that O'odham cultural and religious objects, practices, and sites located on the Tohono O'odham Nation (Nation) and on O'odham traditional lands are identified, protected, and preserved. I also promote respect and understanding for O'odham culture through outreach and education efforts.

Part of my duties also include administering federal grant funding and ensuring that federally funded programs comply with applicable grant conditions and federal laws and regulations.

3. When a new development or construction project is proposed on the Nation or within its traditional use lands, my job is to walk the proposed site and perform a cultural resources survey to make sure there are no artifacts in the construction area. If artifacts are found, the contractor must avoid the cultural site. Another part of my job is to create and maintain good working relationships with museums in Arizona and all over the country, and to work with these institutions regarding the repatriation of O'odham ancestral remains and artifacts, such as ceremonial objects.

4. When I am notified of O'odham artifacts or ancestral remains at a site or in a museum, I travel to perform a blessing. I use traditional sage and eagle feathers and offer tobacco, cornmeal, and water to the ancestor to let them know they will be brought back to the Nation for our yearly reburial ceremony in March, when all artifacts and remains are sent to their final resting place.

5. Some of the programs that I oversee are relevant to the federal protection and repatriation of tribal historic and cultural artifacts. These include the Native American Graves Repatriation Act (NAGPRA) and Section 106 of the National Historic Preservation Act (NHPA), which provide important mechanisms for tribal governments, through their Tribal Historic Preservation Offices, to protect their cultural patrimony and exercise self-determination over their lands and physical and material remains.

6. My role as Cultural Affairs Specialist for the Nation also entails outreach to community both on- and off-reservation. Sometimes, schools, religious organizations, and other non-O'odham people and entities request cultural awareness workshops and trainings with

artifacts. For example, I work with scholars, archaeologists, and other professionals to teach them the proper protocol for handling, storing, and repatriating remains. I also handle cultural awareness trainings for the U.S. Customs and Border Protection (CBP). When people come to me for training, I let them know about the types of cultural resources they might find when they are on O'odham traditional lands and what the laws and proper protocol are once the resources are identified.

7. I also lead or participate in various religious ceremonies as a representative of the Nation. For example, I participate in the blessings to Creation and offerings to I'itoi performed as part of the run to Baboquivari Mountain and provide the runners with the sacred eagle feathers to use during that ceremony.

**Impact of the Border Wall on Tohono O'odham People, Land, and Animals**

8. The O'odham have lived, worked, and worshipped in the Sonoran Desert since time immemorial. Oral traditions teach O'odham that they were created in this land and have always lived here. Numerous versions of the creation story exist but the general account is that Earth Medicine Man was the creator of all things. By taking a piece of his own physical being, he caused it to grow to become the earth. He first made the land, the ocean, the sky, the stars, and the sun and moon. He then created Buzzard, Elder Brother, and Coyote, and called on them to steady the earth and make it a livable place. Elder Brother, known to the O'odham as I'itoi, promised that the earth would always be filled with prickly pears and the people would always be happy. He instructed them to remain where they were, in the Sonoran Desert, because it was the center of all things, and he asked them to care for the land so that it would always care for

them. I'itoi then retreated to the Baboquivari Peak, and from there he lived and watched over the people.[1]

9. Today, the O'odham still know and remember their creation history. Landforms across the Sonoran Desert serve as monuments to the past and living altars for exchange with the Creator, reminding the O'odham of who they are and where they come from. The O'odham believe I'itoi's primary residence is in a cave on the Baboquivari Peak in the eastern portion of the Tohono O'odham Nation. Ceremonies honoring I'itoi and the Baboquivari Mountain range still occur annually.

10. Blasting any portions of the Baboquivari Mountain range would be an insult to our Creator. The border wall will obstruct our view of all the mountains, valleys, and villages of our ancestorial lands in the Sonoran Desert. Songs about the mountain ranges in our ancestorial lands would be compromised by the border wall. Our O'odham belief is the prayers and songs will not reach the intended places because of the border wall; the prayers will not go to the intended persons or places.

**Salt Pilgrimage to Sea of Cortez, Sonora, Mexico**

11. This is my personal experience assisting and providing spiritual guidance for the O'odham salt pilgrimages runners: The late Kenneth Josemaria, Jr. started the salt pilgrimage in Topawa from 2011 to 2014. The salt runners began with a four-day cleansing and purification at a ceremony ground adjacent to the Tohono O'odham Cultural Center and Museum. This was done to make sure the men were of clear mind, body, and hearts before they started their 4-day run to the ocean.

[1] Bahr 2001; Fontana 1989; Underhill 1969, 8-13.

12. It is a powerful spiritual ceremony for the O'odham and only males undertake the salt pilgrimage because it served as a rite of passage from boyhood to manhood. One of the young men participating in the run celebrated his 18th birthday crossing the Mexican border at the Papago Farms on the way back from Tres Ojitos Salt Flats located northwest of Puerto Penasco.



Salt runners in Sonoita, Sonora, Mexico, an ancestral O'odham village. Photo taken from the Internet.[2]

13. This rite of passage is important to preserve our cultural line. Our culture and our traditions will be lost if we do not remember them and practice them and have them to reinforce our traditions through our children. O'odham are runners. Ceremonies like the salt pilgrimage also help develop leadership so that the next generations can step into the role of the elders. When they go on the run, the boys enter into the hierarchy of the spiritual realm and connect

[2] All photos included in my Declaration were taken by me unless otherwise indicated.

with their ancestors who passed on. From their ancestors, they receive blessings and gifts. For example, a runner may become a medicine man and receive the gift of healing.

**October 4th Pilgrimage to Magdalena**

14. The October 4th Pilgrimage to Magdalena is the biggest annual festival in Magdalena and one of the biggest annual fiestas in Northern Sonora. During this time, O'odham pilgrims, or walkers, from different villages on the Nation's side gather in Pozo Verde, an ancient village in Mexico located by the international border. They walk to the town of Magdalena, where they pay homage to the town's patron saint of San Francisco Javier. It takes the walkers four days to reach Magdalena from the time they leave Pozo Verde.



Pilgrims walking on their sacred journey to Magdalena. Photo by the late Bernard Siqueiros.

15. With any cultural pilgrimage one must be of right mind and body. The ceremony starts long before the walkers reach Pozo Verde. Walkers must prepare themselves mentally and physically. When they leave home, they start praying that everything will go well, that the journey will go well, and that there will be no harm to people on the trail. People prepare for this

pilgrimage throughout the year. It is a mental and spiritual journey as well as a physical one. To have a giant imposing structure of a wall right at the start of it will change the traditional route, will interrupt our focus on our spiritual journey, and distract us from the prayers that we are trying to focus on and the mental and spiritual discipline that we must cultivate in order to endure the physical hardship of the journey.

**Water**

16. Life-giving water has always been critical for human, plant, and animal survival in the harsh climate in the Sonoran Desert. Perennial springs and seeps were the only reliable year-round water sources in Tohono O'odham before wells were dug for livestock. Tinajas, natural bedrock tanks, or catchments held rainwater and runoffs for weeks, months, or years.

17. Within each of the Nation's districts, we practice open range grazing, and our horses and cattle travel freely so that they can find food and water sources over a larger area within the desert landscape. When it comes time to harvest our animals or bring them to market, we collect them by rounding them up. O'odham families rely on cattle to supplement their income, especially when travel is needed to perform ceremonies and rites of passage. To prepare for the Magdalena Pilgrimage, for example, families sell cattle to pay for costs and supplies for their four-day journey, including food, gas, campfire wood, campsites, and Mexican wares.

18. Buenos Aires Ranch is one of three ranches located close to the border. It was operated by the same family for generations. The ranch is located 2.5 miles from the eastern boundary of the Tohono O'odham Nation. The windmill and concrete water tank on the ranch are located 107 feet from the U.S./Mexico border. I am concerned that both would be destroyed if the border wall is constructed. If they are, there is no telling what would happen to the groundwater, or where the family would get water for their livestock. This would affect several families who use the ranch, or over thirty people. And this is only one of the many ranches

directly along the border that O'odham families have used for generations and continue to rely on today. Disrupting their lands and their access to water and other resources by building a wall right through the middle of the lands that they cultivate would cause significant hardship to them, and could make it so that they are no longer able to work these lands like their parents and grandparents have done for generations.



Windmill and water storage tank on Buenos Aires Ranch, 107 feet from the U.S.-Mexico border. I am concerned that a secondary border wall could destroy or significantly impact this site.

19. There is also a salt cave on the banks of the wash by the ranch where the livestock go to get their intake of salt nutrients. Salt licks are highly beneficial and often essential for livestock. They provide critical sodium and chloride, which plants often lack, to regulate body fluids, support nerve function, stimulate digestion, and promote healthy growth. The border wall construction could also destroy the salt cave or make it so that animals from one side of the border or the other are unable to access it.

20. There are also a number of unanswered questions about how a wall will impact water flow. Will the monsoon rains be affected by the border wall? Will runoff from the mountains and washes be diverted to different channels?

21. We have a right to ask these questions and to receive answers. The Nation uses a consensus model of government. Decisions affecting the O'odham and our lands cannot be approved immediately. The issues must be taken to the districts, which must take them to the people. The information must be translated for the elders, who must be consulted. This takes time, but it ensures that everyone is heard. The federal government's border wall plans are not being run through the people, and the federal government is not honoring our timeline for making decisions. We have a right to be concerned about how a border wall will impact us, our lands, and our Mexican O'odham. We have been here for millennia, and we know our lands, our seasons, our animals and plants, and the impacts a wall will have on our culture and traditions. We should not be forced to accept this dramatic alteration of our homeland, our landscape and ecology, our livelihoods, and our traditions and culture, without the opportunity to know fully what these changes are going to be and to decide as a community whether those are changes that we are willing to accept.

22. We have seen what can happen when people build on our lands but do not understand the natural landscape. The Vamori High Water Crossing Bridge, which is located on the Nation's lands near the international border. This project was commissioned by Border Patrol, and its contractors did not design it correctly. It neglected to account for days of potential additional waterflow from summer monsoon floodwaters. On August 18, 2022, a major storm came through the Nation. Debris collected during the storm and diverted the water toward the

bridge, causing significant damage. The water washed the approach road for the project and the bank of the wash on the north side of Vamori Wash.



Storm damage to the Vamori High Water Crossing Bridge in 2022.



23. I am concerned that something similar could happen if a border wall is constructed. I worry that debris will collect along the double walls and keep the water from flowing where it needs to go. If this happens, flooding could worsen in some areas, and other areas could experience drought. It would destroy the natural balance of the flow of water and all of the life forms that depend on it.

**Saguaros**

24. Saguaro Cactus, Ha:san in O'odham, has always been known to O'odham as a living person. There is a story of how the Ha:san came to be in our O'odham beliefs. A boy made

a prophesy that he would become the saguaro so that he would last forever and bear fruit each year. The saguaro fruit harvest is a cultural tradition for the Tohono O'odham. The dried saguaro ribs of the Ha:san provided O'odham with building materials. The Ku'ibad is the tool made from the saguaro rib to bring saguaro fruit down from the top of the 50-foot saguaros. The saguaro fruit (bahidaj) can be made into a syrup which can be made into wine for our traditional wine ceremony.

25. The wine ceremony is a religious ceremony filled with prayers and songs. Its purpose is to bring together representatives of O'odham from all directions and to summon the rains for us on the Nation. It is a communal event for tribal members and anyone else on the Nation to participate in. The ceremony occurs on the north, south, east, and west of the reservation, and different villages host their ceremonies at different times. O'odham travel for many miles to join each ceremony and form the sacred circle on the ceremony grounds. It is a powerful ceremony. O'odham come from all corners of the Nation, and the Creator hears our songs and prayers and provides us with life-giving rains.

26. In 2021, the Nation enacted a Resolution for the Recognition and Protection of the Sacred Ha:san, announcing that "the Tohono O'odham … consider the Ha:san [saguaro] as an O'odham person" on the basis of our traditional teachings and stories, and announcing the saguaro's vital importance to the religious practices of the O'odham. The Resolution is attached as **Attachment A** to my Declaration. The Resolution calls on federal agencies to reverse the destruction of these sacred plants. It describes how "the saguaro fruit has been used by the O'odham since time immemorial to make saguaro fruit wine for the important rain-making ceremonies," and that "the saguaro fruit are as essential to O'odham spirituality as sacramental bread and wine are to the Holy Eucharist in Christian traditions."



A rare Cresent Saguaro near the vehicle barrier along the Nation's southern border.

27. The vehicle barriers on the international border from the Tohono O'odham eastern boundary to the western boundary avoid the areas where the saguaros grow. The vehicle barrier zigzags to avoid saguaros and cultural sites. This was the result of negotiations between the Nation and CBP. It was a requirement from the Nation that CBP avoid all saguaros on the border.



Saguaro along the Nation's border. I am concerned that a border wall would damage this saguaro.

28. With the proposed border wall project, the hundreds of saguaros on the border are in danger of being bulldozed like the wall construction at Organ Pipe National Monument in 2020. CBP disregarded the biological and cultural losses at Organ Pipe National Monument to

build the wall without consulting with the O'odham. I am concerned the same thing might happen on the Nation's lands. The saguaro in the photo above would be knocked down to make way for a wall on the Nation's lands like the saguaros in the photos below at Organ Pipe National Monument. It can take centuries for a saguaro to grow and reach its full height.



Damage to a saguaro at Organ Pipe National Park in 2020.



Damage to a saguaro at Organ Pipe National Park in 2020.

**Mountains**

29. Shee'e is the Grey Wolf, also the Mexican Wolf. Shee'e Naggiak, meaning "Place Where A grey Wolf Hangs," is the name of a prominent peak of volcanic rock that sticks up

prominently right on the international border between Chukut Kuk District and Sonora, Mexico.[3] Will Shee'e Naggiak be in danger of being destroyed by a border wall like the mountains and hills at Cabeza Wildlife Refuge?



Shee'e Naggiak, a view from the east side of the Nation looking west.



Shee'e Naggiak, a view from the west side of the Nation looking east.

[3] Winters, 2020.

30. In 2020, a construction company drilled holes into Monument Hill and packed them with explosives to make way for a border wall, resulting in the destruction of mountains and hills at Cabeza Wildlife Refuge.



Border wall and trucks driving over Monument Hill.



Heavy machinery at location of planned secondary wall at Monument Hill.



Heavy machinery at Monument Hill in preparation for secondary wall.

31. I am concerned that the same thing that happened at Monument Hill in the Cabeza Wildlife Refuge will happen at Shee'e Naggiak on the Nation's lands. At both sites, there may be caves, artifacts, and possibly human remains. Our O'odham ancestors were experts at cremation, leaving cremation pots in the grounds and in the caves in the hills, many of which we have yet to discover.

**Cemeteries and Historical Sites**

32. According to Richard and Sandra Martynec's Archaeological Report, conducted along the United States-Mexico border for U.S. Immigration and Customs Enforcement between 1991 and 1992, there are 109 prehistoric and historic sites concentrated on the Tohono O'odham Nation on or near the border. Of the 109 sites they surveyed and documented, 68 of these sites are prehistoric and 21 are historic, and 20 exhibit components of both prehistoric and historic occupation. The sites are connected both north and south of the border.[4]

[4] Martynec et al., 1991.

33. **Attachment B** contains maps of cultural sites on the Tohono O'odham Nation from the eastern boundary to the western boundary provided by Arizona State Museum Archaeological Records Office. These maps show all the sites along the Nation's border that have been identified thus far.

34. I am concerned that the building of the primary and secondary walls along the border could significantly disturb or destroy these sites. Additionally, because there are cultural sites and ancestral remains buried throughout O'odham traditional use lands, it is difficult to predict what harms construction of the walls will cause to them.

35. One identifiable site that will be harmed by the construction of a border wall is located south of Ali Chuk village (Menagers Dam), north of the border vehicle barrier. Here, there are two well-tended graves roughly 60 feet from the vehicle barrier. The living family members of the deceased relatives would suffer great harm if their loved ones were dug up and removed from their resting place so that a wall can be built. According to community members, there is also a grave of a small child in the vicinity, but that ancestor could not be located.



Grave sites at the Ali Chuk Village near the border on the Nation's lands.

**Inter-Generational Trauma**

36. Tohono O'odham have travelled freely back and forth from villages in Sonora, Mexico for generations to work in agriculture fields and ranches around Eloy, Casa Grande, and the Avra Valley area. When they made enough money to get supplies and food for their families, they traveled back home to their villages in Sonora. At the turn of the century, most O'odham families chose to stay and live at the work camps provided by the owners of agricultural fields. O'odham coming from towns and cities where they live now and wanting to visit ancestral lands in Sonora will be shocked to see two 30-foot walls in place of the vehicle barrier.

37. The vehicle barriers and Integrated Fixed Towers (IFT Communication Towers) serve their purpose of deterring drugs from being brought through the Nation and into the United States. The vehicle barrier still allows animals to travel back and forth from the border, avoids saguaros, and allows water to flow. These were compromises that were put into place after the Nation heard from its members and negotiated with CBP. But none of this will be the case if the wall or secondary wall is constructed on the Tohono O'odham Nation.

38. The Nation continues to advocate for comprehensive immigration reforms at the federal level that deliver flexible security tools, address the root causes of undocumented immigration, and facilitate tribal members' travel to ancestral lands on both sides of the U.S./Mexico Border. But if a primary and secondary border wall are built, it will be heartbreaking to our people to know we will not be able to travel freely to and from villages in Sonora. To look now at the vast areas of O'odham in Mexico, it is traumatic to hear the proposed border wall and secondary wall will block the way of life we have known for millennia. It will also affect our future generations. They will not know how we used to travel back and forth to find work and be with each other in community. They will not know of the Nation being an open land—they will only see a wall closing us off. Our ceremonies keep the balance of the world in

order. We perform the ceremonies not just for us but the balance of all living things in the world—plants, animals, and people. It does not matter where they come from, we offer a prayer, we try to take care of things for the betterment of everyone and everything that deters or goes against that belief is itself a very destructive process. Putting up the wall is a destructive thing. Will our next generations remember these stories and our traditional way of life, or will they just see a wall? That is what is at stake.

I declare under penalty of perjury that the following is true and correct.

Dated: June 15, 2026

/s/ Samuel Fayuant
Samuel Fayuant

**Attachment A:**

**RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL**
**(Recognition and Protection of the Sacred Ha:san)**

**RESOLUTION NO. 21-137**

**WHEREAS,** it is the policy of the Tohono O'odham Nation to promote "enjoyable harmony between members of the [N]ation and their environment; to promote efforts which will preserve and protect the natural and cultural environment of the Tohono O'odham Nation, including its lands, air, water, flora and fauna, its ecological systems, and natural resources, and its historic and cultural artifacts and archeological sites; and to create and maintain conditions under which members of the [N]ation and nature can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations of members of the Tohono O'odham Nation" (Constitution, Article XVIII, Section 1); and

**WHEREAS,** Indigenous peoples have made the compelling argument that the trees, wildlife, rivers, and mountains are sacred and should be granted "personhood" and the legal rights associated with it; and

**WHEREAS,** the Tohono O'odham and sister O'odham tribes, hold the Ha:san in the highest regard and consider the Ha:san as an O'odham person; and

**WHEREAS,** some of the commentaries on saguaros as "people" or "kindred spirits" come directly from O'odham scholars, including, José Luis Brennan, Juan Smith, Francis Vagages, Ofelia Zepeda, Danny Lopez, and Camillus Lopez, while others come from competent historians —most of them working for the federal government—who corroborate in written form the oral histories long transmitted as part of the O'odham himdag (Way of Life) — the traditional knowledge and values of O'odham; and

**WHEREAS,** Tohono O'odham scholar José Luis Brennan aka José Lewis worked with the U.S. federal Bureau of American Ethnology recording traditional O'odham narratives and translating them, including one in which an O'odham boy prophesizes that, "I will turn myself into a saguaro, so I shall last forever, and bear fruit each summer," the O'odham have been gifted with such up to this day; and

**WHEREAS,** the Ha:san is an integral part of the O'odham himdag (Way of Life) and early teachings and stories have taught that the Ha:san should never be harmed or disrespected; and

**WHEREAS,** the saguaro fruit has been used by the O'odham since time immemorial to make saguaro fruit wine for the important rain-making ceremonies; and

**WHEREAS,** the saguaro fruit are as essential to O'odham spirituality as sacramental bread and wine are to the Holy Eucharist in Christian traditions; and

**WHEREAS,** the spiritual use of desert plants fits the definition of unalienable rights in the draft release of Secretary Pompeo's Commission on Unalienable Rights in July 2020, in the sense that saguaro fruit are "essential" to the religious practices of the O'odham engaged in rain-making ceremonies, and are therefore an unalienable "cultural property"; and

**WHEREAS,** the majority of O'odham lands in the Sonoran Desert were transferred without the consent of the Tohono O'odham from México to the U.S. following the Gadsden Purchase, Treaty of Guadalupe Hidalgo, and the Gadsden Treaty, which guaranteed the O'odham all the religious and property rights they had enjoyed as Mexican citizens; and

**WHEREAS,** the Agricultural and Natural Resources and Cultural Preservation Committees recommend recognition and protection of the ha:san.

**NOW, THEREFORE, BE IT RESOLVED** that the Tohono O'odham Legislative Council condemns the destruction, damage, and poorly executed transplanting of saguaros during the border wall construction and other Department of Homeland Security, (DHS) projects on tribal and federal lands that are aboriginal homelands of the O'odham.

**BE IT FURTHER RESOLVED** by the Tohono O'odham Legislative Council that this wanton destruction of a scared plant amounts to a violation of the religious liberties of the Tohono O'odham Nation and its members.

**BE IT FINALLY RESOLVED** that the Tohono O'odham Legislative Council calls on all entities, state, and federal agencies to reverse the destruction of sacred plants associated with O'odham traditions and to that:

1. Enter into proper government-to-government consultation with the Tohono O'odham Nation whenever projects or federal or state projects may potentially affect saguaros on the Tohono O'odham Nation or on or around the O'odham aboriginal lands.
2. Adhere to the spirit and detail of the December 5, 2012 memorandum signed by the Department of Defense along with five other federal entities, pledging to Native Americans full government-to government consultation and training for employees to do no or least harm, to sacred sites, ceremonial plants, pilgrimage trails and shrines on federal lands and that these agencies (including the Department of Homeland Security, Customs and Border Protection and the Army Corps of Engineers) explicitly recognize that they must avoid destruction of access to sacred sites and their culturally significant plants.

**3. Refrain from any bulldozing, damage, defacing, or attachment of wiring or other manmade objects to saguaros anywhere on the Tohono O'odham Nation or in traditional cultural properties of the O'odham on lands managed by the National Park Service, Bureau of Land Management, USDA Forest Service, Bureau of Land Management or US Air Force.**

**4. Begin "healing the cultural, spiritual and ecological wounds" caused by saguaro destruction on the Nation and the border wall construction off the Nation by the following actions:**

**(a) removal of the border wall away from sacred sites and sacramental plants;**

**(b) re-consecration by O'odham spiritual leaders of damaged sacred plants and sacred sites (and payment to those involved);**

**(c) restoration of native vegetation damaged along the border to include saguaros, organ pipe cactus and their nurse plants such as Ironwoods, Mesquites, and Palo Verde, and DHS or appropriate entity compensate, O'odham youth work crews to be involved in this restoration and replanting along with appropriate professionals or companies;**

**(d) restitutional compensation for tribal, National Park Service, and National Wildlife Refuge professionals who flagged and mapped all sacred sites and plants of concern areas at the request of the DHS; and**

**(e) cultural sensitivity training for all DHS employees working on the border and on or around O'odham aboriginal lands to ensure that they understand and will not violate the Native American Religious Freedoms and other appropriate laws, customs, or traditions.**

**The foregoing Resolution was passed by the Tohono O'odham Legislative Council on the 04TH day of MAY, 2021 at a meeting at which a quorum was present with a vote of 3,175.7 FOR; -0- AGAINST; -0- NOT VOTING; and -0- ABSENT, pursuant to the powers vested in the Council by Article XVIII, Section 1 of the Constitution of the Tohono O'odham Nation, adopted by the Tohono O'odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat.984).**

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

**Timothy Joaquin, Legislative Chairman**

11 **day of** May **, 2021**

**ATTEST:**

[signature]

**Evonne Wilson, Legislative Secretary**

10 **day of** May **, 2021**

**Said Resolution was submitted for approval to the office of the Chairman of the Tohono O'odham Nation on the** 11 **day of** May **, 2021 at** 2:23 **o'clock,** P **.m., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon his approval or upon his failure to either approve or disapprove it within 48 hours of submittal.**

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

[signature]

**Timothy Joaquin, Legislative Chairman**

**[X] APPROVED** **on the** 12 **day of** May **, 2021**

**[ ] DISAPPROVED** **at** 2:10 **o'clock,** P **.m.**

[signature]

**NED NORRIS, JR., CHAIRMAN**
**TOHONO O'ODHAM NATION**

**Returned to the Legislative Secretary on the** 12 **day of** May **, 2021, at** 3:10 **o'clock,** P **.m.**

[signature]

**Evonne Wilson, Legislative Secretary**

RESOLUTION NO. 21-137

ACTION: RECOGNITION AND PROTECTION OF THE SACRED HA:SAN

MOVED: VICE CHAIRMAN QUINTIN C. LOPEZ SECOND: COUNCILMAN DANIEL L.A. PRESTON III

DATE: MAY 04, 2021

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| BABOQUIVARI 384.8 | 1. LEANDER MASE (Francine Schooling)<br>2. ALBERTA J. RAY (Frances G. Antone) | 192.40<br>192.40 | X<br>X | | | |
| CHUKUT KUK 347.5 | 1. VIVIAN JUAN-SAUNDERS (Juanita Homer)<br>2. MARLAKAY HENRY (Billman Lopez) | 173.75<br>173.75 | X<br>X | | | |
| GU ACHI 279.3 | 1. VICTORIA HOBBS ( )<br>2. TIMOTHY L. JOAQUIN ( ) | 139.65<br>139.65 | X<br>X | | | |
| GU VO 264.5 | 1. DALLAS LEWIS (Nacho Flores)<br>2. GRACE MANUEL ( ) | 132.25<br>132.25 | X<br>X | | | |
| HICKIWAN 213.8 | 1. SANDRA D. ORTEGA ( )<br>2. LOUIS R. LOPEZ (Delma M. Garcia) | 106.90<br>106.90 | X<br>X | | | |
| PISINEMO 230.7 | 1. MONICA K. MORGAN ( )<br>2. MARIETTA MARTIN ( ) | 115.35<br>115.35 | X<br>X | | | |
| SAN LUCY 235.6 | 1. GLORIA RAMIREZ ( )<br>2. JANA MONTANA (Lorraine M. Eiler) | 117.80<br>117.80 | X<br>X | | | |
| SAN XAVIER 238.9 | 1. JANICE FELIX (Adam Andrews)<br>2. DANIEL L.A. PRESTON III (Racheal Vilson-Stoner) | 119.45<br>119.45 | X<br>X | | | |
| SCHUK TOAK 189.0 | 1. QUINTIN C. LOPEZ (Agnes V. Joaquin)<br>2. TERESA F. DONAHUE (Alberta Espinoza) | 94.50<br>94.50 | X<br>X | | | |
| SELLS 547.1 | 1. EVELYN JUAN MANUEL ( )<br>2. ARTHUR WILSON ( ) | 273.55<br>273.55 | X<br>X | | | |
| SIF OIDAK 244.5 | 1. LUCINDA ALLEN (Yolonda Garcia)<br>2. MARY LOPEZ (Ann M. Garcia) | 122.25<br>122.25 | X<br>X | | | |
| TOTAL | | 3,175.7 | 3,175.7 | -0- | -0- | -0- |

**Attachment B: Maps of Cultural Sites on the Tohono O'odham Nation from the Eastern Boundary to the Western Boundary Provided by ASM Archaeological Records Office**[5]




Ali Chuk (Menagers Dam), village located on the Nation's lands on the border.

[5] Documented O'odham cultural sites are circled in each map with black outlines.




Kom Vo, village on the Nation’s lands east of Ali Chuk and west of Papago Farms along the border.




Bailey Peak, west of Papago Farms on the Nation’s lands along the border.




South of Papago Farms on the Nation's lands along the border.




La Lesna Mountains to Wolfley Hill on the Nation's lands along the border.




Tecolote, an O'odham ranch on the Nation's lands along the border.




San Agustin, ranch west of San Miguel village on the Nation’s lands along the border.




San Miguel, village on the Nation's lands along the border where the traditional border crossing is located.




Caponera Peak, near Buenos Aires Ranch on the Nation's lands along the border.

**Attachment C: Resources**

Bahr, Donald M. (ed.), *O'odham Creation and Related Events*. University of Arizona Press, Tucson (2001).

Fontana, Bernard L., *Of Earth and Little Rain*. University of Arizona Press, Tucson (1989).

Martynec, Richard, Charles Suhler, Sandra Martynec, Sharlene N. Allday, Duane E. Peter, Cultural Resources Survey/Monitoring of a JTF-6 Action, Tohono O'odham Sector, Arizona, (1991–1992).

Underhill, Ruth M., *Papago Indian Religion*. Reprinted. AMS Press, New York. Originally published 1946, Columbia University Contributions to Anthropology Vol. 33, Columbia University Press, New York (1969).

Winters, Jr., Harry, *O'odham Place Names, Meanings, Origin, and Histories, Arizona and Sonora*. 2nd Edition, SRI Press (2020).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF ELDELLDA FRANCISCO**

I, Eldellda Francisco, declare the following on the basis of personal knowledge to which I am competent to testify:

1. I am a citizen of the Tohono O'odham Nation and a member of the Chukut Kuk District. I adhere to the traditional O'odham religious and spiritual beliefs and customs, and I participate in our ceremonies and observances, as I was taught to do by my mother, my elders, and those who came before us.

2. To understand the spiritual impact of the border wall, you must first understand that for the Tohono O'odham people, the land is not just where our ceremonies take place—the land itself is sacred.

3. Our ancestors walked these trails long before there was a border, long before there were fences, gates, or walls. They prayed on these lands, lived on these lands, and were buried on these lands. Their footsteps, prayers, songs, and teachings remain connected to these places. We do not simply visit these lands; we maintain a living relationship with them.

4. The border wall cuts through more than the desert. It cuts through a spiritual pathway that has connected our people to the Creator since time immemorial.

5. When our elders can no longer reach sacred places, we lose more than attendance at a ceremony. We lose the opportunity for them to pass teachings to the next generation. When our youth cannot walk the same trails as their ancestors, they lose a direct connection to their history, identity, and spirituality.

6. For the Tohono O'odham people, the wall is not merely steel in the ground. It is a physical barrier placed across a sacred relationship. Imagine a steel wall being built through the center of a church, a temple, or a cemetery where generations of your family are buried. Then imagine being told that the spiritual loss can be replaced somewhere else. It cannot.

7. These lands are not sacred because ceremonies happen there. Ceremonies happen there because the lands are sacred.

8. The spiritual harm is not measured in miles of fencing or the number of people turned away. It is measured in the weakening of a connection that has existed between our people, our ancestors, the Creator, and our lands since the beginning of our history.

9. The wall does not cut through empty desert. It cuts through prayers that have traveled these lands for countless generations.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 3, 2026

/s/ *Eldellda Francisco*
Eldellda Francisco

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION, a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF LAIKEN JORDAHL**

I, Laiken Jordahl, declare the following on the basis of personal knowledge to which I am competent to testify:

1. I live in Tucson, Arizona. I have worked at the Center for Biological Diversity ("Center") since 2017. My job titles have been Borderlands Campaigner, Southwest Conservation Advocate and National Public Lands Advocate. I have been involved in public lands conservation work since 2011, when I started my career working with the Bureau of Land Management.

2. Before joining the Center, I served as a National Park Service Wilderness Fellow, where I worked with stakeholders to monitor conditions in five national parks and monuments, including Organ Pipe Cactus National Monument and Big Bend National Park, and prepared in-

depth reports assessing threats to wilderness character. My work was published in a series of reports entitled "Wilderness Character Narrative and Baseline Monitoring Assessments" for specific national parks and monuments.

3. As a Public Lands Advocate with the Center, I have been centrally involved in the Center's work monitoring the government's border wall construction activities along the State of Arizona's southern border, and the environmental impacts of these activities. I have personally visited and observed numerous sites along Arizona's border before, during, and after border wall construction activities have taken place. I am accordingly familiar with and competent to speak to the contents of this Declaration.

4. On May 22, 2026, I visited the Patagonia Mountains border wall construction project site, approximately 10 miles east of Nogales, Arizona. At the site I took photographic and video drone images of the completed double border wall, additional double border wall and patrol road construction in progress, and associated construction site laydown yard and equipment. I uploaded true and correct copies of these images and video at this weblink, hosted by the Center.

https://www.biologicaldiversity.org/resourcespace/pages/search.php?search=%21collection1676&k=ec62b7a480.

5. Available at the following weblink hosted by the Center is drone footage taken by my Center colleagues Russ McSpadden and Alex Olivera, showing sites of completed border wall, border wall and patrol road construction activities, and border wall construction infrastructure, at various locations along the Arizona border identified in each photo's description. I am familiar with the progress of construction of the wall at these locations and can faithfully attest that these images accurately and faithfully portray what they purport to be as

detailed by the descriptions provided with each video file.

https://www.biologicaldiversity.org/resourcespace/pages/search.php?search=%21collection1485&k=325e5dc40d#.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 11, 2026

Laiken Jordahl

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION, a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF GARY NABHAN, Ph.D**

I, GARY NABHAN, declare the following on the basis of personal knowledge to which I am competent to testify:

1. I am a natural resource conservation scientist, desert ecologist, ethnobotanist, and cultural geographer based in Patagonia, Arizona. I am also an Ecumenical Franciscan Brother and serve as a liaison between Indian spiritual leaders and the Franciscan order.

2. I am the founder and coordinator of Sacred Plants Biocultural Recovery Initiative, which models solutions to deal with challenges to free exercise of religion stemming from globally unprecedented threats to plants utilized for millennia by Indigenous cultures and religious faiths.

3. I received my B.A. in Environmental Biology and Regional Literature from Prescott College in 1974. In 1978, I received an M.S. in Plant Sciences (Horticulture) from the University of Arizona. In 1983, I earned my Ph.D. in Arid Lands Resource Sciences from the University of Arizona, writing my dissertation on the flora and soils of traditional Tohono O'odham farms (or fields) on the reservation and in adjacent Mexico. I completed a two-year program from the Center for Action and Contemplation at the Rohr Institute in 2013.

4. I have over forty years' experience teaching at Arizona state universities. I am a Research Scientist Emeritus at the University of Arizona and Emeritus of the W.K. Kellogg Endowed Chair in Southwest Borderlands Food and Water Security. From 2000 to 2008, I was a tenured Professor in Environmental Sciences, with a focus on applied Indigenous studies and forestry, at Northern Arizona University. I also served as a Founding Director of Northern Arizona University's Center for Sustainable Environments, which coordinated efforts to preserve natural resources between federal agencies and 12 tribes. From 1986 to 1990, I taught ethnobotany as an adjunct professor at Arizona State University.

5. I am the author or editor of more than 35 trade and scholarly books and have contributed over one hundred refereed scholarly articles to popular publications and technical journals, many of which focus on the ecology and biology of deserts, including the Sonoran Desert. I am widely considered a pioneering innovator in the collaborative conservation movement in deserts of the world.

6. I serve or have served as a board member for the Society for Economic Botany and the Society for Conservation Biology, among several other institutions, and as a member of the Congressionally appointed National Parks System Advisory Board and National Plant Germplasm System under both Republican and Democratic administrations.

7. For my work in these areas, I received a MacArthur "genius" Fellowship, a Pew Foundation Fellowship in Conservation and Environment, a Lannan Literary Award, and Lifetime Achievement Awards from the Society for Economic Botany, the Society for Ethnobiology, and the Society for Conservation Biology, among other honors.

8. Throughout my career, I have spent significant time studying the ecology and ethnobiology of deserts in southern Arizona and throughout the American Southwest, including the Sonoran Desert. I have more than fifty years of field research on the plant diversity and Indigenous uses of Sonoran Desert vegetation, having accomplished contract work or consulting with the Tohono O'odham, the Hia ced O'odham, the Seri or Comcaac in Mexico, the New Pascua Yaqui, and the Colorado River Indian tribes.

9. My work with the Tohono O'odham Nation spans nearly 50 years. I began working on the Nation's lands in 1978 through the nonprofit Meals for Millions, which collaborated with the Nation's Health & Human Services and Natural Resources Departments on public health programs, including the Women, Infants, & Children Program. Through this work, I regularly visited 12 to 20 O'odham villages each year to provide affordable, nutritious meals to O'odham families. This commitment was part of my lifelong work to build a movement of food-secure and healthy communities and lands by returning to locally grown and traditional food production.

10. In the early 1990s, I served as a contracting consultant to the Hia C-ed O'odham Alliance, a non-profit community organization that works to promote cultural awareness, economic development, and greater political representation for the Hia C-ed O'odham community. With the Alliance, I assisted efforts to document over 50 historic rancherias, villages, springs, and sacred sites on- and off-Reservation to collect ethnographic background

information for a legal land rights case.

11. When the first Trump Administration announced plans to build a wall through the Nation's lands, I collaborated with now-Tribal Chairman Verlon Jose to assess the cultural and ecological impacts of a border wall. Under the direction of four elected O'odham leaders for the Healing the Border Project, I also worked to assess the impacts of border crossing closures and wall construction on access to sacred ceremonial grounds and sacred plants. I additionally assisted Chairman Jose and other O'odham community members with COVID-19 supply deliveries and relief efforts. This work was conducted through Portable, Practical Educational Preparation (PPEP) programs, which aim to improve the quality of rural life and empower people by providing education, training, and practical life skills. Through the personal relationships I built with members of the Nation over half a century, I learned about many aspects of O'odham culture firsthand.

12. To prepare to write this declaration, I also reviewed existing literature on the subject matter of this declaration. A working list of my references is contained in **Attachment A**. Based on my professional experience, my work with the Nation and time spent on the Nation's lands, my conversations with Nation officials and members, and my review of the literature on O'odham religion, I conclude the following.

13. The Sonoran Desert is a complex landscape filled with diverse vegetation communities. Each stretch of desert soil contains many layers. Among the most important is the microbiotic or cryptogamic crust ("biocrust"), a sponge-like, protective layer comprising fungi, mold, cyanobacteria, and other living organisms.[1] The biocrust's unique purpose is to hold the soil in place, to foster water retention, and to provide plants with essential nutrients like carbon

---

[1] Belnap, Jayne. The World at Your Feet: Desert Biological Soil Crusts. *Frontiers in Ecology and the Environment*, 1(4), 181–189 (2003).

and nitrogen. The biocrust forms over the course of a human lifetime, taking 80 or more years to solidify and support the full range of biodiversity.

14. In some corridors, xero-riparian watercourses, springs, and seeps along desert washes fill up with floodwaters and are stored in the soil after thunderstorms. The rich soil and groundwater access in these areas support unique plant and animal life that cannot exist elsewhere in the region. Sacred trees like mesquite and ironwood provide shaded, fertile nursery grounds where some saguaros and other sacred ceremonial plants begin their lives. In other areas with less water, the flora and fauna are more adapted to drier conditions. Each topographic feature within the Sonoran Desert fosters a complex but often fragile habitat, and harm or changes to one species can affect the entire ecosystem above and below ground.

15. For millennia, the O'odham have considered plants found throughout the Sonoran Desert landscape to be sacred, using them in religious ceremony and illuminating them in O'odham creation narratives and songs. Families and communities gather their sacred plants at specific locations passed down generation by generation for centuries. They move throughout the wider desert landscape according to the seasons and the plants' availability in particularly optimal locations, not at random. When collection takes them far from home, they use the same specific camp sites their ancestors used. O'odham communities located along the lands that are now the international border between the United States and Mexico have traditional gathering places on both sides of the boundary. The community of Menagers Dam, for example, gathers plants within a broad area spanning the border.

16. There are 28 kinds (species) of sacred plants documented on or around the Nation's border with Mexico. These are listed by their scientific, O'odham, and common English names, along with their uses and the sources of documentation, in **Attachment B**. I am among

the dozens of botanists who have made plant voucher specimens both along the border and within 15 miles north on the O'odham reservation. These are mapped on the Southwest Environmental Information Network "SEINet" website,[2] an online portal that catalogs the flora of the U.S. Southwest and Mexico. Examining data points on this publicly accessible website, I confirmed that at least 25 of the 28 plant species with sacred and ceremonial uses to the O'odham may be in patches (e.g. cacti), stands (e.g. trees), or micro habitats in areas along the border that would be impacted by the proposed border wall construction on the Nation's lands. Some of the 25 confirmed species of plants are rarer and more geographically restricted than others (like saguaros and mesquites). Their relative locations are listed in **Attachment C**.

17. Beginning in the seventeenth century, Spanish missionaries introduced Christianity to the O'odham. One of the first Catholic masses in O'odham homelands was held at the site on the present-day border currently called Quitobaquito Springs, which seems to have been selected because it was already deemed sacred and used ceremonially by the Tohono O'odham and Hia-ced O'odham.[3] Over the next century, the O'odham syncretized their Indigenous beliefs and rites with those of Spanish Catholicism with the result that today a majority of the O'odham adhere to a form of Sonoran Catholicism that incorporates their indigenous beliefs, values, and practices with those of more mainstream Catholicism (while some maintain their traditional beliefs apart from Catholicism).

18. Today, both Catholic priests and O'odham *mamakai* (medicine persons) use traditional O'odham sacred plants in O'odham community ceremonies. An example of this is that plants traditionally used by O'odham for purification and as symbols of renewal or

---

[2] https://swbiodiversity.org/seinet/index.php.
[3] Hoy, W. E. A Quest for the Meaning of Quitobaquito. *Kiva*, 34(4), 213–218 (1969), http://www.jstor.org/stable/30247091.

vanquishing evil, such as cottonwood (*Auppa*) and willow (*Ce'ul* or *Komaghi Ce'ul*), are woven into crosses and placed on doors and shrines for the Roman Catholic Feasts and Fiestas of Santa Cruz and San Isidro.

19. In meetings held at the Vatican, scholars have argued that sacred plants important to the exercise of Indigenous traditions and those used in the Abrahamic religious traditions hold a spiritual equivalency that is confirmed by theological tenets and environmental policies of the Catholic Church, among others.[4] Indigenous spiritual leaders, the Catholic Church, and social scientists apply the same criteria to the sacred plants of Indigenous traditions as are legally applied to those of Christianity and Judaism. Because many O'odham adhere to both traditional and Catholic teachings, their uses of sacred plants for spiritual and ritual needs in both traditions are protected under many legal and theological precedents and even condoned at the highest levels of the Catholic Church.[5]

20. One of the most sacred plants in O'odham religious tradition is the saguaro cactus, or *Ha:sañ*. In the O'odham creation stories, an orphaned O'odham boy turned into a saguaro. According to one version of the creation story, the boy declared "I will turn myself into a saguaro, so that I may last forever, and bear fruit each summer."[6] As a result, O'odham cosmology treats these plants as sacred, sentient beings that are used as sacraments, in much the same way that Christianity treats blessed bread and wine to be the sacramental Body and Blood

---

[4] *See* Indigenous Peoples' Knowledge and the Sciences Workshop, The Pontifical Academy of Social Sciences, Mar. 14–15, 2024, https://www.pass.va/en/events/2024/indigenous_peoples.html.

[5] "Address of His Holiness Pope Francis to the Participants in the Workshop on 'Indigenous Peoples' Knowledge and the Sciences: Combining Knowledge and Science on Vulnerabilities and Solutions for Resilience," The Pontifical Academy of Social Sciences, Mar. 14, 2024, https://www.pass.va/en/magisterium/francis/2024-14-march.html.

[6] Rea, Amadeo et al. At the Desert's Green Edge: An Ethnobotany of the Gila River Pima. University of Arizona, Tucson (1997); Batsaki, Yota & Anatolia Tchikine, Eds. Plant Humanities, Harvard University Press, Cambridge, Mass. (Forthcoming, 2026).

of Christ.

21. Saguaros are the primary cactuses used to ferment a sacramental *nawait* cactus wine for the *nawait* rain and *dahiwuak kii* ceremonies. During these ceremonies, which occur at the onset of summer, O'odham sit together and drink saguaro wine to summon the monsoon rains so that O'odham farmers may plant their traditional crops and provide food. Saguaros are essential to the O'odham seasonal cycle of ceremonial practice. Each community harvesting saguaros uses traditional gathering areas passed down through generations. The communities are tied to these cactus populations in spiritual relationship. Just as the Catholic Eucharist, which symbolizes the body and blood of Christ, must be made in a specific way using pure wheat flour and pure, natural grape wine, O'odham communities drink saguaro wine made from specific cacti grown in specific places used by their ancestors for millennia. These practices cannot be performed correctly if they are not done in the traditional way.

22. Recognizing the cultural and religious significance of saguaros to the O'odham, the federal government took steps to protect the O'odham's access to these plants. In 1937, President Franklin Delano Roosevelt granted O'odham tribal members the right to harvest cactus fruit at the Organ Pipe Cactus National Monument in perpetuity through Presidential Proclamation 2232. Beginning in the 1940s, the U.S. Customs Service (now Customs and Border Protection (CBP)) granted the O'odham freedom to harvest saguaro fruit, along with other sacred cacti such as the organ pipe, along the border and in Mexico. The Nation's members were granted and have exercised more than 85 years of unrestricted access to plants along the border and in Mexico.

23. In 2021, the Nation's Legislative Council and each of its districts passed resolutions legally confirming the sacred status of the saguaro and declaring that the cactus is

O'odham kin, has "personhood," and should never be harmed or disrespected. Because spiritual injury may occur to those who damage or destroy these plants, they are of particular moral, ethical and spiritual concern within the O'odham belief system.

24. As described in Attachment C, saguaros are located along the Nation's border with Mexico, including where the proposed border wall will be built. As a result, CBP may need to relocate saguaros from within the border wall's footprint and to create access roads, lay down yards, and work and staging areas. CBP has dug up at least 100 saguaros along the border since 2019, and as many as half did not survive in their new locations.[7]

25. Based on my knowledge of the biological properties of saguaros, they do not easily relocate. Relocation is especially fatal to older or taller saguaros, which are not likely to survive being uprooted and transported to another location. Under O'odham religious belief, the loss of or harm to even one saguaro is spiritually devastating because it is viewed as losing an O'odham person or kin. The spiritual relationships communities form with specific saguaro populations will also be severed if O'odham are forced to drive to collect cactus fruit miles or hours away during the critically important and short harvest season because of a wall.

26. Excessive truck traffic or bulldozing of Sonoran Desert soils to build a wall could fragment the critical biocrust and make the desert soil more vulnerable to erosion and depletion from summer floodwaters, wind, and other elements.[8] This would affect the root systems of

---

[7] GAO-23-105-443, Southwest Border: Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction, 27 (Sept. 2023), https://www.gao.gov/assets/830/828858.pdf; Tori Gantz, "More than 100 saguaros were transplanted in Trump's rush to build border wall. Many have died," KJZZ (Feb. 14, 2024), https://www.kjzz.org/2024-02-14/content-1871287-more-100-saguaros-were-transplanted-trumps-rush-build-border-wall-many-have-died; Curt Prendergast, "Feds move some saguaros, destroy others for border wall near Lukeville," Tucson.com (Oct. 12, 2019), https://tucson.com/news/local/article_55b96d3f-2caf-5314-9b8a-87ae400103ce.html.

[8] Belnap, Jayne. The World at Your Feet: Desert Biological Soil Crusts. *Frontiers in Ecology and the Environment*, 1(4), 181–89 (2003).

plants (e.g. trees) and make them more vulnerable to toppling. It would also disrupt access to critical nutrients like nitrogen, which are essential for plant growth. Once the living composition of the biocrust is destroyed, it will not resolidify or regenerate within our lifetime.

27. The construction of a wall or double wall can also change the flow and destination of summer floodwaters, blocking desert washes that rely on this precipitation and flooding dry areas. As a result, excessive flooding in areas that are typically dry can topple or drown plants, while insufficient flow to other areas that are normally wetter would cause plants to starve from insufficient moisture. Xero-riparian landscapes provide one example of the latter scenario. Plants located in xero-riparian watercourses rely on the precipitation that creates this critical and fragile habitat. When rainwater flow is insufficient, species that make up this productive vegetation community will not be able to survive. The destruction of this habitat will set back regeneration and increase mortality within the whole ecosystem, especially plants that rely on trees for shade and composting.[9]

28. Harm to the desert soil, or to any species of plant, can have lasting impacts on the entire vegetation community on a single strip of land. Because plants rely on each other and the soil for food, shelter, and fertilization in the harsh desert elements, the habitat can quickly be thrown out of balance. These cascading effects can jeopardize traditional plant gathering habitats and camping areas where O'odham have developed spiritual relationships with a multitude of sacred plants over millennia.

---

[9] Nabhan, Gary P. and Carr, John L. eds., *Ironwood: An Ecological and Cultural Keystone of the Sonoran Desert*. Arlington, VA, USA: Conservation International with University of Chicago Press (1994).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 13, 2026

/s/ *Gary Nabhan*
Gary Nabhan

**Attachment A: References**


| |
|---|
| Austin, Daniel F. Baboquivari Mountain Plants. University of Arizona Press, Tucson (2010). |
| Bahr, Donald M. Pima-Papago Ritual Oratory: A Study of Three Texts. Indian Historian Press, San Francisco (1975). |
| Bahr, Donald M. O'odham Creation and Related Events. University of Arizona Press, Tucson (2001). |
| Bahr, Donald M. How Mockingbirds Are: O'odham Ritual Orations. SUNY Press, Albany (2011). |
| Bahr, Donald M., J. Gregorio, D. Lopez & A. Alvarez. Piman Shamanism and Staying Sickness (*Ka:cim Mumkidag*). University of Arizona Press, Tucson (1974). |
| Batsaki, Yota & Anatolia Tchikine, Eds. Plant Humanities, Harvard University Press, Cambridge, Mass. (Forthcoming, 2026). |
| Becerra, Judith, David Yetman, & Exequiel Ezcurra. Elephant Trees, Copal and Cuajlotes. University of Arizona Press (2024). |
| Belnap, Jayne. The World at Your Feet: Desert Biological Soil Crusts. *Frontiers in Ecology and the Environment*, 1(4) (2003). |
| Davis, E.H. The Papago Ceremony of the Vikita. Indian Notes and Monographs, Heye Foundation Museum of the American Indian, New York (1920–1921). |
| Eiler, Jose, Jose, Monti, Nuñez, Nabhan, Polacca & Trujillo (2021). |
| Felger, Richard S. & Felipe Sylvester Molina. Plants and Animals in the Yoeme World: Ethnoecology of the Yaquis in Sonora and Arizona. Desert Institute Press, Silver City NM (2024). |
| Felger, Warren, Anderson & Nabhan (1992). |
| Hoy, W. E. A Quest for the Meaning of Quitobaquito. *Kiva*, 34(4), 213–218 (1969), http://www.jstor.org/stable/30247091. |
| Jones, R. The Wi'igita of Achi and Quitobac. The Kiva 36(4) (1971). |
| Nabhan, Gary P., Rea, A.M., Reichhardt, K.L., Mellink, E. & Hutchinson, C.F. Papago Influences on Habitat and Biotic Diversity: Quitovac Oasis Ethnoecology. *Journal of Ethnobiology*, 2(2) (1982). |
| Nabhan, Gary P. The Desert Smells Like Rain. A Naturalist in O'odham Country (1982). |
| Nabhan, Gary P. *Papago Fields: Arid Lands, Ethnobotony, and Agricultural Ecology (Arizona, Mexico)*. University of Arizona, Tucson (1983). |
| Nabhan, Gary P., Wendy Hodgson, and Francis. Fellows. "A Meager Living in Lava and Sand: Hia c-ed O'odam Subsistence." *Journal of the Southwest* (1989). |
| Nabhan, Gary P. and Carr, John L. eds., *Ironwood: An Ecological and Cultural Keystone of the Sonoran Desert*. Arlington, VA, USA: Conservation International with University of Chicago Press (1994). |
| Nabhan, Gary P. Plant Diversity Influenced by Indigenous Management of Freshwater Springs: Flora of Quitovac, Sonora, in Aridland Springs in North America: Ecology and Conservation. Lawrence E. Stevens and Vicky J. Meretesky, eds. University of Arizona Press, Tucson (2008). |
| Nabhan, Gary P. Working List of Native Plants with Probable or Documented Occurrence Along 62 Mile Border Between Tohono O'odham Nation Reservation Lands & Mexico, Memo to Lorraine Eiler and Austin Nunez of Tohono O'odham Nation (2024). |
| Rea, Amadeo et al. At the Desert's Green Edge: An Ethnobotany of the Gila River |

| |
|---|
| Pima. University of Arizona, Tucson (1997). |
| Underhill, Ruth M., Donald M. Bahr, Baptisto Lopez, Jose Pancho, & David Lopez. Rainhouse & Ocean: Speeches for the Papago Year. University of Arizona Press, Tucson (1979). |

**Attachment B: 2026 Working List of Native Plants with Probable or Documented Occurrence Along 62 Mile Border Between Tohono O'odham Nation Lands & Mexico**

| Scientific name | O'odham name or names | Common English Name | Uses, or inclusions in stories, songs or rituals that can be revealed | Sources of Documentation |
|---|---|---|---|---|
| Agave deserti | A'ud | Desert agave | Used for fermenting sacred "wine," and as an ingredient in face paint used by medicine men (*maakai*). | Bahr (1994); Nabhan (2008). |
| Agave murpheyi | A'ud Nonakam | Hohokam agave | Used for fermenting sacred "wine." | Nabhan (2008). |
| Ambrosia ambrosioides | Ñuñui jeej | Canyon ragweeds, chicura | Used in ceremonial "dry" sweats. | Felger, Warren, Anderson & Nabhan (1992); Nabhan (2008). |
| Anemopsis californica | Waawisa, Vavis | Yerba del manso | Medicinal and scared plant used by medicine men and women to take care of both staying sickness and wandering sickness including fever, impetigo, etc. | Bahr, Gregorio, Lopez & Alvarez (1974); Felger, Warren, Anderson, & Nabhan (2008). |
| Bursera fagaroides | Ko'otidam | Elephant-tree, Copal | Resin-like gum used in smoking and purification. | Austin (2010); Becerra, Yetman, & Ezcurra (2024). |
| Carnegiea gigantea | Haashañ, bahidaj (fruit) | Saguaro | Primary cactus used in fermenting a sacramental *nawait* cactus "wine" for *nawait* rain and *dahiwuak kii ceremonies*; O'odham boy turned into saguaro in Creation narrative; granted sacred personhood by all Tohono O'odham Nation district | Bahr et al. (1994); Bahr (2011); Eiler, Jose, Jose, Monti, Nuñez, Nabhan, Polacca & Trujillo (2021); Nabhan (2008); Rea (1997). |

| | | | | |
|---|---|---|---|---|
| | | | councils and tribal council in 2021. | |
| Datura discolor | Kotadopi | Desert thornapple, jimsonweed, sacred datura, toloache | Spiritually and physically dangerous hallucinogenic plant used in curing songs, including used in hunting songs by medicine men; avoided by others for fear of becoming entranced even by smelling it. | Bahr et al. (1984); Russell (1908); Nabhan (2008). |
| Descurainia pinnata | Su'uvad | Tansy mustard | In creation narrative after flood; a "fine (tansy) mustard-seed" rain. | Bahr (2001). |
| Fouquieria splendens | Melhog | Ocotillo | Primary building material for sacred roundhouses used in ceremonies. | Underhill, et al. (1979); Rea (1997). |
| Fraxinus greggii | Bitoi | Gregg's ash | Cocoons of *Eupackardia calleta* are deposited on this host plant and used to make ceremonial leg rattles by both Yaqui and O'odham spiritual leaders. | Felger & Molina (2024); *see also* www. speciesconnect.com/interaction/eupackardia-calleta-hostof-fraxinus-velutina/. |
| Fraxinus velutina | Bitoi | Velvet Ash | Also a host for *Eupackardia calleta,* the moth providing cocoons for rattles of pascola dancers. | Nabhan (2008); *see also* www. speciesconnect.com/interaction/eupackardia-calleta-hostof-fraxinus-velutina/. |
| Hymenocallis sonorensis | | Burroweed | This fragrant shrub is used to build the walls of ceremonial round houses used in the *Vi'igita* and *Nawait'iga* ceremonies. | Nabhan (2008). |
| Isocoma acradenia | Tatsagi | Alkali goldenbush, chamisa | Yellow flowers used in *Vi'igita* ceremony. | Nabhan (2008). |
| Larrea tridentata | Shegoi, shegai | Creosote bush, | Blessing wand at burials and water | Felger, Warren, Anderson & Nabhan (1985). |

| | | | | |
|---|---|---|---|---|
| | | gobernadora greasewood, hediondilla | purifications, medicine. | |
| Neltuma glandulosa | Kui, vihog (pods) | Honey mesquite, Mezquite | Used to build ceremonial roundhouses, firewood used in ceremonies. | Bahr (2001); Felger, Warren, Anderson, & Nabhan (1992). |
| Neltuma velutina | Kui, vihog (pods) | Mezquite, velvet mesquite | Used to build ceremonial roundhouses, firewood used in ceremonies. | Felger, Warren, Anderson, & Nabhan (1992). |
| Nicotiana obtusifolia | O'odham ha-vivga, Ban viiv | Coyote tabaco, desert tabaco, tabaquillo de coyote | Smoked ceremonially by O'odham medicine men to prognosticate where enemies are hidden; in Creation narrative about growing out of grandmother's grave on hilltop near San Pedro village. | Bahr et al. (1974); Felger, Warren, Anderson, & Nabhan (1992); Nabhan (2008); Rea (1997). |
| Peniocereus greggii | Ho'ok wa'o | Desert night-blooming cereus, reina de la noche, zaramatraca | Wand for ho'ok witch-like character in Creation narrative. | Felger, Warren, Anderson & Nabhan (1992). |
| Pleradenophora bilocularis | Hinaheta? | Mexican jumping bean | Host plant for cocoons of *Rothschildia cincta* and *Eupackardia calleta* moth used by pascola and deer dances of both the Yaqui and O'odham | Nabhan (2008). |
| Phragmites australis | Vapk | "Bamboo," carrizo, common reed grass | Possibly the bamboo cane through which the O'odham first emerged. "Bamboo" | Bahr (2001). |

| | | | | |
|---|---|---|---|---|
| | | | in Creation narrative after Great Flood. | |
| Pluchea sericea | Komahi u'us, u'us kokomadk | Arrow weed | Possibly the bamboo cane through which the O'odham first emerged. Canes used for purification in a 16-day ceremony of an O'odham who killed an enemy. It was also used for sucking out toxins by medicine men and women; "Bamboo" in Creation narrative after Great Flood. | Bahr (2001); Rea (1997). |
| Populus fremontii | Auppa | Alamo, cottonwoo d | Woven wreaths and crosses for Dia de Santa Cruz and Palm Sunday. | Felger, Warren, Anderson & Nabhan (1992). |
| Salix exigua | Ce'ul | Sauz, Willow | Woven wreaths and crosses for Dia de Santa Cruz and Palm Sunday. | Austin (2010); Nabhan (2008). |
| Salix goodingii | Ce'ul | Sauz, willow | Leafy twigs and branches used in and crosses for blessing houses on Dia de Santa Cruz and Palm Sunday. | Austin (2010); Nabhan (2008). |
| Salix lasiolepsis | Ce'ul Kohmagi | Sauz, willow | Leafy twigs and branches used in and crosses for blessing houses on Dia de Santa Cruz and Palm Sunday. | Austin (2008). |
| Salix taxifolia | Ce'ul | Sauz gris, Yew-leaf willow | Leafy twigs and branches used in and crosses for blessing houses on Dia de Santa Cruz and Palm Sunday. | Austin (2008). |
| Stenocereu s thurberi | Chuchuwis | Organpipe cactus, pitahaya dulce | Used in sacred rain ceremonies to ferment *nawait* cactus wine with or separate | Nabhan (2008); Nabhan, Rea, Mellink, Reichhardt & Hutchinson (1992). |

| | | | | |
|---|---|---|---|---|
| | | | from saguaro for rain ceremonies. | |
| Wislizenia refracta | | Jackass clover | Used in altars or shrines in *Vi'igita* ceremony. | Davis (1921); Nabhan (2008). |

**Attachment C: Location of Plants Confirmed Along the Border Between Tohono O'odham Nation Lands & Mexico**

| Scientific name | O'odham name or names | Common English Name | Confirmed along the TO Nation border with Mexico by SEINET |
|---|---|---|---|
| Agave deserti | A'ud | Desert agave | Just N & S of border on W end of reservation. But no dot ON border. |
| Agave murpheyi | A'ud Nonakam | Hohokam agave | No map; found 25 km N of border on E side near Topawa of TO res; 35 km s of border on W side at San Luisito. |
| Ambrosia ambrosioides | Ñuñui jeej | Canyon ragweeds, chicura | On border on W side of TO reservation by ORPI. |
| Anemopsis californica | Waawisa, Vavis | Yerba del manso | On border in Sonoita River drainage; specimen from just below border. |
| Bursera fagaroides | Ko'otidam | Elephant-tree, Copal | Found just N of border on TO Reservation in Baboquivari Mountains at Fresnal Canyon. |
| Carnegiea gigantea | Haashañ, bahidaj (fruit) | Saguaro | Found at Menagers Dam almost on border on W side of TO reservation, and likely all across TO reservation boundary. |
| Datura discolor | Kotadopi | Desert thornapple, jimsonweed, sacred datura, toloache | Found just S of border on W side of TO reservation & likely all the way across to reservation. |
| Descurainia pinnata | Su'uvad | Tansy mustard | Found all across TO reservation and just S of border as well. |
| Fouquieria splendens | Melhog | Ocotillo | Found all across TO reservation and just S of border as well. |

| | | | |
|---|---|---|---|
| Fraxinus greggii* | Bitoi | Gregg's ash | Found just E of Baboquivari Mountains near O'odham acorn gathering grounds, should be on TO reservation too. |
| Fraxinus velutina | Bitoi | Velvet ash | Found along arroyos sporadically across TO reservation. |
| Hymenocallis sonorensis | | | Found just E & off TO reservation boundary, S in O'odham oases in Sonora, but can be only where there are springs, LESS PROBABLE on TO border. |
| Isocoma acradenia | Tatsagi | Alkali goldenbush, chamisa | Found on TO reservation N of border and on line E and W of TO boundary, so should be all the way across. |
| Larrea tridentata | Shegoi, shegai | Creosote bush, gobernadora greasewood, hediondilla | Found all the way across TO S boundary. |
| Neltuma glandulosa | Kui, vihog (pods) | Honey mesquite, Mezquite | Probable largely on W side of TO reservation boundary, grading into N. velutina. |
| Neltuma velutina | Kui, vihog (pods) | Mezquite, velvet mesquite | Found all over TO reservation, including along nearly all of TO reservation boundary. |
| Nicotiana obtusifolia | O'odham ha-vivga, Ban viiv | Coyote tobacco, desert tobacco, tabaquillo de coyote | Found all over TO reservation, including along nearly all of TO reservation boundary. |
| Peniocereus greggii | Ho'ok wa'o | Desert night-blooming cereus, reina de la noche, zaramatraca | Found with close kin P. Striatus near Menagers Dam, just a little N of boundary by less than a mile. |
| Pleradenophora bilocularis | Hinaheta | Mexican jumping bean | Found near Menagers Dam just a little N of boundary by less than a mile. |
| Phragmites australis | Vapk | "Bamboo," carrizo, common reed grass | Found all over TO reservation, including along nearly all of TO reservation boundary. |

| | | | |
|---|---|---|---|
| Pluchea sericea | Komaghi u'us, U'us kokomadk | Arrow weed | Found on TO reservation N of boundary and right on border on far W side, probable several places in washes by TO boundary. |
| Populus fremontii | Auppa | Alamo, cottonwood | Found on TO reservation near springs, seeps, windmills and in intermittent washes all across TO reservation boundary. |
| Salix exigua* | Ce'ul | Sauz, Willow | Found on TO reservation near springs, seeps, and in intermittent washes all across TO reservation boundary. |
| Salix goodingii* | Ce'ul | Sauz, willow | Found on TO reservation near springs, seeps, and in intermittent washes all across TO reservation boundary. |
| Salix lasiolepis | Komaghi Ce'ul | Sauz, willow | Found on TO reservation on E side near boundary in Baboquivari Mountains. |
| Salix taxifolia | Ce'ul | Sauz gris, Yew-leaf willow | Found on TO reservation on E side near boundary in Baboquivari Mountains. |
| Stenocereus thurberi | Chuchuwis | Organpipe cactus, pitahaya dulce | Found all across S section of TO reservation and in Mexico on both immediate sides of TO boundary. |
| Wislizenia refracta | | Jackass clover | Found just W of TO reservation, but also E along boundary, should be along most of TO reservation near boundary. |
| * All plants in this table are documented on SEINET and confirmed by me to exist along the border within the Reservation's boundaries, except for those marked with an asterisk, which are confirmed to exist along the border near the Reservation but have not been specifically confirmed along the border within the Reservation. | | | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,

*Plaintiff*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants*.

Case No. 26-cv-2127

**DECLARATION OF REBECCA ORTEGA**

**DECLARATION OF REBECCA ORTEGA**

1. My name is Rebecca Ortega, and I am a Realty Specialist with the Tohono O'odham Nation Planning and Economic Development Department. In that role, it is among my responsibilities to maintain an up-to-date understanding of the lands within the Nation's Reservation, including their legal geographic status as reflected in their legal descriptions, and to ensure that the Nation's land data remains consistent with relevant federal land data with respect to lands within the Nation's Reservation.

2. Based upon my review of the relevant documentation and professional knowledge and experience regarding the ownership and legal status of the Nation's Reservation land base, I can attest that—with the exception of certain isolated allotted parcels, a handful of isolated parcels claimed by homesteaders or other claimants prior to the creation of the Executive Order Reservation, and pre-1955 mineral entries (none of which abut the Reservation's southern border)— all of the lands within the current Tohono O'odham Reservation's boundaries are held by the United States in trust for the Nation as Tribal Reservation trust lands.

3. I have examined the township, section, and range legal descriptions of the lands listed in President Wilson's Executive Order 2300—Further Reserving Additional Described Lands for Use by the Papago Indians in Arizona, January 14, 1916 ("1916 Executive Order").

4. I have also examined the township, section, and range legal descriptions of the lands listed in President Wilson's Executive Order 2524—Reserving Certain Lands in the State of Arizona for the Papago Indians in Arizona, February 1, 1917.

5. As a result of that examination, I have confirmed that the tracts reserved in the 1916 and 1917 Executive Orders are identical except for a roughly six-mile-wide strip of land running roughly east-west across the northern portion of the Reservation, which strip of land is excluded from the 1917 Executive Order (though it was restored by Congress in 1931).

6. As a result of that examination and by comparison with a physical map dated August 14, 2006 from the Tohono O'odham Department of Natural Resources of the Tohono O'odham Nation overlaid with Bureau of Land Management (BLM) Public Land Survey System (PLSS) data, I am also able to confirm that the following tracts that form the southern boundary of the Nation's Reservation under the 1916 and 1917 Executive Orders are contiguous with the U.S.-Mexico International Border:

T. 19 S., R. 1 W., all.

T. 19 S., R. 1 E., all.

T. 20 S., R. 1 E., all.

T. 20 S., R. 2 E., all.

T. 20 S., R. 3 E., all.

T. 21 S., R. 3 E., all.

T. 21 S., R. 4 E., all.

T. 21 S., R. 5 E., all.

T. 21 S., R. 6 E., all.

T. 22 S., R. 6 E., all.

T. 22 S., R. 7 E., W. 1/2.

7. To my knowledge, there have been no modifications to the Nation's southern boundary since the August 14, 2006 publication date of the map I reviewed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 15, 2026

Rebecca Ortega
Realty Specialist
Tohono O'odham Nation

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,

*Plaintiff*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendant*.

Case No. 26-cv-2127

**DECLARATION OF THOMASA RIVAS**

I, Thomasa Rivas, declare the following on the basis of personal knowledge to which I am competent to testify:

1. I am a citizen of the Tohono O'odham Nation and a member of the Ge Wo'o District, which runs along the southern border of the Reservation in the west. I am 67 years old.

2. I grew up in my district with my family. We lived near the Menanger's Dam. My family grew crops, and we would buy and trade our crops and goods with others. I grew up working in the fields with my parents. Even though I now live in Tucson, I still return to my home frequently.

3. My family has an ancestral burial ground which we take care of. Our ancestors are buried there, at a place in the mountains on the southern side of our territory, in Mexico. We

park on the U.S. side and walk across to Mexico to visit this site. We do this every six years. It is important to us that we be able to take care of our ancestors in this way, because our ancestors are part of our connection to our past. They gave us life and gave us the traditions that we continue to follow today. They gave us our way of life. So we must go and offer them our prayers, and pay our respects and our tribute to them, so that they know that they are not forgotten, just as we hope that our future generations will continue to honor and care for us. We continue to honor their ways, because those ways take care of us and help to keep our community together today. We pray for them so that they can continue to take care of us, guide us and help us in our lives today, as we try to take care of each other while honoring our way of life.

4. We also take care of our relatives when they pass today, and doing so remains a very important part of our culture. Recently, we lost my niece. Like many of our relatives, she was buried in Mexico. We wanted to have a funerary procession for her, like we have always done for many of our lost relatives. But these days, we have to ask permission. We have to give the government a list of those who will cross, and they must all have their identification. Their belongings can be searched. These requirements are a significant burden for many members of our community. When we buried my niece, only a few of us were able to cross.

5. If there is a border wall, it will be even harder for us to properly honor and take care of our ancestors and our relatives the way that we have been taught to do. When it is time to take our relatives to be buried, or to visit and care for their burial sites, we all want to go and to feel our spiritual connection to them, to remain connected even though they are no longer here with us in the same way. When we travel with them or to visit the place of their burial we want to hold them in our prayers and feel our connection. We do not want there to be a wall separating us

from them. We do not want to pass through a great wall that will make us feel separated from those that we have lost, and from our communities on either side of the border, and from our land which connects all of us.

6. In my district, there is an important ceremony, the Vígítha ceremony. It is held in July, on the Mexico side of the border, in the village of Quitovac. It is a ceremony of the Eagle. It is also a creation ceremony. This ceremony is where the Buzzard clan and the Coyote clan come together, and each clan has an important role to fulfill in the ceremony. Clan membership comes through the mother's side. My daughters and I are of the Buzzard clan. The men and the women also have their separate roles to fulfill. The ceremony is about our connection to each other, each group and person doing their part to maintain the ceremony as it was given to us, and fulfilling the ceremony in the way that we were told to do by our ancestors is very important to us. The ceremony cannot happen if the clans and the people cannot come together and fulfill their separate roles.

7. It used to be that everyone from either side of the border would come and attend the ceremony. There used to be only a cattle guard at the border crossing in our district, and everyone would be able to cross, and so they would all come. Because the passage is now more restricted at the border, fewer people can come.

8. A border wall through our territory, near the site of our ceremonies, will forever change the way that we are able to participate in our ceremonies. The Vígítha ceremony is about coming together, not only as a people but with our land and the plants and animals that are on it. It is central to our beliefs as it shows us that all things are connected. The air, the dust storms, and the waters during the monsoon. These are all connected to us, and a wall will change how the air and the water can move upon the land. It will block the animal migrations. It will block us

in as well. The wall is a wall. It will confine us, enclose us. In our tradition our people are not supposed to be confined, to be cut off from each other and from our land and our ancestors. A wall will cut off our spiritual connection between our territory and between one another, and our connection to our ancestors, our ceremonial sites, and our territory. It will dig up our ancestors and destroy our sacred sites. We are connected to our land, and our ceremonies are a part of the land. If the wall is put onto our land, it will destroy this connection to our people and our territory by physically and spiritually cutting through the middle of our communities and separating us from each other. This will damage the connectivity that is the basis of all of our ceremonies.

9. As a people, we have many ceremonies that involve travel. Our ancestors would make spiritual runs along the salt trail from our village to the salt plains in the south, on the Mexico side of the border. Our ancestors who did this run, who performed this ceremony, laid their prayers into the earth when they ran. Their prayers were put into the Earth, have become a part of the earth. Those prayers are there for us, continue to protect us and guide us today. Our people are sustained by these prayers that our ancestors have laid down for us.

10. If the government carves up the earth and destroys the trail to put in a wall across our territory, it will be as if they have taken a knife through the flesh of the earth, the flesh of our prayers. It will desecrate the site where our ancestors left these prayers. It will destroy these prayers, the prayers of our ancestors.

11. Even if we are allowed a gate to cross, this will still affect our ceremonies. Our journeys are spiritual journeys. The journey is our prayer. Our people traditionally did not have any gates or any barriers to cross. We cannot pray in the way that our ancestors prayed if we have to cross through this barrier to do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 11, 2026

/s/ *Thomasa Rivas*
Thomasa Rivas

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF MYLES TRAPHAGEN**

I, Myles B. Traphagen, declare as follows:

1. I have personal knowledge of each fact stated in this declaration, and if called as a witness could competently testify thereto.

2. I submit this Declaration regarding the Tucson 5 Project, a planned set of border wall projects consisting of approximately 63 miles of primary and secondary border walls on the Tohono O'odham Nation Reservation.

**A. Background and Qualifications**

3. I hold a Master of Science Degree in Geography from the University of Arizona and a Bachelor of Arts Degree from the University of California Santa Cruz in Environmental Studies. I conducted research in Hidalgo County, New Mexico, in the extreme southwest corner of the state that borders the Mexican states of Chihuahua and Sonora. This research resulted in my thesis, "Habitat connectivity for the white-sided jackrabbit (Lepus callotis) between the United States and Mexico: The border divides a species."

4. Since 1996, I have conducted field surveys, inventories, and research along the U.S. and Mexico border region and in Mexico. From 1996 to 1998, I worked for the U.S. Fish and Wildlife Service at San Bernardino National Wildlife Refuge in southeast Arizona, conducting bird surveys, grassland restoration, native fish surveys, monitoring artesian well flows, and the recovery of endangered native Rio Yaqui fish species.

5. From 2017 to 2026, I worked as the Borderlands Program Coordinator with Wildlands Network, researching and advocating for wildlife corridors and habitat connectivity. This entailed a significant amount of work in both the U.S. and Mexico on projects such as trail camera trapping, mapping, and designing projects for mitigating road and highway impacts and enhancing habitat connectivity. During this period, I mapped the U.S.-Mexico border wall in

California, Arizona, and New Mexico, providing geospatial data to members of Congress, numerous NGOs, and media outlets.

6. Since 2020, I have served as the Science Coordinator for the Malpai Borderlands Group, a consortium of ranchers in southeast Arizona and southwest New Mexico. In this role, I implement research and monitoring projects on wildlife, vegetation, climate and weather monitoring, and fire and grazing and coordinate projects related to conservation in the borderlands of Arizona and New Mexico.

7. From 2019 to 2023, I was an expert witness for the State of California for a series of lawsuits in the United States District Court for the Northern District of California captioned *State of California et. al., v. Biden et al.*, Case No. 4:19-CV-872-HSG ("*California I*"), *State of California et. al., v. Biden et al.*, Case No. 4:20-CV- 1563-HSG ("*California II*"), *Sierra Club et. al. v. Biden et. al.*, Case No. 4:19-cv-00892-HSG ("*Sierra Club I*"), and *Sierra Club et. al. v. Biden et. al.*, Case No. 4:20-cv-01494-HSG ("*Sierra Club II*"), challenging construction of border barriers on the southern border of the United States. As a component of this work, I provided scientific recommendations to the States, the Department of Homeland Security, and the Department of Justice to provide mitigation recommendations for wildlife, which resulted in the establishment of wildlife passages in the border wall in Arizona and New Mexico.

8. In 2022, I coauthored and published a peer reviewed publication titled "Spatial models of jaguar energy expenditure in response to border wall construction and remediation" in the journal Frontiers in Conservation Science. The research area was in the Pajarito Mountains, which lie only 10 miles to the east of the Baboquivari Mountains on the Tohono O'odham Nation. Our research found that the border wall cuts off springs and surface water availability for jaguar, therefore requiring them to expend more energy to find water sources.

9. In 2024, I coauthored and published a peer reviewed publication in Frontiers in Ecology and Evolution titled "USA-Mexico border wall impedes wildlife movement." Using an array of trail cameras on the border, our research concluded that in places where a border wall was built, there was an 86% reduction in the ability of 20 wildlife species to cross the wall. These species included mountain lion, black bear, mule deer, white-tailed deer, pronghorn, javelina, Gould's turkey, and numerous small and medium sized mammals like skunks and rabbits. Large animals, like black bear, deer, pronghorn, and male mountain lions, were stopped by the border wall in 100% of crossing attempts documented.

10. In 2010 and 2011, I conducted research for the New Mexico Department of Game and Fish to assess the population status of the white-sided jackrabbit in Hidalgo County, New Mexico. The species reaches its northern limit only 15 miles north of the U.S.-Mexico border, in a rural area that has a high rate of Border Patrol vehicle traffic. The results of these surveys estimated the U.S. population to number around 64 hares. Furthermore, survey results suggest that roadkill by the U.S. Border Patrol was a significant factor contributing to a threefold population decline of the hare in less than decade.

11. From 2022 to 2024, I was an expert witness for the State of New Mexico Attorney General's Office to inventory and evaluate damages caused by border wall construction to State Trust Lands that occurred between 2019 and 2021. My research and analysis in this matter focused on the effect of construction staging areas and grading on State-owned native grasslands leased to private ranchers as grazing lands. The construction activities resulted in the loss of forage and carrying capacity for livestock, as well as the introduction of invasive plant species to the area following construction, most likely brought in by heavy equipment from out of state.

12. From 2007 to 2014, I was a Bureau of Land Management Authorized Biologist and worked as a consultant on renewable energy projects in California and Nevada, surveying and translocating desert tortoise and inventorying rare plants and wildlife to ensure compliance under the Endangered Species Act and the National Environmental Policy Act.

13. In 2024 and 2025, I worked with the Tohono O'odham Natural Resources Department and the University of Arizona to deploy a network of trail cameras on the west side of the Baboquivari Mountains on the Tohono O'odham Nation to inventory wildlife occurrence and distribution on the Reservation.

14. In 2024, I participated in the Sonoran Pronghorn Connectivity project with the Center for Large Landscape Connectivity, which was comprised of a multiagency bi-national working group to assess Sonoran Pronghorn survival and connectivity, including the pronghorn recovery units on the Tohono O'odham Nation. The final report was published in September 2025 and is among the sources that form the basis of my opinion in this Declaration.

15. I am a member of the Borderlands Jaguar Linkages Group, which works to build and maintain corridors and connectivity for the jaguar and other large mammals in the Southwestern U.S. and northern Mexico. The Linkages Group includes the following organizations: The Northern Jaguar Project, Sky Islands Alliance, Cuenca Los Ojos, Profauna, Biophilia, Borderlands Restoration Network and Wildlands Network. I provide regional scientific expertise to the group, which includes mapping, land use, fire history, and wildlife habitat and connectivity. We maintain a network of trail cameras in both the U.S. and Mexico that monitors wildlife movements between the two countries.

**B. Executive Summary**

16. The Tucson 5 Project, a planned set of single or double border wall projects consisting of approximately 63 miles of primary and secondary border walls on the Tohono O'odham Nation Reservation, would fragment habitat, block wildlife movement, and damage ecologically critical and culturally sacred areas. These impacts have already been documented in adjacent lands where a border wall has already been built.

17. Three federally listed endangered species will be severely impacted by border wall construction: jaguar, Sonoran pronghorn, and ocelot. The walling off of the last open migration corridor between the U.S. and Mexico will put an end to the recovery of these rare and endangered species in the United States. See Attachment A for an overview of where and how these species interact with the Nation's Reservation.

18. Wall construction will consume large quantities of groundwater, alter surface water flow, and affect wildlife dependent on sparse surface water sources. Wells for groundwater are crucial for supplying domestic sources, livestock watering troughs that many animals, like deer and pronghorn take advantage of. The loss of these water sources could result in increased mortality of animals due to dehydration and the inability to reach scarce surface water sources.

19. Between 2019 and 2021 a groundwater well used for border wall construction adjacent to the San Bernardino National Wildlife Refuge drew an estimated 700,000 gallons per day. Following construction, the artesian wells which fed the pond system at the refuge for the protection of endangered native fish stopped flowing. Solar powered pumps had to be installed on the refuge to keep the water flows running, and several ponds had to be decommissioned because there was not enough water to supply them. A U.S. Fish and Wildlife hydrological study

conducted in 2021 quantified this process. Natural output of water from the artesian springs has not returned to the refuge five years after the groundwater extraction.

20. Construction activities—blasting, grading, road building, groundwater pumping—will destroy vegetation, increase erosion, displace wildlife, and accelerate invasive species spread. These impacts are consistent with what has already been documented in Organ Pipe, Cabeza Prieta National Wildlife Refuge, San Bernardino National Wildlife Refuge, and other lands adjacent to the Nation.

**C. Structure of Border Walls and Known Impacts**

21. The modern design of the border wall, also called bollard or pedestrian fence, is composed of 6-inch diameter and 1/4-inch-thick square steel tubing with columns that are 30 feet tall with 4-inch gaps between each tube. The steel beams are embedded in a 6-foot deep by 2-foot-wide concrete footer trenched into the ground. The deep trenching is known to dramatically increase erosion and mass wasting and has been a source of chronic repair in border wall segments immediately east of the Tohono O'odham Reservation for the last six years. At the top of the structure is a flat 3-foot piece of 1/4 inch sheet metal welded onto the steel bollards to create a slick no-climb surface. The purpose of this structure is to impede all human entry and passage. This also results in the inability of most wildlife to pass through.

22. The 2024 Arizona study that I co-authored found that wildlife crossings for 20 species observed dropped by 86% where border wall segments were built. For large animals like deer, pronghorn, and black bear, 100% of crossing attempts were blocked by the border wall. See Paragraph 9.

## D. Border Wall Impacts on Jaguar Populations

### i. Recovery of Jaguar Populations in the Baboquivari Mountains

23. The jaguar (Panthera onca) is a Federally listed endangered species which reaches its northern range in southern Arizona, with a notable occurrence in the Baboquivari Mountains, which form the eastern boundary of the Tohono O'odham Nation. It is the world's third largest cat and ranges throughout most of Mexico, Central America, and South America. After a period of sparse occurrence in the U.S. following a century of overhunting and predator control, the first live jaguar was photographed in 1996 by rancher and professional hunting guide Warner Glenn in the Peloncillo Mountains of southeastern Arizona. Glenn later authored the book "Eyes of Fire" about his encounter with the jaguar. Six months later a second jaguar, the male "Macho B," was photographed in the Baboquivari Mountains by Jack Childs, a professional hunter and author of the book "Ambushed," about his trail camera work that documented this jaguar.

24. Between 1996 and 2009 Macho B, was repeatedly photographed utilizing the entire length of the Baboquivari range and the adjacent Atascosa Mountains in Pima County of southern Arizona. In 1996, Childs encountered Macho B less than one mile from the Tohono O'odham border. He later tracked him onto tribal land. The Baboquivari Mountains provide rugged, heavily vegetated habitat with low human density that provides secure cover, prey, and refuge. His 13-year residency demonstrates that the landscape between northern Sonora, the Altar Valley, the Atascosa Mountains and the Baboquivari Mountains was permeable, connected, and ecologically suitable for a large carnivore requiring extensive territory. See Attachment B for a graphic description of Macho B's movements.

25. Since 1996, seven more jaguars have been documented in the U.S. at more frequent intervals. Trail camera videos and photographs of different jaguars taken by the University of Arizona Wild Cat Conservation Center and Sky Island Alliance demonstrate a pattern of documented jaguar habitat in the same historically known locations.

26. Following these sightings and acknowledging that the jaguar was recolonizing its former range in the US, in 2014 the U.S. Fish and Wildlife Service declared approximately 764,000 acres of land as critical habitat for the jaguar. The designation of critical habitat was composed of six separate units distributed across Pima, Santa Cruz, and Cochise Counties in southern Arizona, and Hidalgo County in southwestern New Mexico. The Baboquivari Mountain unit (Unit 1), shares the eastern boundary of the Tohono O'odham Nation. It encompasses approximately 63,000 acres, and includes the Baboquivari, Saucito, Quinlan, and Coyote Mountains. This westernmost critical habitat unit protects a major rugged mountain corridor heading toward the Mexican border. This is the same mountain range where Macho B, the second live jaguar photographed in the US, was first documented in 1996 by hunter Jack Childs, who followed the jaguar onto the Reservation in the Baboquivari Mountains.[1]

27. The U.S. Fish and Wildlife Service has determined that the Baboquivari Mountains (Unit 1) contain the essential Primary Constituent Elements required to sustain jaguars in the northwesternmost extent of their range, which include the following physical and biological attributes:

1) Expansive, Undeveloped Space: Provides vast, contiguous patches of land needed to accommodate the large home ranges and long-distance movements of solitary male jaguars.

---

[1] Relatedly, the 145,000-acre Atascosa critical habitat unit lies about 12 miles to the east of the Baboquivari Unit and was also part of the documented home range of Macho B. The study referenced in Paragraph 8 occurred in the Atascosa Unit, which exhibits similar conditions to the Baboquivari Unit.

2) Rugged Terrain: Features steep slopes, rocky outcrops, deep canyons, and high-altitude ridgelines used for concealment, stalking, and resting.
3) Native Vegetation Cover: Consists of Madrean evergreen oak woodlands and Sonoran desert scrub / semi-desert grasslands that offer essential cover for hunting and shelter.
4) Stable Prey Base: Supports healthy populations of native large and medium-sized mammals, primarily white-tailed deer, mule deer, and javelina.
5) Access to Surface Water: Contains perennial, intermittent, or ephemeral water sources (such as springs, tinajas, and canyon streams) within 20 km (12.4 miles) of each other.
6) Low Human Footprint: Maintains an environment mostly free of major infrastructure, heavy vehicle traffic, and dense human populations that could disrupt animal movement.
7) Border Connectivity: Forms a continuous, unobstructed geographic corridor stretching south to the U.S.-Mexico border, enabling jaguars to travel northward from the breeding population in Sonora, Mexico.

**ii. The Border Wall Will End Jaguar Migration into Tohono O'odham Lands.**

28. Macho B's case serves as a baseline for understanding the critical habitat that could be irrevocably disrupted by construction of a border wall across the Nation's southern border. The long-term presence of Macho B in the Baboquivari Mountains demonstrates that this region has historically functioned as a viable jaguar corridor, linking Sonora to southern Arizona.

29. A border wall across the Tohono O'odham Nation, specifically the Baboquivari Mountains, would block the only remaining migratory route between the nascent Arizona jaguar population and the more robust breeding populations in Sonora. In 2021, a 23-mile-long border wall was constructed from the Pajarita mountains to the east, stopping just two miles east of the Tohono O'odham Nation at the southern foot of the Baboquivari Mountains. Currently, a secondary border wall is being constructed in the Pajarita Mountains, Patagonia Mountains, Santa Cruz River, San Rafael Valley, and Huachuca Mountains, with the plan to extend the same primary and secondary border wall system further west across Reservation lands connecting to Organ Pipe Cactus National Monument at the western end of the Reservation. It is

the extension of this border wall across the reservation that threatens the continued existence of the jaguar on the Tohono O'odham Nation.

30. All these locations have repeatedly documented jaguar, but these migration corridors will be rendered ineffective when wall construction is complete. The last remaining unwalled jaguar corridor is the Baboquivari Mountains, half of which lies on the Tohono O'odham Nation. Severing this migratory route would expose animals to excessive energy expenditure while attempting to navigate around the border wall and increased risk of starvation and dehydration because they would not be able to access historical locations for food, water, and shelter. It would also isolate breeding populations, cutting the U.S. population off from the more established and genetically diverse populations in the south. This would render recovery of the species impossible and accelerate regional extinction risk by isolating individuals on either side of the border.

### E. Border Wall Impacts on Sonoran Pronghorn

#### i. Sonoran Pronghorn Population on the Nation's Reservation and Surrounding Territory

31. The Sonoran pronghorn (Antilocapra americana sonoriensis), colloquially known in America as "antelope," is a federally listed endangered species endemic to the Sonoran Desert, with a historical range that includes all the current Tohono O'odham Nation. It has been listed since 1967 under the Endangered Species Preservation Act, which predates the Endangered Species Act of 1973. It is also federally listed in Mexico under the equivalent environmental regulation of NOM-059-ECOL-1994. A truly bi-national species, it ranges between the U.S. and Mexico with a roughly even distribution between the two countries.

32. Mexico and the United States have collaborated for decades on a binational recovery plan. The species nearly went extinct in 2002, when its numbers dropped to just 21

individuals following severe drought conditions. The lack of connectivity between herds, largely due to roads and other barriers, impeded the ability of the animals to find suitable habitat, forage (green vegetation), and water availability. Despite being the second fastest land animal on earth with an ability to travel great distances, the species is at great risk due to a severe prolonged drought, habitat fragmentation by roads and border barriers, and genetic bottlenecks due to a low population size that contributes to inbreeding depression. The border wall would compound these factors greatly.

33. Approximately 460 animals live in three management units in Arizona, with a total target population of 525. The target population is the number of animals that are deemed necessary to maintain a viable population, and acts as the official recovery milestone needed to remove the endangered Sonoran pronghorn from the Endangered Species Act list. Because border fences and major highways isolate United States and Mexican herds, wildlife managers set target numbers for individual "recovery units" to protect genetic diversity across their entire habitat. Each management unit has a target population that is based upon the size and predicted carrying capacity of the unit. Meeting this population goal prevents the herd from shrinking to levels where inbreeding and high fawn mortality threaten extinction.

34. One of the three management units, Sauceda, is on the Tohono O'odham Nation. This unit has been assigned a target population number of 150 individuals. However, 2023 survey data indicate that only 37 individuals occupied the unit at that time. With the population level being so far below the target, this population is extremely vulnerable to risk of local extinction, particularly because it does not have adequate connectivity to the adjacent Cabeza unit.

35. The Quitovac Sonoran pronghorn management unit in Mexico lies less than 20 miles south of the Tohono O'odham Nation. In 2023, 449 animals were reported (with a target of 450), which suggests that this population is robust, and has the potential to contribute animals to the Sauceda population on Tohono O'odham lands. Maintaining an unbroken corridor and connectivity between the Quitovac unit in Mexico and the Sauceda unit is therefore a vital linkage for the survival of the small population that exists on the reservation and represents one of a few remaining opportunities for the species to reoccupy its former range on the reservation and throughout the region.

**ii. Survival of the Sonoran Pronghorn will be severely impacted by construction of a border wall on the Nations' Reservation.**

36. If a 30-foot steel wall is built across the reservation, the impacts on the Sonoran pronghorn will be severe for three main reasons:

37. **Severing the Gene Pool**: The Sonoran pronghorn is a critically endangered subspecies. Animals with low populations are inherently at risk of inbreeding depression. For decades, intensive conservation efforts in Arizona (at the nearby Cabeza Prieta National Wildlife Refuge and Organ Pipe Cactus National Monument) and in Sonora, Mexico, have worked to save them from extinction. The pronghorn rely on crossing the border to access greater genetic variety and thereby prevent inbreeding depression. A physical wall permanently divides the U.S. and Mexican populations, greatly impacting the population's access to genetic diversity critical to its continued viability.

38. **Blocking Climate Adaptation**: The Sonoran Desert is a dynamic, unpredictable environment where rainfall occurs sporadically in both space and time. Pronghorn survive by being nomadic because they track localized monsoon rainstorms across vast distances to find forage and seasonal water holes. If a drought strikes Arizona, the herd may migrate south

into Sonora where it might have rained, and vice versa. Cutting their available habitat use in half deprives them of available options, leaving the segregated populations on either side of the barrier highly vulnerable to starvation or dehydration. The past five years have been the hottest and driest conditions in recorded history in the region. Disrupting the population's ability to roam in search of more viable territory under such conditions imposes significant risks to the populations' continued viability.

39. **Groundwater and surface water use**: Building a border wall, and in this case potentially a double-wall system, requires hundreds of thousands, if not millions, of gallons of groundwater per day to mix concrete and suppress dust. At the San Bernardino National Wildlife Refuge east of the reservation, 700,000 gallons of groundwater per day was extracted for border wall construction in 2020, and the artesian wells that flowed for thousands of years in the San Bernardino valley ceased to flow. Solar powered pumps had to be installed, and since then the wells of the refuge have been "on a ventilator."

40. For over 50 years, intensive efforts have been applied to the recovery of the Sonoran pronghorn. It is a binational and multi-agency effort in which tens of millions of dollars have been spent on its recovery, yet the species is suffering the proverbial "death by a thousand cuts." Habitat fragmentation by highways, fences, and border barriers has been a large cause of the species' decline. The construction of the border wall at Cabeza national wildlife refuge, the core of its habitat in the region, has further exacerbated fragmentation. More frequent and hotter drought conditions have been a continued stress on the pronghorn, and this new normal is showing no signs of abating. The population of Sonoran pronghorn on the reservation is the smallest of the recovery units and one of the most vulnerable. They have very few options, and the construction of a border wall across tribal lands will further reduce any opportunities it has

towards a healthy recovery. The loss of this charismatic and iconic species for the Tohono O'odham people will be felt for generations to come. If the effects of the proliferation of highways and fences, which function similarly to border barriers, is any indicator of what to expect for the pronghorn in the future, then there is a monumental risk that the construction of a border wall across the U.S.'s southern border could doom the species to extinction in its historical range on Tohono O'odham lands.

**F. The Tohono O'odham Nation can provide habitat for Ocelot.**

41. Ocelots were once widespread across southern Arizona but are now exceedingly rare. Most ocelots found in Arizona are believed to disperse northward from breeding populations in the Mexican state of Sonora. The northernmost documented breeding population for ocelot occurs 30 miles south of the U.S.-Mexico border within roaming range of the Reservation and was documented by retired U.S. Fish and Wildlife Service Biologist Jim Rorabaugh, who published a paper on this population in 2020, titled "Ecology of an ocelot population at the northern edge of the species' distribution in northern Sonora, Mexico."

42. In 2024 an ocelot was photographed in the Pajarito Mountains, which, not coincidently, was in the Atascosa jaguar critical habitat unit, less than 20 miles to the east of the Tohono O'odham reservation. This same ocelot has also been photographed in the Patagonia Mountains, Whetstone Mountains, and Santa Rita Mountains, demonstrating that wildlife corridors between these ranges remain active. Researchers determined that this ocelot traveled at least 111 miles between these mountain ranges, making this the longest documented movement by an ocelot in the United States. See Attachment C-Ocelot. Figure from Harrity, E. & Ragan, K., "One small cat and 178 kilometers: longest-known displacement movement by an endangered ocelot (Leopardus pardalis)." *Therya Notes*, 7(1), 51–57 (2026).

43. The cultural connection to the ocelot is strong for the Tohono O'odham. In 2026, youth from the Nation's San Xavier District participated in a community process to name this ocelot, choosing "Himdam" an O'odham word meaning "traveler" to acknowledge his wide-ranging journey across the borderlands. Tribal youth worked with O'odham language speakers and conservation groups to select the name, reflecting the strong connection between wildlife conservation and cultural heritage.

44. A double border wall system is being constructed 30 miles north of the northernmost ocelot breeding population in Mexico. Given the fact that Himdam was documented traveling 111 miles, with a portion of that journey only occurring 12 miles southeast of the reservation, it is likely that Tohono O'odham lands could provide an alternative migration corridor between Mexico and the U.S. for ocelot such as Himdam, particularly once other viable corridors have been cut off by border wall construction and other barriers.

**G. Conclusion**

45. A border wall on the Tohono O'odham Nation would have significant ecological consequences because the reservation encompasses some of the most intact, unwalled wildlife habitat remaining along the U.S.–Mexico border. Many species depend on the ability to move freely across the international boundary to find food, water, mates, and seasonal habitat. A border wall will fragment these habitats, isolate wildlife populations, and reduce genetic diversity by preventing animals from dispersing between populations in Arizona and Sonora.

46. Species that would be most affected include the endangered Sonoran pronghorn, which relies on large expanses of open desert and must move long distances during droughts to locate forage and water, and the jaguar and ocelot, which disperse north from Mexico into Arizona. These rare and endangered wildlife will lose access to critical habitat and

movement corridors. But it is not just the rare and threatened species that will suffer if a wall is built. The common resident wildlife, such as desert bighorn sheep, mule deer, black bears, mountain lions, javelinas, and numerous smaller mammals and reptiles, will also experience reduced connectivity across the landscape and be deprived of their basic needs and resources to fulfill their life cycles.

47. Beyond restricting movement, border wall construction will damage sensitive desert habitats through road building, vegetation clearing, increased erosion, and disruption of natural water flows. The Sonoran Desert experiences intense seasonal rains, and walls are barriers that trap debris and alter drainage patterns, potentially causing localized flooding and habitat degradation. Artificial lighting, increased vehicle traffic through the Nation, and human activity associated with wall infrastructure will further disturb wildlife behavior and reduce habitat quality.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: June 16, 2026

Myles B. Traphagen

Myles B. Traphagen

# ATTACHMENT A




This map is for illustrative purposes only. Sonoran pronghorn unit polygons have been simplified for ease of clarity and do not represent exact boundaries. For actual legal descriptions see U.S. Fish and Wildlife Service. 2016. Recovery Plan for the Sonoran pronghorn (Antilocapra americana sonoriensis), Second Revision. U.S. Fish and Wildlife Service, Southwest Region, Albuquerque, New Mexico, USA.

# Appendix A- Overview

# ATTACHMENT B




This map is for illustrative purposes only. Actual coordinates for jaguar locations are not for public use, so positions are approximated. See: U.S. Fish and Wildlife Service. 2018. Jaguar Recovery Plan (Panthera onca). U.S. Fish and Wildlife Service, Southwest Region, Albuquerque, New Mexico.

## Appendix B- Detail

Jaguar Macho B range in proximity of Tohono O' odham Nation 1996-2009

# ATTACHMENT C

# Appendix C- Ocelot






**Figure 1.** Four detections of the same male ocelot (*Leopardus pardalis*) in four different mountain ranges in Arizona, USA during 2024 and 2025.White dots represent detection locations and dashed lines represent simplified movements between detections. Rancho El Aribabi (black dot) is home to the northernmost breeding population of ocelots in Sonora, MX. Pedestrian walls (shown in red) are steel bollard-type walls between 5.5 - 9.1 m tall and with interstitial spaces averaging ≤ 10 cm. Yellow indicates where construction of pedestrian walls was announced or initiated in 2025. Vehicle barriers (shown in blue) are variable structures designed to stop vehicle but not pedestrian traffic.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF JOHN ROBERT WELCH, Ph.D**

I, JOHN ROBERT WELCH, declare as follows:

1. The facts set forth in this declaration are based on my personal knowledge and professional experience and, if called as a witness, I can competently testify thereto under oath.

2. I am a tenured full professor in the Department of Archaeology at Simon Fraser University in British Columbia, Canada. I have advanced through the faculty ranks to this position since my 2005, pre-tenured appointment as a Canada Research Chair in Indigenous Heritage Stewardship. I teach courses, supervise graduate students, and maintain research and outreach programs centered on the advancement of knowledge concerning Indigenous People's responsibilities for taking care of culturally significant places, belongings, and traditions.

3. My peer-reviewed publications since 2020 have, among other topics, provided

expert recommendations for improvements to cultural landscape studies, to cultural resource damage assessments, to inter-regional trails investigations, and to geoforensic studies in support of archaeological resource crime investigations. I have also published recently on treaty rights in relation to proposed alterations to Indigenous lands and on appropriate nomenclature for petroglyphs and pictographs. My curriculum vitae is included as **Attachment A** of this Declaration.

4. I serve as the vice-president for preservation and collaboration at the nonprofit Archaeology Southwest, a position that has become the vehicle and context for most of my research and outreach. Since joining Archaeology Southwest in 2018, my duties have grown to include supporting programs that provide technical assistance and training to Tribes in the implementation of the Native American Graves Protection and Repatriation Act (NAGPRA) and the Archaeological Resources Protection Act (ARPA). I am also responsible for advocating for the protection of imperiled heritage sites and landscapes and for stewarding Archaeology Southwest's 23 small preserves, each of which protects one or more culturally significant places. The position entails supervision of a diverse team of archaeologists and museum specialists and collaboration with about a dozen Tribes, including the Tohono O'odham Nation (Nation), and another dozen or so governmental and non-governmental organizations, including the U.S. Bureau of Indian Affairs, the Conservation Lands Foundation, and The Nature Conservancy.

5. I have a lifelong interest in the natural and human history, geography, and management of the American Southwest. I earned a master's degree and a PhD in anthropology from the University of Arizona, Tucson in 1985 and 1996, respectively. My dissertation research was on White Mountain Apache Tribe land and on how ancestral Hopi and Zuni communities present there in the 1200s and 1300s shifted toward reliance on farming. That research and my

work with Apache crews as a wildland firefighter laid foundations for my career at the interface of resource stewardship and related Indigenous values, interests, and preferences.

6. I am a registered professional archaeologist (RPA 10027) and have worked in the field for 42 years. From 1984 to 1989, I worked for the University of Arizona, where I helped train students and conduct archaeological excavations and site surveys as part of the Summer Archaeological Field School at Grasshopper, White Mountain Apache Tribe land. I was employed by Statistical Research (1990–1993), a private consulting firm, to direct research into ancient farming and land use in the Tonto Basin and Lower Verde areas, both in central Arizona.

7. Beginning around 1986, while a graduate student at the University of Arizona, I started visiting the Nation's landscapes and archaeological sites and learning about O'odham history and land use. I was intrigued by southern Arizona's culturally infused landscapes, by the reports of archaeological excavations I studied in my coursework, and by remote tracts of the Sonoran Desert on the Nation's land, located only about an hour's drive west from the University of Arizona. My graduate studies included instruction and encouragement from the late archaeologist Emil Haury, the most prominent Arizona archaeologist of the 1900s, and a close student of O'odham lands and histories.

8. My expanding interests in southern and central Arizona lands and archaeologies led me to employment in 1992 by the U.S. Department of the Interior at the Safford District Office of the U.S. Bureau of Land Management. Late in 1992 I transferred to the U.S. Bureau of Indian Affairs (BIA), where I served as the Fort Apache Agency Archaeologist (1992–2005) and, beginning in 1996, as the White Mountain Apache Tribe's historic preservation officer (THPO). In those years of "reinventing government," a policy promulgated by the Clinton White House to boost intergovernmental cooperation, the agency and the Tribe collaborated to create

efficiencies by adopting shared practices for integrated compliance with federal laws and tribal policies. Local adoption of this federal policy afforded truly unprecedented opportunities for the Fort Apache Agency of the BIA to serve the Tribe's interests and for me to provide technical assistance in pursuit of a broad spectrum of cultural resource initiatives.

9. Although my THPO duties focused on protecting archaeological and cultural sites from economic and community development projects, the Tribe and BIA also entrusted me with proactive preservation and adaptive reuse of highly significant places, especially the Cibecue Lutheran Mission Chapel, Grasshopper Pueblo, and the two national historic landmarks owned and cared for by the White Mountain Apache Tribe, Fort Apache and Kinishba Pueblo. My THPO works also extended to working relationships with multiple Tribes' elected and cultural leaders, including the Nation's, to implement statutes intended to protect and assure respectful treatment of ancestors, cultural belongings, and sites. These statutes included NAGPRA, the National Historic Preservation Act (NHPA), the National Environmental Policy Act (NEPA), the American Indian Religious Freedom Act (AIRFA), and associated federal statutes, regulations, and policies. My THPO position allowed me to train Apache scholars and technicians and to support establishment of other tribal historic preservation offices, including the Nation's and the San Carlos Apache Tribe's.

10. My sustained participation in intertribal collaborations featured opportunities to receive guidance from many venerable elders, including the late cultural preservationist Joseph Joaquin, who directed the Nation's NAGPRA efforts through the 1990s and most of the 2010s. Mr. Joaquin helped set the pace and tone for intertribal responses to major land alteration projects and NAGPRA initiatives. Further, Mr. Joaquin demonstrated the benefits of integrating academic and community scholarship to advance interests shared by the Nation and other Tribes.

My THPO duties required me to listen carefully to Apache, O'odham, Hopi, and Zuni historians and cultural leaders and to facilitate plans for mobilizing the knowledge they shared. This work influenced my knowledge of the Nation and its lands and my enduring commitments to using archaeological knowledge and perspectives to obtain recognition for Tribes' right to safeguard, control, and make appropriate use of their cultural resources, often including the land itself.

11. Archaeology Southwest, my employer since 2018, has collaborated with the Nation since at least 1999. The Archaeology Southwest mission embraces efforts to document, assess the significance of, protect, and share appropriate information about archaeological and cultural resource sites and landscapes meaningful to the Nation and its members. This definition of cultural resources includes traditional cultural landscapes and sacred sites. As one example of this type of work, beginning in 2000, Archaeology Southwest enlisted a group of the Nation's historians and cultural specialists in a multi-tribal assessment of the San Pedro Valley, the eastern edge of O'odham Jewed̲, which is the blanket term for the territory under O'odham control and use at the time of Euroamerican contact. The San Pedro Valley is a remarkably intact cultural landscape of villages, farms, trails, and resting places. I served Archaeology Southwest as an unpaid advisor and "humanities scholar" for this project and helped facilitate field visits, consultations, and follow-up research with various collaborators. The most prominent result of the project is the widely cited 2006 book, *History Is in the Land.*[1] The work also catalyzed ongoing projects, including an effort I am currently leading to obtain a formal determination of eligibility for listing the entire San Pedro Watershed in the National Register of Historic Places as a traditional cultural place because of its deep and continuing significance in Apache, Hopi,

[1] Ferguson, T. J., and Chip Colwell-Chanthaphonh. 2006. *History Is in the Land: Multivocal Tribal Traditions in Arizona's San Pedro Valley*. University of Arizona Press, Tucson. https://uapress.arizona.edu/book/history-is-in-the-land.

O'odham, and Zuni cultures.

12. Upon joining Archaeology Southwest, when the first Trump Administration began pursuing the construction of barriers along the U.S. border with Mexico, I reacquainted myself with ethnographic and archaeological evidence for O'odham religious practices that might be interrupted or impaired by the construction of a border wall along the southern border of the Nation's Reservation. My familiarity with published sources of information, along with my past and current experiences working with the Nation's officials, provide the basis for my opinions in this declaration.

13. For the O'odham, the Sonoran Desert is more than just a physical expanse of mountains, valleys, and watercourses—it is a living sacred landscape. The natural landforms that populate the Nation's land, including mountains, washes, hills, springs, and the Gulf of California (Sea of Cortez) to the south, are visual landmarks that embody and relate O'odham creation stories, pronounce and reaffirm the spiritual order, and mark and preserve pathways carved by the O'odham through religious practice over millennia. The sacred landscape is not just a backdrop upon which the O'odham practice their religion; it is an essential and living participant in and conduit for these rituals. The O'odham landscape is both source and destination for essential, inveterate efforts to sustain spiritual balance and harmony at the individual, collective, and cosmological levels. This balance is best encapsulated as the O'odham Himdag, perhaps best understood by English speakers as *way of life* or *worldview*.

14. O'odham believe that Himdag must be maintained in thought, word, and action in relation to all persons and elements of the natural world, and that some illnesses emerge from imbalances resulting from individual or group spiritual transgressions. One type of illness, "staying sickness," is different from illnesses that "wander" and are thus shared by and with

other people. O'odham medical practitioners are also religious leaders and specialize in making diagnoses of the causes of sickness and typically trace staying sickness to the "strength" of powerful non-human entities, such as plants, animals, or minerals that have been offended by human action.[2] O'odham "contract [staying] sicknesses because they have behaved improperly toward a dangerous object which was endowed with dignity at the time of creation." Among the cures for staying sickness prescribed by the medicine man or woman is a pilgrimage to the south to find and make amends with the offended being or object in its home.[3]

15. Himdag has limitless spiritual, cultural, and physical implications and manifestations. Archaeological evidence from the Gila River Valley west of its confluence with the Salt River and south to the Rio Sonora reflects this framing of the O'odham worldview and provides many clear material indications of centuries-old, religiously infused practices linking areas and peoples north and south of the current international boundary. It is noteworthy that the Tohono O'odham landscape south of the Gila River is structured by north-south trending mountain ranges, valleys, and stream channels. Ancient trails conform to this overall landscape structure by aligning and connecting population and agricultural areas in the north to the Sea of Cortez.[4]

16. Early anthropological studies of O'odham culture and religion confirm that people living in residential and agricultural areas to the north of the current international boundary

---

[2] Bahr, Donald M. 1983. Pima and Papago Medicine and Philosophy. In *Southwest*, edited by Alfonso Ortiz, pages 193–200. Handbook of North American Indians, vol. 10, William C. Sturtevant, general editor. Smithsonian Institution, Washington, D.C. Pages 195–198.
[3] Bahr, Donald M., Juan Gregorio, David I. Lopez, and Albert Alvarez. 1974. *Piman Shamanism and Staying Sickness (Ká:Cim Múmkidag).* (Donald M. Bahr, Anthropologist; Juan Gregorio, Shaman; David I. Lopez, Interpreter; Albert Alvarez, Editor). University of Arizona Press, Tucson. Page 22.
[4] Hayden, Julian D. 1972. Hohokam Petroglyphs of the Sierra Pinacate, Sonora, and the Hohokam Shell Expeditions. *The Kiva* 37(2):74–83. Erickson, Winston P. 1994. *Sharing the Desert: The O'odham in History*. University of Arizona Press, Tucson.

maintained integral connections to other human communities and to physical and spiritual resources to the south. The single most critical resource of the south is water, with the majority of life-sustaining precipitation on O'odham land originating from the Sea of Cortez. Traditional O'odham religion prominently features prayers and rituals to sustain access to rain spirits and maintain the pathways for summer monsoon and winter rains needed to support desert life. Traditional healers—medicine men and women—use other prayers and rituals to maintain broadly similar spiritual pathways from the south as means for accessing the essential powers of plants, animals, minerals, and landscape elements of the natural world, the medicine required to cure illnesses by restoring balances disrupted by disrespectful actions or other affronts to powerful beings.[5] Also intrinsically linked to the south are salt flats along the shores of the Sea of Cortez. Enigmatically, while these distinctive coastal features provide almost no habitat for plants or animals, the dietary supplement they provide was critical to O'odham life through much of the 1900s. As discussed below, the salt flats continue to serve as the objective for the spiritual initiation pilgrimage for O'odham boys and, for some O'odham religious adherents, as the final destination for spirits of deceased community members.

17. Among the most elaborate and widely practiced O'odham rituals is the centuries-old Wi:gita Ceremony (also Vikita, Navai't, or Wine Ceremony). The Wi:gita Ceremony marks the beginning of the O'odham annual calendar and attracts participants from communities across O'odham land to acknowledge and rejoice in the commencement of the monsoon summer rains. The most sacred and possibly original location of the Wi:gita Ceremony is the village of Quitovac, Sonora, Mexico, located directly south of the Nation's Arizona trust lands.[6] Many of

[5] Bahr 1983, *supra* note 2.
[6] Davis, Edward H. 1920. The Papago Ceremony of Víkita. *Indian Notes and Monographs* 3(4). Museum of the American Indian, Heye Foundation, New York.

the Nation's citizens seek to participate in the Wi:gita whenever it is observed in Quitovac.

18. When the time comes to host the Wi:gita, O'odham men traditionally run to invite neighboring villages. The ceremony entails several days of dancing, singing, reenactment of O'odham creation stories, and celebration of the annual harvest of saguaro cactus (Carnegiea gigantea) fruit through the drinking of fermented saguaro fruit juice.[7] Participants "sit and drink" the wine, singing and speaking supplications to rain spirits.[8] Some of these ritual orations lament the "dry and pitiful" condition of land in need of rain. Speakers may also describe a runner's journey to a distant "rainhouse" that is replete with "winds, clouds, and seeds" with the goal of convincing the wind to bring the rain and nourish land to the north.[9]

19. Far more than an isolated rain or harvest ritual, the Wi:gita Ceremony is best understood as a mechanism for maintaining and reaffirming the O'odham Himdag and the Nation's unity and sovereignty across vast distances. Has:an (saguaro) are sacred to O'odham and their natural distribution defines the outer limits of O'odham land and resource use. In 2021, the Nation's Legislative Council passed Resolution 21-137, declaring that "the Tohono O'odham and sister O'odham tribes, hold the Ha:san in the highest regard and consider the Ha:san as an O'odham person."[10] Saguaro National Park, near Tucson, prohibits the removal, alteration, or consumptive use of any natural or cultural resource, but formally recognizes and supports

---

[7] Toupal, Rebecca S., Henry F. Dobyns, and Richard W. Stoffle. 2006. Traditional Saguaro Harvest in the Tucson Mountain District, Saguaro National Park, Final Report. Bureau of Applied Research in Anthropology, University of Arizona. https://npshistory.com/publications/sagu/tmd-saguaro-harvest.pdf. Underhill, Ruth M. 1946. *Papago Indian Religion*. Columbia Contributions to Anthropology Vol. 33. Columbia University Press, New York. Pages 41–67.

[8] Underhill, Ruth M., Donald M. Bahr, Baptisto Lopez, Jose Pancho, and David Lopez. 1979. *Rainhouse and Ocean: Speeches for the Papago Year*. University of Arizona Press, Tucson. Page 24.

[9] Underhill et al. 1979, *supra* note 8. Pages 24–28.

[10] Tohono O'odham Legislative Council. 2021. *Resolution of the Tohono O'odham Legislative Council (Recognition and Protection of the Sacred Ha:san).* Resolution no. 21-137.

O'odham traditional cultural and religious rights to harvest saguaro fruit on land managed by the U.S. National Park Service (Park Service). Also in 2021, as part of ongoing commitments to perpetuate O'odham cultural and religious traditions, the Nation repatriated a suite of Wi:gita regalia, including dancer headdresses and other ceremonial objects used in the early 1900s and held at the American Museum of Natural History.[11]

20. The Sitting Ceremony is a mourning ritual to commune with the recently departed and to foster grieving and healing among the living. In this ceremony, O'odham sit with deceased family members or friends for a period of structured, collective grief, in part to facilitate the spirit's final journey southward, along a route parallel to that taken by participants on the Salt Pilgrimage (described below).[12] Josiah Moore, a Tohono O'odham Nation citizen, suggests that Himdag itself has a longitudinal alignment, in that O'odham once "moved seasonally on a north-south axis to various springs, wells, streams, grazing areas and religious and cultural sites between what now is Arizona and Sonora."[13]

21. The Salt Pilgrimage is a diversely documented O'odham religious practice. Carl Lumholtz participated in an O'odham Salt Pilgrimage around 1910, referencing the trip as the "annual salt expedition to the gulf" from O'odham land to the north.[14] Lumholtz describes stops along pilgrimage routes at water sources and spiritually meaningful landmarks, noting religious

---

[11] AMNH 2021. Tohono O'odham Nation Repatriation. https://www.amnh.org/research/anthropology/news-events/tohono-oodham-nation-repatriation.

[12] Underhill, Ruth M. 1939. *Social Organization of the Papago Indians*. Columbia University Contributions to Anthropology, No. 30. Columbia University Press, New York.

[13] Letter from Josiah Moore to Ms. Ruth Ann Meyers, District Director, Immigration and Naturalization Services, 4 February 1987, Morris K. Udall Papers, MSN 325, box 675, folder 13, University of Arizona Library Special Collections, Tucson. Quoted in Schulze, Jeffrey. 2018. *"Are We Not Foreigners Here?": Indigenous Nationalism in the Twentieth-Century U.S.-Mexico Borderlands*. The University of North Carolina Press, Chapel Hill. Page 125.

[14] Lumholtz, Carl. 1912. New Trails in Mexico: An Account of One Year's Exploration in North-Western Sonora, Mexico, and South-Western Arizona, 1909–1910. Charles Scribner's Sons, New York. Page 99.

practices and associations of the trip, including landscape-linked prayers, songs, and rituals.[15]

22. Ruth Underhill describes the Salt Pilgrimage as an integral element in O'odham religion and social organization. She documents the Salt Pilgrimage as an essential demonstration of O'odham recognition of the ocean's spiritual and biophysical powers and the Sea of Cortez as the principal source of religious inspiration, precipitation, and life itself. Underhill's review of the fundamentals of O'odham cosmology includes a southern ocean inhabited by powerful rain spirits and the Salt Pilgrimage as both a rite of passage for young men and a communal act of supplication for the summer monsoon rains upon which desert life depends.[16]

23. Salt Pilgrimages were guided by *siwani,* medicine men who led expeditions from water source to water source and conducted ceremonies that included ritual fasting and the exclusion of speaking except as part of religious observations.[17] For novitiates being trained by expert practitioners, the Salt Pilgrimage begins with gazing southwesterly, absorbing instruction from the *siwani*, then dreaming the route to be followed. The physical ritual features travel by pilgrims through an intricately named sacred landscape—previously experienced through prayers, songs, and dreams—with oral and behavioral rituals linked to each waypoint. Underhill traces one leg in the route southward, past what she translates as "Sharp Mountain" and into what is now the international border into Sonora.[18] Successful completion of one or more Salt Pilgrimages is recognized by the O'odham community as a signal of preparedness to marry, father children, and fulfill the destiny envisioned in pre-adult dreams.

24. Frank Russell's 1908 report observes that the O'odham "made religious

[15] Lumholtz 1912, *supra* note 14, see exemplary content on pages 222, 270–272, 285, 355.
[16] Underhill 1946, *supra* note 7.
[17] Underhill 1946, *supra* note 7; see also Dobyns, Henry. 1972. *The Papago People.* Indian Tribal Series, Phoenix. Page 28.
[18] Underhill 1946, *supra* note 7. Pages 215, 223.

pilgrimages to the salt lakes below the Mexican boundary to obtain the sacred salt. They lived on pinole during the journey and walked with their eyes fixed upon the trail…. As they approached the shore of the lagoon in which the Great Spirit resided they ran at topmost speed and circled four times around the salt deposits before those who understood the proper ritual began to collect the salt…. As the salt gatherers approached the home village they were given a noisy welcome but were compelled to remain outside for four days…. For four days those who remained at home sang for those who journeyed, and then all might eat the salt ….”[19] Russell's Plate XLI features a photograph of a trail shrine similar to those observed along Salt Pilgrimage (*idag*) trails.[20]

25. These scholarly accounts and my knowledge of O'odham Himdag, Jewed̲, and cultural practices are the bases for my understanding of the Salt Pilgrimage as a fusion of virtual, spiritual, and geographical travel. The physical travel itself is a prayer, with each step taken by an O'odham pilgrim along the sacred trails conveying supplications directly into the earth. The material accompaniments along Salt Pilgrimage trails—including shrines, petroglyphs, camp remnants, and trail treads across desert pavement—should be understood less as incidental remnants and more as preserved indicators of O'odham forebearers' commitments to register and sustain spiritual activities. Trails and associated materials are akin to sacred texts, the tangible correlates and indexes for profound, life-changing religious training and resulting wisdom, inspiration, and guidance to new generations of salt pilgrims. Following these specific trails is a

[19] Russell, Frank. 1908. *The Pima Indians. Twenty-sixth Annual Report of the Bureau of American Ethnology to the Secretary of the Smithsonian Institution,1904-1905*, pages 3–389. U. S. Government Printing Office, Washington, D.C. Page 94.
[20] Ferguson, T.J., Maren P. Hopkins, Michael C. Spears, and Sharlot Hart (editors). 2019. O'odham Trails on Organ Pipe Cactus National Monument. School of Anthropology, University of Arizona, Tucson (Report on file, Tohono O'odham Nation Office of Cultural Affairs, Topawa). Page 31.

central part of the ritual practice and is essential to perpetuating O'odham history and culture. The Salt Pilgrimage cannot be performed in accord with established traditions anywhere except O'odham Jewed̲.

26. Recognizing the need to preserve these sacred pathways, the Park Service recognized Organ Pipe Cactus National Park as one of the landscapes important in the O'odham Salt Pilgrimage and associated trails. The Park Service commissioned a study "to create baseline data needed for preservation and maintenance of these linear cultural resources" both within the park and on the western part of the Nation's lands.[21] Funded by the United States and completed in 2019, that study documents multiple Salt Pilgrimage trails and associated artifacts, features, and O'odham oral, behavioral, and religious traditions and practices, all of which require O'odham access to and religious and logistical transit across the international border. Since about 2000, some O'odham have revived this once-widespread practice.

27. On June 5, 2026, I traveled to the Nation's lands to reacquaint myself with the landscape on and around the international border and to inspect areas used in the Salt Pilgrimage. My goals were to gain insights into what O'odham see from the reservation when they regard Mexico and to experience and assess cross-border continuity in relation to my readings of published literature. I was especially interested in the possibility of directly inspecting material indicators of the Salt Pilgrimage. During my visit, I spoke with the Nation's cultural resource officials and members. We traversed sites and landscapes sacred to the O'odham along the border with Mexico and assessed the effects of the proposed border wall construction on cultural resources, including traditional O'odham religious sites. The work entailed cross-examination of historical reports and maps with imagery and digital data from Google Earth™, Gaia GPS™, and

[21] Ferguson et al. 2019, *supra* note 20, Report Abstract.

AzSite, Arizona's statewide data base of documented archaeological sites.

28. Following landscape clues from prior studies and our regional experiences navigating areas on the Nation's lands southwest of Topawa, we located what we think is "Sharp Mountain," a landform bisected by the international border. This barnacle-like volcanic peak south of the Arvicio Ranch (current name for Ak komelik [or Akimelik], an O'odham village no longer occupied) is known in the O'odham language as Shee'e Naggiak ("Hanging Wolf").[22] Underhill identified this crag as a holy place and locus for summit ritual offerings, a critical landmark for one leg of the Salt Pilgrimage. At the northern base of Sharp Mountain, we found a segment of a north-south aligned trail tread (altered by vehicular and livestock traffic), an apparent trail shrine (a "donut" shaped mound of geologically diverse cobbles and small boulders), a nearby boulder emblazoned with multiple petroglyphs, and a scatter of chipped stone, ceramic fragments (also known as potsherds), and part of a mano, or hand-held stone for grinding seeds and grains.

29. We also traveled just over one mile northward to visit the site of Ak komelik (Arvicio Ranch), a far more complex suite of architectural features and objects not previously recorded by professional archaeologists. The site includes a well and possible reservoir or stone corral, dozens of petroglyphs and bedrock grinding areas, a mid-1900s ranch house, outbuildings used until about 2000, and multi-era scatter of diverse artifacts. Given the site's presence on a segment of the Salt Pilgrimage trail, it is probably not coincidental that Ak komelik residents built a stone chapel there, circa 1920.[23]

30. Prior investigations of proposed border road and wall impact areas list the site at

---

[22] Winters, Harry J. 2020. *O'odham Place Names: Meanings, Origins and Histories, Arizona and Sonora*, Second Edition. Nighthorses, Tucson. Pages 111–113.
[23] Weight, Harold O. 1952. Padre of the Papago Trails. *Desert Magazine* 15(2):5–10. Winters 2020, *supra* note 22.

the northern foot of Shee'e Naggiak as AZ C:8:24(ASM) and AZ C:8:25(ASM). Previous investigators identified, in addition to what we observed, clusters of fire-cracked rocks and ash, seashell fragments, and distinctive potsherds with rim coils. The earlier investigators suggested that the ring of cracked rocks and ash were the remains of an horno, or food roasting feature and that the site served as a camp.[24] We noted that pottery with rim coils dates to the post-1450 era and is associated with historical-era O'odham and Yuman ceramic technologies. We noted that the petroglyphs are the only ones found along the entire border survey through the Nation's land. We further noted disagreement with the prior investigators' supposition that the "ring of rocks" represents an horno because few of the rocks we saw are fire-cracked. Also, we saw little charcoal or ash, and the near-surface bedrock would limit the effectiveness of a roasting pit.

31. Based on my experience in the field and my knowledge of the literature, I think Shee'e Naggiak is the Salt Pilgrimage landmark and holy place Underhill references as "Sharp Mountain." I think AZ C:8:24(ASM) and AZ C:8:25(ASM) were likely staging areas utilized by O'odham on long-ago Salt Pilgrimages, and that the petroglyphs there represent "perpetual prayers" left by salt pilgrims to inspire and guide future generations.[25] I think most or all of the pilgrims would have camped at the nearby water source at Ak komelik.

32. Based on the foregoing, it is my opinion that multiple distinct aspects of O'odham religious belief and practice span and define the sacred landscape of the Sonoran Desert and thus the international borderlands. Travel to and from distinct areas of both Arizona and Sonora,

[24] Martynek, Richard, Charles Subler, Sandra Martynec, Sharlene N. Allday, and Duane E. Peter. 1995, Cultural Resources Survey/ Monitoring of A Jtf-6 Action, Tohono O'odham Sector, Arizona. Miscellaneous Report of Investigations Number 39. Geo-Marine, Inc., Plano, Texas Report on file, Tohono O'odham Nation Office of Cultural Affairs, Topawa. Pages 245–249.
[25] I have borrowed the phrase "perpetual prayers" from Cushing, Frank H. 2002. *The Lost Itinerary of Frank Hamilton Cushing*. Edited by Curtis M. Hinsley and David R. Wilcox. The University of Arizona Press, Tucson. Page 117.

Mexico is prescribed to cure spiritual illnesses afflicting the O'odham. Also required on the basis of beliefs held by many O'odham are communal celebrations necessary (a) to affirm and sustain O'odham creation stories, songs, and dances for the benefit of current and future O'odham generations and all of Creation; (b) to summon the rain-bringing spirits to make the desert flourish and to sustain life; and (c) to mourn and commune with the deceased. The evidence for the antiquity, frequency, and significance of the Salt Pilgrimage is especially diverse and abundant. That evidence conforms with longstanding religious and cultural practices and confirms centuries-old religious uses of specific localities on the present-day border.

33. The ceremonies, rituals, and traditions considered in this declaration mark the passage of time, the accrual of wisdom, and the perpetuation of identity and health for O'odham individuals, as experienced through the Salt Pilgrimage; for communities, as demonstrated and perpetuated by the Wi:gita Ceremony and associated retellings of O'odham creation stories; for O'odham and ancestors, as enacted through the Sitting Ceremony and other mourning and funerary traditions; and for the natural world, as nourishing rains are summoned and delivered through the Wi:gita Ceremony, the Salt Pilgrimage, and innumerable other prayers and observances. The Himdag and other essences of what it means to be O'odham are irrevocably tied to physical, spiritual, and cultural travels on the south-to-north trails that define the O'odham Jewe<u>d</u> and Nation.

34. It is my opinion that construction of walls along the southern border of the United States and through the lands of the O'odham Nation would disturb the sacred natural-cultural landscape that is, in effect, the origin, destination, medium, and altar for O'odham religious belief and practice. The proposed wall would directly and adversely impact holy places and eliminate access to important cultural and historical resources, such as traditional trails,

landmarks, and historical markers that O'odham religion both relies on for guidance and actively harnesses and sustains through contemporary practice. It is also my opinion that a wall would make it more difficult for the O'odham to complete their cross-border religious practices, as set forth above, and that this will harm their ability to maintain spiritual equilibrium and balance with the natural world.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 13th day of June, 2026 in Tucson, Arizona.

John R. Welch

John R. Welch, Ph.D.

# ATTACHMENT A

**John R. Welch, PhD, Registered Professional Archaeologist 10227**
Professor, Department of Archaeology, Simon Fraser University welch@sfu.ca
www.sfu.ca/archaeology/about/people/faculty/jwelch.html — https://orcid.org/0000-0001-8820-7150

## EDUCATION

1996 Ph.D. Anthropology, University of Arizona, Tucson, U.S.
1985 M.A. Anthropology, University of Arizona, Tucson, U.S.
1983 A.B. Anthropology (Honors), Spanish, Hamilton College, Clinton, New York, U.S.

## INTERESTS

*Sovereignty-driven cultural and biophysical heritage stewardship and research*
Keywords: Sovereignty-driven research; Community-based conservation; Cultural resources management; Historic preservation; Indigenous archaeology; Resistance; American Southwest

*Western Apache archaeology, history, and human ecology in the Arizona uplands*
Keywords: Apache archaeology; Trail archaeology; Sacred sites protection; Land claims; Heritage tourism and culturally appropriate economic development; Indigenous management models

## COURSE PORTFOLIO

*Policy, Ethics, and Professional Practice in Archaeology*
*Cultural Heritage Management*

## WEBSITE PORTFOLIO (Core member of editorial teams)

*SaveHistory.org*
*digital.lib.sfu.ca/white-mountain-apache-collection*
*archpress.lib.sfu.ca/index.php/archpress*
*RespectGreatBend.org*

## EMPLOYMENT

| | |
|---|---|
| September 2023–Current | **Professor**, Department of Archaeology, Simon Fraser University, Burnaby, BC |
| February 2018–Current | **Vice President, Preservation & Collaboration**, Archaeology Southwest, Tucson. |
| January 2005–Current | **Advisor, Consulting Historian, and Expert Witness**, White Mountain Apache Tribe, Whiteriver, Arizona; San Carlos Apache Tribe, San Carlos, Arizona; Apache Stronghold, Bylas, Arizona. Assist in redeveloping the Fort Apache Historic District, repatriating cultural items, and protecting Holy Places and cultural landscapes |
| April 2005–2023 | **Professor & Director of the Professional Graduate Program in Heritage Resource Management**, jointly appointed in the Department of Archaeology and School of Resource and Environmental Management, Simon Fraser University |
| September 2008–2017 | **Associate Faculty**, Archaeology, Arizona State Museum, University of Arizona, Tucson |
| April 2010–July 2013 | **Faculty Mentor**, White Mountain Apache – University of Arizona Western Apache Ethnography and GIS Field School |
| September 1998–June 2005 | **Visiting Scholar**, Department of Anthropology, University of Arizona, Tucson |

| | |
|---|---|
| September 1992–June 2005 | **Archaeologist**, U.S. Bureau of Indian Affairs (BIA), Fort Apache Agency, Whiteriver, Arizona<br>Provided cultural heritage protection, planning, and compliance services for the federal agency administering White Mountain Apache Tribe trust lands |
| November 1996–Jan 2005 | **Tribal Historic Preservation Officer**, White Mountain Apache Tribe, Whiteriver, Arizona<br>Established the Fort Apache Heritage Foundation 501(c)3; Managed research, intergovernmental consultation, environmental protection, and repatriation initiatives in support of White Mountain Apache heritage conservation and economic and community development |
| May 1996–September 2002 | **Archaeologist**, U.S. Dept of Interior, Emergency Rehabilitation Team. Cultural resource lead on interdisciplinary team that created treatment plans for wildfire-impacted federal and Indian lands |
| January 1998–May 2001 | **Associate Faculty** and chair of the Heritage Preservation Curriculum Committee, Northland Pioneer College, Holbrook, Arizona |
| September 1990–May 1991 | **Associate Faculty**, Human Sciences, Pima Comm. College, Tucson |
| August 1990–Dec 1993 | **Assistant Project Director**, Statistical Research Inc, Tucson<br>Directed study of Tonto Basin and Verde River agricultural ecology and ethnohistory under contract to the U.S. Bureau of Reclamation |
| April 1992–October 1992 | **Gila Resource Area Archaeologist**, Safford District, U.S. Bureau of Land Management, Arizona<br>Provided heritage preservation, research, and interpretation services |
| May 1990–August 1990 | **Archaeologist**, International Archaeological Research Institute Inc.<br>Assisted with excavation and survey on island of Moloka'i, Hawaii |
| August 1983–Dec 1989 | **Teaching Assistant** and **Assistant Director**, Archaeological Field School, Anthropology, University of Arizona, Tucson |
| August 1988–June 1989 | **Archaeologist in Residence**, Fenster School, Tucson |

## FUNDING FOR RESEARCH AND RELATED SCHOLARLY PURSUITS

1. **Grant:** Ecological Restoration Planning **Period:** 2024–2026 **Project Title:** Planning Eco-Cultural Regeneration for Fort Apache and Theodore Roosevelt School National Historic Landmark, White Mountain Apache Tribe Lands **Funding:** America the Beautiful Challenge, National Fish and Wildlife Fdn. **Total:** $333,789 **Involvement:** Grant and Project Supervisor

2. **Grant:** Cultural Landscape Preservation **Period:** 2025–2026 **Project Title:** Cultural-Natural Co-Evolution of San Pedro Valley, Southern Arizona and Northern Sonora, Mexico **Funding**: Tohono O’odham Nation Community Program **Total:** $125,000 **Involvement**: Principal Investigator

3. **Contract:** Historic Property Preservation **Period:** 2025–2026 **Project Title:** New Market and Historic Preservation Tax Credits to Support Rehabilitation of the Fort Apache National Historic Landmark **Funding:** U.S. Bank and Sovereign Bank **Total:** $5,283,000 **Involvement:** Core member of proposal team; coordinator of architect-engineer team

4. **Contract:** National Historic Landmark Repair and Maintenance **Period**: 2024–2027 Project **Title**: District-Wide Preservation Treatments for the Fort Apache and Theodore Roosevelt School National Historic Landmark **Funding**: U.S. Bureau of Indian Affairs **Total**: $8,088,241 **Involvement**: Contract Proposal Preparer and Supervisor
5. **Grant:** Research Grant/ Cooperative Agreement in Support of Government Land Management **Period:** 2023–2024 **Project Title:** Documenting Indigenous Trails in and around National Conservation Lands System Units, Southern Arizona **Funding:** U.S. Bureau of Land Management **Total:** $39,974 **Involvement:** Co-Principal Investigator (Dr. Aaron Wright, 1st Principal) **Collaboration:** Support Dr. Wright in field investigations and lead consultations with affected Tribes in the identification and analysis of trails that connect culturally salient Indigenous places and federally managed lands.
6. **Grant:** Research Grant **Period:** 2023–2024 **Project Title:** Ndee Bi'intin: Apache Trails Documentation Project **Funding:** Douglas B. Craig Memorial Research Grant **Total:** $3,000 **Involvement:** Principal Investigator, supported by Cibecue Apache expert Gregg Henry **Collaboration:** I am supervising Mr. Henry and photographer Bill Hatcher in the identification and analysis of trails that link culturally salient Ndee (Western Apache) places.
7. **Grant:** Preservation Treatment Grant **Period:** 2022–2024 **Project Title:** Masonry Preservation for Nzhooníhí Benkegohen'áání Gowah (Home of Harmony Project, building 116, Fort Apache National Historic Landmark) **Funding:** Heritage Fund, Arizona State Parks **Total:** $298,600 **Involvement:** Grant Preparer and Project Supervisor
8. **Grant:** Preservation Treatment Grant **Period:** 2022–2024 **Project Title:** HVAC for Nzhooníhí Benkegohen'áání Gowah (Home of Harmony Project, building 116, Fort Apache National Historic Landmark) **Funding:** Heritage Fund, Arizona State Parks **Total:** $199,380 **Involvement:** Grant Preparer and Project Supervisor
9. **Grant:** Preservation Treatment Grant **Period:** 2023–2024 **Project Title:** Nzhooníhí Benkegohen'áání Gowah (Home of Harmony Project, building 116, Fort Apache National Historic Landmark) **Funding:** U.S. Economic Development Administration **Total:** $4,780,000 **Involvement:** Grant Preparer and Phase I (Planning & Design) Project Supervisor
10. **Grant:** Capacity Building and Knowledge Mobilization **Period:** 2022–2024 **Project Title:** National Education Coordinator for Apache Stronghold/Protect Chi'chil Bildagoteel/Oak Flat **Funding:** San Manuel Band of Mission Indians Strategic Philanthropy Department **Total:** $85,000 **Involvement:** Project Planner and Grant Co-Writer **Collaboration:** I worked with lead grant writer Peggy Mainor (Mica Group) to secure funding for this initiative.
11. **Grant:** Archives Management Grant **Period:** 2021–2023 **Project Title:** Inventory, Conservation, and Management Planning for the White Mountain Apache Tribe National Archives **Funding:** Mellon Foundation **Total:** $100,000 **Involvement:** Principal Investigator **Collaboration:** I am supervising professional archivist Dennis Preisler in inventory, conservation, and planning for the Tribe's Archives.
12. **Grant:** Landscape Conservation Catalyst Fund **Period:** 2021–2022 **Project Title:** New Protection for Holy Mountains of the Western Apache, Arizona **Funding:** Landscape Conservation Network **Total:** $20,600 **Involvement:** Principal Investigator **Collaboration:** I am coordinating research and outreach to prepare the multi-property nomination to the National Register of Historic Places.

13. **Grant:** Research Grant **Period:** 2021 **Project Title:** The Apache – U.S. Treaty of 1852: Western Apache Reserved Treaty Rights to Tonto National Forest, Arizona. **Funding:** MICA Foundation **Total:** $10,000 **Involvement:** Project Director **Collaboration:** I coordinated investigation and cartography to understand implications of the 1852 Treaty for land management decisions and Apache Nation rights to the free exercise of their religion at Chi'chil Biłdagoteel (Oak Flat). Recognition of either of these rights will hamper efforts to construct the Resolution Copper Mine. Research results are featured in the ***PBS Newshour*** (https://www.pbs.org/newshour/show/in-arizona-a-struggle-over-a-sacred-site-of-the-apache-tribe), ***Washington Post*** (https://www.washingtonpost.com/history/2021/04/12/oak-flat-apache-sacred-land/).

14. **Grant:** Designer-Led Place-Making **Period:** 2021–2023 **Project Title:** Engaging Apache Cultural Preferences and Community Creativity in Site Presentation and Visitor Experience Planning for the Fort Apache and Theodore Roosevelt School National Historic Landmark, Arizona **Funding:** National Endowment for the Arts, *Our Town* **Total:** $100,000 **Involvement:** Principal Investigator **Collaboration:** I am coordinating community outreach and efforts by the THINC and Swaback creative consultants.

15. **Grant:** Research Infrastructure Development Grant **Period:** 2021–2024 **Project Title:** From Households to Landscapes: Cyberinfrastructure for Deep Time Network Analyses in the Pre-Hispanic Southwest **Funding:** National Science Foundation **Total:** $951,000 **Involvement:** I am co-coordinating (with Ashleigh Thompson) the Tribal Work Group for the multi-institutional cyberSW: https://cybersw.org/cybersw/

16. **Grant:** Research Grant **Period:** 2021–2022 **Project Title:** Intersectional analysis of the experiences of Canadian archaeologists **Funding:** Social Sciences and Humanities Research Council (Small SSHRC) **Total:** $7,000 **Involvement:** Principal Investigator, in collaboration with the Canadian Archaeological Association's Working Group on Equity and Diversity **Collaboration:** I supervised research associate Patricia Markert in the analysis of the corpus of interview data linked to the 2019 survey of Canadian archaeologists.

17. **Grant:** Mitacs Accelerate Internship Cluster Grant **Period:** 2019–2021 **Project Title:** Expanding Cultural Heritage Stewardship Knowledge and Capacity with Nlaka'pamux Nation Tribal Council and Teck Highland Valley Copper Operations **Funding:** Mitacs **Total:** $105,000 **Involvement:** Project Director **Collaboration:** I recruited HRM Professional Program students and matching them with SFU faculty supervisors and one of the seven funded research internships to optimize Nlaka'pamux capacity building and research impacts from the Teck HVC operations.

18. **Grant:** Community Listening Foundations for District-Scale Interpretation of the Fort Apache and Theodore Roosevelt School National Historic Landmark **Period:** 2020–2021 **Funding:** Arizona Humanities Council **Total:** $10,000 **Involvement:** Project Director **Collaboration:** I worked with Cline Griggs and other Fort Apache Heritage Foundation Board members, to plan and facilitate about 20 focus group sessions to learn how Apache community members envision the desired future for Fort Apache and what stories they want to be told, and how, during the next phase of property interpretation and presentation.

19. **Grant:** Conservation Assessment Program for Fort Apache and Theodore Roosevelt School National Historic Landmark **Period:** 2019–2020 **Funding:** American Institute for Conservation **Total:** $20,000 **Involvement:** Project Director **Collaboration:** I planned and facilitated an interdisciplinary review by five established professionals of the 26 historic buildings and associated collections that constitute the Fort Apache Historic Park, resulting in a detailed assessment of conservation issues to serve as the plan for the next phase of property preservation and presentation.

20. **Grant:** Interdisciplinary Workshop Grant **Period:** 2018–2019 **Project Title:** Cultural Heritage Crime and Forensic Sedimentology: Global Theoretical and Local Tactical Responses to Thwart and Prosecute Heritage Destruction and Theft **Funding:** Wenner-Gren Foundation for Anthropological Research **Total:** $20,000 **Involvement:** Project Director **Collaboration:** I planned and facilitated a workshop at Fort Apache to focus theoretical perspectives and practical tools on the prevention, investigation, and prosecution of heritage Resource Crime.
21. **Grant:** SSHRC Research Connections Grant **Period:** 2018–2020 **Project Title:** A Knowledge Creation Plan for Advancing Stó:lō Collaborative Resource Stewardship and Shared Land-Use Decision-Making in Southwest British Columbia **Total:** $45,676 **Involvement:** Co-Principal Investigator **Collaboration:** I supported David M. Schaepe (Sto:lo Research and Resource Management Centre) and Natasha Lyons (Ursus Consulting & SFU Archaeology) in convening a workshop and preparing a white paper to guide the first-ever Sto:lo Nation research plan.
22. **Contract:** Research and Consulting Contract **Period:** 2018–2023 **Project Title:** Technical Assistance in Heritage Site Restoration and Preservation **Funding**: U.S. Bureau of Indian Affairs **Total:** $875,000 **Involvement:** Principal Investigator **Collaboration:** I was and still am a principal in Archaeology Southwest's assistance to BIA in preventing and investigating archaeological resource crime, in repairing damages to affected sites, and in creating training and outreach materials.
23. **Grant:** Graduate Research Fellowship Grant **Period:** 2017–2018 **Project Title:** Climate Change Adaptation Planning in Two Indigenous Conservation Organizations. **Funding:** Pacific Institute for Climate Studies **Total:** $5000 **Involvement:** Project Director **Collaboration:** I directed and supported master's research by Vivian Gauer with the Fort Apache Heritage Foundation and the Stolo Research and Resource Management Centre.
24. **Grant:** Open Educational Resource Development Grant (SFU) **Period:** 2016–2017 **Project Title:** OER Assessment and Development for a New Breadth-Humanities Course, Heritage Stewardship in Global Context (ARCH 286) **Funding:** SFU Library OER Fund **Total:** $3000 **Involvement:** Project Director **Collaboration:** I facilitated collaborations among Erin Hogg, Hope Power, and other SFU colleagues in identifying and refining OERs for ARCH 286.
25. **Grant:** Publication Grant **Awarded:** 2016 **Period:** 2016–2017 **Project Title:** Digital Publication of the SFU Archaeology Press Catalogue **Funding:** SFU Scholarly Digitization Fund **Total:** $4960 **Involvement:** Principal Investigator **Collaboration:** I supervised Erin Hogg in creating the full online compendium of the 32 books published by SFU Archaeology Press.
26. **Grant:** Research Grant **Period:** 2016 **Project Title:** 'Ground Truthing' of Ancestral Pueblo Settlement of the Southern and Western Flanks of Arizona's White Mountains, White Mountain Apache Tribe Lands, Arizona. **Funding:** Arizona Archaeological and Historical Society **Total:** $500 **Involvement:** Project Director **Collaboration:** I led seven colleagues on a mobile symposium to visit and boost documentation for 16 Ancestral Pueblo villages.
27. **Contract:** Professional Consulting Services **Period:** 2016 **Project Title:** San Carlos Apache Strike Team **Funding:** San Carlos Apache Tribe, Arizona **Total:** $19,650 **Involvement:** Cultural heritage consultant **Collaboration:** I supported the Apache Strike Team's opposition to the Proposed Resolution Copper Mine by conducting historical research and preparing strategic assessments of documents and plans prepared by the mining company, U.S. Forest Service, and their consultants.

28. **Contract/Grant:** Research and Exhibition / Outreach **Period:** 2015–2016
**Project Title:** Scowlitz Virtual Museum Companion Project **Funding:** SFU Community Engagement Fund **Total:** $10,000 **Involvement:** Co-Principal Investigator **Collaboration:** I support Kate Hennessey (SFU SIAT) and David Schaepe in developing and installing twin exhibits—in the SFU Museum of Archaeology and Ethnology and the Sto:lo Research and Resource Management Centre—to expand the reach of the Virtual Museum of Canada website dedicated to the Scowlitz ancestral village site.

29. **Contract/Grant:** Professional Consulting Services **Period:** 2015–2016
**Project Title:** A Cultural Heritage Program for the San Carlos Apache **Funding:** Resolution Copper Mining Corporation, Arizona **Total:** $10,578 **Involvement:** Cultural heritage consultant **Collaboration:** I supported Statistical Research Inc. Foundation and Apache colleagues in creating a values-based program to protect and perpetuate Apache cultural heritage in the face of changing social, economic and biophysical environments.

30. **Grant:** Curriculum Development Research **Period:** 2015–2016
**Project Title:** Assessment of a Required Graduate Course, *Social Science of Resource Management: Theories of Cooperation* (REM 601) **Funding:** SFU Teaching and Learning Center **Total:** $5000 **Involvement:** Project Director **Collaboration:** I worked with Soudeh Jamshidian and other SFU colleagues to survey students and refine REM 601, the social science core course in the Master's of Resource Management (MRM) program.

31. **Grant:** Curriculum and Credential Development **Period:** 2015–2016
**Project Title:** A Professional Online MA Program in Heritage Resource Management (HRM) **Funding:** SFU Professional Online Scholarship and Training (POST) grant **Total:** $100,000 **Involvement:** Program Director **Collaboration:** I facilitate and direct SFU and HRM industry colleagues in creating and delivering a new Master's program, starting fall 2016.

32. **Grant:** Research Grant **Period:** 2014–2017
**Project Title:** Trails of the Apache **Funding:** SSHRC Small Institutional **Total:** $6950 **Involvement:** Principal Investigator **Collaboration:** I directed landscape-scale efforts to document ancient Apache activity hubs using least-cost path GIS analyses to identify trails and the residential, agricultural, and foraging localities they connect.

33. **Grant:** Research and Internet Publication Grant **Period:** 2013–2015
**Project Title:** People of the River: Sq'éwwets **Funding:** Virtual Museums of Canada **Total:** $193,000 **Involvement:** Collaborator **Collaboration:** I supported David Schaepe and Natasha Lyons in facilitating virtual repatriation to the Scowlitz community of all information and other materials relating to their most important ancestral village site.

34. **Grant:** Publication Grant **Awarded:** 2013 **Period:** 2013–2014 **Project Title:** Digital Publication of Documents on the History and Management of White Mountain Apache Lands, Arizona **Funding:** SFU Scholarly Digitization Fund **Total:** $5000 **Involvement:** Principal Investigator **Collaboration:** I enabled Ian Song (SFU Library) and students to create the text-searchable archive of documents relating to (mis)management of Apache lands.

35. **Contract:** Contract **Awarded:** 2012 **Period:** 2012–2013
**Project Title:** History of the Northern Boundary Dispute, White Mountain Apache Reservation **Funding:** U.S. Bureau of Indian Affairs **Total:** $17,380 **Involvement:** Principal Investigator **Collaboration:** I supported Robert D. Brauchli (White Mountain Apache Legal Department) in prosecuting a White Mountain Apache claim to lands erroneously excluded from their reservation.

36. **Grant:** Management grant **Awarded:** 2012 **Period:** 2012–2013 **Project Title:** Digitizing FAIRsite, the Fort Apache Indian Reservation heritage site inventory **Funding:** The Digital Archaeological Record (tDAR) **Total:** $2680 **Involvement:** Principal Investigator **Collaboration:** I supported Frank McManamon (Arizona State U and Digital Antiquity), Matt Peeples (Archaeology Southwest), and Mr. Mark Altaha (White Mountain Apache Tribe) in designing and trialing a system to incorporate existing site files into a permanent records repository, complete with a digital index to enable heritage site research and conservation.

37. **Grant:** Research Grant **Awarded:** 2011 **Period:** 2011–2014 **Project Title:** CNH: Long-term vulnerability and resilience of coupled human-natural ecosystems to fire regime and climate changes at an ancient Wildland Urban Interface **Funding:** National Science Foundation Grant 1114898 **Total:** $1,498,027 **Involvement:** Co-Investigator **Collaboration:** I supported Tom Swetnam (U Arizona), Chris Roos (Southern Methodist U), T.J. Ferguson (U Arizona) in integrating dendrochronology, archaeology, and ethnography in pursuit of recommendations for forest, fuels and fire management in the upland Southwest U.S.

38. **Grant:** Research and Curriculum Development Grant **Awarded:** 2011 **Period:** 2012–2014 **Project Title:** Tribal Historic Preservation Officer Toolkit: Essential Guide for Tribal Programs **Funding:** U.S. National Park Service **Total:** $39, 634 **Involvement:** Project Consultant **Collaboration:** I supported John Brown (Narragansett Tribe), D. Bambi Kraus (National Association of Tribal Historic Preservation Officers), and an advisory team by conducting surveys, compiling comparable toolkits, and facilitating consultations to build a curriculum to train tribal officials in the functions of tribal historic and cultural preservationists.

39. **Grant:** Research Grant **Awarded:** 2010 **Period:** 2010–2013 **Project Title:** Western Apache Ethnography and GIS Research Experience for Undergraduates **Funding:** National Science Foundation Grant 1004556 **Total:** $254,694 **Involvement:** Joint Investigator **Collaboration:** I supported Karl Hoerig (White Mountain Apache Cultural Center) and T.J. Ferguson (U Arizona) in running a community-based field school that maps traditional use sites across Western Apache homelands.

40. **Grant:** Internship Grant **Awarded:** 2010 **Period:** 2011–2013 **Project Title:** Community land-use planning on First Nations reserves and the influence of land tenure: A case study with the Penticton Indian Band **Funding:** MITACS Accelerate **Total:** $30,000 **Involvement:** Co-Preceptor **Collaboration:** Murray Rutherford (SFU School of Resource and Environmental Management), the Penticton Indian Band Development Corporation, and I supervised intern Marena Brinkhurst's study of how different forms of land tenure influence the process and results of land use planning on Penticton Indian Band lands.

41. **Contract:** Contract **Awarded:** 2010 **Period:** 2010–2012 **Project Title:** History of the Northern Boundary Dispute, White Mountain Apache Reservation **Funding:** U.S. Bureau of Indian Affairs **Total:** $9950 **Involvement:** Principal Investigator **Collaboration:** I supported Robert D. Brauchli (White Mountain Apache Legal Department) in prosecuting a White Mountain Apache claim to lands illegally excluded from their reservation.

42. **Grant:** Publication Grant **Awarded:** 2010 **Period:** 2010–2011 **Project Title:** Documenting the Management History of White Mountain Apache Tribe Lands, Arizona **Funding:** SFU Scholarly Digitization Fund **Total:** $5000 **Involvement:** Principal Investigator **Collaboration:** Ian Song (SFU Library) and I engaged students to build a digital archive of documents relating to federal (mis)management of White Mountain Apache lands.

43. **Contract:** Contract **Awarded:** 2010 **Period:** 2010–2011
**Project Title:** Intergovernmental protocol for Heritage Site Protection, Tla'amin Territory
**Funding:** City of Powell River **Total:** $3770 **Involvement:** Principal Investigator
**Collaboration:** I facilitated efforts by First Nation, City, and Provincial officials to improve consultation and protection for heritage sites threatened by proposed land use changes.

44. **Grant:** Internship Grant **Awarded:** 2010 **Period:** 2010–2011
**Project Title:** An Evaluation of Cultural Heritage as a Basis for First Nations Land Use Planning
**Funding:** MITACS Accelerate **Total:** $30,000 **Involvement:** Preceptor **Collaboration:** David Schaepe (Stó:lo Research and Resource Management Centre), Ch-ihl-kway-ukh Forest Limited officials, and I supervised an intern Karen Brady's development of land use planning tools grounded in Stó:lo cultural precepts and site-specific knowledge.

45. **Contract:** Contract **Awarded:** 2010 **Period:** 2010
**Project Title:** Archaeological Site Inspection, Savary Island Dock Enhancement, Tla'amin First Nation Territory, British Columbia **Funding:** Powell River Regional District **Total:** $6970
**Involvement:** Principal Investigator **Collaboration:** Megan Caldwell (U Alberta), Chris Springer (SFU) and I conducted pre-project heritage site identification surveys and project monitoring to avoid dock expansion impacts to heritage sites.

46. **Grant:** Management grant **Awarded:** 2009 **Period:** 2010–2011
**Project Title:** Pilot Assessment of the Archaeological Sensitivity of the Surface of the Fort Apache and Theodore Roosevelt School Historic District, Arizona
**Funding:** Fort Apache Heritage Foundation **Total:** $7100 **Involvement:** Principal Investigator
**Collaboration:** I guided student crews led by Jenifer Lewis in gathering detailed data to identify significant areas within the 300-acre fort and residential school site.

47. **Grant:** Research Grant **Awarded:** 2008 **Period:** 2008–2011
**Project Title:** Community forests as a new model for forest management in British Columbia
**Funding:** Social Sciences and Humanities Research Council **Total:** $136,820
**Involvement:** Joint Investigator **Collaboration:** I supported Evelyn Pinkerton's (SFU) interdisciplinary assessments of ecological, economic, cultural, and policy issues to promote community forests as alternatives to industrial timber management models.

48. **Grant:** Major Collaborative Research Initiative **Awarded:** 2007 **Period:** 2008–2016 **Project Title:** Intellectual Property in Cultural Heritage **Funding:** Social Sciences and Humanities Research Council **Annual:** $400,000 **Total:** $2,500,000 **Involvement:** Joint Investigator
**Collaboration:** I support and am a Steering Committee member and working group co-chair for George Nicholas' (SFU) major collaborative research initiative (MCRI) examining relationships among past legacies and contemporary assertions of cultural and intellectual property rights and interests.

49. **Contract:** Consultant contract **Awarded:** 2008 **Period:** 2008–2009
**Project Title:** Tribal Engagement in Fort Lowell Master Plan **Funding:** Pima County and City of Tucson, Arizona **Total:** $8900 **Involvement:** Principal Investigator **Collaboration:** I served as tribal liaison in the planning efforts and contributed to draft and final reports.

50. **Grant:** Research Grant **Awarded:** 2008 **Period:** 2008–2010
**Project Title:** Ancestral Knowledge, Ethnohistory, and Archaeology of Two Tahltan Village Sites
**Funding:** Copper Fox Metals, Inc. **Total:** $15,000 **Involvement:** Principal Investigator
**Collaboration:** I supported Tahltan community engagement in Vera Asp's Ph.D research.

51. **Grant:** Research Grant **Awarded:** 2008 **Period:** 2008–2009
**Project Title:** Tourism Development By and For the White Mountain Apache Tribe
**Funding:** Coastal Rainforest Alliance and Harvard University Project on American Indian Economic Development **Total:** $800 **Involvement:** Principal Investigator

52. **Grant:** Strategic Research Grant **Awarded:** 2007 **Period:** 2008–2011
**Project Title:** Sovereignty and stewardship: Expanding First Nations conservation and collaborative capacities **Funding:** Aboriginal Research Program, Social Science and Humanities Research Council **Total:** $219,000 **Involvement:** Principal Investigator **Collaboration:** I coordinated participant-driven research with Tla'amin, Tahltan, Scowlitz and Katzie First Nations to create and implement plans to advance stewardship-based sovereignty.

53. **Grant:** Research Grant **Awarded:** 2007 **Period:** 2007–2008
**Project Title:** Ancestral knowledge, Ethnohistory, and Archaeology of Two Tahltan Village Sites.
**Funding:** Fortune Minerals, Inc. **Total:** $500 **Involvement:** Principal Investigator
**Collaboration:** I supported Tahltan community engagement in Vera Asp's Ph.D research.

54. **Grant:** Research Grant **Awarded:** 2007 **Period:** 2007–2008
**Project Title:** Ancestral knowledge, Ethnohistory, and Archaeology of Two Tahltan Village Sites
**Funding:** Copper Fox Metals, Inc. **Total:** $10,000 **Involvement:** Principal Investigator
**Collaboration:** I supported Tahltan community engagement in Vera Asp's Ph.D research.

55. **Grant:** Research Grant **Awarded:** 2007 **Period:** 2007–2009
**Project Title:** Evaluating ecological, economic, and social trade-offs of managing for valued species **Funding:** BC Forest Science Program **Total:** $80,000 **Involvement:** Joint Investigator
**Collaboration:** I supported Evelyn Pinkerton's (SFU) interdisciplinary assessment of the value spectra linked to non-timber forest flora. Other team members included K. Lertzman and M. Rutherford (SFU), U Toronto (S. Kant), and Kamloops First Nation (J. McGrath).

56. **Grant:** Research Grant **Awarded:** 2007 **Period:** 2007–2008
**Project Title:** Community Resistance as a Window into Customary Conservation Policy and Practice **Funding:** Social Sciences and Humanities Research Council **Total:** $4950
**Involvement:** Principal Investigator **Collaboration:** I compiled oral and documentary histories in support of R. Ewing's MA thesis and repatriation studies. Non-SFU partners: Arizona State Museum (U Arizona); Peabody Museum, Harvard; Glenbow Museum, White Mountain Apache Tribe, Tohono O'odham Nation, Hopi Tribe.

57. **Grant:** Equipment Grant **Awarded:** 2004 **Period:** 2005–2008
**Project Title:** First Nations Cultural and Environmental Resource Management Equipment Infrastructural Development **Funding:** Canada Foundation for Innovation, BC Knowledge Fund, SFU Matching Funds **Total:** $312,000 **Involvement:** Principal Investigator

58. **Grant:** Research Grant **Awarded:** 2005 **Period:** 2005–2007
**Project Title:** A Survey of First Nations Heritage Stewardship **Funding:** SFU President's Research Grant **Total:** $10,000 **Involvement:** Principal Investigator

59. **Grant:** Research Grant **Awarded:** 2005 **Period:** 2005–2007
**Project Title:** Seals of Fate **Funding:** SFU Discovery Parks **Total:** $5000
**Involvement:** Principal Investigator

60. **Grant:** Research Grant **Awarded:** 2003 **Period:** 2003–2005
**Project Title:** Cultural Affiliation Assessment, White Mountain Apache Tribal Lands
**Funding:** National NAGPRA Office, U.S. National Park Service **Total:** $75,000
**Involvement:** Principal Investigator **Collaboration:** I facilitated intertribal collaboration resulting in the repatriation of collections and a guide to the groups affiliated with tribal lands.

61. **Grant:** Research Grant **Awarded:** 2002 **Period:** 2003–2005
**Project Title:** The Battle of Cibecue: Investigation and Preservation Planning for the Fight that Changed the Apache World **Funding:** American Battlefield Protection Program, U.S. National Park Service **Total:** $24,000 **Involvement:** Principal Investigator **Collaboration:** Chip Colwell-Chanthaphonh (Center for Desert Archaeology, Tucson) and I developed and published a study.

62. **Grant:** Operating Grant **Awarded:** 1998 **Period:** 1998–2005
**Project Title:** White Mountain Apache Tribe Historic Preservation Office
**Funding:** U.S. National Park Service **Total:** $480,000 **Involvement:** Principal Investigator

63. **Grant:** Operating and Training Grant **Awarded:** 2001 **Period:** 2002–2004
**Project Title:** Undergraduate Research Experience in Native American Archaeology and Heritage Preservation: A Cooperative Project of the University of Arizona and the White Mountain Apache Tribe (co-PI with Barbara J. Mills) **Funding:** U.S. National Science Foundation Research Experiences for Undergraduates **Total:** $221,999 **Collaboration:** Mills directed the U Arizona field school and research agendas Welch directed the White Mountain Apache stewardship agenda.

64. **Grant:** Strategic Grant **Awarded:** 2002 **Period:** 2002–2003
**Project Title:** Organization Development for the Fort Apache Heritage Foundation
**Funding:** National Trust for Historic Preservation Locals Initiative **Total:** $2500
**Involvement:** Principal Investigator

65. **Grant:** Operating Grant **Awarded:** 2001 **Period:** 2001–2003
**Project Title:** Exterior Restoration, Fort Apache Officers Quarters no. 205 **Funding:** Heritage Fund, Arizona State Parks **Total:** $91,100 **Involvement:** Principal Investigator

66. **Grant:** Operating Grant **Awarded:** 2001 **Period:** 2001–2003 **Project Title:** Nohwiki'i Nohwanane' (Bringing Home the Ancestors): The Western Apache Repatriation Working Group **Funding:** NAGPRA Program, U.S. National Park Service **Total:** $71,381 **Involvement:** Principal Investigator **Collaboration:** I supported Western Apache Repatriation Working Group consultations with and visits to major U.S. museums.

67. **Grant:** Operating Grant **Awarded:** 1999 **Period:** 1999–2002
**Project Title:** Preservation Treatments to the Fort Apache Historic District
**Funding:** Save America's Treasures Program, White House Millennium Council, Washington, DC
**Total:** $313,000 **Involvement:** Principal Investigator

68. **Grant:** Operating Grant **Awarded:** 1998 **Period:** 1998–2000
**Project Title:** Rehabilitation of Fort Apache Officers Quarters no. 203. **Funding:** Heritage Fund, Arizona State Parks **Total:** $82,572 **Involvement:** Principal Investigator

69. **Grant:** Operating Grant **Awarded:** 1997 **Period:** 1997–2000
**Project Title:** Stabilization and Rehabilitation of Grasshopper Ruins **Funding:** University of Arizona Research Fund **Total:** $33,420 **Involvement:** Principal Investigator

70. **Grant:** Research Grant **Awarded:** 1997 **Period:** 1997–1999
**Project Title:** Western Apache Placenames Survey **Funding:** Historic Preservation Fund Grants to Indian Tribes, U.S. National Park Service **Total:** $49,900 **Involvement:** Principal Investigator **Collaboration:** I facilitated participation by representatives from Arizona's five Apache tribes in the documentation of toponyms.

71. **Grant:** Operating Grant **Awarded:** 1997 **Period:** 1997–1999
**Project Title:** Rehabilitation of Fort Apache Officers Quarters no. 207 **Funding:** Heritage Fund, Arizona State Parks **Total:** $101,190 **Involvement:** Principal Investigator

72. **Grant:** Research Grant **Awarded:** 1997 **Period:** 1997–1998
**Project Title:** Fort Apache Rehabilitation Planning **Funding:** U.S. Department of the Interior **Total:** $145,000 **Involvement:** Principal Investigator

73. **Grant:** Operating Grant **Awarded:** 1997 **Period:** 1997–1998
**Project Title:** Fort Apache Restoration Cost Assessment **Funding:** World Monuments Fund/American Express Foundation **Total:** $80,000 **Involvement:** Principal Investigator

74. **Grant:** Operating Grant **Awarded:** 1996 **Period:** 1996–1998
**Project Title:** Rehabilitation of Cibecue's Oldest Church **Funding:** Heritage Fund, Arizona State Parks **Total:** $34,775 **Involvement:** Principal Investigator

75. **Grant:** Operating Grant **Awarded:** 1994 **Period:** 1994–1998
**Project Title:** Nohwiki'i Nohwanane': Establishment of the Western Apache Repatriation Working Group **Funding:** NAGPRA Program, U.S. National Park Service **Total:** $55,000 **Involvement:** Principal Investigator

76. **Grant:** Operating Grant **Awarded:** 1994 **Period:** 1995–1997
**Project Title:** White Mountain Apache Tribe Museum Director Salary
**Funding:** AZ Commission on Arts **Total:** $15,000 **Involvement:** Principal Investigator

77. **Grant:** Research Grant **Awarded:** 1995 **Period:** 1995–1996
**Project Title:** Needs Assessment for the White Mountain Apache Historic Preservation Office
**Funding:** Historic Preservation Fund Grants to Indian Tribes, U.S. National Park Service **Total:** $30,000 **Involvement:** Principal Investigator

78. **Grant:** Research Grant **Awarded:** 1994 **Period:** 1994–1996
**Project Title:** Architectural Preservation and Visitor Use Planning for Kinishba Ruins National Historic Landmark **Funding:** Heritage Fund, Arizona State Parks **Total:** 22,532
**Involvement:** Principal Investigator

79. **Grant:** Operating Grant **Awarded:** 1994 **Period:** 1994–1994
**Project Title:** Emergency Stabilization, Sole Surviving Cavalry Stables at Fort Apache National Register District **Funding:** Heritage Fund, Arizona State Historic Preservation Office **Total:** $5000 **Involvement:** Principal Investigator

80. **Contract:** Contract **Awarded:** 1991 **Period:** 1991–1992
**Project Title:** Factors Affecting Agricultural Sustainability in Tadla, Morocco
**Funding:** U.S. Agency for International Development **Total:** $16,000
**Involvement:** Principal Investigator

# CONTRIBUTIONS

## Peer-Reviewed Journal Articles, Books, and Book Chapters


1. Welch, J.R., Michael Spears, Sean O'Meara, Katie Portman, Alex Binford-Walsh (2025) Cultural Landscape Studies Help Match Cultural Resource Identification and Assessment Efforts to Undertaking Size and Complexity in the Section 106 Process. *Advances in Archaeological Practice* 13(2). https://doi.org/10.1017/aap.2024.38
2. Wright, Aaron M. and J.R. Welch (2025) "A Mark by Any Other Name . . . ": Reconciling Historical and Descendant Terms and Concepts for Indigenous Petroglyphs and Pictographs. *American Antiquity* 1–22. https://doi.org/10.1017/aaq.2025.2
3. Markert, Patricia G., Lisa Hodgetts, Marie-Pier Cantin, Solène Mallet Gauthier, Natasha Lyons, Kisha Supernant, John R. Welch, Adrianna Wiley, and Joshua Dent. (2025) Confronting Archaeology's 'Gray Zones.' *American Antiquity* 90: 555–72. https://doi.org/10.1017/aaq.2024.81.
4. Welch, John R., Fred Nials, Emma L. Britton, Christopher D. Dore, Brandi L. MacDonald, and Randy Ream (2025) How to Prepare for Geoforensic Fieldwork to Investigate Archaeological Resource Crime. *Advances in Archaeological Practice*. https://doi.org/10.1017/aap.2025.9.
5. Bouevitch, N., S. Jamshidian, and J.R. Welch (2024) Indigenous Co-management of Salish Sea Protected Areas. In *Salish Archipelago: Environmental and Social Dynamics in the Salish Sea*, edited by Moshe Rappaport, pp. 399–418. Australia National University Press. http://doi.org/10.22459/SA.2024
6. Rapaport, Moshe, Nancy J. Turner, Richard Hebda and J.R. Welch (2024) Introduction. In *Salish Archipelago: Environmental and Social Dynamics in the Salish Sea*, edited by Moshe Rappaport, pp. 1–13. Australia National University Press. http://doi.org/10.22459/SA.2024
7. Welch, J.R., and Robert Alan Hershey (2024) Revisiting American Indian Treaty Rights in Arizona. *Arizona Attorney* (July/August): 18–26. https://www.azattorneymag-digital.com/azattorneymag/library/page/20240708/19/
8. Welch, J.R., Shannon Cowell, Stacy L. Ryan, Duston Whiting, and Garry J. Cantley (2023) Cultural Resources Damage Assessment. *Advances in Archaeological Practice* 11: 111–125. doi.org/10.1017/aap.2022.46
9. Armstrong, Chelsey, Anne Spice, Mike Ridsdale, J. R. Welch (2023) Liberating Trails and Travel Routes in Gitxsan and Wet'suwet'en Territories from the Tyrannies of Heritage Resource Management Regimes. *American Anthropologist* 125(1): 1–16. doi.org/10.1111/aman.13817
10. Hogg, Erin A., Chelsea H. Meloche, George P. Nicholas, and John R. Welch (2023) Whose Rights? Whose Heritage?: Policy Changes in Canada. In *Heritage and Democracy: Crisis, Critique, and Collaboration*, edited by Kathryn Lafrenz Samuels and Jon D. Daehnke, pp. 48–64. University Press of Florida, Gainsville.
11. Roos, Christopher, I., Thomas W. Swetnam, T. J. Ferguson, Matthew J. Liebmann, Rachel A. Loehman, John R. Welch, Ellis Q. Margolis, Christopher H. Guiterman, William C. Hockaday, Michael J. Aiuvalasit, Jenna Battillo, Joshua Farella, Christopher A. Kiahtipes (2021) Native American Fire Management at an Ancient Wildland-Urban Interface in the Southwest US. *Proceedings of the National Academy of Sciences* 118 (4) e2018733118. doi.org/10.1073/pnas.2018733118.
12. Welch, John R. (2021) "United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians": Policy Implications of the Apache Nation's 1852 Treaty. *International Indigenous Policy Journal* 12(4). https://doi.org/10.18584/iipj.2021.12.4.14181

13. Hogg, Erin A., and John R. Welch (2021) Expert Witnesses' and Lawyers' Perspectives on the Use of Archaeological Data as Evidence in Aboriginal Rights and Title Litigation. *BC Studies: The British Columbian Quarterly* 211 (Autumn 2021): 13–41. doi.org/10.14288/bcs.vi211.193425

14. Gauer, Viviane H., David M. Schaepe, and John R. Welch (2021) Supporting Indigenous adaptation in a changing climate: insights from the Stó:lō Research and Resource Management Centre (British Columbia) and the Fort Apache Heritage Foundation (Arizona). *Elementa: Science of the Anthropocene*. doi.org/10.1525/elementa.2020.00164.

15. Hogg, Erin A., and John R. Welch (2021) Archaeological Evidence in the Tsilhqot'in Decision. *Canadian Journal of Archaeology* 44:155–84. doi.org/10.51270/44.2.155

16. Hogg, Erin A., and J.R. Welch (2020) Aboriginal Rights and Title for Archaeologists: A History of Archaeological Evidence in Canadian Litigation. *Journal of Social Archaeology* 20 (1):1-28. doi.org/10.1177/1469605320916099

17. Welch, John R. (2020) I ♥ Archaeology. In *Archaeologies of Heart and Emotion*, edited by Kisha Supernant, Jane Eva Baxter, Natasha Lyons, and Sonya Atalay, pp. 23-37. Springer Nature. www.academia.edu/42187856/Archaeologies_of_the_Heart

18. Welch, John R., Kanthi Jayasundera, Christopher D. Dore, Michael Klassen, David Maxwell, George Nicholas and Joanne Hammond (2020) Where New Meets Old: Online Graduate Training for Professional Archaeologists and Heritage Practitioners. In *6th e-Learning Excellence Awards 2020: An Anthology of Case Studies*, edited by Dan Remenyi, pp. 223-236. Academic Conferences International Limited, Reading, United Kingdom.

19. Hodgetts, Lisa, Kisha Supernant, Natasha Lyons, John R. Welch (2020) Broadening #MeToo: Tracking Dynamics in Canadian Archaeology through a Survey on Equity and Diversity. *Canadian Journal of Archaeology* 44(1):20-47. canadianarchaeology.com/caa/publications/canadian-journal-archaeologyjournal-canadien-darcheologie/44/1/020-047

20. Welch, J.R. and Michael Corbishley (2020) Grand Challenge No. 4: Curriculum Design; Curriculum Matters: Case Studies from Canada and the UK. *Journal of Archaeology and Education* 4 (3/5):1-25. digitalcommons.library.umaine.edu/jae/vol4/iss3/5

21. Welch, John R. (2019) Conserving Contested Ground: Sovereignty-Driven Stewardship by the White Mountain Apache Tribe and the Fort Apache Heritage Foundation. In *Environmentalism on the Ground: Processes and Possibilities of Small Green Organizing*, pp. 73–97, edited by Jonathan Clapperton and Liza Piper. Athabasca University Press. https://ucalgary.scholaris.ca/server/api/core/bitstreams/7c4e89bb-8f20-47bb-9732-5f3ee59480d1/content.

22. Welch, John R., Mark Altaha, Garry J. Cantley, William H. Doelle, Sarah A. Herr, Morag M. Kersel, Brandi L. MacDonald, Francis P. McManamon, Barbara Mills, Fred Nials, Mary Ownby, Michael Richards, Ramon Riley, Stacy L. Ryan, Duston Whiting, Donna Yates (2019) Hope in Dirt: Report of the Fort Apache Workshop on Forensic Sedimentology Applications to Cultural Property Crime, 15–19 October 2018. *International Journal of Cultural Property* (2019) 26: 197–210. doi:10.1017/S0940739119000092

23. Tosa, Paul, Matthew J. Liebmann, T. J. Ferguson, and John R. Welch (2019) Movement Encased in Tradition and Stone: Hemish Migration, Land Use, and Identity. In *The Continuous Path: Pueblo Movement and the Archaeology of Becoming*, edited by Sam Duwe and Robert Preucel, pp. 60-77. Amerind Foundation and University of Arizona Press, Tucson.

24. Welch, John R.; Burley, David V.; Driver, Jonathan C.; Hogg, Erin A.; Jayasundera, Kanthi; Klassen, Michael; Maxwell, David; Nicholas, George P.; Pivnick, Janet; and Dore, Christopher D. (2018) Digital Bridges Across Disciplinary, Practical and Pedagogical Divides: An Online Professional Master's Program in Heritage Resource Management. *Journal of Archaeology and Education* 2. digitalcommons.library.umaine.edu/jae/vol2/iss2/1

25. Welch, John R. (2018) Sovereignty-Driven Research. In *Giving Back: Research and Reciprocity in Indigenous Settings*, pp. 307–329, edited by R. Douglas K. Herman. Oregon State University Press.

26. Ferris, Neal, Aubrey Cannon, and John R. Welch (2018) Objects as Stepping Stones: Sustainable Archaeology. *Canadian Journal of Archaeology* 42(1): 4-12.

27. Schaepe, David, Bill Angelbeck, David Snook, and John R. Welch (2017) Archaeology as Therapy: Connecting Belongings, Knowledge, Time, Place, and Well-Being. *Current Anthropology* 58(4):502-533. doi.org/10.1086/692985.

28. Welch, J.R. (2017) Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874. *Sage Open* (October-December):1-19. http://journals.sagepub.com/doi/full/10.1177/2158244017747016

29. Saul L. Hedquist, Alyson M. Thibodeau, John R. Welch, and David J. Killick (2017) Canyon Creek Revisited: New Investigations of a Late Prehispanic Turquoise Mine, Arizona, USA. *Journal of Archaeological Science* 87: 44-58. doi: 10.1016/j.jas.2017.09.0040305-4403.

30. Welch, John R., Sarah A. Herr, and Nicholas C. Laluk (2017) Ndee (Apache) Archaeology. In *Oxford Handbook of Southwest Archaeology*, edited by Barbara J. Mills and Severin Fowles, pp. 495-512. Oxford University Press, New York. doi.org/10.1093/oxfordhb/9780199978427.013.26

31. Hogg, Erin A., Welch, J.R. & Ferris, Neal (2017) Full Spectrum Archaeology. *Archaeologies* 13:1-26. doi:10.1007/s11759-017-9315-9

32. Welch, John R. and Joseph A. Ezzo (2017) Agricultural Commitment in the Grasshopper Region. In *The Strong Case Approach in Behavioral Archaeology*, pp. 35-50, edited by Michael B. Schiffer, Charles R. Riggs, and J. Jefferson Reid. University of Utah Press, Salt Lake City.

33. Welch, J.R., Editor (2016) *Dispatches from the Fort Apache Scout: White Mountain and Cibecue Apache History Through 1881,* By Lori Davisson, with Edgar Perry and the Original Staff of the White Mountain Apache Cultural Center. University of Arizona Press, Tucson. https://uapress.arizona.edu/book/dispatches-from-the-fort-apache-scout

34. Natasha Lyons, David M. Schaepe, Kate Hennessy, Michael Blake, Clarence Pennier, Kyle McIntosh, Andy Phillips, J.R. Welch, Betty Charlie, Clifford Hall, Lucille Hall, Alicia Point, Vi Pennier, Reginald Phillips, Johnny Williams Jr., John Williams Sr., Joseph Chapman and Colin Pennier (2016) Sharing Deep History as Digital Knowledge: An Ontology of the Sq'éwlets First Nation Website Project. *Journal of Social Archaeology* 16(3):359–384. doi.org/10.1177/1469605316668451.

35. Welch, J.R, and Evelyn Pinkerton (2015) 'Ain't Gonna Study War No More': Teaching and Learning Cooperation in a Graduate Course in Resource and Environmental Management. *Groupwork* 25(2):6-30.

36. Hoerig, Karl A., J.R. Welch, T. J. Ferguson, and Gabriella Soto (2015) Expanding Toolkits for Heritage Perpetuation: The Western Apache Ethnography and Geographic Information Science Research Experience for Undergraduates. *International Journal of Applied Geospatial Research* 6(1):60-77.

37. Welch, J.R. (2015) The Last Archaeologist to (Almost) Abandon Grasshopper. *Arizona Anthropologist* (Centennial Edition):107-119. https://journals.uair.arizona.edu/index.php/arizanthro/article/viewFile/18856/18499

38. Ferris, Neal, and J.R. Welch (2015) New Worlds: Ethics in Contemporary North American Archaeological Practice, in *Ethics and Archaeological Praxis*, edited by Cristobal Gnecco and Dorothy Lippert, pp. 69–92. Springer, New York.

39. Atalay, Sonya, Lee Rains Clauss, Randall H. McGuire, and John R. Welch, Editors (2014) *Transforming Archaeology: Activist Practices and Prospects*, Left Coast Press, Walnut Creek, Ca.

40. Atalay, Sonya, Lee Rains Clauss, Randall H. McGuire, and John R. Welch (2014) Transforming Archaeology. *In Transforming Archaeology: Activist Practices and Prospects*, edited by Sonya Atalay, Lee Rains Clauss, Randall H. McGuire, and John R. Welch, pp. 7–28. Left Coast Press, Walnut Creek, Ca.

41. Ferris, Neal, and J.R. Welch (2014) Beyond Archaeological Agendas: In the Service of a Sustainable Archaeology, *Transforming Archaeology: Activist Practices and Prospects*, edited by Sonya Atalay, Lee Rains Clauss, Randall H. McGuire, and John R. Welch, pp. 215–237. Left Coast Press, Walnut Creek, Ca.

42. J.R. Welch and Neal Ferris (2014) 'We have Met the Enemy and It is Us': Improving Archaeology through Application of Sustainable Design Principles. In *Transforming Archaeology: Activist Practices and Prospects*, edited by Sonya Atalay, Lee Rains Clauss, Randall H. McGuire, and John R. Welch pp. 91–113. Left Coast Press, Walnut Creek, Ca.

43. Ferris, Neal, J.R. Welch, and Aubrey Cannon (2013) Towards a Sustainable Archaeology. In *Archaeology and Sustainability*, edited by S. Chiu and C.H. Tsang, pp. 387–410. Center for Archaeological Studies, Research Center of Humanities and Social Science, Taipei, Taiwan.

44. Welch, J.R. and Ian Lilley (editors and authors of introduction with the same title) (2013) Beyond the Equator (Principles): Community Benefit Sharing in Relation to Major Land Alteration Projects and Associated Intellectual Property Issues in Cultural Heritage. Report on a Forum at the Annual Meeting of the Society for American Archaeology, 5 April 2013, Honolulu, Hawaiʻi. *International Journal of Cultural Property* 20(4): (entire submission) 467–493; (introduction) 467–469.

45. Welch, J.R. (2013) Globalizing CRM / CHM. In Beyond the Equator (Principles): Community Benefit Sharing in Relation to Major Land Alteration Projects and Associated Intellectual Property Issues in Cultural Heritage. Report on a Forum at the Annual Meeting of the Society for American Archaeology, 5 April 2013, Honolulu, Hawaiʻi. *International Journal of Cultural Property* 20(4):469–474.

46. Welch, J.R., Editor (2013) *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

47. Welch, J.R. (2013) Un-Silencing Kinishba. In *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*, edited by J.R. Welch, pp. 1–11. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

48. Welch, J.R. (2013) Episodes in Kinishba's Cultural and Management Histories. In *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*, edited by J.R. Welch, pp. 13–30. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

49. Welch, J.R., Mark T. Altaha, and Nicholas C. Laluk (2013) The Kinishba Boundary Survey. In *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*, edited by J.R. Welch, pp. 243–260. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

50. Welch, J.R. and T. J. Ferguson (2013) Apache, Hopi, and Zuni Perspectives on Kinishba History and Stewardship. In *Kinishba Lost and Found: Mid-Century Excavations and Contemporary Perspectives*, edited by J.R. Welch, pp. 261–287. Arizona State Museum Archaeological Series 206, University of Arizona, Tucson.

51. Welch, J.R. (2012) Effects of Fire on Intangible Cultural Resources: Moving Toward a Landscape Approach. In *Wildland Fire in Ecosystems: Effects of Fire on Cultural Resources and Archaeology*, edited by K.C. Ryan, A.T. Jones, and C.H. Koerner, pp. 157–170. RMRS-GTR-42-vol. 3. Ft. Collins, CO: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. https://research.fs.usda.gov/treesearch/40433.

52. Caldwell, Megan E., Dana Lepofsky, Georgia Combes, Michelle Washington, John R. Welch, and John R. Harper (2012) A Bird's Eye View of Northern Coast Salish Intertidal Resource Management Features, Southern British Columbia, Canada, *Journal of Island and Coastal Archaeology* 7:1–15.

53. Welch, J.R., Dana Lepofsky, Megan Caldwell, Georgia Combes, and Craig Rust (2011) Treasure Bearers: Personal Foundations For Effective Leadership In Northern Coast Salish Heritage Stewardship, *Heritage and Society* 4(1):83–114.

54. Welch, J.R., Dana Lepofsky, and Michelle Washington (2011) Assessing Collaboration with the Sliammon First Nation in a Community-Based Heritage Research and Stewardship Program, *Archaeological Review from Cambridge* 26(2):171–190.

55. Welch, J.R. (2011 [2008]) National Historic Landmark Nomination for Fort Apache and Theodore Roosevelt School. National Park Service, Washington, DC. (book-length, peer- and agency-reviewed significance assessment that was unanimously endorsed by the NHL Committee of the U.S. Park System Advisory Board. http://www.nps.gov/nhl/news/LC/spring2011/FortApache.pdf).

56. Welch, J.R., and Robert C. Brauchli (2010) "Subject to the Right of the Secretary of the Interior": The White Mountain Apache Reclamation of the Fort Apache and Theodore Roosevelt School Historic District, *Wicazo Sa Review* 25(1):47–73. www.jstor.org/stable/40891309

57. Nicholas, George, Catherine Bell, Rosemary Coombe, John R. Welch, Brian Noble, Jane Anderson, Kelly Bannister, and Joe Watkins (2010) Intellectual Property Issues in Heritage Management, Part 2: Legal Dimensions, Ethical Considerations, and Collaborative Research Practices, *Heritage Management* 3(1):117–147.

58. Welch, J.R., Ramon Riley and Michael V. Nixon (2009) Discretionary Desecration: American Indian Sacred Sites, Dzil Nchaa Si An (Mount Graham, Arizona), and Federal Agency Decision Making, *American Indian Culture and Research Journal* 33(4):29–68. doi.org/10.17953/aicr.33.4.2866316711817855

59. Welch, J.R., Mark K. Altaha, Karl A. Hoerig and Ramon Riley (2009) Best Cultural Heritage Stewardship Practices by and for the White Mountain Apache Tribe, *Conservation and Management of Archaeological Sites* 11(2):148–160.

60. Welch, J.R. (2009) Reconstructing the Ndee Sense of Place. In *The Archaeology of Meaningful Places*, edited by Brenda Bowser and M. Nieves Zedeño, pp. 149–162. University of Utah Press, Salt Lake City.

61. Welch, J.R. (2008) Places, Displacements, Histories and Memories at a Frontier Icon in Indian Country. In *Monuments, Landscapes, and Cultural Memory*, edited by Patricia E. Rubertone, pp. 101–134. World Archaeological Congress and Left Coast Press, Walnut Creek, California.

62. Mills, Barbara J., Mark Altaha, J.R. Welch, and T. J. Ferguson (2008) Field Schools Without Trowels: Teaching Archaeological Ethics and Heritage Preservation in a Collaborative Context. In *Collaborating at the Trowel's Edge: Teaching and Learning in Indigenous Archaeology*, edited by Stephen W. Silliman, pp. 25–49. University of Arizona Press, Tucson.

63. Nicholas, George P., J.R. Welch, and Eldon C. Yellowhorn (2008) Collaborative Encounters. In *Archaeological Practice: Engaging Descendant Communities*, edited by Chip Colwell-Chanthaphonh and T. J. Ferguson, pp. 273–298. AltaMira Press, Walnut Creek, California.

64. Welch, J.R., and T. J. Ferguson (2007) Putting Patria into Repatriation: Cultural Affiliations of White Mountain Apache Tribe Lands. *Journal of Social Archaeology* 7:171–198. DOI: 10.1177/1469605307077477

65. Welch, J.R. (2007) 'A Monument to Native Civilization': Byron Cummings' Still-Unfolding Vision for Kinishba Ruins. *Journal of the Southwest* 49 (1):1–94.

66. Welch, J.R. (2007) The White Mountain Apache Photographs of Chuck Abbott and Esther Henderson. *Journal of the Southwest* 49 (1):95–116.

67. Welch, J.R. (2007) Kinishba Bibliography. *Journal of the Southwest* 49(1):117–127.

68. Welch, J.R., Chip Colwell-Chanthaphonh and Mark Altaha (2005) Retracing the Battle of Cibecue: Western Apache, Documentary, and Archaeological Interpretations. *Kiva* 71(2):133–163.

69. Welch, J.R., Alex Jay Kimmelman, and Stan Schuman (2002) National Register Nomination for Lower Cibecue Lutheran Mission, White Mountain Apache Tribe lands. Keeper of the National Register of Historic Places, National Park Service, Washington, DC.

70. Mahaney, Nancy, and J.R. Welch (2002) The Legacy of Fort Apache: Interpretive Challenges at a Community Historic Site. *Journal of the Southwest* 44(1):35–47.

71. Welch, J.R., and Ramon Riley (2001) Reclaiming Land and Spirit in the Western Apache Homeland. *American Indian Quarterly* 25(1):5–12.

72. Welch, J.R., and Todd Bostwick (editors) (2001) *The Archaeology of Ancient Tactical Sites*. The Arizona Archaeologist No. 32, Arizona Archaeological Society, Phoenix.

73. Welch, J.R. (2001) Ancient Masonry Fortresses of the Upper Salt River. In *The Archaeology of Ancient Tactical Sites*, edited by John R. Welch and Todd Bostwick, pp. 77–96. The Arizona Archaeologist No. 32, Arizona Archaeological Society, Phoenix.

74. Welch, J.R. (2000) The White Mountain Apache Tribe Heritage Program: Origins, Operations, and Challenges. In *Working Together: Native Americans and Archaeologists*, edited by Kurt E. Dongoske, Mark Aldenderfer, and Karen Doehner, pp. 67–83. Society for American Archaeology, Washington, DC. http://www.saa.org/Portals/0/SAA/publications/SAAbulletin/16-1/SAA9.html.

75. Anyon, Roger, T.J. Ferguson, and J.R. Welch (2000) Heritage Management by American Indian Tribes in the Southwestern United States. In *Cultural Resource Management in Contemporary Society*, edited by Francis P. McManamon and Alf Hutton, pp. 120–141. Routledge, New York.

76. Van West, Carla, Richard S. Ciolek-Torrello, John R. Welch, Jeffrey H. Altschul, Karen R. Adams, Steven D. Shelley, and Jeffrey A. Homburg (2000) Subsistence and Environmental Interactions. In *Salado*, edited by Jeffrey S. Dean, pp. 29–56. Amerind Foundation, Dragoon, Arizona and University of New Mexico Press, Albuquerque.

77. Welch, J.R. (1997) White Eyes' Lies and the Battle for Dzil Nchaa Si An. *American Indian Quarterly* 27(1):75–109. https://doi.org/10.2307/1185589

78. Whittlesey, Stephanie, Teresita Majewski, John R. Welch, Matthew Bischoff, and Richard S. Ciolek-Torrello (1997) Euroamerican History, 1540 to the Present. In *Vanishing River: Landscapes and Lives of the Lower Verde Valley: The Lower Verde Archaeological Project: Overview, Synthesis, and Conclusions*, edited by Stephanie Whittlesey, Richard S. Ciolek-Torrello, and Jeffrey H. Altschul, pp. 281–336. Statistical Research Inc. Press, Tucson, Arizona.

79. Adams, Karen R., and John R. Welch (1997) Land form Associations, Seasonal Availability, and Ethnobotany of Plants in the Lower Verde. In *Vanishing River, Landscapes and Lives of the Lower Verde Valley: The Lower Verde Archaeological Project*, Volume 2: Agricultural, Subsistence, and Environmental Studies, edited by Jeffrey A. Homburg and Richard S. Ciolek-Torrello, pp. 33–55. Statistical Research Inc. Press, Tucson, Arizona.

80. Homburg, Jeffrey A., John R. Welch, Stephanie M. Whittlesey, and Richard S. Ciolek-Torrello (1997) The Environmental Setting of the Lower Verde Archaeological Project. In *Vanishing River, Landscapes and Lives of the Lower Verde Valley: The Lower Verde Archaeological Project*, Volume 2: Agricultural, Subsistence, and Environmental Studies, edited by Jeffrey A. Homburg and Richard S. Ciolek-Torrello, pp. 1–15. Statistical Research Inc. Press, Tucson, Arizona.
81. Welch, J.R. (1996) The Dry and the Drier: Conflict and Cooperation in Moroccan Irrigation Systems. In *Canals and Communities: Small-Scale Irrigation Systems*, edited by Jonathan B. Mabry, pp. 69–87. University of Arizona Press, Tucson.
82. Welch, J.R., Jonathan B. Mabry, and Hsain Ilahiane (1996) Rapid Rural Appraisal of Arid Land Irrigation. In *Canals and Communities: Small-Scale Irrigation Systems*, edited by Jonathan B. Mabry, pp. 119–138. University of Arizona Press, Tucson.
83. Reid, J. Jefferson, J.R. Welch, Barbara K. Montgomery, and Maria Nieves Zedeno (1996) A Demographic Overview of the Late Pueblo III Period in the Mountains of East-Central Arizona. In *The Prehistoric Pueblo World, A.D. 1150–1350*, edited By Michael A. Adler, pp. 73–85. University of Arizona Press, Tucson.
84. Welch, J.R. (1995) Preservation, Research, and Public Interpretation at Pueblo Devol, an Arizona Cliff Dwelling. *Kiva* 61(2):121–143.
85. Welch, J.R. and Richard S. Ciolek-Torrello (1994) Nineteenth- and Twentieth-Century Land Use in the Tonto Basin. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 57–78. Statistical Research Inc., Tucson, Arizona.
86. Ciolek-Torrello, Richard S. and J.R. Welch (editors) (1994) *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin. Statistical Research Inc., Tucson, Arizona
87. Ciolek-Torrello, Richard S. and John R. Welch (1994) Introduction. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 1–18. Statistical Research Inc., Tucson, Arizona.
88. Welch, J.R., and Richard S. Ciolek-Torrello (1994) Analytic Approaches to Ancient Agroecology: Goals and Methods of the Agricultural Field Study. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin. edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 41–56. Statistical Research Inc., Tucson, Arizona.
89. Welch, J.R. (1994) Environmental Influences on Tonto Basin Agricultural Productivity and Sustainability. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 19–39. Statistical Research Inc., Tucson, Arizona.
90. Ciolek-Torrello, Richard S., Stephanie M. Whittlesey, and John R. Welch (1994) A Synthetic Model of Prehistoric Land Use. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 437–472. Statistical Research Inc., Tucson, Arizona.
91. Welch, J.R. (1994) Archaeological Studies of Agricultural Contexts. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 223–251. Statistical Research Inc., Tucson, Arizona.
92. Adams, Karen R., and J.R. Welch (1994) Tonto Basin Plant Geography and Ecology. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 121–133. Statistical Research Inc., Tucson, Arizona.

93. Welch, J.R. (1994) Ethnographic Models for Tonto Basin Land Use. In *The Roosevelt Rural Sites Study*, Volume 3: Changing Land Use in the Tonto Basin, edited by Richard S. Ciolek-Torrello and John R. Welch, pp. 79–120. Statistical Research Inc., Tucson, Arizona.

94. Ciolek-Torrello, Richard S., and J.R. Welch (1993) Reconstructing Prehistoric Land Use in the Tonto Basin, Arizona. *Proceedings of the 24th Chacmool Conference*, edited by Ross W. Jamieson, Sylvia Abonyi, and Neil Mirau, pp. 273–282. The Archaeological Association of the University of Calgary, Alberta.

95. Welch, J.R. (1992) Irrigation Agriculture in the Tonto Basin. *Proceedings of the 1992 Salado Conference*, edited by Richard Lange, pp. 93–111. Arizona Archaeological Society, Tucson.

96. Welch, J.R., and Daniela Triadan (1991) The Canyon Creek Turquoise Mine, East-Central Arizona. *Kiva* 56(2):145–164.

97. Welch, J.R. (1991) From Horticulture to Agriculture in the late Prehistory of the Grasshopper Region, Arizona. In *Mogollon V*, edited by Patrick H. Beckett, pp. 75–92. COAS, Las Cruces, New Mexico.

98. Donaldson, Bruce R., and J.R. Welch (1991) Western Apache Dwellings and their Archaeological Correlates. In *Mogollon V*, edited by Patrick H. Beckett, pp. 93–105. COAS, Las Cruces, New Mexico.

99. Ciolek-Torrello, Richard S., S. D. Shelley, Jeffrey H. Altschul, and John R. Welch (1990) *The Roosevelt Rural Sites Study Research Design*. Technical Series 28 (1). Statistical Research Inc., Tucson.

### Articles, Reports, Reviews, and Other Works Not Formally Peer-Reviewed

1. Welch, John R., Paul F. Reed, Skylar Begay (2025) Public Lands: The Places That Hold Our Nation's Stories Are Not for Sale. Tucson Sentinel, March 9, 2025, https://www.tucsonsentinel.com/opinion/report/030925_public_lands_op/public-lands-places-that-hold-our-nations-stories-are-not-sale/

2. John R. Welch (2025) Review of *Mogollon Communal Spaces and Places in the Greater American Southwest*. Robert J. Stokes, Katherine A. Dungan, and Jakob W. Sedig, editors. 2024. University of Utah Press, Salt Lake City. American Antiquity 90(2). doi: https://doi.org/10.1017/aaq.2024.76

3. Welch, John R. (2024) White Mountain Apache THPO and Archaeology Southwest Boost Protections for Mattocks Pueblo, Mimbres Valley. Archaeology Southwest Preservation Archaeology Blog https://www.archaeologysouthwest.org/2024/10/24/white-mountain-apache-thpo-and-archaeology-southwest-boost-protections-for-mattocks-pueblo-mimbres-valley/

4. Welch, John R., William H. Doelle, Skylar Begay, Ashleigh Thompson (2023) On Head Shaking While Others Nod: Archaeology Southwest's Collaborative Opposition to the SunZia Power Line. https://www.archaeologysouthwest.org/2023/08/15/on-head-shaking-while-others-nod-archaeology-southwests-collaborative-opposition-to-the-sunzia-power-line/

5. Hershey, Robert A., and John R. Welch (2023) *Killers of the Flower Moon* is a Study in Genocidal Villainy That Continues in Today's War on Native American Sacred Sites. Counterpunch, December 20, 2023. https://www.counterpunch.org/2023/12/20/killers-of-the-flower-moon-is-a- study-in-genocidal-villany-that-continues-in-todays-war-on-native-american-sacred-sites/

6. Cowell, Shannon, John R. Welch, and Randy Ream (2023) How Often Are Heritage Resource Crimes Prosecuted in Arizona? SaveHistory.org (blog). https://savehistory.org/az_prosecutions/
7. Welch, John, and Bill Doelle (2023) San Pedro Riparian Area is At Risk. Opinion. *Arizona Daily Star*, June 7, 2023. https://arizonadailystar-az.newsmemory.com/?publink=065ba186d_134abf3
8. Welch, John R., Skylar Begay, Ashleigh Thompson, Brian Williams, and Bill Doelle (2022) Unfencing Preservation Archaeology. Preservation Archaeology Blog. Archaeology Southwest. https://www.archaeologysouthwest.org/2022/10/25/unfencing-preservation-archaeology.
9. Gauer, Viviane H., and John R. Welch (2022) Indigenous-led capacity for climate adaptation: a case study with the Stó:lō Research and Resource Management Centre. Juried poster, Ecological Management Association of British Columbia, April 28, 2022.
10. Leonard, Kathryn, Sean Hammond, Shannon Cowell, Ashleigh Thompson, and John R. Welch (2022) Heritage Resource Looting and Vandalism in Arizona: How Serious is the Problem? July 19, 2022. https://www.savehistory.org/az-site-stewards/
11. Krista Beazley and J. R. Welch (2021) Fort Apache Heritage Foundation starts listening (sessions). Fort Apache Scout, January 15, 2021.
12. Welch, J.R., Fred Nials, and Duston J. Whiting (2021) Fort Apache Dirtscapes: Sampling White Mountain Apache Tribe Lands to Enable Forensic Sedimentology and Prosecute Archaeological Resource Crimes. *The Society for American Archaeology Archaeological Record* 21(3):8-12. http://onlinedigeditions.com/publication/?i=708266&ver=html5&p=1
13. Stacy L. Ryan, Shannon Cowell, and John R. Welch (2021) What Does a Crime Against History Look Like? In Respect the Land You Stand Upon, edited by Stacy L. Ryan. *Archaeology Southwest Magazine* 34 (2-3):20-21.
14. John R. Welch, Fred Nials, and D. J. "Dusty" Whiting (2021) Fort Apache Dirtscapes. In Respect the Land You Stand Upon, edited by Stacy L. Ryan. *Archaeology Southwest Magazine* 34 (2-3):9.
15. Ramon Riley and John R. Welch (2021) Everything Is a Sacred, Living Entity: An Apache Perspective on Archaeological Resource Crime. In Respect the Land You Stand Upon, edited by Stacy L. Ryan. *Archaeology Southwest Magazine* 34 (2-3):23-25.
16. Benjamin H. Nuvamsa and John R. Welch (2021) Our Way of Life Is Forever Disrupted: A Hopi Perspective on Archaeological Resource Crime. In Respect the Land You Stand Upon, edited by Stacy L. Ryan. *Archaeology Southwest Magazine* 34 (2-3):28-30.
17. John R. Welch (producer, host & videographer) (2021) Komatke Trail Survey, Sonoran Desert National Monument. Archaeology Southwest. https://www.youtube.com/watch?v=-hfWon15pOA
18. J.R. Welch (2020) Archaeological Resource Crime is a Wicked Problem. Blog, Save History: https://www.savehistory.org/archaeological-resource-crime-is-a-wicked-problem/.
19. Benjamin H. Nuvamsa and John R. Welch (2020) Conversation with Benjamin H. Nuvamsa. Blog, Save History: https://www.savehistory.org/interview-with-benjamin-h-nuvamsa/.
20. J.R. Welch (2020) Listening to Apache Voices. *Fort Apache Scout* December 10, 2020.
21. Hanacek, Ksenija, and J. R. Welch (2020) Proposed copper mine on land sacred to the indigenous Apache of Arizona, USA. Environmental Justice Atlas. https://ejatlas.org/conflict/a-proposed-copper-mine-on-a-land-that-is-sacred-to-the-apache-indigenous-of-arizona-usa
22. J.R. Welch (compiler and lead author) (2020) A Guide to Field Investigation and Documentation of Archaeological Resources Protection Act (ARPA) Violations. Department of Justice Services, U.S. Bureau of Indian Affairs, Albuquerque.

23. J.R. Welch (2019) Congressman O'Halleran Pledges Support for Work to Promote Stewardship and to Prevent Grave Robbing, Looting. *Fort Apache Scout* August 30, 2019.
24. J.R. Welch (2019) "Congressman O'Halleran Supports Site Stewardship and Work to Prevent Grave Robbing, Looting." ACRAsphere, August 22, 2019, https://acra-crm.org/acrasphere/7844079
25. Natasha Lyons, Kisha Supernant, and John R. Welch (2019) What Are the Prospects for an Archaeology of Heart? *SAA Archaeological Record* 19(2):6–9.
26. Schaepe, David, Natasha Lyons, and John R. Welch, with Dalton Silver and the Téméxw, Stewardship Alliance (2019). Knowledge Creation for Advancing Reconciliation through Collaborative Resource Stewardship and Shared Land-Use Decision-Making: A Case of Indigenous-Crown Relations in Southwest British Columbia. Submitted to the Social Sciences and Humanities Research Council. https://www.researchgate.net/publication/344012326_Knowledge_Creation_for_Advancing_Reconciliation_through_Collaborative_Resource_Stewardship_and_Shared_Land-Use_Decision-Making_A_Case_of_Indigenous-Crown_Relations_in_Southwest_British_Columbia
27. J.R. Welch (2019) (Yet) Another Southwest: Incipient Preservation Archaeology in Southwest Ethiopia. Preservation Archaeology Blog. Archaeology Southwest https://www.archaeologysouthwest.org/2019/02/14/yet-another-southwest-incipient-preservationarchaeology-in-southwest-ethiopia/
28. J.R. Welch, Mark Altaha, Ramon Riley (2019) THPO, BIA, Fort Apache Heritage Foundation, and Archaeology Southwest Team up to Curb Grave Robbing, Looting. *Fort Apache Scout*, February 15, 2019.
29. J.R. Welch, Mark Altaha, Stacy Ryan, and Garry Cantley (2019) White Mountain Apache THPO, BIA, and Archaeology Southwest Team up to Boost Training to Curb Grave Robbing, Looting, *Site Steward Newsletter*, Arizona State Parks.
30. Helen Erickson, Karl A. Hoerig and John R. Welch (2018) Fort Apache and Theodore Roosevelt School National Historic Landmark [Fort Apache, Arizona], *SAH Archipedia,* eds. Gabrielle Esperdy and Karen Kingsley, Charlottesville: UVaP, 2012—, http://sah-archipedia.org/buildings/AZ-01-017-0034.
31. Welch, J.R. (2017) Cycles of Resistance, *SAA Archaeological Record* 17(1):17-21. http://onlinedigeditions.com/publication/?i=378203&article_id=2700507&view=articleBrowser&ver=html5.
32. Welch, J.R. (2017) How Can the Cultural / Heritage Management (CRM) Industry Reduce Key Obstacles to Upward Mobility for Junior Staff? Linked In, https://www.linkedin.com/pulse/how-can-cultural-heritage-management-crm-industry-reduce-welch
33. Benrita "Mae" Burnette, Ronnie Cachini, T. J. Ferguson, Sharlot Hart, Stewart B. Koyiyumptewa, Octavius Seowtewa, Paul Tosa, and J.R. Welch (2017) Fire Adds Richness to the Land: Ethnographic Knowledge about Forests and Fire. *Archaeology Southwest* 30(4):5-6.
34. Vigil, Francis, and J.R. Welch (2017) Beyond Community Consent: Toward Sovereignty-Driven Academic Research. *Archaeology Southwest* 30(4):26-27.
35. Welch, J.R., and Erin Hogg (2017) Heritage Resource Management. Open access bibliography containing over 1,000 complete citations to books, articles and other resources. https://www.zotero.org/groups/635575/heritage_resource_management

36. Welch, J.R., Mark Altaha, and the BFRR Collective (2016) 'Ground-Truthing' Ancestral Pueblo Settlement of the Southern and Western Flanks of Arizona's White Mountains, White Mountain Apache Tribe Lands, Arizona. *Glyphs* 67(3):12-15. http://www.az-arch-and-hist.org/publications/glyphs/
37. The Black Trowel Collective (2016) Foundations of an Anarchist Archaeology: A Community Manifesto. http://savageminds.org/2016/10/31/foundations-of-an-anarchist-archaeology-a-community-manifesto/
38. Ferris, Neal, and J.R. Welch (2016) Notes from the Next Century: Sustainable Archaeology, *Kiva* 82(3):330.
39. Welch, J.R. (2016) Toward Full-Spectrum Cultural Heritage Management (or, My Big, Fat Cultural Future!). *IPinCH Newsletter* 7(Spring 2016):13. http://www.sfu.ca/ipinch/sites/default/files/news/newsletters/ipinch_newsletter_7_final_singles_web.pdf
40. Welch, J.R. (2016) Preservation, Decolonization and Sovereignty Reclamation at the Fort Apache and Theodore Roosevelt National Historic Landmark, Arizona. IHOPE featured case study http://ihopenet.org/preservation-decolonization-and-sovereignty-reclamation-at-the-fort-apache-and-theodore-roosevelt-national-historic-landmark-arizona/
41. Welch, J.R., Editor (2016) *The Site that Nobody Really Knows: Kinishba Reawakened*. *Archaeology Southwest* 30(1): 1-28. https://www.archaeologysouthwest.org/what-we-do/information/asw/asw30-1/
42. Welch, J.R., (2016) The Site that Nobody Really Knows: Kinishba Reawakened. *Archaeology Southwest* 30(1): 3-5.
43. Welch, J.R., (2016) Episodes in Kinishba History. *Archaeology Southwest* 30(1): 6-7.
44. Welch, J.R., (2016) A Dream Deferred: Cummings and the Shaeffers at Kinishba. *Archaeology Southwest* 30(1): 8-10.
45. Welch, J.R., (2016) The Fateful Box: Excavations at Kinishba after 1939. *Archaeology Southwest* 30(1): 11-13.
46. Welch, J.R., Nicholas C. Laluk, and Mark T. Altaha (2016) The Kinishba Boundary Survey. *Archaeology Southwest* 30(1): 23-25.
47. Welch, J.R., and T.J. Ferguson (2016) Preservation Spotlight: Apache, Hopi, and Zuni Perspectives on Kinishba History and Stewardship—This Place is Protected. *Archaeology Southwest* 30(1): 26-27.
48. Hart, Sharlot, T. J. Ferguson, John Welch, and Paul Tosa (2016) Fire Adds Richness to the Land. Pueblo of Jemez *Red Rocks Reporter* (January): 7. http://www.jemezpueblo.org/uploads/FileLinks/46a94f403cfa4d6e9573eeeb89520879/JANUARY_2016_FINAL.pdf
49. Welch, J.R., Karl Hoerig, and Stephen Grede (2016) *Visitor Guide to Kinishba*. White Mountain Apache Tribe Heritage Program, Fort Apache, Arizona (revised edition).
50. Welch, J.R. (2015) From the Garbage Czar, with Love (and apologies to the "real" Uncle Willy). *Arizona Anthropologist* (Centennial Edition):120-121.
51. Welch, J.R. (2014) Cultural Heritage: What is it? Why is it important? Fact Sheet Presented by the Intellectual Property Issues in Cultural Heritage Project (IPinCH). http://www.sfu.ca/ipinch/sites/default/files/resources/fact_sheets/ipinch_chfactsheet_final.pdf.

52. Welch, J.R., and the SAA Amity Pueblo Task Force (2014) The Amity Pueblo Remediation. Analysis presented in the Society for American Archaeology Government Affairs Newsletter, December 2014. http://www.saa.org/AbouttheSociety/GovernmentAffairs/tabid/115/Default.aspx

53. Welch, J.R., editor (2014) Community-Based Cultural Heritage Research. Wiki for the IPinCH project's Community-Based Cultural Heritage Research (CBCHR) Working Group. https://wiki.sfu.ca/research/ipinch/index.php/Main_Page.

54. Welch, J.R. (2014) Untitled blog for the Simon Fraser University Indigenous Research Institute. http://www.sfu.ca/olc/blog/indigenous-sfu-community-stories/indigenous-research-institute-sfu-john-r-welch.

55. Welch, J.R. (2014) White Mountain Apache Collection. Text-searchable compendium of over 500 archival documents relating to the history and resource management of the Fort Apache Indian Reservation, Arizona. http://content.lib.sfu.ca/cdm/search/collection/faca/page/1.

56. Welch, J.R. (2013) IPinCH and Golder Associates Host Lively Forum on IP and Benefits-Sharing Issues in International Cultural Resources Management. IPinCH Digest: 2013, Volume 4 (April 2013):1. http://www.sfu.ca/ipinch/news/ipinch-news/ipinch-and-golder-associates-host-lively-forum-ip-and-benefits-sharing-issues-inter.

57. Welch, J.R., Rudy Ethelbah, and Larry Ethelbah (2013) Freda Ethelbah: Apache Living Treasure, Mickey Free Granddaughter. *White Mountain Independent*, July 17, 2013. http://www.wmicentral.com/news/latest_news/freda-ethelbah-apache-living-treasure-mickey-free-granddaughter/article_8effce98-ed97-11e2-a8fc-0019bb2963f4.html.

58. Welch, J.R., Rudy Ethelbah, and Larry Ethelbah (2013) Freda Ethelbah: Apache Living Treasure, Mickey Free Granddaughter. *Fort Apache Scout*, July 12, 2013, pages 1, 3.

59. Welch, J.R. (2012) Review of *Indigenous Peoples and the Collaborative Stewardship of Nature: Knowledge Binds and Institutional Conflicts*, by Ross, Anne, Kathleen Pickering Sherman, Jeffrey G. Snodgrass, Henry D. Delcore, and Richard Sherman (Left Coast Press, Walnut Creek, California, 2011), *Journal of Anthropological Research* 68:129–130.

60. Welch, J.R. (2011) Heritage Site Protection Protocol for Tla'amin Territory, British Columbia. Multi-party Agreement sent to respective councils in November 2011.

61. Welch, J.R., and Lindsay Tripp (2011) Cooperation in Land and Resource Management – Guide to research materials. http://www.lib.sfu.ca/help/subject-guides/rem/cooperation-in-rem.

62. Welch, J.R., Erica Kowsz, and Lindsay Tripp (2011) Applied Archaeology and Cultural Resource Management (CRM) – Guide to research materials. http://www.lib.sfu.ca/help/subject-guides/archaeology/applied-archaeology-and-cultural-resource-management.

63. Lyons, Natasha, Andy Philipps, Dave Schaepe, Betty Charlie, Clifford Hall, Kate Hennessey, and John R. Welch (2011) The Scowlitz Site Online: Launch of the Scowlitz Artifact Assemblage Project. *The Midden* 43(2):11–14.

64. Lewis, Jennifer, and J.R. Welch (2011) Historic Property Identification and Documentation Survey of Portions of the Fort Grant Prison, Arizona. Submitted to Arizona Department of Corrections.

65. Welch, J.R. (2011) Review of *From Cochise to Geronimo: The Chiricahua Apaches, 1874–1886*, by Sweeney, Edwin R. (University of Oklahoma Press, 2010) *Journal of Arizona History* 52:393–395.

66. Welch, J.R. (2011) Review of *The Museum of Anthropology at the University of British Columbia*, edited by Carol E. Mayer and Anthony Shelton (Douglas & McIntyre and University of Washington Press, Vancouver and Seattle, 2009), *Museum Anthropology* 34(2):175–176.

67. Welch, J.R., Eric McLay, Michael Klassen, Fred Foster, and Robert Muir (2011) A Database of Unauthorized Heritage Site Alterations. *The Midden* 43(1):2–3.
68. Caldwell, Megan, Dana Lepofsky, John R. Welch, Chris Springer, and Nyra Chalmer (2011). Tla'amin-SFU Field School in Archaeology & Heritage Stewardship 2010 Field Report and 2011 Prospectus. Submitted to the Sliammon First Nation.
69. Welch, J.R., F. Foster, R. Gillies, M. Klassen, E. McLay, R. Muir (2010) The Heritage Conservation Act Contravention Data Base. *BC Association of Professional Archaeologists Fall/Winter Bulletin* 2010(2):2–3.
70. Nicholas, George, J.R. Welch, Alan Goodman, and Randall McGuire (2010) Beyond the Tangible: Repatriation of Cultural Heritage, Bioarchaeological Data, and Intellectual Property. Anthropology News (March):10–11.
71. Welch, J.R. (2010) Review of *Opening Archaeology: Repatriation's Impact on Research and Practice*, edited by Thomas W. Killion (School for Advanced Research Press, 2008) *American Antiquity* 75:201-202.
72. Lewis, Jennifer, and J.R. Welch (2010) Fort Apache-Theodore Roosevelt School (FA-TRS) Survey 2010, Fort Apache Historic Park, Arizona. Submitted to the Fort Apache Heritage Foundation.
73. Ewing, Robyn, T.J. Ferguson, and J.R. Welch (2009) Repatriation and Reburial Bibliography, http://tinyurl.com/cput3r, RefShare, Simon Fraser University, Burnaby, BC.
74. Jackley, Julia, Dana Lepofsky, John R. Welch, Megan Caldwell, Chris Springer, Morgan Ritchie, Craig Rust and Michelle Washington (2008) Tla'amin-SFU Archaeology and Heritage Program 2009. *The Midden* 41(4):5–7.
75. Welch, J.R. (2009) Review of *Shadows at Dawn: A Borderlands Massacre and the Violence of History,* by Karl Jacoby (The Penguin Press, New York, 2008). *Journal of Arizona History* 50(4):403–404.
76. Lepofsky, Dana, and John R. Welch (2009) Herring Archaeology in Tla'amin Territory. *Midden* 41(3):3.
77. Tla'amin First Nation – Simon Fraser University Archaeology and Heritage Stewardship Program. Website and electronic documents, http://www.sliammonfirstnation.com/archaeology.
78. Johnson, Sarah, Dana Lepofsky, John R. Welch, Craig Rust and Michelle Washington (2008) Field School Update: Tla'amin-SFU Field School in Archaeology & Heritage Stewardship, *The Midden* 40(3):8–9.
79. Welch, J.R., Mark Altaha, Doreen Gatewood, Karl Hoerig, and Ramon Riley (2008) Past is Present: Fort Apache and Theodore Roosevelt School. In *American Indian Places*, edited by Frances Kennedy, p. 230. Houghton Mifflin Press, New York.
80. Welch, J.R., Mark Altaha, and Nicholas Laluk (2008) Decolonizing Kinishba Ruins National Historic Landmark. In *American Indian Places*, edited by Frances Kennedy, pp. 208–209. Houghton Mifflin Press, New York.
81. Welch, John R., and Karl A. Hoerig (2008) The White Mountain Apache Tribe. In "Nature-Based Tourism and Tenuring Strategy," prepared by Peter W. Williams, Aaron Heidt, Jen Reilly, and Sydney Johnsen. Coastal First Nations Rainforest Solutions Project.
82. Welch, J.R. (2008) Review of *Zuni Origins: Toward a New Synthesis of Southwestern Archaeology*, edited by David A. Gregory and David R. Wilcox (University of Arizona Press, 2007) *Canadian Journal of Archaeology* 32:289–292.

83. Welch, J.R. (2008) Review of *Chiricahua Apache Enduring Power*, by Trudy Griffin-Pierce (University of Alabama Press, 2006) *American Anthropologist* 110(1):108–109.
84. Lepofsky, Dana, John R. Welch, Sarah Johnson, Craig Rust, and Lisa Wilson (with Michelle Washington, Georgia Combes, Hugh Prichard, and the 2008 students) (2008) Tla'amin-SFU Field School in Archaeology & Heritage Stewardship: 2008 Season Report and 2009 Prospectus. Department of Archaeology, Simon Fraser University.
85. Asp, Vera J., Knut Fladmark, John R. Welch, Robert Muir, and George Kauffman (2007) Tahltan and Tanzilla Villages. Ancestral Knowledge, Ethnohistory, and Archaeology of Two Tahltan Villages: Report on 2007 Fieldwork. Department of Archaeology, Simon Fraser University.
86. Welch, J.R., David V. Burley, Michael Klassen, and George P. Nicholas (2007) New Options for a Professional Preparation Curriculum at Simon Fraser University. *The Midden* 39(4):16–19.
87. Welch, J.R. (2007) Peer Review of Ndee: The Apache Experience, exhibit planning grant submitted by the Heard Museum, Phoenix, Arizona to the National Endowment of the Humanities.
88. Welch, J.R. (2007) Review of Apache Playing Cards, by Wayland, Virginia, and Alan Ferg (Waveland Press, 2006) *Journal of Arizona History* 49(1):77–79.
89. Welch, J.R. (2007) Review of *History is in the Land: Multivocal Tribal Traditions in Arizona's San Pedro Valley*, by T.J. Ferguson and Chip Colwell-Chanthaphonh (University of Arizona Press, 2006). *Journal of Arizona History* 48(2):202–204.
90. Welch, J.R., Mark Altaha, Doreen Gatewood, Karl Hoerig, and Ramon Riley (2006) Archaeology, Stewardship, and Sovereignty. *The SAA Archaeological Record* 6(4):17–20, 57.
91. Welch, J.R., Karl A. Hoerig, and Raymond Endfield, Jr. (2005) Enhancing Cultural Heritage Management and Research through Tourism on White Mountain Apache Tribe Trust Lands. *The SAA Archaeological Record* 5(3):15–19.
92. Welch, J.R., Chip Colwell-Chanthaphonh and Mark Altaha (2005) Triangulating Perspectives on the Battle of Cibecue. *Glyphs* 56(6):7–8.
93. Welch, J.R., and T.J. Ferguson (2005) Cultural Affiliation Assessment of White Mountain Apache Tribal Lands (Fort Apache Indian Reservation). Final Report, prepared in fulfillment of a National NAGPRA Documentation and Planning Grant, National Park Service. Historic Preservation Office, White Mountain Apache Tribe, Arizona.
94. Hoerig, Karl A., and J.R. Welch (2005) *Fort Apache Walking Tour Guide*. White Mountain Apache Tribe Heritage Program, Fort Apache, Arizona.
95. Welch, J.R., Karl Hoerig, and Stephen Grede (2005) *Visitor Guide to Kinishba Ruins*. White Mountain Apache Tribe Heritage Program, Fort Apache, Arizona.
96. Welch, J.R. (2004) Final Report: Kinishba National Historic Landmark Boundary Study. Report prepared under Contract for the National Park Service, Southwestern Regional Office, Santa Fe.
97. Welch, J.R. (2002) The Rodeo-Chediski Fire and Cultural Resources. *Arizona Archaeological Council Newsletter* 26(3):1–3.
98. Welch, J.R. (2001) The End of Prehistory. *Anthropology News*, May 2001, pp. 9–10.
99. Welch, J.R. (2000) Old Fort Apache: A Tribe's Struggle to Take the Best Parts of the Past into the Future. *Heritage Matters*, October 2000, pg. 6.
100. Welch, J.R. (2000) The New Battle for Old Fort Apache. *White Mountain Magazine* 46:22–23, 116–117 (Summer).
101. Welch, J.R., with George Pinter, Nancy Mahaney, Ngozi Robinson, and Bambi Kraus (2000)

*Ndee La'ade: Gathering of the People*. White Mountain Apache Tribe, Whiteriver, Arizona.

102. Welch, J.R., Nancy Mahaney, and Ramon Riley (2000) The Reconquest of Fort Apache: The White Mountain Apache Tribe Reclaims its History and Culture. *CRM* 23(9):16–19.

103. Welch, J.R., and Ramon Riley (1998) The Reconquest of Apachería: Apaches Reclaim their History and Culture. *Ciencia Hoi*.

104. Welch, J.R. (1998) White Mountain Apache Heritage Program Operations and Challenges. *Bulletin, Society for American Archaeology* 16(1):8–11.

105. Welch, J.R. (1998) *Arch-Bark*: Smokescreen or Shortcut? *Glyphs* 49(2):14

106. Welch, J.R. (1997) Did Archaeoastronomy Begin at the Sabino Canyon Ruin? *Old Pueblo Archaeology* 10:1–5.

107. Welch, J.R. (1997) Origins of the White Mountain Apache Heritage Program. *Bulletin, Society for American Archaeology* 15(5):26–28.

108. Welch, J.R. (1996) Archaeological Measures and Social Implications of Agricultural Commitment. Doctoral dissertation, Department of Anthropology, University of Arizona. University Microforms, Ann Arbor, Michigan.

109. Welch, J.R. (1992) Book Note: The Fite Ranch Project, by Yvonne R. Oakes, *Kiva* 57(1):281.

110. Welch, J.R. (1989) Early Investigations at the Sabino Canyon Ruin. Archaeology in Tucson, *Institute for American Research Newsletter*, Summer 1989, pp. 4–6.

111. Welch, J.R. and Aamir Rashid Mufti (1983) Structuralism and Systems of Folk Classification. *Northeastern Anthropological Association Newsletter*, Fall, pp. 1–4.

### Selected Conference Presentations and Invited Lectures, Colloquia, Seminars

1. Welch, J.R. (2024) What's Archaeology Got to Do With lt? Resolution Copper Mine, SunZia Powerline, and Traditional vs. Landscape-Scale Cultural Resource Compliance. Annual Meeting of the Arizona Archaeological Society, Sedona, October 26, 2024.
2. Welch, J.R. (2023) Forensic Sedimentology in an Indigenous Key: Crafting Collaboration at a Science-Humanities-Social Science Interface. University of Missouri Research Reactor and Department of Chemistry Colloquium, Columbia, Missouri, October 27, 2023.
3. Welch, J.R. (2021) Protected Places: Archaeology Southwest's Conservation Properties and Their Emerging Roles in Preservation Archaeology, Archaeology Café Online, January 5, 2021. https://www.archaeologysouthwest.org/event/protected-places-archaeology-southwests-conservation-properties-and-their-emerging-roles-in-preservation-archaeology/
4. Welch, J.R. webinar organizer (2020) Perspectives and Tools for Addressing Archaeological Resource Crime in Indian Country: Prevention, Detection, Investigation, Remediation. Webinar invited by the Arizona State Site Stewards, November 12, 2020. https://www.youtube.com/watch?v=HsDHKhVHV9g.
5. Welch, J.R. and Krista Beazley (2020) Cultural Tourism as Creative Placemaking at Fort Apache. Association for American Indian Tourism (Fort Apache segment runs roughly 18:30-39:50, https://youtu.be/-cK4Z48PmkY?si=iXH8PumwXPAYbDdz.
6. Welch, J.R. (2020) A Tale of Two Cities: Casa Malpais, Kinishba, and the Elusive Promise of Archaeological Tourism. Archaeology Southwest Café, May 5, 2020, https://www.archaeologysouthwest.org/event/why-you-should-experience-casa-malpais-and-kinishba/
7. Welch, J.R. (2019) The White Mountain Experiment in Community-Based Site Protection. Archaeology Southwest Tea Series, May 6, 2019, https://www.youtube.com/watch?v=lmTIrcN5PYo
8. Welch, J.R. (2018) Landscapes, Consultations, Archaeologies, and the Promise of Full-Spectrum

Heritage Resource Management. Invited keynote. Annual meeting of the Federal Columbia River Power System Cultural Resource Program, Kalispell, Montana, November 8, 2018

9. Welch, J.R. (2018) Fort Apache: Conflict, Conservation, and (Re)Conciliation(?) in Indian Country. Haffenreffer Museum 2018 Shepard Krech III Lecture, Brown University, April 5, 2018. https://www.youtube.com/watch?v=qCj_xKgVUNc&index=1&list=PL031FD246CE1CDC15&t=0s
10. Lyons, Natasha, Lisa Hodgetts, Kisha Supernant, John R. Welch (2018) What Does #MeToo Mean for Archaeology? Paper presented in "Unsettling Archaeology" symposium at the 51st Annual Meeting of the Canadian Archaeological Association, Winnipeg, Manitoba May 3, 2018
11. Welch, J.R., David Burley, Erin Hogg, Kanthi Jayasundera, David Maxwell, George Nicholas, Janet Pivnick, Christopher D. Dore, and Michael Klassen (2017) Digital bridges across disciplinary, practical and pedagogical divides: An Online Professional Master's Program in Heritage Resource Management. Paper presented in "The 'Other Grand Challenge': Archaeological Education & Pedagogy in the Next 50 Years," Chacmool Conference, Calgary, Alberta, November 9, 2017.
12. Welch, J.R. (2017) Fort Apache: Pasts, Presents, Futures. Summer Public Lecture Series, Fort Vancouver, Washington, July 20. http://www.friendsfortvancouver.org/archeology-lecture-series-july-2017/
13. Welch, J.R. (2017) Open Eyes, Open Minds, Open Arms, and Open Hearts Open Archaeology. Paper presented at the Society for American Archaeology Annual Meeting, Vancouver, April 1.
14. Welch, J.R., Francis Vigil, and Rachel A. Loehman (2015) Toward a Sovereignty-Driven Paradigm for Transdisciplinary Research on Social-Ecological Systems. Paper presented at the Society for American Archaeology Annual Meeting, San Francisco, California, April 17.
15. Welch. J.R. (2015) Tribal Historic Preservation Officer Toolkit Training Workshop: Quick Start Guide—Essential Guide for Tribal Programs. Full-day workshop presented to 20 tribal government officials at the National Tribal Preservation Conference, Laguna Pueblo lands near Albuquerque, New Mexico, August 17.
16. Schaepe, David M., Bill Angelbeck, John R. Welch, and David Snook (2015) Archaeology as Therapy: Linking Community Archaeology to Community Health. Paper presented at the meeting of the Society for Applied Anthropology, Pittsburgh, Pennsylvania, March 28.
17. Welch, John R. (presenter and discussant) (2015) Sovereignty-Driven Research Ethics: Beyond Baseline Compliance, Consent and Limitation of Liability. Panel discussion, Indigenous Research Ethics conference, Vancouver, February 19. https://indigenousresearchethics2015.wordpress.com/
18. Welch. J.R. (2015) Tribal Historic Preservation Officer Toolkit Training Workshop: Essential Guide for Tribal Programs. Full-day workshop presented to 22 tribal government officials at the National Tribal Preservation Conference, Milwaukee, Wisconsin, September 11.
19. Welch, John R. (presenter) (2014) Fire and Humans in Resilient Ecosystems. Curriculum development workshop for teachers, Laboratory for Tree-Ring Research and College of Education, University of Arizona, Tucson, June 23.
20. Welch, John R. (organizer and moderator) (2014) CRM-ology: Toward a Research Design for Improving the Dominant Form of Archaeological Practice. Forum, Society for American Archaeology Annual Meeting, Austin, Texas, April 25.
21. Hogg, Erin A., and John R Welch (2014) What does Collaborative Archaeology Mean to You? Community-Engagement in Field Schools, Research Projects, and Consulting. Poster presented at the meeting of the Society for American Archaeology, Austin, Texas, April 25.
22. Ruth Aloua and John R. Welch (2014) Closing the Gap Between Management Practice and Policy at a National Historical Park in Hawai'i. Paper presented in the invited symposium, Society for Applied Anthropology, Albuquerque, New Mexico.

23. Hogg, Erin, and John R. Welch (2013) Do you Collaborate? Community Engagement in Field Schools, Research, and Consulting Projects. Poster presented at the meeting of the Canadian Archaeological Association, Whistler, B.C, May 17, 2013.
24. Welch, John R., and Ian Lilley (organizers and moderators) (2013) Beyond the Equator (Principles): Community Benefit Sharing in Relation to Major Land Alteration Projects and Associated Intellectual Property Issues in Cultural Heritage. Forum, Society for American Archaeology Annual Meeting, Honolulu, Hawaii. April 5.
25. Welch, John R., and Karl A. Hoerig (2013) Fort Apache Heritage Foundation. Presentation in symposium, Bellwhether Nonprofits of the Southwest. Society for American Archaeology Annual Meeting, Honolulu, Hawaii. April 4.
26. Atalay, Sonya, Lee Rains Clauss, Randall H. McGuire, and John R. Welch (organizers) (2013) Archaeology, Relevance, and Activism. Seminar, Amerind Foundation, Arizona. February 27-March 3.
27. Welch, John R. (2013) Placemaking and Displacement at Fort Apache and the Theodore Roosevelt School. Archaeology Café public lecture, sponsored by Archaeology Southwest, available at http://www.archaeologysouthwest.org/event/archaeology-cafe-tucson-placemaking-and-displacement-at-fort-apache-and-theodore-roosevelt-school/.
28. Welch, John R. (2012) Home, Home at the Fort: A Millennium of Place Making and Displacement at Fort Apache and TR School National Historic Landmark, Arizona. Environmental Science Program Seminar, Thompson Rivers University, Kamloops, British Columbia.
29. Welch, John R., and Neal Ferris (2011) Making a Sustainable Archaeology. Society for American Archaeology Annual Meeting, Sacramento, California.
30. Ferris, Neal, John R. Welch, and Aubrey Cannon (2011) Capacities for a Sustainable Archaeology. Sustainable Archaeology Workshop, Taipei, Taiwan.
31. Lepofsky, Dana, John R. Welch, and Michelle Washington (Siemthlut) (2011) The Tla'amin-SFU Field School in Archaeology and Heritage Stewardship. People of the River Conference, May 2011.
32. Welch, J.R., Dana Lepofsky, and Michelle Washington (Siemthlut) (2010) Assessing Collaboration with the Sliammon First Nation in a Community-Based Heritage Research and Stewardship Project, in "Perspectives on the Ethical Engagement of Indigenous Peoples In Archaeological Practice" symposium organized by Kerry Thompson, annual meeting of the Society for American Archaeology, St. Louis, Missouri.
33. Speller, C., D. Lepofsky, A. Benson, M. Washington, M. Caldwell, J.R. Welch, D. Yang. (2010) Reconstructing Past Abundance, Diversity, and Use of Herring in the Pacific Northwest of North America, International Council for Archaeozoology, 11th Annual Conference, Paris, France, August 23–28.
34. Welch, J.R., Siemthlut (Michelle Washington) and Dana Lepofsky (2009) *Getting to 100*: Harmonizing Community, Research, and Societal Interests Through the Tla'amin First Nation-Simon Fraser University Field School in Archaeology and Heritage Stewardship, in "Practicing Public Archaeology: Contemporary Issues of Engagement and Action" symposium organized by Paul Thacker, annual meeting of the Society for Applied Anthropology, Santa Fe, New Mexico.
35. Laluk, Nicholas C. and J.R. Welch (2008) Interpretation and Indigenation of Place: Fort Apache, Arizona, in "Archaeology of the Recent Indigenous Past" symposium organized by Nina Swidler, annual meeting of the Society for Historical Archaeology, Albuquerque, New Mexico.

36. Welch, J.R., Vera J. Asp and George Kaufmann (2008) Linking Documentary and Material Histories Through Community-Based Archaeology in Tahltan Territory, British Columbia, in "Ways of Becoming Athapaskan" symposium organized by H. Kory Cooper, B. Sunday Eiselt, and J.R. Welch, annual meeting of the Society for American Archaeology, Vancouver.
37. Ewing, Robyn and J.R Welch (2008) Seeking Middle Ground: Repatriation's Roles in the Negotiation of New Relationships among Indigenous Communities, Museums and Archaeologists, annual meeting of the Society for American Archaeology, Vancouver.
38. Washington, Michelle, J.R. Welch and Dana Lepofsky (2008) Digging Common Ground: The Tla'amin-Simon Fraser University Field School in Archaeology and Heritage Stewardship, September meeting of the Archaeological Society of British Columbia, Vancouver.
39. Welch, J.R., Dana Lepofsky and Siemthlut (Michelle Washington) (2008) Getting to 100: Harmonizing Community, Research, and Societal Interests through Archaeology and Heritage Stewardship, seminar, Vancouver Island University, Powell River, British Columbia.
40. Asp, Vera J., J.R. Welch and George Kaufmann (2008) A Cultural Landscape Approach to the Integration of Documentary and Material Histories in Tahltan Territory, British Columbia, Northwest Archaeological Conference, Victoria, British Columbia.
41. Welch, J.R. and Karl Hoerig (2007) Archaeology, Ndee Identity, and Tribal Sovereignty, in "Archaeologists as Gatekeepers of American Indian Identity" symposium organized by Sonya Atalay and Randy McGuire, annual meeting of the Society for American Archaeology, Austin, Texas.
42. Welch, J.R. (2006) Of, By, and For the Ndee: Archaeology, Heritage Stewardship, and White Mountain Apache Sovereignty, in "Decolonizing Archaeology" symposium, Chacmool Conference, Calgary, Alberta.
43. Welch, J.R. (2005) Ancient Masonry Fortresses of the Upper Salt River, Arizona, September meeting of the Archaeological Society of British Columbia, Vancouver.
44. Welch, J.R. (2005) Panellist, "Anthropologist as Expert Witness," organized by Sylvia Rodriguez.
45. Welch, J.R., Mark Altaha and Nicholas Laluk (2004) Apache? "The Protohistoric Period in the Southern Southwest" symposium, Arizona Archaeological Council, Tucson.

## Works Accepted for Publication or In Press

1. Welch, J.R., Mark Altaha, Nicholas Laluk, and Ramon Riley (2026) Wisdom Sits in Fort Apache: Sovereignty-Driven Redevelopment at Frontier Icon. In *Riding the Frontiers of Decolonization*, edited by Meriam Jorgensen. Harvard University Press (accepted).
2. Welch, John R., Rick Budhwa, Shannon Cowell, Christopher D. Dore, Sarah Herr, Stephen E. Nash, Gerald Wait. 2026 (in press) Cultural Resource Management. In *Routledge Handbook of Applied Anthropology*, edited by Christina Wasson, Edward Liebow, Hsain Ilhiane, Alaka Wali, and Karine Lopes Narahara. Routledge, London.
3. Welch, John R., Robert C. Brauchli, Robert Alan Hershey, George Hesse, Joseph P. Kalt, Gwendena Lee-Gatewood, Jonathan W. Long, Dallas Masey, Cheryl Pailzote (2026) Consequential Victories: Ronnie Lupe and White Mountain Apache Sovereignty. *Wicazo Sa Review.* (Accepted).
4. MacDonald, Brandi L., Fred Nials, and John R. Welch (2026) A Field Guide and Geoforensic Sampling Design for Archaeological Resource Crime Investigation, White Mountain Apache Tribe Land, USA. *Advances in Archaeological Practice* (Accepted)

**Graduate Student Supervision & Completion at SFU**

| Name | Degree | Project / Thesis | Start–Finish |
|---|---|---|---|
| Wong, Nok Shung | M.A. (HRM) | Heritage Conservation in Hong Kong | 2021–2026 |
| Herrera, Jennifer | M.A. (HRM) | "Bridging" Tejano Identity and Indigenous Ancestry Using Archaeological Collections | 2021–2023 |
| Quenoz, Michael | M.A. (HRM) | Drainage Poor...Flies, numerous and troublesome: Reconstructing the Sewer System of First World War Camp Logan in Memorial Park, Houston, TX | 2021–2025 |
| Nelson, Claire | M.A. (HRM) | Unionizing Cultural Resource Management | 2021–2024 |
| Budhwa, Rick | PhD. | Reforming Heritage Conservation in British Columbia | 2021– |
| McKillop, Vanessa | M.A. (HRM) | Weji-sqalia'tiek, They 'sprouted up from the earth': Archaeology and Management of Shubenacadie River Valley Paleoshorelines, Nova Scotia | 2017– 2019 |
| Owens, Camille | M.A. (HRM) | Engaging Public Archaeology Protocols in the Interpretation of Museum Collections | 2017– 2022 |
| Pitul, Michael | M.A. (HRM) | Underwater cultural heritage law and policy in Ontario: History and prospects for reform | 2017– 2019 |
| Campbell, Michael | M.A. (HRM) | CRM Archaeology and Native Land Claims in British Columbia | 2017–drop |
| Johnson, Meghan | M.A. (HRM) | Building Representation: The Development of Barkerville Historic Town & Park's Chinese Narrative | 2017–2019 |
| O'Neil, Casey | M.A. (HRM) | Evaluation of Sample Size Protocols for Large Data Recovery Projects | 2016 –2019 |
| Gauer, Viviane | M.R.M. | Climate Change Adaptation Planning in Two Native-Owned Conservation Organizations | 2016 –2019 |
| Pollock, Jaclyn | M.A. | Building Representation: The Development of Barkerville Historic Town & Park's Chinese Narrative | 2016–2018 |
| Huck, Michael | M.R.M. | Co-constructing Rural Climate Adaptation: Insights from the State of Climate Adaptation and Resilience in the Basin Pilot Project | 2015–2019 |
| Hogg, Erin A. | Ph.D. | Archaeological Data as Evidence in Aboriginal Rights and Title Litigation in Canada | 2014–2019 |
| Hogg, Erin A. | M.A. | Community Engagement in British Columbia Archaeology | 2012–2014 |
| Aloua, Ruth Rebeccalynne | M.A. | Reauthorizing Kanaka Oiwi Heritage Discourse at Kaloko-Honokohau National Historic Park, Hawaii | 2011–2015 |
| Nelly Bouevitch | M.R.M. | Eco-cultural restoration as a step towards co-management: Lessons from the Gulf Islands National Park Reserve | 2011–2016 |
| Knighton, Mykol | M.R.M. | Cultural Heritage Tourism Planning for the Tla'amin First Nation | 2010–2016 |

| Name | Degree | Project / Thesis | Start–Finish |
|---|---|---|---|
| Lewis, Jennifer | Ph.D. | Revaluing “looted” archaeological materials at Fort Apache and Theodore Roosevelt School National Historic Landmark, Arizona | 2010–2017 |
| Morrison, Jessica | M.R.M. | Stó:lo Connect: A Case Study in Collaborative First Nation Referral Management | 2010–2013 |
| Brady, Karen | M.R.M. | Cultural Heritage as Foundation for Regional Planning | 2009–2014 |
| Hoffmann, Tanja | Ph.D. | An Indigenous Model for Environmental Impact Assessment | 2008–2017 |
| Jamshidian, Soudeh | Ph.D. | Effects of Top-Down Environmental Management in Post-Conflict Settings | 2007–2020 |
| Kasstan, Steven | Ph.D. | Caribou is Life: An Ethnoarchaeology of Ethen-eldèli Denesųłiné Respect for Caribou | 2007–2016 |
| Ewing, Robyn | M.A. | Negotiated Repatriation as Middle Ground | 2006–2010 |

**Partial List of Graduate Student Committees at SFU**

| Name | Degree | Thesis / Project | Start–Finish |
|---|---|---|---|
| Niver, Will | Ph.D. | TBA | 2020– |
| Spearing, Whitney | M.A. (HRM) | Microstratigraphic protocol to assess the impact of wildland fires on subsurface archaeological sites | 2017–2019 |
| Meloche, Chelsea | Ph.D. | What Happens Next? Exploring Connections Between Repatriation, Restorative Justice, and Reconciliation in Canada | 2015–2022 |
| Nadeau, Maureen | M.R.M | Exploring Ethical Space for land use planning in the Upper Columbia region of British Columbia | 2020–2022 |
| Stefanyshen, Earl | M.A. (HRM) | Microstratigraphic protocol to assess the impact of wildland fires on subsurface archaeological sites | 2017–2019 |
| Settle, Kathleen | M.A. (HRM) | Vacuum Truck Excavation as a New and Effective Technique in Urban Archaeology | 2016–2019 |
| Brinkhurst, Marena | M.R.M | Community Land Use Planning on First Nations Reserves and the Influence of Land Tenure: A Case Study with the Penticton Indian Band | 2010–2013 |
| Matthews, Beth | M.A. | A Spatial Analysis of Pleistocene-Holocene Transition Sites in the Southern Columbia Plateau and Northern Great Basin of North America | 2008–2016 |

| | | | |
|---|---|---|---|
| Duke, Guy | M.A. | Past Irrigation Practices in the Memories of the Indigenous Peoples of Chimborazo, Ecuador | 2008–2010 |
| Johnson, Sarah | M.A. | A Tla'amin Cultural Landscape | 2007–2010 |
| Kaufmann, George | M.A. | Missionary Classrooms in a Northern Indian Agency | 2007–2009 |
| Peters, Alana | M.A. | Archaeology and Memories of the Casa Grande | 2007–2011 |
| Hammond, Joanne | M.A. | First Nations Heritage Policies as a Window into Community Stewardship | 2006–2009 |
| Klassen, Michael | Ph.D. | Indigenous Heritage Stewardship and the Transformation of Archaeological Practice | 2005–2013 |
| Lennentine, Miku | M.R.M | Brave New World of Community Forestry | 2006–2009 |
| Astofooroff, Nikki | M.R.M. | Achieving Environmental Sustainability in British Columbia Coastal Communities: A Case Study of Haida Gwaii | 2006–2008 |
| Speller, Camilla | Ph.D. | Investigating Turkey Domestication in the Southwest Through Ancient DNA Analysis | 2005–2009 |
| Badenhorst, Shaw | Ph.D. | The Zooarchaeology of Great House Sites in the San Juan Basin of the American Southwest | 2005–2008 |
| Fothergill, Brooklynne | M.A. | Investigations of the Bluff Great House Fauna | 2005–2008 |
| Sanderson, Darlene | Ph.D. | Nipiy Wasekimew / Clear Water: The Meaning of Water, From the Words of the Elders | 2002–2007 |
| Dunn, Catharine | M.R.M | Aboriginal Partnership for Sustainable 2010 Olympic and Paralympic Winter Games | 2004–2007 |
| Woodward, Robyn | Ph.D. | Medieval Legacies: The Industrial Archaeology of an Early Sixteenth Century Sugar Mill at Sevilla La Nueva, Jamaica | 2004–2006 |
| Rawlings, Tiffany | Ph.D. | Faunal Analysis and Meat Procurement: Reconstructing the Sexual Division of Labor at Shields Pueblo, Colorado | 2001–2006 |

**Graduate Student Committee Membership Outside SFU**

| Name | Degree | Institution / Thesis Topic | Start–Fin. |
|---|---|---|---|
| Rich Hutchings | Ph.D. | University of British Columbia / *Rising Affluence, Rising Seas*—Archaeology and Resource Management Responses to The Maritime Heritage Crisis | 2009–2014 |
| Joshua Dent | Ph.D. | University of Western Ontario / Accounts of Engagement: Conditions and Capitals of Indigenous Participation in Canadian Commercial Archaeology | 2010–2016 |
| Aaron Naumann | Ph.D. | University of Washington / Indigenous Archaeology Revisited | 2016– |
| Jonathan Clapperton | Ph.D. | University of Saskatchewan / *Stewards of the Earth?* Aboriginal Peoples, Environmentalists and Historical Representation | 2008–2012 |
| Nicholas Laluk | Ph.D. | University of Arizona / Historical Archaeology at the Chiricahua – Western Apache Interface | 2008–2014 |
| Mary Ann Wade | Ph.D. | University of Northern Arizona / Theodore Roosevelt School and White Mountain Apache Education | 2007–2010 |
| Karen Capuder | Ph.D. | University of Washington / Skokomish Cultural Landscapes | 2006–2012 |
| Bill Angelbeck | Ph.D. | University of British Columbia / Archaeology of Coast Salish Conflict (External Examiner) | 2004–2009 |
| Nicholas Laluk | M.A. | University of Arizona / Apache Scout Camp Archaeology at Fort Apache | 2003–2006 |
| Lauren Jelinek | M.A. | University of Arizona / Apache Archaeology of the Forestdale Valley | 2003–2005 |

**Supervision of Research Personnel**

2011–2012 Erica Kowsz, A.B., Fulbright Canada Scholar **Funded by:** Fulbright Program

2009–2011 Fred Foster, B.S., Research Assistant **Funded by:** Social Sciences and Humanities Research Council Aboriginal Program Grant

2007–2010 Natasha Lyons, PhD, Post-Doctoral Fellow **Funded by:** Social Sciences and Humanities Research Council

2006–2007 Robyn Ewing, B.A, Research Assistant **Funded by:** SFU President's Grant

# EXPERT SERVICE

**Apache Stronghold v. United States of America**; Case Number 21-15295; U.S. Ninth Circuit Court of Appeals. Expert for the plaintiff nonprofit organization involving alleged infringement on free religious practice and treaty rights on the part of the U.S. Forest Service. Under contract with Apache Stronghold. See Welch, John R. (2021) ""United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians": Policy Implications of the Apache Nation's 1852 Treaty," *International Indigenous Policy Journal* 12(4).

**Tohono O'odham Nation, *et al.* v. U.S. Department of Interior, et al.**; Case Civ. No. 4:24-cv-00034-JGZ in U.S. District Court for Arizona. Expert for Archaeology Southwest in a case involving alleged noncompliance with the U.S. National Historic Preservation Act by the U.S. Bureau of Land Management. See J.R. Welch, William H. Doelle, Skylar Begay, Ashleigh Thompson (2023) On Head Shaking While Others Nod: Archaeology Southwest's Collaborative Opposition to the SunZia Power Line. https://www.archaeologysouthwest.org/2023/08/15/on-head-shaking-while-others-nod-archaeology-southwests-collaborative-opposition-to-the-sunzia-power-line/

**San Carlos Apache Tribe v. United States of America**; Case pending in U.S. District Court for Arizona. Expert for the plaintiff tribe in a case involving alleged noncompliance with the U.S. National Environmental Policy Act on the part of the U.S. Forest Service. Contracted with San Carlos Apache Tribe. See J.R. Welch (2021) "Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874" *Sage Open* (October-December):1-19.

**San Carlos Apache Tribe v. Arizona Department of Water Quality**; Case Number LC2019-000264-001; Arizona Court of Appeals. Expert for the plaintiff tribe in a case involving alleged noncompliance with the U.S. Clean Water Act on the part of the State of Arizona U.S. Forest Service. Contracted with San Carlos Apache Tribe.

**White Mountain Apache Tribe v. United States of America**; Case Number 537 U.S. 465; U.S. Supreme Court. Expert for plaintiff tribe in remedying failure by the U.S. to maintain the Fort Apache and Theodore Roosevelt School National Historic Landmark as a prudent fiduciary. Service provided as Tribal Historic Preservation Officer. See .J.R. Welch and Robert C. Brauchli (2010) ""Subject to the Right of the Secretary of the Interior": The White Mountain Apache Reclamation of the Fort Apache and Theodore Roosevelt School Historic District," *Wicazo Sa Review* 25(1):47–73.

# SERVICE

## Academic (External)

| | |
|---|---|
| 2025–2027 | Editorial Board Member, *American Antiquity* |
| 2021–2025 | External Reviewer for seven tenure cases: Southern Methodist U, U British Columbia, Harvard U., U Massachusetts Amherst, Colorado State U, Connecticut College |
| 2020–2025 | Editorial Board Member, Conservation and Management of Archaeological Sites |
| 2015–2025 | Editorial Board Member, *Advances in Archaeological Practice*; *Conservation and Management of Archaeological Sites* |
| 2018–2022 | Member, Canadian Archaeological Association Working Group on Ethics, Diversity, and Inclusion |
| 2017–2019 | Registrar, Register of Professional Archaeologists |

| | |
|---|---|
| 2017 | External Reviewer for Tenure and Promotion Case: Harvard University |
| 2014–2020 | Co-Chair, Amity Pueblo Task Force, Society for American Archaeology |
| 2013–2016 | Member, Government Affairs Committee, Society for American Archaeology |
| 2013 | External Reviewer for Tenure and Promotion Cases: Southern Methodist University, Ft. Lewis College |
| 2011–2013 | Chair, Continuing Professional Education Committee, Register of Professional Archaeologists |
| 2003–Life | Trustee, Josephine H. Miles Testamentary Trust, benefiting the Colorado Historical Society and two American Indian schools in Wyoming and Montana |
| 2003–2010 | Member, Government Archaeology Committee, Soc. for American Archaeology |
| 2006–2009 | Co-Chair, Continuing Professional Education Committee, Register of Professional Archaeologists |
| 2003–2007 | Institutional Grant Administrator, *Doo Aniina' Agot'eehi Baa Nohwii Nagoshd'* (I'll Tell You About How it Was): Programming Endowment Challenge Grant, U.S. National Endowment for the Humanities |
| 2003–2006 | Humanities Scholar, The San Pedro Ethnohistory Internet Project, U.S. National Endowment for the Humanities and Southwest Foundation grant to Center for Desert Archaeology, Tucson |
| 2003–2005 | Member, Board of Directors, Ocotillo Literary Endeavors, Tucson 2002– |
| 2005 | Project Advisor, Ndee Bike' (Footprints of the Apache) and The Fort Apache Legacy, U.S. National Endowment for the Humanities Interpretation Program Implementation grant to Nohwike' Bagowa White Mountain Apache Tribe Cultural Center and Museum |
| 1998–2005 | Founding Member of Board of Directors, U.S. National Association of Tribal Historic Preservation Officers, Washington, DC |
| 2003–2004 | Project Advisor, Guide to Historic Sites of American Indians and the U.S. Military, U.S. Department of Defense |
| 2002–2004 | Member of Project Review Panel, American Indian Treaty Rights and Historic Preservation, U.S. Department of Defense |
| 2002–2003 | Project Humanities Scholar, Our Apache Books, Arizona Humanities Council |
| 1997–1999 | Member of Board of Directors, Arizona Archaeological Council |

**SFU (Senate, University-Wide, Faculty, and Departmental)**

| | |
|---|---|
| 2021–2023 | Co-Chair (with C. Giovas), Museum of Archaeology and Ethnology Strategic Planning Committee, Department of Archaeology |
| 2019–2024 | Member, Graduate Studies Committee / Department of Archaeology 2015– |
| 2023 | Director, Professional Graduate Program in Heritage Resource Management |
| 2017–2018 | Member, Tenure & Promotion / School of Resource and Environmental Mgmt. |
| 2012–2016 | Member, Tenure & Promotion / Department of Archaeology |
| 2015–2017 | Member, Pacific Water Research Center Steering Committee |
| 2013–2014 | Chair, Graduate Studies Com./ School of Resource and Environmental Mgmt. |
| 2013–2014 | Member, Graduate Studies Committee / Department of Archaeology |

| | |
|---|---|
| 2013 | Member, Design Committee Environmental Resource Mgmt. Major (BENV) |
| 2012–2013 | Member, Tenure & Promotion / School of Resource and Environmental Mgmt. |
| 2011–2013 | Member, Senate Committee on International Activities |
| 2011–2012 | Chair, Undergraduate Studies Committee/ Department of Archaeology 2011– |
| 2014 | Member, two President's Super Colloquia Steering Groups: *Toward a Theory of Global Justice* (Spring 2013) and *Protecting Indigenous Heritage* (Fall 2014) |
| 2011 | Member, Community Teaching Fellows Proposal Adjudication Committee |
| 2010–2011 | Chair, Student Awards / School of Resource and Environmental Management |
| 2007–Current | Member, Museum of Archaeology and Ethnology Collections Committee |
| 2007–2010 | Member, Grad. Studies / School of Resource and Environmental Management |
| 2006–2011 | Member, First Nations Studies Advisory Committee |
| 2005–2007 | Member, First Nations University-Wide Coordinating Committee |
| 2006–2008 | Member, Tenure & Promotion / School of Resource and Environmental Mgmt. |
| 2005–08, 2010–14 | Member, Tenure & Promotion / Department of Archaeology |
| 2005–2006 | Member, Harassment, Equity and Ethics Com. / Resource and Environ. Mgmt. |
| 2005–2006 | Member, Student Awards / Department of Archaeology |

### Community

| | |
|---|---|
| 2019–2023 | Member, Academic Collaboration Committee, American Cultural Resources Association |
| 2007–current | Member and Board Secretary, Fort Apache Heritage Foundation Board of Directors |
| 2015–2016 | Advisory Committee member, *Tribal Preservation Planning Needs in Case of Emergency*, project developed by the National Association of Tribal Historic Preservation Officers (NATHPO) with support from the U.S. Federal Emergency Management Agency. |
| 2005–2012 | Archaeology Department liaison, SFU United Way Campaign 2005– |
| 2011 | Archaeology and REM School liaison, SFU United Way Campaign |
| 2007–2010 | Member, Public Education Committee, Archaeological Society of British Columbia |
| 2007–2009 | Member, Fort Apache Master Plan Revision Team, White Mountain Apache Tribe |
| 1998–2007 | Founding Board Member (ex officio), Secretary, Executive Director (pro tempore), Fort Apache Heritage Foundation, Fort Apache, Arizona |
| 2003–2005 | Member, Board of Directors, Arizona Wilderness Coalition |
| 2002 | Judge, Miss White Mountain Apache Queen Committee, White Mountain Apache Tribe |

## AWARDS AND HONORS

2025 **Title:** The Castleton Award for excellence in rock art research **Type:** Scholarship **Organization:** American Rock Art Research Association **Details:** In honor of 2025 article published in American Antiquity 90(3)

2024 **Title:** Distinguished Alumni Award **Type:** Service **Organization:** Fountain Valley School, Colorado Springs **Details:** Occasional award for representing school's values and principles

2024 **Title:** Gordon R. Willey Prize **Type:** Research Publication **Organization:** American Anthropological Association **Details:** Recognition for "Liberating Trails and Travel Routes in Gitxsan and Wet'suwet'en Territories from the Tyrannies of Heritage Resource Management Regimes," by Chelsey Geralda Armstrong, Anne Spice, Mike Ridsdale, and John R. Welch, *American Anthropologist* 125(2):361-376 as the best archaeology article appearing in *American Anthropologist* during the preceding three years.

2017 **Title:** Presidential Recognition Award **Type:** Advocacy **Organization:** Society for American Archaeology **Details:** Recognition for service as the co-chair of the SAA's Amity Pueblo Task Force

2005–15 **Title:** Canada Research Chair (Tier 2) **Type:** Interdisciplinary Research **Organization:** Social Sciences and Humanities Research Council **Details:** Academic appointment to address Indigenous heritage stewardship

2007 **Title:** Fellow **Type:** Service **Organization:** Society for Applied Anthropology **Details:** Endorsement by SfAA Board of the nomination by Shelby Tisdale

1999 **Title:** Governors Award **Type:** Service **Organization:** State of Arizona **Details:** For individual achievement in historic preservation

1992 **Title:** Appreciation Award **Type:** Service **Organization:** Arizona Archaeological and Historical Society **Details:** For contributions to preservation and public education

1991 **Title:** Comins Fellowship **Type:** Fellowship **Organization:** University of Arizona **Details:** Support for dissertation preparation

1983 **Title:** Undergraduate Essay Prize **Type:** Research **Organization:** Northeastern Anthropological Association **Details:** Annual prize for the best student essay submittal

1983 **Title:** Harold C. Bohn Anthropology Prize **Type:** Scholarship **Organization:** Hamilton College **Details:** Award to the best graduate anthropology major

# OTHER

## Manuscript and Proposal Refereeing (Last Five Years)

*American Antiquity*
*Canadian Journal of Archaeology*
*Journal of Social Archaeology*
*Journal of Archaeological Science*
*Journal of the Commons*
*Environment and History*
University of Hawaii Press
University of Arizona Press
University of Utah Press
*Fire Ecology*
*Journal of Environmental Education Research*
Social Science and Humanities Research Council of Canada

## Current Professional Affiliations

Az Archaeological and Historical Society
World Archaeological Congress
Register of Professional Archaeologists
Society for American Archaeology

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION, a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127 |

**DECLARATION OF MARY LUCY ZAZUETA**

I, Mary Lucy Zazueta, declare the following on the basis of personal knowledge to which I am competent to testify:

1. I am a citizen of the Tohono O'odham Nation. I was born on the Nation's Reservation, in Sells, Arizona. I now live in Santa Cruz, Arizona, about fifteen minutes away from the border, on the Reservation.

2. When I was young, I went with my family to live on my uncle's land, which is about two or three miles south of the border, near where the San Miguel gate is now. There was no gate across the border then. The boundary was only a fence, and it was often laid over on the ground. We could move freely, for school and groceries and other things, and to go to the

cemetery for All Souls' Day or if someone passed away. Everything we needed was right there in our backyard.

3. When I was 12, the government put up the metal gates and started to restrict crossings. We had to travel farther away to cross. The nuns could no longer come across to pick us up and take us to school on the northern side. So my family moved back to Sells, where we could go to school and have more access to other things that we needed over here. Having to move back to Sells was hard for us because it separated us from my uncle's family and the land where we lived. It meant that we could no longer be together and could not travel across our territory in the ways that we were used to. Today my family still lives on both sides of the border.

4. I am a traditional O'odham healer. I have been practicing these traditions since I was 13 years old. People come to me for traditional spiritual healing and medicine. I treat people from the north and south of the border. I understand the spiritual ailments that afflict our people. I see people who have illnesses and suffer because something has gone wrong in their lives. Maybe they have done something wrong or maybe something has happened to disrupt their connection with the spirit world and make them vulnerable. There are different reasons why people might be sick, and it is my job to figure out why and to help them get better through blessings and prayers. I do not know why I was chosen to have this understanding, but I know that when I pray and do things the way that I have been taught and the way that the spirits guide me, sometimes I am able to help people to get better.

5. Sickness is a sign that something is not in balance. We believe that everything has life. We are not disrespectful to Mother Earth or to animals or other human beings. We are taught that the skies, the heaven, everything in our culture has its own life. We celebrate these things in different months and different seasons through our ceremonies. We tell our stories in the winter

and hold our rain ceremonies in the summer and fall. We visit our families and care for the gravesites of our relatives and ancestors. We have to do these things. This is our cycle of life, and these are our obligations.

6. When people cannot do what needs to be done, they can fall out of balance and become spiritually sick. It becomes a hardship. Mentally, you know you did not fulfill your promise. It will always be a promise that was not completed. This is a big weight on our people and causes our spirits and our hearts to feel bad. We know what we need to do, and when we do not do it, our mental and physical health suffers.

7. Our people travel all the time to see family and visit our religious sites. It is a central part of our identity. If people are not able to freely travel across our lands, they will not be able to access the places where ceremonies and prayers must take place.

8. We have to perform our ceremonies in the places where they originated and have always been done. We cannot do them in other places because it does not work that way. The place is an important part of the ceremonial function. We have an important ceremony in Quitovac. It is a rain ceremony. We do this ceremony in Mexico. That is where it takes place, where it has to take place, because being in that place is an important part of what the ceremony is. We could not do it anywhere else because then it would be something completely different.

9. In our ceremonies, everything has to be done in a certain way. People must use the ceremonial objects in the proper way, sing songs and pray in the proper way. When they sing the songs, the ceremonial objects come to life, and the spirits will come and be with us and heal us through the performers. They will heal the people who pray, the people they pray for, and the whole community. When we perform the ceremonies in the proper way, everyone is touched by these spirits and receives the blessings and benefits of these prayers. If we do not do it in the

proper way, then the spirits do not come. Something else will happen. Instead of being healed people can become sick, physically or spiritually. If we are not able to pray in the right way, it can be very bad for the people who are praying and for the people they are praying for. So the ceremonies need to be performed in the right way, the way that our ancestors have done it and taught us to do.

10. Having to pass through a wall to participate in our ceremonies affects our ceremonial practices. When we are preparing to go to our ceremonies, we must keep an open heart. We must make ourselves ready to participate in the ceremony in the right way. We must embrace the connection that we have to each other and to the spirits who we pray will help us in the ceremony. We need to feel connected because we are all one with Mother Earth, we are not separate things.

11. But the wall represents the opposite to all of this. It disrupts our connection to each other and to the land. It harms the land, the mountains, the water, all the different animals that need to cross over and migrate. It destroys the openness of our land, and it blocks us in instead of helping us to open up. This creates a mental and spiritual disruption that affects our ability to embrace the spiritual energies within our land and territory, and to properly perform the ceremonies that connect us with these spirits.

12. People with families on both sides meet at the border when they are going to do prayer and make their offerings. They cannot do that and be together through a wall. If we have to pass through this wall to go to the places where we pray and participate in ceremonies, that affects our minds in a way that does not allow us to be prayerful in the way that we are supposed to.

13. One of the most important reasons for us to travel across the border is to take care of our relatives and ancestors who have passed on. Many of our family members are buried on the Mexico side. The cemetery there is very important to us. It is where we laid to rest so many of our relatives. It used to be in our backyard. Our people go to the cemetery and take care of their relatives and their ancestors, to clean and tend to their graves, take flowers to them, and talk with them. We bring candles and pray with them there. We must do these things very carefully because burial sites and ceremonies must be protected. It is dangerous to disrupt or offend our people who have gone on to the spirit world. These disruptions can lead to sickness and other consequences for our people down the road, and our people will suffer.

14. A wall will separate us from the places where our ancestors are buried. It will divide the places where we pray and the people we pray for and keep us from the spirits that guide and protect us and heal us. The wall will interrupt the flow of energy between the living and the spirit worlds. It will remove us from our ancestors and keep our prayers from reaching those we are praying for. We could stand on one side of the wall and know that there are cultural artifacts and the resting places of our ancestors just over the other side at the cemetery, but we would not be able to access them or be with them. We could look, but we would not be able to see the beauty on the other side except through these looming bars. We could still stand there and pray to our Creator and to the spirits, but it would not be the same as if we could put cornmeal, food, and water down as offerings. We will not be able to fully perform our spiritual obligations to our families.

15. Recently, during the COVID-19 pandemic, we lost my uncle. Later, we lost my aunt. We wanted to take them to be buried in the cemetery in Mexico with the rest of our family. But it was too difficult to do this, and too many people would not have been able to go when we

buried them. So we buried them in Sells instead. It hurt us to have to do this. It hurt us that my aunt and uncle had to be buried away from the rest of our family, where we have traditionally buried many of our family members, in their resting places in our lands in the South. This is what we have always done, and it is how we wish to be taken care of when our time comes. We want to be with our ancestors. This is especially hard for the elders because that was their home. We want to all be together. We know that they want to be together. Before, it was not hard to take our loved ones home. But if there is a wall, this will be how it is from now on. We will not be able to bury our dead the way that we want to and the way that they want us to.

I declare under penalty of perjury that the following is true and correct.

Dated: June 11, 2026

/s/ *Mary Lucy Zazueta*
Mary Lucy Zazueta