**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5306**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

TOHONO O'ODHAM NATION,

*Plaintiff-Appellant*,

*v.*

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 1:26-cv-02127-RJL (Hon. Richard J. Leon)

---

# BRIEF FOR GOVERNOR KATIE HOBBS, IN HER OFFICIAL CAPACITY AS GOVERNOR OF ARIZONA, AS *AMICUS CURIAE* IN SUPPORT OF TOHONO O'ODHAM NATION URGING REVERSAL

---


Sambo (Bo) Dul*
Coppersmith Brockelman PLC
2800 North Central Avenue, Suite 1900
Phoenix, AZ 85004
(602) 381-5469
bdul@cblawyers.com

**Application for admission forthcoming*

Justin B. Cox
Law Office of Justin B. Cox
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Counsel for *Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. Parties and *Amici*. As of the date of this filing, and except for *amicus curiae* Governor Katie Hobbs, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Appellant Tohono O'odham Nation.

B. Rulings Under Review. The ruling under review is the August 14, 2026, Memorandum Opinion, Dkt. 45, JA0944–61, and Order, Dkt. 46, JA0962, of United States District Court Judge Richard J. Leon, denying the Tohono O'odham Nation's Motion for Preliminary Injunction in Case No. 1:26-cv-02127-RJL. The Memorandum Opinion has no official reporter citation; it is available at 2026 WL 2363980.

C. Related Cases. This case has not previously been before this Court or any other court other than the district court. *Amicus* is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel represents that all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), counsel for *amicus curiae* Governor Katie Hobbs certifies that a separate brief is necessary to present the Governor's distinct perspective on how the federal government's actions affect the Tohono

O’odham Nation, the State’s cultural and natural resources, and the efficacy of government administration in the State. Moreover, to the extent Rule 29(d)’s joinder requirement applies to the Governor, who appears in her official capacity as the chief executive of a State, *see* D.C. Cir. R. 29(b), (d) (requirement “does not apply to a governmental entity,” which includes “a State”), joinder is not practicable: to counsel’s knowledge, no other *amicus* supporting the Nation speaks from the perspective of a border State’s executive branch.

The Governor is particularly well suited to provide this perspective given her responsibility to protect Arizona’s lands and people and her unique role in maintaining government-to-government relationships with Tribal Nations, such as the Tohono O’odham Nation. This role provides the Governor with a distinct interest in promoting meaningful consultation with tribal officials and intergovernmental cooperation when federal actions affect the Nation’s sovereign rights in its lands.

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), undersigned counsel states that no party’s counsel authored this brief in whole or in part; no party or party’s counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amicus curiae* or her counsel contributed money that was intended to fund preparing or submitting this brief.

## TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES................i

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING ....................................................................................................i

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ..................................................................................... ii

TABLE OF CONTENTS ............................................................................... iii

TABLE OF AUTHORITIES.............................................................................v

GLOSSARY OF ABBREVIATIONS .............................................................1

STATUTES AND REGULATIONS ...............................................................1

INTEREST OF *AMICUS CURIAE*.....................................................................1

SUMMARY OF ARGUMENT.........................................................................5

ARGUMENT ...................................................................................................6

I. ARIZONA'S EXPERIENCE DEMONSTRATES THAT EFFECTIVE BORDER SECURITY AND RESPECT FOR TRIBAL SOVEREIGNTY ARE COMPATIBLE .................................6

A. Arizona Has Achieved Historic Border Security Gains Through a Multi-Faceted Strategy That Includes Tribal Consultation and Cooperation.........................................6

B. The Arizona Senate President and House Speaker's Characterization of a Binary Choice Between Security and Tribal Rights Is Contradicted by Arizona's Own Record .........................................................................10

II. PRIOR WALL CONSTRUCTION WITHOUT MEANINGFUL TRIBAL CONSULTATION CAUSED DOCUMENTED, IRREPARABLE HARM THAT IS LIKELY TO RECUR.......................................................................12

A. The Monument Hill and A'al Waipia Destruction Demonstrates the Concrete Harm of Proceeding Without Consultation ..............................................................12

B. The Current Project Presents Comparable—and Escalating—Conditions ....................................................... 14

C. The Legal Standard for Irreparable Harm and Reversal of the Denial of a Preliminary Injunction Is Satisfied........................................................................... 16

III. A PRELIMINARY INJUNCTION WOULD ENABLE THE PROVEN PROCESS OF TRIBAL CONSULTATION AND COLLABORATION WITHOUT COMPROMISING BORDER SECURITY ....................................................................... 18

A. The Governor's Record Demonstrates That Tribal Consultation and Collaboration Produce Workable Solutions........................................................................... 18

B. DHS's Own Directives and Federal Law Counsel in Favor of the Consultation It Has Failed to Conduct ................ 21

C. An Injunction Preserving the Status Quo Imposes Minimal Harm on the Government........................................... 23

CONCLUSION ........................................................................................... 24

CERTIFICATE OF COMPLIANCE ........................................................... 26

CERTIFICATE OF SERVICE ..................................................................... 26

ADDENDUM ............................................................................................ Add. 1

## TABLE OF AUTHORITIES

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) .................................... 17

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) .................................... 17

*Gordon v. Holder*, 632 F.3d 722 (D.C. Cir. 2011) .................................... 16

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) .................................... 5

*Nken v. Holder*, 556 U.S. 418 (2009) .................................... 5

*Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. Dep't of the Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) .................................... 18

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) .................................... 12

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) .................................... 16

**Constitutional Provisions**

Ariz. Const. art. V, § 4 .................................... 1

**Statutes**

8 U.S.C. § 1103 note .................................... 3, 21

25 U.S.C. § 3002(c) .................................... 1, 22

42 U.S.C. § 1996 .................................... 1, 23

54 U.S.C. § 302706(b) .................................... 1, 22

54 U.S.C. § 306108 .................................... 1, 15, 22

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, tit. I, § 102, 110 Stat. 3009-546, 3009-554, *as amended by* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, tit. V, § 564(a), 121 Stat. 1844, 2090 (2007) (codified as amended at 8 U.S.C. § 1103 note) .................................... 3, 21, 23

Ariz. Rev. Stat. Ann. § 41-101 .................................... 1

Ariz. Rev. Stat. Ann. § 41-1728.01 .................................... 1, 19

Ariz. Rev. Stat. Ann. § 41-2051 ....................................................................1, 3

**Rules**

D.C. Cir. R. 28(a)(1)(C) ....................................................................i

D.C. Cir. R. 29(b) .................................................................... i, ii

D.C. Cir. R. 29(d) .................................................................... i, ii

Fed. R. App. P. 29(a)(4)(E) .................................................................... ii

**Executive and Agency Materials**

Ariz. Exec. Order No. 2023-27 (Dec. 15, 2023) ....................................................6

Ariz. Exec. Order No. 2025-01 (Mar. 31, 2025) .................................2, 6, 7, 24

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 45,823 (July 21, 2026) ..............................................15, 24

Exec. Order No. 13,175, 65 Fed. Reg. 67,249 (Nov. 9, 2000) ..............................21

Memorandum on Government-to-Government Relations with Native American Tribal Governments, 59 Fed. Reg. 22,951 (May 4, 1994) ............22

Memorandum on Tribal Consultation, 74 Fed. Reg. 57,881 (Nov. 9, 2009) ....................................................................22

Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships, 86 Fed. Reg. 7491 (Jan. 29, 2021) ..........................22

Memorandum on Uniform Standards for Tribal Consultation, 87 Fed. Reg. 74,479 (Dec. 5, 2022) ....................................................................22

U.S. Dep't of Homeland Sec., Directive No. 071-04, *Consultation and Coordination with Tribal Nations* (Dec. 15, 2022) ..............................15, 23

U.S. Dep't of Homeland Sec., Instruction No. 071-04-001, *Implementing Consultation and Coordination with Tribal Nations* (Feb. 8, 2023) .......15, 23

**Legislative Materials**

*Destroying Sacred Sites and Erasing Tribal Culture: The Trump Administration's Construction of the Border Wall: Oversight*

*Hearing Before the Subcomm. for Indigenous Peoples of the U.S. of the H. Comm. on Nat. Res.*, 116th Cong. (2020) ....................................... 13

**Other Authorities**

Ariz. Dep't of Homeland Sec., *Tribal Consultation Report, FY 2024* (2024) ............................................................................................. 7, 9

Ariz. Dep't of Homeland Sec., *Tribal Consultation Report, FY 2025* (2025) ............................................................................................. 9, 20

Ariz. Dep't of Pub. Safety, *Tribal Consultation Annual Report, FY 2023* (2023) ............................................................................................. 20

Ariz. Dep't of Pub. Safety, *Tribal Consultation Annual Report, FY 2024* (2024) ............................................................................................. 8, 20

Ariz. Dep't of Pub. Safety, *Turquoise Alerts ("Emily's Law")* ................................ 19

Arlyssa D. Becenti, *Border Wall Crews Damage Ancient Tohono O'odham Site*, Ariz. Daily Star (May 2, 2026) ............................................ 14

Zach Bradshaw, *US Transfers Sacred Oak Flat Site to Resolution Copper, Dealing Blow to Tribal Opponents*, Cronkite News (Mar. 16, 2026) ........... 20

Rafael Carranza, *Sacred Native American Site in Arizona Blasted for Border Wall Construction*, Ariz. Republic (Feb. 7, 2020) ............................ 13

Stephanie Casanova, *Tohono O'odham Fight Border Wall on Sacred, Sovereign Lands*, High Country News (Sept. 11, 2026) ............................... 14

@DHSGenCounsel, X (Aug. 14, 2026, 1:14 PM) ................................................ 18

First Nations Development Institute, Apache Stronghold v. United States*: The Ongoing Battle to Save a Sacred Apache Site* (2024) ............................ 20

Paul Ingram, *Border Patrol SWAT Team Blocks Arizona Tribal Police from Trespassing Border Wall Contractors*, Ariz. Mirror (Aug. 26, 2026) ............................................................................................. 15, 18

Paul Ingram, *Border Wall Contractor Bulldozed & 'Desecrated' Native Sacred Site in Southern Arizona*, Tucson Sentinel (May 5, 2026) ................ 14

Paul Ingram, *CBP Relationship with Tohono O'odham Nation Frays as Border Wall Project Moves Ahead*, Tucson Sentinel (Sept. 9, 2026) ...... 11, 14

Office of the Ariz. Governor, *Governor Hobbs' Accomplishments, Keeping Arizona Families Safe and Secure*..........................................2, 7, 24

Office of the Ariz. Governor, Operation Desert Guardian Overall Impacts to Date.............................................................................................8, 12, 24

Press Release, Office of the Ariz. Governor, *Operation Desert Guardian Makes Over 600 Arrests, Seizes Over 900 Pounds of Drugs* (Sept. 5, 2025) ...............................................................................................7, 12, 24

Resolution Copper, *Resolution Copper Establishes $54 Million Tribal Trust* (July 29, 2026)..........................................................................................20

Levi Rickert, *DHS Nominee Mullin Pressed on 2020 Election, Tribal Consultation*, Native News Online (Mar. 18, 2026)......................................23

U.S. Gov't Accountability Off., GAO-23-105443, *Southwest Border: Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction* (2023)..............................13, 21

## GLOSSARY OF ABBREVIATIONS

ADHS Arizona Department of Homeland Security

DPS Arizona Department of Public Safety

## STATUTES AND REGULATIONS

Except for the following, all applicable statutes are contained in the Addendum to Opening Brief of Appellant Tohono O'odham Nation: 25 U.S.C. § 3002(c); 42 U.S.C. § 1996; 54 U.S.C. §§ 302706(b), 306108; Ariz. Const. art. V, § 4; Ariz. Rev. Stat. Ann. §§ 41-101, 41-2051(A)–(C), 41-1728.01. These are set forth in the addendum to this brief.

## INTEREST OF *AMICUS CURIAE*

Governor Katie Hobbs, in her official capacity as the Governor of the State of Arizona, respectfully submits this brief as *amicus curiae* in support of the Tohono O'odham Nation's appeal of the order of the United States District Court denying the Nation's Motion for Preliminary Injunction in Case No. 1:26-cv-02127-RJL.

The Arizona Constitution vests the executive power of the State of Arizona in the Governor and directs that the Governor shall "transact all executive business with the officers of the government" and "take care that the laws be faithfully executed." Ariz. Const. art. V, § 4; *see also* Ariz. Rev. Stat. Ann. § 41-101. In fulfilling her constitutional and statutory duties, Governor Hobbs seeks to ensure the safety and prosperity of all Arizonans. As part of that duty, the Governor must lead

the State's executive branch in executing the law while also respecting the sovereignty of Arizona's twenty-two federally recognized Tribal Nations.

The Governor provides a unique and important perspective on the issues before this Court. Since taking office in January 2023, she has invested over $200 million in border security initiatives, including the deployment of the Arizona National Guard to the southern border under Operation SECURE, the establishment of Task Force SAFE to combat drug trafficking at border Ports of Entry, and the creation of Arizona's first-ever Border Coordination Office within the Arizona Department of Homeland Security. *See* Ariz. Exec. Order No. 2025-01 (Mar. 31, 2025).[1] In March 2025, the Governor established Operation Desert Guardian, a joint task force synchronizing enforcement across jurisdictions in partnership with county sheriffs, municipal police, tribal law enforcement, federal partners, and state agencies. *Id.* These initiatives have produced measurable results: altogether, the State's counterdrug efforts supported the seizure of over 18.5 million fentanyl pills, over 10,000 pounds of other illicit drugs, and over 1,600 weapons, for a total value of over $59 million.[2]

---

[1] *Available at* azgovernor.gov/office-arizona-governor/executive-order/2025-01.

[2] Office of the Ariz. Governor, *Governor Hobbs' Accomplishments, Keeping Arizona Families Safe and Secure* (hereinafter "*Hobbs' Accomplishments*"), *available at* azgovernor.gov/governor-hobbs-accomplishments#keeping-arizona-families-safe-and-secure (last visited Sept. 23, 2026).

Simultaneously, the Governor takes seriously the State's solemn responsibility to consult with Tribal Nations. Arizona law requires the Governor's Office on Tribal Relations to facilitate government-to-government relationships and directs each state agency to "develop and implement tribal consultation policies." Ariz. Rev. Stat. Ann. § 41-2051(A)–(C). Since January 2023, the Governor and the Nation have engaged in dozens of formal government-to-government consultations, producing durable policy outcomes that serve both public safety and tribal sovereignty.

Congress has also given States a role here. In carrying out border-barrier construction, the Secretary of Homeland Security "shall consult with . . . States, local governments, Indian tribes, and property owners" "to minimize the impact on the environment, culture, commerce, and quality of life" of affected communities. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, div. C, tit. I, § 102(b)(1)(C)(i), 110 Stat. 3009-546, 3009-554, *as amended by* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, tit. V, § 564(a), 121 Stat. 1844, 2090 (2007) (codified as amended at 8 U.S.C. § 1103 note).

The Governor submits this *amicus* brief to demonstrate—from direct executive and operational experience—that robust border security and meaningful respect for tribal sovereignty are simultaneously achievable. Two Arizona

legislators, the President of the Arizona Senate and the Speaker of the Arizona House of Representatives, filed an *amicus* brief below in support of Defendants, arguing that national security interests heavily outweigh the Nation's equitable claims. The Governor respectfully disagrees. Her executive record shows that the choice the Arizona Senate President and House Speaker present—between security and sovereignty—is a false one, and that the interests of the State, its residents, and its Tribal Nations are best served by pursuing and achieving both.

The Governor does not suggest that consultation could supply the congressional authorization the Nation argues is required; the Nation's claims rest on its rights in its own lands. The Governor's point is about the equities: a pause costs the government nothing, while proceeding risks irreversible harm.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order denying a preliminary injunction to the Nation because the balance of the equities and the public interest—which merge here, *see Nken v. Holder*, 556 U.S. 418, 434–35 (2009); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)—weigh in favor of granting relief.

***First***, Arizona's own record demonstrates that vigorous border security does not require disregarding tribal sovereignty. The State has achieved major enforcement results through a multi-faceted strategy that integrates tribal cooperation, and border encounters in the Tucson Sector—which encompasses the Nation's Reservation—are at historic lows.

***Second***, prior border wall construction conducted without meaningful tribal consultation resulted in documented, irreparable damage to sacred sites and cultural artifacts at Monument Hill and A'al Waipia (Quitobaquito Springs) in southern Arizona. The current project is proceeding under comparable conditions, creating likely and unnecessary risk of the recurrence of harm.

***Third***, a preliminary injunction would not compromise border security. It would, however, afford the time necessary for the government-to-government consultation the Department of Homeland Security's own directives and federal law require or encourage—and that Arizona's experience shows is both feasible and productive.

## ARGUMENT

### I. ARIZONA'S EXPERIENCE DEMONSTRATES THAT EFFECTIVE BORDER SECURITY AND RESPECT FOR TRIBAL SOVEREIGNTY ARE COMPATIBLE

#### *A. Arizona Has Achieved Historic Border Security Gains Through a Multi-Faceted Strategy That Includes Tribal Consultation and Cooperation*

Arizona has been on the front lines of border security. Rather than treating it as a binary choice between enforcement and tribal rights, the Governor has pursued a comprehensive approach that integrates both. The results speak for themselves.

In 2023, the Governor signed Executive Order 2023-27, deploying the Arizona National Guard to the southern border as part of Operation SECURE to support fentanyl interdiction, analytical support, and human smuggling enforcement. Ariz. Exec. Order No. 2023-27 (Dec. 15, 2023).[3] In 2024, the Governor built on those successes by establishing the SAFE Initiative (Stopping Arizona's Fentanyl Epidemic), under which Task Force SAFE mobilized the Arizona National Guard to assist U.S. Customs and Border Protection in combating drug trafficking and other illicit activities at border Ports of Entry. Ariz. Exec. Order No. 2025-01. That same year, the Governor established Arizona's first-ever Border Coordination Office within the Arizona Department of Homeland Security to enhance coordination

---

[3] *Available at* azgovernor.gov/office-arizona-governor/executive-order/2023-27.

between state, local, federal, and tribal agencies and community organizations. *See* Ariz. Dep't of Homeland Sec., *Tribal Consultation Report, FY 2024*, at 2 (2024) (hereinafter "ADHS FY 2024 Report").[4] In March 2025, the Governor established Operation Desert Guardian, a statewide joint task force focused on the identification, deterrence, interdiction, and dismantling of transnational criminal organizations. Ariz. Exec. Order No. 2025-01.

The results of these initiatives have been substantial, supporting the seizure of over 18.5 million fentanyl pills, over 10,000 pounds of other illicit drugs, and over 1,600 weapons, for a total value of over $59 million. *Hobbs' Accomplishments*; Ariz. Exec. Order No. 2025-01. Arizona Department of Public Safety troopers separately seized 2,645 pounds of fentanyl valued at $35.5 million in 2024. Ariz. Exec. Order No. 2025-01, at 2. Operation Desert Guardian, in its first six months of operation (March through August 2025), produced 622 arrests tied to narcotics trafficking, weapons violations, and outstanding warrants; the seizure of 971 pounds of drugs (including 72,000 fentanyl pills, 401 pounds of methamphetamine, and 80 pounds of cocaine); 59 firearms seized; 43 stolen vehicles recovered; and 118 coordinated missions spanning multi-day surges and synchronized detention sweeps.[5]

---

[4] *Available at* gotr.azgovernor.gov/sites/default/files/tribal-consultation-annual-report-fy2024/dohs-tribal-consultation-annual-report-fy2024.pdf.

[5] Press Release, Office of the Ariz. Governor, *Operation Desert Guardian Makes Over 600 Arrests, Seizes Over 900 Pounds of Drugs* (Sept. 5, 2025) (hereinafter

Tribal cooperation is integral to this framework. The Arizona Department of Public Safety ("DPS") maintains mutual aid and cross-commissioning agreements with multiple Arizona Tribal Nations, with more agreements pending.[6] DPS provides forensic crime lab services under agreements with sixteen Tribal Nations. DPS FY 2024 Report at 1. In FY 2024, DPS assisted tribal law enforcement with approximately 200 requests—including traffic control, criminal investigations, and thirty-one aviation missions—and collaborated with Tribal Nations to upgrade the State's microwave radio system, which provides critical communications for over 12,000 users across twelve state agencies and multiple local, federal, and tribal agencies. *Id.* at 2.

The Arizona Department of Homeland Security has pursued similar engagement with border tribes specifically. Its Border Coordination Office met with the Cocopah Indian Tribal Council and tribal law enforcement to discuss border

---

"Operation Desert Guardian Press Release and Report"), *available at* azgovernor.gov/office-arizona-governor/news/2025/09/operation-desert-guardian-makes-over-600-arrests-seizes-over. A report from the Governor's Office entitled "Operation Desert Guardian Overall Impacts to Date" is linked on the Press Release (select "Learn more about Operation Desert Guardian and the state's counterdrug efforts") and available at perma.cc/454V-N4WK (last visited Sept. 23, 2026).

[6] Ariz. Dep't of Pub. Safety, *Tribal Consultation Annual Report, FY 2024*, at 1 (2024) (hereinafter "DPS FY 2024 Report"), *available at* gotr.azgovernor.gov/sites/default/files/tribal-consultation-annual-report-fy2024/dps-tribal-consultation-annual-report-fy2024.pdf.

security coordination.[7] The Cocopah Indian Tribe—a sovereign nation on the border, like the Tohono O'odham Nation—received $304,000 in FY 2024 Operation Stonegarden Grant Program funding for border security operations, building on $274,567 in such funding from the prior year. ADHS FY 2025 Report at 2; ADHS FY 2024 Report at 2. These grants demonstrate that federal resources flow to tribes to enhance border security capacity—not to override it.

The Nation itself has been among the most active partners in border security. With the Nation's authorization, the Department of Homeland Security has built two CBP Forward Operating Bases on the Reservation, constructed ten 160-foot-tall Integrated Fixed Towers equipped with night vision, thermal sensors, and ground-sweeping radar, and deployed vehicle surveillance units and a vehicle checkpoint on the highway to Phoenix. Br. for Appellant at 8–9 (hereinafter "Opening Br."). In 2006, the Nation agreed to vehicle barriers and a patrol road along the vast majority of its southern border, which "have virtually eliminated unauthorized vehicle transit" onto the Reservation. *Id.* at 9. Since 2013, the Nation has led a multi-agency drug trafficking task force that has dismantled major trafficking operations, and it played

---

[7] Ariz. Dep't of Homeland Sec., *Tribal Consultation Report, FY 2025*, at 2 (2025) (hereinafter "ADHS FY 2025 Report"), *available at* gotr.azgovernor.gov/sites/default/files/tribal-consultation-annual-report-fy2025/dohs-tribal-consultation-annual-report-fy2025.pdf.

a lead role in forming the Shadow Wolves—the Department's only all-Native American tactical security force. *Id.* at 8.

These combined federal, state, and tribal efforts have produced laudable results. CBP reports a sixty-two percent decrease in border encounters in the Tucson Sector between FY 2025 and FY 2026, and a roughly ninety-five percent decline in border apprehensions across that Sector compared to 2024. *Id.* at 9–10. Incidents of illegal entry on the Reservation have decreased by approximately ninety percent in recent years. *Id.* at 55 (citing JA0219–0221).

### *B. The Arizona Senate President and House Speaker's Characterization of a Binary Choice Between Security and Tribal Rights Is Contradicted by Arizona's Own Record*

Arizona's Senate President and House Speaker filed an *amicus* brief below arguing that border security is "essential to the public safety of the United States" and that, accordingly, "the balance of equities and public interest should tip heavily in favor of the United States and denying a preliminary injunction."[8] The Governor shares the Arizona Senate President and House Speaker's commitment to border security—indeed, the executive record described above demonstrates it. But the legislators present a false dichotomy. They argue that any pause in wall construction

---

[8] Br. of Amici Curiae Arizona Senate President Warren Petersen & Arizona House Speaker Steve Montenegro in Supp. of Defs. & in Opp'n to Pl.'s Mot. for Prelim. Inj. at 2, 11–12, *Tohono O'odham Nation v. Mullin*, No. 1:26-cv-02127-RJL (D.D.C. filed July 8, 2026), Dkt. 20 (hereinafter "Legislative Br.").

would leave Arizona exposed to the harms they catalog: fentanyl trafficking, high-speed smuggling pursuits, and border-related crime. Legislative Br. at 3–8.

Arizona's record refutes that premise. And a preliminary injunction maintaining the status quo would preserve the extensive infrastructure already in place: vehicle barriers, surveillance towers, Forward Operating Bases, a highway checkpoint, and multi-agency task forces. Opening Br. at 8–9. None of these capabilities would be diminished by a preliminary injunction.

Those capabilities are themselves the product of negotiation. According to the Nation's Chairman, the Nation and CBP worked out the design and routing of the existing vehicle barrier as part of broader agreements under which the Nation permitted forward operating bases, numerous surveillance towers, and use of a tribal well.[9] More recently, Border Patrol proposed a buried fiber-optic detection system, and the Nation's leaders were preparing public hearings on it when that effort stopped. *Id.*

The Arizona Senate President and House Speaker further argue that declining border encounters merely reflect the Trump Administration's enforcement priorities and that a future administration could reverse course. Legislative Br. at 12. But

---

[9] Paul Ingram, *CBP Relationship with Tohono O'odham Nation Frays as Border Wall Project Moves Ahead*, Tucson Sentinel (Sept. 9, 2026) (hereinafter "*CBP Relationship Frays*"), *available at* tucsonsentinel.com/local/report/090926_cbp_oodham_relationship.

regardless of the federal administration, the institutional infrastructure Arizona has built—Operation Desert Guardian's joint task force framework, the Border Coordination Office, the SAFE Initiative, the growing network of mutual aid agreements with Tribal Nations—is designed precisely for durability in Arizona. It provides a "repeatable enforcement framework" designed to operate independent of any shifting enforcement priorities at the federal level. Operation Desert Guardian Press Release and Report.

Moreover, a preliminary injunction lasts only until the merits are resolved; its "purpose . . . is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The relevant question is the balance of harms *during that period*, when, by the federal government's own account, border encounters are at historic lows. What a future administration might do has no bearing on whether construction must begin this fall.

## II. PRIOR WALL CONSTRUCTION WITHOUT MEANINGFUL TRIBAL CONSULTATION CAUSED DOCUMENTED, IRREPARABLE HARM THAT IS LIKELY TO RECUR

### *A. The Monument Hill and A'al Waipia Destruction Demonstrates the Concrete Harm of Proceeding Without Consultation*

The risks of proceeding without meaningful tribal consultation are not hypothetical. In 2020, federal contractors building a section of border wall engaged in blasting on Monument Hill, damaging a sacred site that held cultural artifacts and

human remains.[10] Similar destruction occurred at A'al Waipia (also known as Quitobaquito Springs), an ancient pilgrimage site.[11] In neither instance did CBP engage the Nation's leadership in formal government-to-government consultation, despite the Nation's requests. The loss of irreplaceable cultural resources was the result.[12] By contrast, when a senior U.S. Army Corps of Engineers official met with the Nation about a burial site in Cabeza Prieta National Wildlife Refuge, the agency modified the barrier's foundation and covered the site during construction to minimize the impact. GAO Report at 47.

The pattern has continued. On April 23, 2026, a border-wall contractor bulldozed part of the Las Playas Intaglio, a roughly 1,000-year-old cultural site near the border west of Ajo, and U.S. Customs and Border Protection confirmed the

---

[10] *See* Rafael Carranza, *Sacred Native American Site in Arizona Blasted for Border Wall Construction*, Ariz. Republic (Feb. 7, 2020), *available at* yahoo.com/news/sacred-native-american-arizona-blasted-043614389.html.

[11] *See* U.S. Gov't Accountability Off., GAO-23-105443, *Southwest Border: Additional Actions Needed to Address Cultural and Natural Resource Impacts from Barrier Construction* 23–32 (2023) (hereinafter "GAO Report"), *available at* www.gao.gov/assets/gao-23-105443.pdf.

[12] *See* GAO Report at 46; *Destroying Sacred Sites and Erasing Tribal Culture: The Trump Administration's Construction of the Border Wall: Oversight Hearing Before the Subcomm. for Indigenous Peoples of the U.S. of the H. Comm. on Nat. Res.*, 116th Cong. 13 (2020) (statement of Ned Norris, Jr., Chairman, Tohono O'odham Nation), *available at* govinfo.gov/content/pkg/CHRG-116hhrg40260/pdf/CHRG-116hhrg40260.pdf.

damage.[13] According to Nation leaders, the site had previously been identified by a cultural monitor as one for the contractor to avoid.[14] According to the Nation's Vice Chair, cultural monitors had been assigned to that project, and the damage occurred anyway. *See CBP Relationship Frays*, *supra*. And the government now proposes a second border fence near A'al Waipia itself; in early September 2026, contractors began clearing land nearby.[15]

### ***B. The Current Project Presents Comparable—and Escalating—Conditions***

The current project is proceeding under comparable conditions. The Department of Homeland Security is pursuing border wall construction on the Nation's Reservation without even adequately consulting the Nation. DHS has waived several environmental and historical protection reviews, including the processes that would have triggered statutory consultation under the National

---

[13] *See* Arlyssa D. Becenti, *Border Wall Crews Damage Ancient Tohono O'odham Site*, Ariz. Daily Star (May 2, 2026), *available at* tucson.com/news/local/border/article_50f4781a-021a-4147-a38b-8be88efde41c.html.

[14] *See* Paul Ingram, *Border Wall Contractor Bulldozed & 'Desecrated' Native Sacred Site in Southern Arizona*, Tucson Sentinel (May 5, 2026), *available at* tucsonsentinel.com/local/report/050426_oodham_intaglio_damaged.

[15] *See* Stephanie Casanova, *Tohono O'odham Fight Border Wall on Sacred, Sovereign Lands*, High Country News (Sept. 11, 2026), *available at* www.hcn.org/articles/tohono-oodham-fight-border-wall-on-sacred-sovereign-lands; *CBP Relationship Frays*, *supra*.

Historic Preservation Act, 54 U.S.C. § 306108. *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 91 Fed. Reg. 45,823, 45,824 (July 21, 2026). Despite maintaining its own formal tribal consultation directives,[16] DHS has not formally consulted with the Nation regarding the current construction—or even regarding access to tribal territory. Instead, eleven days after the district court's ruling, contractors entered the Reservation over the Nation's objection, and armed Border Patrol agents—including the agency's tactical unit—blockaded tribal police from citing or removing them.[17]

The record before the district court identifies specific sacred mountains in the wall's path, including the Baboquivari range, where the Tohono O'odham believe the "center of the universe" and the "home of the Creator, I'itoi" are located. Opening Br. at 12 (citing JA0195). Unrebutted expert testimony from Professor

---

[16] *See* U.S. Dep't of Homeland Sec., Instruction No. 071-04-001, *Implementing Consultation and Coordination with Tribal Nations* (Feb. 8, 2023), www.dhs.gov/sites/default/files/2023-04/dhs-consultation-policy.pdf; U.S. Dep't of Homeland Sec., Directive No. 071-04, *Consultation and Coordination with Tribal Nations* (Dec. 15, 2022), www.dhs.gov/sites/default/files/2023-04/dhs_tribal_consultation_directive_071-04.pdf.

[17] *See* Paul Ingram, *Border Patrol SWAT Team Blocks Arizona Tribal Police from Trespassing Border Wall Contractors*, Ariz. Mirror (Aug. 26, 2026), *available at* azmirror.com/2026/08/26/border-patrol-swat-team-blocks-arizona-tribal-police-from-trespassing-border-wall-contractors.

Senseney established that construction will require "substantial earthwork, blasting [and] mountaintop removal" in four separate mountainous areas, with impacts "unlikely to be fully reclaimed for centuries in the arid environment of the Reservation." *Id.* at 11 (citing JA0140).

The conditions that produced the destruction at Monument Hill and A'al Waipia persist. Absent judicial intervention, irreparable harm is likely to recur.

### *C. The Legal Standard for Irreparable Harm and Reversal of the Denial of a Preliminary Injunction Is Satisfied*

This Court has held that reversal is appropriate where the district court addressed a preliminary injunction factor "in conclusory fashion." *Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011). The district court below did precisely that with respect to the balance of equities and the public interest. The district court gave little weight to the Nation's harms, finding all of the Nation's harms outweighed by the government's security interests. JA0960–61.

The legal standard for irreparable harm is well established. A movant satisfies its burden by showing "that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The Monument Hill and A'al Waipia destruction, combined with the comparable conditions now prevailing, satisfies this standard.

"[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). "If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* And within this Court's irreparable harm framework, the analysis "assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law" and "examine[s] only whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006). There can be no serious dispute that the blasting of sacred mountains and the destruction of millennia-old cultural artifacts inflict injury that cannot be undone.

The district court erroneously discounted the Nation's harms because the federal government represented that "many—if not all" of them "could be mitigated through consultation with the Nation and accommodations." JA0960. And the court closed by expressing its expectation that the federal government would "follow through on its guarantees of consultation." JA0961. Events have since tested that expectation. Within hours of the ruling, DHS's General Counsel posted: "We respect tribal sovereignty but not to the detriment of border security. This wall is getting

built. Our authority is beyond dispute."[18] Eleven days later, armed agents escorted contractors onto the Reservation and blockaded the Nation's police. *See* Ingram, *Border Patrol SWAT Team*, *supra*. Consultation that follows the destruction of a sacred site is not consultation; it is notification. The value of consultation lies entirely in its capacity to shape a decision before that decision is made—particularly where, as here, the decision is irreversible. *See Quechan Tribe of the Fort Yuma Indian Rsrv. v. U.S. Dep't of the Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010) (if a tribe "hasn't been adequately consulted and the project goes ahead anyway," its "legally-protected procedural interest would effectively be lost").

## III. A PRELIMINARY INJUNCTION WOULD ENABLE THE PROVEN PROCESS OF TRIBAL CONSULTATION AND COLLABORATION WITHOUT COMPROMISING BORDER SECURITY

### *A. The Governor's Record Demonstrates That Tribal Consultation and Collaboration Produce Workable Solutions*

The Governor's experience confirms that tribal consultation and collaboration are not an obstacle to governmental action—they are a mechanism for producing more durable, workable outcomes, whether the issue is border security, public safety, or the protection of cultural resources.

[18] @DHSGenCounsel, X (Aug. 14, 2026, 1:14 PM), x.com/DHSGenCounsel/status/2088313210797441387.

For example, after the murder of Native teen Emily Pike, Governor-led listening sessions on missing and murdered indigenous people led to coordination and collaboration with Tribal Nations on a new statewide alert system—the Turquoise Alert—that notifies the public when a tribal member under the age of sixty-five is endangered and missing.[19] The Arizona Legislature later codified the system, which now protects the broader under-sixty-five population statewide. Ariz. Rev. Stat. Ann. § 41-1728.01. What began as a government-to-government conversation became enforceable, permanent policy that now benefits all Arizonans, not just tribal members.

Tribal consultation can also deescalate volatile situations. The federal government and Arizona tribes disagreed for years over a transfer of sacred land at Chi'chil Biłdagoteel (Oak Flat) to a private copper mine in Superior, Arizona. Apache Stronghold and its allies protested the sale, created physical barriers, and drove a caravan thousands of miles to protest in Washington, D.C. Years of tribal consultation did not stop the land transfer, but it shaped the contours of the project, strengthened consultation precedent, and helped deescalate a situation in which

[19] Ariz. Dep't of Pub. Safety, *Turquoise Alerts ("Emily's Law")*, www.azdps.gov/turquoise-alert (last visited Sept. 22, 2026).

protesters—including non-Native participants—were putting their physical safety at risk.[20]

Arizona has developed robust institutional infrastructure to support this collaborative model. For example, DPS maintains mutual aid agreements and forensic lab service agreements with Tribal Nations, assisted tribal law enforcement with approximately 200 requests in FY 2024 and 240 in FY 2023, and has collaborated on shared communications infrastructure serving over 12,000 users.[21] The Arizona Department of Homeland Security Border Coordination Office has engaged directly with border tribes on security coordination. ADHS FY 2025 Report at 2. Since January 2023, the Governor and the Nation have engaged in dozens of formal government-to-government consultations. These are not isolated episodes. They represent a proven, repeatable process.

---

[20] *See* Zach Bradshaw, *US Transfers Sacred Oak Flat Site to Resolution Copper, Dealing Blow to Tribal Opponents*, Cronkite News (Mar. 16, 2026), cronkitenews.azpbs.org/2026/03/16/resolution-copper-oak-flat-land-transfer/; First Nations Development Institute, Apache Stronghold v. United States*: The Ongoing Battle to Save a Sacred Apache Site* (2024), www.firstnations.org/stories/apache-stronghold-v-united-states-the-ongoing-battle-to-save-a-sacred-apache-site/; Resolution Copper, *Resolution Copper Establishes $54 Million Tribal Trust* (July 29, 2026), resolutioncopper.com/resolution-copper-establishes-54-million-tribal-trust/.

[21] DPS FY 2024 Report at 1–2; Ariz. Dep't of Pub. Safety, *Tribal Consultation Annual Report, FY 2023*, at 2 (2023), *available at* gotr.azgovernor.gov/sites/default/files/tribal-consultation-annual-report-fy2023/dps-tribal-consultation-annual-report-fy2023.pdf.

### *B. DHS's Own Directives and Federal Law Counsel in Favor of the Consultation It Has Failed to Conduct*

The federal government's obligation to consult with Tribal Nations is not merely a matter of policy preference. It has long been embedded in statute, executive order, and a chain of Presidential directives spanning multiple administrations.

Most directly, Congress built consultation into border-barrier construction itself. In carrying out Section 102 of IIRIRA, the Secretary "shall consult with . . . States, local governments, Indian tribes, and property owners" "to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites" of construction. IIRIRA § 102(b)(1)(C)(i), 8 U.S.C. § 1103 note. And DHS has told GAO that, for barrier projects built under waivers before December 2022, it followed Section 102(b)(1)(C)'s consultation requirements in place of its own tribal consultation policy. GAO Report at 44 n.80. Although the provision creates no right of action, IIRIRA § 102(b)(1)(C)(ii)(I), it reflects Congress's own judgment about how barrier construction should proceed—a judgment that bears directly on the public interest.

The Executive Branch has long expressed the same judgment. Executive Order 13175, signed November 6, 2000, directs federal agencies to "have an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications." Exec. Order No. 13,175, 65 Fed. Reg. 67,249 (Nov. 9, 2000). Successive Presidential Memoranda

have reinforced and expanded this obligation. *See* Memorandum on Government-to-Government Relations with Native American Tribal Governments, 59 Fed. Reg. 22,951 (May 4, 1994); Memorandum on Tribal Consultation, 74 Fed. Reg. 57,881 (Nov. 9, 2009); Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships, 86 Fed. Reg. 7491 (Jan. 29, 2021); Memorandum on Uniform Standards for Tribal Consultation, 87 Fed. Reg. 74,479 (Dec. 5, 2022). Here, too, regardless of whether they are judicially enforceable, these actions reflect the Executive Branch's longstanding judgment that meaningful consultation before action serves the public interest, which is the interest this Court must weigh.

Absent a valid waiver, multiple statutes would require tribal consultation in contexts directly relevant here. The National Historic Preservation Act requires federal agencies to "take into account the effect" of federal undertakings on historic properties, including those of religious and cultural significance to tribes, and to consult with Indian tribes that attach religious and cultural significance to affected historic properties. 54 U.S.C. §§ 306108, 302706(b). The Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3002(c), imposes consultation obligations regarding the treatment and disposition of Native American cultural items. The American Indian Religious Freedom Act declares the policy of the United States "to protect and preserve for American Indians their inherent right of freedom

to believe, express, and exercise the[ir] traditional religions . . . , including but not limited to access to sites[.]" 42 U.S.C. § 1996.

DHS itself maintains formal directives requiring tribal consultation. *See* Instruction No. 071-04-001, *supra*; Directive No. 071-04, *supra*.[22] The Secretary's waiver of environmental review requirements under IIRIRA § 102(c)(1) eliminated the procedural triggers that would have forced compliance with consultation mandates like the National Historic Preservation Act. But the waiver did not eliminate the policy rationale that makes consultation essential: preventing irreversible harm to cultural resources that, once destroyed, can never be restored.

Despite this comprehensive framework, DHS has not formally consulted with the Nation regarding the current construction or even regarding access to tribal territory.

### ***C. An Injunction Preserving the Status Quo Imposes Minimal Harm on the Government***

A preliminary injunction would preserve a status quo in which the border is already more secure than it has been in decades. Indeed, the waiver notice for this

---

[22] *See also* Levi Rickert, *DHS Nominee Mullin Pressed on 2020 Election, Tribal Consultation*, Native News Online (Mar. 18, 2026) (quoting then-nominee Mullin as stating, "I appreciate tribal sovereignty. We do have a job to secure the border, but we will work with tribal nations because there are other ways to have a physical barrier."), *available at* nativenewsonline.net/currents/dhs-nominee-mullin-pressed-on-2020-election-tribal-consultation/.

very project declares that DHS "has delivered the most secure border in history." 91 Fed. Reg. at 45,823. The Nation has authorized extensive infrastructure that remains fully operational: two CBP Forward Operating Bases, ten Integrated Fixed Towers with surveillance technology, vehicle barriers along the vast majority of the southern border, vehicle surveillance units, and a highway checkpoint. Opening Br. at 8–9. Arizona's state-level enforcement apparatus provides a robust additional layer: Operation Desert Guardian's joint task force is operational and producing measurable results; the Border Coordination Office coordinates federal, state, local, and tribal stakeholders; and the State's counterdrug efforts have generated over $59 million in seizure value. Ariz. Exec. Order No. 2025-01; Operation Desert Guardian Press Release and Report; *Hobbs' Accomplishments*.

Arizona's experience confirms that Tribal Nations are partners in—not obstacles to—border security. An injunction that preserves time for consultation would not disarm the government; it would reinforce the collaborative model that has produced the very security gains the government now touts.

## CONCLUSION

Ensuring border security and respecting tribal sovereignty are not mutually exclusive. Arizona's executive record demonstrates this in practice: the State has achieved historic border security gains through a multi-faceted strategy that integrates tribal cooperation, and the border along the Tucson Sector is more secure

today than at any point in recent history. It will remain so while this appeal proceeds. What cannot be restored, once lost, are the sacred mountains and cultural resources in this wall's path. The district court's assumption that consultation will occur in due course cannot substitute for a preliminary injunction that actually preserves the status quo and secures time for the government-to-government consultation that Arizona's record confirms produces effective outcomes.

This Court should reverse the district court's order and direct the entry of a preliminary injunction.

September 23, 2026

Respectfully submitted,

/s/ Justin B. Cox

Justin B. Cox
Law Office of Justin B. Cox
PO Box 1106
Hood River, OR 97031
(541) 716-1818
justin@jcoxconsulting.org

Sambo (Bo) Dul*
Coppersmith Brockelman PLC
2800 North Central Avenue, Suite 1900
Phoenix, AZ 85004
(602) 381-5469
bdul@cblawyers.com

Counsel for *Amicus Curiae*

**Application for admission forthcoming*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,101 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: September 23, 2026 /s/ Justin B. Cox

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on September 23, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 23, 2026 /s/ Justin B. Cox

## ADDENDUM

Pursuant to D.C. Circuit Rule 28(a)(5), the following provisions are reproduced verbatim.

## TABLE OF CONTENTS


25 U.S.C. § 3002(c) ........................................ Add. 2

42 U.S.C. § 1996 ........................................ Add. 2

54 U.S.C. § 302706(b) ........................................ Add. 2

54 U.S.C. § 306108 ........................................ Add. 3

Ariz. Const. art. V, § 4 ........................................ Add. 3

Ariz. Rev. Stat. Ann. § 41-101 ........................................ Add. 3

Ariz. Rev. Stat. Ann. § 41-1728.01 ........................................ Add. 5

Ariz. Rev. Stat. Ann. § 41-2051(A)–(C) ........................................ Add. 6

**25 U.S.C. § 3002(c)**

§ 3002. Ownership

* * *

(c) Intentional excavation and removal of Native American human remains and objects

The intentional removal from or excavation of Native American cultural items from Federal or tribal lands for purposes of discovery, study, or removal of such items is permitted only if—

> (1) such items are excavated or removed pursuant to a permit issued under section 470cc of title 16 which shall be consistent with this chapter;
>
> (2) such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate (if any) Indian tribe or Native Hawaiian organization;
>
> (3) the ownership and right of control of the disposition of such items shall be as provided in subsections (a) and (b); and
>
> (4) proof of consultation or consent under paragraph (2) is shown.

* * *

**42 U.S.C. § 1996**

§ 1996. Protection and preservation of traditional religions of Native Americans

On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

**54 U.S.C. § 302706(b)**

§ 302706. Eligibility for inclusion on National Register

* * *

(b) Consultation.—In carrying out its responsibilities under section 306108 of this title, a Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to property described in subsection (a).

* * *

**54 U.S.C. § 306108**

§ 306108. Effect of undertaking on historic property

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

**Ariz. Const. art. V, § 4**

Governor; powers and duties; special sessions of legislature; message and recommendations

Section 4. The governor shall transact all executive business with the officers of the government, civil and military, and may require information in writing from the officers in the executive department upon any subject relating to the duties of their respective offices. He shall take care that the laws be faithfully executed. He may convene the legislature in extraordinary session. He shall communicate, by message, to the legislature at every session the condition of the state, and recommend such matters as he shall deem expedient.

**Ariz. Rev. Stat. Ann. § 41-101**

41-101. Powers and duties; attestation of acts of governor; salary

A. The governor has the powers and shall perform the duties as prescribed in this article. The governor:

1. Shall supervise the official conduct of all executive and ministerial officers.

2. Shall see that all offices are filled and the duties performed or, in default, invoke such remedy as the law allows.

3. Shall appoint a private secretary to the governor and shall appoint all officers of this state not made elective, unless otherwise provided.

4. Notwithstanding section 38-211, shall appoint the lieutenant governor to serve as the governor's chief of staff or the director of the Arizona department of administration or to fill any position for which the governor is otherwise authorized by law to make an appointment.

5. Shall be the sole official means of communication between this state and the government of any other state or the United States.

6. May direct the attorney general to appear on behalf of this state when any action or legal proceeding is pending that affects the title of this state to any property or that may result in a claim against this state.

7. May require the attorney general, or any county attorney, to inquire into the affairs or management of any corporation doing business in this state.

8. May require the attorney general to aid a county attorney in the discharge of his duties.

9. May offer rewards for escaped insane persons, not exceeding five hundred dollars.

10. May require any officer or board to make special reports to him on demand in writing.

11. May convene the legislature at some other place when the seat of government becomes dangerous from disease or a common enemy.

12. May enter into intergovernmental agreements with officers, agencies or departments of the United States to provide funding or other resources available from any related state agency, board or commission for the purpose of operating federal parks located in this state during any period when such parks would otherwise be subject to shutdown due to a lack of federal appropriation and as deemed necessary to promote tourism, this state's economic well-being, or the health, safety or welfare of the state's citizens. The governor shall not provide general fund appropriations from any related state agency, board or commission to operate a federal park pursuant to this paragraph for more than twenty-one days without the approval of the legislature. The joint legislative budget committee shall review any expenditure of funds or other resources pursuant to this paragraph.

13. Has such powers and shall perform such other duties as devolve on him by law.

B. All official acts of the governor, except approval of the laws, shall be attested by the secretary of state.

C. The governor is eligible to receive an annual salary pursuant to section 41-1904.

D. Before an individual is hired as an employee of the office of the governor, that individual shall submit a full set of fingerprints to the governor for the purpose of

obtaining a state and federal criminal records check pursuant to section 41-1750 and Public Law 92-544. The department of public safety may exchange this fingerprint data with the federal bureau of investigation.

**Ariz. Rev. Stat. Ann. § 41-1728.01**

41-1728.01. Turquoise alert system; requirements; definitions

A. The department shall establish the turquoise alert system as a quick response system designed to issue and coordinate alerts following the report of a missing person.

B. On the request of an authorized person at a law enforcement agency that is investigating a report of a missing person, the department shall request an activation of the emergency alert system and issue a turquoise alert if all of the following conditions are met:

1. The missing person is under sixty-five years of age.

2. The law enforcement agency investigating the missing person report:

(a) Has used all available local resources.

(b) Has determined that the person has gone missing under unexplained or suspicious circumstances.

(c) Believes that the missing person is in danger or that the missing person is in the company of a potentially dangerous person or that there are other factors indicating that the missing person may be in peril.

3. There is information available that, if disseminated to the public, could assist in the safe recovery of the missing person.

4. The department has been designated to use the federally authorized emergency alert system for the issuance of turquoise alerts.

C. If the department issues a turquoise alert pursuant to this section, the department shall provide the turquoise alert information to any other entity that provides similar notifications in this state.

D. For the purposes of this section:

1. "Law enforcement agency" means the Arizona department of public safety, a municipal police department, a county sheriff's office, a tribal law enforcement agency and a federal law enforcement agency that operates within this state.

2. "Person" includes a member of a federally recognized Indian Tribe.

**Ariz. Rev. Stat. Ann. § 41-2051(A)–(C)**

41-2051. Governor's office on tribal relations; director; responsibilities of state agencies; report

A. The governor's office on tribal relations is established. The office shall assist state agencies in implementing tribal consultation and outreach activities.

B. The governor shall appoint the director pursuant to section 38-211. The director is entitled to receive compensation pursuant to section 38-611. The office may employ clerical, professional and technical personnel subject to chapter 4, article 4 of this title and shall prescribe their duties and determine their compensation pursuant to section 38-611.

C. Each state agency shall:

1. Develop and implement tribal consultation policies to guide the agency's work and interaction with the tribal nations of this state.

2. To the extent practicable and permitted by law, seek input from appropriate elected or appointed tribal officials before undertaking any action or policy that will, or is reasonably believed to, have the potential to affect a tribal community or its members.

3. To the fullest extent possible and to the best of the agency's ability, integrate the input generated from tribal consultation into the agency's decision-making processes to achieve mutually acceptable solutions.

4. Designate a state member to assume responsibility for the agency's implementation of the tribal consultation policies and to act as the principal point of contact for tribal affairs.

5. On or before October 1 of each year, review the agency's tribal consultation policies and submit an electronic progress report with performance measures to the office. The office shall make the reports available to tribal leaders and legislators.

* * *