**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-5306**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

TOHONO O'ODHAM NATION,

*Plaintiff-Appellant*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Columbia
Case No. 4:26-cv-2127-RJL (Hon. Richard J. Leon)

# EMERGENCY MOTION OF THE TOHONO O'ODHAM NATION FOR AN INJUNCTION PENDING APPEAL

Elizabeth B. Prelogar
Joshua Revesz
COOLEY LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant Tohono O'odham Nation*

(additional counsel listed on next page)

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634

Philip H. Tinker
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100

# GLOSSARY

| **Abbreviation** | **Term** |
|---|---|
| CBP | United States Customs and Border Protection |
| Department | United States Department of Homeland Security |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009 (1996) |
| Nation | Tohono O'odham Nation |
| Secretary | The Secretary of the United States Department of Homeland Security; the Commissioner of United States Customs and Border Protection; and the Chief of United States Border Patrol |
| Section 102 | Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border) |

**INTRODUCTION**

Pursuant to D.C. Circuit Rules 8 and 27(e), the Tohono O'odham Nation moves this Court for an emergency injunction pending appeal prohibiting the Secretary of the Department of Homeland Security and the other defendants to this action (collectively, the "Secretary") from engaging in or directing activity in furtherance of the construction of a border wall or related infrastructure on the Nation's Reservation. On August 27, the Nation filed a motion seeking the same relief from the district court, which has yet to rule. JA0966-0968. Because the Secretary intends to begin construction as early as next Monday, October 12, JA0627, the Nation respectfully requests relief by that date.

The emergency is stark. Absent judicial intervention, the Secretary will begin constructing, over the Nation's strenuous objections, at least a single and quite possibly a double border wall and related infrastructure across the 62-mile length of the southern boundary of the Nation's Reservation in Arizona, which is co-extensive with the international border with Mexico. Construction of the border wall will not only usurp the sovereign authority of the Nation over its lands but result in their permanent devastation.

In these extraordinary circumstances, the Nation readily satisfies every requirement for relief to preserve the status quo pending resolution of this expedited appeal.

*First*, the Nation is likely to succeed on the merits, including its claim that the Secretary's planned border-wall construction will trespass on the Nation's sovereign lands. The merits of that claim are straightforward. And while the district court rejected the claim on procedural grounds, its holdings conflict with binding precedent.

*Second*, the equities are not close. An assertion by federal officials that they can blast, bulldoze, and permanently dispossess a federally recognized tribe of reservation lands absent Congress's assent is unprecedented in the modern era. Across other portions of the southern border, the Secretary has paused wall construction in response to concerns raised about environmental devastation. But as a result of the district court's preliminary injunction denial and its inaction on an injunction pending appeal, the Secretary is poised to begin destroying the Reservation landscape in furtherance of his wall project next week. The Nation asks this Court to pause such irreversible and profoundly harmful activity until the Court has the opportunity to rule on the merits of the Nation's claims.

## FACTUAL BACKGROUND

1. The Tohono O'odham Nation exercises sovereignty over a 2.8-million-acre Reservation in the Sonoran Desert in southern Arizona, the 62-mile southern boundary of which is coextensive with the international border. The Nation has long devoted significant resources to border security and has forged an

extensive relationship with the Department—a relationship that includes the maintenance of two Department operating bases on the Reservation, JA0216, vehicle barriers that "have virtually eliminated unauthorized vehicle transit" from Mexico, JA0215-0216, and the deployment of state-of-the-art surveillance technology. JA0216-0217.

2. However, the Nation has long opposed plans for a wall on its lands, JA0114-0120. Building a wall and associated infrastructure along the border will necessarily entail the blasting and excavation of four sets of mountain peaks, "resulting in permanent and irreversible alterations to the natural landscape and topography of the Reservation," JA0140; *see also* JA0134-0135; JA0137. Those peaks are sacred to the O'odham. JA0131-0134; JA0044; JA0195; JA0324; JA0332-0333.

Moreover, wall construction will "require[] extensive staging areas, material storage, equipment parking, and portable concrete batch plants that extend hundreds to thousands of feet beyond the immediate border," JA0140, "result[ing] in substantial and long-lasting disturbances to soils, hydrology, desert pavement, and vegetation communities, and these impacts are unlikely to be fully reclaimed for centuries in the arid environment of the Reservation." *Id.*; *see also* JA0270-0271; JA0275-0276. The project will further require multiple access roads to be

graded across the Reservation, as well as switchback roads for heavy machinery to access the mountainous areas. JA0130-0131; JA0135.

As the government recently confirmed, the project would additionally entail the attempted relocation of thousands of cacti, JA0826, JA0831, including saguaros, JA0275. Saguaros are among "the most sacred plants in O'odham religious tradition," JA0273, the fruits of which are "as essential to O'odham spirituality as sacramental bread and wine are…in Christian traditions." JA0238. Saguaros are accordingly protected under tribal and State law. *See* JA0247-0249; Ariz. Rev. Stat. § 3-906.

And saguaro relocation efforts are rarely successful. In the Department's past border projects in Arizona, relocation killed half the transplanted cacti. U.S. Gov't Accountability Off., GAO-23-105-443, *Southwest Border: Additional Actions Needed to Address Cultural and Natural Resources Impacts from Barrier Construction*, 27 (2023).[1] The fatality rate is especially high for "older or taller saguaros, which are not likely to survive[.]" JA0275. And relocation is especially risky this time of year, when "cool temperatures and moisture promote decay in fresh transplants." USDA, *Salvage Techniques for Saguaro Cacti, Barrel Cacti and Ocotillo* 6 (2009).[2]

---

[1] https://www.gao.gov/assets/830/828858.pdf.
[2] https://www.nrcs.usda.gov/plantmaterials/azpmctn8957.pdf.

3. Despite the Nation's long-asserted objections, the Department informed the Nation on May 15, 2026 that it would issue a contract solicitation that same day for a border wall on the Nation's Reservation, JA0087. In the ensuing weeks, the Department released additional project documents and maps. JA0089-0094; JA0096-0101. On June 16, the Nation filed suit challenging the Secretary's planned border wall construction as constituting (1) a trespass on its Reservation lands and (2) an ultra vires diminishment of the Reservation. JA0011-0030. It simultaneously moved for a preliminary injunction. JA0031-0033. While the Nation is vigorously pressing both claims on this appeal, *see* Appellant's Opening Br. 17-49, each of which independently warrants the Nation's requested relief, it will focus on the trespass claim for purposes of the instant motion.

4. On June 26, 2026, the Department awarded a contract for construction of up to two thirty-foot-high walls, a patrol road, and related infrastructure including shelters, light poles, and surveillance technology on the Nation's Reservation. JA0787. The contract requires that construction "be completed by September 14, 2027," JA0791, and as noted, the Secretary intends to commence substantial construction-related activities on October 12, 2026. JA0627.

5. On August 14, 2026, the district court denied the Nation's preliminary injunction motion. Add.1-18; JA0944-0961. Of particular relevance here, the court concluded that the availability of a trespass cause of action against federal officials

is "at best uncertain," Add.15; the Secretary likely possesses sovereign immunity from such a claim in any event, Add.14-15; and "uncertainties remain" regarding whether construction activities would have impacts outside the "Roosevelt Reservation"—a sixty-foot-wide corridor along portions of the international border reserved for federal purposes that (in the government's view) exists on the Nation's Reservation. Add.16. The court further held that the Nation had not established irreparable harm. It did so by reprising its merits conclusion that wall construction will not necessarily have impacts outside the sixty-foot corridor. Add.17 (citation omitted). And the court determined that in any event such harm would be outweighed by the government's interest in border security. *Id.*

6. Given the Secretary's plans to begin construction next week, the Nation filed a motion to expedite its appeal on August 27, 2026, Appellant's Mot. to Expedite, the same day that it sought an injunction pending appeal from the district court. This Court granted the motion for expedition on September 9 and directed the Clerk to schedule oral argument on the first appropriate date in December. Order at 1, No. 26-5306 (D.C. Cir. Sept. 9, 2026). The district court has not acted on the motion for an injunction pending appeal.

7. With construction imminent, and mindful of this Court's rule that an emergency motion must be filed seven days prior to the date by which judicial action is necessary, *see* D.C. Circuit Rule 27(e), undersigned counsel contacted the

Secretary's counsel on October 1 to determine if the Secretary would defer construction-related activities until a district court ruling on the Nation's Motion for Injunction Pending Appeal and this Court's review. The Secretary declined, and the Department has instead confirmed that it plans to move ahead with construction-related activity (including saguaro relocation efforts) next week, necessitating this filing.

## LEGAL STANDARD

An application for emergency relief in this Circuit must address "(i) the likelihood that the moving party will prevail on the merits; (ii) the prospect of irreparable injury to the moving party if relief is withheld; (iii) the possibility of harm to other parties if relief is granted; and (iv) the public interest." D.C. Cir. R. 8(a). The required merits showing is arguably higher than that for an injunction pending appeal under F.R.C.P. 62(d), where the movant must show that "the issue on appeal presents a 'serious legal question' on the merits." *Cigar Ass'n of Am. v. U.S. Food and Drug Admin*., 317 F. Supp.3d 555, 560 (D.D.C. 2018) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841, 842-44 (D.C. Cir. 1977)). The Nation embraces the likelihood-of-success standard here as it readily satisfies it along with the other criteria for injunctive relief.

# ARGUMENT

## I. The Nation Is Likely to Succeed on Its Trespass Claim.

### A. The Nation May Sue to Prevent Unauthorized Intrusions on Its Reservation.

The district court held that—regardless of the severity of on-reservation trespasses that federal officers may commit—federal courts have no power to enjoin such officials because (1) tribes (unlike other plaintiffs) cannot maintain federal common law trespass actions against federal officers, Add.15-16; and (2) those officers enjoy sovereign immunity from suit, Add.14-15. Both holdings contravene binding precedent.

#### 1. The Nation Has a Federal Common Law Cause of Action.

The district court decreed that the availability of a trespass claim "by an Indian tribe against the federal government is at best uncertain." Add.15. But no such uncertainty exists—Indian tribes have long sued trespassers (including federal officials) under the common law, and the Supreme Court has approved of that cause of action.

The tort of trespass has long been understood to run against government officials, *see United States v. Lee*, 106 U.S. 196, 220-21 (1882) (rejecting proposition that "courts cannot give remedy when the citizen has been deprived of his property…[,] converted to the use of the government without any lawful authority…because the president has ordered it" and noting that "[i]f such be the

law of this country, it sanctions a tyranny"). There likewise exists a long tradition of enjoining trespasses that would be difficult to reverse: "[I]t is now a common practice in cases where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate…to issue an injunction, though the title to the premises be in litigation." *Erhardt v. Boaro*, 113 U.S. 537, 539 (1885).

These principles retain their force today, including in actions against the federal government. Recently, for example, when Department agents began cutting wire fencing that the State of Texas had placed along part of the southern border, the Fifth Circuit enjoined the Department based on the state's common law trespass claim. *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 192 (5th Cir. 2024).

The Supreme Court has recognized, moreover, that Indian tribes possess the same common law rights as other landowners. In *Oneida County v. Oneida Indian Nation of New York State*, the Court held that, under "well-established principles," tribes can sue "for violation of their possessory rights based on federal common law." 470 U.S. 226, 236 (1985); *see also id.* at 235-36 & n.6 (collecting cases). These rules are of longstanding vintage, *see, e.g.*, *Marsh v. Brooks*, 49 U.S. 223, 232 (1850) ("That an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question."), and they flow inexorably from the nature of tribal landholdings. "When the United States establishes a tribal

reservation, the reservation generally includes (among other things) the land" and the rights to associated resources, and "[e]ach of those rights is a stick in the bundle of property rights that makes up a reservation." *Arizona v. Navajo Nation*, 599 U.S. 555, 563 (2023). "Over tribal lands, the tribe has the rights of a landowner as well as the rights of…sovereignty," including "the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain[.]" *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146 n.12 (1982) (citation modified).

The Supreme Court has also affirmed that federal officials, like other trespassers, are subject to suit under the common law when they intrude on tribal lands. As an example of the federal common law, the *Oneida* Court cited *Edwardsen v. Morton*—which explains that "a cause of action for trespass" lies "*against federal officers*" if tribes are "disturbed in their use and occupancy." 369 F. Supp. 1359, 1378-79 (D.D.C. 1973) (emphasis added); *see Oneida*, 470 U.S. at 236 n.6 (describing *Edwardsen* as "upholding [a] trespass action"). This accorded with prior decisions of the Court, including its determination in *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113-14 (1919), that a tribe can obtain a preliminary injunction against federal officials for the unauthorized appropriation of its land.

The district court grappled with none of this. Without explanation, it dismissed *Edwardsen*'s discussion of tribal trespass claims as "dicta," Add.15,

while ignoring *Oneida* altogether and citing not a single countervailing case to justify its skepticism of tribal trespass claims against federal officials. It did not explain why tribes (of all entities) would be uniquely dispossessed of the time-honored right to sue federal officials for trespass, or why tribes may obtain such injunctive relief against *other* parties but not against federal officials.

**2. The Secretary Is Not Entitled to Sovereign Immunity.**

The district court likewise erred in holding that the Secretary is immune from suit. *See* Add.14-15. This Circuit has recognized that "if [a] federal officer…allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit" for injunctive relief. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949)). In such circumstances, "sovereign immunity…never attached in the first place." *Id*. "This exception to sovereign immunity is known as the *Larson-Dugan* exception." *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024); *see Dugan v. Rank*, 372 U.S. 609 (1963).

While the district court suggested that this well-accepted body of precedent does not permit "common law tort claims" against federal officials, Add.15, longstanding Supreme Court precedent provides that federal officers may be sued—including for common law torts—if their actions are "unconstitutional" or "beyond [their] statutory powers," *Larson*, 337 U.S. at 698. Just this past Term, the

Court reiterated that a plaintiff "may sue in equity without a congressionally-provided cause of action to prevent an injurious act by a [federal] public officer." *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026) (quotation marks omitted).

This Court has accordingly explained that "sovereign immunity does not prevent an injunction against a state officer who abridges a common law duty without statutory authorization." *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024); *see also Schilling*, 102 F.4th at 506 ("*Larson-Dugan* is triggered" where "defendants acted outside of the scope of their duty…imposed by the common law"). The district court cited no authority suggesting that common law trespass claims are uniquely excluded from long-established doctrine regarding officer suits, and none exists.

### B. The Secretary's Construction Activities Would Necessarily Trespass on Tribal Lands.

On the merits, the Nation's trespass claim is straightforward. "Federal common law governs an action for trespass on Indian lands." *Bad River Band v. Enbridge Energy Co., Inc.*, 184 F.4th 874, 886 (7th Cir. 2026) (quoting *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009)). That law "generally comports with the Restatement of Torts," *id.* (quoting *Milner*, 583 F.3d at 1182), under which one is liable to another for trespass if, without consent, "he intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land," Restatement (Second) of Torts

§ 158 (1965). The Secretary's proposed actions—to enter or cause his agents to enter the Reservation for purposes not authorized by the Nation, alter the landscape, and leave behind at least one permanent wall and associated infrastructure—are quintessential acts of trespass.

The Secretary counters that his contractors will confine their work to the sixty-foot "Roosevelt Reservation" that, in his telling, exists along the Nation's southern boundary. That is wrong for two fundamental reasons.

*First,* the Secretary's premise is incorrect. By its plain terms, President Roosevelt's Proclamation only reserved to the United States "public lands within sixty feet of the international boundary." Proclamation of May 27, 1907, 35 Stat. 2136, 2136. It did not attach to territory that was not "public land[]" in 1907, such that there are portions of the southern border where the Roosevelt Reservation does not lie. *See, e.g.*, Notice of Correction, 91 Fed. Reg. 13861, 13862 (Mar. 23, 2026) (United States acknowledging same for portion of border in New Mexico).

It was well settled by 1907 that "[a]ll land, to which any claims or rights of others have attached, does not fall within the designation of 'public land.'" *Bardon v. N. Pac. R.R. Co.*, 145 U.S. 535, 538 (1892); *see also N. Lumber Co. v. O'Brien*, 204 U.S. 190, 196 (1907) (same). This principle included lands to which tribes held aboriginal title—i.e., the "right of exclusive use and occupancy held by Natives in lands and waters used by them…prior to the assertion of sovereignty

over such areas by the United States," *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 536 n.4 (1987) (citation omitted).

Hence, a unanimous Supreme Court explained in *United States v. Santa Fe Pacific Railroad Co.* that the aboriginal rights of an Arizona tribe to occupy its lands "unless extinguished [by Congress] survived" an 1866 grant of public lands to a railroad because "it has been the policy of the federal government from the beginning to respect the Indian right of occupancy," which "is considered as sacred as the fee-simple of the whites," 314 U.S. 339, 345 (1941) (citations omitted); *see also, e.g.*, *Barker v. Harvey*, 181 U.S. 481, 491 (1901) (where Indians hold an unextinguished "right of occupation,…it could not well be said that [the] lands…were a part of the public domain[.]").

There is no dispute that in 1907, the lands that would become the Nation's Reservation were subject to the Nation's unextinguished aboriginal rights. In 1915, the Commissioner of Indian Affairs selected a "Committee of Eight" to recommend a reservation location for the Nation. JA0563; JA0576. The Committee's report identified the lands that came to be the present-day Reservation because the O'odham had "inhabited [them]…from time immemorial," JA0580. Their longstanding "exclusive use" of the area established "a right of occupancy" and "a title or right of possession, of which they cannot be deprived without authority from Congress." JA0606. The Secretary of the Interior

endorsed this recommendation, JA0490, and President Wilson accepted it in issuing the Executive Orders that established the Reservation, S. Doc. No. 70-53, at 1005-11.[3]

In sum, the lands that became the Nation's Reservation were not "public lands" in 1907 because they remained subject to the Nation's unextinguished aboriginal rights, and the Roosevelt Reservation accordingly did not attach to them. The district court engaged with none of this, relying instead on sources that long postdate the Nation's Reservation and that do not support the Secretary's counter-textual position in any event. *See* Appellant's Opening Br. 37-41.

*Second*, the Secretary's contractors cannot restrict their work to within sixty feet of the border and hence will be in trespass regardless of whether the Roosevelt Reservation attached to the Nation's lands.

As explained in a declaration by Christopher Senseney—a former military engineer who served as an engineer of record on two border wall projects proximate to the Nation's Reservation, and who is a Professor of Civil Engineering at the University of Colorado, JA0123-0124—there are four separate mountainous areas on the Nation's Reservation's sixty-two-mile southern border. JA0131-0134. Building the wall along the border would require leveling those mountains, activity that indisputably cannot be contained within sixty feet. JA0131-0136; *see also*

[3] https://bit.ly/4oBmpno.

JA0774-0775 (illustrative photographs). That is why Paul Enriquez, CBP's Director of Infrastructure, does not dispute that wall construction along the border could require blasting through "four particular mountainous locations," JA0631, and has nowhere claimed that such activity can be restricted to a sixty-foot corridor.

At the preliminary injunction hearing, counsel for the Secretary accordingly conceded that "if you…restrict us to the 60-foot zone, then you've got difficult engineering challenges ahead of you[.]" JA0752. He argued that the Secretary could seek the Nation's consent for the wall to "meander[]" inland, JA0753, but the Nation will not provide such consent because that would divide the Nation's Reservation, with the Nation's citizenry on one side of the wall and its sacred peaks and substantial borderlands on the other. Either option—mountain blasting or partition of the Nation's lands—will constitute a trespass. The district court simply ignored this basic reality.

Professor Senseney has further detailed that border-wall construction "requires extensive staging areas, material storage, equipment parking, and portable concrete batch plants that extend hundreds to thousands of feet beyond the immediate border[.]" JA0140. Director Enriquez acknowledges that such staging areas could extend hundreds of feet north of the border. JA0629.

Finally, Professor Senseney has explained that the project will require at least nine east-west access roads to be constructed far beyond the sixty-foot corridor, as well as switchback roads for heavy machinery to access the mountainous areas of the Reservation. JA0130-0131; *see also* JA0135-0136. Such roads have been commonplace in the Secretary's recent border wall projects, JA0724-0730.

Any notion, then, that the border wall project on the Reservation can be carried out entirely within sixty feet of the border is fanciful.

### C. Congress Has Not Authorized the Secretary to Trespass on the Nation's Reservation.

The Secretary lacks any statutory justification for his planned trespass. The laws authorizing border wall construction do not authorize federal officials or their contractors to trespass, let alone on tribal land. While Section 102 of the IIRIRA directs the Secretary "to install additional physical barriers and roads" along the border, IIRIRA § 102(a), it requires only that he "construct reinforced fencing along not less than 700 miles of the [approximately 2,000-mile] southwest border," Pub. L. No. 110-161, § 564, 121 Stat. 2090 (amending IIRIRA § 102(b)(1)(A)). It does not mandate a wall "in [any] particular location," IIRIRA § 102(b)(1)(D), much less on the Nation's Reservation. As such, it can hardly be said to sanction trespass.

Basic Indian law principles underscore this conclusion. While Congress can abrogate a tribe's reservation rights, it must make its specific intent to do so unmistakable. The Court distilled its precedents establishing that standard in *United States v. Dion*, which holds that "[w]hat is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." 476 U.S. 734, 739-740 (1986). While *Dion* involved a treaty-established reservation, the Court cited both treaty and non-treaty precedents. *Id*. And *Oneida* confirms that the requirement of congressional clarity for abrogation of tribal rights applies equally "in nontreaty matters." 470 U.S. at 247-48. The Secretary cannot identify a statute that remotely meets that standard.

* * *

Under well-established law, the Nation is not powerless to prevent the unprecedented acts of trespass the Secretary threatens. It may maintain a federal common law trespass action, from which the Secretary enjoys no immunity. The border wall project will necessarily entail substantial trespasses with no statutory justification. The Nation has accordingly established a likelihood of success on the merits of its trespass claim.

## II. The Equitable Factors Favor an Injunction Pending Appeal.

### A. The Nation Will Suffer Irreparable Injury Absent an Injunction.

If the Secretary is allowed to begin construction while this appeal is pending, the Nation will suffer several quintessential forms of irreparable harm.

First, it is difficult to imagine a more complete abrogation of the Nation's sovereignty than for the Secretary to move unilaterally over the Nation's vehement objections to blast and bulldoze the Nation's homeland. Such "loss of sovereign authority over [a] Tribe's historic lands" is irreparable, as it "cannot be calculated in terms of money." *Mashpee Wampanoag Tribe v. Bernhardt*, Civil Action No. 18-2242, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) (citations omitted); *see also, e.g.*, *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (Gorsuch, J.) ("[We have] repeatedly stated that an invasion of tribal sovereignty can constitute irreparable injury." (citation omitted)).

Second, such action would likewise eviscerate the Nation's core property rights. "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights," *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982), and "where a tort claim seeks to stop a 'continuing trespass to land,'…irreparable injury exists, and injunctive relief is appropriate," *Texas*, 123 F.4th at 212 (quoting Restatement (Second) of Torts § 938 cmt. c (1979)).

Third, "[e]nvironmental injury…can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco*, 480 U.S. at 545. Here, the Secretary's plan would flatten mountaintops, destroy sacred plants including saguaros, and bulldoze permanent scars across the Nation's Reservation landscape. O'odham lands cannot be restored once the government has obliterated them. And, as the Secretary's announcement that he will begin saguaro relocation on October 12 confirms, immense damage could be done before the Court has the opportunity to decide this case on the merits.

Neither the Secretary nor the district court has seriously disputed any of this. The court instead concluded that the Nation's "alleged harms…are not likely to materialize because…the Roosevelt Reservation likely exists along the Nation's border, and defendants have not yet articulated plans to construct outside the Roosevelt Reservation." Add.17.

This double-counting by the district court of its merits assessments contradicts Circuit precedent, which holds that "[w]ithin the irreparable harm analysis itself—which assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law—we examine only whether that violation, if true, inflicts irremediable injury," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir.

2006). The harms asserted by the Nation are quintessential irremediable injuries warranting injunctive relief.

**B. The Equities Weigh Heavily in Favor of an Injunction.**

"The balance of harms and the public interest factors merge when the government is the opposing party." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021). Those factors heavily favor an injunction pending appeal.

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (quotation marks omitted); *see also, e.g.*, *Glob. Health Council v. Trump*, 153 F.4th 1, 22 (D.C. Cir. 2025) (same); *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (same). Because the Secretary's planned actions will constitute unauthorized trespass, the public interest favors enjoining them.

The district court instead deferred to the Secretary's asserted border security interests. *See* Add.17-18. "But our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 594 U.S. 758, 766 (2021); *see Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (same). The Nation, as described

above, shares the government's interest in border security, but that interest cannot justify illegal intrusions on the Nation's land.

The instant motion, moreover, seeks an injunction only for the pendency of an expedited appeal, and there is substantial reason to doubt that the Secretary will suffer significant harm during that time. Even without a wall along significant lengths of the international boundary, border security is the strongest it has been in decades, with the Department announcing in April 2026 that "[b]order encounters for first six months of the fiscal year are the lowest in recorded history," and CBP Commissioner Scott stating that "[t]his isn't temporary—it's the new normal," Press Release, U.S. Dep't of Homeland Sec. (Apr. 9, 2026).[4] In July, the Department declared that "[w]ith daily apprehensions down 94% from the previous administration, the border remains more secure than at any point in history," and Secretary Mullin pronounced "[o]ur border is CLOSED to lawbreakers," Press Release, U.S. Dep't of Homeland Sec. (July 16, 2026).[5] These trends are no different on the Tucson Sector of the border (which includes the Nation's

---

[4] https://www.dhs.gov/news/2026/04/09/trump-administration-delivers-11-straight-months-zero-releases-border.

[5] https://www.dhs.gov/news/2026/07/16/trump-administration-delivers-14-straight-months-zero-releases-border.

Reservation), where the Department reports a ninety-six percent decline in border apprehensions this year compared to 2024.[6] *See also* JA0219-0221.

Indeed, the Secretary's decision to abstain from border wall construction elsewhere along the border undermines any claim that the requested injunction will significantly harm his interests. At Big Bend National Park in Texas, for example, the Secretary has decided in the face of economic and political pressures to pause or forgo border wall construction and to instead use (at most) the same vehicle barriers and surveillance technology already used effectively on the Nation's Reservation. Reply Supp. Mot. Prelim. Inj. 23, Dkt. 25.

By contrast, the Nation will suffer significant harm absent relief from this Court. The Secretary has made clear that he will feel unrestrained while this appeal proceeds, Resp. Opp'n Mot. Inj. Pending Appeal 20, Dkt. 53, and his incentive will indeed be to engage in as much construction as possible, rendering the permanent destruction of the Nation's lands a fait accompli.

* * *

---

[6] https://www.cbp.gov/newsroom/stats/nationwide-encounters (reporting 16,135 apprehensions in 2026 to date, compared to 452,512 for same period in 2024) (locate section labeled "U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component," and select "Choose Region: Southwest Land Border" and "Area of Responsibility: Tucson Sector" fields).

Never in the modern era have federal officials claimed authority to come uninvited onto a reservation, fundamentally destroy reservation resources, and leave behind massive infrastructure rendering portions of the reservation otherwise unusable. The ultimate resolution of the Secretary's authority to so act will have sweeping implications. But in the meantime, the Secretary will substantially advance the irremediable destruction of the Nation's lands absent an injunction, the issuance of which is amply warranted under these circumstances.

## CONCLUSION

For the foregoing reasons, the Nation respectfully requests that the Court enjoin the Secretary from engaging in or directing activity in furtherance of the construction of a border wall or related infrastructure on the Nation's Reservation pending resolution of this expedited appeal. The Nation asks that this Court issue such relief prior to October 12, 2026, when Secretarial action will otherwise commence—or, to the extent the Court requires more time to consider this motion, that it enter an administrative injunction to give the panel "sufficient opportunity to consider the emergency motion[.]" *Heritage Found. v. U.S. Dep't of Justice*, No. 26-5235, 2026 WL 1996225, at *1 (D.C. Cir. July 10, 2026) (per curiam).

Dated: October 5, 2026

Respectfully submitted,

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
jhandelsman@kanjikatzen.com
ajoshi@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.LC.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Elizabeth B. Prelogar
Joshua Revesz
COOLEY LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com
jrevesz@cooley.com

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Appellant Tohono O'odham Nation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,186 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

As required by Circuit Rules 27(a)(4) and 28(a)(1), undersigned counsel for Plaintiff/Appellant the Tohono O'odham Nation hereby provides the following information:

### I. Parties Appearing Below

The parties appearing before the U.S. District Court are:

1. The Tohono O'odham Nation, a federally recognized Indian tribe.
2. Markwayne Mullin, Secretary of the United States Department of Homeland Security (named in his official capacity).
3. Rodney Scott, Commissioner of United States Customs and Border Protection (named in his official capacity).
4. Rosario Vasquez, Chief of the United States Border Patrol (named in his official capacity).

### II. Amici Curiae Appearing Below

The amici curiae appearing before the U.S. District Court are:

1. Warren Petersen, in his capacity as President of the Arizona Senate.
2. Steve Montenegro, in his capacity as Speaker of the Arizona House of Representatives.

### III. Parties Appearing in this Court

The parties appearing before this Court are:

1. The Tohono O'odham Nation, a federally recognized Indian tribe.
2. Markwayne Mullin, Secretary of the United States Department of Homeland Security (named in his official capacity).

3. Rodney Scott, Commissioner of United States Customs and Border Protection (named in his official capacity).

4. Rosario Vasquez, Chief of the United States Border Patrol (named in his official capacity).

## IV. Amici Curiae Appearing in this Court

The amici curiae appearing before this Court are:

1. Governor Katie Hobbs, in her official capacity as Governor of Arizona.

2. National Congress of American Indians.

3. Inter Tribal Association of Arizona, Inc.

4. Salt River Pima-Maricopa Indian Community, a federally recognized Indian tribe.

5. Ak-Chin Indian Community, a federally recognized Indian tribe.

6. Center for Biological Diversity.

7. National Native American Law Students Association.

8. University of Arizona Native and Indigenous Law Students Association.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2026, I electronically filed the foregoing Emergency Motion of the Tohono O'odham Nation for an Injunction Pending Appeal with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

# ADDENDUM

Memorandum Opinion, Dkt. 45
Filed August 14, 2026 .......................... 1

Order [denying Plaintiff's Motion for Preliminary Injunction], Dkt. 46
Filed August 14, 2026 .......................... 19

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TOHONO O'ODHAM NATION,<br><br>Plaintiff,<br><br>v.<br><br>MARKWAYNE MULLIN, *et al.*,<br><br>Defendants. | ) | Civil Case No. 26-2127 (RJL) |

**MEMORANDUM OPINION**

August 13th, 2026 [Dkt. #3]

For decades, plaintiff the Tohono O'odham Nation and the United States Government have worked together to secure a sixty-two mile stretch of the international border with Mexico. In 2004, the Tohono O'odham Nation agreed to construction of a vehicle barrier over most of the international border that stops vehicles—but not people—from crossing. The Government now plans to replace the vehicle barrier with a congressionally-authorized and funded border wall next to the Tohono O'odham Reservation. Plaintiff seeks a preliminary injunction to stop construction on grounds that the border wall will change the Reservation boundaries and will result in trespasses over the Reservation. Because plaintiff is unlikely to succeed on the merits of these claims, and because the remaining preliminary injunction factors favor the Government, I will **DENY** plaintiff's Motion for a Preliminary Injunction.

## BACKGROUND

### I. The United States-Mexico International Border

The international border between the United States and Mexico stretches for nearly 2,000 miles and spans four states—California, Arizona, New Mexico, and Texas.[1] Securing and maintaining control of such a lengthy and geographically varied border is a challenge, especially given the high volume of illegal entries and drug smuggling. For example, at the Arizona border from 2021 to 2026, the Government apprehended 1.3 million illegal aliens and seized thousands of pounds of illicit drugs, including over 3,475 pounds of fentanyl, 17,200 pounds of marijuana, and 11,750 pounds of methamphetamine. Decl. of Paul Enriquez ("Enriquez Decl.") [Dkt. #18-2] ¶ 10.

Congress has directed the Secretary of Homeland Security (the "Secretary") to "achieve and maintain operational control over" the United States-Mexico border, including through "physical infrastructure enhancements." Secure Fence Act of 2006, Pub. L. No. 109-367, § 2(a), 120 Stat. 2638, 2638 (codified at 8 U.S.C. § 1701 note). Congress has repeatedly passed legislation authorizing the Secretary to construct physical barriers at the border. *See, e.g.*, Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 102, 110 Stat. 3009, 3009-554 (1996) (codified at 8 U.S.C. § 1103 note and hereinafter referred to as the Illegal Immigration Reform and Immigrant Responsibility Act, or "IIRIRA"). Most recently, Congress appropriated $46 billion to U.S. Customs and Border Protection for, among other things, the "[c]onstruction, installation, or improvement

[1] Smart Wall Map, U.S. Customs & Border Protection, https://perma.cc/9LWK-6HEP (last accessed Aug. 10, 2026).

of new or replacement primary, waterborne, and secondary barriers." One Big Beautiful Bill Act, Pub. L. No. 119-21, tit. IX, sec. 90001, 139 Stat. 72, 358 (2025).

To fast-track border construction, Congress authorized the Secretary to "waive all legal requirements . . . necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1). Congress further limited federal courts' jurisdiction over "any action undertaken, or any decision made, by the Secretary" pursuant to IIRIRA's waiver authority. IIRIRA § 102(c)(2)(A). The statute permits only constitutional challenges to such "action[s]" or "decision[s]," and any legal challenges must be brought within sixty days. IIRIRA § 102(c)(2)(B), (C). On April 3, 2008, the Secretary issued a broad waiver of numerous environmental and procedural laws, including the Administrative Procedure Act, for projects "in the States of California, Arizona, New Mexico, and Texas." 73 Fed. Reg. 18293; *see also* 91 Fed. Reg. 45823, 45823 (July 21, 2026) (waiving numerous laws specifically for the Tucson 5 Project).

## II. The Tohono O'odham Nation

Plaintiff, the Tohono O'odham Nation ("plaintiff" or "the Nation"), is a "federally recognized Indian tribe with a government-to-government relationship with the United States." Compl. [Dkt. #1] ¶ 8. The Nation occupies a 2.8 million-acre reservation in Arizona. *Id.* ¶ 13. For approximately sixty-two miles, the Nation's reservation runs alongside the international border with Mexico. *Id.*

Plaintiff's "broader aboriginal territory" "extends throughout much of present-day Arizona and into Mexico." *Id.* ¶ 24. There are currently "[s]eventeen O'odham communities with approximately 2,000 members" in Mexico, and members of the Nation

"continue to cross the border for sacred pilgrimages and ceremonies at important religious and cultural sites." *Id.* ¶ 27.

The Nation has a "long-standing cooperative relationship" with the U.S. Government when it comes to border security and enforcement. *Id.* ¶ 34. In addition to collaborating with federal law enforcement agencies, the Nation has led a High Intensity Drug Trafficking Task Force (the NATIVE Task Force) targeting drug trafficking within the Nation's borders. Decl. of James Cook ("Cook Decl.") [Dkt. #3-5] ¶ 11. The Nation has authorized construction of "two Customs and Border Protection Forward Operating Bases on the Reservation," ten "Integrated Fixed Towers" for border surveillance, and "vehicle barriers and a patrol road along the vast majority of the border, with the exception of those areas where vehicle access is impossible due to mountainous terrain." Compl. ¶¶ 36, 38. Today, the four-foot vehicle barrier along most of the international border prevents vehicles from crossing the border but offers little resistance to pedestrians who wish to go over or under these barriers. *See* Cook Decl. ¶ 15.

## III. The Tucson 5 Project

In the spring of 2026, the U.S. Department of Homeland Security informed plaintiff of its "plans to construct a border wall and associated infrastructure along the international border within the Nation's Reservation." Compl. ¶ 49. Plaintiff has not consented to any construction. *Id.* ¶ 51. On June 26, 2026, U.S. Customs and Border Protection awarded a contract for construction of a "primary physical barrier" and "barrier system attributes" in what the Government is calling the "Tucson 5 Project." Enriquez Decl. ¶ 11. Design work

is underway. *See id.* ¶ 14. U.S. Customs and Border Protection "does not anticipate construction activities starting prior to October 12, 2026." *Id.*

## IV. Procedural History

On June 16, 2026, the Nation sued defendants Markwayne Mullin, Rodney Scott, and Rosario Vasquez ("defendants") all in their official capacities as Secretary of the U.S. Department of Homeland Security, Commissioner of U.S. Customs and Border Protection, and Chief of U.S. Border Patrol, respectively. *See* Compl. The next day, the Nation moved for a preliminary injunction halting construction of the border wall adjacent to the Nation's reservation. *See* Pl.'s Mot. for Prelim. Inj. ("Mot.") [Dkt. #3]. The Government opposes. *See* Defs.' Mem. of Points & Authorities in Opp'n to Pl.'s Mot. for Prelim. Inj. [Corrected] ("Opp'n") [Dkt. #19-1]. Plaintiff filed its reply on July 14, 2026. *See* Pl.'s Reply Mem. ("Reply") [Dkt. #25].

On July 22, 2026, the Court held a hearing on plaintiff's motion for a preliminary injunction. *See* Hr'g Tr. [Dkt. #43]. At the close of the hearing, the Court provided the parties with the opportunity to "submit a supplemental pleading based on the arguments that took place here today." Hr'r Tr. at 37:6–7. The parties submitted their supplemental briefs on July 30, 2026. *See* Suppl. Mem. of the Tohono O'odham Nation in Supp. of its Mot. for Prelim. Inj. ("Pl.'s Suppl. Br.") [Dkt. #37]; Defs.' Suppl. Br. in Opp'n to Pl.'s Mot. for Prelim. Inj. ("Defs.' Suppl. Br.") [Dkt. #39-1]. The motion is now ripe for decision.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555

U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

## ANALYSIS

### I. Likelihood of Success on the Merits

#### A. Ultra Vires *Claim*

Plaintiff argues that defendants' planned construction of the border wall is *ultra vires* because the wall will diminish the boundaries of the Reservation without express congressional authorization and will violate 25 U.S.C. § 398d.[2] While *ultra vires* review is available, I conclude that plaintiff is unlikely to succeed on the merits because the federal Roosevelt Reservation exists along the international border and, in any event, plaintiff has not established that construction of a border wall will indeed alter Reservation boundaries.

##### 1. Availability of *Ultra Vires* Review

Before getting to the merits of a nonstatutory *ultra vires* claim, the plaintiff must show that "(i) there is no express statutory preclusion of all judicial review" and "(ii) there is no alternative procedure for review of the statutory claim." *Fed. Express Corp. v. U.S. Dep't of Com.* ("*FedEx*"), 39 F.4th 756, 763 (D.C. Cir. 2022) (internal quotation marks

[2] 25 U.S.C. § 398d provides that "[c]hanges in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress."

omitted). Defendants argue that IIRIRA Section 102(c)(2) expressly precludes review of plaintiff's *ultra vires* claim. On this point, I disagree.

"Judicial review for *ultra vires* agency action 'rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief.'" *FedEx*, 39 F.4th at 763 (quoting *National Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022)). The "presum[ption] that agency action is judicially reviewable," however, "may be overcome by specific language that is a reliable indicator of congressional intent." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505 (D.C. Cir. 2019) (quoting *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017)). The relevant question, then, is whether Congress has "clearly and directly" prohibited judicial review of plaintiff's *ultra vires* claim. *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991).

Defendants argue that IIRIRA's waiver provision—Section 102(c)(1)—and the accompanying jurisdiction-stripping provision—Section 102(c)(2)—preclude plaintiff's *ultra vires* claim. Section 102(c)(1) provides:

> Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary . . . determines necessary to ensure expeditious construction of the barriers and roads under this section.

8 U.S.C. § 1103 note.

Section 102(c)(2)(A) provides:

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims *arising from any action undertaken, or any decision*

> *made, by the Secretary of Homeland Security pursuant to paragraph (1).* A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

*Id.* (emphasis added). The connection between plaintiff's *ultra vires* claim and the jurisdiction-stripping provision is not obvious. Plaintiff argues that defendants' planned construction of the border wall is *ultra vires* because the wall will diminish reservation boundaries without congressional authorization. Unlike many recent border wall cases, plaintiff does not challenge the legality of a secretarial waiver pursuant to IIRIRA Section 102(c)(1). *See, e.g.*, *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 235 (D.D.C. 2019). Defendants nevertheless argue that Section 102(c)(2)'s jurisdiction-stripping provision applies here because *ultra vires* review is available only when "there is no alternative procedure for review of the statutory claim," *FedEx*, 39 F.4th at 763, and plaintiff relies on the Secretary's waiver of the Administrative Procedure Act to satisfy this requirement. In other words, because plaintiff's *ultra vires* claim is "premised on an IIRIRA waiver," Section 102(c)(2) precludes plaintiff's claim. Defs.' Suppl. Br. at 4.

Our Circuit's reasoning in *North American Butterfly Association v. Wolf* strongly suggests—if not requires me to find—that plaintiff's *ultra vires* claim about diminishment of reservation boundaries does not "arise from" the Secretary's 2008 waiver of the Administrative Procedure Act. In *North American Butterfly*, our Circuit Court explained that Section 102(c)(2) "[b]y its terms . . . does not extend to construction or related activities that do not necessarily flow from exercise of the waiver authority as such, but that IIRIRA section 102(a)-(b) authorizes independently." 977 F.3d 1244, 1260 (D.C. Cir. 2020).

"Because 'arise' out of means 'to originate from a specified source, the phrase 'arising out of' generally requires 'a causal connection,' not merely a 'logical' one." *Id.* (internal citations omitted).

The 2008 waiver *enables* plaintiff to bring an *ultra vires* claim because there are no other avenues for judicial review. But it can hardly be said that the Secretary's waiver *caused* plaintiff's *ultra vires* claim. *Cf. Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) (explaining, in the context of personal jurisdiction, that "arise out of" requires a "causal showing"). Interpreting Section 102(c)(2)'s "arising from" language to "require[] a causal connection," *North American Butterfly*, 977 F.3d at 1260 (internal quotation marks omitted), also gives effect to IIRIRA's specific reference to Section 102(c)(1). Congress could have stripped jurisdiction over any actions or decisions pursuant to the Secretary's authority under Sections 102(a) and 102(b), but it instead focused the jurisdiction-stripping provision on the Secretary's waiver authority under Section 102(c). Consistent with this reasoning, at least one court has exercised jurisdiction over *ultra vires* claims "challeng[ing] the scope of the Secretary's authority to build roads and walls under section 102(a) and 102(b), not the scope of waiver authority under section 102(c)." *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019). Section 102(c)(2) therefore does not supply "clear and convincing evidence that Congress intended to deny the District Court jurisdiction" over plaintiff's *ultra vires* claim. *MCorp*

*Fin., Inc.*, 502 U.S. at 44.[3]

**2. <u>Merits</u>**

That hurdle aside, to succeed on the merits of its *ultra vires* claim, plaintiff must establish that defendants have "plainly act[ed] in excess of [their] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *FedEx*, 39 F.4th at 763 (internal quotation marks omitted). As I have said before, "*ultra vires* review is a high bar"—it is the ultimate "Hail Mary pass." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 104 (D.D.C. 2026) (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)). Plaintiff is unlikely to clear this high bar.

To succeed on an *ultra vires* claim, the plaintiff must show that "the agency has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.'" *FedEx*, 39 F.4th at 764 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). "Only error that is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* (cleaned up). The legal error must be "so extreme that one may view it as jurisdictional or nearly so." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *Griffith*, 842 F.2d at 493).

---

[3] Defendants do not separately argue that there is a "statutory review scheme provid[ing] aggrieved persons with a meaningful and adequate opportunity for judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal quotation marks omitted).

Plaintiff argues that the proposed border wall will unlawfully diminish the Nation's reservation boundaries without the authority of Congress and in violation of 25 U.S.C. § 398d. Plaintiff's *ultra vires* claim suffers, unfortunately, from multiple deficiencies.

*First*, the Roosevelt Reservation likely exists along the international border. In 1907—ten years before the creation of the Nation's modern-day Reservation by executive order—President Theodore Roosevelt "set apart as a public reservation[] all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico." Proclamation of May 27, 1907, 35 Stat. 2136, 2136 [Dkt. #18-3]. Plaintiff argues that it had aboriginal title to the land *before* the creation of the Roosevelt Reservation, so the Nation's lands were not "public lands," and therefore the Roosevelt Reservation has never existed on the reservation. Mot. at 22–31. But historical evidence casts doubt on plaintiff's theory.

In a 1934 dispute before the Solicitor of the Interior, the Nation argued that they held rights to land "in fee by virtue of a title vested in them before the area in question came under the sovereignty of the United States," so "the land never became part of the public domain," or "public lands." Solicitor's Memorandum Opinion M-27656 (Mar. 1, 1934) at 360, *supplemented by* M-27656 (Supp.) (May 7, 1934) [Dkt. #18-7]. The Solicitor of the Interior issued an opinion concluding that "the interest of the [Nation] in the land they claim [is] subordinate to a superior proprietorship in the United States." *Id.* at 363. The Nation did not "have a perfected title in fee which precludes the United States from exercising any proprietorship over the land." *Id.* While the opinion recognized that the Nation retained the "Indian right of surface occupancy," *id.* at 438, this right was not

equivalent to an "independent title which can . . . embarrass any future action that to Congress may seem appropriate in the premises." *Id.* at 438, 370–71. The opinion therefore calls into question plaintiff's claim that the Reservation land was not "public land" before the President established the Reservation in 1917.

Subsequent practice reflects multiple instances in which the Government and the Nation acknowledged the existence of the Roosevelt Reservation. In 1937, Congress passed a law modifying the boundaries of the Nation's Reservation but expressly noting that "[t]his extension shall not affect . . . the reservation of a strip of land sixty feet wide along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907." Act of July 28, 1937, Pub. L. No. 75-217, 50 Stat. 536 [Dkt. #18-4]. And as recently as 2004, the Nation—in approving construction of a vehicle barrier along the international border—acknowledged that U.S. Border Patrol "plans to construct the border vehicle barrier and road entirely within the sixty-foot strip of land reserved by the Presidential Proclamation of President Theodore Roosevelt dated May 27, 1907." Resolution No. 04-095 (Mar. 8, 2004) [Dkt. #18-6].

Plaintiff points to other historical evidence to argue that the Roosevelt Reservation has never existed on the Nation's Reservation because the Reservation was never "public land," but plaintiff's evidence is flawed. The 1968 Indian Claims Commission decision that recognized the Nation's aboriginal title also stated specifically that the "Gadsden Purchase of 1854 brought the subject lands under United States sovereignty and *they became public land* by the Act of July 22, 1854." 19 Ind. Cl. Comm. 394, 432 [Dkt. #3-15] (emphasis added). The decision goes on to say that the "[1854] Act provided for the

application to the new public lands of the pre-emption laws of the Territory of New Mexico *other than on lands covered by claims based on Spanish or Mexican law*." *Id.* (emphasis added). Plaintiff suggests that this phrase included claims based on aboriginal title. *See* Reply at 7–8. But the case plaintiff relies on does not say this outright. *See United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339, 351 (1941) ("[T]hese Acts were concerned not with the problem of ascertaining the boundaries of Indian country but with the problem of quieting titles originating under Spanish or Mexican grants.") Such conflicting historical evidence is not the stuff of successful *ultra vires* claims.[4]

*Second*, even if the Roosevelt Reservation does not exist on the Nation's Reservation, plaintiff has not shown how construction of a wall on the existing international border will change the boundaries of the Nation's reservation. The core of plaintiff's *ultra vires* theory is that only Congress can "adjust the Nation's boundaries." Pl.'s Suppl. Br. at 2. As a legal matter, it is well-established that Congress has exclusive authority to diminish reservation boundaries, and that Congress must make its intent to do so clear and unambiguous. *See McGirt v. Oklahoma*, 591 U.S. 894, 903–04 (2020). But I am not aware of any case holding that construction of a border wall adjacent to a Reservation—with the possibility of activities that may interfere with the Nation's use and occupancy rights—necessarily diminishes the Reservation's boundaries.

---

[4] Plaintiffs' reliance on references to the Nation's grazing of cattle up to the border is not persuasive because, as defendants argue, "[t]here is no conflict between the federal government's reservation of the land for national security purposes and transient uses like grazing." Defs.' Suppl. Br. at 8.

To the contrary, the establishment of non-Indian towns, or the sale of property to non-Indians, does *not* change the reservation status of the lands. *See, e.g.*, *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 358–59 (1962) (rejecting argument that "lands owned by towns" were "exclud[ed] from a reservation"). As defendants persuasively argue, "constructing a border barrier is not the type of action that could change the status or boundaries of a reservation." Defs.' Suppl. Br. at 5.

Plaintiff's novel *ultra vires* theory therefore fails to meet the "high bar," *Nat'l Tr. for Historic Pres.*, 827 F. Supp. 3d at 104, for extraordinary equitable relief.

**B. *Trespass Claim***

As a fallback, plaintiff argues that defendants' planned border wall may be enjoined for the independent reason that it constitutes a trespass on the Reservation. Plaintiff's trespass claim is unlikely to succeed on the merits because the federal government's sovereign immunity bars its claim.

As our Circuit has explained, "claims against the federal government and its actors are jurisdictionally barred by sovereign immunity." *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024). Congress may waive sovereign immunity through "clear statutory text" in statutes such as the Administrative Procedure Act or the Federal Tort Claims Act. *Id.* Courts interpret such statutes "strictly," and any exceptions to the Government's sovereign immunity "are not to be lightly implied." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). Plaintiff does not argue that any statute waives sovereign immunity here. It couldn't!

Instead, plaintiff relies on the *Larson-Dugan* exception to sovereign immunity for both its *ultra vires* and trespass claims. Under the *Larson-Dugan* exception, "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949)). In other words, sovereign immunity does not bar successful *ultra vires* claims. As explained *supra* Section I.A., plaintiff's *ultra vires* claim fails on the merits so the *Larson-Dugan* exception cannot operate to waive defendants' sovereign immunity for plaintiff's trespass claim.

Plaintiff argues that the *Larson-Dugan* exception also extends to suits seeking "an injunction against a state officer who abridges a common law duty without statutory authorization." Mot. at 19–20 (quoting *Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024)). But the cases cited by plaintiff all involve mandamus petitions seeking access to documents under the common law right of public access. *See Leopold*, 102 F.4th at 493; *Schilling*, 102 F.4th at 505; *Leopold v. Sullivan*, 823 F. Supp. 3d 59, 64 (D.D.C. 2026). As far as I can tell, no court has extended the *Larson-Dugan* exception to common law tort claims, let alone trespass claims, seeking injunctive relief against the Government.

However, even if plaintiff established a waiver of the Government's sovereign immunity, the availability of a federal common law trespass claim by an Indian tribe against the federal government is at best uncertain. Plaintiff relies on dicta to suggest the availability of such a cause of action. *See Edwardsen v. Morton*, 369 F. Supp. 1359, 1371 (D.D.C. 1973) (explaining that "officers are themselves liable in trespass if their actions

cause[] third parties to enter the land" but concluding that "resort to that principle of tort law actually is unn[e]cessary in view of the fiduciary duty of the federal government and its agents to protect the interests of Native Americans"). But plaintiff has not identified any case (outside the context of a Federal Tort Claims Act claim for damages) involving a common law trespass suit against the Government.

Indeed, significant uncertainties remain about the actual scope of construction activities and the extent to which they may interfere with the Nation's land outside the Roosevelt Reservation. *See* Enriquez Decl. ¶ 13 ("[T]he contractor has been instructed to confine the project footprint . . . to the 60-foot federal Roosevelt Reservation."). At this early stage, plaintiff has not established a "'clear showing' of entitlement" to the extraordinary remedy of preliminary injunctive relief. *Haynes v. Navy Fed. Credit Union*, 841 F. Supp. 2d 221, 223 (D.D.C. 2012) (quoting *Winter*, 555 U.S. at 21).

**II. Remaining *Winter* Factors**

Because plaintiff is unlikely to succeed on the merits, I could deny relief on that basis alone. *Cf. Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025). But for the sake of completeness, I will briefly address the remaining *Winter* factors, all of which favor defendants.

To prevail, plaintiff must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The threat of harm must be "both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks omitted). Plaintiff

must also show that "the balance of equities tips in [its] favor," and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. When "the Government is the opposing party," these final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiff argues that the planned border wall will inflict irreparable harm to its sovereignty and proprietary control over its lands, as well as cause environmental and First Amendment harms. *See* Mot. at 41–43. Plaintiff's alleged harms based on its claim to the land leading up to the international border are not likely to materialize because, as explained *supra* Section I.A.2., the Roosevelt Reservation likely exists along the Nation's border, and defendants have not yet articulated plans to construct outside the Roosevelt Reservation. Regarding the environmental and First Amendment harms, plaintiff has pointed to numerous harms to the landscape, including "four sets of mountain peaks" that are "sacred peaks to the Tohono people." Hr'g Tr. at 12:11–12, 15. Defendants note, however, that plans have not yet been finalized for the border wall, and that many—if not all—of plaintiff's alleged environmental and First Amendment injuries could be mitigated through consultation with the Nation and accommodations, such as crossing gates to enable members of the Nation to access the international border. *See* Enriquez Decl. ¶¶ 16–17, 24–29, 33. Given the possibility of mitigating plaintiff's injuries, I find that plaintiff has not yet established irreparable harm that is "certain" and "great." *Mexichem Specialty Resins, Inc.*, 787 F.3d at 555 (internal quotation marks omitted).

And in any event, I find that the Government's interests in securing the border, enforcing immigration laws, and ensuring public safety outweigh any surviving irreparable harms at this juncture. "The Supreme Court has recognized that the public interest in

enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981). Congress, through enacting IIRIRA and appropriating funds for border wall construction, has identified physical border walls as a key component of border security. Given the national security and foreign policy considerations related to the border wall, deference to the Government is warranted, particularly for plaintiff's *ultra vires* claim. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 723 (D.C. Cir. 2022).

## CONCLUSION

The international border is an area of great significance to both the United States and to the Nation. While I have concluded that a preliminary injunction is unwarranted, I fully expect the Government in the months ahead to follow through on its guarantees of consultation and cooperation with the Nation to address the Nation's concerns regarding border wall construction!

For the foregoing reasons, it is hereby **ORDERED** that plaintiff's Motion for a Preliminary Injunction [Dkt. #3] is **DENIED**. An accompanying order will issue contemporaneously with this opinion.

RICHARD J. LEON
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TOHONO O'ODHAM NATION, Plaintiff, | ) | |
| v. | ) | Civil Case No. 26-2127 (RJL) |
| MARKWAYNE MULLIN, *et al.*, Defendants. | ) | |

**ORDER**

August 13th, 2026 [Dkt. #3]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiff's Motion for Preliminary Injunction [Dkt. #3] is **DENIED**.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge