**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 26-5306

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

TOHONO O'ODHAM NATION,
*Plaintiff-Appellant*,

v.

MARKWAYNE MULLIN, et al.,
*Defendants-Appellees*.

---

Appeal from the U.S. District Court for the District of Columbia
No. 1:26-cv-2127 (Hon. Richard J. Leon)

---

# BRIEF FOR APPELLEES

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

AMBER BLAHA
CHRISTOPHER ANDERSON
KYLE GLYNN
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and amici

Plaintiff in the district court, and Appellant in this Court, is the Tohono O'odham Nation, a federally recognized Indian tribe.

Defendants in the district court, and Appellees in this Court, are Markwayne Mullin, in his official capacity as Secretary of U.S. Department of Homeland Security; Rodney S. Scott, in his official capacity as Commissioner of U.S. Customs and Border Protection; and Rosario Vasquez, in his official capacity as Chief of U.S. Border Patrol.

Warren Petersen, in his capacity as President of the Arizona Senate, and Steve Montenegro, in his capacity as Speaker of the Arizona House of Representatives, filed a brief as amici curiae in the district court, opposing Plaintiff's motion for a preliminary injunction.

Amici curiae for Appellants in this Court are: National Congress of American Indians; Inter Tribal Association of Arizona, Inc.; Salt River Pima-Maricopa Indian Community; Ak-Chin Indian Community; National Native American Law Student Association; University of Arizona Native and Indigenous Law Students Association; Center for Biological Diversity; and Katie Hobbs, in her official capacity as Governor of Arizona.

There were no additional parties or amici curiae in district court, and no additional parties or amici have entered an appearance before this Court.

### B. Rulings under review

The rulings under review are Judge Richard J. Leon's August 14, 2026, memorandum opinion (Dkt. 45) and order (Dkt. 46) denying Plaintiff's motion for a preliminary injunction. The opinion is available on Westlaw at *Tohono O'odham Nation v. Mullin*, 2026 WL 2363980 (D.D.C. Aug. 14, 2026), and in the Joint Appendix at JA0944-61. The order is included in the Joint Appendix at JA0962.

### C. Related cases

Undersigned counsel is not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

s/ *Christopher Anderson*
CHRISTOPHER ANDERSON
Counsel for Appellees

# TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

TABLE OF AUTHORITIES ..... vi

GLOSSARY ..... xiii

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 2

STATEMENT OF THE ISSUE ..... 2

PERTINENT STATUTES AND REGULATIONS ..... 3

STATEMENT OF THE CASE ..... 3

A. Legal Background ..... 3

1. Border Construction Authorities ..... 3

2. Gadsden Purchase Treaty ..... 7

3. Roosevelt Reservation Proclamation ..... 7

4. Establishment of the Tohono O'odham Reservation ..... 8

B. The Tucson 5 project ..... 10

C. Procedural Background ..... 10

SUMMARY OF ARGUMENT ..... 12

LEGAL STANDARD ..... 16

ARGUMENT ..... 17

I. The Tribe is unlikely to succeed on its federal common law trespass claim. 17

A. There is no cause of action for trespass by a tribe against the United States as trustee. 18

B. The Tribe's trespass claim is barred by sovereign immunity. 23

C. Even assuming the Tribe could state a common law trespass claim, it is unlikely to succeed on the merits. 27

1. The United States has a right to use the Roosevelt Reservation for purposes of border security. 27

a. The lands in question were "public lands" in 1907. 27

b. Congress confirmed the presence of the Roosevelt Reservation when it expanded the Tohono Reservation. 33

c. Recent history confirms that the Roosevelt Reservation is in effect on the Tohono Reservation 35

2. The district court correctly found that the trespass claim based on impacts outside the Roosevelt Reservation is speculative and premature. 36

II. The Tribe is unlikely to succeed on its ultra vires claim. 38

A. Congress authorized the Secretary to build physical barriers to secure the border. 38

B. The Tribe cannot show the Tucson5 project exceeds delegated authority and contradicts a specific statutory prohibition. 40

C. IIRIRA bars the Tribe's ultra vires claim. 44

III. The remaining factors weigh against a preliminary injunction. ....................46

A. Plaintiff has not shown irreparable harm is likely. ............................47

B. The balance of equities and public interest decisively favor the government......................................................................52

CONCLUSION ..........................................................................................55

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

### Cases

*Arizona v. Navajo Nation*,
599 U.S. 555 (2023)........................................................................19

*Arizona v. United States,*
567 U.S. 387 (2012)..........................................................................3

*Ark. Dairy Coop. Ass'n v. U.S. Dept. of Agric.*,
573 F.3d 815 (D.C. Cir. 2009)..........................................................46

*Barker v. Harvey*,
181 U.S. 481 (1901)...................................................................27, 30

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991)..........................................................................43

*Blackie's House of Beef, Inc. v. Castillo*,
659 F.2d 1211 (D.C. Cir. 1981)........................................................52

*Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*,
461 U.S. 273 (1983)........................................................................22

*Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*,
492 U.S. 408 (1989)........................................................................42

*Buttz v. N. Pac. R.R,*
119 U.S. 55 (1886)..........................................................................29

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022)..............................................37, 43, 45

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)....................................................46, 50

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981)........................................................................17

*Clevinger v. Advoc. Holding*s,
134 F.4th 1230 (D.C. Cir. 2025)....................16

*Connecticut v. Massachusetts,*
282 U.S. 660 (1931)....................36

*Cramer v. United States*,
261 U.S. 219 (1923)....................30

*Ctr. for Biological Diversity v. McAleenan*,
404 F. Supp. 3d 218 (D.D.C. 2019)....................44

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (2009) ....................16, 17

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019)....................43

*Del. & Hudson Ry. Co. v. United Transp. Union*,
450 F.2d 603 (D.C. Cir. 1971)....................50, 51

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024)....................23

*Dugan v. Rank*,
372 U.S. 609 (1963)....................23

*Edwardsen v. Morton*,
369 F. Supp. 1359 (D.D.C. 1973)....................20, 21

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010)....................21

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025)....................36

*FDIC v. Meyer*,
510 U.S. 471 (1994)....................22

*Fed. Express Corp. v. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022)....................37, 39, 43

*Friends of the Earth U.S. v. Export-Import Bank*,
187 F. 4th 616 (D.C. Cir. 2026)....................17

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)....................16

*Hernandez v. Mesa*,
589 U.S. 93 (2020)....................21

*Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017)....................43

*Int'l Bhd. of Elec. Workers v. Wash. Terminal Co.*,
473 F.2d 1156 (D.C. Cir. 1972)....................51

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
119 F.4th 58 (D.C. Cir. 2024)....................46

*Kleppe v. New Mexico*,
426 U.S. 529 (1976)....................33

*Landon v. Plasencia*,
459 U.S. 21 (1982)....................52

*Lane v. Pueblo of Santa Rosa*,
249 U.S. 110 (1919)....................19, 20

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949)....................20, 23, 24

*Leopold v. Manger*,
102 F.4th 491 (D.C. Cir. 2024)....................25

*Lewis v. Clarke*,
581 U.S. 155 (2017)....................22

*Mashpee Wampanoag Tribe v. Bernhardt*,
No. 18-2242, 2020 WL 3034854 (D.D.C. June 5, 2020)....................48

*McGirt v. Oklahoma*,
591 U.S. 894 (2020)....................41, 42

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)........................................................................26

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021)........................................................................16

*Munaf v. Geren*,
553 U.S. 674 (2008)........................................................................16

*Nat'l Life Ins. Co. v. Silverman*,
454 F.2d 899 (D.C. Cir. 1971)........................................................................18

*Nat'l Min. Ass'n v. Dep't of the Interior*,
177 F.3d 1 (D.C. Cir. 1999)........................................................................38

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*,
609 U.S. — , 2026 WL 2564318 (Aug. 31, 2026)..........................................51

*Nat'l Treasury Emps. Union v. Von Raab*,
489 U.S. 656 (1989)........................................................................52

*Navajo Tribe of Indians v. New Mexico*,
809 F.2d 1455 (10th Cir. 1987)........................................................................42

*Nebraska v. Parker*,
577 U.S. 481 (2016)........................................................................40

*Nixon v. Warner Commc'ns, Inc.*,
435 U.S. 589 (1978)........................................................................25

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020)........................................................................45

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025)........................................................................37

*Oliphant v. Suquamish Indian Tribe*,
435 U.S. 191 (1978)........................................................................47

*Oneida Cnty. v. Oneida Indian Tribe of N.Y. State*,
470 U.S. 226 (1985)........................................................................18, 21

*Quechan Indian Tribe v. United States*,
535 F. Supp. 2d 1072 (S.D. Cal. 2008) ....................22

*Schilling v. Rogers*,
363 U.S. 666 (1960)....................44

*Seymour v. Superintendent of Wash. State Penitentiary*,
368 U.S. 351 (1962)....................41

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011)....................16

*Tee-Hit-Ton Indians v. United States*,
348 U.S. 272 (1955)....................21, 31

*Texas v. Dep't of Homeland Sec.*,
123 F.4th 186 (5th Cir. 2024)....................20, 49

*Tohono O'odham Nation v. Mullin*,
2026 WL 2363980 (D.D.C. Aug. 14, 2026) .................... ii

*United States v. Dann*,
873 F.2d 1189 (9th Cir. 1989) ....................22

*United States v. Jicarilla Apache Nation*,
564 U.S. 162 (2011)....................18, 19

*United States v. Lee*,
106 U.S. 196 (1882)....................20

*United States v. Mitchell*,
445 U.S. 535 (1980)....................19

*United States v. Navajo Nation*,
537 U.S. 488 (2003)....................21

*United States v. Ramsey*,
431 U.S. 606 (1977)....................3

*United States v. Santa Fe Pac. Rail Co.*,
314 U.S. 339 (1941)....................29, 31

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
790 F.3d 1000 (10th Cir. 2015) ....................48

*Wagner v. Taylor*,
836 F.2d 566 (D.C. Cir. 1987)....................51

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)....................16, 50

*Winton v. Amos*,
255 U.S. 373 (1921)....................47

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)....................36, 46

**Constitution and Statutes**

U.S. Const., Art. I, § 8, cl. 3....................3

2 U.S.C. § 1979 ....................25

5 U.S.C. §§ 551-559....................6

6 U.S.C. § 202 ....................3

6 U.S.C. § 202(2) ....................38

8 U.S.C. § 1103 ....................4

8 U.S.C. § 1701 ....................4

16 U.S.C. §§ 1536-1544 ....................6

25 U.S.C. § 398d....................15, 39, 40, 43

28 U.S.C. § 1292(a)(1)....................2

28 U.S.C. § 1331 ....................2

28 U.S.C. § 1362....................2

28 U.S.C. § 1505 ........................................................................................21

42 U.S.C. §§ 4321-4370m-12 ...........................................................................6

Pub. L. No. 75-217, 50 Stat. 536 (1937)..............................................................9

Pub. L. No. 79-709, 46 Stat. 1202 (1931)............................................................9

Pub. L. No. 104-208, 110 Stat. 3009 (1996)........................................................4

Pub. L. No. 119-21, 139 Stat. 72, 357 (2025)..................................................7, 38

Pub. L. No. 109-13, 119 Stat. 231(2005)..............................................................5

Pub. L. No. 109-367, 120 Stat. 2638 (2006).....................................................4, 5

Pub. L. No. 110-161, 121 Stat. 1844 (2007)..........................................................5

**Regulations**

73 Fed. Reg. 18293 (Apr. 3, 2008) ...........................................6, 22, 26, 44

90 Fed. Reg. 8467 (Jan. 20, 2025) ........................................................................4

91 Fed. Reg. 45824 (July 21, 2026)......................................6, 22, 38, 44, 54

**Other Authorities**

Proc. No. 758, 35 Stat. 2136 (May 27, 1907) .........................................................7

Exec. Order 14165 (Jan. 20, 2025) .......................................................................4

H.R. Rep. 109-72 (2005)........................................................................................5

Restatement (Second) of Trusts § 197 (Am. L. Inst. 1959)...................................18

*Scott & Ascher on Trusts* § 24.1 (6th ed. 2025)......................................................18

## GLOSSARY

| | |
|---|---|
| DHS | U.S. Department of Homeland Security |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act |
| Tribe | Tohono O'odham Nation |
| Secretary | Secretary of Homeland Security |

## INTRODUCTION

Securing the United States' southwestern border is a national imperative. To that end, Congress has expressly directed the Secretary of Homeland Security (Secretary) to install physical barriers where, in his discretion, the Secretary determines such barriers are necessary to gain operational control of the border. And to ensure protracted review and litigation does not hold such projects hostage, Congress empowered the Secretary to waive "all legal requirements" to facilitate expeditious construction.

This case concerns a congressionally funded project to build a border-barrier system along a stretch of the international border that is next to the Tohono O'odham tribal reservation (Tohono Reservation) in Arizona. The project will replace an existing vehicle barrier, and is expected to be constructed on lands that the United States reserved for border security purposes more than one hundred years ago. But the Tohono O'odham Nation (the Tribe) sued to challenge the project, asserting that the Secretary lacks authority to protect this stretch of international border without the Tribe's consent. On that novel theory, the Tribe sought a preliminary injunction blocking the Secretary from carrying out Congress's directive to secure the border.

The district court correctly denied the Tribe's preliminary injunction motion. The Tribe is unlikely to succeed on the merits because it cannot show that the United States lacks authority to construct the project absent the Tribe's consent. The district

court also did not abuse its broad discretion in concluding that the Tribe failed to show likely irreparable harm and, even if it could, that the balance of equities and public interest decisively disfavor shutting down a project to secure the southwestern border and protect the public from transnational criminal organizations. The Tribe has failed to show that the district court abused its discretion in concluding that no factor favors preliminary relief, and this Court should affirm.

## STATEMENT OF JURISDICTION

The Tribe invoked the district court's jurisdiction under 28 U.S.C. § 1331 and § 1362. JA0014. The court denied the Tribe's preliminary injunction motion on August 14, 2026. JA0961. The tribe timely appealed on August 27, 2026. JA0963. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion by declining to enjoin the Department of Homeland Security (DHS) from securing the United States' international border with Mexico, where (1) the Tribe failed to show a likelihood of success on the merits of its trespass claim, (2) the Tribe failed to show a likelihood of success on its ultra vires claim, and (3) the Tribe failed to show that it will be irreparably harmed and the public interest decisively outweighs any harm that the Tribe identified.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in Appellant's addendum or are attached as an addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal Background

#### 1. Border Construction Authorities

The Constitution vests in the Federal Government "the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977); *see*, *e.g.*, U.S. Const., Art. I, § 8, cl. 3 (Congress has power "[t]o regulate Commerce with foreign Nations"); *id.* cl. 4 (Congress has power "[t]o establish [a] uniform Rule of Naturalization"). Congress has charged DHS with "[s]ecuring the borders . . . of the United States," "[p]reventing the entry of terrorists and the instruments of terrorism into the United States," and enforcing the immigration and customs laws of the United States. 6 U.S.C. § 202; *see also Arizona v. United States,* 567 U.S. 387, 397 (2012).

In the Secure Fence Act of 2006, Congress directed DHS to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States," including construction of "physical infrastructure enhancements to prevent

unlawful entry by aliens into the United States and facilitate access to the international land and maritime borders by United States Customs and Border Protection." Pub. L. No. 109-367, § 2(a), 120 Stat. 2638 (2006) (codified as 8 U.S.C. § 1701 note). The Act defines "operational control" to mean "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband." *Id.* § 2(b). Consistent with that mandate, the President has directed the Secretary to "take all appropriate action to deploy and construct . . . physical barriers to ensure complete operational control of the southern border of the United States." Exec. Order 14165, § 3, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025).

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) authorizes the Secretary to undertake expedited construction of "additional physical barriers and roads" near border areas "of high illegal entry." Pub. L. No. 104-208, div. C, § 102, 110 Stat. 3009, 3554-55 (codified at 8 U.S.C. § 1103 note). Section 102 has been amended several times.

In its current form, Section 102(a) directs the Secretary to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). To "carry[] out" § 102(a)'s general mandate, Congress has

identified specific border construction projects and priorities in IIRIRA §102(b). In the Secure Fence Act, Congress required construction of "at least 2 layers of reinforced fencing, [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five designated areas along the southern border. § 2(a), 120 Stat. at 2638. This included the area "extending from 10 miles west of the Calexico, California port of entry to 5 miles east of the Douglas, Arizona port of entry," which includes the segment of the border adjacent to the Tohono O'odham Reservation (Tohono Reservation). *Id.* In 2007, Congress amended § 102(b) to replace the location specifications of the Secure Fence Act with a new requirement that the Secretary "construct[] reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective." Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, § 564(2), 121 Stat. 1844.

To facilitate border construction, Congress gave the Secretary "sole discretion" to waive "all legal requirements" whenever he finds a waiver is "necessary to ensure expeditious construction . . . under this section." *See* Pub. L. No. 109-13, div. B., § 102, 119 Stat. 231 (2005) (amending § 102(c)(1)); *see also* H.R. Rep. 109-72, at 171 (2005) (explaining "Congress' intent that the . . . waiver authority extends to any local, state or federal statute, regulation, or administrative order that could impede expeditions construction of border security infrastructure."). And to ensure the effect of the Secretary's waiver is not delayed by litigation, the statute declares that

district courts "shall not have jurisdiction" to hear non-constitutional claims arising from "any action undertaken" or "any decision made" pursuant to the waiver authority. *Id.* § 102(c)(2)(A). Section 102(c) further provides that an "order of the district court may be reviewed only" by petitioning the Supreme Court for certiorari. *Id.* § 102(c)(2)(C). Thus, Congress barred non-constitutional claims and expressly prohibited seeking review in a court of appeals of waiver-related claims.

In 2008, the Secretary issued a determination to "waive in their entirety" the requirements of numerous laws, including the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370m-12, the Endangered Species Act, 16 U.S.C. §§ 1536-1544, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, for project areas in Arizona and other states. *Determination Pursuant to § 102 of the IIRIRA of 1996, as Amended*, 73 Fed. Reg. 18293 (Apr. 3, 2008). The Secretary issued a determination effective July 21, 2026 that waives legal requirements in specified statutes with respect to the construction of physical barriers and roads in the Tucson Sector, including the Tucson 5 project area. *Determination Pursuant to § 102 of the IIRIRA of 1996, as Amended*, 91 Fed. Reg. 45824 (July 21, 2026).

In 2025, Congress appropriated $46.5 billion for the "the border infrastructure and wall system" including "[c]onstruction, installation, or improvement of new or replacement primary, waterborne, and secondary barriers" as well as "[a]ccess

roads" and "detection technology." Working Families Tax Cut Act, Pub. L. 119-21, Title IX, Sec. 90001, 139 Stat. 72, 357 (2025).

### 2. Gadsden Purchase Treaty

In 1853, the United States agreed to pay Mexico $10 million for 29,670 square miles of land, which includes present-day southern Arizona where the Tohono Reservation is located. Gadsden Purchase Treaty, 10 Stat. 1031 (1853) (ratified in 1854). Through a series of statutes, Congress authorized the disposition of public lands within the Gadsden Purchase, as well as entry to homesteaders and mineral claims. Act of July 22, 1854, 10 Stat. 308; Act of May 20, 1862, 12 Stat. 392; Act of July 26, 1866, 14 Stat. 251; *see also Papago Tribe v. United States*, 19 Ind. Cl. Comm. 394, 413-14 (1968), JA0417-18.

### 3. Roosevelt Reservation Proclamation

In 1907, President Roosevelt issued a proclamation setting "apart as a public reservation" a 60-foot-wide strip of public land along the entire United States-Mexico boundary in California and the Territories of Arizona and New Mexico. Proc. No. 758, 35 Stat. 2136 (May 27, 1907). The Proclamation declared that it was "necessary for the public welfare" to reserve these lands "from the operation of the public land laws" "as a protection against the smuggling of goods" and thus reserved them from entry, settlement, or appropriation under the public land laws. *Id.* at 2136. In addition to border security purposes, the 1907 Proclamation allowed the withdrawn

land to "be used for public highways but for no other purposes whatever, so long as the reservation of same under this proclamation shall continue in force." *Id.* at 2137.

For over a century, the United States has used the Roosevelt Reservation to install barriers along the international border, including within the Tohono Reservation. *See* JA0384-95. Between 2007 and 2009, DHS constructed approximately 52 miles of vehicle barriers along the border within the Tohono Reservation. JA0627. The Tohono O'odham Legislative Council's resolution supporting the construction of those barriers expressly acknowledged that the "sixty-foot strip of land" was "reserved by the Presidential Proclamation of President Theodore Roosevelt dated May 27, 1907 for customs enforcement purposes." JA0657. For road construction "outside the sixty-foot strip of United States reserved land," the resolution approved easements. JA0657.

**4. Establishment of the Tohono O'odham Reservation**

Through a series of Executive Orders between 1874 and 1912, presidents set aside tracts of land for Tohono O'odham Indians (then referred to as the "Papago" Indians), but none of these were near the U.S.-Mexico border. Prompted by increasing conflicts resulting from non-Indian settlement, in a 1917 Executive Order, President Wilson withdrew and "set apart" a larger reservation for the Tribe. Exec. Order 2524, *Reserving Certain Lands in the State of Arizona for the Papago Indians in*

*Arizona* (Feb. 1, 1917); *see also* JA0419; JA0425; JA0437-38. The reservation excepted mineral interests, stating that minerals "shall continue to be subject to exploration, location and entry" under the mining laws and regulations, and authorized townsites to be developed within the reservation as necessary in connection with the mineral development. *Id*. at 4. The Proclamation also stated "[t]hat nothing herein contained shall affect any existing legal right of any person to any of the lands herein described." *Id.*

Congress recognized in a series of statutes that the 1917 executive order "creat[ed] the [Tohono] Reservation." Pub. L. No. 79-709, 46 Stat. 1202 (1931). In 1937, Congress extended the boundary of the Tohono Reservation to include additional lands along the international border. Pub. L. No. 75-217, 50 Stat. 536, 536 (1937). The 1937 Act provided that the "extension shall not affect any valid rights initiated prior to the approval hereof nor the reservation of a strip of land sixty feet wide along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907 (35 Stat. 3136)." *Id.* Congress further provided that the "lands herein described when added to the [Tohono Reservation] as provided in this Act shall become a part of said reservation in all respects and upon all the same terms as if said lands had been included in the Executive order issued by the President on February 1, 1917." *Id.*

### B. The Tucson 5 project

The Tucson 5 project will secure an approximately 62-mile stretch of U.S.-Mexico border in the U.S. Border Patrol's Tucson Sector, adjoining the Tribal Reservation. JA0626. The Tucson Sector experiences significant illegal entry and drug-smuggling activities. *Id.*; JA0619-20. Without this project, this 62-mile stretch would be one of the few areas along the Arizona-Sonora border without barriers to deter illegal crossings of pedestrians. JA0626; *see also* JA0619.

In June 2026, DHS awarded a contract for the Tucson 5 project, including work to design and construct a border-barrier system to include a physical barrier, roads, and attributes like cameras, lights, sensors, and other detection technology. JA0626-27. DHS has instructed the contractor to confine the project's footprint to the 60-foot Roosevelt Reservation. JA0627; *see also* JA0629. Given its long border-security presence in the Tucson Sector, DHS has developed an understanding of the natural, biological, historic, and cultural resources in the project area. JA0627-28. Its planning efforts for this project have included coordination with the Tribe, which will continue through design and execution of the project. JA0628; JA0632-34.

### C. Procedural Background

The Tribe filed a two-count complaint against DHS officials, seeking to enjoin the Tucson 5 project from proceeding without the Tribe's consent. JA0011-30.

Count one alleges that the project's planned construction is an "ultra vires diminishment" of the Tohono Reservation's boundaries. JA0028. Count two alleges that planned construction will occur on the Tohono Reservation and is a trespass actionable under federal common law. JA0028-29.

The Tribe moved for a preliminary injunction, JA0031-33, which the district court denied after a hearing, JA0944-61 (opinion); JA0962 (order). The court concluded that the Tribe "is unlikely to succeed on the merits of [its] claims" and that "all" remaining preliminary injunction factors weighed against the injunction. JA0944; JA0959.

As to the ultra vires claim, the district court concluded that the "congressionally-authorized and funded" Tucson 5 project is unlikely to diminish the Tohono Reservation's boundaries, JA0944; JA0954, and that "multiple deficiencies" infect the Tribe's "novel" boundary-diminishment theory. JA0953-57. The court concluded that "the Roosevelt Reservation likely exists," JA0954, and that "even if the Roosevelt Reservation does not exist," the Tribe failed to show how the project "will change the boundaries" of the Tohono Reservation. JA0956-57.

The district court concluded that the Tribe's trespass claim suffers from multiple deficiencies, too. As a threshold matter, sovereign immunity bars that claim. JA0957-58. And even if the claim is not barred, the Tribe failed to show that a cause

of action against the United States for trespass is available under federal common law. JA0958-59.

On the remaining factors, the Tribe did not show that irreparable harm is likely or that the equities favor an injunction. The district court found the Tribe's alleged harms to be speculative because the project design has not been finalized and can be tailored to mitigate impacts to the Tribe's interests. JA0960. The court nonetheless weighed the Tribe's asserted harms against the government's "interests in securing the border, enforcing immigration laws, and ensuring public safety." JA0960-61. In its equitable discretion, the court found that the government's interests "outweigh any surviving irreparable harms" to the Tribe "at this juncture." JA0960.

After appealing the denial of the preliminary injunction, the Tribe moved the district court for an injunction pending appeal. JA0966. The district court denied that motion on October 8, 2026. The Tribe moved for an injunction pending appeal in this Court on October 5, 2026.

## SUMMARY OF ARGUMENT

The district court acted within its discretion in declining to preliminarily enjoin the Secretary and DHS from securing the international border with Mexico. The court correctly concluded that the Tribe satisfied none of the requirements to obtain that extraordinary relief.

1. The Tribe is unlikely to succeed on its trespass claim.

A. Tribes have no federal common law cause of action against the United States for trespass on tribal trust lands. The Tribe relies on cases allowing tribes to sue non-federal trespassers, but those precedents do not apply to the United States, which stands in a fundamentally different relationship to tribes and tribal lands. The federal government's trust responsibilities with respect to tribal trust lands are defined by statute and are not subject to judicial supplementation through the recognition of common law rights of action. And because the Tribe has other adequate remedies, the recognition of a common law right of action is unnecessary.

B. The Tribe's trespass claim is also barred by sovereign immunity. The Tribe has identified no statutory waiver of immunity applicable to its claim, and there is none. Nor does the so-called *Larson-Dugan* exception apply. That exception allows a claim for equitable relief to be brought against federal officers whose actions are alleged to be either unconstitutional or in excess of statutory authority, but the Tribe does not allege that the Tucson 5 project is unconstitutional, and it is plainly authorized by statute. The Tribe's trespass action is thus barred by sovereign immunity.

C.i. Even if the Tribe's trespass claim did not fail at the threshold, the Tribe would fail to establish likelihood of success on the merits. The Tucson 5 project will not trespass on the Tribe's lands because current plans are to build it within the Roo-

sevelt Reservation. The Tribe's argument that the Roosevelt Reservation "never attached" to Tohono O'odham lands because those lands were not "public lands" fails as a matter of history and precedent, as the United States has consistently treated lands subject to Tohono O'odham's aboriginal title as "public lands." And no court has held that lands subject to claims of aboriginal title cannot also be "public lands" under the general land laws. Indeed, *Santa Fe Pacific Rail Co.*, the case on which the Tribe most heavily relies, held that a statute validly conveyed legal title to "public lands" that were also subject to a claim of aboriginal title. The Roosevelt Reservation thus exists along the southern border of the Tohono Reservation, and construction of the Tucson 5 project will not constitute a trespass.

ii. The Tribe's alternative theory—that construction of the Tucson 5 project will inevitably require access to lands outside the Roosevelt Reservation for transportation and staging—is speculative and premature. DHS has instructed its contractor to confine construction activities to the footprint of the Roosevelt Reservation, so there is no present reason to presume that activities will occur outside the Reservation. And the Court should assume that if access beyond the Roosevelt Reservation is required, DHS will secure that access lawfully. So long as DHS does so, no trespass will occur, and the Tribe's trespass claim will fail.

2. The Tribe is also unlikely to succeed on its ultra vires claim.

A. Congress has expressly authorized DHS to construct the border-barrier system, and granted the Secretary discretion to determine where barriers are necessary to gain operational control of the border. This "express authorization" for the Tucson 5 project defeats the Tribe's ultra vires claim.

B. The Tribe has not, and cannot, show that the project exceeds DHS's statutory authority. The Tribe asserts that the project will diminish the boundaries of the Tohono Reservation in violation of 25 U.S.C. § 398d, but a tribal reservation is not diminished simply because land within the reservation is put to a use with which the Tribe disagrees.

C. Alternatively, IIRIRA's express bar on judicial review forecloses the Tribe's ultra vires claim. The statute limits judicial review to claims challenging the constitutionality of DHS's exercise of its waiver authority. But the Tribe alleges no constitutional claim. And the ultra vires claim is barred because it "aris[es] from" an "action" or "decision" made pursuant to the waiver authority.

3. The district court did not abuse its discretion in finding that the remaining factors weigh against a preliminary injunction.

A. The Tribe has not shown that irreparable harm is likely. The Tribe claims harm to its sovereignty and proprietary rights, but those rights do not include authority to dictate federal border control activities on the Roosevelt Reservation. And its other claimed harms are speculative.

B. The balance of the equities and public interest decisively favors the federal government. Compelling national security and public safety concerns outweigh any claimed harms to the Tribe.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). The party seeking one must make a "clear showing" that (1) it is "likely" to succeed on the merits, (2) it is "likely" to suffer irreparable harm absent injunctive relief, (3) the "balance of equities" tips in its favor, and (4) the injunction "is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 22 (2008). The last two factors "merge" where "the government is the party sought to be enjoined." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).[1]

---

[1] Since *Winter*, this Court has questioned whether its pre-*Winter* "sliding scale approach remains good law," *see Clevinger v. Advoc. Holdings*, 134 F.4th 1230, 1235, 1236 n.2 (D.C. Cir. 2025), and the Court has suggested that "the likelihood of success is an independent, free-standing requirement for a preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Davis v. Pension Benefit Guarantee Corp.*, 571 F.3d 1288, 1292 (2009)), although it has not decided this question, *id.* at 1235-36.

This Court reviews a district court's denial of a preliminary injunction for an abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error. *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024).

**ARGUMENT**

The Tribe has satisfied none of the requirements for a preliminary injunction. The Tribe cites no case that has accepted either its federal common law trespass or ultra vires theory. And neither is likely to succeed. Failing to show likelihood of success on the merits "is alone sufficient to defeat" a preliminary-injunction motion. *Friends of the Earth U.S. v. Export-Import Bank*, 187 F.4th 616, 625 (D.C. Cir. 2026). Even a "strong showing of irreparable harm, for example, cannot make up for a failure" to satisfy this "independent, free-standing requirement." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring). This Court should affirm the district court's denial of the preliminary injunction on this basis alone. But the district court also correctly determined that the other *Winter* factors favor DHS, and the Tribe has not shown that the district court committed clear error.

## I. The Tribe is unlikely to succeed on its federal common law trespass claim.

The district court correctly determined that the Tribe's trespass claim is likely to fail. This trespass claim is not cognizable under federal common law—this is not

one of the "few and restricted' instances" where the "unusual exercise of [such] law-making" is appropriate. *City of Milwaukee v. Illinois*, 451 U.S. 304, 313-14 (1981). Assuming any such claim is available, sovereign immunity bars it. And even if the Tribe could clear those hurdles, the claim would fail on the merits.

### A. There is no cause of action for trespass by a tribe against the United States as trustee.

To the government's knowledge, no court has ever recognized a federal common law cause of action for trespass brought by a tribe against the United States with respect to tribal trust property. The Tribe does not disagree. It insists, however, that it must have a cause of action for trespass against federal officials because the Supreme Court has recognized that tribes may bring common law trespass actions against other parties. *See Oneida Cnty. v. Oneida Indian Tribe of N.Y. State*, 470 U.S. 226, 236 (1985). That argument overlooks that the United States, as trustee, stands in a fundamentally different relationship to the Tribe and its lands.

The trustee-beneficiary relationship has implications for the government's duties to the Tribe and the Tribe's remedies for any breach. Historically at common law, for example, a trust beneficiary could not bring tort actions, such as trespass or ejectment, against a trustee for misuse or misappropriation of trust property. Instead, the beneficiary was limited to an equitable action for breach of trust. *See Nat'l Life Ins. Co. v. Silverman*, 454 F.2d 899, 915 (D.C. Cir. 1971); Restatement (Second) of Trusts § 197, cmt. c (Am. L. Inst. 1959); *Scott & Ascher on Trusts* § 24.1 (6th ed.

2025). Though the United States' trust duties to tribes are defined by statute, not common law, the principle is the same: a tribe's complaints against the United States with respect to property held in trust may be addressed only through remedies for breach of trust.

"[T]he Indian trust relationship . . . is a sovereign function subject to the plenary authority of Congress," *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 175 (2011). Accordingly, the government's obligations to tribes with respect to land held in trust are "defined and governed by statute, rather than the common law." *Id.* at 174. A corollary of that principle is that, absent an indication in a "specific, applicable trust-creating statute or regulation" that common law remedies apply, a tribe's remedies against the United States with respect to trust property are defined exclusively by statute and may not be supplemented by federal common law. *Jicarilla*, 564 U.S. at 184; *see Arizona v. Navajo Nation*, 599 U.S. 555, 564 (2023) ("The Federal Government owes *judicially enforceable duties* to a tribe 'only to the extent it expressly accepts those responsibilities.'" (quoting *Jicarilla*, 564 U.S. at 177) (emphasis added)); *United States v. Mitchell*, 445 U.S. 535, 546 (1980) (refusing to infer a right to recover money damages in the General Allotment Act).

No statute permits a tribe to bring a trespass action for injunctive relief against the United States with respect to trust property. Instead, the Tribe relies on cases holding that tribes may bring common law claims for trespass against third parties

other than the federal government, Br. 18-19, but those cases are inapposite because they do not implicate the unique relationship between tribes and the federal government. And the one cited case that was brought against the United States, *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110 (1919), was not a trespass suit, but an equitable action to enjoin the Secretary of the Interior from disposing of lands to which the plaintiff Indians alleged they held title when the United States acquired the territory from Mexico, *id*. at 111. The Court decided only that if the plaintiffs could establish legal (not aboriginal) title, then the government could not dispose of the lands under the public land laws. *See id*. at 113. It did not decide whether the plaintiffs had title, and it said nothing about trespass.

Nor is the Tribe correct that common law trespass actions are generally available against federal officers. The Tribe cites *United States v. Lee*, 106 U.S. 196 (1882), but as the Supreme Court explained, the Court permitted that case to proceed only because the plaintiff would otherwise have had no remedy for an alleged taking without just compensation. *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682, 695-96 (1949). The Tribe also cites *Texas v. Department of Homeland Security*, 123 F.4th 186 (5th Cir. 2024), but that case held only that the APA waived sovereign immunity from a suit by a state in the unusual circumstances of that case, *id*. at 199-200; it did not hold that trespass suits are generally available against the United States.

The only case that even suggests that a tribe could maintain a trespass claim against the federal government is *Edwardsen v. Morton*, 369 F. Supp. 1359 (D.D.C. 1973), in which the plaintiff alleged that federal officials had "facilitat[ed] . . . unlawful transfers of land" and authorized "third-party trespasses" on lands to which the plaintiffs held aboriginal title. *Id*. at 1362. Although the court speculated that a trespass claim might lie against federal officials, the court concluded that "resort to that principle of tort law actually is unnecessary *in view of the fiduciary duty of the federal government and its agents to protect the interests of Native Americans*." *Id*. at 1371 (emphasis added). The court went on to analyze under the APA whether the federal defendants had violated their trust duties. The court never held that a tort suit against the government was available. *Id.* at 1375. In any event, *Edwardsen* is a district court decision, and the Supreme Court's bare citation of it in a footnote, along with other cases adjudicating tribal claims for violation of possessory rights, does not give it precedential value. *See Oneida Cnty*, 470 U.S. at 236 n.6.

Allowing the Tribe's trespass claim to proceed would therefore require the Court to recognize a novel federal common law cause of action against the United States, and one without a historical common law parallel. But the circumstances in which federal courts may create common law rules are narrow, and do not include the creation of novel rights of action against the United States when statutory reme-

dies are available. *See, e.g.*, *Hernandez v. Mesa*, 589 U.S. 93, 100-101 (2020) (describing Court's "reluctan[ce] to create new causes of action" under federal common law); *El-Shifa Pharmaceutical Indus. Co. v. United States*, 607 F.3d 836, 853 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ("the [Supreme] Court has not endorsed any federal common law causes of action against the Government during the post-*Erie* period."). In the case of the tribal trust relationship, Congress has provided remedies for the United States' alleged violations of tribes' property rights through the APA and the Indian Tucker Act, 28 U.S.C. § 1505. *E.g.*, *United States v. Navajo Nation*, 537 U.S. 488, 502-03 (2003); *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 273. In some circumstances, an action for damages under the Federal Tort Claims Act may also be available. *See Quechan Indian Tribe v. United States*, 535 F. Supp. 2d 1072 (S.D. Cal. 2008) (adjudicating such a claim).

Ordinarily, a tribe may seek declarative and injunctive relief against the government under the APA, so a trespass suit for injunctive relief would be unnecessary. *E.g.*, *United States v. Dann*, 873 F.2d 1189 (9th Cir. 1989). But the Secretary has waived application of the APA to actions taken in furtherance of border-barrier construction, 73 Fed. Reg. at 18293; 91 Fed. Reg. at 45824, and the Tribe has not challenged the validity of the waiver. An APA action is therefore unavailable. The Tribe

still has remedies for damages, however, so the creation of an additional, unprecedented cause of action is unwarranted, and the Tribe is unlikely to succeed on its trespass claim.

**B. The Tribe's trespass claim is barred by sovereign immunity.**

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). That immunity covers not only suits against government entities but also "lawsuits brought against employees in their official capacity," which are simply "another way of pleading an action against an entity of which an officer is an agent." *Lewis v. Clarke*, 581 U.S. 155, 162 (2017) (quotation omitted). Thus, suits against federal officers are generally barred absent a statutory waiver of immunity. *See Dep't of Agric. Rural Dev. Rural Hous Serv. v. Kirtz*, 601 U.S. 42, 48-49 (2024). In its preliminary injunction motion and in its opening brief, the Tribe identified no statutory waiver of sovereign immunity that would allow this suit. Instead, the Tribe relies solely on the *Larson-Dugan* exception to sovereign immunity.

In *Larson*, the Supreme Court identified two categories of "suits for specific relief against officers of the sovereign which are not suits against the sovereign." 337 U.S. at 689. The first is when "the officer's powers are limited by statute" and

the officer takes "actions beyond those limitations." *Id.* The second is when "the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." *Id*. at 690. In both circumstances, the unauthorized actions are considered "beyond the officer's powers" and therefore "not the conduct of the sovereign," such that they "may be made the object of specific relief" without implicating sovereign immunity. *Id*. at 689-90; *see also Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).

These "two types" of suits are "the only ones in which a restraint may be obtained against the conduct of Government officials." *Larson*, 337 U.S. at 690. The Court rejected the argument that "there exists a third category of cases in which the action of a Government official may be restrained" based on claims that the official's conduct is "'illegal' as a matter of general law," such as the common law of torts. *Id.* at 692.

That should be the end of the matter. The Tribe does not assert that the Tucson 5 project is unconstitutional, and Congress indisputably authorized the Secretary to construct barriers at the border: Section 102 of IIRIRA instructs the Secretary to "take such actions as may be necessary to install additional physical barriers . . . in the vicinity of the United States border," wherever the Secretary determines such barriers "would be most practical and effective." IIRIRA § 102(b)(1)(A), *see also*

§ 102(b)(1)(D). The Secretary's actions are therefore "the conduct of the sovereign," *Larson*, 337 U.S. at 689-90, and the *Larson-Dugan* exception is inapplicable.

The Tribe's allegation that the Secretary cannot complete the Tucson 5 project without committing a common law trespass does not change the analysis. In *Larson*, the plaintiff did not dispute that the defendant officer had statutory authority to act, but alleged that the officer's actions were tortious and thus not authorized by statute. 337 U.S. at 692. The Court rejected that argument: "if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law." *Id*. at 695. So too here: Even if the Tribe were correct that implementation of the Tucson 5 project would require a trespass (it is not, see below Section I.C) the Tribe would still be seeking to enjoin an act of the sovereign, and its suit would still be barred by sovereign immunity. *Id*. at 695 ("[A]n officer's tortious action is [not] ipso facto beyond his delegated powers.").

This Court's decision in *Leopold v. Manger*, 102 F.4th 491 (D.C. Cir. 2024), is not to the contrary. That case was a mandamus action in which the plaintiff sought to compel release of documents under the common law right of access to public records. *Id*. at 492; *see Nixon v. Warner Commc'ns, Inc.* 435 U.S. 589, 597 (1978) (recognizing such a right). This Court held that the suit could proceed under the *Larson-Dugan* exception even though it rested on a common law duty, rather than a

statute. *Id*. at 406. But the duty at issue in *Leopold* was a mandatory, affirmative duty, not merely a source of potential liability. And the Court recognized that when an officer's action is authorized by statute, the officer's act becomes "the action[] of the sovereign" and cannot be enjoined "whether or not they are tortious under general law." *Id.* at 496. Ultimately, the Court held that the plaintiff had not established a clear breach of the common law duty, in part because a statute authorized the withholding of "security information." *Id*. at 501-503 (applying 2 U.S.C. § 1979).

The *Larson-Dugan* exception is inapplicable, and the Tribe has identified no statutory waiver of sovereign immunity. It is therefore unlikely to succeed on its trespass claim.

One last point: In its motion in the district court for an injunction pending appeal, the Tribe asserted—for the first time—that § 702 of the APA waives sovereign immunity from the Tribe's suit. ECF No. 50-1 at 7 (Aug. 27, 2026). The Tribe has forfeited this argument by raising it neither in its motion for a preliminary injunction nor in its opening brief in this Court. *See, e.g., Media Matters for Am. v. Paxton*, 138 F.4th 563, 584-85 (D.C. Cir. 2025). In any event, § 702 is unavailable to the Tribe because the Secretary has waived application of the APA to border wall construction activities. 73 Fed. Reg. at 18293.

### C. Even assuming the Tribe could state a common law trespass claim, it is unlikely to succeed on the merits.

#### 1. The United States has a right to use the Roosevelt Reservation for purposes of border security.

President Roosevelt reserved for the government a 60-foot "strip of land lying along the boundary line between the United States and the Republic of Mexico" to be "kept free from obstruction as a protection against the smuggling of goods between the United States and said Republic." 35 Stat. 2136. The United States has consistently held and used this "Roosevelt Reservation" for the purpose of maintaining border security, and the reservation remains in force today.

The Tribe argues that the Roosevelt Reservation "never attached to its lands" because, in its view, those lands were not "public lands" in 1907 when the Roosevelt Reservation was established. That argument ignores history and lacks support in precedent.

##### a. The lands in question were "public lands" in 1907.

Congress opened the lands acquired from Mexico in the Gadsden Purchase—including the lands that now comprise the Tohono Reservation—to settlement in the Act of July 22, 1854, 10 Stat. 308, and made those lands available for homesteading in the Act of May 20, 1862, 12 Stat. 392. The lands were opened to mineral entry in 1866. Act of July 26, 1866, 14 Stat. 251.

Those Acts had their intended effect: throughout the late 19th and early 20th Century, non-Indian settlers established ranches and staked mining claims throughout Arizona, including in the area historically occupied by the O'odham people. *Papago Tribe*, 19 Indian Cl. Comm. at 414-15, JA418-19. Thus, from 1854 onward, the lands that would later become the Tohono Reservation were "public lands" as that term is used in the public land laws. *See Barker v. Harvey*, 181 U.S. 481, 490 (1901) ("The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws."). When President Roosevelt reserved "all public lands within sixty feet of the international boundary," 10 Stat. 308, that reservation on its face included the strip of land on the southern boundary of the future Tohono Reservation.

The Indian Claims Commission's findings of fact confirm that analysis. The Commission found that after the government opened the lands to settlement, "white settlers moved into the Papago Country in steadily increasing numbers," 19 Ind. Cl. Comm. at 414, JA0418, and that the government disposed of land in the area occupied by Tohono O'odham for railroads and for governmental purposes. JA0417. Encroachment by non-Indian settlers on lands occupied by O'odham was a source of friction, JA0422-25, and became one of the principal justifications for the creation of a larger Tohono Reservation, JA0419. The Commission further found that President Wilson created the Tohono Reservation by withdrawing "some 2,225,000 acres

from *the public lands*" in 1916 and then restoring "about 475,000 acres of the more fertile and desirable reservation lands to the status of *public lands*" in 1917. JA0425 (emphasis added). Indeed, the Tribe's petition before the Indian Claims Commission alleged that the United States "treated every part of the former Papago territory outside of the various reservations as public lands of the United States, to be disposed of freely and for a profit to private citizens or to be owned and managed by the Defendant for governmental purposes." JA0453; *see also* JA0448-50.

The Tribe does not dispute this history. Instead, the Tribe argues that, despite the clear intention of the Proclamation, the lands at issue could not be "public lands" because O'odham held aboriginal title to those lands in 1907. That is incorrect as a matter of law. Even if the Tribe had aboriginal title to the lands within the Tohono Reservation in 1907, federal law allowed Congress to open to settlement lands subject to claims of aboriginal title. *Buttz v. N. Pac. R.R.*, 119 U.S. 55, 66 (1886). And the existence of unextinguished aboriginal title is consistent with the designation of lands as "public lands." *See United States v. Santa Fe Pac. Rail Co.*, 314 U.S. 339, 344 (1941).

The Tribe asserts that "the Supreme Court has repeatedly ruled that tribal lands subject to aboriginal title are not public lands," Br. 33, but no case has so held. The Tribe relies principally on *Santa Fe Pacific Rail Co.*, but that case stands more nearly for the opposite proposition. The statute at issue in *Santa Fe* granted to a

railroad a "right of way through *the public lands*." Act of July 27, 1866, ch. 278, § 2, 14 Stat. 292, 294 (emphasis added). Recognizing that some lands subject to "Indian title" fell "under the operation of this act," Congress provided for "Indian title" to those lands to later be extinguished "consistent with public policy and the welfare of the Indians, and only by their voluntary cession." *Id.* (quoted in *Santa Fe*, 314 U.S. at 344). While the Supreme Court affirmed that Congress could protect aboriginal tribal lands in this way, 314 U.S. at 344-47, it also affirmed that such lands were "public lands" that Congress could convey to non-Indians or reserve for federal use. *Id*. at 347.

The other cases cited by the Tribe are similarly inapposite. *Cramer* did not directly address a claim of aboriginal title. *Cramer v. United States*, 261 U.S. 219 (1923). Instead, it held that lands actually occupied and enclosed by individual Indians were "reserved" within the meaning of a statute conveying land to a railroad, even though at the time of the statutory grant, Indians were ineligible to acquire title to public lands through the homestead laws. *Id*. at 230. In so holding, the Court relied on the actual occupancy of the lands by individual Indians, not on general claims of aboriginal title. Indeed, the Court modified the decree to limit the Indians' rights to the lands they enclosed, rather than the entirety of the section of land conveyed to the railroad. *Id*. at 234-35.

The Tribe also misreads *Barker v. Harvey*, 181 U.S. 481 (1901). In the passage the Tribe quotes, the Court hypothesized that if the Indians in question had been granted a permanent right of occupancy by the Mexican government, that right would limit the United States' power to dispose of the land. *Id.* at 492. It did not hold, however, that lands subject to a generalized claim of aboriginal title, not confirmed by any government, are excluded from the definition of "public lands." *See id.* at 491-92, 498-99.

The Tribe also argues that its aboriginal lands were not "public lands" under the 1854 Act because that Act reserved "all lands subject to claims of right predating United States sovereignty." Br. 32. But the 1854 Act only reserved "claims to lands under the laws, usages, and customs of Spain and Mexico." § 8, 10 Stat. at 309. In a 1934 Opinion, the Solicitor of the Interior explained that claims of aboriginal title are not "claims to lands under the laws . . . of Spain and Mexico," 10 Stat. 309, that conveyed rights on Tohono O'odham. M-27656 at 363-68, JA0666-71. The Tribe does not dispute the Solicitor's analysis, nor does it suggest that it holds any rights confirmed by the Spanish or Mexican governments. The lands to which the Tribe asserts aboriginal title were therefore not reserved under the 1854 Act but were public lands available for settlement.

When considered in historical context, it makes sense that lands subject to aboriginal title could also be "public lands." Large swathes of land in the United

States were subject to claimed aboriginal title. Yet that title did not prevent the federal government from disposing of that land to settlers or reserving it for its own use. *See, e.g.*, *Tee-Hit-Ton Indians*, 348 U.S. at 279 (holding that aboriginal lands may be "fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians").

In many instances, the United States extinguished aboriginal title through treaties or other means, but it did so independently of the opening of those lands to settlement and frequently only *after* the lands had been conveyed to settlers. *See, e.g.*, *Santa Fe*, 314 U.S. at 250-51. The Tribe's argument that lands subject to aboriginal title were not available for disposition as "public lands" is inconsistent with that history and, if accepted, could call into question the legitimacy of numerous conveyances. The better reading of the law, and of history, is that lands could be both "public lands" *and* subject to aboriginal title, and that in 1907, the lands that now comprise the Tohono Reservation were both. Accordingly, President Roosevelt's reservation of a 60-foot strip of "public lands" along the border was effective in the area occupied by the Tribe, and the Roosevelt Reservation remains in effect on the Tohono Reservation today.

#### b. **Congress confirmed the presence of the Roosevelt Reservation when it expanded the Tohono Reservation.**

When Congress extended the Tohono Reservation in 1937, it confirmed that the Roosevelt Reservation had indeed attached to the Tribe's aboriginal lands in 1907. *See* An Act to Extend the Papago Boundaries in Arizona, Pub. L. No. 75-217, 50 Stat. 536. That Act added lands along the U.S.-Mexico border, lengthening the southern boundary of the Tohono Reservation, and provided that "the extension shall not affect . . . the reservation of a strip of land sixty feet wide along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907." *Id*. Congress further stated that "lands herein described when added to the [Tohono Reservation] . . . shall become a part of said reservation . . . upon all the same terms as if said lands had been included in the Executive order" establishing the Reservation. *Id*. By stating that the newly added lands would be reserved on the "same terms" as the existing reservation lands while simultaneously recognizing the Roosevelt Reservation, Congress implicitly affirmed that the Roosevelt Reservation was in effect on the existing Tohono Reservation and would be in effect across the entirety of the expanded Reservation.

The Tribe argues that two statutes appropriating funds for fencing along the border in the Tohono Reservation are inconsistent with the presence of the Roosevelt Reservation. First, it cites an 1918 statute appropriating funds for the "construction

of a fence . . . between Mexico and the [Tohono Reservation]," 40 Stat. 561, 569, and argues that the appropriation is inconsistent with the limitation on use of the Roosevelt Reservation for "public highways." Br. 35. Assuming the Tribe is right that Congress intended the fence to prevent cattle from crossing the border, Br. 36, neither the fence, nor the fact that cattle sometimes grazed within the Roosevelt Reservation, would be a use incompatible with the 1907 Proclamation, which on its face was meant to address transit across the international border. But even if it did, Congress indisputably has the authority to add to the permissible uses of reserved lands, *see Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976), so the act of appropriating funds for a fence is hardly evidence of "a clear understanding" by Congress that the Roosevelt Reservation did not extend within the Tohono Reservation. The same is true of the act appropriating funds for a fence running northward from the border. 45 Stat. 617. Assuming such a fence is incompatible with the use of the Roosevelt Reservation for public highways—a proposition that is far from obvious (fences have gates)—Congress's appropriation of funds is best read as the authorization of an additional use, not as a denial of the Roosevelt Reservation's existence. Indeed, Congress's repeated authorization of the expenditure of funds to construct a border fence along the Tohono Reservation's southern boundary suggests Congress's understanding that the government could continue to use this land for border security purposes.

**c. Recent history confirms that the Roosevelt Reservation is in effect on the Tohono Reservation**

As the district court found, the Tribe has acknowledged the existence of the Roosevelt Reservation along the Tohono Reservation's southern border as recently as 2004. JA0955. The Tribe argues that such statements cannot contradict statutory text, Br. 40, but as explained, the best reading of the relevant statutes is that the lands comprising the Tohono Reservation were "public lands" in 1907 and that the Roosevelt Reservation therefore extends across them.

The Tribe also points to 2019 negotiations concerning a right-of-way agreement as "making clear that the Roosevelt Reservation does not extend to the Nation's lands." Br. 40. But the government's agreement to delete references to the Roosevelt Reservation in the right-of-way agreement is not a concession that the Roosevelt Reservation is not in effect on the Tohono Reservation. As the draft agreement provides, the government sought access to areas of the Tohono Reservation both within and without the Roosevelt Reservation. Thus, a right-of-way would be necessary regardless of whether the Roosevelt Reservation was in effect. Parties to agreements routinely negotiate language that avoids areas of disagreement, and the government's willingness to delete reference to the Roosevelt Reservation merely reflects that the government did not need to press that point to meet its objectives.

Both history and law show that President Roosevelt reserved a 60-foot strip of land for border security purposes in the area occupied by the Tribe, and that reservation remains in force today. Construction of the Tucson 5 project therefore will not trespass on the Tribe's property rights, and its trespass claim is therefore likely to fail.

### 2. The district court correctly found that the trespass claim based on impacts outside the Roosevelt Reservation is speculative and premature.

The Tribe's last argument is that even if the Roosevelt Reservation is available for border-barrier construction, the Secretary will nonetheless inevitably trespass on tribal lands because construction will require activities outside the 60-foot strip. But DHS has instructed its contractor "to confine the project footprint, which includes, among other things, the alignment of the barrier system and temporary staging areas, to the 60-foot federal Roosevelt Reservation." JA0627.

The Tribe counters that it is "fanciful" to think that construction can be confined to the Roosevelt Reservation. Br. 28. But even if the Tribe were later proved right, and the Tucson 5 project required access to land outside the Roosevelt Reservation, that would not mean that construction of the barrier would inevitably result in a trespass. The Secretary is entitled to a presumption of regularity in his implementation of statutory authorities. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 577 (2025). The Court should therefore presume that if access to land

outside the Roosevelt Reservation is necessary, DHS will secure such access lawfully. In the past, access has been achieved through negotiation with the Tribe. But if the Tribe "will not provide such consent," Br. 27, the Secretary can pursue other legal options including, if necessary, seeking authorization from Congress.

The point, however, is that all this is speculative. Design of the Tucson 5 project is still being finalized. JA0627. Until the design is complete, it is impossible to know whether or to what extent access to lands outside the Roosevelt Reservation may be necessary or whether the Secretary will be able to secure the necessary rights. "Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.'" *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Connecticut v. Massachusetts,* 282 U.S. 660, 674 (1931)). As things currently stand, the Tribe cannot succeed on its trespass claim.

Finally, the Nation's suggestion that DHS has already trespassed by traveling over roads on the Tohono Reservation to perform preconstruction activities is unfounded. As the Nation acknowledges, Br. 28-29, the Nation granted the government a right-of-way for "maintenance, operation and repair of portions of the Traditional Northern Road." JA1048. The right-of-way also contemplates the government's use of the road. *Id*. ¶ 3(A)(2) (providing that the right-of-way may be cancelled for extended non-use). The right-of-way nowhere limits the reasons for which the government may use the road.

## II. The Tribe is unlikely to succeed on its ultra vires claim.

An ultra vires claim "rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025). It is "essentially a Hail Mary pass" that requires showing action "entirely in excess of [the agency's] delegated powers and contrary to a *specific prohibition* in a statute." *Id.* Because satisfying that "especially demanding" standard requires showing "extreme" error, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (citation omitted), "[g]arden-variety errors of law or fact are not enough," *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (alteration in original, citation omitted). The challenged action must be "a clear departure by the agency from its statutory mandate" or, in other words, "blatantly lawless agency action." *Id.* (cleaned up).

The Tribe is unlikely to clear the high bar for succeeding on its ultra vires claim. The Tribe does not and cannot dispute that Congress authorized the Secretary to build a barrier system to secure the border with Mexico. Nor can the Tribe show that the project plainly exceeds the Secretary's delegated authority.

### A. Congress authorized the Secretary to build physical barriers to secure the border.

Congress made the Secretary "responsible" for "[s]ecuring the borders" "of the United States." 6 U.S.C. § 202(2). To that end, IIRIRA section 102(a) expressly directs that DHS "shall" act "as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border" for the purpose of

"deter[ring] illegal crossings." Section 102(b) further directs that DHS must carry out section 102(a) by "construct[ing] reinforced fencing along not less than 700 miles of the southwest border" "to gain operational control of the southwest border." Congress has also appropriated $46.5 billion for border infrastructure and barriers. Pub. L. 119-21, tit. IX, sub. A, § 90001 (2025). The Secretary has determined that the Tucson 5 project is "necessary" to maintain "operational control of the border [and address] critical national security and public safety threats." JA0622-23; *see also* 91 Fed. Reg. at 45823. This "express authorization" for the Tucson 5 project alone defeats the Tribe's ultra vires claim. *Nat'l Min. Ass'n v. Dep't of the Interior*, 177 F.3d 1, 9 (D.C. Cir. 1999) (rejecting an ultra vires challenge to regulations when a statute provided "express authorization" for them).

The Tribe notes that IIRIRA does not "mandat[e] construction at *any* specific location, let alone the Tribe's reservation." Br. 50. That does not mean DHS is not authorized to construct new border-barrier system within the project area. The statute affords the Secretary discretion to determine where border barriers are necessary, and it contains no prohibition on construction on lands that the United States holds in trust for Indian tribes. Notably, through IIRIRA's consultation provision in section 102(b)(1)(C), Congress expressly contemplated that "Indian tribes" may be affected stakeholders when the Secretary carries out the directive to secure the southwestern border.

### B. The Tribe cannot show the Tucson 5 project exceeds delegated authority and contradicts a specific statutory prohibition.

Given IIRIRA's plain text, the Tribe cannot show that the Tucson 5 project is "blatantly lawless agency action." *Fed. Express*, 39 F.4th at 764. The Tribe attempts to get around this problem by reframing the Tucson 5 project as an action to redefine the Tohono Reservation's legal boundaries. Br. 43-51. Changing the boundaries of the Tohono Reservation, the Tribe continues, violates 25 U.S.C. § 398d, which states that "[c]hanges in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." But DHS has not asserted any authority to change the Tohono Reservation's boundaries. Nor does it need such authority to construct barrier on the Roosevelt Reservation. Section 398d therefore has no bearing on the Tucson 5 project.

As a matter of law, construction of the project will not change the Tohono Reservation's boundaries. The Tribe concedes that it has identified no case establishing that placing border barriers (or any other structure) on a tribal reservation could possibly affect that reservation's legal boundaries. Br. 47. Nor does it cite any case for the related proposition that government construction within a tribal reservation amounts to a violation of section 398d. Indeed, the Tribe cites *no* case finding a violation of that statute.

Instead, the Tribe musters only "diminishment" cases—that is, cases concerning whether congressional enactments or other actions affected the jurisdictional status of reservation lands. *See* Br. 46-47 The question in those cases was whether Congress diminished reservation boundaries when it opened reservation lands to non-Indian ownership. The Tribe primarily relies on *Nebraska v. Parker*, 577 U.S. 481 (2016), and its statement that a "hallmark[] of diminishment" is to "extinguish the land's prior use . . . as an Indian reservation." *Id.* at 489. But the Tribe quotes that language out of context; the Court was specifically describing "statutory provision[s]" that "restore land to the public domain" and "return it to the United States either to be sold or set aside for other public purposes." It was not referring to the erection of structures within a reservation's boundaries. And as the Tribe concedes, reservation land retains that status "until Congress *explicitly indicates* otherwise." Br. 50 (quoting *McGirt v. Oklahoma*, 591 U.S. 894, 914 (2020)).

Indeed, the diminishment cases relied on by the Tribe recognize that there may be non-tribal land ownership and use within a tribal reservation, but that such ownership or use does not change lands' reservation status, even if it interferes with tribal use and occupancy rights. For example, the Tribe concedes (Br. 48) that *Seymour v. Superintendent of Washington State Penitentiary* concerned a statute that "open[ed] the way for non-Indian settlers to own land on the reservation." 368 U.S. 351, 356 (1962). And in *McGirt v. Oklahoma*, the Supreme Court confirmed that the

Muscogee Creek Reservation exists, notwithstanding that it includes "most of the city of Tulsa." 591 U.S. 894, 899 (2020). As a result, the Muscogee (Creek) Nation lacks rights of use or occupancy over much of its reservation lands, but that does not mean that the reservation has been diminished. *See also id.* at 906 (discussing cases rejecting the proposition that non-Indian fee ownership of reservation lands diminished or terminated reservation status); *id.* at 922 (concluding that the loss of Creek land ownership did not show diminishment). These cases demonstrate that the federal government's exercise of its long-recognized right to use the Roosevelt Reservation to secure the border will not cause a change in the Tohono Reservation's boundaries.

At bottom, the Tribe's argument conflates reservation status with use and occupancy rights. Br. 46-47 (the Roosevelt Reservation "will lose every incident of reservation status" because the Tribe "will be wholly excluded from exercising its rights of use and occupancy on that land"). Reservation status is a jurisdictional issue; it affects which sovereign's laws apply. *See McGirt*, 591 U.S. at 907 (recognizing that Congress may "allow [tribes] to exercise governmental functions over land even if they no longer own it communally."). It is "conceptually quite distinct" from land ownership and a tribe's rights of use or occupancy. *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1475-76 (10th Cir. 1987). Reservation status is not

determined by land ownership; reservations often contain land where the tribe possesses some jurisdiction but lacks rights of use and occupancy. *See Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation*, 492 U.S. 408, 422-23 (1989) (discussing limited tribal authority over lands held in fee by non-Indians within the tribal reservation). The Tribe's argument, taken to its logical conclusion, suggests that those tribal reservations have been diminished, contrary to the Supreme Court's holding in *McGirt*. *See* 591 U.S. at 905-08.

In any event, it is speculative that the Tribe will be "wholly excluded from exercising its rights of use and occupancy" or "powers of self-government and territorial management" in the area occupied by the Tucson 5 project, Br. 46, as DHS intends to continue consulting with the Tribe about access issues. JA00635.

Thus, the Tribe's insistence that IIRIRA does not authorize changes to reservation boundaries, Br. 50, is beside the point. Construction of the border barrier will not alter the Tohono Reservation's boundaries, and the Tribe identifies no other "*specific prohibition*" that the Tucson 5 project might violate. *Changji*, 40 F.4th at 722 (emphasis added). The Tribe therefore fails to identify any "overstep" that is "plain on the record and *on the face of the statute*." *Fed. Express*, 39 F.4th at 765 (emphasis added) (quotation omitted).

For these reasons, the district court correctly concluded that neither the diminishment cases nor section 398d are implicated here. Because the Tribe hangs its ultra

vires claim on the premise that the project will change the reservation boundaries, its remaining arguments in support of that claim lack merit.

### C. IIRIRA bars the Tribe's ultra vires claim.

This Court may also affirm the denial of the preliminary injunction "for a different reason" than "the one the district court identified." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 (D.C. Cir. 2017). Here, IIRIRA's "express" bar on judicial review wholly forecloses the Tribe's ultra vires claim. *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019); *see also Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991).

Section 102(c)(1) of IIRIRA authorizes the Secretary "to waive all legal requirements" the Secretary "in [his] sole discretion, determines necessary to ensure expeditious construction of the barriers and roads" authorized by IIRIRA. Subparagraph 102(c)(2)(A) restricts district court review of "any action undertaken, or any decision made" pursuant to the Secretary's waiver authority to alleged "violation[s] of the Constitution of the United States." And subparagraph 102(c)(2)(C) provides the review of district court decisions may be had only by writ of certiorari in the Supreme Court.

If Congress wants to allow the Secretary to waive any legal requirement, it may do so; and if Congress wants to bar claims arising from that waiver, it may do

so. *See Schilling v. Rogers*, 363 U.S. 666, 674-76 (1960). And here, the plain text makes "crystal clear that Congress intended to eliminate litigation that would 'delay the expeditious construction of border security infrastructure[,]' to the fullest extent possible." *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 239 (D.D.C. 2019) (Jackson, J.).

The Tribe's ultra vires claim "arises from," Section 102(c)(1). As noted above, the Secretary has waived application of the APA to border-barrier construction projects, including the Tucson 5 project. 73 Fed. Reg. 18293; 91 Fed. Reg. at 45824. The Tribe relies on its inability to bring an APA challenge—a bar that "arises from" the Secretary's waiver—to justify bringing an ultra vires claim that would otherwise be precluded by the APA. Br. 44; *see Changji*, 40 F.4th at 722 (stating that ultra vires review is available only when "there is no alternative procedure for review"). But in authorizing the Secretary to waive legal requirements, such the APA, Congress surely did not intend to authorize a litigant to circumvent such waivers by resorting to non-statutory review of claims that are precluded by the waiver. Nor may the Tribe employ ultra vires review to circumvent IIRIRA's limitation of judicial review to constitutional claims. *See id*. (holding that a statutory withdrawal of APA review did not expand the scope of ultra vires review). Subparagraph 102(c)(2)(A) of IIRIRA therefore barred the district court from considering the Tribe's argument that the Tucson 5 project exceeds the Secretary's statutory authority.

This Court's decision in *North American Butterfly Ass'n v. Wolf* does not dictate a different conclusion. That case concerned claims challenging a project to build a border barrier, but the claims did not arise from the waiver because they "predate[d]" and did "not depend on" the waiver determination. 977 F.3d 1244, 1260-61 (D.C. Cir. 2020). The opposite circumstances exist here. The Tribe's claim postdates the waiver and—as the Tribe acknowledges—depends on the premise that the Secretary waived APA review of the project. The claim therefore "arises from" the Secretary's exercise of his waiver authority and, because it does not allege a constitutional violation, is barred by subparagraph 102(c)(2)(A).

## III. The remaining factors weigh against a preliminary injunction.

Since the Tribe has failed to establish a likelihood of success on the merits, this Court need not review the other preliminary injunction factors. *See Ark. Dairy Coop. Ass'n v. U.S. Dept. of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). But as the district court correctly determined, all the remaining factors favor defendants. JA0959. The Tribe's claimed harms are illusory, speculative, and uncertain, and do not outweigh the federal government's interests "in securing the border, enforcing immigration laws, and ensuring public safety." JA0960-61. The Tribe has failed to show that the district court abused its discretion in concluding that a preliminary injunction is unwarranted.

### A. The Tribe has not shown irreparable harm is likely.

This Court has "set a high standard" for showing irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To meet that standard, plaintiff must demonstrate injury that is "both certain and great," "actual and not theoretical," "beyond remediation," and "of such *imminence* that there is a 'clear and present' need" for the injunction. *Chaplaincy*, 454 F.3d at 297 (quoting *Wisc. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) The Tribe fails to clear that high bar. That failure is itself "fatal" to the preliminary injunction motion. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024).

On appeal, the Tribe points to three alleged harms: (1) an "abrogation" of its sovereignty, (2) lessened "proprietary control over its lands," and (3) threats to its environmental interests. Br. 51-54. But the district court correctly concluded that these alleged harms are either "not likely to materialize" because they are premised on rights that the Tribe does not possess, or are speculative harms that are not "certain" and "great." JA0960.

First, the Tribe claims that the project will "reshape" the Tohono Reservation and thus cause a "loss of sovereign authority." Br. 52. But as discussed above, the Tribe does not possess unfettered sovereign authority over the Roosevelt Reserva-

tion; those lands were reserved by the federal government for border security purposes. *See* above, Section I.C.1. The Tribe's authority is subordinate to that federal reservation, as well as to Congress's plenary authority over tribal property. *See, e.g.*, *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209 (1978) ("Upon incorporation into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty."); *Winton v. Amos*, 255 U.S. 373, 391 (1921) ("It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property.").

Indeed, 52 miles of vehicle barriers have been in place for nearly two decades within the Tohono Reservation, and "CBP has long had a border security presence in and near the Tucson 5 project area." JA0627. Congress has directed DHS to "achieve and maintain operational control of the international land border," 120 Stat. at 2638, including by installing "additional physical barriers and roads" and constructing "reinforced fencing" to deter illegal entries into the United States. IIRIRA § 102(a), (b)(1)(A). And as described above, Section II.B, the Tucson 5 project will not change the boundaries or reservation status of lands within the project area. The Tribe has not shown that the Tucson 5 project will infringe on any sovereign rights that the Tribe possesses.

The Tribe suggests that *any* objectionable activity within its Reservation abrogates the Tribe's sovereignty and is de facto irreparable harm. Br. 52. But the cases the Tribe cites do not support this proposition. *Mashpee Wampanoag Tribe v. Bernhardt*, an unreported district court decision, concerned removing land from trust status. No. 18-2242, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020). The district court noted that taking land out of trust could constitute irreparable injury because it had myriad effects, including tax liability, loss of eligibility for federal programs, jurisdictional effects, and potential harm to third parties. *Id*. But here, no land is being removed from trust status, and the Tribe points to no comparable effects. Similarly, *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000 (10th Cir. 2015), is distinguishable as it involved state criminal prosecution of tribal citizens within the reservation, implicating liberty and jurisdictional interests not at issue here.

The Tribe's second purported harm—loss of "proprietary control"—fails for similar reasons. The Tribe does not possess full proprietary control over the Roosevelt Reservation. *See* Section I.C.2. The Tribe's circumstances are thus different from those at issue in *Texas v. DHS*, 123 F.4th at 211, where there was no dispute that Texas had ownership and control over the property at issue.

Third, the Tribe claims irreparable environmental harm, but it greatly overstates the evidence before the district court. As the district court noted, "plans have

not yet been finalized for the border wall." JA0960. Any specific environmental harms were thus speculative. In any event, the Tucson 5 project will impact a narrow strip of land on the edge of the 2.8-million-acre Tohono Reservation. *See* JA0627. The Tribe claims that "the Secretary's plans will unquestionably have significant impacts on the Nation's lands outside" the Roosevelt Reservation, but as the district court correctly concluded, the Tribe has failed to establish this as a factual matter given that "defendants have not yet articulated plans to construct outside the Roosevelt Reservation." JA0960. And the district court correctly concluded that any alleged harms are neither "certain" nor "great" given that "many—if not all—of plaintiff's alleged environmental . . . injuries could be mitigated through consultation." JA0960. The Tribe has not shown that those findings are clearly erroneous.

If the Tribe is suggesting that the Court must assume the truth of its assertions about the extent of its authority over the Roosevelt Reservation, or its factual allegations regarding harm (Br. at 53), that is inaccurate. *See, e.g.*, *Winter*, 555 U.S. at 375-76 (plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction"). The Tribe cites only *Chaplaincy of Full Gospel Churches* for this proposition, but the analysis in that case was specific to an alleged violation of the Establishment Clause, which this Court found was a unique context for purposes of

the irreparable harm analysis. 454 F.3d at 299-303. The Tribe has brought no Establishment Clause claim in this suit, and its assertions that saguaro cactuses are "sacred" does not confer some special status on its claims of environmental harm.

More on point are decisions of this Court that that expressly admonish that "the finding of irreparable injury *cannot* meaningfully be rested on a mere contention of a litigant, but depends on an appraisal of the validity, or at least the probable validity, *of the legal premise underlying the claim* of right in jeopardy of impairment." *Del. & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603, 619-20 (D.C. Cir. 1971) (emphasis added). Put another way, "an assessment of the merits also suffuses the other factors requisite to a preliminary injunction," including "the requirement that movant show irreparable harm in the absence of an injunction." *Id.*; *see also Int'l Bhd. of Elec. Workers v. Wash. Terminal Co.*, 473 F.2d 1156, 1167 (D.C. Cir. 1972). These precedents support the district court's consideration of the merits of the competing claims of authority over the Roosevelt Reservation.

At bottom, "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm," *Wagner v. Taylor*, 836 F.2d 566, 575-76 (D.C. Cir. 1987), and the district court's analysis reasonably reflects a careful and measured approach. The Tribe has not shown that the district court abused its discretion.

### B. The balance of equities and public interest decisively favor the government.

Even if the Tribe could show that it faced some harm, such a showing would not favor injunctive relief because harms to the public interest outweigh the Tribe's interests. *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*, 609 U.S. — , 2026 WL 2564318, at *3-4 (Aug. 31, 2026) (per curiam). Here, the district court correctly concluded that the public interest in securing the international border greatly outweighs the Tribe's concerns.

Enforcing our nation's immigration laws is critically important to the national security and public safety of the United States. As the Supreme Court has repeatedly recognized, the federal government's interests in securing the border, enforcing immigration laws, and preventing the influx of narcotics are "compelling" and "weighty." *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The government's interest in efficient administration of the immigration laws at the border . . . is weighty."); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989) (recognizing that the government has "compelling interests in safety and in the integrity of our borders"); *see also Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant." (citing cases)). And Congress has repeatedly emphasized that physical border walls are "a key component of border security." JA0961.

History has shown that the volume of illegal immigration and smuggling across the Southwest border can be staggering. As documented by the House Committee on Homeland Security, "U.S. Customs and Border Protection has reported more than 8.2 million encounters of inadmissible aliens at the Southwest border, a number that grows to more than 10.1 million when factoring in America's borders and ports of entry nationwide." House Committee on Homeland Security, *Crisis by Design: A Comprehensive Look at the Biden-Harris Administration's Unprecedented Border Crisis* at 3 (Sept. 18, 2024) (citation omitted).[2] And specifically, the Border Patrol's Tucson Sector "experiences significant illegal entry and drug smuggling activity." JA0626. "Between fiscal year 2021 and June 1, 2026, USBP apprehended over 1,333,000 illegal aliens attempting to enter the United States between border crossings in the Tucson Sector. In that same time period Border Patrol seized over 17,200 pounds of marijuana, over 750 pounds of cocaine, over 150 pounds of heroin, over 11,750 pounds of methamphetamine, and over 3,475 pounds of fentanyl." JA0626. The Tohono Reservation is already a "funnel point for illegal crossings," such that "[a]pprehensions on the reservation accounted for 33.6% of all illegal entries" in the Tucson Sector in FY24, even though the Reservation constitutes only 62 out of 262 miles (23%) of the border within the sector. JA0619. And there

[2] Available at https://homeland.house.gov/wp-content/uploads/2024/09/September-2024-Border-Report.pdf.

is substantial evidence of transnational criminal organizations and related smuggling activities operating in the Tucson Sector, including within the Tohono Reservation. JA0619-21.

The Tribe recognizes these concerns. As Verlon Jose, Chairman of Tohono O'odham, testified to Congress, the Tribe conducted over 1,500 migrant death investigations and recoveries between 2003 and 2024. JA0073. The Tribe's police force spends "about half of its time on border issues, including the investigation of immigrant deaths, illegal drug seizures, and human smuggling," *Id*. And "smugglers have held tribal families hostage, damaged and stolen property, and recruited tribal youth to engage in smuggling activity." *Id*.

If the Tucson 5 project is not constructed, the 62-mile stretch of border within the Tohono Reservation would be one of the few remaining areas without pedestrian border barriers, increasing the likelihood of cross-border criminal activity there. JA0626, JA0619. DHS has thus determined that the Tucson 5 project is "necessary for DHS and CPB to obtain operational control of the border." JA0622-23; *see also* 91 Fed. Reg. at 45823. Enjoining the project would "increase the likelihood of exploitation by [transnational criminal organizations]" and illegal crossings. JA0623.

Faced with this evidence, the district court correctly determined that "the Government's interests in securing the border, enforcing immigration laws, and ensuring

public safety outweigh any surviving irreparable harms at this juncture." JA0960. The Tribe has not shown that this determination was an abuse of discretion.

## CONCLUSION

This Court should affirm the denial of the Tribe's motion for a preliminary injunction.

Respectfully submitted,

s/ *Christopher Anderson*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

AMBER BLAHA
CHRISTOPHER ANDERSON
KYLE GLYNN
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

October 14, 2026
90-1-4-18215

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,851 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

s/ *Christopher Anderson*
CHRISTOPHER ANDERSON

Counsel for Appellees

**APPELLEES' ADDENDUM**

6 U.S.C. § 202 ........................................................................................................1

Act of July 22, 1854, 10 Stat. 308..........................................................................3

Act of May 20, 1862, 12 Stat. 392 .........................................................................6

Act of July 26, 1866, 14 Stat. 251 ..........................................................................8

Proc. No. 758, 35 Stat. 2136 (May 27, 1907) ........................................................11

Pub. L. No. 109-367, § 2(a), 120 Stat. 2638 (2006) (codified as 8
U.S.C. § 1701 note) ........................................................................................13

Working Families Tax Cut Act, Pub. L. 119-21, Title IX, Sec. 90001,
139 Stat. 72, 357 (2025) ................................................................................17

Exec. Order. 14165, § 3, 90 Fed. Reg. 8467 (Jan. 20, 2025)..................................19

*Determination Pursuant to § 102 of the IIRIRA of 1996, as Amended*,
73 Fed. Reg. 18293 (Apr. 3, 2008)..................................................................23

*Determination Pursuant to § 102 of the IIRIRA of 1996, as Amended*,
91 Fed. Reg. 45824 (July 21, 2026) ..................................................................26

United States Code Annotated
Title 6. Domestic Security (Refs & Annos)
Chapter 1. Homeland Security Organization
Subchapter IV. Border, Maritime, and Transportation Security (Refs & Annos)
Part A. Border, Maritime, and Transportation Security Responsibilities and Functions (Refs & Annos)

6 U.S.C.A. § 202

§ 202. Border, maritime, and transportation responsibilities

Effective: February 24, 2016
Currentness

The Secretary shall be responsible for the following:

**(1)** Preventing the entry of terrorists and the instruments of terrorism into the United States.

**(2)** Securing the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.

**(3)** Carrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the date on which the transfer of functions specified under section 251 of this title takes effect.

**(4)** Establishing and administering rules, in accordance with section 236 of this title, governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.

**(5)** Establishing national immigration enforcement policies and priorities.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**(6)** Except as provided in part C of this subchapter, administering the customs laws of the United States.

**(7)** Conducting the inspection and related administrative functions of the Department of Agriculture transferred to the Secretary of Homeland Security under section 231 of this title.

**(8)** In carrying out the foregoing responsibilities, ensuring the speedy, orderly, and efficient flow of lawful traffic and commerce.

## CREDIT(S)

(Pub.L. 107-296, Title IV, § 402, Nov. 25, 2002, 116 Stat. 2177; Pub.L. 114-125, Title VIII, § 802(g)(1)(B)(ii)(II), Feb. 24, 2016, 130 Stat. 211.)

Notes of Decisions (13)

6 U.S.C.A. § 202, 6 USCA § 202
Current through P.L. 119-120. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

out of any money in the treasury not otherwise appropriated, and to be expended under the superintendence of the Secretary of War, for the continuation of the improvement of the Cape Fear River, North Carolina, at or near its communication with the ocean.

How expended.

Approved, July 22, 1854.

---

July 22, 1854.

Chap. CIII. — *An Act to establish the offices of Surveyor-General of New Mexico, Kansas, and Nebraska, to grant Donations to actual Settlers therein, and for other purposes.*

Surveyor-General for New Mexico; his appointment, power, authority, duties and compensation.
1853, ch. 69.
Appropriation for clerk hire.
Location of his office.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President, by and with the advice and consent of the Senate, shall be, and he is hereby, authorized to appoint a Surveyor-General for New Mexico, whose annual salary shall be three thousand dollars, and whose power, authority, and duties shall be the same as those provided by law for the Surveyor-General of Oregon; he shall have proper allowances for clerk hire, office rent, and fuel, not exceeding what now is or hereafter may be allowed by law to the said Surveyor-General of Oregon; and he shall locate his office from time to time at such places as may be directed by the President of the United States.

Donation of public lands to every white male citizen, or to every white male above 21 years of age, who has declared his intention and who are residing in said Territory at passage of this act.
Donation of public lands to those who shall remove there between January 1st, 1853, and January 1st, 1858.
Proviso.

Sec. 2. *And be it further enacted,* That, to every white male citizen of the United States, or every white male above the age of twenty-one years who has declared his intention to become a citizen, and who was residing in said Territory prior to the first day of January, eighteen hundred and fifty-three, and who may be still residing there, there shall be, and hereby is, donated one quarter section, or one hundred and sixty acres of land. And to every white male citizen of the United States, or every white male above the age of twenty-one years, who has declared his intention to become a citizen, and who shall have removed or shall remove to and settle in said Territory between the first day of January, eighteen hundred and fifty-three, and the first day of January, eighteen hundred and fifty-eight, there shall in like manner be donated one quarter-section, or one hundred and sixty acres, on condition of actual settlement and cultivation for not less than four years: *Provided, however,* That each of said donations shall include the actual settlement and improvement of the donee, and shall be selected by legal subdivisions, within three months after the survey of the land where the settlement was made before the survey; and where the settlement was made after the survey, then within three months after the settlement has been made; and all persons failing to designate the boundaries of their claims within that time, shall forfeit all right to the same.

Patent to issue — when.
Proviso.
Proviso.
Patents to issue to citizens only.

Sec. 3. *And be it further enacted,* That, on proof of the settlement and cultivation required by this act, to the satisfaction of the surveyor-general, or other officer designated by law for that purpose, subject to the supervision of the Secretary of the Interior, a certificate shall be issued to the party entitled, on presentation of which, if approved by the Secretary of the Interior, a patent shall issue thereon: *Provided, however,* That on the death of any such settler before the completion of the four years' occupancy and cultivation required by this act, the right shall descend to his heirs at law, who shall be entitled to a certificate and patent, as aforesaid, on proof, as before provided, of continued occupancy and cultivation by such settler to the time of his death: *Provided, however,* That when lands are claimed under any of the provisions of this act by persons who are not citizens of the United States, patents shall not issue therefor until they become citizens.

Reservation of mineral and other lands.

Sec. 4. *And be it further enacted,* That none of the provisions of this act shall extend to mineral or school lands, salines, military or other reservations, or lands settled on and occupied for purposes of trade and commerce, and not for agriculture, and all legal subdivisions settled on

and occupied, in whole or in part, for purposes of trade and commerce, and not for agriculture, shall be subject to the provisions of the act of twenty-third of May, eighteen hundred and forty-four, in relation to town sites on the public lands, whether so settled and occupied before or after the survey of said lands, except that said lands shall be donated instead of being sold. 1844, ch. 17.

Reservation of land for schools.

Sec. 5. *And be it further enacted*, That when the lands in the said Territory shall be surveyed, under the direction of the Government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each township, in said Territory, shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be created out of the same.

Reservation of land for a university.

Sec. 6. *And be it further enacted*, That, when the lands in said Territory shall be surveyed as aforesaid, a quantity of land equal to two townships shall be, and the same is hereby, reserved for the establishment of a University in said Territory, and in the State hereafter to be created out of the same, to be selected, under the direction of the legislature, in legal subdivisions of not less than one half-section.

Land not taken under this act subject to the act of 1841, ch.16.

Sec. 7. *And be it further enacted*, That any of the lands not taken under the provisions of this act shall be subject to the operation of the Preëmption Act of fourth September, eighteen hundred and forty-one, whether settled upon before or after the survey; and, in all cases where the settlement was made before the survey, the settler shall file his declaration within three months after the survey is made and returned; and any person claiming a donation under this act shall be permitted to enter the land claimed by him at any time prior to the four years' occupancy and cultivation required, by paying therefor at the rate of one dollar and twenty-five cents per acre, and proving occupancy and cultivation up to the time of such payment.

Time in which the land may be entered.

Spanish and Mexican claims to land to be ascertained.

Sec. 8. *And be it further enacted*, That it shall be the duty of the Surveyor-General, under such instructions as may be given by the Secretary of the Interior, to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico; and, for this purpose, may issue notices, summons witnesses, administer oaths, and do and perform all other necessary acts in the premises. He shall make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo, of eighteen hundred and forty-eight, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States; and shall also make a report in regard to all pueblos existing in the Territory, showing the extent and locality of each, stating the number of inhabitants in the said pueblos, respectively, and the nature of their titles to the land. Such report to be made according to the form which may be prescribed by the Secretary of the Interior; which report shall be laid before Congress for such action thereon as may be deemed just and proper, with a view to confirm *bonâ fide* grants, and give full effect to the treaty of eighteen hundred and forty-eight between the United States and Mexico; and, until the final action of Congress on such claims, all lands covered thereby shall be reserved from sale or other disposal by the government, and shall not be subject to the donations granted by the previous provisions of this act.

Portion of such claims to be reported. Vol. 9, 922.

The report to be laid before Congress for action.

Lands covered by such claims reserved from sale.

Full power given to execute this act.

Sec. 9. *And be it further enacted*, That full power and authority are hereby given the Secretary of the Interior to issue all needful rules and regulations for fully carrying into effect the several provisions of this act.

Surveyor-General for Nebraska

Sec. 10. *And be it further enacted*, That the President of the United States shall be and he is hereby, authorized to appoint, by and with the

and Kansas; his appointment, powers, duties, and compensation.

advice and consent of the Senate, a Surveyor-General for the Territories of Nebraska and Kansas, who shall locate his office at such place as the President of the United States shall from time to time direct, and whose duties, powers, obligations and responsibilities and compensation shall be the same as those of the Surveyor-General of Wisconsin and Iowa, and who shall be allowed the same amount for office rent, fuel, incidental expenses, and clerk hire, as is allowed to said Surveyor-General of Wisconsin and Iowa.

Standard meridian and other lines to be surveyed.

Sec. 11. *And be it further enacted,* That said Surveyor-General shall cause the necessary surveys to be made in said Territories of standard meridian, base, and parallel lines, and of township and subdivisional lines, under such rules and regulations as shall be prescribed by the Commissioner of the General Land-Office.

Certain lands subject to the operation of the Act of 1841, ch. 16.

Sec. 12. *And be it further enacted,* That all the lands to which the Indian title has been or shall be extinguished within said Territories of Nebraska and Kansas, shall be subject to the operations of the Preëmption Act of fourth September, eighteen hundred and forty-one, and under the conditions, restrictions, and stipulations therein mentioned; *Provided, however,* That where unsurveyed lands are claimed by preëmption, notice of the specific tracts claimed shall be filed within three months after the survey has been made in the field, and on failure to file such notice or to pay for the tracts claimed before the day fixed for the public sale of the lands by the proclamation of the President of the United States, the parties claiming such lands shall forfeit all right thereto: *Provided,* said notices may be filed with the Surveyor-General, and to be noted by him on the township plats, until other arrangements shall have been made by law for that purpose.

Proviso.

Proviso.

Omaha Land District.

Sec. 13. *And be it further enacted,* That the public lands in the Territory of Nebraska, to which the Indian title shall have been extinguished, shall constitute a new land district to be called the Omaha District; and the public lands in the Territory of Kansas, to which the Indian title shall have been extinguished, shall constitute a new land district, to be called the Pawnee District: the officers for each of which districts shall be established at such points as the President may deem expedient; and he is hereby authorized to appoint, by and with the advice and consent of the Senate, a Register and Receiver of Public Moneys for each of said districts, who shall each be required to reside at the site of their respective offices, and they shall have the same powers, perform the same duties, and be entitled to the same compensation as are or may be prescribed by law in relation to other land-offices of the United States. And the President is hereby authorized to cause the surveyed lands to be exposed for sale from time to time, in the same manner and upon the same terms and conditions as the other public lands of the United States.

Pawnee Land District.

Place of office.

Register and Receiver for said districts to be appointed.

Land to be surveyed and exposed for sale.

Approved, July 22, 1854.

---

July 27, 1854.

Chap. CV.—*An Act creating a Collection District in New York, to be called the District of Dunkirk, and constituting Dunkirk a Port of Entry, and the Ports of Barcelona, Silver Creek, and Cattaraugus Creek, Ports of Delivery.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the counties of Cattaraugus and Chautauque and the harbors, rivers, and waters on the southern shore of Lake Erie, in the State of New York, west of and including Cattaraugus Creek and the shores, on each side of said creek, and west along the shore and territory bordering on Lake Erie aforesaid, to the Pennsylvania State line, and the islands in the said lake contiguous thereto, heretofore embraced in the District of Buffalo Creek, shall be and are hereby constituted a collection district to be called the District of Dunkirk; and a port of entry for said district is hereby established at

Collection district of Dunkirk established.

Said district designated.

Dunkirk made the port of entry.

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 77 of 100


Repeal of inconsistent laws.

SEC. 20. *And be it further enacted*, That all acts and parts of acts heretofore passed, which are inconsistent with any of the provisions of this act, are, for the purposes of this act, hereby repealed, so far as the same are inconsistent herewith.

APPROVED, May 17, 1862.

---

May 20, 1862.

CHAP. LXXV. — *An Act to secure Homesteads to actual Settlers on the Public Domain.*

Certain persons may enter certain quantities of certain unappropriated public lands.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That any person who is the head of a family, or who has arrived at the age of twenty-one years, and is a citizen of the United States, or who shall have filed his declaration of intention to become such, as required by the naturalization laws of the United States, and who has never borne arms against the United States Government or given aid and comfort to its enemies, shall, from and after the first January, eighteen hundred and sixty-three, be entitled to enter one quarter section or a less quantity of unappropriated public lands, upon which said person may have filed a preëmption claim, or which may, at the time the application is made, be subject to preëmption at one dollar and twenty-five cents, or less, per acre; or eighty acres or less of such unappropriated lands, at two dollars and fifty cents per acre, to be located in a body, in conformity to the legal subdivisions of the public lands, and after the same shall have been surveyed: *Provided*, That any person owning and residing on land may, under the provisions of this act, enter other land lying contiguous to his or her said land, which shall not, with the land so already owned and occupied, exceed in the aggregate one hundred and sixty acres.

Such persons to make affidavit.

Contents of affidavit.

SEC. 2. *And be it further enacted*, That the person applying for the benefit of this act shall, upon application to the register of the land office in which he or she is about to make such entry, make affidavit before the said register or receiver that he or she is the head of a family, or is twenty-one years or more of age, or shall have performed service in the army or navy of the United States, and that he has never borne arms against the Government of the United States or given aid and comfort to its enemies, and that such application is made for his or her exclusive use and benefit, and that said entry is made for the purpose of actual settlement and cultivation, and not either directly or indirectly for the use or benefit of any other person or persons whomsoever; and upon filing the said affidavit with the register or receiver, and on payment of ten dollars, he or she shall thereupon be permitted to enter the quantity of land specified: *Provided, however*, That no certificate shall be given or patent issued therefor until the expiration of five years from the date of such entry; and if, at the expiration of such time, or at any time within two years thereafter, the person making such entry; or, if he be dead, his widow; or in case of her death, his heirs or devisee; or in case of a widow making such entry, her heirs or devisee, in case of her death; shall prove by two credible witnesses that he, she, or they have resided upon or cultivated the same for the term of five years immediately succeeding the time of filing the affidavit aforesaid, and shall make affidavit that no part of said land has been alienated, and that he has borne true allegiance to the Government of the United States; then, in such case, he, she, or they, if at that time a citizen of the United States, shall be entitled to a patent, as in other cases provided for by law: *And provided, further*, That in case of the death of both father and mother, leaving an infant child, or children, under twenty-one years of age, the right and fee shall enure to the benefit of said infant child or children; and the executor, administrator, or guardian may, at any time within two years after the death of the surviving parent, and in accordance with the laws of the State in which such children for the time being have their domicil, sell

Certificates and patents, when to issue and upon what proof.

Affidavit.

Provision in case of death of applicant, &c.

said land for the benefit of said infants, but for no other purpose; and the purchaser shall acquire the absolute title by the purchase, and be entitled to a patent from the United States, on payment of the office fees and sum of money herein specified.

Record of applications to be made.

Sec. 3. *And be it further enacted*, That the register of the land office shall note all such applications on the tract books and plats of his office, and keep a register of all such entries, and make return thereof to the General Land Office, together with the proof upon which they have been founded.

Such lands not to be subject to prior debts.

Sec. 4. *And be it further enacted*, That no lands acquired under the provisions of this act shall in any event become liable to the satisfaction of any debt or debts contracted prior to the issuing of the patent therefor.

When lands thus entered revert to government.

Sec. 5. *And be it further enacted*, That if, at any time after the filing of the affidavit, as required in the second section of this act, and before the expiration of the five years aforesaid, it shall be proven, after due notice to the settler, to the satisfaction of the register of the land office, that the person having filed such affidavit shall have actually changed his or her residence, or abandoned the said land for more than six months at any time, then and in that event the land so entered shall revert to the government.

Not over one quarter section can be thus acquired.

Rules and regulations of Land Office.

Fees of registers and receivers, when to be paid.

Existing preëmption rights not impaired.

Certain minors may have the privileges of this act.

Sec. 6. *And be it further enacted*, That no individual shall be permitted to acquire title to more than one quarter section under the provisions of this act; and that the Commissioner of the General Land Office is hereby required to prepare and issue such rules and regulations, consistent with this act, as shall be necessary and proper to carry its provisions into effect; and that the registers and receivers of the several land offices shall be entitled to receive the same compensation for any lands entered under the provisions of this act that they are now entitled to receive when the same quantity of land is entered with money, one half to be paid by the person making the application at the time of so doing, and the other half on the issue of the certificate by the person to whom it may be issued; but this shall not be construed to enlarge the maximum of compensation now prescribed by law for any register or receiver: *Provided*, That nothing contained in this act shall be so construed as to impair or interfere in any manner whatever with existing preëmption rights: *And provided, further*, That all persons who may have filed their applications for a preëmption right prior to the passage of this act, shall be entitled to all privileges of this act: *Provided, further*, That no person who has served, or may hereafter serve, for a period of not less than fourteen days in the army or navy of the United States, either regular or volunteer, under the laws thereof, during the existence of an actual war, domestic or foreign, shall be deprived of the benefits of this act on account of not having attained the age of twenty-one years.

Punishment for false swearing under this act.

1857, ch. 116, § 5. Vol. xi. p. 250.

Sec. 7. *And be it further enacted*, That the fifth section of the act entitled "An act in addition to an act more effectually to provide for the punishment of certain crimes against the United States, and for other purposes," approved the third of March, in the year eighteen hundred and fifty-seven, shall extend to all oaths, affirmations, and affidavits, required or authorized by this act.

Applicant may have the land upon paying minimum price, &c., before the five years expire.

Sec. 8. *And be it further enacted*, That nothing in this act shall be so construed as to prevent any person who has availed him or herself of the benefits of the first section of this act, from paying the minimum price, or the price to which the same may have graduated, for the quantity of land so entered at any time before the expiration of the five years, and obtaining a patent therefor from the government, as in other cases provided by law, on making proof of settlement and cultivation as provided by existing laws granting preëmption rights.

Approved, May 20, 1862.

CHAP. CCLIII. — *An Act to grade East Capitol Street and establish Lincoln Square.* July 25, 1866.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the commissioner of public buildings be, and he hereby is, authorized and directed, in such manner as he may deem most proper, to cause East Capitol Street to be graded from Third Street east to Eleventh Street east, and to cause the square at the intersection of said street with Massachusetts, North Carolina, Tennessee, and Kentucky avenues, between Eleventh and Thirteenth streets east, to be enclosed with a wooden fence, and the same shall be known as Lincoln Square. And the sum of fifteen thousand dollars is hereby appropriated out of any money in the treasury not otherwise appropriated, to enable the said improvement to be made.

East Capitol Street to be graded and Lincoln Square enclosed.

Appropriation.

Approved, July 25, 1866.

CHAP. CCLIV. — *An Act in Relation to the unlawful Tapping of Government Water Pipes.* July 25, 1866.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the unlawful tapping of any water pipe laid down in the District of Columbia by authority of the United States is hereby declared to be a misdemeanor and an indictable offence; and any person who may be indicted for and convicted of such offence in the criminal court of the District of Columbia shall be subject to such fine as the court may think proper to impose, not exceeding five hundred dollars, or to imprisonment for a term not exceeding one year. And it is hereby made the special duty of the commissioner of public buildings to bring to the notice of the attorney of the United States for the District of Columbia, or to the grand jury, any infraction of this law.

Unlawful tapping of government water pipes punishable by fine or imprisonment.

Commissioner of public buildings to prosecute.

Approved, July 25, 1866.

CHAP. CCLV. — *An Act to authorize the Entry and Clearance of Vessels at the Port of Calais, Maine.* July 25, 1866.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, from and after the passage of this act, the Secretary of the Treasury may authorize, under such regulations as he shall deem necessary, the deputy collector of customs at the port of Calais, in the State of Maine, to enter and clear vessels, and to perform such other official acts as the said Secretary shall think advisable.

Deputy collector of customs at Calais, Me., may enter and clear vessels, &c.

Approved, July 25, 1866.

CHAP. CCLXII. — *An Act granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for other Purposes.* July 26, 1866.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the mineral lands of the public domain, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and occupation by all citizens of the United States, and those who have declared their intention to become citizens, subject to such regulations as may be prescribed by law, and subject also to the local customs or rules of miners in the several mining districts, so far as the same may not be in conflict with the laws of the United States.

Mineral lands declared open to occupation to all citizens, &c. subject to regulations, &c.

Sec. 2. *And be it further enacted,* That whenever any person or association of persons claim a vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar, or copper, having previously occupied and improved the same according to the local custom or rules of miners in the district where the same is situated, and having expended in actual labor and improvements thereon an amount of not less than one thousand dol-

Persons, &c. claiming, without opposition, any vein of quartz-bearing gold, &c. having occupied and made expenditures on the

same, and filing diagram, may enter the tract and receive a patent therefor.

Patent to grant what.

lars, and in regard to whose possession there is no controversy or opposing claim, it shall and may be lawful for said claimant or association of claimants to file in the local land office a diagram of the same, so extended laterally or otherwise as to conform to the local laws, customs, and rules of miners, and to enter such tract and receive a patent therefor, granting such mine, together with the right to follow such vein or lode with its dips, angles, and variations, to any depth, although it may enter the land adjoining, which land adjoining shall be sold subject to this condition.

After filing diagram of tract claimed, what proceedings to be had before patent issues.

Notice to be published.

Survey of plat of premises.

Payment of five dollars per acre, and costs of survey, &c.

Survey, plat, &c. to cover only one vein, to be named in patent.

Sec. 3. *And be it further enacted*, That upon the filing of the diagram as provided in the second section of this act, and posting the same in a conspicuous place on the claim, together with a notice of intention to apply for a patent, the register of the land office shall publish a notice of the same in a newspaper published nearest to the location of said claim, and shall also post such notice in his office for the period of ninety days; and after the expiration of said period, if no adverse claim shall have been filed, it shall be the duty of the surveyor-general, upon application of the party, to survey the premises and make a plat thereof, indorsed with his approval, designating the number and description of the location, the value of the labor and improvements, and the character of the vein exposed; and upon the payment to the proper officer of five dollars per acre, together with the cost of such survey, plat, and notice, and giving satisfactory evidence that said diagram and notice have been posted on the claim during said period of ninety days, the register of the land office shall transmit to the general land office said plat, survey, and description; and a patent shall issue for the same thereupon. But said plat, survey, or description shall in no case cover more than one vein or lode, and no patent shall issue for more than one vein or lode, which shall be expressed in the patent issued.

Proceedings when the location and entry of mine are upon unsurveyed lands.

Location not to exceed 200 feet along vein, with additional claim for discoverer, and right to follow vein to any depth, &c.

Limit to number and extent of locations.

Sec. 4. *And be it further enacted*, That when such location and entry of a mine shall be upon unsurveyed lands, it shall and may be lawful, after the extension thereto of the public surveys, to adjust the surveys to the limits of the premises according to the location and possession and plat aforesaid, and the surveyor-general may, in extending the surveys, vary the same from a rectangular form to suit the circumstances of the country and the local rules, laws, and customs of miners: *Provided*, That no location hereafter made shall exceed two hundred feet in length along the vein for each locator, with an additional claim for discovery to the discoveror of the lode, with the right to follow such vein to any depth, with all its dips, variations, and angles, together with a reasonable quantity of surface for the convenient working of the same as fixed by local rules: *And provided further*, That no person may make more than one location on the same lode, and not more than three thousand feet shall be taken in any one claim by any association of persons.

Further condition of sale, and to be expressed in patent.

Sec. 5. *And be it further enacted*, That as a further condition of sale, in the absence of necessary legislation by Congress, the local legislature of any State or Territory may provide rules for working mines involving easements, drainage, and other necessary means to their complete development; and those conditions shall be fully expressed in the patent.

Where adverse claimants appear, proceedings stayed until right is settled.

Patent then to issue.

Sec. 6. *And be it further enacted*, That whenever any adverse claimants to any mine located and claimed as aforesaid shall appear before the approval of the survey, as provided in the third section of this act, all proceedings shall be stayed until a final settlement and adjudication in the courts of competent jurisdiction of the rights of possession to such claim, when a patent may issue as in other cases.

President may establish additional land districts, &c. for purposes of this act.

See *Post*, p. 470.

Sec. 7. *And be it further enacted*, That the President of the United States be, and is hereby, authorized to establish additional land districts and to appoint the necessary officers under existing laws, wherever he may deem the same necessary for the public convenience in executing the provisions of this act.

Sec. 8. *And be it further enacted*, That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted.

Right of way for highways.

Sec. 9. *And be it further enacted*, That whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed: *Provided, however*, That whenever, after the passage of this act, any person or persons shall, in the construction of any ditch or canal, injure or damage the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage.

Owners of vested rights to use of water for mining, &c. to be protected, and right of way for canals and ditches granted.

Damages.

Sec. 10. *And be it further enacted*, That wherever, prior to the passage of this act, upon the lands heretofore designated as mineral lands, which have been excluded from survey and sale, there have been homesteads made by citizens of the United States, or persons who have declared their intention to become citizens, which homesteads have been made, improved, and used for agricultural purposes, and upon which there have been no valuable mines of gold, silver, cinnabar, or copper discovered, and which are properly agricultural lands, the said settlers or owners of such homesteads shall have a right of pre-emption thereto, and shall be entitled to purchase the same at the price of one dollar and twenty-five cents per acre, and in quantity not to exceed one hundred and sixty-acres; or said parties may avail themselves of the provisions of the act of Congress approved May twenty, eighteen hundred and sixty-two, entitled "An act to secure homesteads to actual settlers on the public domain," and acts amendatory thereof.

Owners of homesteads made upon lands designated as mineral, in which no valuable mines of gold, &c. have been found, &c. may pre-empt the same, &c.;

or may take them as homesteads.

1862, ch. 75. Vol xii. p. 392.

Sec. 11. *And be it further enacted*, That upon the survey of the lands aforesaid, the Secretary of the Interior may designate and set apart such portions of the said lands as are clearly agricultural lands, which lands shall thereafter be subject to pre-emption and sale as other public lands of the United States, and subject to all the laws and regulations applicable to the same.

Upon survey, lands clearly agricultural may be set apart and made subject to pre-emption and sale.

Approved, July 26, 1866.

---

CHAP. CCLXIII. — *An Act to authorize "The Chesapeake Bay and Potomac River Tidewater Canal Company" to enter the District of Columbia, and extend their Canal to the Anacostia River at any Point above Benning's Bridge.*

July 26, 1866.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That "The Chesapeake Bay and Potomac River Tide-water Canal Company," incorporated by the general assembly of the State of Maryland, at the January session thereof, eighteen hundred and sixty-six, by an act entitled "An act to incorporate the Chesapeake Bay and Potomac River Tide-water Canal Company," be, and the same are hereby, authorized to extend their canal from the point where it strikes the boundary line of the District of Columbia, thence in and through the said District to the Anacostia River at any point thereon above Benning's bridge.

The Chesapeake Bay, &c. Canal Company may extend its canal to Anacostia River;

Sec. 2. *And be it further enacted*, That the said company are hereby authorized and empowered to take, purchase, and hold, for the purpose[s] of this act, so much real estate and other property as shall be necessarily required for the proper construction of the extension aforesaid, and for the construction of all proper and convenient basins, locks, reservoirs, docks, and wharves, to be connected with said extension. And where the said company shall not be able to procure such real estate by purchase

may take and hold property necessary for proper construction of extension, &c.

Proceedings where land can-

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 82 of 100



tions shall not apply to any land embraced in any selection, entry, or filings, which may have been permitted to remain of record subject to the creation of a permanent reservation.

Reserved from settlement.

Warning is hereby given to all persons not to make settlement upon any of the lands reserved by this proclamation, unless and until they are listed by the Secretary of Agriculture and opened to homestead settlement or entry by the Secretary of the Interior under the Act of Congress, approved June eleventh, nineteen hundred and six, entitled, "An Act To provide for the entry of Agricultural lands within forest reserves."

Vol. 34, p. 233.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the City of Washington this 25th day of May, in the year of our Lord one thousand nine hundred and seven, and of the Independence of the United States the one hundred and thirty-first.

[SEAL.]

THEODORE ROOSEVELT

By the President:
ELIHU ROOT
*Secretary of State.*

---

May 27, 1907.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

## A PROCLAMATION.

Mexican boundary. Preamble.

WHEREAS, it is necessary for the public welfare that a strip of land lying along the boundary line between the United States and the Republic of Mexico be reserved from the operation of the public land laws and kept free from obstruction as a protection against the smuggling of goods between the United States and said Republic;

Reservation of a strip of land 60 feet wide.

Location.

Now, therefore, I, THEODORE ROOSEVELT, President of the United States, do hereby declare, proclaim and make known that there are hereby reserved from entry, settlement or other form of appropriation under the public land laws and set apart as a public reservation, all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico, within the State of California and the Territories of Arizona and New Mexico; and where any river or stream forms any part of said international boundary line, this reservation shall be construed and taken as extending to and including all public lands belonging to the United States which lie within sixty feet of the margin of such river or stream.

Lands excepted.

Excepting from the force and effect of this proclamation all lands which are at this date embraced in any legal entry or covered by any lawful filing, selection or rights of way duly of record in the proper United States Land Office, or upon which any valid settlement has been made pursuant to law, and the statutory period within which to make entry or filing of record has not expired; and also excepting all lands which at this date are embraced within any withdrawal or reservation for any use or purpose to which this reservation for customs purposes is repugnant; PROVIDED, that these exceptions shall not continue to apply to any particular tract of land unless the entryman, settler or claimant continues to comply with the law under which the entry, filing or settlement was made, or unless the reservation or withdrawal to which this reservation is inconsistent

continues in force; PROVIDED FURTHER, that the said strips, tracts, or parcels of land, reserved as aforesaid, may be used for public highways but for no other purpose whatever, so long as the reservation of same under this proclamation shall continue in force. Use for public highways.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States to be affixed.

DONE at the City of Washington this 27th day of May, in the year of our Lord one thousand nine hundred and seven, and of [SEAL.] the Independence of the United States the one hundred and thirty-first.

THEODORE ROOSEVELT

By the President:
ELIHU ROOT
*Secretary of State.*

---

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

May 27, 1907.

## A PROCLAMATION

WHEREAS, it appears that the public good would be promoted by adding to the Diamond Mountain National Forest certain lands, within the State of California, which are in part covered with timber, and by excluding therefrom certain lands; Diamond Mountain National Forest, Cal. Preamble. Vol. 34, pp. 3113, 3241.

Now, therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by the Act of Congress, approved June fourth, eighteen hundred and ninety-seven, entitled, "An Act Making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight, and for other purposes," do proclaim that the boundaries of the Diamond Mountain National Forest are hereby changed and that they are now as shown on the diagram forming a part hereof; Boundaries modified. Vol. 30, p. 36. *Post*, pp. 2138, 2240.

Excepting from the force and effect of this proclamation all lands which are at this date embraced in any legal entry or covered by any lawful filing or selection duly of record in the proper United States Land Office, or upon which any valid settlement has been made pursuant to law, if the statutory period within which to make entry or filing of record has not expired; and also excepting all lands which at this date are embraced within any withdrawal or reservation for any use or purpose with which this reservation for forest uses is inconsistent: Provided, that these exceptions shall not continue to apply to any particular tract of land unless the entryman, settler, or claimant continues to comply with the law under which the entry, filing, or settlement was made, or unless the reservation or withdrawal with which this reservation is inconsistent continues in force; not excepting from the force and effect of this proclamation, however, any part of the National Forest hereby enlarged which may have been withdrawn to protect the coal therein, but this proclamation does not vacate any such coal land withdrawal: and provided that these exceptions shall not apply to any land embraced in any selection, entry, or filing, which may have been permitted to remain of record subject to the creation of a permanent reservation. Lands excepted. Coal lands.

Warning is hereby given to all persons not to make settlement upon any of the lands reserved by this proclamation, unless and until they are listed by the Secretary of Agriculture and opened to homestead settlement or entry by the Secretary of the Interior under Reserved from settlement.

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 84 of 100

PL 109–367, October 26, 2006, 120 Stat 2638

UNITED STATES PUBLIC LAWS

109th Congress - Second Session

Convening January 7, 2005

Additions and Deletions are not identified in this database.

Vetoed provisions within tabular material are not displayed

PL 109–367 (HR 6061)

October 26, 2006
SECURE FENCE ACT OF 2006

An Act To establish operational control over the international land and maritime borders of the United States.

Be it enacted by the Senate and House of Representatives
of the United States of America in Congress assembled,

<< 8 USCA § 1101 NOTE >>

SECTION 1. SHORT TITLE.

This Act may be cited as the "Secure Fence Act of 2006".

<< 8 USCA § 1701 NOTE >>

SEC. 2. ACHIEVING OPERATIONAL CONTROL ON THE BORDER.

(a) IN GENERAL.—Not later than 18 months after the date of the enactment of this Act, the Secretary of Homeland Security shall take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States, to include the following—

(1) systematic surveillance of the international land and maritime borders of the United States through more effective use of personnel and technology, such as unmanned aerial vehicles, ground-based sensors, satellites, radar coverage, and cameras; and

(2) physical infrastructure enhancements to prevent unlawful entry by aliens into the United States and facilitate access to the international land and maritime borders by United States

Customs and Border Protection, such as additional checkpoints, all weather access roads, and vehicle barriers.

(b) OPERATIONAL CONTROL DEFINED.—In this section, the term "operational control" means the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband.

(c) REPORT.—Not later than one year after the date of the enactment of this Act and annually thereafter, the Secretary shall submit to Congress a report on the progress made toward achieving and maintaining operational control over the entire international land and maritime borders of the United States in accordance with this section.

<< 8 USCA § 1103 NOTE >>

SEC. 3. CONSTRUCTION OF FENCING AND SECURITY IMPROVEMENTS IN BORDER AREA FROM PACIFIC OCEAN TO GULF OF MEXICO.

Section 102(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104–208; 8 U.S.C. 1103 note) is amended—

(1) in the subsection heading by striking "Near San Diego, California"; and

(2) by amending paragraph (1) to read as follows:

"(1) SECURITY FEATURES.—

"(A) REINFORCED FENCING.—In carrying out subsection (a), the Secretary of Homeland Security shall provide for least 2 layers of reinforced fencing, the installation of additional physical barriers, roads, lighting, cameras, and sensors—

"(i) extending from 10 miles west of the Tecate, California, port of entry to 10 miles east of the Tecate, California, port of entry;

"(ii) extending from 10 miles west of the Calexico, California, port of entry to 5 miles east of the Douglas, Arizona, port of entry;

"(iii) extending from 5 miles west of the Columbus, New Mexico, port of entry to 10 miles east of El Paso, Texas;

"(iv) extending from 5 miles northwest of the Del Rio, Texas, port of entry to 5 miles southeast of the Eagle Pass, Texas, port of entry; and

"(v) extending 15 miles northwest of the Laredo, Texas, port of entry to the Brownsville, Texas, port of entry.

"(B) PRIORITY AREAS.—With respect to the border described—

"(i) in subparagraph (A)(ii), the Secretary shall ensure that an interlocking surveillance camera system is installed along such area by May 30, 2007, and that fence construction is completed by May 30, 2008; and

"(ii) in subparagraph (A)(v), the Secretary shall ensure that fence construction from 15 miles northwest of the Laredo, Texas, port of entry to 15 southeast of the Laredo, Texas, port of entry is completed by December 31, 2008.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 86 of 100

"(C) EXCEPTION.—If the topography of a specific area has an elevation grade that exceeds 10 percent, the Secretary may use other means to secure such area, including the use of surveillance and barrier tools.".

SEC. 4. NORTHERN BORDER STUDY.

(a) IN GENERAL.—The Secretary of Homeland Security shall conduct a study on the feasibility of a state of-the-art infrastructure security system along the northern international land and maritime border of the United States and shall include in the study—

(1) the necessity of implementing such a system;

(2) the feasibility of implementing such a system; and

(3) the economic impact implementing such a system will have along the northern border.

(b) REPORT.—Not later than one year after the date of the enactment of this Act, the Secretary of Homeland Security shall submit to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate a report that contains the results of the study conducted under subsection (a).

SEC. 5. EVALUATION AND REPORT RELATING TO CUSTOMS AUTHORITY TO STOP CERTAIN FLEEING VEHICLES.

(a) EVALUATION.—Not later than 30 days after the date of the enactment of this Act, the Secretary of Homeland Security shall—

(1) evaluate the authority of personnel of United States Customs and Border Protection to stop vehicles that enter the United States illegally and refuse to stop when ordered to do so by such personnel, compare such Customs authority with the authority of the Coast Guard to stop vessels under section 637 of title 14, United States Code, and make an assessment as to whether such Customs authority should be expanded;

(2) review the equipment and technology available to United States Customs and Border Protection personnel to stop vehicles described in paragraph (1) and make an assessment as to whether or not better equipment or technology is available or should be developed; and

(3) evaluate the training provided to United States Customs and Border Protection personnel to stop vehicles described in paragraph (1).

(b) REPORT.—Not later than 60 days after the date of the enactment of this Act, the Secretary of Homeland Security shall submit to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate a report that contains the results of the evaluation conducted under subsection (a).

Approved October 26, 2006.

LEGISLATIVE HISTORY—H.R. 6061:

CONGRESSIONAL RECORD, Vol. 152 (2006):

Sept. 14, considered and passed House.

Sept. 21, 25, 26, 28, 29, considered and passed Senate.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 42 (2006):

Oct. 26, Presidential remarks.

PL 109–367, 2006 HR 6061

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

(3) determining whether an unaccompanied alien child poses a danger to self or others by conducting an examination of the unaccompanied alien child for gang-related tattoos and other gang-related markings and covering such tattoos or markings while the child is in the care of the Office of Refugee Resettlement;

(4) data systems improvement and sharing that supports the health, safety, and well being of unaccompanied alien children by determining the appropriateness of potential sponsors of unaccompanied alien children and of adults residing in the household of the potential sponsor and by assisting with the identification and investigation of child labor exploitation and child trafficking; and

(5) coordinating and communicating with State child welfare agencies regarding the placement of unaccompanied alien children in such States by the Office of Refugee Resettlement.

(c) DEFINITIONS.—In this section:

(1) POTENTIAL SPONSOR.—The term “potential sponsor” means an individual or entity who applies for the custody of an unaccompanied alien child.

(2) UNACCOMPANIED ALIEN CHILD.—The term “unaccompanied alien child” has the meaning given such term in section 462(g) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)).

## TITLE IX—COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS

### Subtitle A—Homeland Security Provisions

### SEC. 90001. BORDER INFRASTRUCTURE AND WALL SYSTEM.

In addition to amounts otherwise available, there is appropriated to the Commissioner of U.S. Customs and Border Protection for fiscal year 2025, out of any money in the Treasury not otherwise appropriated, to remain available until September 30, 2029, $46,550,000,000 for necessary expenses relating to the following elements of the border infrastructure and wall system:

***358**


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

(1) Construction, installation, or improvement of new or replacement primary, waterborne, and secondary barriers.

(2) Access roads.

(3) Barrier system attributes, including cameras, lights, sensors, and other detection technology.

(4) Any work necessary to prepare the ground at or near the border to allow U.S. Customs and Border Protection to conduct its operations, including the construction and maintenance of the barrier system.

**SEC. 90002. U.S. CUSTOMS AND BORDER PROTECTION PERSONNEL, FLEET VEHICLES, AND FACILITIES.**

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Commissioner of U.S. Customs and Border Protection for fiscal year 2025, out of any money in the Treasury not otherwise appropriated, the following:

(1) PERSONNEL.—$4,100,000,000, to remain available until September 30, 2029, to hire and train additional Border Patrol agents, Office of Field Operations officers, Air and Marine agents, rehired annuitants, and U.S. Customs and Border Protection field support personnel.

(2) RETENTION, HIRING, AND PERFORMANCE BONUSES.—$2,052,630,000, to remain available until September 30, 2029, to provide recruitment bonuses, performance awards, or annual retention bonuses to eligible Border Patrol agents, Office of Field Operations officers, and Air and Marine agents.

(3) VEHICLES.—$855,000,000, to remain available until September 30, 2029, for the repair of existing patrol units and the lease or acquisition of additional patrol units.

(4) FACILITIES.—$5,000,000,000 for necessary expenses relating to lease, acquisition, construction, design, or improvement of facilities and checkpoints owned, leased, or operated by U.S. Customs and Border Protection.

Exec. Order No. 14165, 90 FR 8467, 2025 WL 327879(Pres.)
Executive Order 14165

Securing Our Borders

January 20, 2025

***8467** By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered:

Section 1. Purpose. Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

Deadly narcotics and other illicit materials have flowed across the border while agents and officers spend their limited resources processing illegal aliens for release into the United States. These catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States.

We have limited information on the precise whereabouts of a great number of these illegal aliens who have entered the United States over the last 4 years.

This cannot stand. A nation without borders is not a nation, and the Federal Government must act with urgency and strength to end the threats posed by an unsecured border.

One of my most important obligations is to protect the American people from the disastrous effects of unlawful mass migration and resettlement.

My Administration will marshal all available resources and authorities to stop this unprecedented flood of illegal aliens into the United States.

Sec. 2. Policy. It is the policy of the United States to take all appropriate action to secure the borders of our Nation through the following means:
(a) Establishing a physical wall and other barriers monitored and supported by adequate personnel and technology;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(b) Deterring and preventing the entry of illegal aliens into the United States;

(c) Detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States;

(d) Removing promptly all aliens who enter or remain in violation of Federal law;

(e) Pursuing criminal charges against illegal aliens who violate the immigration laws, and against those who facilitate their unlawful presence in the United States;

(f) Cooperating fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities; and

(g) Obtaining complete operational control of the borders of the United States. ***8468**

Sec. 3. Physical Barriers. The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States.

Sec. 4. Deployment of Personnel. (a) The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate and lawful action to deploy sufficient personnel along the southern border of the United States to ensure complete operational control; and
(b) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to supplement available personnel to secure the southern border and enforce the immigration laws of the United States through the use of sections 1103(a)(2) and (4)-(6) of the INA (8 U.S.C. 1103(a)(2) and (4)-(6)).

Sec. 5. Detention. The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States. The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as “catch-and-release,” whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

Sec. 6. Resumption of Migrant Protection Protocols. As soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take

all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

Sec. 7. Adjusting Parole Policies. The Secretary of Homeland Security shall, consistent with applicable law, take all appropriate action to:

(a) Cease using the "CBP One" application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States;

(b) Terminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans."

(c) Align all policies and operations at the southern border of the United States to be consistent with the policy of Section 2 of this order and ensure that all future parole determinations fully comply with this order and with applicable law.

Sec. 8. Additional International Cooperation. The Secretary of State, in coordination with the Attorney General and the Secretary of Homeland Security, shall take all appropriate action to facilitate additional international cooperation and agreements, consistent with the policy of Section 2, including entering into agreements based upon the provisions of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)) or any other applicable provision of law.

Sec. 9. DNA and Identification Requirements. (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to fulfill the requirements of the DNA Fingerprint Act of 2005, title X of Public Law 109-162, for all aliens detained under the authority of the United States; and

(b) The Secretary of Homeland Security shall take all appropriate action to use any available technologies and procedures to determine the validity of any claimed familial relationship between aliens encountered or apprehended by the Department of Homeland Security.

Sec. 10. Prosecution of Offenses. The Attorney General and the Secretary of Homeland Security shall take all appropriate action to prioritize the ***8469** prosecution of offenses that relate to the borders of the United States, including the investigation and prosecution of offenses that involve human smuggling, human trafficking, child trafficking, and sex trafficking in the United States.

Sec. 11. Additional Measures. Within 14 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall provide recommendations to the President regarding the use of any other authority to protect the United States from foreign threats and secure the southern border.

Sec. 12. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.
(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,January 20, 2025.
Billing code 3395-F4-P ***8609**

Exec. Order No. 1416590 FR 84672025 WL 327879(Pres.)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 94 of 100

73 FR 18293-01, 2008 WL 872373(F.R.)
NOTICES
DEPARTMENT OF HOMELAND SECURITY
Office of the Secretary

# Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended

Thursday, April 3, 2008

AGENCY: Office of the Secretary, Department of Homeland Security.

***18293** ACTION: Notice of determination.

SUMMARY: The Secretary of Homeland Security has determined, pursuant to law, that it is necessary to waive certain laws, regulations and other legal requirements in order to ensure the expeditious construction of barriers and roads in the vicinity of the international land border of the United States.

DATES: This Notice is effective on April 3, 2008.

Determination and Waiver: I have a mandate to achieve and maintain operational control of the borders of the United States. Public Law 109-367, § 2, 120 Stat. 2638, 8 U.S.C. 1701 note. Congress has provided me with a number of authorities necessary to accomplish this mandate. One of these authorities is found at section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (“IIRIRA”). Public Law 104-208, Div. C, 110 Stat. 3009-546, 3009-554 (Sept. 30, 1996) (8 U.S.C 1103 note), as amended by the REAL ID Act of 2005, Public Law 109-13, Div. B, 119 Stat. 231, 302, 306 (May 11, 2005) (8 U.S.C. 1103 note), as amended by the Secure Fence Act of 2006, Public Law 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006) (8 U.S.C. 1103 note), as amended by the Department of Homeland Security Appropriations Act, 2008, Public Law 110-161, Div. E, Title V, Section 564, 121 Stat. 2090 (Dec. 26, 2007). In Section 102(a) of IIRIRA, Congress provided that the Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States. In Section 102(b) of IIRIRA, Congress has called for the installation of fencing, barriers, roads, lighting, cameras, and sensors on not less than 700 miles of the southwest border, including priority miles of fencing that must be completed by December 2008. Finally, in section 102(c) of the IIRIRA, Congress granted to me the authority to waive all legal requirements that I, in my sole discretion, determine

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 95 of 100

necessary to ensure the expeditious construction of barriers and roads authorized by section 102 of IIRIRA.

I determine that the areas in the vicinity of the United States border described on the attached document, which is incorporated and made a part hereof, are areas of high illegal entry (collectively "Project Areas"). These Project Areas are located in the States of California, Arizona, New Mexico, and Texas. In order to deter illegal crossings in the Project Areas, there is presently a need to construct fixed and mobile barriers (such as fencing, vehicle barriers, towers, sensors, cameras, and other surveillance, communication, and detection equipment) and roads in the vicinity of the border of the United States. In order to ensure the expeditious construction of the barriers and roads that Congress prescribed in the IIRIRA in the Project Areas, which are areas of high illegal entry into the United States, I have determined that it is necessary that I exercise the authority that is vested in me by section 102(c) of the IIRIRA as amended.

Accordingly, I hereby waive in their entirety, with respect to the construction of roads and fixed and mobile barriers (including, but not limited to, accessing the project area, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of fences, roads, supporting elements, drainage, erosion controls, safety features, surveillance, communication, and detection equipment of all types, radar and radio towers, and lighting) in the Project Areas, all federal, state, or other laws, regulations and legal requirements of, deriving from, or related to the subject of, the following laws, as amended: The National Environmental Policy Act (Pub. L. 91-190, 83 Stat. 852 (Jan. 1, 1970) (42 U.S.C. 4321 et seq.)), the Endangered Species Act (Pub. L. 93-205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 et seq.)), the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act) (33 U.S.C. 1251 et seq.)), the National Historic Preservation Act (Pub. L. 89-665, 80 Stat. 915 (Oct. 15, 1966) (16 U.S.C. 470 et seq.)), the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), the Archeological Resources Protection Act (Pub. L. 96-95, 16 U.S.C. 470aa et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), the Noise Control Act (42 U.S.C. 4901 et seq.), the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.), the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601 et seq.), the Archaeological and Historic Preservation Act (Pub. L. 86-523, 16 U.S.C. 469 et seq.), the Antiquities Act (16 U.S.C. 431 et seq.), the Historic Sites, Buildings, and Antiquities Act (16 U.S.C. 461 et seq.), the Wild and Scenic Rivers Act (Pub. L. 90-542, 16 U.S.C. 1281 et seq.), the Farmland Protection Policy Act (7 U.S.C. 4201 et seq.), the Coastal Zone Management Act (Pub. L. 92-583, 16 U.S.C. 1451 et seq.), the Wilderness Act (Pub. L. 88-577, 16 U.S.C. 1131 et seq.), the Federal Land Policy and Management Act (Pub. L. 94-579, 43 U.S.C. 1701 et seq.), the National Wildlife Refuge System Administration Act (Pub. L. 89-669, 16 U.S.C. 668dd-668ee), the Fish and Wildlife Act of 1956 (Pub. L. 84-1024, 16 U.S.C. 742a, et seq.), the Fish and Wildlife Coordination Act (Pub. L. 73-121, 16 U.S.C. 661 et seq.), the Administrative Procedure Act (5 U.S.C. 551 et seq.), the

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 96 of 100

Otay Mountain Wilderness Act of 1999 (Pub. L. 106-145), Sections 102(29) and 103 of Title I of the California Desert Protection Act (Pub. L. 103-433), 50 Stat. 1827, the National Park Service Organic Act (Pub. L. 64-235, 16 U.S.C. 1, 2-4), the National Park Service General Authorities Act (Pub. L. 91-383, 16 U.S.C. 1a-1 et seq.), Sections 401(7), 403, and 404 of the National Parks and Recreation Act of 1978 (Pub. L. 95-625), Sections 301(a)-(f) of the Arizona Desert Wilderness Act (Pub. L. 101-628), the Rivers and Harbors Act of 1899 (33 U.S.C. 403), the Eagle Protection Act (16 U.S.C. 668 et seq.), the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.), the American Indian Religious Freedom Act (42 U.S.C. 1996), the Religious Freedom Restoration Act (42 U.S.C. 2000bb), the National Forest Management Act of 1976 (16 U.S.C. 1600 et seq.), and the Multiple Use and Sustained Yield Act of 1960 (16 U.S.C. 528-531).

This waiver does not supersede, supplement, or in any way modify the previous waivers published in the Federal Register on September 22, 2005 (70 FR 55622), January 19, 2007 ( ***18294** 72 FR 2535), and October 26, 2007 (72 FR 60870).

I reserve the authority to make further waivers from time to time as I may determine to be necessary to accomplish the provisions of section 102 of the IIRIRA, as amended.

Dated: April 1, 2008.

Michael Chertoff,

Secretary.

[FR Doc. 08-1095 Filed 4-1-08; 2:03 pm]

BILLING CODE 4410-10-P

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 97 of 100

91 FR 45823-01, 2026 WL 2086513(F.R.)
NOTICES
DEPARTMENT OF HOMELAND SECURITY
Office of the Secretary

# Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended

Tuesday, July 21, 2026

AGENCY: Office of the Secretary, Department of Homeland Security.

***45823** ACTION: Notice of determination.

SUMMARY: The Secretary of Homeland Security has determined, pursuant to law, that it is necessary to waive certain laws, regulations, and other legal requirements in order to ensure the expeditious construction of barriers and roads in the vicinity of the international land border in the state of Arizona.
DATES: This determination takes effect on July 21, 2026.

SUPPLEMENTARY INFORMATION: Important mission requirements of the Department of Homeland Security ("DHS") include border security and the detection and prevention of illegal entry into the United States. Border security is critical to the nation's national security. Recognizing the critical importance of border security, Congress has mandated DHS to achieve and maintain operational control of the international land border. Secure Fence Act of 2006, Public Law 109-367, section 2, 120 Stat. 2638 (Oct. 26, 2006) (8 U.S.C. 1701 note). Congress defined "operational control" as the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband. Id. Consistent with that mandate, the President's Executive Order on Securing Our Borders directs that I take all appropriate action to deploy and construct physical barriers to ensure complete operational control of the southern border of the United States. Executive Order 14165, section 3 (Jan. 20, 2025).
Congress has provided to the Secretary of Homeland Security a number of authorities necessary to carry out DHS's border security mission. One of those authorities is found at section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended ("IIRIRA"). Public Law 104-208, Div. C, 110 Stat. 3009-546, 3009-554 (Sept. 30, 1996) (8 U.S.C. 1103 note), as amended by the REAL ID Act of 2005, Public Law 109-13, Div. B, 119 Stat. 231, 302, 306 (May 11, 2005) (8 U.S.C. 1103 note), as amended by the Secure Fence Act of 2006, Public Law 109-367, section 3, 120 Stat. 2638 (Oct. 26, 2006) (8 U.S.C. 1103 note), as amended by the Department

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of Homeland Security Appropriations Act, 2008, Public Law 110-161, Div. E, Title V, section 564, 121 Stat. 2090 (Dec. 26, 2007). In section 102(a) of IIRIRA, Congress provided that the Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States. In section 102(b) of IIRIRA, Congress mandated that in carrying out the authority of section 102(a), I provide for the installation of additional fencing, barriers, roads, lighting, cameras, and sensors to achieve and maintain operational control of the border. Finally, in section 102(c) of IIRIRA, Congress granted to the Secretary of Homeland Security the authority to waive all legal requirements that I, in my sole discretion, determine necessary to ensure the expeditious construction of barriers and roads authorized by section 102 of IIRIRA.

**Determination and Waiver**

***Section 1***

The United States Border Patrol Tucson Sector is an area of high illegal entry. Between fiscal year 2021 through June 1, 2026, the United States Border Patrol ("Border Patrol") apprehended over 1,333,000 illegal aliens attempting to enter the United States between border crossings in the Tucson Sector. In that same time period Border Patrol seized over 17,200 pounds of marijuana, over 750 pounds of cocaine, over 150 pounds of heroin, over 11,750 pounds of methamphetamine, and over 3,475 pounds of fentanyl.

Since the President took office, DHS has delivered the most secure border in history. More can and must be done, however. As the statistics cited above demonstrate, the Tucson Sector is an area of high illegal entry where illegal aliens regularly attempt to enter the United States and smuggle illicit drugs, and given my mandate to achieve and maintain operational control of the border, I must use my authority under section 102 of IIRIRA to install additional barriers and roads in the Tucson Sector. Therefore, DHS will take immediate action to construct additional barriers and roads in a segment of the border in the Tucson Sector. The segment where such construction will occur is referred to herein as the "project area," which is more specifically described in Section 2 below.

***Section 2***

I determine that the following area in the vicinity of the United States border, located in the State of Arizona within the United States Border Patrol Tucson Sector, is an area of high illegal entry (the "project area"): Starting at Border Monument 163 and extending east to Border Monument 140.

There is presently an acute and immediate need to construct additional physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries into the United

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 99 of 100

States in the project area pursuant to section 102(a) and 102(b) of IIRIRA. In order to ensure the expeditious construction of additional physical barriers and roads in the project area, I have determined that it is necessary that I exercise the authority that is vested in me by section 102(c) of IIRIRA.

Accordingly, pursuant to section 102(c) of IIRIRA, I hereby waive in their entirety, with respect to the construction of physical barriers and roads (including, but not limited to, accessing the project areas, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, ***45824** cameras, and sensors) in the project area, all of the following statutes, including all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the following statutes, as amended: The National Environmental Policy Act (Pub. L. 91-190, 83 Stat. 852 (Jan. 1, 1970) (42 U.S.C. 4321 et seq.)); the Endangered Species Act (Pub. L. 93-205, 87 Stat. 884 (Dec. 28, 1973) (16 U.S.C. 1531 et seq.)); the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. 1251 et seq.)); the National Historic Preservation Act (Pub. L. 89-665, 80 Stat. 915 (Oct. 15, 1966), as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 470 et seq., now codified at 54 U.S.C. 100101 note and 54 U.S.C. 300101 et seq.)); the Migratory Bird Treaty Act (16 U.S.C. 703 et seq.); the Migratory Bird Conservation Act (16 U.S.C. 715 et seq.); the Clean Air Act (42 U.S.C. 7401 et seq.); the Archeological Resources Protection Act (Pub. L. 96-95 (16 U.S.C. 470aa et seq.)); the Paleontological Resources Preservation Act (16 U.S.C. 470aaa et seq.); the Federal Cave Resources Protection Act of 1988 (16 U.S.C. 4301 et seq.); the National Trails System Act (16 U.S.C. 1241 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.); the Noise Control Act (42 U.S.C. 4901 et seq.); the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.); the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. 9601 et seq.); the Archaeological and Historic Preservation Act (Pub. L. 86-523, as amended, repealed, or replaced by Pub. L. 113-287 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 469 et seq., now codified at 54 U.S.C. 312502 et seq.)); the Antiquities Act (formerly codified at 16 U.S.C. 431 et seq. and 16 U.S.C. 431a et seq., now codified 54 U.S.C. 320301 et seq.); the Historic Sites, Buildings, and Antiquities Act (formerly codified at 16 U.S.C. 461 et seq., now codified at 54 U.S.C. 320301-320303 & 320101-320106); the Eagle Protection Act (16 U.S.C. 668 et seq.); the Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.); the Administrative Procedure Act (5 U.S.C. 551 et seq.); Section 438 of the Energy Independence and Security Act (42 U.S.C. 17094); the National Fish and Wildlife Act of 1956 (Pub. L. 84-1024 (16 U.S.C. 742a, et seq.)); the Fish and Wildlife Coordination Act (Pub. L. 73-121 (16 U.S.C. 661 et seq.)); the Wild and Scenic Rivers Act (Pub. L. 90-542 (16 U.S.C. 1281 et seq.)); the Farmland Protection Policy Act (7 U.S.C. 4201 et seq.); the Federal Land Policy and Management Act (Pub L. 94-579 (43 U.S.C. 1701 et seq.)); the Wilderness Act (Pub. L. 88-577 (16 U.S.C. 1131 et seq.)); the National Wildlife Refuge System Administration Act (Pub. L. 89-669 (16

USCA Case #26-5306 Document #2198153 Filed: 10/14/2026 Page 100 of 100

U.S.C. 668dd-668ee)); the National Wildlife Refuge System Improvement Act of 1997 (Pub. L. 105-57); the Wild Horse and Burro Act (16 U.S.C. 1331 et seq.); the National Park Service Organic Act and the National Park Service General Authorities Act (Pub. L. 64-235, 39 Stat. 535 (Aug. 25, 1916) and Pub. L. 91-383, 84 Stat. 825 (Aug. 18, 1970) as amended, repealed, or replaced by Pub. L. 113-287, 128 Stat. 3094 (Dec. 19, 2014) (formerly codified at 16 U.S.C. 1, 2-4 and 16 U.S.C. 1a-1 et seq., now codified at 54 U.S.C. 100101-100102, 54 U.S.C. 100301-100303, 54 U.S.C. 100501-100507, 54 U.S.C. 100701-100707, 54 U.S.C. 100721-100725, 54 U.S.C. 100751-100755, 54 U.S.C. 100901-100906, 54 U.S.C. 102101-102102)); Sections 401(7), 403, and 404 of the National Parks and Recreation Act of 1978 (Pub. L. 95-625, 92 Stat. 3467 (Nov. 10, 1978)); 50 Stat. 1827 (April 13, 1937); Sections 301(a)-(f) of the Arizona Desert Wilderness Act (Pub. L. 101-628); The National Forest Management Act of 1976 (16 U.S.C. 1600 et seq.); and The Multiple Use and Sustained Yield Act of 1960 (16 U.S.C. 528-531).

This waiver does not revoke or supersede any other waiver determination made pursuant to section 102(c) of IIRIRA. Such waivers shall remain in full force and effect in accordance with their terms. I reserve the authority to execute further waivers from time to time as I may determine to be necessary under section 102 of IIRIRA.

Markwayne Mullin,

Secretary of Homeland Security.

[FR Doc. 2026-14604 Filed 7-20-26; 8:45 am]

BILLING CODE 9111-14-P

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.