**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 26-5306

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

TOHONO O'ODHAM NATION,
*Plaintiff-Appellant*,

v.

MARKWAYNE MULLIN, et al.,
*Defendants-Appellees*.

---

Appeal from the U.S. District Court for the District of Columbia
No. 1:26-cv-2127 (Hon. Richard J. Leon)

---

# OPPOSITION TO APPELLANT'S EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
AMBER BLAHA
CHRISTOPHER P. ANDERSON
KYLE GLYNN
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 2

STANDARD OF REVIEW .......... 5

ARGUMENT .......... 5

I. The Tribe has not established a likelihood of success on the merits. .......... 6

A. The Tribe is unlikely to succeed on its trespass claim. .......... 6

1. The Tribe does not have a federal common law cause of action for trespass against the United States. .......... 6

2. The Tribe's suit is barred by sovereign immunity. .......... 9

B. The Tribe is unlikely to succeed on the merits of its trespass claim. .......... 11

1. The Tribe's trespass claim fails because Defendants have no current plans to build outside the Roosevelt Reservation. .......... 12

2. The Tribe's claim that barrier construction will occupy land outside the Roosevelt Reservation is premature. .......... 15

II. The equitable factors do not support an injunction. .......... 16

A. Plaintiff has not shown irreparable harm is likely. .......... 17

B. The balance of equities and public interest decisively favor the government. .......... 20

CONCLUSION .......... 22

CERTIFICATE OF COMPLIANCE .......... 24

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Navajo Nation*,
599 U.S. 555 (2023)....7

*Ark. Dairy Coop. Ass'n v. Dep't of Agric.*,
573 F.3d 815 (D.C. Cir. 2009)....16

*Barker v. Harvey*,
181 U.S. 481 (1901)....13, 14, 15

*Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*,
461 U.S. 273 (1983)....9

*Buttz v. N. Pac. R.R,*
119 U.S. 55 (1886)....13

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)....17, 19

*Clevinger v. Advoc. Holding*s,
134 F.4th 1230 (D.C. Cir. 2025)....5

*Del. & Hudson Ry. Co. v. United Transp. Union*,
450 F.2d 603 (D.C. Cir. 1971)....20

*Dugan v. Rank*,
372 U.S. 609 (1963)....10

*Edwardsen v. Morton*,
369 F. Supp. 1359 (D.D.C. 1973)....8

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025)....16

*FDIC v. Meyer*,
510 U.S. 471 (1994)....6

*Hernandez v. Mesa*,
589 U.S. 93 (2020)....9

*Int'l Bhd. of Elec. Workers v. Wash. Terminal Co.*,
473 F.2d 1156 (D.C. Cir. 1972)....20

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
849 F.3d 1129 (D.C. Cir. 2017)....................................................................5

*Landon v. Plasencia*,
459 U.S. 21 (1982)....................................................................................20

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949)...........................................................8, 9, 10, 11

*Leopold v. Manger*,
102 F.4th 491 (D.C. Cir. 2024)...................................................................11

*Lewis v. Clarke*,
581 U.S. 155 (2017)......................................................................................9

*Mashpee Wampanoag Tribe v. Bernhardt*,
No. 18-2242, 2020 WL 3034854 (D.D.C. June 5, 2020) .............................18

*Munaf v. Geren*,
553 U.S. 674 (2008)......................................................................................5

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*,
609 U.S. ___ , 2026 WL 2564318 (Aug. 31, 2026) .....................................20

*Nat'l Treasury Emps. Union v. Trump*,
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025).........................22

*Nat'l Treasury Emps. Union v. Von Raab*,
489 U.S. 656 (1989)............................................................................... 20-21

*Oliphant v. Suquamish Indian Tribe*,
435 U.S. 191 (1978)....................................................................................18

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011)......................................................................5

*Tee-Hit-Ton Indians v. United States*,
348 U.S. 272 (1955)............................................................................... 13-14

*Texas v. Dep't of Homeland Security*,
123 F.4th 186 (5th Cir. 2024)...............................................................8, 19

*United States v. Jicarilla Apache Nation*,
564 U.S. 162 (2011)......................................................................................7

*United States v. Lee*,
106 U.S. 196 (1882)....................8

*United States v. Santa Fe Pac. Rail Co.*,
314 U.S. 339 (1941)....................14

*Ute Indian Tribe of the Uintah and Ouray Resrv. v. Utah*,
790 F.3d 1000 (10th Cir. 2015)....................18

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008)....................5, 8

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)....................16, 17

**Statutes**

Act of July 22, 1854, 10 Stat. 308....................12

Act of May 20, 1862, 12 Stat. 392....................12

Act of July 26, 1866, 14 Stat. 251....................12

Act of July 27, 1866, 14 Stat. 292....................14

Pub. L. No. 75-217, 50 Stat. 536 (1937)....................4

Pub. L. No. 104-208, div. C, § 102, 110 Stat. 3009 (1996)
(codified at 8 U.S.C. § 1103 note)....................2, 10, 18

Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat. 2638 (codified as 8 U.S.C. § 1701 note)....................2

Pub. L. No. 119-21, 139 Stat. 72, 357 (2025)....................3

**Other Authorities**

Proc. No. 758, 35 Stat. 2136 (May 27, 1907)....................3, 13

Exec. Order 2524, *Reserving Certain Lands in the State of Arizona for the Papago Indians in Arizona* (Feb. 1, 1917)....................3

91 Fed. Reg. 45824 (July 21, 2026)....................22

## INTRODUCTION

This case concerns a congressionally funded project to build a new border-barrier system (replacing an existing vehicle barrier) along the international border adjacent to Plaintiff Tohono O'odham Nation's tribal reservation in Arizona. Plaintiff sued to challenge the project, asserting that the Secretary of Homeland Security (Secretary) lacks authority to protect this stretch of international border without Plaintiff's consent. On that novel theory, it sought a preliminary injunction blocking the Secretary from carrying out Congress's directive to secure the border. The district court denied the Tribe's preliminary-injunction motion on August 14, 2026, and the Tribe appealed. The Tribe sought an injunction pending appeal from the district court, which the district court denied on October 8, 2026. The Tribe now seeks emergency relief from this Court.

This Court should deny emergency relief. The Tribe is unlikely to succeed on the merits because it cannot state a federal common law trespass claim against federal officials. And even if it could, defendants are not in trespass because the government has reserved the authority to use lands at the international border for border-security purposes. Nor has the Tribe shown likely irreparable harm and, even if it did, the balance of equities and public interest decisively disfavor shutting down a project that is necessary to secure the southwestern border and protect the American people from transnational criminal enterprises.

This Court has entered an expedited briefing schedule on the Tribe's appeal at the Tribe's request, and oral argument is expected to be scheduled for December. There is no need for interim relief.

**BACKGROUND**

1. Congress has directed the Secretary to "achieve and maintain operational control" over the borders of the United States, including by constructing "physical infrastructure enhancements to prevent unlawful entry by aliens into the United States." Secure Fence Act of 2006, Pub. L. No. 109-367, § 2(a), 120 Stat. 2638 (2006) (codified at 8 U.S.C. § 1701 note). Section 2 of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) authorizes the Secretary of Homeland Security to undertake expedited construction of "additional physical barriers and roads" near border areas "of high illegal entry." Pub. L. No. 104-208, div. C, § 102, 110 Stat. 3009, 3554-55 (1996) (codified at 8 U.S.C. § 1103 note). In 2025, Congress appropriated $46.5 billion for the "the border infrastructure and wall system." Pub. L. 119-21, Title IX, Sec. 90001, 139 Stat. 72, 357-78 (2025).

2. This case concerns the Tucson 5 project, which will secure an approximately 62-mile stretch of the U.S.-Mexico border that adjoins the Tohono O'odham Reservation. JA0626. This stretch of the border has historically experienced significant illegal entry and drug-smuggling activities. JA0618-19; JA0627. In June 2026,

the Department of Homeland Security (DHS) awarded a contract to design and construct this project; that work includes a physical barrier, roads, and attributes like cameras, lights, sensors, and other detection technology. JA0626. Design work is ongoing. *Id.* Without this project, this 62-mile stretch would be one of the few areas along the Arizona border that lacks barriers to deter illegal crossings of pedestrians. JA0619.

3. DHS has instructed its contractor to confine the project's footprint to the Roosevelt Reservation, a strip of land that stretches 60 feet out from the border. JA0627. That reservation was established in 1907, when President Roosevelt issued a proclamation setting aside a 60-foot strip of land along the U.S.-Mexico border "from the operation of the public land laws" to be "kept free from obstruction as a protection against the smuggling of goods." Proc. No. 758, 35 Stat. 2136 (May 27, 1907).

4. The Tohono O'odham Reservation was subsequently established by executive order in 1917 and expanded in 1937. Exec. Order 2524, *Reserving Certain Lands in the State of Arizona for the Papago Indians in Arizona* (Feb. 1, 1917); Pub. L. No. 75-217, 50 Stat. 536, 536 (1937).

5. In June 2026, the Tribe sued DHS officials, seeking to enjoin the Tucson 5 project from proceeding without tribal consent. The district court denied the Tribe's request for a preliminary injunction. JA0944. The court concluded that the

Tribe "is unlikely to succeed on the merits of [its] claims" and that "all" remaining preliminary injunction factors weighed against the injunction. JA0944; JA0959. First, as to the Tribe's ultra vires claim, the district court concluded that the Tucson 5 project is unlikely to diminish the Tribal Reservation's boundaries, and that "the Roosevelt Reservation likely exists." JA0954. The court next concluded that the Tribe's trespass claim is barred by sovereign immunity, and that the Tribe did not show a likelihood that it may bring a trespass claim against the UnitedStates under federal common law. JA0957-59.

On the remaining factors, the Tribe did not establish that irreparable harm is likely. The district court found the Tribe's alleged harms speculative because project design plans had not been finalized and can be tailored to mitigate impacts to tribal interests. JA0960. "[I]n any event," the " Government's interests in securing the border, enforcing immigration laws, and ensuring public safety outweigh any surviving irreparable harms" to Plaintiff "at this juncture." JA0960.

6. On October 8, 2026, the district court denied the Tribe's motion for an injunction pending appeal. Dkt. No. 63 (attached). The court held that "plaintiff has not identified any reason for reconsidering my conclusion that all four factors favor the Government." *Id.* at 3. On the likelihood of success on the merits, the court "do[es] not find that plaintiff has established 'serious legal question[s]' warranting an injunction pending appeal." *Id.* at 4 (citation omitted).

## STANDARD OF REVIEW

Like preliminary injunctive relief, an injunction pending appeal is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008), granted only "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008); *see also John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (calling an injunction pending appeal an "exceptional remedy"). To obtain this relief, a plaintiff must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. Since *Winter*, this Court has questioned whether its pre-*Winter* "sliding scale approach remains good law," *see Clevinger v. Advoc. Holding*s, 134 F.4th 1230, 1235, 1236 n.2 (D.C. Cir. 2025). The Court has suggested that "the likelihood of success is an independent, free-standing requirement for a preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011), although it has not decided this question, *id.* at 1235-36.

## ARGUMENT

Plaintiff has not established that it is entitled to the extraordinary relief of an injunction pending appeal. The Tribe cites no case that has accepted its federal common law trespass claim against the government. The trespass claim is not likely to

succeed, nor has the Tribe established that any of the other injunction factors favor the "exceptional remedy" of emergency relief. This Court should deny the motion.

## I. The Tribe has not established a likelihood of success on the merits.

In its motion for an emergency injunction, the Tribe has abandoned its lead claim alleging that the Tucson 5 project is an ultra vires diminishment of the Tribal Reservation, which the district court determined lacked merit. JA0949-57. The Tribe's common law trespass claim fares no better. As the district court correctly determined, the Tribe has not established that it may bring a common law trespass claim against the United States, and the federal government's sovereign immunity bars that claim in any event. JA0957-59. These are not "procedural grounds" for dismissal, as the Tribe asserts (Mot. 2); they are substantive bars to the suit. *See, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). And even if the Tribe had a trespass cause of action, it would fail on the merits.

### A. The Tribe is unlikely to succeed on its trespass claim.

#### 1. The Tribe does not have a federal common law cause of action for trespass against the United States.

To the government's knowledge, no court has ever recognized a federal common law cause of action for trespass against the United States with respect to tribal

trust property. The Tribe's unsupported assertion that tribes "have long sued trespassers (including federal officials) under the common law," Mot. 8, is false. The Tribe cites only precedents involving nonfederal trespassers, but those cases are inapplicable to actions against the United States, which stands in a unique relationship to Indian tribes.

"[T]he Indian trust relationship . . . is a sovereign function subject to the plenary authority of Congress," *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 175 (2011). Accordingly, the government's obligations to tribes with respect to land held in trust are "defined and governed by statute, rather than the common law." *Id*. at 174. A corollary of that principle is that, absent an indication in a "specific, applicable trust-creating statute or regulation" that common law remedies apply, a tribe's remedies against the United States with respect to trust property are defined exclusively by statute and may not be supplemented by federal common law. *See Arizona v. Navajo Nation*, 599 U.S. 555, 564 (2023) ("The Federal Government owes *judicially enforceable duties* to a tribe 'only to the extent it expressly accepts those responsibilities.'" (quoting *Jicarilla*, 564 U.S. at 177) (emphasis added).

The Tribe has identified no statutory basis for recognizing a trespass cause of action against the United States, and there is none. Instead, the Tribe relies on various cases holding that tribes may bring common law claims for trespass against third parties *other* than the federal government. Mot. 9-10. But those cases are inapposite

because they do not implicate the unique relationship between tribes and the federal government.

Nor is the Tribe correct that common law trespass actions are generally available against federal officers. The Tribe cites *United States v. Lee*, 106 U.S. 196 (1882), but as the Supreme Court later explained, the Court permitted that case to proceed only because the plaintiff would otherwise have had no remedy for an alleged taking without just compensation. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 695-96 (1949). The Tribe also cites *Texas v. Department of Homeland Security*, 123 F.4th 186 (5th Cir. 2024), but that case held only that the APA waived sovereign immunity from a suit by a state in the unusual circumstances of that case, *id*. at 199-200; it did not hold that trespass suits are generally available against the United States.

The Tribe principally relies on a 53-year-old district court case, *Edwardsen v. Morton*, 369 F. Supp. 1359 (D.D.C. 1973), but although that court speculated about the availability of a trespass claim against federal officials, the court concluded that "resort to that principle of tort law actually is unnecessary in view of the fiduciary duty of the federal government." *Id.* at 1371. *Edwardsen* thus did not hold that a tort suit was available, and in any event, is a nonbinding district court decision that does not "clear[ly]" establish that the Tribe is entitled to relief. *Winter*, 555 U.S. at 22.

Allowing the Tribe's trespass claim to proceed would therefore require the Court to recognize a novel federal common law cause of action against the United States. But the circumstances in which federal courts may create common law causes are narrow, *see Hernandez v. Mesa*, 589 U.S. 93, 100-101 (2020), and the Tribe has not shown they are met here.

**2. The Tribe's suit is barred by sovereign immunity.**

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). That immunity covers not only suits against government entities but also "lawsuits brought against employees in their official capacity," which are simply "another way of pleading an action against an entity of which an officer is an agent." *Lewis v. Clarke*, 581 U.S. 155, 162 (2017) (quotation omitted).

The Tribe has identified no statutory waiver of sovereign immunity. Instead, the Tribe relies solely on the *Larson-Dugan* exception to sovereign immunity, which recognizes two categories of "suits for specific relief against officers of the sovereign which are not suits against the sovereign." *Larson*, 337 U.S. at 689. The first is when "the officer's powers are limited by statute" and the officer takes "actions beyond those limitations." *Id*. The second is when "the statute or order conferring power

upon the officer to take action in the sovereign's name is claimed to be unconstitutional." *Id*. at 690. In both circumstances, the unauthorized actions are considered "beyond the officer's powers" and therefore "not the conduct of the sovereign," such that they "may be made the object of specific relief" without implicating sovereign immunity. *Id*. at 689-90; *see also Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).

These "two types" of suits are "the only ones in which a restraint may be obtained against the conduct of Government officials." *Larson*, 337 U.S. at 690. The Court expressly rejected the argument that "there exists a third category of cases in which the action of a Government official may be restrained or directed," based on claims that the official's conduct is " 'illegal' as a matter of general law," such as the common law of torts. *Id*. at 692.

The Tribe does not assert that the Tucson 5 project is unconstitutional, and Congress indisputably authorized the Secretary to construct barriers at the border. *See* IIRIRA § 102(b)(1) (8 U.S.C. § 1103 note). The Secretary's actions are therefore "the conduct of the sovereign," *Larson*, 337 U.S. at 689-90, and the *Larson-Dugan* exception is inapplicable.

The Tribe argues that its suit may proceed nonetheless because it alleges that the Secretary cannot build the planned wall without trespassing on tribal land. Mot. 11-12. *Larson* squarely forecloses that argument. There, the plaintiff did not dispute that the defendant officer had statutory authority to act, but alleged that the officer's

actions were tortious and thus outside his statutory authority. 337 U.S. at 692. The Court rejected that argument: "if the actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, whether or not they are tortious under general law." *Id*. at 695. The same reasoning applies here. Even if the Tribe were correct about the trespass (it is not, below pp. 11-15), the Tribe would still be seeking to enjoin an act of the sovereign, and its suit is barred by sovereign immunity. *Id*. at 695.

Nor is the Tribe helped by this Court's decision in *Leopold v. Manger*, 102 F.4th 491 (D.C. Cir. 2024). The duty at issue in *Leopold* was a mandatory, affirmative duty, not merely a source of potential liability. And the Court recognized that when an officer's action is authorized by statute, the officer's act becomes "the action[] of the sovereign" and cannot be enjoined "whether or not they are tortious under general law." *Id.* at 496.

The *Larson-Dugan* exception is inapplicable, and the Tribe has identified no statutory waiver of sovereign immunity. It is therefore unlikely to succeed on its trespass claim.

### B. The Tribe is unlikely to succeed on the merits of its trespass claim.

Even if the Tribe had a cause of action for trespass and could establish a waiver of sovereign immunity, it would be unlikely to succeed on its claim. DHS's contractor has been instructed to confine the project footprint within the Roosevelt

Reservation, JA0627, and if any deviations are necessary, to keep the project footprint as close to the border as possible. JA0629. If it turns out to be necessary to access areas beyond the Roosevelt Reservation to facilitate barrier construction—an issue not before this Court—DHS has various avenues to obtain lawful access rights. The Tribe therefore cannot establish that the Tucson 5 project will "necessarily" result in a trespass (Mot. 12), and the Tribe is unlikely to succeed on its claim for this additional reason.

**1. The Tribe's trespass claim fails because Defendants have no current plans to build outside the Roosevelt Reservation.**

United States has consistently held and used the Roosevelt Reservation—including Roosevelt Reservation lands within the Tohono Reservation—to maintain border security. The Tribe argues, however, that the Roosevelt Reservation never attached to the segment of the border at issue because those lands were not "public lands" in 1907. (Mot. 13-15). That argument ignores history and precedent.

Congress opened the lands acquired in the Gadsden Purchase to settlement in the Act of July 22, 1854, 10 Stat. 308, and made them available for homesteading in the Act of May 20, 1862, 12 Stat. 392. Congress further opened lands "of the public domain" (including these lands) to mineral entry in 1866. Act of July 26, 1866, 14 Stat. 251. Following these Acts, non-Indian settlers established ranches and staked mining claims throughout Arizona, including in the area historically occupied by the

Tribe. *See* 19 Indian Cl. Comm. 341, 414-15, JA418-19. Thus, from 1854 onward, the lands that would later become the Tohono Reservation were "public lands" as that term is used in the public land laws. *See Barker v. Harvey*, 181 U.S. 481, 490 (1901) ("The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws."); *see also* JA0425 (Indian Claims Commission finding that President Wilson created the Tohono Reservation by withdrawing "some 2,225,000 acres from the public lands"). Thus, when President Roosevelt in 1907 reserved "all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico," 35 Stat. 2138, that reservation included the strip of land along the international border within what is now the Tohono Reservation.

The Tribe insists that those lands were not "public lands" because the O'odham held aboriginal title to those lands in 1907. That argument is a non-sequitur. Even if the Tribe had aboriginal title to the lands within the Tohono Reservation in 1907, federal law allowed Congress to open or reserve lands subject to claims of aboriginal title. *See Buttz v. N. Pac. R.R.*, 119 U.S. 55, 66 (1886); *see also Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955) (aboriginal title is "a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the

Indians."). And the existence of unextinguished aboriginal title is consistent with the designation of lands as "public lands." *See United States v. Santa Fe Pac. Rail Co.*, 314 U.S. 339, 344 (1941).

The Tribe relies principally on *Santa Fe Pac. Rail Co.*, but that case stands more nearly for the opposite proposition. The statute at issue in *Santa Fe* granted to a railroad a "right of way through *the public lands*." Act of July 27, 1866, ch. 278, § 2, 14 Stat. 292, 294 (emphasis added). Recognizing that some lands subject to "Indian title" fell "under the operation of this act," Congress provided that "Indian title" to land conveyed under the statute would be extinguished "consistent with public policy and the welfare of the Indians, and only by their voluntary cession." *Id.* (emphasis added) (quoted in *Santa Fe*, 314 U.S. at 344). While the Supreme Court affirmed that Congress could protect aboriginal tribal lands in this way, 314 U.S. at 344-47, it also affirmed that such lands were "public lands" that Congress could convey to non-Indians or reserve for federal use. *Id*. at 347.

Nor does *Barker v. Harvey*, 181 U.S. 481 (1901), aid the Tribe. There, the Court hypothesized that if the Indians in question had been granted a permanent right of occupancy by the Mexican government, that right would limit the government's power to dispose of the land. *Id*. at 492. But the Court did not hold that lands subject only to a claim of aboriginal title, not confirmed by any government, are excluded from the definition of "public lands." *See id.* at 491-92, 498-99.

The lands now occupied by the Tribe's reservation were "public lands" in 1907, and thus subject to President Roosevelt's proclamation. The subsequent creation of the Tohono Reservation did not alter the effect of the 1907 Proclamation, and the Roosevelt Reservation remains in force at the Tohono Reservation's southern border. Congress confirmed that fact when it expanded the Tohono Reservation in 1937, providing that the "extension" of the reservation "shall not affect . . . the reservation of a strip of land sixty feet wide along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907 (35 Stat. 2136)." 1937 Act, 50 Stat. at 536. Congress thus confirmed that the Roosevelt Reservation attached to the Tribe's aboriginal lands in 1907 and affirmed its view that the Roosevelt Reservation is compatible with the existence of the Tohono Reservation.

### 2. The Tribe's claim that barrier construction will occupy land outside the Roosevelt Reservation is premature.

The Tribe's last argument is that even if the Roosevelt Reservation were available for border-barrier construction, the Secretary will nonetheless inevitably trespass on tribal lands because construction will require activities outside the 60-foot strip. (Mot. 15-17). But the Secretary has instructed the contractor "to confine the project footprint, which includes, among other things, the alignment of the barrier system and temporary staging areas, to the 60-foot federal Roosevelt Reservation." JA0627.

The Tribe counters that it is "fanciful" to think that construction of the proposed barrier can be confined to the Roosevelt Reservation. Mot. 17. But even if the Tribe were proved right, and construction of the barrier were to require access to land outside the Roosevelt Reservation, that would not mean that construction of the barrier would inevitably result in a trespass. The Secretary is entitled to a presumption of regularity in his implementation of statutory authorities. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 577 (2025). The Court should therefore presume that if the Secretary needs to access land outside the Roosevelt Reservation, he will secure lawful access to do so. The Tribe is therefore unlikely to succeed on its claim for injunctive relief based on possible, but undefined, future trespasses. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." (quotation omitted)).

## II. The equitable factors do not support an injunction.

Since the Tribe has failed to establish a likelihood of success on the merits, this Court need not review the other preliminary injunction factors. *See Ark. Dairy Coop. Ass'n v. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). But as the district court correctly determined, all the remaining factors favor defendants. JA0959.

Plaintiff's claimed harms are illusory, speculative, and uncertain, and do not outweigh the federal government's interests "in securing the border, enforcing immigration laws, and ensuring public safety." JA0960-61.

**A. Plaintiff has not shown irreparable harm is likely.**

There is "a high standard" for showing irreparable harm. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To meet that standard, plaintiff must demonstrate injury that is "both certain and great," "actual and not theoretical," "beyond remediation," and "of such *imminence* that there is a 'clear and present' need" for the injunction. *Id.* at 297 (quoting *Wisc. Gas. Co.*, 758 F.2d at 674). The Tribe fails to clear that high bar.

The Tribe points to three alleged harms: (1) an "abrogation" of its sovereignty, (2) lessened "proprietary control over its lands," and (3) threats to environmental interests. Mot. 19-20. But as the district court correctly concluded, these alleged harms are either "not likely to materialize" because they are premised on rights that the Tribe does not possess, or are speculative harms that are not "certain" and "great." JA0960.

First, the Tribe claims that the project impairs its "sovereign authority" to control its reservation. Mot. 19. But the Tribe's authority does not include the ability to control federal activities to secure the international border within the Roosevelt Reservation or to prevent DHS from fulfilling Congress's direction to construct physical

barriers and other infrastructure to gain operational control at the southwest border. *See* IIRIRA § 102(a), (b)(1)(A) (8 U.S.C. § 1103 note). The Tribe's sovereignty is subordinate to the federal reservation, as well as to Congress's plenary authority. *See, e.g., Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 209 (1978) ("Upon incorporation into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty."). Indeed, vehicle barriers have been in place for nearly two decades over approximately 52 miles of the border within the Tohono Reservation, and "CBP has long had a border security presence in and near the Tucson 5 Project area." JA0627. The cases relied on by the Tribe do not involve comparable circumstances. *See Mashpee Wampanoag Tribe v. Bernhardt*, No. 18-2242, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) (removing land from trust status could constitute irreparable injury because of potential tax liability, loss of eligibility for federal programs, jurisdictional effects, and potential harm to third parties); *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000 (10th Cir. 2015) (concerning State criminal prosecution of tribal citizens within the reservation).

The Tribe's second purported harm—loss of "proprietary control"—fails for similar reasons. The Tribe does not possess full proprietary control over the Roose-

velt Reservation. These circumstances are thus markedly different from those at issue in *Texas v. DHS*, 123 F.4th at 211, where there was no dispute that Texas had ownership and control over the property at issue.

Third, the Tribe claims irreparable environmental harm, but overstates what is at issue. As the district court noted, until plans are finalized, specific environmental harms are speculative. JA0960. And in any event, the Tucson 5 project will impact only a narrow strip of land on the edge of the 2.8-million-acre Tohono Reservation, and DHS has stated its intent to limit disruption to the landscape. JA0629-38. Moreover, as the district court observed, any alleged harms are not both "certain" and "great" given that "many—if not all—of plaintiff's alleged environmental [] injuries could be mitigated through consultation with the Nation." JA0960.

The Tribe suggests that the Court must assume the truth of its position about the Roosevelt Reservation, and that the district court erroneously "double-count[ed]" its merits assessment. Mot. 20. That is incorrect. The sole case the Tribe cites for this proposition is *Chaplaincy of Full Gospel Churches*, but the irreparable harm analysis in that case is limited to Establishment Clause allegations. 454 F.3d at 299-303. The Tribe has brought no Establishment Clause claim in this suit. More on point are decisions of this Court that that expressly admonish that "the finding of irreparable injury *cannot* meaningfully be rested on a mere contention of a litigant, but depends on an appraisal of the validity, or at least the probable validity, *of the legal*

*premise underlying the claim* of right in jeopardy of impairment." *Del. & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603, 619-20 (D.C. Cir. 1971) (emphasis added); *see also Int'l Bhd. of Elec. Workers v. Wash. Terminal Co.*, 473 F.2d 1156, 1167 (D.C. Cir. 1972). These precedents endorse the district court's consideration of the merits of the competing claims of authority over the Roosevelt Reservation.

**B. The balance of equities and public interest decisively favor the government.**

Even if Plaintiff could show that it faces some harm, that showing would not favor injunctive relief because harms to the public interest outweigh Plaintiff's interests. *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres.*, 609 U.S. ___ , 2026 WL 2564318, at *3-4 (Aug. 31, 2026) (per curiam). Here, the public interest in securing the international border greatly outweighs the Tribe's interests.

Enforcing our nation's immigration laws is critically important to the national security and public safety of the United States. As the Supreme Court has recognized, the federal government's interests in securing the border, enforcing immigration laws, and preventing the influx of narcotics are "compelling" and "weighty." *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The government's interest in efficient administration of the immigration laws at the border . . . is weighty."); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989) (recognizing that the government has "compelling interests in safety and in the integrity of our borders").

And Congress has repeatedly emphasized that physical border walls are "a key component of border security." JA0961.

History has shown that the volume of illegal immigration and smuggling across the southwest border can be staggering. The United States Border Patrol's Tucson Sector "experiences significant illegal entry and drug smuggling activity." JA0626. "Between fiscal year 2021 and June 1, 2026, USBP apprehended over 1,333,000 illegal aliens attempting to enter the United States between border crossings in the Tucson Sector. In that same time period Border Patrol seized over 17,200 pounds of marijuana, over 750 pounds of cocaine, over 150 pounds of heroin, over 11,750 pounds of methamphetamine, and over 3,475 pounds of fentanyl." JA0626. The Tohono Reservation is already a "funnel point for illegal crossings." JA0619. And there is substantial evidence of transnational criminal organizations and related smuggling activities operating in the Tucson Sector, including within the Tohono Reservation. JA0619-21; *see also* JA0073 (Tribal Chairman's testimony about impacts of smuggling and migrants). If the Tucson 5 project is not constructed, this stretch of border would be one of the few remaining areas without pedestrian border barriers. JA0626, JA0619. Enjoining the project would "increase the likelihood of exploitation by" transnational criminal organizations and illegal crossings. JA0623; 91 Fed. Reg. 45824 (July 21, 2026).

As the district court correctly determined, "the Government's interests in securing the border, enforcing immigration laws, and ensuring public safety outweigh any surviving irreparable harms at this juncture." JA0960. The third and fourth factors weigh strongly against Plaintiff's proposed injunction.

* * *

The Tribe cannot demonstrate that even one of the relevant factors supports its request—let alone all four—and thus has failed to meet its heavy burden to show entitlement to the extraordinary relief it seeks.[1]

## CONCLUSION

For these reasons, the Tribe's motion should be denied.

---

[1] If the Court disagrees, it should require a bond that reflects the costs that would be sustained by the government. *See* Fed. R. App. P. 8(a)(2)(E) ("The court may condition relief on a party's filing a bond or other appropriate security in the district court."); *Nat'l Treasury Employees Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) ("injunction bonds are generally required").

Respectfully submitted,

s/ *Christopher Anderson*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

AMBER BLAHA
CHRISTOPHER P. ANDERSON
KYLE GLYNN
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

October 15, 2026
90-1-4-18215

**CERTIFICATE OF COMPLIANCE**

I hereby certify:

1. This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Rule 32(f), this document contains 5,179 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a0(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

s/ *Christopher Anderson*

Counsel for Federal Defendants

# ADDENUDUM

*Tohono O'odham Nation v. Mullin*,
No. 26-cv-2127 (D.D.C)
Memorandum Order (Oct. 8, 2026) ........................................................... 1a

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TOHONO O'ODHAM NATION, Plaintiff, v. MARKWAYNE MULLIN, *et al.*, Defendants. | ) | Civil Case No. 26-2127 (RJL) |

**MEMORANDUM ORDER**

October 8th, 2026 [Dkt. #50]

On August 14, 2026, I denied plaintiff Tohono O'odham Nation's motion for a preliminary injunction to halt border wall construction. *See* Mem. Op. [Dkt. #45]. Plaintiff's appeal of my ruling is now pending before our Circuit Court. *See* Notice of Appeal [Dkt. #48]. In the meantime, plaintiff has moved for an injunction pending appeal under Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1)(C). Mot. of the Tohono O'odham Nation for Inj. Pending Appeal ("Mot.") [Dkt. #50]. For the following reasons, plaintiff's motion for an injunction pending appeal is **DENIED**.

**BACKGROUND**

My opinion denying plaintiff's motion for a preliminary injunction recounts the factual and procedural background of this case. *See* Mem. Op. at 2–5. Most relevant here,

the Government has represented that construction activities on the border wall alongside plaintiff's Reservation will start, at the earliest, on October 12, 2026. *Id.* at 5. Our Circuit granted plaintiff's motion for expedited briefing on appeal; briefing will conclude on October 21, 2026, and oral argument will take place in December 2026. *See* Order, *Tohono O'odham Nation v. Mullin*, No. 26-5306 (D.C. Cir. filed Sept. 9, 2026), Doc. #2192131. Plaintiff has moved this Court for an injunction halting border wall construction until the resolution of the appeal. *See* Mot. The Government opposes. *See* Defs.' Resp. in Opp'n to Pl.'s Mot. for Inj. Pending Appeal [Dkt. #53]. On September 17, 2026, plaintiff filed its reply. *See* Reply Mem. of the Tohono O'odham Nation in Supp. of its Mot. for Inj. Pending Appeal [Dkt. #59]. The motion is now ripe. On October 5, 2026, plaintiff moved for an injunction pending appeal—the same relief it seeks here—before our Circuit Court pursuant to D.C. Circuit Rule 27(e). *See* Notice of Related Filing [Dkt. #61]; *see also* Suppl. Notice [Dkt. #62].

**LEGAL STANDARD**

To obtain an injunction pending appeal under Federal Rule of Civil Procedure 62(d), the Court applies the "same four-factor test applicable to all injunction motions." *MediNatura, Inc. v. Food & Drug Admin.*, 2021 WL 1025835, at *4 (D.D.C. Mar. 16, 2021). The moving party "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Several of my colleagues have applied a "more flexible" version of the four-factor

test to a motion for an injunction pending appeal because "the express language of Rule 62(d) contemplates the possibility that the district court may grant an injunction pending appeal from an interlocutory order denying preliminary injunction." *MediNatura, Inc.*, 2021 WL 1025835, at *6 (alterations incorporated) (quoting *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 2016 WL 9184999, at *2 (N.D. Cal. June 7, 2016)); *see also Heritage Found. v. Dep't of Just.*, 2026 WL 1770708, at *1 (D.D.C. June 19, 2026). "[I]n rare cases, the threat of irreparable harm may be so grave and the balance of equities may favor the movant so decisively that an injunction pending appeal may be proper, even without a likelihood of success on the merits, so long as the movant at least establishes a serious legal question on the merits and shows that the other three factors tip sharply in its favor." *Perlmutter v. Blanche*, 2025 WL 2409755, at *1 (D.D.C. Aug. 20, 2025) (cleaned up).

## ANALYSIS

If the analysis for an injunction pending appeal is identical to the preliminary injunction analysis under Federal Rule of Civil Procedure 65, plaintiff has not identified any reason for reconsidering my conclusion that all four factors favor the Government. *See generally* Mem. Op.

Even assuming that a more "flexible" standard applies, plaintiff has failed to carry its burden of showing an entitlement to the "extraordinary remedy" of an "affirmative injunction against a defendant." *MediNatura, Inc.*, 2021 WL 1025835, at *6. On the likelihood of success on the merits, while the legal issues identified by the plaintiff are indeed "novel," Tr. of Mot. Hr'g [Dkt. #43] at 32:19, I do not find that plaintiff has

established "serious legal question[s]" warranting an injunction pending appeal, *Perlmutter*, 2025 WL 2409755, at *1. Succeeding on plaintiff's trespass claim necessarily would require the Court to expand the *Larson-Dugan* exception to common law tort claims outside of the context of the common law right of public access. *See* Mem. Op. at 15. And plaintiff's *ultra vires* claim would require the Court to find that construction of a border wall has the legal effect of diminishing the boundaries of plaintiff's Reservation—something no court has yet held. *See id.* at 13. Lack of likelihood of success on the merits warrants denying plaintiff's motion. *See Appalachian Voices v. U.S. Env't Prot. Agency*, 2025 WL 2732746, at *2 (D.D.C. Sept. 25, 2025) (denying motion for injunction pending appeal where plaintiff failed to show a likelihood of success on the merits); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) ("[T]he Court may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show either irreparable injury or a likelihood of success on the merits.").

The remaining *Winter* factors do not favor plaintiff "so decisively" that an injunction pending appeal is proper. *Perlmutter*, 2025 WL 2409755, at *1. The Government has identified serious national security and public safety concerns at the international border. *See* Mem. Op. at 2, 17–18. An injunction pending appeal is "an intrusion into the ordinary process of administration and judicial review and accordingly is not a matter of right, even if irreparable injury might otherwise result to the [movant]." *Memphis Publ'g Co. v. Fed. Bureau of Investigation*, 195 F. Supp. 3d 1, 3 (D.D.C. 2012) (ellipses omitted) (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009)). While plaintiff has identified weighty interests

at stake in this case, I see no compelling reason to revisit my conclusion that the balance of equities and public interest favor the Government at this juncture. *See* Mem. Op. at 16–18.

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that plaintiff's Motion for an Injunction Pending Appeal [Dkt. #50] is **DENIED**.

**SO ORDERED.**

RJLeon

RICHARD J. LEON
United States District Judge