**ORAL ARGUMENT SCHEDULED FOR DEC. 1, 2026**

**No. 26-5306**

---

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

TOHONO O'ODHAM NATION,

*Plaintiff-Appellant*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 4:26-cv-2127-RJL (Hon. Richard J. Leon)

---

# REPLY BRIEF OF APPELLANT

---


Elizabeth B. Prelogar
Joshua Revesz
COOLEY LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com

*Counsel for Appellant Tohono O'odham Nation*


(additional counsel listed on next page)

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634

Philip H. Tinker
KANJI & KATZEN, P.L.LC.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY .............................................................................................. vii

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT ..............................................................................................2

I. The Nation Is Likely to Succeed on Its Trespass Claim. ................................2

A. The Nation May Sue Federal Officials to Prevent Unauthorized Intrusions on Its Reservation. ..............................................................2

1. The Nation Has a Cause of Action Under Federal Common Law. ......................................................................................2

2. The Secretary Is Not Entitled to Sovereign Immunity. ..............7

B. The Secretary's Construction Activities Would Necessarily Trespass on Tribal Lands. ......................................................................9

1. The Secretary Cannot Confine Construction Activities to Within Sixty Feet of the Border. ..............................................10

2. The Roosevelt Reservation Never Attached to the Nation's Reservation. .........................................................................12

II. The Nation Is Likely to Succeed on Its Ultra Vires Claim. ..........................18

A. Review Is Not Precluded by Statute. ...............................................19

B. The Secretary Will Be Acting in Excess of His Delegated Powers and Contrary to a Specific Statutory Prohibition. ..............................20

1. IIRIRA Does Not Authorize the Secretary to Construct a Wall on the Nation's Lands. ...................................................20

2. The Secretary's Wall Will Diminish the Nation's Reservation in Violation of Section 398d. ................................21

III. Equitable Factors Strongly Favor a Preliminary Injunction..........................24

A. The Nation Will Suffer Irreparable Injury Absent an Injunction. ......24

B. The Equities Weigh Heavily in Favor of an Injunction. .....................26

CONCLUSION ..........................................................................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

**Arizona v. Navajo Nation*,
599 U.S. 555 (2023) ........ 5

*Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co.*,
184 F.4th 874 (7th Cir. 2026) ........ 4

**Bardon v. Northern Pacific Railroad Co.*,
145 U.S. 535 (1892) ........ 13, 15

**Barker v. Harvey*,
181 U.S. 481 (1901) ........ 15

*Beecher v. Wetherby*,
95 U.S. 517 (1877) ........ 16

*Buttz v. Northern Pacific Railroad*,
119 U.S. 55 (1886) ........ 15

**Cramer v. United States*,
261 U.S. 219 (1923) ........ 14, 15

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ........ 10

**Edwardsen v. Morton*,
369 F.Supp. 1359 (D.D.C. 1973) ........ 4

*El Paso Natural Gas Co. v. United States*,
750 F.3d 863 (D.C. Cir. 2014) ........ 6

*Garcia v. Texas*,
564 U.S. 940 (2011) ........ 12

**In re Border Infrastructure Environmental Litigation*,
915 F.3d 1213 (9th Cir. 2019) ........ 20

**Lane v. Pueblo of Santa Rosa*,
249 U.S. 110 (1919) ........ 3, 5

*Lane v. Watts*,
234 U.S. 525 (1914) .......... 3

**Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) .......... 3, 7, 8, 9

**Leavenworth, Lawrence, & Galveston Railroad Co. v. United States*,
92 U.S. 733 (1875) .......... 13

**Leopold v. Manger*,
102 F.4th 491 (D.C. Cir. 2024) .......... 7, 8

*Lower Brule Sioux Tribe of South Dakota v. United States*,
712 F.2d 349 (8th Cir. 1983) .......... 9

**McGirt v. Oklahoma*,
591 U.S. 894 (2020) .......... 22, 23

**Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) .......... 22

**Minnesota v. Hitchcock*,
185 U.S. 373 (1902) .......... 14

**Nebraska v. Parker*,
577 U.S. 481 (2016) .......... 22, 23

*Noble v. Union River Logging Railroad Co.*,
147 U.S. 165 (1893) .......... 3

**North American Butterfly Association v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) .......... 19, 20

*Northern Lumber Co. v. O'Brien*,
204 U.S. 190 (1907) .......... 13

**Oneida County v. Oneida Indian Nation of New York State*,
470 U.S. 226 (1985) .......... 4

*Schilling v. U.S. House of Representatives*,
102 F.4th 503 (D.C. Cir. 2024) .......... 7

*Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States*,
299 U.S. 476 (1937) ........ 22

**Spalding v. Chandler*,
160 U.S. 394 (1896) ........ 13, 15, 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
985 F.3d 1032 (D.C. Cir. 2021) ........ 22

*Tee-Hit-Ton Indians v. United States*,
348 U.S. 272 (1955) ........ 16

**Texas v. Department of Homeland Security*,
123 F.4th 186 (5th Cir. 2024) ........ 3

*Trump v. Cook*,
609 U.S. 528 (2026) ........ 4

*United States v. Dann*,
873 F.2d 1189 (9th Cir. 1989) ........ 7

**United States v. Dion*,
476 U.S. 734 (1986) ........ 20

**United States v. Jicarilla Apache Nation*,
564 U.S. 162 (2011) ........ 5, 6

**United States v. Lee*,
106 U.S. 196 (1882) ........ 3

*United States v. Mitchell*,
445 U.S. 535 (1980) ........ 5, 6

**United States v. Santa Fe Pacific Railroad Co.*,
314 U.S. 339 (1941) ........ 14, 15, 16

**Statutes and Other Legislative Materials**

5 U.S.C. § 551(13) ........ 7

5 U.S.C. § 704 ........ 7

25 U.S.C. § 398d ........ 1, 18, 19, 21, 24

Act of July 22, 1854, 10 Stat. 308 ........ 15

S. Doc. No. 70-53 (1929) ........ 18

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border) ........ 9, 19, 20, 21

**Other Authorities**

2 Joseph Story, Commentaries on Equity Jurisprudence § 928 (1836) ........ 2

3 William Blackstone, Commentaries (1768) ........ 2

Department of Interior, M-36368, Status of Land Lying Within a Defined Sixty-Foot Boundary Line Between the U.S. and Canada (Sept. 12, 1956) ........ 14

Department of Justice, Justice Manual §5-14.120 ........ 3

Press Release, U.S. Customs and Border Protection, Under President Trump and Secretary Mullin, DHS Announces Lowest Fiscal Year Border Crossings in American History (Oct. 16, 2026) ........ 26

Proclamation of May 3, 1912, 37 Stat. 1741 ........ 14

Proclamation of May 27, 1907, 35 Stat. 2136 ........ 12, 17

Proclamation of June 15, 1908, 35 Stat. 2189 ........ 14

U.S. Government Accountability Office, GAO-22-105215, Tribal Economic Development: Action Is Needed to Better Understand the Extent of Federal Support (2022) ........ 7

# GLOSSARY

| Abbreviation | Term |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551-559 |
| CBP | United States Customs and Border Protection |
| Department | United States Department of Homeland Security |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009 (1996) |
| Nation | Tohono O'odham Nation |
| Nation.Br. | Opening Brief of Appellant [Tohono O'odham Nation] |
| NCAI.Br. | Amici Curiae Brief of National Congress of American Indians and Inter Tribal Association of Arizona, Inc. in Support of Appellant Tohono O'odham Nation |
| Secretary | The Secretary of the United States Department of Homeland Security; the Commissioner of United States Customs and Border Protection; and the Chief of United States Border Patrol |
| Section 102 | Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border) |
| Sec'y.Br. | Brief for Appellees |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Secretary defies centuries of law in contending that trespass suits are generally unavailable against federal officials, and that tribal breach-of-trust cases eliminate other rights of action. He ignores clear precedent in arguing that officers acting beyond their authority cannot be sued under common law for injunctive relief, and that a presidential proclamation pertaining only to "public lands" applies to lands to which the Nation held unextinguished title. And he argues that this Court should overlook what he cannot dispute—that his border wall construction plans on the Reservation necessarily entail substantial encroachments beyond the sixty-foot corridor he claims for federal purposes—because Congress might enact legislation authorizing the trespass. But while Congress indisputably has that power, it has not exercised it yet, and the Nation's entitlement to an injunction depends on its likelihood of success under existing law.

The Secretary likewise ignores a wealth of precedent in arguing that his border wall project will not diminish the Nation's Reservation. By eliminating the Nation's use and occupancy rights and its governance over a sixty-two-mile stretch of Reservation land, the Secretary's actions will constitute a hallmark exercise in diminishment, making them ultra vires Section 398(d).

The imminent harms threatened by the Secretary to the Nation's treasured lands and resources—and to its sovereign and proprietary interests in safeguarding

them—can never be cured by a monetary award, and hence are irreparable. The Secretary's efforts to downplay those harms only reflect his disregard for the Nation's interests. And while the Secretary suggests that his undisputed interest in border security militates against preservation of the status quo, he is at the same time proclaiming that border crossings and crimes (including on the Nation's lands) are at record lows, and has paused wall construction elsewhere. The district court abused its discretion in not issuing a preliminary injunction under these circumstances.

## ARGUMENT

### I. The Nation Is Likely to Succeed on Its Trespass Claim.

#### A. The Nation May Sue Federal Officials to Prevent Unauthorized Intrusions on Its Reservation.

##### 1. The Nation Has a Cause of Action Under Federal Common Law.

A right to possess land carries the right to exclude unauthorized entrants. 3 William Blackstone, Commentaries *209 (1768). And for hundreds of years, litigants have sought injunctions "to prevent irreparable mischiefs," and courts have granted them with "not the slightest hesitation, if the acts…threatened to the property would be ruinous or irreparable[.]" 2 Joseph Story, Commentaries on Equity Jurisprudence § 928, p. 207 (1836).

Contrary to the Secretary's suggestion, federal officers have long been subject to such suits. *Compare* Sec'y.Br.20-21, *with United States v. Lee*, 106 U.S. 196, 197 (1882) (ejecting federal officer to prevent trespass); *Noble v. Union River Logging R.R. Co.*, 147 U.S. 165, 177 (1893) (enjoining federal officer to protect property interest); *Lane v. Watts*, 234 U.S. 525, 540 (1914) (same); *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113 (1919) (same).[1] That is why the Secretary has no real answer to the Fifth Circuit's recognition that a landowner may "seek[] to enforce generally applicable" laws "against trespass," even against the United States, *Texas v. DHS*, 123 F.4th 186, 206 (5th Cir. 2024). The Nation accordingly does not ask "the Court to recognize a novel federal common law cause of action against the United States," Sec'y.Br.21-22—it asks only that the Court uphold a right to sue that has existed since the Founding.[2]

[1] The government's attempted distinction of *Lee*, Sec'y.Br.20, is spurious. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949), explains why sovereign immunity did not bar the action in *Lee*. *Id.* at 696 (discussing *Lee*'s "specific application of the constitutional exception to…sovereign immunity"). It nowhere limits the cause of action *Lee* recognizes. As for *Pueblo of Santa Rosa*, the Secretary portrays it as "not a trespass suit, but an equitable action[.]" Sec'y.Br.20. But there, a tribe sought "to prevent" an invasion of its lands through injunctive relief against federal officers, 249 U.S. at 113—precisely the relief the Nation seeks.

[2] Resisting the invocation of federal common law in this context is a curious endeavor in any event, as "the majority of Federal Indian Law…involves questions of federal common law. These questions often relate to: the protection of trust and restricted lands and the resources connected to those lands[.]" Dep't of Just., Justice Manual §5-14.120.

Nor can the Secretary credibly contend that tribes are uniquely disabled from suing federal trespassers. Tribes possess "a federal common-law right to sue to enforce their aboriginal land rights" against private citizens and governmental entities alike, *Oneida Cnty. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 235 (1985), and have done so for two hundred years. *See id.* at 235-36 (citing 19th- and 20th-century cases); *see also, e.g.*, *Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co.*, 184 F.4th 874, 886 (7th Cir. 2026) ("Federal common law governs an action for trespass on Indian lands." (citation omitted)).[3] This "right to sue for trespass," *Oneida* explains, is one of the basic "rights of Indian title." 470 U.S. at 236 n.6. That is why *Oneida* cites approvingly a case sustaining a "trespass action" against federal officials. *Id.* (citing *Edwardsen v. Morton*, 369 F.Supp. 1359, 1371 (D.D.C. 1973)).[4]

Resisting this precedent, the Secretary claims a special privilege to trespass based on the government's "trust relationship" with tribes. Sec'y.Br.18-19. He argues that under common-law principles governing private trusts, a beneficiary

---

[3] That Congress has provided other "remedies for the United States' alleged violations of tribes' property rights," Sec'y.Br.22, changes nothing. The Secretary cites no authority suggesting that these backward-looking statutory schemes "preclude equitable remedies" for those "who require[] immediate relief[.]" *Trump v. Cook*, 609 U.S. 528, 549 (2026).

[4] The Secretary selectively quotes *Edwardsen* to argue that it ruled against the government exclusively on non-trespass grounds. But *Edwardsen* says: "[T]he [federal] officers are themselves liable in trespass if their actions caused third parties to enter the land." 369 F.Supp. at 1371.

typically cannot sue a trustee for trespass. Sec'y.Br.18. The assertion is ripe with irony. In resisting tribal breach-of-trust claims, the government has spent decades arguing that it is not akin to a private trustee, and the Supreme Court has agreed: "The Government, of course, is not a private trustee." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 173 (2011). The Court accordingly "will not 'apply common-law trust principles' to infer duties" on the part of the government "unless Congress has created a conventional trust relationship…as to a particular trust asset[.]" *Arizona v. Navajo Nation*, 599 U.S. 555, 566 (2023) (quoting *Jicarilla*, 564 U.S. at 178). With the government having established that private common-law trust principles do not subject it to trust liability, the Secretary cannot now invoke such principles to defeat tribal claims unrelated to the government's role as trustee. *See Pueblo of Santa Rosa*, 249 U.S. at 113 ("That would not be an exercise of guardianship, but an act of confiscation.").

Nor does the fact that the government holds land in trust for tribes permit federal officials to enter or destroy such land. *Contra* Sec'y.Br.18-19. Tribal land is generally held "in trust" only in the sense that the government can restrict alienation to third parties. *See United States v. Mitchell*, 445 U.S. 535, 544 (1980) ("*Mitchell I*"). As the government has stressed to the Supreme Court, the "type of trust that is created when the government holds land in trust for a tribe" is "only a limited or bare one," not "a conventional fiduciary relationship." Reply Brief for

Federal Parties, *Navajo* (Nos. 21-1484, 22-51) ("*Navajo* Brief"), 2023 WL 2403173, at *5, *16-17. Hence, until now, the government has always maintained that this "bare" trust neither "give[s] rise to judicially enforceable trust duties" nor gives federal officials "authority to control or manage a tribe's land." *Navajo* Brief at *16-17 (citing, inter alia, *Jicarilla*, 564 U.S. at 174, and *Mitchell I*, 445 U.S. at 542); *see also El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 895 (D.C. Cir. 2014) (no "conventional fiduciary relationship" with "rights and duties" exists for tribal land in "'bare trust'"). "[A]bsent statutory provisions to the contrary," the government has explained, "tribes retain the power to control…their own land." *Navajo* Brief at *17.

In now arguing otherwise, the Secretary badly misreads both *Jicarilla* and *Navajo*. Those cases concern when tribes may maintain "*a breach-of-trust claim*" against the United States, and in that context hold that the United States bears enforceable *trust* duties only if a "treaty, statute, or regulation" imposes them. *Navajo*, 599 U.S. at 563-64 (emphasis added) (citing *Jicarilla*, 564 U.S. at 173-74, 177-78). Those cases simply do not affect tribes' legal claims outside the breach-of-trust context and hence do not constrain this action, where the Nation invokes no "trust" duty but instead asserts its core possessory rights against intrusion.

A contrary ruling would eviscerate tribal rights. "[T]he federal government holds about 46 million acres of land in trust for tribes[.]"[5] The Secretary's position, if accepted, would empower executive branch officials to commandeer these lands without congressional authorization, leaving tribes with after-the-fact monetary compensation as their only legal remedy.[6] This would upend the longstanding principle that tribal rights may only be abrogated through a clear expression of congressional intent. *See* Nation.Br.42-43; *see also* NCAI.Br.15-16.

### 2. The Secretary Is Not Entitled to Sovereign Immunity.

A federal officer does not share the immunity of the sovereign when acting "beyond his delegated powers." *Larson*, 337 U.S. at 695. This Court has squarely applied this principle in federal common-law actions. *Leopold v. Manger*, 102 F.4th 491, 494-95 (D.C. Cir. 2024); *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024). Here, the Secretary's planned trespass will exceed

[5] U.S. Gov't Accountability Off., GAO-22-105215, Tribal Economic Development: Action Is Needed to Better Understand the Extent of Federal Support 6 (2022).

[6] To blunt the stark consequences of his position, the Secretary suggests that, absent a Section 102 waiver, tribes can bring APA actions. Sec'y.Br.22-23. But unless authorized by an agency order, trespasses by federal officials will not satisfy the APA's requirement of "final agency action," 5 U.S.C. § 704; *see id.* § 551(13). Indeed, the only case the Secretary cites in support of his assertion says nothing about the APA, but rather observes more broadly that a holder of Indian title "must be able to protect the title by asserting it against [an executive] official or agency" *United States v. Dann*, 873 F.2d 1189, 1196 n.5 (9th Cir. 1989). Moreover, it is implausible that tribes could not sue to protect their lands from federal trespass prior to the APA's enactment.

his delegated authority, and he accordingly cannot invoke sovereign immunity to defeat the claim. Nation.Br.23-25. The Secretary's contrary arguments miss the mark.

First, he asserts that alleging a tort is insufficient to trigger the *Larson-Dugan* exception—the plaintiff must also allege that the defendant's actions go "beyond his delegated powers." Sec'y.Br.25 (quoting *Larson*, 337 U.S. at 695). But the Nation *has* alleged that the Secretary is violating the Nation's possessory rights *without congressional authorization*. Nation.Br.41-43; *infra* p. 9. The Nation is therefore unlike the plaintiff in *Larson*, who "did not dispute that the defendant officer had statutory authority to act" in the allegedly tortious manner, Sec'y.Br.25 (citing *Larson*, 337 U.S. at 692).

Second, the Secretary seemingly suggests that a federal officer acts "beyond his delegated powers" only if he violates an express statutory prohibition. *See* Sec'y.Br.23-24. But Circuit law precludes that argument: "Under the '*Larson-Dugan*' exception…federal courts may enjoin federal officers from *taking actions that the sovereign has not 'empowered the officer to do* or the officer is doing in a way which the sovereign has forbidden.'" *Leopold*, 102 F.4th at 494 (quoting *Larson*, 337 U.S. at 689 (emphasis added) (brackets omitted)).

Third, the Secretary suggests, without support, that this Court allows for common-law claims under *Larson-Dugan* only if they involve "mandatory,

affirmative dut[ies].” Sec’y.Br.26. But this gets the doctrine backwards. It is *more* difficult to show that a suit requiring “affirmative action by the sovereign” is not in fact “against the sovereign.” *Larson*, 337 U.S. at 691 n.11. The paradigmatic officer suit, after all, seeks “the cessation” of challenged conduct. *Id.*

Finally, the Secretary claims to be exercising delegated authority because “Congress indisputably authorized the Secretary to construct barriers at the border[.]” Sec’y.Br.24. But he identifies only IIRIRA’s general instruction to build border barriers, § 102(b)(1), which requires only that 700 miles of wall be built along the 2,000-mile border, Nation.Br.41-42. Authority to construct a wall does not empower the Secretary to occupy whatever land he might prefer.[7] The Secretary cannot identify any statute authorizing trespass, much less one with the requisite clarity of intent to authorize trespass on *tribal* lands. Nation.Br.42-43.

### B. The Secretary’s Construction Activities Would Necessarily Trespass on Tribal Lands.

On the merits, the Secretary entirely fails to counter either of the reasons why his plans threaten imminent trespass on the Nation’s Reservation: (1) the

[7] That IIRIRA authorizes the Secretary to purchase or condemn border land further confirms that Congress did not contemplate that the Secretary would trespass to construct the wall. *See* IIRIRA § 102(d). The government has not tried to condemn the Nation’s land, nor could it absent a new statute, because IIRIRA’s condemnation provision evidences no specific congressional intent to abrogate the Nation’s rights. *See Lower Brule Sioux Tribe of S.D. v. United States*, 712 F.2d 349, 354 (8th Cir. 1983) (while Congress can “take tribal lands by eminent domain, it must enact statutes expressly authorizing the taking of Indian lands”).

uncontroverted record evidence establishes that wall construction activities cannot be constrained to a sixty-foot corridor along the border; and (2) the Roosevelt Reservation never attached to the Nation's lands in any event.

### 1. The Secretary Cannot Confine Construction Activities to Within Sixty Feet of the Border.

The Nation's opening brief details the uncontroverted evidence establishing that border wall construction will necessarily entail actions and effects well beyond a sixty-foot corridor. The Secretary's response is most notable for what it does not say. The Secretary does not—and cannot—dispute that building a wall on the Reservation will require either blasting and regrading multiple mountains, or building around them, and that neither option can be confined to such a corridor. Nation.Br.27. Nor does he dispute that wall construction will require extensive staging areas, concrete batching plants, and access and switchback roads that will again extend well beyond the corridor. Nation.Br.28. There is nothing remote or speculative about these inevitable trespasses.

The Secretary invokes the limiting terms of his construction contract, which the district court accepted at face value without any reference to the record evidence before it. But courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (citation omitted). The contract (to which the Nation is not a party) prescribes a physical impossibility, and the district court committed legal error in

privileging its terms over the unequivocal facts about wall construction in the record. Further confirming the district court's error, the Secretary and his contractors have already demonstrated a willingness to disregard the contract's terms in trespassing on the Nation's roads for border wall construction-related activities. Nation.Br.28-29.

The Secretary's response to this latter point only confirms his disregard for the terms of agreements meant to protect the Nation's interests. He asserts that a 2019 right-of-way granting CBP access to certain Nation roads "nowhere limits the reasons for which the government may use the road[s]." Sec'y.Br.37. But that right-of-way grant was issued pursuant to a 2019 agreement between the Nation and CBP allowing CBP to build and maintain access to ten Integrated Fixed Towers (IFTs). The granting instrument conveys an "easement for right-of-way for construction, maintenance, operation and repair of portions of the Traditional Northern Road [defined to include several private Nation roads], including necessary and related improvements[.]" JA1048. The right-of-way is "related to the IFT project," *id.*, and its validity is contingent on the roads being "used for the purpose above specified," *id.* Moreover, it may be cancelled for "trespass, unauthorized new construction, [or] changes in use not permitted in the grant[.]"

*Id.*[8] These terms simply cannot be squared with the Secretary's claim to unfettered use of the Nation's roads.

The Secretary further argues that even if the Nation is "proved right, and the [border wall] project require[s] access to land outside the Roosevelt Reservation," the Court should presume that the Secretary will secure lawful access to the Nation's lands. Sec'y.Br.36. Only two means exist to do so: (1) the Nation's consent, which it will not provide; or (2) congressional action. But while legislation authorizing a wall on Nation land would surely warrant lifting an injunction, the prospect of such legislation supplies no warrant for denying one now. The Nation's likelihood of success on the merits turns on the law as it exists, "not what it might eventually be," *Garcia v. Texas*, 564 U.S. 940, 941 (2011), and for the same reason the Secretary's effort to make prospective use of the presumption of regularity has no bearing here.

#### 2. The Roosevelt Reservation Never Attached to the Nation's Reservation.

By its plain text, the Roosevelt Reservation attached only to "public lands." Proclamation of May 27, 1907, 35 Stat. 2136, 2136. The Secretary does not contest

---

[8] The associated agreement further confirms what the granting instrument makes clear. It recites that "portions of the Traditional Northern Road…provide access to [the] proposed IFT roads and sites," and "CBP…requested that the Nation consent to grants of easement for rights-of-way for IFT tower sites and related access roads and approach roads." JA0681.

that in 1907 the Nation held unextinguished aboriginal title to the lands that became its Reservation. He instead argues that "the existence of unextinguished aboriginal title is consistent with the designation of lands as 'public lands.'" Sec'y.Br.29. The Secretary entirely misapprehends the meaning—well-established by 1907—of both public lands and aboriginal title.

While claiming that no case supports the Nation's position, the Secretary does not so much as mention *Bardon v. Northern Pacific Railroad Co.*, 145 U.S. 535 (1892), which holds that "by 'public land,' as it has been long settled, is meant such land as is open to sale…under general laws. All land, to which any claims or rights of others have attached, does not fall within the designation of 'public land,'" *id.* at 538. The Supreme Court reiterated this principle just months before the establishment of the Roosevelt Reservation. *See N. Lumber Co. v. O'Brien*, 204 U.S. 190, 196 (1907) (Harlan, J.). And in detailing its development, *Bardon* discusses settled precedent making clear that land subject to "the Indians' right of occupancy" was not "free from any lawful claim" and hence was not "public lands." 145 U.S. at 543 (discussing *Leavenworth, L. & G.R. Co. v. United States*, 92 U.S. 733 (1875)).

The Secretary's contrary position defies precedent and logic. Aboriginal title vested in tribes a "right to the perpetual occupancy of the land" to use "as they saw fit until…surrendered to the government," *Spalding v. Chandler*, 160 U.S. 394,

403 (1896), a right "as sacred as the fee-simple," *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339, 345 (1941) (quotation marks omitted). In the Secretary's telling, that same land was simultaneously "public land[]" under the general land laws. Sec'y.Br.31. *Minnesota v. Hitchcock*, 185 U.S. 373 (1902), decisively rejected such a position. The Court held that land subject to a tribe's right of occupancy did not fall within a grant of "public lands" to Minnesota, and that whether the land is "a reservation…or unceded Indian country…[was] a matter of little moment." *Id*. at 388-89. Thus, while upon "a cession of the Indian rights of occupancy,…the lands would have become public lands," *id*. at 394, because that had not occurred, "the claim of Minnesota to these lands cannot be sustained," *id*. at 402.[9]

*Cramer v. United States*, 261 U.S. 219 (1923), is to the same effect. Nation.Br.33. The Secretary argues that it addressed only individual aboriginal rights, Sec'y.Br.30, but the law draws no relevant distinction between the two, and

---

[9] In 1956, the Solicitor of the Interior concluded that even that tribe's *ceded* lands did not fall within proclamations issued by President Roosevelt in 1908 and President Taft in 1912 reserving a sixty-foot strip of "public lands" along the U.S.-Canada border. *See* Proclamation of June 15, 1908, 35 Stat. 2189; Proclamation of May 3, 1912, 37 Stat. 1741. Because the tribe had not yet received payment when the proclamations issued, it "retained an equity in the ceded lands," which "accordingly were not included within the…two Presidential orders as only 'public lands' were affected by those orders." Dep't of Interior, M-36368, Status of Land Lying Within a Defined Sixty-Foot Boundary Line Between the U.S. and Canada, at 1753, 1754 (Sept. 12, 1956).

indeed *Cramer* expressly applies the law governing "original tribal nomadic occupancy," 261 U.S. at 227; *see Santa Fe*, 314 U.S. at 345-46 (stating same). And while the Secretary contends that the Nation "misreads" *Barker v. Harvey*, 181 U.S. 481 (1901), Sec'y.Br.31, the decision plainly states that lands subject to a "right of permanent occupancy" are not "part of the public domain," 181 U.S. at 491—and aboriginal title indisputably conferred a "right to…perpetual occupancy," *Spalding*, 160 U.S. at 403.[10]

The Secretary's contention that "Congress opened" the Nation's lands "to settlement in the Act of July 22, 1854," Sec'y.Br.27, is likewise at war with precedent. The Nation enjoyed "a legally protected possessory interest" in its aboriginal lands under Spanish and Mexican rule, JA0675, which the 1853 Gadsden Purchase Treaty preserved, Nation.Br.31-32. *Santa Fe* recognizes that the 1854 Act "reserved from sale or other disposal" all lands claimed "under the laws, usages, and customs of Spain and Mexico," 314 U.S. at 350 (quoting § 8, 10 Stat. 308, 309), pending subsequent "action of Congress," *id.* at 351, and further states

---

[10] The Secretary cites *Buttz v. Northern Pacific Railroad*, 119 U.S. 55 (1886), Sec'y.Br.29, which interpreted a grant of "public lands" to include lands encumbered with an Indian right of occupancy. But as *Bardon* explains, such a grant could "only" be so interpreted if it contained, as in *Buttz*, "an express provision" extending it to Indian lands. 145 U.S. at 543. Absent that, "the Indians' right of occupancy…negatived the idea that congress, even in the absence of any positive stipulation to protect the [tribe], intended to grant their land to [others], either absolutely or *cum onere* [subject to the encumbrance]," *id.*

that "[w]e are not advised that Congress took any such action," *id*. Thus, the 1854 Act "did not extinguish any Indian title based on aboriginal occupancy[.]" *Id*. at 350.[11]

The Secretary further contends that Solicitor Margold's 1934 Opinion determined that "claims of aboriginal title" did not fall within the 1854 Act's reservation of lands claimed under Spanish and Mexican law. Sec'y.Br.31. But the Opinion, while rejecting the Nation's claim to absolute fee and mineral rights, emphatically affirmed its aboriginal right of occupancy. After noting the 1854 Act's reservation of lands claimed under those prior sovereigns, JA0663, it states that "Spanish and Mexican law are decisive of the question here presented," JA0667, and because that law "protect[ed] the Indians in their occupancy," JA0668, "the United States acquired title to the land in question subject to an Indian right of occupancy," JA0673; *see also* Nation.Br.37-38 (discussing same).

Citing a decision of the Indian Claims Commission (JA418-19), the Secretary further contends that because "settlers established ranches and staked

---

[11] The Secretary additionally cites *Santa Fe* for the proposition that extinguishment of aboriginal title occurred "frequently only *after* the lands had been conveyed to settlers." Sec'y.Br.31-32. But statutes authorizing such conveyances (which were not in fact common) vested no right of possession in the grantee, who "took the fee subject to the encumbrance of Indian title," *Santa Fe*, 314 U.S. at 347, which, "unless extinguished survived the…grant," *id*. at 345. Thus, until aboriginal title was extinguished, "[t]he grantee…*could not disturb the occupancy of the Indians*[.]" *Beecher v. Wetherby*, 95 U.S. 517, 525 (1877) (emphasis added); *see Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 281 (1955) (quoting same).

mining claims" on the Nation's aboriginal lands, they must have been "public lands." Sec'y.Br.28. But far from concluding that those entries were lawful, the Commission determined that they violated "the rights of the Papagos to use and occupancy of their ancestral homelands[.]" JA0418, JA0420.

The Secretary argues that Congress's facilitation of cattle grazing by the Nation along the international border in the 1918 fencing statute, Nation.Br.35-36, was not "incompatible" with the Roosevelt Reservation. Sec'y.Br.34. But the Roosevelt Reservation could "be used for public highways *but for no other purpose whatever*, so long as…this proclamation shall continue in force." 35 Stat. at 2137 (emphasis added). That unqualified prohibition cannot be reconciled with Congress's recognition and facilitation of cattle grazing by the Nation up to the international boundary. The Secretary alternatively contends that Congress could "add to the permissible uses" of the Roosevelt Reservation by authorizing such grazing, Sec'y.Br.34. But neither the text nor context of the 1918 legislation remotely suggests that Congress understood itself to be doing so.

The Secretary further argues that the 1937 statute adding lands to the Reservation "implicitly affirmed" the Roosevelt Reservation's existence across the Nation's Reservation. Sec'y.Br.33. But he has no answer to the fact that the 1937 Act uses language that is agnostic regarding the existence of the Roosevelt Reservation, Nation.Br.38-39 & n.6. The 1937 Act states, moreover, that the added

lands would become part of the Reservation on "all the same terms as if said lands had been included in the Executive order…on February 1, 1917," JA0651, and that order unequivocally set apart "*all*…land" up to the international boundary "as a *reservation for the benefit of the Papago Indians*," S. Doc. No. 70-53, at 1005 (emphasis added).

Finally, the Secretary agrees that the parties' twenty-first-century references to the Roosevelt Reservation "cannot contradict statutory text[.]" Sec'y.Br.35. Nor can they sideline more than a century of Supreme Court precedent relied on by the Nation above and in its opening brief. The Secretary further acknowledges that during 2019 right-of-way negotiations, Nation.Br.40-41, the Nation asserted the non-existence of the Roosevelt Reservation, and the government was aware of that position. Sec'y.Br.35. So even if subsequent party statements could upend statutory meaning and controlling Supreme Court precedent, there simply has been no consistent acceptance of the Roosevelt Reservation over time.

## II. The Nation Is Likely to Succeed on Its Ultra Vires Claim.

The Secretary's actions are unlawful on an additional basis: They violate a clear statutory prohibition, altering the boundaries of the Nation's reservation without consent from Congress. *See* 25 U.S.C. § 398d ("Changes in the boundaries of reservations…shall not be made except by Act of Congress.").

The Secretary concedes that the Nation meets the second prong of the ultra vires test, as there is no alternative procedure for reviewing this statutory claim. He argues that the Nation does not meet the first and third prongs, because review of its claim is expressly precluded by statute and because his actions neither exceed his delegated authority nor violate Section 398d. He is wrong on both counts.

**A. Review Is Not Precluded by Statute.**

IIRIRA § 102(c)(1) allows the Secretary to waive various legal requirements in carrying out border wall construction, and IIRIRA § 102(c)(2)(A) provides for only limited judicial review of "claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1) [the waiver provision]." The Nation's ultra vires claim does not challenge any Secretarial waiver decision. It accordingly does not "aris[e]" from such a decision and under the plain text of § 102(c)(2)(A) does not fall within its sweep.

The Secretary attempts to avoid this conclusion by arguing that only because he waived the APA does the Nation's reservation diminishment claim satisfy the second prong of the ultra vires test (namely that there exists no alternative procedure for review). But "'arise' out of means to originate from a specified source," *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1260 (D.C. Cir. 2020) (quotation marks and citation omitted), and the Nation's suit in no way originates with the Secretary's decision to waive the APA: The Nation has not challenged the

validity of that waiver, and this suit does not require the Court to reach any conclusion about the waiver to resolve the Nation's claims. Rather, this case resembles *In re Border Infrastructure Environmental Litigation*, 915 F.3d 1213 (9th Cir. 2019)—whose statutory analysis *North American Butterfly* endorses, 977 F.3d at 1260. *Border Infrastructure* holds that where claims "challenge the scope of the Secretary's authority to build roads and walls under sections 102(a) and 102(b) [the Secretary's general border wall construction authority], not the scope of waiver authority under section 102(c)," they "'aris[e] from' sections 102(a) and 102(b), not section 102(c)." 915 F.3d at 1221. That textual conclusion describes this case to a tee.

### B. The Secretary Will Be Acting in Excess of His Delegated Powers and Contrary to a Specific Statutory Prohibition.

#### 1. IIRIRA Does Not Authorize the Secretary to Construct a Wall on the Nation's Lands.

The Secretary contends that IIRIRA "defeats the Tribe's ultra vires claim" because it grants "express authorization" for border wall construction and "contains no prohibition on construction" on tribal lands. Sec'y.Br.39. But abrogating tribal land rights requires far more: "clear evidence that Congress actually considered the conflict between its intended action" and tribal rights and "chose to resolve that conflict by abrogating" the latter, *United States v. Dion*, 476 U.S. 734, 739-40 (1986); *see* Nation.Br.42-43. The Secretary ignores that standard

because he cannot meet it. The grants of construction authority he identifies, Sec'y.Br.38-39, do not require construction at any "particular location," IIRIRA § 102(b)(1)(D), let alone contemplate construction on the Nation's lands, *see supra* p. 9 & n.7. They accordingly fall far short of authorizing the latter.

### 2. The Secretary's Wall Will Diminish the Nation's Reservation in Violation of Section 398d.

The Secretary does not dispute that Section 398d's proscription is clear: even for reservations created by executive order, their boundaries may be altered only by act of Congress. The Secretary claims instead that Section 398d has no application here because his actions will not change the boundaries of the Nation's Reservation. In doing so, he largely makes the Nation's case for it. He and the Nation agree that reservation status can endure where Congress curtails use and occupancy rights without eliminating tribal jurisdiction. Sec'y.Br.42-43. But he then fails to acknowledge that his plans will entail eliminating both the Nation's use of the subject lands and its governance over them. He cannot do so under Section 398d.

Supreme Court precedent recognizes two principal components of reservation status. One is the right to use and occupy reservation lands as a tribe so chooses. *See, e.g.*, *Spalding*, 160 U.S. at 403 (reservations created by "treaty or executive order" entitle tribes to "perpetual occupancy of the land, with the privilege of using it…as they s[ee] fit until…surrendered to the government");

*Shoshone Tribe of Indians of Wind River Rsrv. in Wyoming v. United States*, 299 U.S. 476, 496 (1937) (describing the "right of occupancy" as a "primary" incident of reservation status). The other is a tribe's right "of self-government and territorial management" over its reservation. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982); *accord Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1044 (D.C. Cir. 2021). While the Secretary contends that the Nation "conflates reservation status with use and occupancy rights," Sec'y.Br.42, the Nation has plainly asserted that the Secretary's planned wall will deprive it of both "use and occupancy" and "self-government and territorial management," Nation.Br.47.

The Secretary contends that the Supreme Court's diminishment precedents "recognize that…non-tribal land ownership and use within a tribal reservation …does not change lands' reservation status, even if it interferes with tribal use and occupancy rights." Sec'y.Br.41. To be sure, not every act of Congress that eliminates use and occupancy rights constitutes a diminishment, particularly where the tribe "continue[s] to exercise governmental functions over [the] land," *McGirt v. Oklahoma*, 591 U.S. 894, 907 (2020). But reservation status is lost when the tribe is also divested of "jurisdiction over the disputed land," *Nebraska v. Parker*, 577 U.S. 481, 487 (2016), leaving it with neither rights of occupancy nor territorial governance. *Parker* hence proclaims that to foreclose the "prior use" of land as an

Indian reservation and "set [it] aside for other public purposes" is "hallmark" diminishment. 577 U.S. at 489. The Secretary can only counter that *Parker* "was not referring to the erection of structures within a reservation's boundaries," Sec'y.Br.41, but *Parker* nowhere limits that principle to the facts before it.

The Secretary's border wall project will strip the Nation of both core aspects of reservation status over the affected lands. The Nation will no longer be able to use the sixty-two-mile-long stretch of territory that will be occupied by the wall and associated infrastructure. Nor will it be able to exercise jurisdiction over that land, which will be tightly controlled by the Department. The Secretary suggests that this "is speculative…as DHS intends to continue to consult with the Tribe about access issues." Sec'y.Br.43. But that only proves the point—any access granted to the Nation and its citizens will be at the sufferance of executive branch officials.

The Secretary also counters that "[a]s a matter of law, construction of the project will not change the Tohono Reservation's boundaries" because reservation status endures "'until Congress *explicitly indicates* otherwise.'" Sec'y.Br.40-41 (quoting *McGirt*, 591 U.S. at 914). The argument is as circular as it is sweeping in its implications. It would allow executive branch officials to take all manner of actions eliminating tribal use and control over reservation lands—razing tribal territory to build massive federal installations, for example—while claiming that

they are not affecting reservation status because only Congress may do so. But that position is too clever by half. If accepted, it would render Section 398d a nullity (why would Congress need to say that only Congress can alter reservation boundaries if only Congress can alter reservation boundaries). Where both governance and use are foreclosed, reservation status is eliminated. Section 398d proscribes executive branch officials from taking such action absent an act of Congress, and since no such legislation exists here, the Secretary's plans are ultra vires that statute.

## III. Equitable Factors Strongly Favor a Preliminary Injunction.

### A. The Nation Will Suffer Irreparable Injury Absent an Injunction.

The Nation has detailed the substantial harms to its sovereign, proprietary, and environmental interests that the Secretary's imminent plans to overrun its Reservation will inflict. Nation.Br.51-54. Such harms can never be undone by monetary damages. *Id.*; *see also* NCAI.Br.15.

The Secretary seeks to dismiss those harms through a series of misplaced arguments. Bizarrely, he points to the existence of other federal infrastructure on the Nation's lands, Sec'y.Br.48. But its presence only underscores the strength of the Nation's rights because, across multiple Administrations and as recently as 2019, the government secured the Nation's consent to those far less intrusive installments. JA0039-42. The Secretary also dismisses his threatened destruction of

Nation property as implicating only "a narrow strip of land on the edge of the 2.8-million-acre" Reservation. Sec'y.Br.50. That "narrow strip" is sixty-two miles long and contains, among other highly valued natural features, thousands of saguaro cacti targeted for imminent uprooting and mountains targeted for obliteration—both of which are central to the O'odham belief system. The argument is akin to claiming that detonating Mount McKinley or the Grand Canyon would not irreparably harm the American people because each occupies a small fraction of the country. Nor can the catastrophic destruction be mitigated through "consultation." Sec'y.Br.50. All the discussion in the world will not turn rubble back into mountains.

Finally, the Secretary suggests, without explanation, that the harm to the Nation's sovereignty will be less here than in other cases finding injuries to sovereign interests to be irreparable. Sec'y.Br.49. But the Secretary's planned trespass "is unprecedented in the modern era of federal Indian law." NCAI.Br.23. By duly enacted Resolution, JA0114-0120, the Nation is on record as firmly opposed to construction of the border wall given the substantial harms to Nation interests that will ensue. If the wall is nevertheless built, that will only be as a result of federal officials imposing their superior might. It is hard to imagine a greater affront to sovereignty than having to stand aside and watch as lands the Nation has stewarded for centuries are obliterated.

### B. The Equities Weigh Heavily in Favor of an Injunction.

There is no gainsaying that the government has vital interests in border security, interests that the Nation shares and works tirelessly to further. Nation.Br.7-10. But Circuit precedent (nowhere addressed by the Secretary) is clear that the public interest lies in having government agencies abide by the law. Nation Br. 54-55. That principle has especial force here, where all agree that Congress, with its strong focus on border security, can enact legislation authorizing wall construction on the Nation's lands if it so chooses.

The Secretary's arguments as to why even a short-term preservation of the status quo embodied in a preliminary injunction will harm his interests fall flat. He continues to recycle dated statistics, Sec'y.Br.53-54, instead of acknowledging, as he did again just last week, that "[o]ver the past year, CBP recorded its lowest numbers [of encounters and apprehensions] in American history."[12] *See also* Nation.Br.55 (quoting similar statements from the past year). This is true even without a wall along substantial stretches of the southern border, and the story is no different on the Nation's Reservation. Nation.Br.55.

Nor does the Secretary's briefing acknowledge that, in response to concerns about environmental devastation and economic loss, he has abandoned plans to

[12] https://www.cbp.gov/newsroom/national-media-release/under-president-trump-and-secretary-mullin-dhs-announces-lowest

construct a border wall elsewhere without any indication that calamity at the border will ensue. As the Solicitor General has now represented to the Supreme Court, the Department has decided not to build a border wall in Big Bend National Park, Big Bend Ranch State Park, or the Black Gap Wildlife Management Area. *See* Application for a Stay, *Mullin v. Friends of the Ruidosa Church*, No. 26A560, at 33 (U.S. Oct. 21, 2026).

The Nation's federally protected interests warrant no less respect. While the Secretary has not attempted to demonstrate that maintaining the status quo while this case is resolved on the merits will harm his interests, immense irreversible damage will be wrought on the Nation's lands absent a preliminary injunction. Equity strongly counsels that preliminary relief issue.

## CONCLUSION

The Nation urges this Court to reverse the district court and to direct it to issue the preliminary injunction moved for by the Nation.

Dated: October 28, 2026

Respectfully submitted,

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
Anjana R. Joshi
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
jhandelsman@kanjikatzen.com
ajoshi@kanjikatzen.com

Philip H. Tinker
KANJI & KATZEN, P.L.LC.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Elizabeth B. Prelogar
Joshua Revesz
COOLEY LLP
1299 Pennsylvania Avenue NW
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com
jrevesz@cooley.com

Howard M. Shanker
Attorney General
Logan Takao Cooper
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Appellant Tohono O'odham Nation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,452 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2026, I electronically filed the foregoing Reply Brief of Appellant with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji